# ZIELINSKI EXHIBIT 6 (FILED UNDER SEAL)

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | |
|---|---|
| IN RE OUTPATIENT MEDICAL | |
| CENTER EMPLOYEE ANTITRUST | |
| LITIGATION | Docket No. 1:21-cv-00305 |

CONFIDENTIAL – UNDER PROTECTIVE ORDER

VIDEO DEPOSITION OF BARRY GERHART, Ph.D.

WEDNESDAY, MARCH 5, 2025

SAN FRANCISCO, CALIFORNIA

Reported by:   Marilynn Hoover, RPR

California CSR No. 8841

WEDNESDAY, MARCH 5, 2025; SAN FRANCISCO, CALIFORNIA

THE VIDEOGRAPHER: Good morning, ladies and gentlemen.

We're on video record. The time is 9:09 a.m. Today's date is March 5th, 2025.

This marks the beginning of video 1, volume 1, in the deposition of Barry Gerhart, Ph.D., in the case In Re Outpatient Medical Center Employee Antitrust Litigation, appearing before the United States District Court, Northern District of Illinois, Eastern Division; case number 1:21-cv-00305.

We're located today at 275 Battery Street, San Francisco, California.

Would all counsel in the room please identify themselves for the record.

MS. ZIELINSKI: Sarah Zielinski from McGuire Woods, for SCA.

MR. TALBOT: Andrew Talbot from McGuire Woods, on behalf of SCA.

MS. CHAMPION: Sarah Champion, an economist with Cornerstone Research, on behalf of defendants.

MS. MANNING: Amy Manning, McGuire Woods, on behalf of SCA.

MR. KLIEBARD: Good morning, counsel and Professor Gerhart. I am Ken Kliebard. I am with

Barry Gerhart, Ph. D. Confidential
March 05, 2025

Morgan Lewis, representing DaVita.

MS. BATES:  Julia Bates with King & Spalding, representing USPI and Tenet.

MS. LIU:  Diana Liu from King & Spalding, representing USPI and Tenet.

MR. BREWER:  Connor Brewer from King & Spalding, representing USPI and Tenet.

MS. LOU:  Melissa Lou, in-house counsel with DaVita.

MS. LANE:  Molly Lane with Morgan Lewis, on behalf of DaVita Inc.

MR. HARVEY:  Dean Harvey of Lieff Cabraser, for the plaintiffs.

MS. ZANDI:  Sarah Zandi of Lieff Cabraser, for the plaintiffs.

MS. CHAN:  Lin Chan, Lieff Cabraser, for the plaintiffs.

THE VIDEOGRAPHER:  Would those on Zoom please identify themselves for the record.

MS. DURAN:  Julianne Duran, King & Spalding, for USPI and Tenet.

MS. MOYE:  Veronica Moyé, King & Spalding, for USPI and Tenet.

MR. SHAPIRO:  Nathan Shapiro, Morgan Lewis & Bockius, on behalf of DaVita Inc.

MR. CHRESTIONSON:  Jason Chrestionson, Morgan Lewis & Bockius, on behalf of DaVita Inc.

MS. STEINER:  Jordanne Steiner, Wilson Sonsini Goodrich & Rosati, on behalf of Andrew Hayek.

MR. AMMER:  Joseph Ammer with Edgeworth Economics.

MS. SCHWAIGER:  Susan Schwaiger from Nussbaum Law Group, for the plaintiffs.

MR. SHAKOW:  Peter Shakow, in-house counsel at Optum SCA.

MS. PETROPOULOS:  Wendy Petropoulos with Cornerstone Research.

THE VIDEOGRAPHER:  Okay.  You may swear in the witness.

THE STENOGRAPHIC REPORTER:  Good morning.

My name is Marilynn Hoover.  I am a California certified shorthand reporter and my license number is 8841.

Thank you.

--o0o--

BARRY GERHART, Ph.D., called as a witness, being duly sworn on oath, was examined and did testify as follows:

--o0o--

or credentials in economics?

MS. CHAN:  Objection.  Vague and ambiguous.

THE WITNESS:  I think my Ph.D. minor was labor economics.

Q.  BY MS. ZIELINSKI:  You don't recall?

A.  I think -- I think it was.  I'd have to check.  That would -- I can't think of anything else approaching a formal credential.

Q.  Regardless, what you say throughout your report is that your conclusions are based on your experience in research and compensation in human resources management; correct?

MS. CHAN:  Objection.  Vague and ambiguous. Compound.

THE WITNESS:  That's where my expertise is.

Q.  BY MS. ZIELINSKI:  Okay.  And that's the expertise that you're relying on to formulate your opinions; correct?

MS. CHAN:  Objection.  Vague and ambiguous.

You may answer.

THE WITNESS:  Yes.

Q.  BY MS. ZIELINSKI:  In 7(A), after the word "incentives to collude" here, you reference "evidence that is common to the class."

Do you see that?

Barry Gerhart, Ph. D. Confidential
March 05, 2025

A.   Um-hum.

Q.   That refers to the class that's defined in this case; correct?

A.   Um-hum.  Yes.  Sorry.

Q.   What do you mean by "evidence that's common to the class"?

A.   The effects would be similar for members of the class.

Q.   The effects?

A.   Yeah.

Q.   Of what?

A.   Of something like a no-poach agreement or exchange of competitively sensitive information.

Q.   What experience or expertise do you have in evaluating whether or not evidence is common to a class?

MS. CHAN:  Objection.  Compound.  Vague and ambiguous.

THE WITNESS:  Yeah, I think it's relying on my expertise and my understanding of how turnover and compensation work and what the likely effects are on the class members.

Q.   BY MS. ZIELINSKI:  In that paragraph, you go on to say that it's your opinion that defendants were incentivized to collude.

Barry Gerhart, Ph. D. Confidential
March 05, 2025

Do you see that?

A.    I know it's there, but where exactly are we looking?

Q.    7(A).

A.    Yeah.

Q.    After the italicized "incentives to collude."

A.    Yeah.

Q.    It's that first sentence.

A.    I see it.

Q.    You're offering -- So you're offering the opinion that defendants -- Well, strike that.

You're not offering an opinion on whether defendants actually did collude; correct?

MS. CHAN:  Objection.  Vague and ambiguous.

THE WITNESS:  Yeah, I didn't see that as part of my charge, but I can speak to what incentives there would be to collude.

Q.    BY MS. ZIELINSKI:  Okay.  So it's your opinion that defendants were incentivized to collude, but not that they actually -- but you've not actually opined that they actually did collude; correct?

A.    I have not opined -- There's --

MS. CHAN:  Objection.  Vague and ambiguous.

You can answer.

THE WITNESS:  Yeah, there's -- there's evidence in the report that would be relevant to that.

Q.   BY MS. ZIELINSKI:  So where you're talking about -- where your report talks about collusion, you're talking about evidence that you reviewed as opposed to an opinion you're offering regarding the conduct; is that correct?

A.   Yeah.

MS. CHAN:  Objection.

THE WITNESS:  Yes.

MS. CHAN:  Vague and ambiguous.

THE WITNESS:  My focus is on what the consequences would be of collusion.

Q.   BY MS. ZIELINSKI:  And not whether they -- not whether they did it or not; correct?

A.   That's not my --

MS. CHAN:  Objection.  Vague and ambiguous.

You can answer.

THE WITNESS:  That's not my focus.

Q.   BY MS. ZIELINSKI:  And, similarly, you -- you're not offering an opinion about whether the defendants entered into an agreement to fix wages; correct?

MS. CHAN:  Objection.  Vague and ambiguous.

You may answer.

THE WITNESS:  Yeah, again, I would say my focus is on the consequences of such actions.

Q.   BY MS. ZIELINSKI:  Okay.  So you're not offering an opinion on that; correct?

MS. CHAN:  Objection.  Vague and ambiguous.

You may answer.

THE WITNESS:  I'm -- I'm not.

Q.   BY MS. ZIELINSKI:  Okay.  Let's flip to the table of contents of your report.

Starting with Roman numeral 5, these -- these are the headings -- I guess a preliminary question:  These are the headings of the -- that are used throughout your report; correct?

A.   Yes.

Q.   So all of these correspond to opinions or conclusions that you've reached in your report; correct?

MS. CHAN:  Objection.  Vague and ambiguous.

THE WITNESS:  I would say yes.

Q.   BY MS. ZIELINSKI:  Okay.  Looking at Roman numeral 6, it says:  "Defendants' collusion would likely have suppressed employees' compensation."

Do you see that?

A.   Yes.

Q.   Are you offering an opinion that defendants'

Barry Gerhart, Ph. D. Confidential
March 05, 2025

alleged conduct actually suppressed employees' compensation or is just -- or likely would?

MS. CHAN: Objection. Vague and ambiguous.

You may answer.

THE WITNESS: Likely.

Q. BY MS. ZIELINSKI: And so you're not -- And is that true -- Let me go to a couple other opinions.

That's also true for heading 6(C), defendants' CSI exchanges likely restricted labor market compensation; correct?

MS. CHAN: Objection. Vague and ambiguous.

THE WITNESS: Sorry. What -- What is your question there?

Q. BY MS. ZIELINSKI: Do you see that?

A. I see it, yes.

Q. You are opining -- You are not opining that defendants' CSI exchanges in fact restricted labor market competition; you are opining that they likely restricted labor market competition. Correct?

MS. CHAN: Objection. Vague and ambiguous.

THE WITNESS: Well, I am concluding they likely restricted labor market competition.

Q. BY MS. ZIELINSKI: And, similarly, for the heading for section 7 -- or, I'm sorry, not seven -- eight, it says: "A structured compensation system

objections.  You can object to the form, but these types of lengthy speaking objections are designed to impede the truth-finding function.  If you want to keep making them, again, that's fine, we will bring this to Magistrate Judge Kim's attention.

MS. CHAN:  And I will note we have a stipulated order here about objections.  These are not speaking objections.  And the stipulated order at ECF number 442 states that objections shall be limited to the form of the question, e.g. asked and answered, compound, et cetera, which is what I've been doing.

MR. KLIEBARD:  You've been stringing together multiple objections and saying "you can answer" and making other things that are designed to impeded the truth-finding function.

MS. CHAN:  We'll have to agree to disagree.

MR. KLIEBARD:  Okay.  I will stand by my 35 years of experience working in the Northern District of Illinois.

Q.  BY MS. ZIELINSKI:  Well, let's -- let's move on.

Throughout your report, you use the term "labor market"; correct?

A.  Um-hum.

Q.  What's a labor market?

Barry Gerhart, Ph. D. Confidential
March 05, 2025

A.   It's where supply and demand, at least on a competitive labor market, meet to price and allocate labor.

Q.   And how is the scope of a labor market determined?

MS. CHAN:  Objection.  Vague and ambiguous. Calls for a legal conclusion.

THE WITNESS:  I think the logic would typically be where -- where people come from and where they go to, let's say, from companies:  So where do your hires come from?  Where do people depart to if they go to another employer?  That would be key information in determining what -- what the labor market is that -- for you.

Q.   BY MS. ZIELINSKI:  Any other factors that would be considered for determining a labor market?

MS. CHAN:  Objection.  Vague and ambiguous. Calls for a legal conclusion.

THE WITNESS:  I think that's a pretty good start.

Q.   BY MS. ZIELINSKI:  So labor markets include not only companies that a firm competes with in the products or services market, but also other companies outside of that market that may also have employees with the right skills?

Barry Gerhart, Ph. D. Confidential
March 05, 2025

A.    Yeah.  Yeah.

MS. CHAN:  Objection.  Misstates prior testimony.  Vague and ambiguous.

THE WITNESS:  So the product market is different than the labor market.  They don't have to be different but they can be different.

Q.    BY MS. ZIELINSKI:  And do organizations operate in many different labor markets?

MS. CHAN:  Objection.  Vague and ambiguous.

THE WITNESS:  Typically, yes.

Q.    BY MS. ZIELINSKI:  Is it true that different individuals have different employment options based on their skills, their preferences, geographic mobility, things like that?

MS. CHAN:  Objection.  Compound.  Vague and ambiguous.

THE WITNESS:  Generally speaking, yes.

Q.    BY MS. ZIELINSKI:  And, because of those differences, do different individuals also participate in separate labor markets?

MS. CHAN:  Objection.  Compound.  Vague and ambiguous.

THE WITNESS:  Well, based on what you said, probably, yes.  I'd probably want to get into a little more specific information about what those differences

Barry Gerhart, Ph. D. Confidential
March 05, 2025

are, but it seems likely.

Q.  BY MS. ZIELINSKI:  And can you -- can you explain what you mean by that?

A.  Well, I mean, I -- I would ask you to -- What was the question again, if I may ask?

MS. ZIELINSKI:  Oh, I'm sorry.  Go ahead. Would you repeat it back, please.

(Record read.)

MS. CHAN:  Objection.  Compound, and vague and ambiguous.

THE WITNESS:  So if you're hiring for manual labor or other low-skill jobs, that would -- that would tend to be more local, for instance; and the higher the level the job, the more it would be a broader market, for instance, a national market.

Q.  BY MS. ZIELINSKI:  And are there different markets based on varying skills as well?

MS. CHAN:  Objection.  Vague and ambiguous.

THE WITNESS:  I mean, general -- generally, yes.  I probably would need to talk about what specific skills; but, yes.

Q.  BY MS. ZIELINSKI:  Let's turn to page 12 of your report, paragraph 21.

It says:  "Plaintiffs allege that defendants unlawfully conspired to suppress competition in the

Barry Gerhart, Ph. D. Confidential
March 05, 2025

market for senior-level employees."

Do you see that?

A.   Yes.

Q.   Plaintiffs are alleging a single labor market; correct?

MS. CHAN:  Objection.  Calls for a legal contention, legal conclusion.  Vague and ambiguous, and outside of the scope of his opinion.

THE WITNESS:  Yeah, I'm thinking about the question.

It would certainly be an important part of the labor market that these three companies kind of share and are operating in.

Q.   BY MS. ZIELINSKI:  When you say "an important part of the labor market," what labor market are you referring to?

A.   I think we'd want to look at as the degree to which employees would move between these companies in a competitive, unrestricted labor market.

Q.   And also the degree to which employees move to and from non-defendants as well; correct?

MS. CHAN:  Objection.  Misstates prior testimony.  Vague and ambiguous.  Compound.

THE WITNESS:  That -- That would be of interest, I think, too, yes.

MS. ZIELINSKI: Okay. Do you agree with plaintiffs' view of the market that they allege here?

MS. CHAN: Objection. Vague and ambiguous. Calls for a legal conclusion.

THE WITNESS: Do I agree with like the two words "the market"? Or is that --

Q. BY MS. ZIELINSKI: Well, do you have an understanding of the market that plaintiffs are alleging in this case?

MS. CHAN: Objection. Vague and ambiguous. Calls for speculation.

THE WITNESS: I think I would go back to what I said before, that you'd want to look at the degree to which which companies people move between if there's a competitive, unrestricted market.

Q. BY MS. ZIELINSKI: Did you look at those things related to the defendants in this case?

MS. CHAN: Objection. Vague and ambiguous. Compound.

THE WITNESS: Yeah, I don't know that I had information; but, no, I didn't look at it in detail.

Q. BY MS. ZIELINSKI: All right. You're not offering an opinion about the market in this case?

MS. CHAN: Objection. Vague and ambiguous.

You may answer.

THE WITNESS: What sort of opinion are we talking about?

Q. BY MS. ZIELINSKI: Are you offering an opinion about the scope of the relevant labor market as it relates to the defendants in this case?

A. My focus was on the movement between these three companies, I think, primarily, in this case.

Q. Okay. But you're -- you are not asserting that these three companies, in and of themselves, are in a relevant labor market; correct?

MS. CHAN: Objection. Vague and ambiguous.

THE WITNESS: I don't think I asserted that.

MS. ZIELINSKI: Okay. Because if employees came from or moved to non-defendant companies, those other companies would also be part of the relevant market, labor market; correct?

MS. CHAN: Objection. Vague and ambiguous. Compound. Calls for a legal conclusion.

THE WITNESS: I think any company that you lose employees to or you get employees from is -- that's part of the analysis.

Q. BY MS. ZIELINSKI: Was determining the scope of the market, the labor market in this case, important to your opinions?

MS. CHAN: Objection. Vague and ambiguous.

Barry Gerhart, Ph. D. Confidential
March 05, 2025

Compound.

THE WITNESS: I think my primary focus was on, really, what the consequences would be of restricting movement between these companies.

Q. BY MS. ZIELINSKI: How can you reach the conclusion that the defendants would likely be able to suppress compensation, without evaluating who participates in their labor market?

MS. CHAN: Objection. Vague and ambiguous. Compound.

THE WITNESS: I think there's evidence in the report about just how important unsolicited job offers are.

One piece of evidence is from the Federal Reserve, where they did a study that found that over 75 percent of people switched jobs without actively searching, and they concluded that unsolicited offers were of course then very important.

So if you're at one of these companies and there's an unsolicited offer that never came, that's -- that's going to have a negative effect. And the report goes through and talks about what happens if that offer doesn't come, or if it comes later, and the kind of system-wide consequences that could have.

But the report, as you, I'm sure, have read,

also describes that, you know, it's not that you have to move to take advantage of the outside offer; you could also leverage it in negotiations with your current company.

So that was -- that was my focus in the report.

Q.   BY MS. ZIELINSKI:  Did you see evidence that those things occurred in this case?

MS. CHAN:  Objection.  Vague and ambiguous. Compound.

THE WITNESS:  I would -- I recall people testifying who believed that was the case, yes.

Q.   BY MS. ZIELINSKI:  Who -- Where employees of defendants received offers from non-defendant firms? You saw evidence of that; correct?

MS. CHAN:  Objection.  Vague and ambiguous.

THE WITNESS:  Sorry.  Would you ask me that one more time, please.

Q.   BY MS. ZIELINSKI:  You saw evidence in the record that employees of defendants received offers from non-defendant firms; correct?

MS. CHAN:  Objection.  Vague and ambiguous.

THE WITNESS:  Yes, but that wasn't actually what I was focusing on in my answer before.  I was focusing on the offers that never came.

Barry Gerhart, Ph. D. Confidential
March 05, 2025

Q. BY MS. ZIELINSKI: You didn't do a quantitative analysis to determine the number of offers you allege never came; correct?

THE WITNESS: I did not.

MS. CHAN: Objection. Vague and ambiguous.

THE WITNESS: Yeah.

MS. CHAN: We've been going for about an hour; so, when you're ready, can we take a break?

Q. BY MS. ZIELINSKI: Did you do a quantitative analysis to determine how many offers class members continued to receive from non-defendant firms during the class period?

A. I did not.

MS. CHAN: Objection. Vague and ambiguous.

MS. ZIELINSKI: All right. We can take a break.

MS. CHAN: Okay.

THE VIDEOGRAPHER: We're off the record. The time is 10:10 a.m.

(Recess.)

THE VIDEOGRAPHER: We are back on the record. The time is 10:29 a.m.

This marks the beginning of video 2, volume 1, in the continuing deposition of Barry Gerhart, Ph.D.

Barry Gerhart, Ph. D. Confidential
March 05, 2025

Q.   BY MS. ZIELINSKI:  Dr. Gerhart, would you agree that, to the extent that defendants hired employees from non-defendant firms, that defendants would have paid those new hires competitively?

MS. CHAN:  Objection.  Vague and ambiguous. Compound.

THE WITNESS:  I -- I think that would probably have to be within sight of what the competitive rate would be.

Q.   BY MS. ZIELINSKI:  Because, otherwise, those employees would go elsewhere; correct?

MS. CHAN:  Objection.  Vague and ambiguous.

THE WITNESS:  I mean, to the extent you pay below market, there's more of a chance somebody's going to go elsewhere.

Q.   BY MS. ZIELINSKI:  So newly hired employees would have to be paid at a competitive rate?

MS. CHAN:  Objection.  Vague and ambiguous.

THE WITNESS:  I would expect they'd be, again, as I said, paid within sight, within the ballpark.

Q.   BY MS. ZIELINSKI:  Would you agree that the COVID-19 pandemic impacted labor markets?

MS. CHAN:  Objection.  Vague and ambiguous.

THE WITNESS:  Yes.

Q.   BY MS. ZIELINSKI:  How so?

A.   Well, there were some pretty wild swings in the job opening rate, the unemployment rate.  So the unemployment rate was historically low before the pandemic, then of course it shot up.  And then, actually, during the pandemic, there were some companies which were -- were doing quite well, you know, like Amazon.  And so, in the labor market, there's always parts that do better and some that don't do as well; but, yes, the pandemic had an effect.

Q.   And that would also be true for healthcare companies; correct?

MS. CHAN:  Objection.  Vague and ambiguous.  Compound.

THE WITNESS:  Yeah, it's not something I looked at in the report.  I don't feel like I'm an expert on that, so...

Q.   BY MS. ZIELINSKI:  Would you agree that the effects that you talked about a moment ago, of COVID-19 on labor markets, were different in 2020 than in 2021?

MS. CHAN:  Objection.  Compound.  Vague and ambiguous.  Calls for speculation.

THE WITNESS:  I'd have to go back and look

Barry Gerhart, Ph. D. Confidential
March 05, 2025

to have an effect on compensation?

MS. CHAN:  Objection.  Vague and ambiguous.

THE WITNESS:  I didn't quantify that.

Q.   BY MS. ZIELINSKI:  Is there -- Is it your view that there needs to be a substantial difference in the number of cold calls in order to have an effect?

MS. CHAN:  Objection.  Vague and ambiguous.  Calls for speculation.

THE WITNESS:  Yeah.  As I said, even missing one cold call could be very consequential.

Q.   BY MS. ZIELINSKI:  So, in your view, the difference of a single cold call would have an effect on compensation?

MS. CHAN:  Objection.  Misstates the testimony.  Vague and ambiguous.

THE WITNESS:  I -- I think it's very possible that, person by person, if they were missing cold-call opportunities that they otherwise would have gotten, that could be very consequential.

Q.   BY MS. ZIELINSKI:  But that wouldn't necessarily be true if the person obtained information about job opportunities and compensation through other avenues; correct?

MS. CHAN:  Objection.  Vague and ambiguous.

Barry Gerhart, Ph. D. Confidential
March 05, 2025

Calls for speculation.

THE WITNESS:  And the other avenues, again, were?  Please remind me.

Q.   BY MS. ZIELINSKI:  Of other cold calls.

A.   Oh, yeah.

Q.   Other -- I mean, you tell me:  What are other ways that people receive information, market information?

A.   I don't think there's anything as valuable as a cold call.  I mean, certainly, looking at a general advertisement isn't the same.  So any -- any cold call with a meaningful opportunity is pretty important.

Q.   But if the person was able to obtain market information about job opportunities and compensation through other avenues, then missing a single cold call wouldn't have the same impact; correct?

MS. CHAN:  Objection.  Vague and ambiguous. Calls for speculation.

THE WITNESS:  Well, I'll try not to do this too much; but I'm kind of thinking of an article that I wrote, I think, in 1990, where I think I said something about "each person almost has their own individual market for opportunities."

So that would indicate that it's much better

to rely on opportunities that are really tailored to you, and that you get an opportunity from somewhere else is better than not getting any opportunity from somewhere else, but it's definitely not nearly as good as getting all opportunities that would have come your way but for some sort of restriction.

Q.   BY MS. ZIELINSKI:  But it would be an individualized assessment to determine whether a single cold call had an impact on -- had an impact; correct?

MS. CHAN:  Objection.  Vague and ambiguous. Calls for speculation.  Calls for a legal conclusion.

THE WITNESS:  Yeah, I don't -- I don't see that it's a good outcome for anybody if they're not getting these opportunities that they would have gotten otherwise.

Q.   BY MS. ZIELINSKI:  Well, again, it depends on the -- like you said, it depends on the particular individual and their job market and what opportunities are available to that person.

A.   Well, when I --

MS. CHAN:  Objection.

THE WITNESS:  Yeah.

MS. CHAN:  Asked and answered.  Vague and ambiguous.  Calls for speculation.  And not a

Barry Gerhart, Ph. D. Confidential
March 05, 2025

not fair.

And, as I think we saw, there's quite a bit of testimony that the companies placed a high value on making sure -- whatever term they used, it was basically internal equity -- they talked about pay being appropriate, pay being fair, pay being equitable. So that's -- I would start with that element, the internal equity within a similar role.

And then you mentioned -- I'm sorry. I think you mentioned different pay levels and -- You didn't mention different pay levels? I thought you did.

Q. BY MS. ZIELINSKI: Oh, I see job levels.

A. Okay. So different job levels, which would be different pay levels.

And one place to start would be if you look at -- World at Work does a couple pay surveys regularly about how people -- how companies design their pay systems, and one of the parameters they -- they survey is midpoint progression, which is the percentage difference between, say, a pay grade midpoint and the pay grade midpoint at the next level, the pay grade midpoint below that, and they -- they -- they have targets that they -- that they try to adhere to on what the differentials in pay are between pay

levels.

So, to the extent they're doing that, if at one pay level somebody uses an outside offer to leverage higher pay and that affects the pay of other people in that role and pay level, then to maintain the differential between that level and the next level, the next level would have to go up. And if you're -- if you're -- if somebody's reporting to you and their pay is getting closer to yours, you may not believe that is fair.

So that would be another aspect of internal equity, and I'll just -- I'll pause there for now.

Q. BY MS. ZIELINSKI: And this -- this cascading effect that you just described, those are the class members who you say were indirectly affected by the alleged conduct; is that correct?

MS. CHAN: Objection. Compound. Vague and ambiguous. Calls for a legal conclusion.

THE WITNESS: I think that's the word I used, and, again, with caveats that "indirect" doesn't mean less important.

Q. BY MS. ZIELINSKI: Sure. And you agree -- you would agree with me that the vast majority of the proposed class members are going to fall into that indirect bucket as opposed to the direct bucket?

Barry Gerhart, Ph. D. Confidential
March 05, 2025

MS. CHAN: Objection. Vague and ambiguous. Compound.

Q. BY MS. ZIELINSKI: I'll rephrase my question.

You would agree with me that the vast majority of the proposed class members are going to fall into that indirect bucket; correct?

MS. CHAN: Objection. Vague and ambiguous. Calls for a legal conclusion.

THE WITNESS: Well, that's an interesting question. I guess it would depend on how many people would have gotten cold-called and gotten outside offers. And so if it was a larger percentage of people, then the direct effects would be -- would get bigger; and then the indirect effects, I guess, would also be expected to be bigger because there'd be even more pressure for wages to rise.

So, yeah, it's -- I -- it's possible that -- that most people could have the so-called indirect effects, but it's not -- I don't know that it's necessarily true.

Q. BY MS. ZIELINSKI: Okay. You haven't conducted an analysis to determine that one way or the other; correct?

MS. CHAN: Objection. Vague and ambiguous.

Barry Gerhart, Ph. D. Confidential
March 05, 2025

THE WITNESS: Yeah, I have not quantified that.

Q. BY MS. ZIELINSKI: Let's turn to page 182.

And you conclude here that defendants' employees would experience cascading effects.

Do you see that?

A. Where on 182? Oh, down at the bottom?

Q. Oh, I'm sorry. Yep.

A. Yep.

Q. Okay. And in the paragraphs that follow, you describe your methodology for arriving at this conclusion; correct?

MS. CHAN: So I'm going to just object that there are many pages of paragraphs that follow; so this is compound, and perhaps the witness should have the opportunity to review those paragraphs.

Q. BY MS. ZIELINSKI: Well, actually, let me just refer you to the rest of 148.

You say, after the heading, that "defendants' documents indicate that top-down salary structures would cause across-the-board cascading effects."

Correct?

A. That's what -- That's the way I read it, yes.

Barry Gerhart, Ph. D. Confidential
March 05, 2025

Q. Okay. And, in order to determine -- to reach your opinion that there would be cascading effects, you base that opinion on defendants' documents; correct?

MS. CHAN: Objection. Vague and ambiguous.

THE WITNESS: The opinion is based on how compensation systems work in the vast majority of companies. And then I think we have testimony consistent with that, especially around things like -- or, for example, around things like internal equity being a focus in these companies.

Q. BY MS. ZIELINSKI: You didn't conduct any empirical analysis of defendants' employees' pay to determine whether there were such cascading effects; correct?

MS. CHAN: Vague and ambiguous.

THE WITNESS: I think that's correct, I did not quantify it.

Q. BY MS. ZIELINSKI: You're -- You're aware that data reflecting defendants' employees' pay was produced in this case; correct?

MS. CHAN: Hold on. I'm going to instruct the witness not to answer to the extent that this question is asking about attorney/expert communications or work product upon which the expert

Barry Gerhart, Ph. D. Confidential
March 05, 2025

STATE OF CALIFORNIA        )
                           )  SS.
COUNTY OF SAN FRANCISCO )

I, MARILYNN HOOVER, CSR No. 8841 for the State of California, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was duly sworn to testify the truth, the whole truth, and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named, and thereafter reduced by me to typewritten form; and that the same is a true, correct, and complete transcript of the said proceedings.

Before completion of the deposition, review of the transcript [ ] was [X] was not requested.  If requested, any changes made by the deponent (and provided to the reporter) during the period allowed shall be appended hereto.

I further certify that I am not interested in the outcome of the action.

Witness my hand this 8th day of March 2025.

_____

Marilynn Hoover, RPR

California CSR No. 8841

| Page | Line | Correction | Reason for Change |
|------|------|------------|-------------------|
|      |      | See attached chart for corrections | |
|      |      | | |
|      |      | | |
|      |      | | |
|      |      | | |
|      |      | | |
|      |      | | |
|      |      | | |
|      |      | | |
|      |      | | |
|      |      | | |
|      |      | | |
|      |      | | |
|      |      | | |
|      |      | | |
|      |      | | |

Witness Signature                                      Date

*Barry Gerhart*

SARA J BROWN
NOTARY PUBLIC
STATE OF WISCONSIN

Subscribed and sworn to before me this
___ day of _____ 20__

Notary Public, Dane Co., State of Wis
My commission expires ___ 8/17/2027

I, _Barry Gerhart_, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted on the previous page(s), and that I am signing this before a Notary Public.

_Barry Gerhart_

STATE OF _WI_

COUNTY OF _Dane_

Before me, _Sara J Brown_, on this day personally appeared _Barry Gerhart_, known to me, or proved to me under oath or through _WI DL_ (description of identity card or other document), to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office on this, the _3_ day of _April_, 20_23_.

SARA J BROWN
NOTARY PUBLIC
STATE OF WISCONSIN

_Sara J Brown_

NOTARY PUBLIC IN AND FOR THE
STATE OF _WI_

My Commission Expires: _8/17/2027_

**Errata for Expert Deposition of Dr. Barry Gerhart**
*In Re Outpatient Medical Center Antitrust Litigation* (N.D. Ill.)
March 5, 2025

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---|---|---|---|---|
| 1 | 37 | 19–21 | "Yeah, I think the term 'directly' there is meant 'the most easily seen,' maybe." | "Yeah, I think the term 'directly' there is meant to mean 'the most easily seen,' maybe." | Clarification |
| 2 | 51 | 12–15 | "I think I would go back to what I said before, that you'd want to look at the degree to which which companies people move between if there's a competitive, unrestricted market." | "I think I would go back to what I said before, that you'd want to look at the degree to which companies people move between if there's a competitive, unrestricted market." | Delete repeated word for clarification |
| 3 | 74 | 19–20 | "So if you reduce labor cost, it leads to hire profits over time." | "So if you reduce labor costs, it leads to higher profits over time." | Typographic error |
| 4 | 78 | 16–17 | "For higher-level employees, um-hum." | "For higher-level employees, yes." | Clarification |
| 5 | 114–15 | 114:23–115:2 | "No quantitative analysis bringing to bear knowledge of how these processes work and what the consequences of restricting mobility are and how—how mobility can lead to higher pay for employees or opportunities for mobility." | "No quantitative analysis. My focus was on bringing to bear knowledge of how these processes work and what the consequences of restricting mobility are and how—how mobility can lead to higher pay for employees or opportunities for mobility." | Typographic error; clarification |
| 6 | 118 | 10–11 | "Yeah. As I said, even missing one cold call could be very consequential." | "As I said, even missing one cold call could be very consequential." | Clarification |
| 7 | 129 | 4 | "Um-hum." | "Yes." | Clarification |
| 8 | 130 | 10 | "Um-hum." | "Yes." | Clarification |
| 9 | 131 | 20–22 | "And then my recollection is, I think it was Rucker left, Hayek then recruited Rucker; so that one's probably not too relevant." | "And then my recollection is, I think it was Hayek left, Hayek then recruited Rucker; so that one's probably not too relevant." | To conform the record to the facts; clarification |

1

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---|---|---|---|---|
| 10 | 137 | 1–3 | "For instance, the CEO and COO of SCA moving from DaVita." | "For instance, the future CEO and COO of SCA moving from DaVita." | To conform the record to the facts; clarification |
| 11 | 138 | 2–3 | "So your—So if I'm understanding . . ." | "So you're—So if I'm understanding . . ." | Typographic error |
| 12 | 164 | 17–20 | "And I think it's typically—once the percentage is set, then how it's allocated internally would typically be based on internal equity kinds of principles and internal equity principles." | "And I think it's typically—once the percentage is set, then how it's allocated internally would typically be based on internal equity kinds of principles and clearly stated internal equity." | Clarification |
| 13 | 190 | 10–13 | "And I think I also mentioned that your merit increase budget could also be influenced by your growth and how much hiring you have to do, because labor is a drive demand . . ." | "And I think I also mentioned that your merit increase budget could also be influenced by your growth and how much hiring you have to do, because labor is a derived demand . . ." | Typographic error |
| 14 | 197 | 9–11 | "I don't think it's my main charge is to establish whether there was exchange that wouldn't be acceptable from a legal standpoint . . ." | "I don't think my main charge is to establish whether there was exchange that wouldn't be acceptable from a legal standpoint . . ." | Clarification |
| 15 | 210 | 7–10 | "And then I think we talked about adjacent job levels would be affected if pay is going up in the job level below or above, and then it could relate to job levels not immediately adjacent." | "And then I think we talked about how adjacent job levels would be affected if pay is going up in the job level below or above, and then it could relate to job levels not immediately adjacent." | Clarification |
| 16 | 215 | 11–14 | "Well, I would think, the more outside offers there are, the more pressure it would put on the system and that there would be system-like cascading effects." | "Well, I would think, the more outside offers there are, the more pressure it would put on the system and that there would be system-wide cascading effects." | Typographic error |
| 17 | 224 | 19–22 | "'Restraints that can strain the employee labor market | "'Restraints that constrain the employee | Typographic error; to |

2

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
|  |  |  | and suppress compensation, such as no-poach agreements and CSI exchanges, enable firms to benchmark to lower rates so that upward pay adjustments do not occur.'" | labor market and suppress compensation, such as no-poach agreements and CSI exchanges, enable firms to benchmark to lower rates so that upward pay adjustments do not occur.'" | conform the record to the facts |
| 18 | 228–29 | 228:25–29:4 | "But it's certainly possible that class members who negotiated their pay were able to negotiate a salary that would have offset or been uneffected by the alleged suppression of compensation; correct?" | "But it's certainly possible that class members who negotiated their pay were able to negotiate a salary that would have offset or been unaffected by the alleged suppression of compensation; correct?" | Typographic error |
| 19 | 272 | 22–23 | "Well, that was my intention, yes." | "It was my intention to include everything I relied on for my opinions about USPI's compensation practices in the report." | Clarification |
| 20 | 283 | 15–16 | "Empirical Research Issues and Comparative HRM" | "Empirical Research Issues in Comparative HRM" | Typographic error; to conform the record to the facts |
| 21 | 289 | 7–8 | "I was looking at things common to the class employees across the companies." | "I was looking at things common to the class member employees across the companies." | Clarification |
| 22 | 290 | 13–17 | "I think it was Staffieri who said something to the effect of, when he's setting pay, he needs to know what other people are paid, because he doesn't want any individual employee's pay to get out of the whack with the pay of other people . . ." | "I think it was Staffieri who said something to the effect of, when he's setting pay, he needs to know what other people are paid, because he doesn't want any individual employee's pay to get out of whack with the pay of other people . . ." | Typographic error |
| 23 | 293 | 9–11 | " . . . then you can assume that there would be more offers and that less offers | " . . . then you can assume that there would be more offers | Typographic error |

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
|  |  |  | for employees of those two companies to move to the other company?" | and not less offers for employees of those two companies to move to the other company?" |  |
| 24 | 294 | 10–13 | "I see it as if there's specially good offers coming in and they're coming from the defendant companies, then that would be pretty critical to know." | "I see it as if there's especially good offers coming in and they're coming from the defendant companies, then that would be pretty critical to know." | Typographic error |

4

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

IN RE OUTPATIENT MEDICAL

CENTER EMPLOYEE ANTITRUST

LITIGATION    Docket No. 1:21-cv-00305

HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER

VIDEO-RECORDED REBUTTAL DEPOSITION OF

BARRY GERHART, Ph.D., VOLUME II

THURSDAY, JULY 10, 2025

SAN FRANCISCO, CALIFORNIA

Reported by:   Marilynn Hoover, RPR

California CSR No. 8841

THURSDAY, JULY 10, 2025; SAN FRANCISCO, CALIFORNIA

THE VIDEOGRAPHER: Good morning, ladies and gentlemen. We're on video record.

The time is 9:04 a.m. Today's date is July 10th, 2025.

This marks the beginning of video 1, volume 2, in the continuing deposition of Barry Gerhart, Ph.D., in the case In Re Outpatient Medical Center, et al., appearing before the United States District Court for the Northern District of Illinois, Eastern Division; case number 1:21-cv-00305.

We're located in person today at 275 Battery Street, San Francisco, California.

Would all counsel in the room please identify themselves for the record.

MR. SEIDEL: Good morning. David Seidel with the Joseph Saveri Law Firm, on behalf of the plaintiffs.

MS. ZANDI: Sarah Zandi, Lieff Cabraser Heimann & Bernstein, on behalf of plaintiffs.

MR. SAVERI: Joseph Saveri on behalf of the plaintiffs.

MS. ZIELINSKI: Sarah Zielinski, McGuire Woods, on behalf of the SCA defendants.

MR. WADE: Joshua Wade, also of McGuire

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

Woods, for the SCA defendants.

MS. CARTER: Michele Carter, Cornerstone Research, on behalf of defendants.

MR. DAWSON: Matthew Dawson, King & Spalding, on behalf of USPI.

MS. LIU: Diana Liu, also King & Spalding, on behalf of the defendants.

MR. KLIEBARD: Good morning. Ken Kliebard, Morgan Lewis, on behalf of DaVita.

MS. LANE: Molly Lane, appearing on behalf of DaVita, from Morgan Lewis.

MS. LOU: Melissa Lou, in-house counsel for DaVita.

THE VIDEOGRAPHER: And would those joining by Zoom please identify themselves for the record.

MS. MOYE: Good morning. Veronica Moye, King & Spalding, for USPI.

MS. MANNING: Good morning. Amy Manning, McGuire Woods, for SCA.

MS. MOUNAYER: Good morning. Chelsea Mounayer, McDermott Will & Emery, for defendant Thiry.

MS. STEINER: Good morning. Jordanne Steiner, Wilson Sonsini Goodrich & Rosati, for defendant Andrew Hayek.

MR. SHAPIRO: Good morning. Nathan Shapiro,

Morgan Lewis, on behalf of DaVita.

MR. CHRESTIONSON:  Good morning.  Jason Chrestionson, Morgan Lewis, also on behalf of DaVita.

MR. MOHRAZ:  Andrew Mohraz with DaVita.

MR. BREWER:  Connor Brewer, King & Spalding, USPI.

MS. PETROPOULOS:  Wendy Petropoulos, Cornerstone Research.

THE VIDEOGRAPHER:  Go for it.

MR. SAVERI:  Is that everybody?

THE STENOGRAPHIC REPORTER:  Yes, to my knowledge, that's everyone.

MR. SAVERI:  Thank you.

THE VIDEOGRAPHER:  You may swear in the witness.

THE STENOGRAPHIC REPORTER:  Good morning.

My name is Marilynn Hoover.  I am a California certified shorthand reporter and my license number is 8841.  Thank you.

--o0o--

BARRY GERHART, Ph.D.,
called as a witness, being duly sworn on oath by the stenographic reporter, was examined and did testify as follows:

--o0o--

Q. How much time did you spend working on your report?

A. I haven't separated my time out by different tasks. I just try to keep a running total.

Q. Okay. What's your running total thus far for this matter?

A. I don't know what it is exactly. I know for sure it's well over a hundred hours, but I'm not sure beyond that.

Q. Okay. So, since the last time you were deposed -- or during your last deposition, you've said that you had spent 50 hours working on this matter, as of that point in time.

A. Yeah.

Q. Do you recall that?

A. That sounds about right.

Q. Okay. And as of right now, you've spent at least an additional 50 hours working on this matter; is that correct?

A. Yes.

Q. Okay. Can you -- And are you -- are you able to be any more specific than an additional 50 hours?

A. No. Like I said, I just try to of course track my time.

Q.    Okay.

A.    Yeah.

Q.    Did anyone assist you in drafting that report, defendants' Exhibit 84?

A.    It's my report and everything in here is at my direction.

Q.    Did you have a team of people reporting to you, to assist you with your report?

A.    A team of people reporting to me?  No.

Q.    Okay.  Other than attorneys involved in this case, you didn't have any assistance with the report; correct?

A.    I didn't work with anybody but counsel.

Q.    Okay.  Got it.

A.    Well, there was some data that I looked at; but I asked counsel how I could get the data, and they connected me to -- I think it's Econ One.  That's all I can think of.

Q.    Okay.  And who -- what is Econ One?

A.    I don't honestly know.  I just -- I -- I guess they do some work to provide data.  They're good with spreadsheets.  So I needed a spreadsheet with some data, to do some simple arithmetic.

Q.    And what data -- what data was compiled by Econ One?

A.    So I don't -- There's -- There's a figure with plotting; I think it's mean salary over time, by company and by director.  And so they gave me the mean salaries.

Q.    Okay.

A.    They also gave me -- I was trying to look at one of the charts from one of the defense experts and probably, I think, Saravia.  And I couldn't quite tell what the numbers were from the chart.  So they also got the numbers underlying her chart, that they provided to me.

Q.    And was Econ One retained by you or by your counsel?

MR. SEIDEL:  I'm going to caution the witness:  You can answer the question to the extent you can without divulging any communications with us or with -- or with them.

THE WITNESS:  I didn't know about them.  I just asked how I could get the data I just described, and they connected me to Econ One.

MS. ZIELINSKI:  Okay.  All right.  Can I have defendants' Exhibit 85.

(Exhibit DX85 marked.)

Q.    BY MS. ZIELINSKI:  All right.  I am handing you what has been marked defendants' Exhibit 85, and

my question is:  Is that a true and correct copy of the rebuttal report that you submitted on June 30th, 2025?

THE CONCIERGE:  Is that tab 3.

MR. WADE:  Yes, this is tab 3.

THE WITNESS:  Yes, it looks like it is.

Q.   BY MS. ZIELINSKI:  Okay.  And did you personally draft -- did you personally draft this report?

A.   It's my report.  Everything in it is at my direction.

Q.   How much time did you personally spend working on this report?

A.   I don't know.

Q.   Okay.  Fair to say that the time that you spent working on this report is part of the additional 50 hours that you testified to before?

A.   Well, actually, I don't think I said 50 hours.  I just said my total time so far is over a hundred.

I'm sorry.  What was the question again?

Q.   The -- Right.  And, but you also testified that, as of the last deposition, you had spent 50 hours.

A.   Um-hum.

assignment is to say what the likely consequences would be.

Q. Okay. And so if -- throughout your report, if you're referencing the defendants' agreements, it's your intention to describe your view of evidence as opposed to offering an opinion that defendants in fact entered into an agreement; is that correct?

MR. SEIDEL: Objection to form.

THE WITNESS: That sounds correct.

Q. BY MS. ZIELINSKI: Okay. And you also testified in your prior deposition that you were not offering an opinion that defendants entered into an agreement, or agreements, to fix wages.

Do you recall that?

MR. SEIDEL: Objection to form.

THE WITNESS: I -- I think that's correct.

Q. BY MS. ZIELINSKI: Okay. And that's also true with your supplemental reports: You are also not offering an opinion that the defendants agreed to fix wages; correct?

A. I think that's correct.

Q. Okay. So, again, in your report, if you are referring to defendants having an alleged wage-fixing agreement, you are describing your view of evidence as opposed to offering an opinion that the defendants

entered into a wage-fixing agreement; correct?

A. Correct.

MR. SEIDEL: Object to --

THE WITNESS: Oh.

MR. SEIDEL: Objection to form.

No worries. Go ahead.

THE WITNESS: Correct.

Q. BY MS. ZIELINSKI: You are not offering an opinion that defendants engaged in an overarching conspiracy among all three defendants; correct?

A. I'm offering no opinion on that.

Q. Okay. And you're also not offering any opinion that evidence is consistent with defendants engaging in an overarching conspiracy; correct?

A. I think that's correct.

Q. Okay. You understand that plaintiffs here have alleged that there was an overarching conspiracy among all three defendants?

MR. SEIDEL: Objection to form.

THE WITNESS: Yes.

Q. BY MS. ZIELINSKI: Okay. But it's your understanding that whether defendants' conduct constitutes an overarching conspiracy is a question for the jury to answer at trial; right?

MR. SEIDEL: Objection. Calls for a legal

conclusion.

THE WITNESS:  Well, as far as I understand, yes.

Q.   BY MS. ZIELINSKI:  Okay.  And since it's a question for the jury to answer at trial, it's not your role as an expert witness to answer that question on their behalf; correct?

MR. SEIDEL:  Objection to form.  Calls for a legal conclusion.

THE WITNESS:  I -- I think that's correct.

Q.   BY MS. ZIELINSKI:  Okay.  Let's turn to page 92 of that report.

And here, heading 6 above paragraph 234, you offer the opinion that defendants have market power; correct?

A.   Yes.

Q.   And you did not offer that opinion in your initial report; correct?

A.   I think that's probably correct.

Q.   So that's a new opinion that you're offering in rebuttal; correct?

MR. SEIDEL:  Objection to form.

THE WITNESS:  It's -- It's a new term, yes; and, beyond that, I'm not sure how I would describe it.  But, yeah, I don't think we -- I don't think the

term "market power" was in the first one.

Q.   BY MS. ZIELINSKI:   Do you agree that defendants could not have suppressed the compensation of proposed class members without market power?

A.   I'd have to think about that, but -- I think market power is pretty fundamental, but I'd have to think through that.

Q.   Okay.  So you don't have an opinion one way or the other as to whether defendants could have suppressed compensation of proposed class members without market power?

A.   So market power, one aspect of it is employees don't respond to changes in wages, for example, with turnover, as strongly.  So I think, probably, yes -- Oh, sorry.  I actually forgot your question.

But given if employees don't respond to changes in wages as strongly as might have been expected in the past, then that would generally give employers more leeway in where they set their wage.

Q.   Okay.  Let me ask my question again.

Do you agree that defendants could not have suppressed the compensation of proposed class members without market power?

A.   I think that's probably correct.

Q.   Okay.  What analysis did you conduct that measures the market power of defendants?

A.   I'm not -- Do you mean -- Well, what -- what do you mean by "analysis"?

Q.   Well, let me -- I guess we'll start with an empirical analysis.

You didn't conduct any empirical analysis showing that defendants had market power; correct?

A.   No.  I don't think I did anything that would speak to that quantitatively, yes.

Q.   Okay.  You did not, for example, conduct a hypothetical monopsonist test?

A.   No, I don't believe I did.

Q.   Okay.  You did not define a relevant labor market or markets?

A.   No, I did not.

Q.   Okay.  And you didn't calculate defendants' market shares; correct?

A.   Which market share do you refer to?

Q.   In the market where you claim they have market power.

MR. SEIDEL:  Objection to form.

THE WITNESS:  Yeah, I guess I'll say I didn't.  There's probably some things I did that are relevant, but I think -- I didn't calculate some

measure of market power explicitly.  I think that's correct.

Q.   BY MS. ZIELINSKI:  Okay.  All right.

So, aside from empirical testing to establish market power, did you conduct any other analysis to measure the defendants' market power?

A.   I don't think directly, no.

Q.   Okay.  You claim that you did not need to define a relevant market to demonstrate market power; correct?

A.   I don't know if I explicitly said that or not, but I -- so I'm not actually sure.

Q.   Okay.  But, regardless, you've not specified what market the -- the market in which the defendants -- the market or markets in which the defendants supposedly had market power; correct?

A.   I don't think there's any explicit definition.  Correct.

Q.   Okay.  And you've not analyzed whether defendants had market power in each of the labor markets in which proposed class members participated; correct?

MR. SEIDEL:  Objection to form.

THE WITNESS:  I think that's correct.  Yeah.

Q.   BY MS. ZIELINSKI:  Do you have an

understanding of the purpose of defining a relevant market in antitrust cases?

A.   I do not have much knowledge at all of antitrust.

Q.   Okay.  Do you understand that a relevant market is defined by identifying alternatives?

A.   Again, I don't have any expertise in antitrust.

Q.   Okay.  If you don't have expertise in antitrust, how is it that you are able to offer the opinion that defendants have market power from an antitrust perspective?

MR. SEIDEL:  Objection to form.

Objection to the extent it calls for a legal conclusion.

THE WITNESS:  Yeah.  So when I use the term "market power," it's more on the labor side; and that relates to work I've done, over many years, on human resources and compensation, and studying how much variation there is in wages across employers and that sort of thing.

So when I said before that I didn't use the term "market power" before, I feel like I've studied related issues over time but I just -- that wasn't a term that I -- that I used.  There wasn't much reason

on the five-digit, was -- made sense for some purposes.

Q.    Would you still -- So hold on.

So even if it were determined that defendants had less than 1 percent share of employment in the relevant market, would you still offer the opinion that they have market power?

MR. SEIDEL:  Objection to form.

Objection to the extent it calls for a legal conclusion.  Vague.

THE WITNESS:  So, again, the definition of "market power" I'm using is kind of, I think, standard in the labor econ literature; and that is, changes in wages don't lead to as much of a response in employee turnover; and, given that, that gives you some latitude on how high or low to set your wage as an employer.

Q.    BY MS. ZIELINSKI:  So I don't know if you are agreeing, that if you're answering -- whether you're answering yes or no to my question, so I want to pose it again.

Even if it were determined that defendants had less than 1 percent share of employment in the relevant market, would you still offer the opinion that they have market power?

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

MR. SEIDEL:  Objection.  Asked and answered.

THE WITNESS:  Yeah.  So, yes.

MS. ZIELINSKI:  This is a good time to take a break.

MR. SEIDEL:  Sounds great.

MS. ZIELINSKI:  Okay.  We'll go off the record.

THE VIDEOGRAPHER:  We're off the record. The time is 10:14 a.m.

(Recess.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 10:32 a.m.

This marks the beginning of video 2, volume 2, in the continuing deposition of Barry Gerhart, Ph.D.

Q.   BY MS. ZIELINSKI:  Dr. Gerhart, I'm going to start by asking you a question to clarify some testimony you gave previously.

So, before the break, earlier today, I asked you:  "Aside from empirical testing to establish market power, did you conduct any other analysis to measure the defendants' market power?"

And you answered:  "I don't think, directly, no."

Do you recall that?

A.    Yes.

Q.    Okay.  And my question is:  Was there any analysis, whether direct or indirect, done to measure the defendants' market power?

A.    Yeah, I guess the answer is probably no.  I was just, I guess, not wanting -- I was just trying to think through what I did and how direct or indirect, if either.

So I think the answer is that a lot of my market power discussion is based on the current literature in mostly labor economics about what market power is and how much there is in the -- in the U.S.

Q.    Okay.  So, setting aside that literature, you did not conduct any analysis to measure the defendants' market power; correct?

A.    I think that's -- that's correct. Obviously, some of the -- Not some.  The allegations about, for instance, no-poach would be relevant to market power, just like noncompetes would be, but...

Q.    But you did not conduct any analysis to measure the defendants' market power; correct?

A.    No, I don't think so.  Yeah, I think that's right.

Q.    Okay.  All right.  Let's look at paragraph 235 of your report, which is at page 94.

And in that paragraph, you include a quote from David Card, that "many or even most firms have some wage-setting power."

Do you see that?

A.   I see it.

Q.   And is it your understanding that Professor Card is saying that almost every employer has some degree of wage-setting power over their employees?

A.   That's the way I read it.

Q.   And that's because of labor market frictions; is that correct?

A.   Yeah, labor market friction is a major factor in market power.

Q.   And labor market frictions are things like imperfect information and job search costs, things like that; correct?

A.   And two-way matching, which one of the defense experts, one or more, spent some time on. But, yeah, I think that's very relevant.

Q.   Okay.  And those frictions exist in almost every labor market; is that right?

A.   That sounds right.  Yeah, I think that's probably right.

Q.   Okay.  Well, is it right or...

A.   I -- I --

Barry Gerhart, Ph.D. Volume II Highly Confidential
July 10, 2025

STATE OF CALIFORNIA      )
                         )  SS.
COUNTY OF SAN FRANCISCO )

I, MARILYNN HOOVER, CSR No. 8841 for the State of California, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was duly sworn to testify the truth, the whole truth, and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named, and thereafter reduced by me to typewritten form; and that the same is a true, correct, and complete transcript of the said proceedings.

Before completion of the deposition, review of the transcript [ ] was [X] was not requested.  If requested, any changes made by the deponent (and provided to the reporter) during the period allowed shall be appended hereto.

I further certify that I am not interested in the outcome of the action.

Witness my hand this 14th day of July 2025.


_____

Marilynn Hoover, RPR

California CSR No. 8841

| Page | Line | Correction | Reason for Change |
|------|------|------------|-------------------|
| | | See attached chart for corrections | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

_Barry Gerhart_
_____
Witness Signature

08/21/2025
Date

I, _Barry Gerhart_, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted on the previous page(s), and that I am signing this before a Notary Public.

_Barry Gerhart_

STATE OF _WI_

COUNTY OF_ Dane_

Before me, _August 21, 2025_, on this day personally appeared_ Barry Gerhart_, known to me, or proved to me under oath or through_ Driver Lic._ (description of identity card or other document), to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office on this, the _21_ day of _August_, 20_25_.

NOTARY PUBLIC IN AND FOR THE
STATE OF_ Wisconsin_

My Commission Expires: _11/6/2027_

**Errata for Expert Deposition of Dr. Barry Gerhart, Vol. II**
*In Re Outpatient Medical Center Antitrust Litigation* (N.D. Ill.)
July 10, 2025

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---|---|---|---|---|
| 1. | 319 | 1 | "Exhibit 84." | "defendants' Exhibit 84." | Clarification |
| 2. | 323 | 25 | "Um-hum." | "Yes." | Clarification |
| 3. | 327 | 22 | "the animators case." | "the Animators case." | Typographic error |
| 4. | 329 | 9–10 | "beyond compensation in human resources management" | "beyond compensation and human resources management" | Typographic error |
| 5. | 338 | 19 | "I think that's probably correct." | "My initial report does show that defendant firms had market power during the Conduct Period, given the presence of various labor market frictions, and given my determination that the  no-poach conduct and CSI Exchanges would likely have suppressed pay Class-wide" | Clarification; to conform the record to the facts |
| 6. | 340 | 9–10 | "I don't think I did anything that would speak to that quantitatively, yes." | "I don't think I did anything that would speak to that quantitatively." | Clarification |
| 7. | 342 | 3–4 | "I do not have much knowledge at all of antitrust." | "I do not have much knowledge at all of antitrust law." | Clarification |
| 8. | 343 | 15 | "manning" | "Manning" | Typographic error |
| 9. | 353 | 22 | "the other outpatient care centers industry." | "the Other Outpatient Care Centers industry." | To conform the record to the facts |
| 10. | 357 | 3–4 | "the other outpatient care centers industry;" | "the Other Outpatient Care Centers industry;" | To conform the record to the facts |
| 11. | 358 | 5–6 | "the other outpatient care centers" | "the Other Outpatient Care Centers industry" | To conform the record to the facts |

1

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 12. | 358 | 11 | "the other outpatient care center industry," | "the Other Outpatient Care Centers industry," | To conform the record to the facts |
| 13. | 358 | 17–18 | "there's evidence in the report" | "there's evidence in the rebuttal report" | Clarification |
| 14. | 359 | 4 | "of the report" | "of the rebuttal report" | Clarification |
| 15. | 359 | 25 | "the other outpatient care industry" | "the Other Outpatient Care Centers industry" | To conform the record to the facts |
| 16. | 361 | 1 | "the five-digit" | "the five-digit industry code" | Clarification; to conform the record to the facts |
| 17. | 363 | 5 | "Yeah, I guess the answer is probably no." | "I did not perform any quantitative analysis to measure the defendants' market power." | Clarification; to conform the record to the facts |
| 18. | 363 | 16 | "I think that's—that's correct." | "That is partially correct." | Clarification; to conform the record to the facts |
| 19. | 363 | 22–23 | "No, I don't think so. Yeah, I think that's right." | "I did not perform any quantitative analysis to measure the defendants' market power. I did assess defendants' experts' testimony and determine that based on my review of the evidence and my knowledge of the compensation-related literature and basic labor economics, their testimony did not convince me that the evidence is inconsistent to show that defendants had the market power necessary to harm all or nearly all class | Clarification; to conform the record to the facts |

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| | | | | members' compensation." | |
| 20. | 365 | 16–17 | "the three defendants" | "the three defendant firms" | Clarification; to conform the record to the facts |
| 21. | 366 | 12 | "there's less information" | "there's less of an information deficit" | Clarification |
| 22. | 367 | 16 | "the three defendants," | "the three defendant firms," | Clarification; to conform the record to the facts |
| 23. | 369 | 23 | "in antitrust" | "in antitrust law" | Clarification |
| 24. | 371 | 4–5 | "like a no-poach" | "like a no-poach agreement" | Clarification |
| 25. | 371 | 5–8 | "And I guess part of that is trying to think about what would have happened without such a no-poach versus what happened with such an alleged no-poach." | "And I guess part of that is trying to think about what would have happened without such a no-poach agreement versus what happened with such an alleged no-poach agreement." | Clarification |
| 26. | 374 | 2 | "a successful no-poach" | "a successful no-poach agreement" | Clarification |
| 27. | 375 | 17 | "like no-poach." | "like a no-poach agreement" | Clarification |
| 28. | 377 | 20–22 | "What the report says is that the defendants seem like they would be very good matches that defendant employees" | "The report and rebuttal show that defendants seem like they would be very good matches for other defendants' employees" | Clarification; to conform the record to the facts |
| 29. | 381 | 4–5 | "Yeah, I don't think I would necessarily say that." | "No, that is not my opinion." | Clarification |
| 30. | 383 | 11 | "Yes." | "It's possible." | Clarification |
| 31. | 388 | 9–10 | "Sure, some things will vary by individuals, yes. A lot of things vary by individuals." | "Sure, some preferences will vary by individuals." | Clarification; to conform the record to the facts |

3

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 32. | 389 | 12–13 | "same five-digit industry" | "same five-digit industry code" | Clarification; to conform the record to the facts |
| 33. | 389 | 25 | "Yeah, it's hard to know." | "I would need more information." | Clarification |
| 34. | 390 | 22 | "same five-digit industry" | "same five-digit industry code" | Clarification; to conform the record to the facts |
| 35. | 391 | 7 | "within their five-digit" | "within their five-digit industry" | Clarification; to conform the record to the facts |
| 36. | 391 | 11 | "within their five-digit" | "within their five-digit industry" | Clarification; to conform the record to the facts |
| 37. | 394 | 5–6 | "I didn't do a quant—No, I didn't quantify that. | "No, I didn't quantify that, but I did perform a qualitative analysis of the evidence, which was consistent to show that defendants' employees would have valued opportunities at other defendant firms." | Clarification; to conform the record to the facts |
| 38. | 397 | 3–4 | "Let's mark this as defendants 87." | "Let's mark this as defendants' Exhibit 87." | Typographic error |
| 39. | 398 | 21 | "other outpatient care centers industry;" | "Other Outpatient Care Centers industry;" | To conform the record to the facts |
| 40. | 400 | 9–10 | "But I think the other thing on the post-conduct is," | "But I think the other thing on the post-conduct period is," | Clarification |
| 41. | 400 | 16 | "the pre-conduct and conduct and post-conduct" | "the pre-conduct and conduct and post-conduct periods" | Clarification |
| 42. | 403 | 18–19 | "'healthcare-related non-OCC industries'" | "'Healthcare Related (non-OCC) industries'" | To conform the record to the facts |

4

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 43. | 403 | 20 | "'outpatient care centers.'" | "'Outpatient Care Centers.'" | To conform the record to the facts |
| 44. | 403 | 25 | "'healthcare and social assistance.'" | "'Healthcare and Social Assistance.'" | To conform the record to the facts |
| 45. | 405 | 4–7 | "So he—I think 'healthcare-related' must be code 62, and 'outpatient care centers' looks like it's 6214. So it's not 'other outpatient care centers'; it's broader." | "So he—I think 'Healthcare Related' must be code 62, and 'Outpatient Care Centers' looks like it's 6214. So it's not 'Other Outpatient Care Centers'; it's broader." | To conform the record to the facts |
| 46. | 405 | 15–16 | "within the two-digit healthcare industry" | "within the two-digit Healthcare and Social Assistance industry" | To conform the record to the facts |
| 47. | 406 | 12–14 | "Four-digit would be outpatient care centers. And then within outpatient care centers, there's a lot of different types." | "Four-digit would be Outpatient Care Centers. And then within Outpatient Care Centers, there's a lot of different types." | To conform the record to the facts |
| 48. | 406 | 20–21 | "for outpatient care centers?" | "for Outpatient Care Centers?" | To conform the record to the facts |
| 49. | 407 | 1 | "'other outpatient care center'" | "'Other Outpatient Care Center'" | To conform the record to the facts |
| 50. | 407 | 2 | "outpatient care center" | "'Outpatient Care Center'" | To conform the record to the facts |
| 51. | 407 | 24 | "within the five-digit outpatient care center industry" | "within the five-digit Other Outpatient Care Centers industry" | To conform the record to the facts |
| 52. | 411 | 20–21 | "Yeah, I'd have to—I think that's what I—I think what I meant to say is if" | "My opinion is that if" | Clarification |
| 53. | 413 | 6 | " the 'other outpatient care centers'" | " the 'Other Outpatient Care Centers'" | To conform the record to the facts |
| 54. | 419 | 9 | "the pre-conduct;" | "the pre-conduct period;" | Clarification |

5

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---|---|---|---|---|
| 55. | 421 | 19 | "the pre-conduct and the conduct period" | "the pre-conduct period and the conduct period" | Clarification |
| 56. | 425 | 20–21 | "lower-level employees And senior-level employees" | "lower-level employees and senior-level employees" | Typographic error |
| 57. | 438–439 | 438:25–439:1 | "I found that very, very relevant, I guess, is what I would say, yes." | "I found that very, very relevant, I guess, is what I would say, yes. I provided a factual background of Plaintiffs' conspiracy claim in support of my analysis, and determined that the evidence was consistent to show certain start and end dates." | Clarification; to conform the record to the facts |
| 58. | 439 | 22 | "Doesn't seem to be consistent with that, no." | "Doesn't seem to be consistent with that, no, but the weight of the evidence I reviewed was consistent to show a 2019 end date." | Clarification; to conform the record to the facts |
| 59. | 441 | 10 | "I think that's correct." | "I think that's correct with respect to this specific piece of evidence, but taken together the bulk of the evidence was consistent with a 2019 end date." | Clarification; to conform the record to the facts |
| 60. | 450 | 19–21 | "Well, I think the no-poach would give them a less incentive to not adhere to the wage-fixing." | "Well, I think the no-poach agreements would give them less incentive to not adhere to the wage-fixing agreements." | Clarification; typographic error |
| 61. | 452 | 9 | "increase composition" | "increase compensation" | Typographic error; clarification |
| 62. | 454 | 17–19 | "No, and I'm not—I'm not intending to offer a | "No, and I'm not intending to offer a | Clarification; to conform |

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---|---|---|---|---|
| | | | legal opinion.  It's more of a lay-person impression." | legal opinion.  I submitted this evidence in my rebuttal report to respond to defendants' experts' argument that I provided insufficient evidence regarding the CSI Exchanges in my opening report. Accordingly, as I explain in my rebuttal report, defendants' experts' argument does not give me cause to change my assessment in my opening report." | the record to the facts |
| 63. | 454 | 22–23 | "That—That part is—I think that's right, yeah." | "I am not offering an expert opinion about typical actions of colluding parties to conceal their conduct. I submitted this evidence as support for my finding in my rebuttal report that defendants' experts had not persuaded me that my expert opinions in my opening report regarding the CSI exchange were unsupported." | Clarification; to conform the record to the facts |
| 64. | 466 | 16 | "that it effects their behavior" | "that it affects their behavior" | Typographic error |
| 65. | 467 | 12–13 | "People do kind of care about their pay, so that's why it gets so much attention." | "People do care about their pay, so that's why it gets so much attention." | Clarification |
| 66. | 475 | 3–4 | "I think this is from World at Work—World at Work survey" | "I think this is from World at Work—a World at Work survey" | Clarification |

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 67. | 476 | 11 | "No.  No, it's not." | "My opinion is that Defendant firms had systematic pay structures." | Clarification |
| 68. | 484 | 8 | "co-workers wages?" | "co-workers' wages?" | Typographic error |
| 69. | 486–487 | 486:23–481:1 | "Let me be clear:  So there's employer policies aimed at preventing pay transparency in general, but that doesn't necessarily work very well." | "Let me be clear:  So there's employer policies aimed at preventing pay transparency in general, but that doesn't necessarily work very well to prevent employees from discussing their pay with each other." | Clarification |
| 70. | 491 | 23 | "directors salaries" | "directors' salaries" | Typographic error |
| 71. | 498 | 16–18 | "this analysis does not tell us whether base pay for individual class members move together over time; correct?" | "this analysis does not tell us whether base pay for individual class members moves together over time; correct?" | Typographic error |
| 72. | 498 | 22 | "So that's why I'm not using individual." | "So that's why I'm not using individual pay." | Clarification; to conform the record to the facts |
| 73. | 505 | 5–6 | "Hmm.  Yeah, again, I look at evidence that I think is relevant." | "Again, I look at evidence that I think is relevant, rather than at hypotheticals." | Clarification |
| 74. | 506 | 14 | "That sounds right." | "My opinion about likely impact to class members in this case partially depends upon information about job opportunities being conveyed to the recipient of a cold call. Information received by recipients of cold calls is not the | Clarification; to conform the record to the facts |

8

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---|---|---|---|---|
| | | | | only pathway of impact." | |
| 75. | 509 | 4–6 | "Well, the only thing I can say for sure at the moment would be personal experience for— over the years, seeing people do that." | "The basis for my opinion that you don't necessarily need a specific salary offer to negotiate with your current employer is based on my expertise in compensation and human resource management. It is also based on evidence in my reports showing that defendants responded to even the threat of outside offers to retain employees." | Clarification; to conform the record to the facts |
| 76. | 512 | 11–12 | "'They can also adjust over time to changing.'" | "'They can also adjust over time to changing market conditions and/or business strategies.'" | To conform the record to the facts |
| 77. | 513 | 2–3 | "example of what change in market conditions or business strategies would cause." | "example of what changes in market conditions or business strategies would cause." | Typographic error |
| 78. | 514 | 10 | "Yes. This is Exhibit 84." | "Yes. This is defendants' Exhibit 84." | To conform the record to the facts |
| 79. | 515 | 16–18 | "I think, probably, if I rewrote it, I would say—I might say I'm not accurate; but it didn't seem—" | "My opinion is that based on my experience in compensation and human resource management and my review of the evidence, I do not think that Zaideman's testimony that SCA entirely lacked a compensation | Clarification; to conform the record to the facts |

9

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| | | | | framework before 2021 was accurate." | |
| 80. | 528 | 6–7 | "I'm not sure there's a way to do it very precisely." | "My rebuttal report describes why I would have expected much higher mobility of the Class Members between Defendants, absent the restrictions." | Clarification |
| 81. | 528 | 24 | "Yes." | "I prepared a rebuttal report that was served May 30 and then I updated that rebuttal report for June 30." | Clarification; to conform the record to the facts |

10

# ZIELINSKI EXHIBIT 7 (FILED UNDER SEAL)

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

- - - - - - - - - - - - - - x

IN RE:  OUTPATIENT MEDICAL :

CENTER EMPLOYEE ANTITRUST  : Master Docket No.

LITIGATION                 : 1:21-cv-00305-SRH-YBK

- - - - - - - - - - - - - - x


HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER


Videotaped Deposition of

EVAN P. STARR, Ph.D.


Baltimore, Maryland

Wednesday, March 19, 2025

9:24 a.m.


Job No. 577303

Pages:  1 - 271

Reported by:  Janet A. Hamilton, RDR

HIGHLY CONFIDENTIAL
Transcript of Evan P. Starr, Ph.D.
Conducted on March 19, 2025                                    2

Videotaped Deposition of EVAN P. STARR,

Ph.D., held at the office of:




        Kramon & Graham, P.A.

        750 East Pratt Street

        Suite 1100

        Baltimore, Maryland   21202-3201

        410.752.6030











        Pursuant to Notice, before Janet A.

Hamilton, Registered Diplomate Reporter and Notary

Public in and for the State of Maryland.

HIGHLY CONFIDENTIAL

Transcript of Evan P. Starr, Ph.D.
Conducted on March 19, 2025                    3

                  A P P E A R A N C E S

    ON BEHALF OF THE PLAINTIFFS:

          DEAN M. HARVEY, ESQUIRE

          SARAH D. ZANDI, ESQUIRE

          LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

          275 Battery Street, 29th Floor

          San Francisco, California  94111-3339

          415.956.1000

    -And-   EMILY HARWELL, ESQUIRE (via Zoom)

          250 Hudson Street, 8th Floor

          New York, New York  10013

          212.355.9500


    ON BEHALF OF DEFENDANT DaVITA, INC.:

          MORGAN LEWIS & BOCKIUS LLP

          J. CLAYTON EVERETT, JR., ESQUIRE

          1111 Pennsylvania Avenue, NW

          Washington, DC  20004-2541

          202.739.3000

    -And-   NATHAN T. SHAPIRO, ESQUIRE

          101 Park Avenue

          New York, New York  10178-0060

          212.309.6000

HIGHLY CONFIDENTIAL
Transcript of Evan P. Starr, Ph.D.
Conducted on March 19, 2025                4

A P P E A R A N C E S   C O N T I N U E D


-And-    KENNETH M. KLIEBARD, ESQUIRE

         110 North Wacker Drive

         Chicago, Illinois  60606

         312.324.1000


-And-    MOLLY MORIARTY LANE, ESQUIRE (via Zoom)

         One Market, Spear Street Tower

         28th Floor

         San Francisco, California  94105-1596

         415.442.1333


-And-    JOHN C. DODDS, ESQUIRE

         2222 Market Street

         Philadelphia, Pennsylvania  19103-3007

         215.963.5000

HIGHLY CONFIDENTIAL
Transcript of Evan P. Starr, Ph.D.
Conducted on March 19, 2025                    5

A P P E A R A N C E S   C O N T I N U E D

ON BEHALF OF DEFENDANTS UNITED SURGICAL PARTNERS

HOLDINGS, INC., UNITED SURGICAL PARTNERS

INTERNATIONAL, INC., and TENET HEALTHCARE

CORPORATION:

        KING & SPALDING LLP

        EMILY NEWTON, ESQUIRE (pro hac vice)

        LAUREN SMITH, ESQUIRE

        JACOB (JAY) PAOLILLO, ESQUIRE (via Zoom)

        1180 Peachtree Street, NE

        Suite 1600

        Atlanta, Georgia  30309

        404.572.2745


-And-   VERONICA MOYÉ, ESQUIRE (pro hac vice)

        1185 Avenue of the Americas

        34th Floor

        New York, New York  10036

        212.556.2100

HIGHLY CONFIDENTIAL

Transcript of Evan P. Starr, Ph.D.
Conducted on March 19, 2025                6

       A P P E A R A N C E S   C O N T I N U E D


    ON BEHALF OF DEFENDANTS SURGICAL CARE

    AFFILIATES, LLC and SCAI HOLDINGS LLC:

         McGUIREWOODS LLP

         SARAH A. ZIELINSKI, ESQUIRE

         AMY B. MANNING, ESQUIRE

         77 West Wacker Drive

         Suite 4100

         Chicago, Illinois  60601-1818

         312.849.8100

 -And-   JOSHUA D. WADE, ESQUIRE

         Gateway Plaza

         800 East Canal Street

         Richmond, Virginia  23219-3916

         804.775.1000


    ON BEHALF OF DEFENDANT ANDREW HAYEK:

         WILSON SONSINI GOODRICH & ROSATI, P.C.

         JORDANNE M. STEINER, ESQUIRE (pro hac vice)

         1700 K Street, NW, Fifth Floor

         Washington, DC  20006

         202.920.8703

A P P E A R A N C E S   C O N T I N U E D


ON BEHALF OF DEFENDANT KENT THIRY:

     McDERMOTT WILL & EMERY LLP

     DANIEL R. CAMPBELL, ESQUIRE (via Zoom)

     KATHARINE M. O'CONNOR, ESQUIRE (via Zoom)

     444 West Lake Street

     Suite 400

     Chicago, Illinois  60605

     312.372.2000


ALSO PRESENT:

     ANDREW MOHRAZ, ESQ., Associate General

        Counsel, DaVita, Inc.

     ADAM NUDELMAN, Videographer

     SOPHIE MEADOWS, Edgeworth Economics

     ERIN JOHNSON, Ph.D., NERA

     WENDY L. PETROPOULOS, Ph.D.

        Cornerstone Research

     MICHELE CARTER, Cornerstone Research

C O N T E N T S

EXAMINATION OF EVAN P. STARR, Ph.D.            PAGE

   By Mr. Everett                                12




                    E X H I B I T S

              (Attached to the transcript)

STARR DEPOSITION

Exhibit DX 82      Expert Report of

                   Dr. Evan P. Starr

Exhibit DX 83      List of corrections to

                   Report of Dr. Evan P. Starr

HIGHLY CONFIDENTIAL
Transcript of Evan P. Starr, Ph.D.
Conducted on March 19, 2025                    9

THE VIDEOGRAPHER: This is media unit number 1 in the videotaped deposition of Evan Starr in the matter of In Re: Outpatient Medical Center Employee Antitrust Litigation in the US District Court for the District, Northern District of Illinois, Eastern Division, Case Number 1:21-cv-00305. Today's date is March 19, 2025. Time on the record is 9:24 a.m. Videographer today is Adam Nudelman representing US Legal.

Would all attorneys present please identify themselves, state whom they represent, beginning with the party noticing the proceeding.

MR. EVERETT: Good morning. This is Clay Everett from Morgan Lewis & Bockius on behalf of DaVita.

MR. SHAPIRO: Nathan Shapiro, Morgan Lewis & Bockius on behalf of DaVita.

MR. KLIEBARD: Good morning. Ken Kliebard from Morgan Lewis & Bockius --

THE REPORTER: I can't hear you, sir.

MR. KLIEBARD: Oh, sorry. Ken Kliebard, K-L-I-E-B-A-R-D, also with Morgan Lewis & Bockius, on behalf of DaVita.

MS. CARTER: Michele Carter, Cornerstone

HIGHLY CONFIDENTIAL

Transcript of Evan P. Starr, Ph.D.

Conducted on March 19, 2025                    10

Research for defendants.

MS. MOYE:  Veronica Moyé, that's M-O-Y-É, King & Spalding, for USPI and Tenet.

MS. NEWTON:  Emily Newton also from King & Spalding for the Tenet and USPI defendants.

MS. MANNING:  Amy Manning of McGuireWoods for SCA.

MS. ZIELINSKI:  Sarah Zielinski of McGuireWoods for SCA.

MS. ZANDI:  Sarah Zandi, Lieff Cabraser Heimann & Bernstein for plaintiffs.

MR. HARVEY:  Dean Harvey of Lieff Cabraser for the plaintiffs.

MR. WADE:  Joshua Wade of McGuireWoods for SCA.

MR. DODDS:  Jack Dodds from Morgan Lewis for DaVita.

MR. MOHRAZ:  Andrew Mohraz, M-O-H-R-A-Z, in-house counsel for DaVita.

MS. STEINER:  Jordanne Steiner from Wilson Sonsini Goodrich & Rosati on behalf of defendant Andrew Hayek.

MS. SMITH:  Lauren Smith with King & Spalding on behalf of USPI.

HIGHLY CONFIDENTIAL
Transcript of Evan P. Starr, Ph.D.
Conducted on March 19, 2025                    11

MR. HARVEY:  Could those attending remotely also state their appearance, please.

If we can hear them.

THE VIDEOGRAPHER:  Has anyone checked to see if --

MS. ZANDI:  I think we might have muted them.  The screen is showing -- I'll let you look.

THE VIDEOGRAPHER:  Repeat it.  Would the Zoom participants repeat the intros.

MR. HARVEY:  Zoom folks?  Yeah.

MR. CAMPBELL:  Sure.  You've got Dan Campbell from McDermott Will & Emery on behalf of defendant Kent Thiry.

MS. O'CONNOR:  Kate O'Connor from McDermott Will & Emery on behalf of Kent Thiry.

MS. LANE:  Molly Lane from Morgan Lewis & Bockius on behalf of DaVita.

MS. JOHNSON:  Erin Johnson from NERA -- that's N-E-R-A -- on behalf of DaVita.

MS. PETROPOULOS:  Wendy Petropoulos, Cornerstone.

MS. MEADOWS:  Sophie Meadows from Edgeworth Economics.

MR. PAOLILLO:  Jay --

09:26:19
09:26:20
09:26:25
09:26:31
09:26:36
09:26:39
09:27:10
09:27:14
09:27:23
09:27:25
09:27:26
09:27:31
09:27:32
09:27:34
09:27:37
09:27:38
09:27:44
09:27:46
09:27:50
09:27:52
09:27:54
09:27:57
09:28:02

HIGHLY CONFIDENTIAL
Transcript of Evan P. Starr, Ph.D.
Conducted on March 19, 2025                    12

          THE REPORTER:  I'm sorry.  Say that again,
please.

          MR. PAOLILLO:  Jay, J-A-Y, Paolillo,
P-A-O-L-I-L-L-O, from King & Spalding for USPI and
Tenet.

          MS. HARWELL:  Emily Harwell from Lieff
Cabraser for the plaintiffs.

          MR. HARVEY:  Anyone else?  Okay.

          THE VIDEOGRAPHER:  Court reporter today,
Jan Hamilton, also with US Legal, will now
administer the oath.  You can proceed.

                P R O C E E D I N G S

                     -----

          EVAN P. STARR, Ph.D.,
a witness herein, being duly sworn, testified as
follows:

 EXAMINATION BY COUNSEL FOR DEFENDANT DAVITA, INC.
BY MR. EVERETT:

    Q  Good morning, Dr. Starr.  So I'm Clay
Everett, as I've just announced, representing
DaVita.

        We haven't met before, have we?

    A  Not to my knowledge.

    Q  You've had your deposition taken in the

HIGHLY CONFIDENTIAL

Transcript of Evan P. Starr, Ph.D.

Conducted on March 19, 2025                    21

Q   Have you ever otherwise testified live in court?

A   I presume testimony in front of the US Senate and the US House would not count as testifying live in court.  This is different testimony.  Yes.  So I think if you're asking have I testified live in court, aside from that one arbitration case, then I think the answer is no.

Q   You served an expert report in this matter on January 15th, 2025; is that correct?

A   I believe that was right.

Q   And then you made some corrections to that expert report; is that correct?

A   That's correct.

Q   And served a revised report that incorporated those corrections; correct?

A   That's right.

Q   What were the circumstances that led you to preparing the corrected report?

MR. HARVEY:  Let me just caution the witness not to reveal the content of any communications you had with plaintiffs' counsel or with other consulting or testifying experts.

A   Can you repeat the question?

Q   What were the circumstances that led you to serve the corrected expert report?

A   As I was rereading the report after we submitted it, I noticed several formatting problems that were unexpected and, and changed, and I wanted to correct those; and so that's -- and then in rereading the report there were several small substantive changes that, that I thought, as someone who cares about the quality of their work, I wanted to make sure that those small substantive changes were -- nonsubstantive changes were corrected.

Q   Are you working with any consulting firm, economic consulting firm or other consulting firm, in relation to the work that you performed in this case?

A   I had a team that was operating under my direction, but I'm not employed by a consulting firm.

Q   What's the name of the firm?

A   Econ One.

Q   And who on that team worked with you?

A   Augustus Urschel and Madeleine Bowe.

Q   So let's -- let's mark now your corrected

09:39:33
09:39:36
09:39:40
09:39:44
09:39:47
09:39:54
09:39:58
09:40:01
09:40:06
09:40:09
09:40:12
09:40:16
09:40:20
09:40:25
09:40:28
09:40:32
09:40:34
09:40:39
09:40:44
09:40:47
09:40:50
09:40:52
09:40:58
09:41:07

HIGHLY CONFIDENTIAL
Transcript of Evan P. Starr, Ph.D.
Conducted on March 19, 2025                23

expert report which I think for the videographer is document B to pull up on the Zoom, and we'll mark this as Defendants' Exhibit 82.

(DX Exhibit 82 was marked for identification.)

Q  So Dr. Starr, what's been presented to you has been marked as Defendants' Exhibit 2 which I'll, I'll aver for you is the corrected expert witness report that you served in this matter.  If you could just confirm that that is, in fact, what Defendants' Exhibit 82 is?

A  There are a lot of pages here, so I'll, I'll take your word for it that this is the updated report.

Q  Okay.  But it looks like the updated report?

A  It looks like the updated report.

Q  And this report contains a written summary of all of the opinions that you intend to testify to in this case; is that correct?

A  It does, with one small exception, which is that as I was rereading the report over the last few days I found a few more small non, nonsubstantive errors that I would like to, to

HIGHLY CONFIDENTIAL
Transcript of Evan P. Starr, Ph.D.
Conducted on March 19, 2025                     35

roles as alleged in the Complaint, and that then directs your future inquiry. And then you learn about -- when you read those depositions, you learn about the existence of these documents. You learn about the FBI interviews, and so then you go read those. And so that's the approach that I took in this case. That's the approach that I take when I'm doing any academic inquiry.

Q And of the 27 depositions that are identified, or deposition transcripts that are identified in your appendix and materials relied upon, did you review those entire deposition transcripts?

A I read all of the deposition testimony that -- that we cite here. I don't know if I read every single word of every one, but I -- I read all of the documents and evidence that we cite in those depositions here.

Q And you as a -- a fair and academic expert would take into account evidence both -- that is both consistent with the conclusions that you are seeking to draw or opinions you're seeking to draw and inconsistent; is that correct?

A In the pursuit of answering the task at

09:57:37
09:57:43
09:57:45
09:57:46
09:57:50
09:57:53
09:57:57
09:57:58
09:58:00
09:58:03
09:58:05
09:58:08
09:58:11
09:58:12
09:58:16
09:58:19
09:58:24
09:58:28
09:58:30
09:58:36
09:58:40
09:58:44
09:58:48
09:58:51

HIGHLY CONFIDENTIAL
Transcript of Evan P. Starr, Ph.D.
Conducted on March 19, 2025

36

hand, then I would consider all of the evidence and I would -- I'm not sure I understood your question, but it seemed to suggest that there would be a preordained answer. And there was no preordained answer. It was guided by the qualitative and quantitative evidence.

Q And you, in paragraph 12(a)i summarize opinions that you intend to offer about agreements between defendants relating to solicitation of employees; is that correct?

A That's right.

Q And there you state that the evidence you reviewed shows that SCA and DaVita and SCA and USPI agreed not to solicit each other's employees, including but not limited to senior employees, without their knowledge or consent.

Is that correct? That's an opinion that you have?

A That's -- that's correct here.

Q Okay. There's no reference there to an opinion about any sort of nonsolicitation agreement between DaVita and USPI; is that correct?

A I wasn't asked to look into the -- any

sort of agreement between DaVita and USPI.

Q  That was outside the scope of your assignment?

A  It was.

Q  So your assignment was limited to assessing whether the evidence was consistent with anticompetitive conduct and inconsistent with unilateral conduct with regard to a -- an alleged agreement between DaVita and SCA concerning solicitation of employees; is that correct?

MR. HARVEY:  Objection.  Compound.

A  I want to make sure I understand.  Are you asking me if what was asked of me was to look at only the DaVita and SCA alleged conduct?

Q  I'm trying to break it down.  So there are -- you reference in paragraph 12(a)i two different bilateral agreements relating to solicitation of employees; correct?

A  That's correct, yes; the bilateral meaning SCA and DaVita and separately SCA and USPI.

Q  Okay.  So two separate bilateral nonsolicitation or solicitation agreements; correct?

A  Yes, and it's more just the not

soliciting, but I suppose we'll get into that later.

Q   And you were not asked to assess whether the evidence is consistent or inconsistent with anticompetitive conduct with regard to any solicitation agreement between USPI and DaVita; correct?

A   That's correct.  I was not asked to look into USPI and DaVita as it relates to a nonsolicitation no-poach agreement.

Q   Okay.  And so when asked to look at it, you didn't look at it; correct?

A   I didn't look at it.

Q   And you're not offering an opinion that there was such an agreement; is that correct?

A   As written here, I have no opinion on the existence or nonexistence of an agreement between DaVita and USPI.

Q   Okay.  So you say that the, the solicitation agreements included but were not limited to senior employees; is that correct?

A   That's what I wrote, yes.

Q   Do you intend to offer any opinions about agreements relating to solicitation that covered

employees who were not senior employees?

A  My task was to look at the, the qualitative and quantitative evidence and to assess the challenged conduct among class members, which I understand to be senior-level employees and above; and so while some of the qualitative evidence is suggestive that the no-poach agreements extended beyond senior-level employees, I'm not offering an opinion as to anybody beyond class members.

Q  Okay.  So your opinions relating to agreements concerning solicitation are limited to senior employees; correct?

A  Again, so as I, as I just said, the evidence does suggest that the no-poach agreements could have been broader than just the senior-level employees; but I don't have an opinion, and I haven't focused on, the nonsenior-level employees, the nonclass members here because my task was to estimate the harm to class members.

Q  So if you look at the first sentence of paragraph 12(a)i, you reference the, your review of qualitative evidence; correct?

A  Correct.

HIGHLY CONFIDENTIAL

Transcript of Evan P. Starr, Ph.D.
Conducted on March 19, 2025

40

Q  And you reference agreements so as to restrict competition for each other's employees; is that correct?

A  Yes.

Q  You're not offering opinion about what the purpose of the underlying agreements to the extent that they existed were, are you?

A  I don't have any opinions on the motivations for why these were gotten into.  I don't have any opinions on the, what exactly the executives we are talking about had in their heads when they were agreeing to these.

I don't have an opinion on even the existence of these agreements themselves.  The evidence I was looking for is the evidence consistent with the no-poach agreements, the qualitative and quantitative evidence, is it consistent with no, with no-poach agreements, and then what are the effects of those agreements.

Q  And it's outside the scope of your expertise to assess the motivations or reasons why parties may have entered into agreements of the type that you're assessing; correct?

MR. HARVEY:  Objection to form.

10:04:31
10:04:35
10:04:40
10:04:40
10:04:41
10:04:44
10:04:49
10:04:54
10:04:56
10:05:01
10:05:05
10:05:10
10:05:14
10:05:15
10:05:18
10:05:21
10:05:24
10:05:26
10:05:28
10:05:35
10:05:38
10:05:44
10:05:47
10:05:51

A   I don't have any opinions on the motivations for entering into them in this case. I can speak to the motivations in the literature, in the academic literature; but in this particular case, I don't have any opinions on the motivations of the executives and why they got into these agreements.

Q   Okay.  So then if we, if we move on to sub or romanette 2 in 12(a) of your corrected expert report, you reference CSI exchanges; is that correct?

A   Yes.

Q   And you describe there your conclusions or opinions relating to the exchange of information between certain of the defendants; correct?

A   Yes.

Q   And again, you discuss information exchanges that are bilateral; correct?

A   Yes.  I discuss CSI exchanges between DaVita and SCA, and SCA and USPI.

Q   So two bilateral exchanges of information: One between SCA and USPI, and the other between SCA and DaVita; correct?

A   That's right.

Q   And you say in paragraph 12(a)ii that those exchanges of information indicate, number one, that each defendant in the pair considered the other defendant a relevant labor market competitor.

Did I read that correctly?

A   That's right.

Q   And is that your opinion?

A   That is -- that's my opinion, yes.

Q   And what do you mean by "relevant labor market competitor"?

A   What I mean by a relevant labor market competitor is that if, if you were -- the only reason that you would seek out compensation information from another company is because you consider them a relevant competitor.

Q   And by "relevant competitor," you mean another company that would be operating in the same market for employees?

A   Labor market, yes.

Q   Labor?

A   Labor market.

Q   And you reference the relevant labor market; correct?

10:07:19
10:07:26
10:07:30
10:07:34
10:07:37
10:07:39
10:07:40
10:07:40
10:07:42
10:07:44
10:07:47
10:07:49
10:07:52
10:07:57
10:07:59
10:08:03
10:08:07
10:08:10
10:08:14
10:08:18
10:08:22
10:08:23
10:08:25

information between USPI and DaVita; is that correct?

A    The question was -- sorry.  There was a reference to the non, the no-poach agreements and to the CSI exchanges.

Is your -- is your question that my analysis is -- is focused only on the SCA and DaVita CSI exchanges and the SCA-USPI CSI exchanges, but is not focused on the DaVita USPI exchange?  Is that what your question is?

Q    Even beyond focus.  Are you offering any opinions about exchange of information between USPI and DaVita?

A    I was not asked to look into any information exchanges between USPI and DaVita.  I don't have any opinions on it.

Q    It's outside the scope of your assignment; correct?

A    It was outside the scope of my assignment.

Q    And it's not something you looked at?

A    It's not something that I looked at.

Q    And you have no opinions about it?

A    I have no opinions on it.

Q    Okay.  In the -- and then going back to

12(a) romanette ii, you write that the CSI exchanges indicate, number 2, that they allowed them, the two bilateral participants and bilateral exchanges, to coordinate on pay levels or increases, potentially lowering class pay; correct?

A   Yeah.

Q   You're not offering any opinion that the exchanges of information resulted in actual coordination of pay levels, are you?

A   The evidence that, that I reviewed here in my conclusions relate to the sharing of this information; and I don't have an opinion on exactly how that information was then taken in and used in decision-making.

Q   Okay.  And so, again, just to be clear, you're not offering the opinion that the defendants actually did coordinate pay levels?

A   As I wrote here, it allowed them to coordinate should they want to because now they have information.

Q   But it did not -- you're not offering an opinion, are you, that the defendants actually coordinated pay levels; correct?

HIGHLY CONFIDENTIAL
Transcript of Evan P. Starr, Ph.D.
Conducted on March 19, 2025                                    46

A  I'm not offering an opinion on whether they actually coordinated pay levels.

Q  And you're not offering an opinion that the defendants actually coordinated compensation, are you?

A  Can you explain what the difference is with that question and the other one?

Q  I, I just wanted to make sure that I'm not missing something with pay levels.

A  I see.  Well, my analysis, at the end of the day, is about the quantitative harms from both of these sets of conduct; and I'm not offering an opinion on whether they actually coordinated on exactly the pay levels.

Q  Or coordinated on pay levels at all; correct?

A  Again, I feel like I've answered that question.  I'm not sure what the difference is. Maybe you can explain it to me.

Q  Well, you -- you introduced something that wasn't in my question, which is in your answer you indicated that you were not offering an opinion about the specific pay levels.

A  Mm-hmm.

HIGHLY CONFIDENTIAL

Transcript of Evan P. Starr, Ph.D.
Conducted on March 19, 2025                    47

Q  My question is to some extent broader.  It is you are not offering any opinion that the defendants actually coordinated pay levels; correct?

A  I see.  Sorry.  A little -- I'm not offering opinion on whether the defendants coordinated pay levels.  That's correct.

Q  So then going back just to finish out the first opinion to the nonsolicitation opinions -- are you following me -- that are -- your opinions with regard to nonsolicitation are described in paragraph 12(a) romanette i; correct?

MR. HARVEY:  Objection.  Vague.

A  I think -- if we could get on the same page about language.

Q  Yeah.  Sure.

A  Because it -- it would help me.  In my report, throughout the report, I use the term no-poach agreements, and because I've studied a variety of -- of nonsolicit and noncompete and related clauses, nonsolicitation has a particular meaning in the way that I've typically used it, and so if we could keep with the no-poach agreement language, that would just help me stay

on the same page.

Q  What's your -- in the -- in your understanding, based on your experience, what is a nonsolicitation agreement?

A  Typically a nonsolicitation agreement is a term in an employment contract that an employee would sign which stipulates that they won't reach out to former clients or customers or co-workers that they previously worked with after they were to leave typically again for a set amount of time after they leave.

Q  Okay.  And, again, just to differentiate that in your mind and to be clear why you're asking for the terminology no-poach to be used, the difference that you're drawing, or distinction that you're drawing, is that in your mind nonsolicitations are limited to agreements between employers and their employees; is that correct?

A  There's two distinctions.  One is that, yes, in the way that I've typically used these terms, a nonsolicit contract would be one between an employer and an employee, but the second is that the agreements in this case that are called no-poach agreements, those have been traditionally

HIGHLY CONFIDENTIAL
Transcript of Evan P. Starr, Ph.D.
Conducted on March 19, 2025                    131

conduct using common methods and evidence.    13:17:47

Q  Yeah.  So you haven't done a relevant    13:17:50
market analysis; correct?    13:17:52

A  I wasn't asked --    13:17:53

MR. HARVEY:  Objection to form.    13:17:54

A  Let me repeat what I just said.  I wasn't    13:17:55
asked to do a relevant market analysis, however    13:17:56
you're referring to that, and I did not do one.    13:17:59

Q  A clear indication of who -- which    13:18:03
employers might be able to employ individuals with    13:18:07
readily transferrable skills is the employer from    13:18:12
which an employee was hired.    13:18:17

Is that fair?    13:18:21

MR. HARVEY:  Objection to form.    13:18:23

A  I'm sorry.  I found the question    13:18:26
confusing.  Could you restate it?    13:18:27

Q  Sure.  So there are lots of people that    13:18:28
during the conduct period at issue in this case    13:18:30
moved from other employers to, for instance,    13:18:35
DaVita or SCA or USPI; correct?    13:18:40

MR. HARVEY:  Objection to form.    13:18:44

A  Among -- among the class members, during    13:18:48
the window of data that we have, which again is    13:18:53
approximately 2008, which is the start of the SCA    13:18:57

data up until 2022, we do see senior-level employees moving between SCA and USPI and SCA and DaVita.

Q  And from other employers as well; correct?

A  In the data that's provided, we only have payroll records -- sorry.  We have a lot of data from only these three companies.  So if I see an individual in the data, let's say, at SCA and they move to DaVita within the time period for which I have data, I can observe that move.  If they moved to another company outside of the three companies for which I have access to the data, I don't know what kind of job they took.

Q  There is data that would allow you to determine what job they took and which employer; correct?

MR. HARVEY:  Objection to form.

A  I wasn't asked to -- to look into that. There may be data that you could use to -- to assess that, but it wasn't one of my assignments.

Q  But you'd agree with me that if -- and you focused on departure so let's focus on departures first.

You would agree with me, would you not,

that if a senior-level employee departed, say, DaVita for another employer, then that employer is clearly a relevant employment alternative for that employee; correct?

MR. HARVEY: Objection to form.

A Yes. If a -- if a senior level employee left for a fourth company outside of this, then whoever the -- let's say they left from SCA, and we'll call the other company, company A. That's going to get confusing -- company D. If they left SCA and they moved to company D, then SCA and company D, I would say, are labor market competitors for that worker.

Q Okay. And -- and you've done some analysis of the number and percentage of departures by senior-level employees to the other defendants; is that correct?

A I have, yes.

Q Okay. And that's -- that's actually reflected, is it not, in your expert report in figures 2 and 3, the results of that analysis?

Let's look at figure 2.

A Which page is that on?

Q That's on page 80.

A   Okay.

Q   All right.  So in figure 2 you provide some graphs showing the number of departures that are moves between covered defendants.  That's one graph; is that right?

A   That's right.

Q   And another graph that is the percentage of departures that are moved between covered defendants; correct?

A   That's right.

Q   Okay.  So, first of all, just in terms of the raw numbers, it appears that in the period that you analyzed, from 2008 to 2022, the number of departures from any of the defendants that moved to another covered defendant were between roughly 1 and 11.

Does that seem right?

A   Yeah.  And we should be clear here.  By the term, covered defendants, as I'm using it, as a result of the bilateral nature of these agreements, I was calling -- the covered defendants would be those who are in the bilateral relationship.  So SCA to DaVita would be covered defendants, and SCA to USPI and vice versa would

It's certainly the case that the defendants hired more than, for instance, five individuals in 2008 at the senior level and above; correct?

A   Again, I'd have to look at the evidence there; but the thing is about hiring is that it could come from internally versus externally.

Q   Mm-hmm.

A   And so, you know, I think your point is that another way to normalize the numbers in the left panel is to, instead of divide by the percentage of departures, to divide by the percentage of hires.

And I didn't do that, but what I -- when we do look at moves between covered defendants, those are both a departure and then a, and then a subsequent hire.

Q   Right.  So it is symmetrical in the sense that at least on the left panel the departures that moved between covered defendants, those are also by definition hires --

A   Hires.

Q   -- by the covered defendants?

A   Sorry.  I talked over you.  Yes.

HIGHLY CONFIDENTIAL
Transcript of Evan P. Starr, Ph.D.
Conducted on March 19, 2025                    147

Q  Okay.                                                      13:37:33

A  I was just glad we were understanding each                13:37:33
other.                                                        13:37:36

Q  Yeah, yeah, I appreciate that.                            13:37:37

And my question is really just that in the                   13:37:38
same symmetrical way, to the extent that there               13:37:41
were hires from other employers, those other                 13:37:47
employers would also be relevant competitors in              13:37:50
the relevant labor market for those employees.  Do           13:37:56
you agree with that?                                         13:38:00

A  Yes.  Let me put it in my own words, so to                13:38:00
maybe by example.  So if DaVita wants to hire a              13:38:04
director from company E, then I would say -- and             13:38:09
they do so, I would say that DaVita and company E            13:38:13
are labor market competitors for that worker.                13:38:18

Q  And would -- and that other company E                     13:38:21
would be a competitive constraint on the exercise            13:38:26
of market power by DaVita with regard to that                13:38:30
employee; correct?                                           13:38:34

MR. HARVEY:  Objection to form.                              13:38:35

A  Well, I think when you think about the                    13:38:36
extent of, of competition among employers, the              13:38:40
way -- the way that economists have come to think            13:38:47
about this is that there is a, a job ladder that             13:38:51

workers are climbing, and some companies are happy paying lower wages and then suffering higher turnover. Other companies are happy to be paying higher wages suffering less turnover.

And so the existence of low-paying companies, that does set a, some pressure on companies that are willing to pay more; and the companies that are paying more, they put a little pressure on companies that are paying less; but it's not as if everybody is paying the exact same thing all at once.

Q Okay. So even for a particular title or, you know, particular role, there's not a single market clearing wage; is that right?

A In -- so in the classic economics theories we like to have supply and demand where we have a nice intersection, and there is a market clearing wage. In reality there is a differential pay across companies for the same jobs.

Q And within companies, too, right; differential pay?

A And even within companies, they, they can pay each other -- I mean broadly the companies can pay each other -- you know, within, within range

HIGHLY CONFIDENTIAL
Transcript of Evan P. Starr, Ph.D.
Conducted on March 19, 2025                    155

A   I'm -- I'm somewhat familiar with that.

Q   You haven't attempted to define a relevant market in this case, have you?

A   Well, when it comes to thinking about market power, my -- my reading and my understanding of those -- those documents is that there are several ways to demonstrate market power, and in the merger context, it can be hard to demonstrate market power because the merger hasn't happened.  And so there are several ways in that context to think about whether, you know, whether companies might have market power, and that would require defining a relevant market.

In this context I wasn't asked to study the relevant labor market and define the precise contours of the labor market.  I wasn't asked to figure out exactly which companies every worker was going -- every worker was going to or coming from.  I was asked to assess the harm done to the workers as a result of the alleged conduct, whether that conduct -- the evidence, qualitative and quantitative, was consistent with anticompetitive harm.

My understanding of this literature and

these documents is that you can establish market power through a market definition exercise, or you can establish it directly. And as I talk about later in my report, the evidence that I uncover from the wage suppression models constitute direct evidence of market power.

Q   Okay. It was a very long answer. My question was simple. You have not attempted to, nor have you defined a relevant market in this case; is that correct?

MR. HARVEY: Objection. Argumentative. Asked and answered.

A   I wasn't asked to define a relevant market, and I did not define a relevant market.

Did you want to go back to the --

Q   I'll get back to that in a minute. So my next question for you, sir, is whether you agree that defendants' challenged conduct could not have suppressed class member wages if defendants lacked market power over them.

Would you agree with that?

MR. HARVEY: Object to form.

A   Sorry. A lot of --

MR. HARVEY: Objection to form.

A   There were a lot of negatives in there. Could you restate the question?

Q   Yep.  Would you agree that defendants' challenged conduct could not have suppressed class member wages if defendants lacked market power over them?

MR. HARVEY:  Objection to form.

A   I think -- I think the -- the question that you're asking is let's imagine a world in which the defendants had no market power.  They had no power to set wages.

In that world is it possible that the conduct could have suppressed wages?  Is that your question?

Q   If you want to look, I'm actually reading from your report.

A   Okay.

Q   So my question is whether you agree with what you wrote, which is that defendants' challenged conduct could not have suppressed class member wages if defendants lacked market power over them?

MR. HARVEY:  Counsel, could you please identify where you're reading?

more disaggregated compensation data. So to harmonize it, we aggregated it all to the individual employee company level.

So I would -- I would now have a dataset where I observe individual A at DaVita in 2010. The defendants didn't give, harmonize time frames of the data. SCA only gave data that started in 2008. USPI and DaVita had data that started a little bit earlier, and so we call this an unbalanced panel in econometrics.

And so what the model does is it has to define for each company when does the conduct period start and stop, and so that's defined -- the conduct overall is defined. So this is at, remember, the individual company level, and the conduct varies at the -- sorry -- the individual company year level, and the conduct varies at the company year level, based on the record evidence that I analyzed previously.

And so the conduct variable is set to 2008 to 2019 for DaVita and SCA, and it's set to 2010 to 2019 for USPI based on the record evidence that's described previously.

And so for workers that are employed at

this time period -- they may have been employed for a year or two; they don't necessarily have to be employed over the whole time frame -- that this is the aggregate effect on their compensation during the conduct period was about negative 14.5 percent across each of the three defendants.

Q  So just at the last part I just want to make sure I understand.  So the 14.5 percent, is that at 14.5 percent suppression on an individual per year or over the entire time the individual's included in that class?

A  Thank you for that clarification.

This is per year, and this is for the typical class member regardless of which company you are at, because later we're going to disaggregate between companies.

Q  Okay.  But at least in terms of this model, this is across all three companies; correct?

A  That's right.

Q  Okay.  And I -- it was in your description -- thank you very much for that, by the way -- in your description of how you put together the model, but the data was harmonized at

14:43:44
14:43:46
14:43:49
14:43:53
14:43:55
14:43:59
14:44:03
14:44:06
14:44:10
14:44:18
14:44:23
14:44:24
14:44:26
14:44:28
14:44:31
14:44:33
14:44:35
14:44:37
14:44:41
14:44:41
14:44:43
14:44:47
14:44:49
14:44:50

HIGHLY CONFIDENTIAL
Transcript of Evan P. Starr, Ph.D.
Conducted on March 19, 2025

the individual company year level; correct?

A   That's right.

Q   And so, and that's based in part on the fact that DaVita's compensation data was at the annual level of aggregation?

A   That's right.

Q   Okay.  And then the other variables that you included in your model as control variables, did you also harmonize those to the annual level?

A   Yes.  As, as described in the control variables, I think I have approximately ten, ten control variables; and so it depends on which control variable that you're talking about, for example.

Some of them have natural variation across time.  So, for example, the state unemployment rate can vary from year to year, and so that is a state year variable.

State GDP per capita, that also can vary across time and state as well.  State healthcare expenditures per capita, again, that changes year to year.  Averager -- average manager earnings in that state in the industries by the defendants, that also changes year to year.

HIGHLY CONFIDENTIAL
Transcript of Evan P. Starr, Ph.D.
Conducted on March 19, 2025                    271

CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

I, Janet A. Hamilton, Registered Diplomate Reporter and Notary Public before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that review was not requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand this 22nd day of March, 2025.

Registered Diplomate Reporter

My commission expires

March 31, 2028

No. 577303

Re:    Deposition of **Evan P. Starr, Ph.D.**
       Date: 3/19/2025
       Case: Outpatient Medical Center Employee Antitrust Litigation, In Re:
       Return to: transcripts@planetdepos.com

| Page | Line | Correction/Change and Reason |
|------|------|------------------------------|
|  |  | See attached chart for corrections. |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

April 19, 2025

_____
(Date)

_____
(Signature)

No. 577303

Re:     Deposition of **Evan P. Starr, Ph.D.**
        Date: 3/19/2025
        Case: Outpatient Medical Center Employee Antitrust Litigation, In Re:
        Return to: transcripts@planetdepos.com

|  |  |  |
|--|--|--|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

April 19, 2025
_____          _____
        (Date)                          (Signature)

No. 577303

Re:     Deposition of **Evan P. Starr, Ph.D.**
        Date: 3/19/2025
        Case: Outpatient Medical Center Employee Antitrust Litigation, In Re:
        Return to: transcripts@planetdepos.com

ACKNOWLEDGMENT OF DEPONENT


I, Evan P. Starr, Ph.D., do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me and any corrections appear on the attached Errata sheet signed by me.

April 19, 2025  _____

     (Date)              (Signature)

**Errata for Volume 1 of the Expert Deposition of Evan P. Starr, Ph.D.**
*In Re Outpatient Medical Center Antitrust Litigation* (N.D. Ill.)
March 19, 2025

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 1 | 22 | 8 | "several small substantive changes" | "several small nonsubstantive changes" | Clarification |
| 2 | 23 | 7 | "Defendants' Exhibit 2" | "Defendants' Exhibit 82" | Clarification; to conform the transcript to the record |
| 3 | 40 | 5 | "You're not offering opinion about what the" | "You're not offering any opinion about what the" | Clarification |
| 4 | 41 | 9 | "romanette 2 in 12(a)" | "romanette ii in 12(a)" | Typographic error |
| 5 | 44 | 9–10 | "DaVita USPI exchange" | "DaVita-USPI exchange" | Typographic error |
| 6 | 46 | 24 | "Mm-hmm." | "Yes." | Clarification |
| 7 | 55 | 12 | "section V.B, 5.B, I review the evidence." | "section V.B, I review the evidence." | Clarification; to conform the testimony to the record |
| 8 | 57 | 5 | "subsection 5(b)ii of your report;" | "subsection V(B)ii of your report;" | Clarification; to conform the transcript to the record |
| 9 | 57 | 19 | "section 5(b)ii of your report;" | "section V(B)ii of your report;" | Clarification; to conform the transcript to the record |
| 10 | 58 | 19 | "the DaVita-SCA agreements beginnings" | "the DaVita-SCA agreement's beginnings" | Typographic error |
| 11 | 61 | 1–2 | "consistent with an anticompetitive conduct." | "consistent with anticompetitive conduct." | Clarification |
| 12 | 61 | 6-8 | "The evidence that I reviewed in part A is that suggests, yes, that there is a proactive recruitment restriction." | "The evidence that I reviewed in part A is that suggests, yes, that there is a proactive recruitment restriction." | Clarification |
| 13 | 62 | 15 | "section paragraph 70, sections (A)1, 2 and 3." | "paragraph 70, sections (A)i, ii and iii." | Clarification; to conform the testimony to the record |
| 14 | 63 | 14 | "no-poach agreements" | "no-poach agreement" | Clarification; to conform the |

1

3217488.4

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---|---|---|---|---|
| | | | | | testimony to the record |
| 15 | 63 | 16 | "SCA and DaVita agreements," | "SCA and DaVita's agreement," | Clarification; to conform the transcript to the record |
| 16 | 66 | 14 | "agreements" | "agreement" | Clarification; to conform the testimony to the record |
| 17 | 69 | 1 | "SCA DaVita agreement" | "SCA-DaVita agreement" | Typographic error |
| 18 | 74 | 14 | "SCA and USPI agreements" | "SCA and USPI agreement" | Clarification; to conform the transcript to the record |
| 19 | 74 | 20 | "page 78.6." | "page 78, point vi." | Typographic error; to conform the testimony to the record |
| 20 | 77 | 7 | "section 5" | "section V" | Typographic error; to conform the testimony to the record |
| 21 | 80 | 18 | "Oh yes." | "Oh. Yes." | Typographic error; clarification |
| 22 | 80 | 21 | "no-poach agreements" | "no-poach agreement" | Clarification; to conform the testimony to the record |
| 23 | 81 | 13 | "material modification." | "material modification?" | Typographic error |
| 24 | 85 | 22–23 | "the effects of all the subcomponents of the alleged misconduct" | "the effects of each subcomponent of the alleged misconduct" | Clarification; to conform the testimony to the record |
| 25 | 86 | 21 | "start middle of 2008" | "starts middle of 2008" | Typographic error |
| 26 | 90 | 13–14 | "sharing at CSI; correct?" | "sharing of CSI; correct?" | Typographic error; to conform the transcript to the record |
| 27 | 93 | 1 | "(Witness nodded.)" | "Yes." | Clarification |
| 28 | 96 | 9–11 | "and so this suggests that around 2009 the Hayek | "and so this suggests that around 2009 Hayek | Clarification |

2

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| | | | obtained planned wage increase from USPI," | obtained planned wage increase from USPI," | |
| 29 | 111 | 8–9 | "So that the class in this case" | "So the class in this case" | Clarification; potentially a typographic error |
| 30 | 114 | 5–6 | "and the senior—senior-senior executives" | "and the senior corporate officers" | Clarification; to conform the testimony to the record |
| 31 | 116 | 21 | "section 5" | "section V" | Typographic error |
| 32 | 120 | 15–17 | "And so how did you identify who were in the legal recruiting and HR departments?" | "And so how did you identify who were in the legal, recruiting, and HR departments?" | Typographic error; to conform the transcript to the record |
| 33 | 120 | 21–23 | "And at least it was your intent in the, in the data build to exclude everyone in the legal recruiting and HR departments;" | "And at least it was your intent in the data build to exclude everyone in the legal, recruiting, and HR departments;" | Typographic error; to conform the transcript to the record |
| 34 | 121 | 10–12 | "but so was the intention to exclude anyone from the legal recruiting and HR departments" | "but so was the intention to exclude anyone from the legal, recruiting, and HR departments" | Typographic error; to conform the transcript to the record |
| 35 | 121 | 21–22 | "And that would include anyone in the legal recruiting and HR departments?" | "And that would include anyone in the legal, recruiting, and HR departments?" | Typographic error; to conform the transcript to the record |
| 36 | 122 | 5–6 | "and that was to exclude everyone from the legal recruiting and HR departments;" | "and that was to exclude everyone from the legal, recruiting, and HR departments;" | Typographic error; to conform the transcript to the record |
| 37 | 122 | 12–13 | "Excluding those in legal recruiting and HR." | "Excluding those in legal, recruiting, and HR." | Typographic error; to conform the transcript to the record |
| 38 | 122 | 14–15 | "And if someone in the legal recruiting or HR departments was actually included" | "And if someone in the legal, recruiting, or HR departments was actually included" | Typographic error; to conform the transcript to the record |

3

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 39 | 130 | 11 | "in the healthcare industry, in the ASE" | "in the healthcare industry, in the ASC" | Typographic error |
| 40 | 154 | 3–7 | "The Horizontal Merger Guidelines are what the DOJ and FTC released as it relates to their thinking on competition is used related to horizontal competitors engaging in M&A and anticompetitive conduct." | "The Horizontal Merger Guidelines are what the DOJ and FTC released as it relates to their thinking on competition with respect to horizontal competitors engaging in M&A and anticompetitive conduct." | Clarification |
| 41 | 158 | 1 | "paragraph 12(E)" | "paragraph 12(e)" | Typographic error; to conform the transcript to the record |
| 42 | 171 | 6 | "Burdette and Mortenson" | "Burdett and Mortensen" | Typographic error |
| 43 | 177 | 18-19 | "just don't go after these workers that appears in the report as well." | "'just don't go after these workers' that appears in the report as well." | Clarification |
| 44 | 180 | 5-6 | "the conduct, reduced compensation and aggregate by 14.5" | "the conduct reduced compensation in aggregate by 14.5" | Clarification |
| 45 | 187 | 21 | "what would conduct have been" | "what would compensation have been" | Clarification |
| 46 | 193 | 7 | "To look at each year's again, we'd have to" | "To look at each year, again, we'd have to" | Clarification |
| 47 | 212 | 20 | "he has estimates that executives were harmed" | "he estimates that executives were harmed" | Clarification |
| 48 | 214 | 19 | "section 5" | "section V" | Typographic error; to conform the testimony to the record |
| 49 | 251 | 24 | "specific significant estimate" | "statistically significant estimate" | Typographic error |
| 50 | 267 | 16 | "section 9" | "section IX" | Typographic error; to conform the transcript to the record |
| 51 | 267 | 19 | "part 7(F)" | "part VII(F)" | Typographic error; to |

4

3217488.4

5

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
|   |         |         |               |           | conform the testimony to the record |

3217488.4

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

- - - - - - - - - - - - - x

IN RE:  OUTPATIENT MEDICAL :

CENTER EMPLOYEE ANTITRUST  : Master Docket No.

LITIGATION                 : 1:21-cv-00305-SRH-YBK

- - - - - - - - - - - - - x

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Videotaped Deposition of

EVAN P. STARR, Ph.D.

VOLUME 2

Baltimore, Maryland

Thursday, March 20, 2025

9:18 a.m.

Job No. 577304

Pages:  272 - 522

Reported by:  Janet A. Hamilton, RDR

Videotaped Deposition of EVAN P. STARR,

Ph.D., held at the office of:

Kramon & Graham, P.A.

750 East Pratt Street

Suite 1100

Baltimore, Maryland  21202-3201

410.752.6030

Pursuant to Notice, before Janet A.

Hamilton, Registered Diplomate Reporter and Notary

Public in and for the State of Maryland.

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS:

DEAN M. HARVEY, ESQUIRE

SARAH D. ZANDI, ESQUIRE

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

275 Battery Street, 29th Floor

San Francisco, California  94111-3339

415.956.1000


ON BEHALF OF DEFENDANT DaVITA, INC.:

MORGAN LEWIS & BOCKIUS LLP

J. CLAYTON EVERETT, JR., ESQUIRE

1111 Pennsylvania Avenue, NW

Washington, DC  20004-2541

202.739.3000

-And-   NATHAN T. SHAPIRO, ESQUIRE

101 Park Avenue

New York, New York  10178-0060

212.309.6000

(Appearances continued on next page)

HIGHLY CONFIDENTIAL

Transcript of Evan P. Starr, Ph.D., Volume 2

Conducted on March 20, 2025                    275

A P P E A R A N C E S   C O N T I N U E D

-And-    KENNETH M. KLIEBARD, ESQUIRE

         110 North Wacker Drive

         Chicago, Illinois  60606

         312.324.1000


-And-    MOLLY MORIARTY LANE, ESQUIRE (via Zoom)

         One Market, Spear Street Tower

         28th Floor

         San Francisco, California  94105-1596

         415.442.1333


-And-    JOHN C. DODDS, ESQUIRE

         2222 Market Street

         Philadelphia, Pennsylvania  19103-3007

         215.963.5000

(Appearances continued on next page)

A P P E A R A N C E S   C O N T I N U E D

ON BEHALF OF DEFENDANTS UNITED SURGICAL PARTNERS

HOLDINGS, INC., UNITED SURGICAL PARTNERS

INTERNATIONAL, INC., and TENET HEALTHCARE

CORPORATION:

      KING & SPALDING LLP

      EMILY NEWTON, ESQUIRE (pro hac vice)

      LAUREN SMITH, ESQUIRE

      1180 Peachtree Street, NE

      Suite 1600

      Atlanta, Georgia  30309

      404.572.2745


-And-   VERONICA MOYÉ, ESQUIRE (pro hac vice)

      1185 Avenue of the Americas

      34th Floor

      New York, New York  10036

      212.556.2100


(Appearances continued on next page)

A P P E A R A N C E S   C O N T I N U E D


ON BEHALF OF DEFENDANTS SURGICAL CARE

AFFILIATES, LLC and SCAI HOLDINGS LLC:

     McGUIREWOODS LLP

     SARAH A. ZIELINSKI, ESQUIRE

     AMY B. MANNING, ESQUIRE

     77 West Wacker Drive

     Suite 4100

     Chicago, Illinois  60601-1818

     312.849.8100

-And-   JOSHUA D. WADE, ESQUIRE

     Gateway Plaza

     800 East Canal Street

     Richmond, Virginia  23219-3916

     804.775.1000


ON BEHALF OF DEFENDANT ANDREW HAYEK:

     WILSON SONSINI GOODRICH & ROSATI, P.C.

     JORDANNE M. STEINER, ESQUIRE (pro hac vice)

     1700 K Street, NW, Fifth Floor

     Washington, DC  20006

     202.920.8703

A P P E A R A N C E S   C O N T I N U E D


ON BEHALF OF DEFENDANT KENT THIRY:

McDERMOTT WILL & EMERY LLP

DANIEL R. CAMPBELL, ESQUIRE (via Zoom)

KATHARINE M. O'CONNOR, ESQUIRE (via Zoom)

444 West Lake Street

Suite 400

Chicago, Illinois  60605

312.372.2000


ALSO PRESENT:

ANDREW MOHRAZ, ESQ., Associate General

Counsel, DaVita, Inc.

ADAM VAUGHN, Videographer

WENDY L. PETROPOULOS, Ph.D.

Cornerstone Research

MICHELE CARTER, Cornerstone Research

HIGHLY CONFIDENTIAL

Transcript of Evan P. Starr, Ph.D., Volume 2
Conducted on March 20, 2025

279

C O N T E N T S

EXAMINATION OF EVAN P. STARR, Ph.D.                    PAGE

By Mr. Everett                                        282

By Ms. Newton                                         445

By Ms. Zielinski                                      476

E X H I B I T S

(None marked)

THE VIDEOGRAPHER:  We are on the record at 9:18 a.m.  Audio and video recording will continue to take place.  All parties agree to go off record.  Please note the microphones are sensitive and may pick up whispering and private conversations.

This is the recorded proceeding of Dr. Evan P. Starr taken by counsel in the matter of Outpatient Medical Center Employee Antitrust Litigation.  This proceeding is taking place at Kramon & Graham, P.A., 750 East Pratt Street, Suite 1100, Baltimore, Maryland 21202.  My name is Adam Vaughn, and I am the videographer on behalf of US Legal Support located at 11625 North Chase Drive, Suite 900, Houston, Texas, 77060.

I am not related to any party in this action nor am I financially interested in the outcome.  The court reporter is Jan Hamilton on behalf of US Legal Support.  Counsel will state their appearances for the record, after which the court reporter will enter the statement for the proceeding into the record and swear in the witness.

MR. EVERETT:  This is Clay Everett from

Morgan Lewis for DaVita.

MR. SHAPIRO:  Nathan Shapiro, Morgan Lewis, for DaVita.

MR. KLIEBARD:  Good morning.  Ken Kliebard of Morgan Lewis, also on behalf of DaVita.

MS. CARTER:  Michele Carter, Cornerstone Research, for defendants.

MS. MOYÉ:  Veronica Moyé, King & Spalding, USPI and Tenet.

MS. NEWTON:  Emily Newton, King & Spalding, also for Tenet and USPI.

MS. MANNING:  Amy Manning, McGuireWoods, SCA.

MS. ZIELINSKI:  Sarah Zielinski, McGuireWoods, SCA.

MS. ZANDI:  Sarah Zandi, Lieff Cabraser Heimann & Bernstein for plaintiffs.

MR. HARVEY:  Dean Harvey, Lieff Cabraser for plaintiffs.

MR. WADE:  Joshua Wade, McGuireWoods for SCA.

MR. DODDS:  Jack Dodds, Morgan Lewis for DaVita.

MR. MOHRAZ:  Andrew Mohraz for DaVita.

MS. STEINER:  Jordanne Steiner, Wilson Sonsini Goodrich & Rosati for Andrew Hayek. 09:20:24 09:20:25

MS. SMITH:  Lauren Smith, King & Spalding, for USPI and Tenet. 09:20:28 09:20:30

MR. HARVEY:  And the Zoom?

P R O C E E D I N G S

-----

EVAN P. STARR, Ph.D., a witness herein, being duly sworn, testified as follows:

EXAMINATION BY COUNSEL FOR DEFENDANT DAVITA
MR. EVERETT:

Q  All right.  Good morning, Dr. Starr. 09:20:54

A  Good morning. 09:20:55

Q  Just I wanted to follow up real briefly on one thing from yesterday.  Yesterday you testified that in one of your academic papers you utilized a regression that incorporated a linear time trend. 09:20:56 09:20:59 09:21:01 09:21:06

Do you recall that? 09:21:09

A  Yes. 09:21:10

Q  Which -- which paper is that? 09:21:10

A  If I could look in my CV, I can give you the title. 09:21:13 09:21:17

Q  And while you're looking for it, just to 09:21:24

employee compensation?  Would that in your opinion  14:06:01

transmit across all class members?  14:06:05

MR. HARVEY:  Objection to form.  14:06:11

A  What do you mean by a narrow shock?  14:06:13

Q  I guess the opposite of what you mean by a  14:06:15

broad shock.  14:06:18

MR. HARVEY:  Objection to form.  14:06:18

A  So I think that the -- at issue in this  14:06:21

case are -- is the alleged misconduct which is  14:06:24

agreements not to poach each others' workers,  14:06:28

which consists of a direct prohibition on  14:06:31

solicitation and the tell-your-boss provision and  14:06:35

separately the CS -- the CSI exchanges.  And so  14:06:39

I'm not sure it's worth talking about narrow  14:06:44

shocks to an individual worker or not when the --  14:06:47

the conduct at issue in this case is clearly not  14:06:53

narrow.  14:06:56

The evidence is -- let me be clear.  The  14:07:00

evidence is consistent with the agreements at  14:07:03

issue in this case not being narrow.  The -- it's  14:07:04

possible at the same time -- and let me play with  14:07:09

your hypothetical for just a moment -- that if the  14:07:12

right worker is seen as a -- as a benchmark in a  14:07:16

certain job and that worker is able to leave, for  14:07:22

438

example, that that puts -- that gives information and competitive pressure for other workers.

I'll just give you one example that comes to mind off the top of my head. The example of Skip Thurman is an interesting one at DaVita, and Skip Thurman saw one of his co-workers, Bill Myers, leave, and he got a raise of ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮. And that helped Skip Thurman realize that he was being largely undercompensated relative to -- to what he could earn elsewhere. He described the no-poach agreements as, I believe, an invisible fence. He likened it to being in a kennel, and he realized that not only was he underpaid but others were also underpaid. And so based on his testimony, it seems to me possible that even just a handful of departures or a handful of effects that resulted from the no-poach agreement could -- could create broad effects that would affect other workers.

Q  Is that something you've tested?

A  What I've looked at in this case, as we've talked about several times, and forgive me if I sound like a broken record here, is whether the evidence in this case is consistent with

anticompetitive conduct, whether I can quantify the harms from the conduct, whether all or nearly all class members are harmed using common methods and evidence, and -- and that -- that's what I've done.

And so I haven't tested whether a single job mobility event or a single event of any kind, aside from what I was asked to do, I haven't looked at those individual events and tried to assess what impacts they have.

Q Is -- if there was a positive shock to compensation, would that also tend to filter through and impact every employee among the senior employees of defendants?

A So I'll just return, I think, to the example that we started with here, which is probably the easiest to understand, which is that if -- you imagine a world in which the defendants are sharing their raise information. And, again, just to give a purely hypothetical, suppose that SCA is thinking about raises of 4 percent and then they learn that DaVita and USPI are giving 2 percent raises. If they then give everyone a raise of 2 percent instead of 4 percent, that's

broadly felt.  If instead they were to go from 2 percent to 4 percent, again, that would be broadly felt.

Q  So you gave the example before of Skip Thurman.  Have you looked to see whether others who worked in a similar role as Mr. Thurman or Mr. Myers who Mr. Thurman was referring to got raises when -- when the information that you were talking about became available?

A  Yeah.  I'd love to talk about the common impact section in my report where we use a variety of methods to estimate whether all or nearly all members of the class were harmed, and so that would include Skip Thurman and -- and the others, subject to the caveat that they were in the director and above jobs.

Q  But -- but I think the example that you gave was that Mr. Thurman became aware of some other employee getting an offer with -- for substantially more compensation than he or -- or perhaps others in a similar role were being paid.

Did that positive shock result in an increase in pay for Mr. Thurman or others?

A  So my understanding of part of the Skip

14:10:14
14:10:17
14:10:20
14:10:21
14:10:26
14:10:29
14:10:33
14:10:38
14:10:43
14:10:47
14:10:50
14:10:53
14:10:56
14:10:58
14:11:02
14:11:04
14:11:06
14:11:09
14:11:15
14:11:19
14:11:23
14:11:27
14:11:31
14:11:39

HIGHLY CONFIDENTIAL
Transcript of Evan P. Starr, Ph.D., Volume 2
Conducted on March 20, 2025

522

CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

I, Janet A. Hamilton, Registered Diplomate Reporter and Notary Public before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that review was not requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand this 26th day of March, 2025.

Registered Diplomate Reporter

My commission expires

February 4, 2028

No. 577304

Re:      Deposition of **Evan P. Starr, Ph.D., Volume 2**
              Date: 3/20/2025
              Case: Outpatient Medical Center Employee Antitrust Litigation, In Re:
              Return to: transcripts@planetdepos.com

| Page | Line | Correction/Change and Reason |
|------|------|------------------------------|
|  |  | See attached chart for corrections. |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

April 19, 2025
_____
(Date)

_____
(Signature)

No. 577304

Re:    Deposition of **Evan P. Starr, Ph.D., Volume 2**
Date: 3/20/2025
Case: Outpatient Medical Center Employee Antitrust Litigation, In Re:
Return to: transcripts@planetdepos.com

| | | |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

April 19, 2025
_____      _____
(Date)                                (Signature)

No. 577304

Re:     Deposition of **Evan P. Starr, Ph.D., Volume 2**
        Date: 3/20/2025
        Case: Outpatient Medical Center Employee Antitrust Litigation, In Re:
        Return to: transcripts@planetdepos.com

ACKNOWLEDGMENT OF DEPONENT


I, Evan P. Starr, Ph.D., Volume 2, do hereby

acknowledge that I have read and examined the

foregoing testimony, and the same is a true, correct

and complete transcription of the testimony given by

me and any corrections appear on the attached Errata

sheet signed by me.


April 19, 2025

(Date)                                  (Signature)

**Errata for Expert Deposition of Evan P. Starr, Ph.D., Volume 2**
*In Re Outpatient Medical Center Antitrust Litigation* (N.D. Ill.)
March 20, 2025

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---|---|---|---|---|
| 1 | 285 | 2–3 | "'Low Wage Workers and the Enforceability of Noncompete Agreements,'" | "'Low-Wage Workers and the Enforceability of Non-Compete Agreements,'" | Typographic error; to conform the testimony to the record |
| 2 | 289 | 8–10 | "'Locked in Noncompete Enforceability in the Careers of High Tech Workers'" | "'Locked In? Noncompete Enforceability and the Careers of High Tech Workers'" | Typographic error; to conform the testimony to the record |
| 3 | 289 | 13–15 | "'Do Firms Value Court Enforceability of Noncompete Agreements: A Revealed Preference Approach,'" | "'Do Firms Value Court Enforceability of Noncompete Agreements? A Revealed Preference Approach,'" | Typographic error; to conform the testimony to the record |
| 4 | 298 | 16–18 | "'Employment Restrictions on Resource Transferability and a Value Appropriation From Employees';" | "'Employment Restrictions on Resource Transferability and Value Appropriation From Employees';" | Typographic error; to conform the testimony to the record |
| 5 | 315 | 23-24 | "They're all specifically significant" | "They're all statistically significant" | Typographic error |
| 6 | 317 | 21-23 | "done in section IV because it does get to the time trend issue here. So in section IV I recognize that," | "done in section VI because it does get to the time trend issue here. So in section VI, I recognize that," | Typographic error |
| 7 | 319 | 1 | "We're going to connect directors" | "We're going to compare directors" | Typographic error |
| 8 | 336 | 9–10 | "for leave USPI or SCA" | "for 'Leave for USPI or SCA'" | Clarification; to conform the transcript to the record |
| 9 | 349 | 13 | "but invested at some later point" | "but it vested at some later point" | Typographic error; clarification |
| 10 | 378 | 10 | "we use what the companies' provided with us." | "we use what the companies provided us with." | Clarification |
| 11 | 387 | 7 | "Mm-hmm." | "Yes." | Clarification |
| 12 | 392 | 24 | "paragraph 120(D)." | "paragraph 120(d)." | Typographic error; to |

1

3218799.4

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| | | | | | conform the testimony to the record |
| 13 | 393 | 11 | "paragraph D" | "paragraph (d)" | Typographic error; to conform the testimony to the record |
| 14 | 397 | 1 | "emergency declaration from the US wasn't until May" | "emergency declaration from the US declaring the pandemic over wasn't until May" | Clarification; to conform the testimony to the record |
| 15 | 405 | 2 | "all class members was harmed." | "all class members were harmed." | Typographic error |
| 16 | 406 | 8–9 | "Frischwaugh-Lovell theorem" | "Frisch-Waugh-Lovell theorem" | Typographic error |
| 17 | 406 | 11 | "The Frischwaugh-Lovell theorem." | "The Frisch-Waugh-Lovell theorem." | Typographic error |
| 18 | 408 | 3 | "effect between directors above and managers" | "effect between directors and above and managers" | Clarification |
| 19 | 414 | 22 | "paragraph 12(C)" | "paragraph 12(c)" | Typographic error; to conform the transcript to the record |
| 20 | 414 | 24 | "12(C) you said?" | "12(c) you said?" | Typographic error; to conform the testimony to the record |
| 21 | 415 | 6 | "12(C)," | "12(c)," | Typographic error; to conform the transcript to the record |
| 22 | 415 | 16 | "paragraph 12(C)" | "paragraph 12(c)" | Typographic error; to conform the transcript to the record |
| 23 | 416 | 9 | "section 12(C)" | "section 12(c)" | Typographic error; to conform the testimony to the record |
| 24 | 417 | 8 | "the harm to all or nearly all members" | "the harm to all or nearly all class members" | Clarification |

2

3218799.4

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 25 | 417 | 23 | "all or nearly all members were harmed" | "all or nearly all class members were harmed" | Clarification |
| 26 | 418 | 2 | "why all or nearly all members" | "why all or nearly all class members" | Clarification |
| 27 | 418 | 22–23 | "section VII.F.ii" | "section VII.F.1" | Typographic error; clarification; to conform the transcript to the record |
| 28 | 419 | 15 | "subsection VII.F.i." | "subsection VII.F.1" | Typographic error; clarification; to conform the transcript to the record |
| 29 | 421 | 2 | "subsection VII.F.i." | "subsection VII.F.1" | Typographic error; clarification; to conform the transcript to the record |
| 30 | 421 | 7–8 | "section VII—7.1" | "section VII.F.1" | Clarification; to conform the testimony to the record |
| 31 | 421 | 15 | "section VII.F.i" | "section VII.F.1" | Typographic error; clarification; to conform the transcript to the record |
| 32 | 421 | 17 | "section VII.F.i" | "section VII.F.1" | Typographic error; clarification; to conform the testimony to the record |
| 33 | 424 | 13-14 | "the compensation structures being the same across dependents is not necessary" | "the compensation structures being the same across defendants is not necessary" | Clarification |
| 34 | 442 | 11 | "all or nearly all members were" | "all or nearly all class members were" | Clarification |
| 35 | 443-444 | 22-1 | "the qualitative evidence shows that for the compensation generally at these companies is set with | "the qualitative evidence shows that the compensation generally at these companies is set with reference to a | Clarification |

3

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| | | | reference to a compensation structure." | compensation structure." | |
| 36 | 448 | 1–2 | "paragraph 101(A)." | "paragraph 101(a)." | Typographic error; to conform the transcript to the record |
| 37 | 448 | 7 | "101(B)" | "101(b)" | Typographic error; to conform the transcript to the record |
| 38 | 448 | 10 | "101(F)" | "101(f)" | Typographic error; to conform the transcript to the record |
| 39 | 448 | 13 | "101(G)" | "101(g)" | Typographic error; to conform the transcript to the record |
| 40 | 448 | 16 | "101(I)" | "101(i)" | Typographic error; to conform the transcript to the record |
| 41 | 448 | 19 | "101(K)" | "101(k)" | Typographic error; to conform the transcript to the record |
| 42 | 448 | 22 | "101(K)" | "101(k)" | Typographic error; to conform the transcript to the record |
| 43 | 459 | 12 | "paragraph 101(G)." | "paragraph 101(g)." | Typographic error; to conform the transcript to the record |
| 44 | 459 | 16 | "paragraph 101(G)" | "paragraph 101(g)" | Typographic error; to conform the transcript to the record |
| 45 | 460 | 12–13 | "I wrote 'in'" | "I wrote, 'In'" | Typographic error; to |

4

3218799.4

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
|  |  |  |  |  | conform the testimony to the record |
| 46 | 460 | 20 | "paragraph 101(K)" | "paragraph 101(k)" | Typographic error; to conform the transcript to the record |
| 47 | 461 | 9 | "paragraph K" | "paragraph k" | Typographic error; to conform the testimony to the record |
| 48 | 466 | 14 | "paragraph 101(C)" | "paragraph 101(c)" | Typographic error; to conform the transcript to the record |
| 49 | 466 | 21 | "101(J)" | "101(j)" | Typographic error; to conform the transcript to the record |
| 50 | 467 | 4 | "paragraph 101(N)," | "paragraph 101(n)," | Typographic error; to conform the transcript to the record |
| 51 | 467 | 7 | "paragraph 101(O)." | "paragraph 101(o)." | Typographic error; to conform the transcript to the record |
| 52 | 467 | 18 | "101(L)." | "101(l)." | Typographic error; to conform the transcript to the record |
| 53 | 468 | 7–8 | "In paragraph 101(C), you can flip to paragraph C," | "In paragraph 101(c), you can flip to paragraph c," | Typographic error; to conform the transcript to the record |
| 54 | 473 | 17 | "101(M)." | "101(m)." | Typographic error; to conform the transcript to the record |

5

3218799.4

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---|---|---|---|---|
| 55 | 477 | 21–22 | "paragraph E," | "paragraph e," | Typographic error; to conform the testimony to the record |
| 56 | 477 | 23 | "paragraph E" | "paragraph e" | Typographic error; to conform the testimony to the record |
| 57 | 478 | 1 | "on an all-for-one plan such that everyone at the" | "on an 'all-for-one' plan, such that everyone at the" | Typographic error; to conform the testimony to the record |
| 58 | 478 | 3 | "department and company performance" | "'department and company performance'" | Typographic error; to conform the testimony to the record |
| 59 | 478 | 11 | "paragraph E" | "paragraph e" | Typographic error; to conform the testimony to the record |
| 60 | 499 | 20 | "top down policy" | "top-down policy" | Typographic error |
| 61 | 511 | 3 | "VP of human resources" | "VP of Human Resources" | Typographic error; to conform the testimony to the record |
| 62 | 511 | 5–6 | "chief talent officer" | "Chief Talent Officer" | Typographic error; to conform the testimony to the record |
| 63 | 511 | 7–8 | "SVP of chief human resources and support" | "SVP, Chief Human Resources and Support Services Officer" | Typographic error; clarification; to conform the testimony to the record |
| 64 | 521 | 1 | "broadly across the workers at d companies." | "broadly across the workers at different companies." | Typographic error |

6

3218799.4

IN THE UNITED STATES DISTRICT COURT FOR

THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

------------------------------ Master Docket No.

IN RE OUTPATIENT MEDICAL CENTER   1:21-cv-00305-SRH-YBK

EMPLOYEE ANTITRUST LITIGATION,

---------------------------------

Baltimore, Maryland

Tuesday, July 15, 2025

*** HIGHLY CONFIDENTIAL ***

Deposition of EVAN P. STARR, Ph.D., VOL. III, a witness herein, called for examination by counsel for the Defendant DaVita, in the above-entitled matter, pursuant to notice, the witness being duly sworn by Barbara J. Moore, a Notary Public in and for the State of Maryland, taken at the offices of KRAMON & GRAHAM, P.A., 750 E. Pratt Street, Baltimore, Maryland, at, and the proceedings being taken down by Stenotype by BARBARA MOORE, CRR, RMR, and transcribed under her direction.

Evan P. Starr Volume III Highly Confidential
July 15, 2025

APPEARANCES:

On Behalf of the Plaintiff:

DEAN M. HARVEY, ESQ. (pro hac vice)
LIN Y. CHAN, ESQ. (pro hac vice)
YAMAN SALAHI, ESQ. (pro hac vice)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
dharvey@lchb.com

On Behalf of the Defendant DaVita, Inc.:
J. CLAYTON EVERETT, ESQ.
NATHAN T. SHAPIRO, ESQ.
KENNETH M. KLIEBARD, ESQ.
MORGAN LEWIS, LLP
1111 Pennsylvania Avenue, NW
Washington, D.C.   20004

SARA CHAMPION, ESQ.
CORNERSTONE RESEARCH
2001 K St NW, Suite 800
Washington, DC 20006

On Behalf of SCA Defendants:

SARAH A. ZIELINSKI, ESQ.
ANDREW E. TALBOT, ESQ.
AMY B. MANNING, ESQ. (Via Zoom)
PETER SHAKOW, ESQ. (Via Zoom)
McGUIRE WOODS, LLP
77 W Wacker Drive, # 4100
Chicago, IL 60601

Evan P. Starr Volume III Highly Confidential
July 15, 2025

APPEARANCES (Continued):

On Behalf of Defendants Tenet and USPI:

EMILY SHOEMAKER NEWTON, ESQ.

LAUREN SMITH, ESQ.

VERONICA MOYÉ, ESQ.

KING & SPALDING, LLP

1180 Peachtree Street, NE

Suite 1600

Atlanta, GA 30309

Videographer:  Adam Nudelman

TABLE OF CONTENTS

WITNESS                                                          PAGE

EVAN P. STARR, Ph.D.

BY ATTORNEY EVERETT                                               528

BY ATTORNEY ZIELINSKI                                            788


                              EXHIBITS

EXHIBIT          DESCRIPTION                          PAGE

EX DX 90    Updated expert witness report       563

EX DX 91    Errata                              563

EX DX 92    May 30 rebuttal report              564

EX DX 93    LinkedIn download                   566

EX DX 94    Lafontaine paper                    613

EX DX 95    Collaci paper                       633

EX DX 96    Gibson paper                        640

P R O C E E D I N G S

THE VIDEOGRAPHER:  This is media Unit No. 1 in the videotaped deposition of Dr. Evan Starr in the matter of In Re Outpatient Medical Center Employee Antitrust Litigation, Case No. 1:21-cv-00305.

Today's date is July 15, 2025. Time on the record 9:16 a.m.  This video deposition is taking place in Baltimore, Maryland.

Would all attorneys present please identify themselves, state whom they represent, beginning with the party that noticed this proceeding.

ATTORNEY EVERETT:  Good morning, Clay Everett for Morgan Lewis for DaVita.

(Attorneys stated their appearances for the record.)

ATTORNEY EVERETT:  I assume that the Zoom notices could be noted in the report; is that correct?

THE VIDEOGRAPHER:  Adam Nudelman, also with U.S. Legal.  We'll now administer the oath and we can proceed.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

EVAN P. STARR, having been called as a witness on behalf of the Plaintiff and having been first duly sworn, was examined and testified as follows:

EXAMINATION BY

ATTORNEY EVERETT:

BY ATTORNEY EVERETT:

Q.    Good morning, Dr. Starr.

A.    Good morning.

Q.    You wouldn't disagree, would you, that the employers that hired Defendants' senior-level employees are competitors for those employees?

ATTORNEY HARVEY:  Objection to form.

THE WITNESS:  Can you state the question again.

BY ATTORNEY EVERETT:

Q.   Sure.  You wouldn't disagree, would you, that employers that hired Defendants' senior-level employees were competitors for those employees, would you?

ATTORNEY HARVEY:  Same objection.

THE WITNESS:  If a -- if an employer A hires from, let's say, a worker from DaVita, then I would say yes, that employer and DaVita were competing over that worker.

BY ATTORNEY EVERETT:

Q.   And likewise, you wouldn't disagree that employers from whom the defendants hired senior-level employees were competitors with regard to the senior-level employees, would you?

A.   So, again, so if -- just to make it complete, if a senior-level employee was to work at DaVita and they were hired by somebody from DaVita or DaVita hired from another company, I would say they are in the labor market competition for that worker.

Q.      And that is because the choices of those employees about which employer to pursue, are their revealed preferences; is that correct?

ATTORNEY HARVEY:  Objection to form.

THE WITNESS:  Can you -- reveal preference typically means something very specific in the econ world.  So can you tell me what you mean by that.

BY ATTORNEY EVERETT:

Q.      Why don't you tell me specifically what in the econ world "revealed preferences" mean.

A.      So typically when we think about revealed preference, we're thinking about -- it's typically confused with consumer theory where you have workers making choices among baskets of goods, and they reveal those preferences based what you choose.

Q.      And there is an analog regarding revealed preferences in labor markets as well; correct?

A.      In labor markets workers also may

follow this kind of ideal experiment which is to take two workers -- a worker who is indifferent between two companies, and then one of the companies that announces this policy.

And so -- and so the question is who do you identify which company's workers are indifferent between. So we used Indeed data, Indeed.com job search data in that paper, and we study in a given job search section when they click on one of the companies that announces these policies which other jobs they click on. And we're thinking of those. The companies they may also be interested in. And so that's the kind of idea in that -- in that study.

BY ATTORNEY EVERETT:

Q. Indeed.com is a third-party source of data; is that right?

A. Indeed.com is a platform that hosts job postings, among other things.

Q.    And in terms of at least the data that you used from Indeed.com for your work on the Dobbs decision and that paper, that was data from the third-party platform Indeed that you captured; correct?

A.    We have several Indeed coauthors who had access to their internal data, that's right.

Q.    And that Indeed.com data included data only for individuals that were actually participating on that platform; right?

A.    The Indeed data, yes.  It looks at -- if you are not on the Indeed data, then we will not track you.  If you are on the Indeed platform, then you would be captured on that data set.

Q.    Okay.  And so to some extent it's a self-selected sample, self-selected by the employees or potential employees that were participating on the Indeed platform and likewise, I guess, also the employers that were participating on the Indeed platform; correct?

ATTORNEY HARVEY:  Objection to

form.

THE WITNESS:  So the ability to have -- to see who is a competitor, in this case in the way that they were thinking about it in this paper is -- depends on whether you have an active job posting at that time.

And so you can't click on a company in a simultaneous job succession if they don't have a job posting up.  So it depends on labor demand side having a job posting there and then what the worker has clicked on in examining.

So yeah, the Indeed people will tell you that almost all job searches done today at least is based on online searches, 80 percent or something, if I recall correctly.

BY ATTORNEY EVERETT:

Q.    At least in terms, first of all, I guess 80 percent done through on posting, so 20 percent are not included, for instance?

self-report, would you call that third-party data as well?

Q.    I would.  So are those types of third-party data sources that you have relied upon in your academic work?

A.    I have, yes.  Would you consider surveys, third party as well, or is that not third party?

Q.    I would.

A.    That I'm running.

Q.    I would not include surveys that you are running, but I may include that term third-party data, surveys, perhaps, or self-reported data that is collected by a third party that you can rely upon.

A.    So you now changed the definition. Self-reported third-party data because the payroll tax records, those are for tax purposes.  I'm not sure when you say "self-reported," that's different than a survey when somebody says I'm working at this job for this amount of time, something like that.

So, you know, when you make the distinction of self-reported, to me that suggests sort of like a survey-type thing. I rely on third-party sources according to your definition.

Q. Okay. And just to be clear, because you're right, I probably did introduce an additional concept in the middle of that. So when you say you did rely on some third-party sources, you mean some self-reported data that was collected by a third party; correct?

A. So in my research I've used government data that you have to get proprietary access to use. I've used survey data collected by myself by governments. We've used this Indeed data. We've run our own experiments and we've collected the data ourselves. So yeah, so we've used data in all thse places.

Q. Okay. Have you in the past used Burning Glass data?

A. We had acquired it for a project related to job postings. We bought their job posting data. And then ultimately for the specific

project that we were approved to get the data, there was too much noise.  I can go into details if you'd like, but we were -- it's a paper that's now published in the Review of Economics and Statistics and phase a paper that's looking at the non-compete ban in the state of Washington, which happened in 2020.

And we were interested in -- so that ban banned noncompetes for workers making below $100,000 a year.  And so we were curious like this is kind of a special -- so we thought we kind of use this to study whether firms valued the ability enforce noncompetes.

So they did those papers very simple.  You take a worker who is making $99,000 a year.  In 2019, their noncompetes are potentially enforceable, but in 2020 their noncompetes are no longer enforceable.  If they still are making below $99,000 a year, they're below that bright red line.

As far as if they have to leave there, they can give them a small raise to get them over the threshold.  And so if firms are willing to -- if

A.    Yes.

Q.    And those are the only changes or errors that you have identified in DX-90?

A.    Yes.

Q.    Then I'm going to mark also, again for completeness, your May 30 rebuttal report.  So that's going to be DX-92.

ATTORNEY SHAPIRO:  And that is Tab E.

(Exhibit 92 was marked for identification.)

Q.    Dr. Starr, I've marked -- what has been put before you has been marked for identification as DX-91.

Can you confirm that that is -- I'm sorry, DX-92, I'm sorry.  Can you confirm that that is a copy of your rebuttal expert witness report dated May 30, 2025?

A.    Yes.

Q.    So let's look at DX-90, the June 30 rebuttal report.  And if you go to page 46 and paragraph 50A.

Evan P. Starr Volume III Highly Confidential
July 15, 2025

A.    (Witness complies with request.)

Q.    And you'll see the first sentence there reads, "One individual is listed as going to nine different companies from DaVita because each of those nine jobs was started after the individual started at DaVita, and there was no official end date to the individual's time at DaVita."

Did I read that correctly?

A.    Yes.

Q.    Is that reflecting your opinion, at least as of June 30, 2025?

A.    This is describing one individual in the Lightcast data.

Q.    And that makes a reference in footnote 144 to the next employer companies for that individual as being Abbott Laboratories, Amgen, Paragonrx, International Renal Advantage, Belmont University, Meharry Medical College, Accretive Health, Corizon Health in the state of Tennessee?

Did I read that correctly?

A.    You did.

Evan P. Starr Volume III Highly Confidential
July 15, 2025

Q.    Those are the nine employees -- I'm sorry, nine employers that are listed for the next employer for this individual from DaVita; correct?

A.    That's right.

Q.    Okay.  Did you attempt to identify who this individual was?

A.    I didn't.  The Lightcast data is anonymous, so I would have had to have gone and try to find out and search for all these other things.

Q.    You'd have to look a resume through some other source that lined up with this person's resume; correct?

A.    Right.

Q.    And do you know what the person's position was at DaVita identified by the Lightcast data?

A.    Sitting here right now, I can't remember exactly what the job title was at this moment in time.

Q.    Let's mark as DX-93, please.

                    (Exhibit 93 was marked for

                 identification.)

Evan P. Starr Volume III Highly Confidential
July 15, 2025

Q.   So Dr. Starr, what's been marked for identification as DX-93, I'll represent to you is a download from LinkedIn of a profile for Orville Campbell MD/MDA, okay?

A.   Okay.

Q.   So if you look at Mr., I guess Dr. Campbell's profile from LinkedIn, you can see the reference on page 2 of 7 to DaVita.

Do you see that?

A.   Yes.

Q.   And this indicates that Dr. Campbell was a medical director at DaVita from 2003 to the present.

A.   That's right.

Q.   Are medical directors part of the class -- DaVita medical directors, are they part of the class in this case?

A.   I'd have to go back and double-check the exact job titles, but if it has the word "director" in there, my sense is it probably was in the class.

Q.   Do you have an understanding of

whether medical directors from DaVita are employees of DaVita?

A.    I'm not sure.

Q.    Okay.  Would it surprise you to learn that they are independent contractors?

A.    I'm not sure if that would surprise me or not.

Q.    You'll see here in terms of experience in addition to DaVita, there's reference to the same nine companies or institutions that are identified in footnote 144 of DX-90 that we looked at a moment ago.  Is that correct?

A.    At this moment I'm just looking at the names and confirm with my report.  I do see some of the names listed here.  I also see a variety of other -- of other names which are not listed in my nine.

Q.    Do you know how many or what percentage of the profiles that included multiple other members or preceding employers were associated with employees that had the title "DaVita medical director"?

ATTORNEY HARVEY:  Objection to form.

THE WITNESS:  Let me make sure I understand your question.  So your question is among those that had multiple previous or next employers for DaVita?

BY ATTORNEY EVERETT:

Q.    Yes.

A.    What percentage of individuals that have multiple previous or next employers for DaVita had the title medical director?

Q.    DaVita medical director.

A.    DaVita medical director.

Q.    Yes.  So let me ask it again so that we've got it clear, a clearer question.

So Dr. Starr, you have -- just to start out, let me set a little foundation.

So I think you mentioned before, Dr. Starr, that there are -- one of the concerns that you had with regard to the Lightcast data was that there are some entries in the Lightcast data where there are multiple either former, immediately former

employees -- employers, I'm sorry -- or multiple immediately following employers for one of the defendants; correct?

A.    That's one of the many concerns that I have.

Q.    With regard to that concern, how many -- how many employees that are in the Lightcast data have that issue?

A.    How many, overall have, could lead to multiple of these?  Assuming the employees in the Lightcast data are real, I don't know the answer off the top of my head exactly what percentage have contributed multiple previous or next employers.

Q.    Do you think it's a large percentage?

                    ATTORNEY HARVEY:  Objection to form.

                    THE WITNESS:  I think that it's clear from examples like this that you can get large numbers of competitors if you're going to measure them in this way.

Evan P. Starr Volume III Highly Confidential
July 15, 2025

Off the top of my head I couldn't tell you how many specific individuals in the Lightcast data have multiple prior or previous prior or next employers.

BY ATTORNEY EVERETT:

Q.    And can you tell me of the employees in the Lightcast data that have multiple immediately previous or immediately following employers, how many of those or what percentage of those are DaVita medical directors?

A.    I can't tell you.  I should say I don't know the number.  I couldn't tell you if I could go back and look at it specifically.  But I don't know it sitting here.

Q.    Another criticism that you level of the Lightcast data is discrepancies in how names are written.

Do you recall that?

A.    Yes.

Q.    Okay.  And your critique there is that the results of the analysis may be distorted because the defendants' experts didn't combine

Evan P. Starr Volume III Highly Confidential
July 15, 2025

employers with minor variations in their names; correct?

A.    I think my critique was that there are employees that were written down that were clearly defendants.  It was either written in the USSCA or the USPI or DaVita something or other that was measured as something other than DaVita or USPI or some other defendants.

Q.    With regard to the defendants in particular, you can determine how many in which the employees moved between Defendants from the structured data; right?

A.    Yes.

Q.    And that is a small number; correct?

ATTORNEY HARVEY:  Objection to form.

THE WITNESS:  Small relative to what?

BY ATTORNEY EVERETT:

Q.    To the total number of employees that moved either to or from the defendants' senior-level employees.

they've traditionally been separate.

Q. Have you ever taught industrial organization?

A. I have. I've taught managerial economics, and I've taught intramicro and intermediate micro, and I taught antitrust courses in graduate school as well.

Q. So I guess turning back to these naturally occurring sources of monopsony power, those exist in labor markets regardless of any, say, no-poach agreement; right?

A. There are naturally existing frictions that exist independent of firm conduct and independent of firm behavior.

Q. And for the three defendants here, do you have the opinion that each of them had some monopsony power by virtue of these types of naturally occurring frictions?

A. So when I think about whether the companies and the defendants in this case have market power, I think we can look to the economic literature, which has some estimates of the typical

Evan P. Starr Volume III Highly Confidential
July 15, 2025

firm market power in the healthcare industry.

And when you look across industries,
healthcare has the most market power relative to
just -- to -- sorry.  Healthcare has the second
most market power, according to some estimates.

And so as a default, I would expect that
they have market power and a significant degree of
market power.  I'm not relying on that for my
opinion that the defendants had market power.  I'm
primarily relying on my wage regression that the
documents -- that defendants had market power.  But
I think it would be expected that they would, given
the prior literature.

Q.    Okay.  And they would have had any
of that naturally occurring monopsony power
bothboth before, during and after the conduct at
issue?

A.    There would be some naturally
occurring market power.  I imagine that they would
have had that both before and during and after the
conduct, and their behavior may have also either
extended their market power or it may have -- they

may have actualized their market power in ways that they weren't during the after period or before period.

Q.    And have you done any analysis to determine whether the naturally occurring monopsony power that defendants may have had that arose from things such as frictions varied over time?

A.    Your question is have I studied whether the other sources of market power have varied over time in addition to -- so we should talk about, I guess -- I'm not sure where you're going.  I haven't done a separate analysis that identifies market power arising from naturally occurring frictions versus firm conduct.

The empirical model that I estimate is designed to take into account a variety of other issues and identify the effect of the conduct itself.

So I'm confident in that, but I haven't done a separate analysis that would say search all matching frictions that were naturally occurring would have been higher here or there.

And so the goal is purely on causal identification. Whatever the relevant contours of the labor market are for a given individual is immaterial once you've estimated the appropriate causal effect.

Just to give an example of how that works in this case, if you recall, my empirical model compares the same workers to themselves. And so presumably that same worker is in a similar labor market or has similar preferences and skills as they did at different points in time.

And so when you have that sort of comparison that's driving your estimate, the labor market for that individual is already held sort of constant, and in that sense it's not necessary to think about all the potential moves and where everybody goes to.

Evan P. Starr Volume III Highly Confidential
July 15, 2025

BY ATTORNEY EVERETT:

Q.    Again, just to be clear, you have not attempted to define even the rough contours of any labor market in this case; correct?

ATTORNEY HARVEY:  Objection to form.

THE WITNESS:  As I just testified, my task was not to identify the rough contours of the labor market.  It was to identify the harm done to the employees as a result of the challenged conduct, among other assignments.

And so that was what I did, and what I did is consistent with the literature.  If you study the no-poach agreements that have been studied in the literature, for example, and the High Tech case and in the franchise cases, none of those studies do an analysis that examines the rough contours of the labor market, as you put it.  That's because you don't need to do that when the goal

is to estimate the harm of the conduct.

So my analysis is consistent with the literature, and it's consistent with the other research that I've done on identifying the harms from mobility restrictions.

BY ATTORNEY EVERETT:

Q.    And the literature that you're referring to on no-poach agreements is four papers. Is that right?

A.    Well, so I would include, you know, if you want to think about the literature mobility restrictions more broadly, there are limited instances of no-poach agreements in the literature. There's a handful of papers, but the literature on non-compete agreements is much larger.

And so I think in totality I don't think many of them take the perspective that Defendants' experts do hear that you have to study and count the exact number of employers that people go to.

Q.    So I guess putting aside the non-compete literature, which I acknowledge you've

franchise agreements?

A. So we have to be clear. So I think the Lafontaine paper has a slightly different sample than the Collaci, et al paper. I believe, if I recall correctly, the Collaci et al paper is looking at all franchises, whereas the Lafontaine et al is looking at a subset of, I believe it's the restaurant business. I'm trying to remember off the top of my head, but it wasn't the same subsample as in the two papers.

Q. That's fair. And I'm happy to -- why don't we do it.

So let's mark the Lafontaine paper as DX-94.

(Exhibit 94 was marked for identification.)

Q. Your recollection is good, though. So it is, I'll represent to you that you could confirm that the Lafontaine paper is focused on franchise agreements in the food service industry.

ATTORNEY SHAPIRO: That's document U like in umbrella.

Evan P. Starr Volume III Highly Confidential
July 15, 2025

Q.    And you'll see at page 7 -- let me try to find it on the page here.

So in the last paragraph on page 7, Lafontaine et al, note that, "In contrast we focus on wages and food service chains across the U.S., both fast food and seated which allows us to examine the industry in more depth."

So does that confirm that the sample that the Lafontaine paper analyzed was focused on restrictions in franchise agreements in the food service industry?

A.    Yes.

Q.    Okay.  And in general, the workers at food service chains are lower skilled than members of the proposed class in this case.  Is that correct?

A.    I imagine they have probably lower average earnings, and I don't know about skills and what you mean by that, but I imagine the compensation is substantially lower than the typical class member.

Q.    In general, wages for food service

workers are set in different ways than wages for the senior-level employees that are at issue in this case; correct?

ATTORNEY HARVEY:  Objection to form.

THE WITNESS:  I imagine that in this case we have, you know, equity is like DaVita especially, I don't imagine that the fast food workers are getting equity compensation.

BY ATTORNEY EVERETT:

Q.    Okay.  And you'd expect there to be less negotiation by the food service workers regarding their wages compared to individual negotiation that senior-level employees like the defendants in this case -- that Defendants' employees in this case would have done; correct?

ATTORNEY HARVEY:  Objection to form.

THE WITNESS:  Well, when it comes to negotiations, I think it was -- there's a paper I'm recalling from a

while back that looks at bargaining and

estimates that about 30 percent of

workers, about a third of workers bargain

over their wages.  And it's not as high

for low wage workers.

BY ATTORNEY EVERETT:

Q.    Okay.  And I think you've alluded to
this in your reference to equity, but in general,
food service workers are usually not paid bonuses
like senior-level employees might be; correct?

A.    I'm not sure.  So we have to be
careful because there are different types of
workers here.  Some of them I believe Lafontaine
will look at managers differently from other
workers in this context, so I don't know what the
compensation structures are for managers versus
lower level workers.

Q.    Okay.  And so we go back and look at
page 2 of this paper, DX-94, in the last paragraph,
the authors reference some issues that they -- that
could buy us their estimates of the effects.

A.    Uh-huh.

Q.    And the first potential issue that they identify is sample selection.  Is that correct?

A.    Maybe you can point me to the exact sentence that you're looking at so we can be on the same page.

Q.    Yes, sure.  So the last paragraph of page 2, it starts, "In our empirical work, we face a number of issues that could bias our estimates of the NPC effect.  First sample selection could be a problem."

A.    Yes, I see that.

Q.    Okay.  And, in particular, what the authors identify is that "because their data source is limited to the universe of online job ads, only a small fraction of those ads have information on wages, and that subsample might not be representative."

Did I read that correctly?

A.    You did.

Q.    Okay.  And what the authors are identifying there is, first of all, that this study

Evan P. Starr Volume III Highly Confidential
July 15, 2025

is relying on posted wages; correct?

A.    That's right.

Q.    And workers who are hired -- let me strike that.

I guess the posted -- online posted wages may not be representative of the actual wages that were paid to the workers who were studied; correct?

A.    So I have to actually go back to two things.  One is that the sample selection problem is that while they have the universe of online job ads, at least according to what they write here, not all of those have wage information.

And so presumably those jobs also pay something and we don't know what it is, because we only observe the job ad, not what people were actually paid.

Your second point is even for those job ads where they say they're going to pay $15 or $20, that's not realized compensation.  That's just what's posted in the advertisement.  Is that what you're saying?

Q.    That is.

A.     Okay.  So I would agree with you that this is looking at advertised wages in job postings, not realized compensation.

Q.     The bottom line point, which I think you at least allude to, if not directly reference in your rebuttal reports, is that the no-poach agreements that were studied in this paper reduced compensation of restaurant chain employees by 5 percent when compared to restaurant chains that did not include no-poach agreements in their franchise context.

Is that consistent with your understanding?

A.     Where are you reading from?  I'm sorry.

Q.     That is a good question.  It's in the abstract section, the bottom line conclusion.

A.     Okay.  Yes.

Q.     Okay.  And just to be clear, as that description of the conclusion suggests what this paper does is it conducts a cross-sectional analysis, so comparing firms that had no-poach agreements in their franchise agreements against

similar firms that did not have those.

Is that your understanding?

A.     I do not think this is a cross-sectional.  This has longitudinal elements as well.  It's not a purely cross-sectional empirical design.

Q.     This is not a before, during, and after analysis, is it?

A.     I'd have to go back and look at exactly what the empirical setup is to remind myself.  My recollection is this is studying changes over time.  Looking at when the no-poach agreements were removed versus not.

This is similar to the other no-poach papers have a similar design.  It's not purely cross-sectional.  They're typically exploiting variations in companies that have these agreements and don't and looking at what happened before and after.

Q.     All right.

A.     By the way, I think Lafontaine caused a long difference in differences is their

A. Yes. So overall the -- without equity pay, we had effects of 6.3 percent, and DaVita was 7.8 percent for that equity pay.

Q. And when you take equity pay into account, it would include -- it would -- the numbers are significantly higher at 12.4 percent overall; correct?

ATTORNEY HARVEY: Objection to form.

THE WITNESS: If you were to compare the conduct estimate without equity compensation and the conduct estimate with all total compensation together where the equity is valued in the time that it is reported and granted to the individuals, then we go from 6.3 percent overall to -- I'm going to have to go back. Was it 12.4 percent?

BY ATTORNEY EVERETT:

Q. That's my recollection, but feel free to check it.

A. Let me just confirm for the record.

Evan P. Starr Volume III Highly Confidential
July 15, 2025

For this 12.6 percent.

BY ATTORNEY EVERETT:

Q.     Sorry.  I was wrong.  A little higher.

12.6 percent compared to 3 to 4 percent; correct?

A.     That's right.

Q.     And just to be clear, the reported pay that was analyzed in the Callaci et al paper is reported pay on Glassdoor; is that correct?

A.     On Glassdoor.

Q.     And that's self-reported information?

A.     I think the better pay to look at is the Gibson paper when it comes to justifying the Glassdoor data.  He does a lot of work to show that the pay data from Glassdoor is reflective of the population he's trying to study.

Q.     But, again, it is self-reported Glassdoor data that they're relying on for this paper?

A.     That's correct.

Evan P. Starr Volume III Highly Confidential
July 15, 2025

Q.    And does that self-reported compensation information on Glassdoor include other forms of compensation beyond salary or wages?

A.    I don't know if we're going to look at the Gibson paper next, but the Gibson paper does break out pay by different pay types, and so he looks at compensation without equity and then separately equity pay.

And so I think if we're going to talk about the differences between the estimates that I have and the estimates in the no-poach cases, then we should be comparing without equity when we're going to compare to these low-wage workers who were not paid to equity.  And we should compare to Gibson's estimates particularly because it's a high, you know, it's a more similar skilled sample in terms of at least the compensation that these individuals are getting.

And so there I think, again, if you look at my estimates without -- without equity we have on average minus 6.3 percent, and in the Gibson paper I think it was 5.6 percent.

Q.    All right.  So let's look at the Gibson paper next.  Go ahead and mark it.  So this is the third of four papers in the literature on estimating the effects of no-poach agreements on compensation.

                    (Exhibit 96 was marked for identification.)

                    ATTORNEY SHAPIRO:  Exhibit W.

    BY ATTORNEY EVERETT:

Q.    So Dr. Starr, you've been handed what's been marked as for identification as DX-96, which is a working paper from Matthew Gibson titled Employer Market Power in Silicon Valley.

        Are you familiar with this paper?

A.    Yes.

Q.    And Gibson is seeking to estimate effects of no-poach agreements in the high tech industry on compensation.  Is that correct?

A.    Yeah.  My understanding is he's trying to estimate the effect of these no-poach agreements on high tech workers on their compensation.

Evan P. Starr Volume III Highly Confidential
July 15, 2025

Q.   So if we look at page 2 of the --
this DX-96 paper from Matthew Gibson, he indicates
the conduct that he is seeking to estimate the
effects from, and that is no-poaching agreements
among the following firms.  Adobe, Apple, Ebay,
Google, Intel, Intuit, Lucas Film and Pixar.

Do you see that in the first sentence of
the second paragraph on page 2?

A.   Yes.

Q.   So what he was studying was
potential effects of agreements between eight
different firms; correct?

A.   Yes.

Q.   All of those firms were
headquartered in the San Francisco Bay area and
maintain large workforces there.

Does that sound correct to you?

A.   I'll tell you I know Google and all
these companies, obviously it has lots of places,
I'm not sure where the headquarters of some of
these companies are.  But some of them were in the
bay area, I know.

Q.   Okay.  So, and we can look at, perhaps, page 54 of DX-96, and under heading "H.2.2, Geographic Distance," Dr. Gibson indicates that "all firms participating in the no-poaching agreements were headquartered in the San Francisco Bay area and maintain large headquarters there."

Does that confirm that that is, in fact, the case?

A.   Sure.

Q.   And this paper looks at the geographic distance as a relevant factor because competition for workers may be limited by geography; correct?

ATTORNEY HARVEY:  Objection to form.

THE WITNESS:  The question is this paper looks at geographic distances, and it looks like maybe variation in the effect of the -- by distance.  Sorry.  So what was the question?

BY ATTORNEY EVERETT:

Q.   So competition for workers may vary

Evan P. Starr Volume III Highly Confidential
July 15, 2025

by geography.  Is that fair?

ATTORNEY HARVEY:  Objection to form.

THE WITNESS:  So I think we have to be clear about what you mean by "geography."  So if we go back to the Dobbs paper we talked about earlier and we looked at what jobs people are clicking on, they tend to stay in the same county as, you know, like location is a very important input into which jobs workers are clicking on.  And so location is important for people who are thinking about working.

BY ATTORNEY EVERETT:

Q.    And this paper studying the effects on compensation of no-poach agreements in the high tech industry, one of the factors that Dr. Gibson looked at is geographic distance; correct?

A.    I'd have to read why, exactly why he's looking at geographic distance, but it seems to suggest have they all have their headquarters

close to each other, but they also have offices all over the country as well.

Q.   And in particular, Dr. Gibson was looking at the fact that for the eight firms that were purportedly part of no-poaching agreements that he studied, their workers were concentrated in the San Francisco Bay area and the firms' headquarters were close to one another; correct?

ATTORNEY HARVEY:  Objection to form.

THE WITNESS:  I see here on page 4 he says, "all firms were headquartered in the San Francisco Bay area and maintained large workforce there."

I'm not sure what "large" means or what fraction of each workforce was concentrated in that area.  Google has offices in Michigan and Austin and New York City and all over the place.  I'm not sure what fraction was in the headquarters space versus elsewhere.

BY ATTORNEY EVERETT:

Q.    The headquarters of the three defendants in this case are not geographically proximate, are they?

ATTORNEY HARVEY:  Objection to form.

THE WITNESS:  I haven't calculated the distance between them, but you'd have to put on the map exactly what the headquarters are, but these are slightly different situations because they run clinics all over the country versus a tech company where you can in some cases work from anywhere in the country.  It's a little different.

BY ATTORNEY EVERETT:

Q.    DaVita is headquartered in Denver. Does that sound correct to you?

A.    Yes, Colorado.

Q.    Denver, Colorado.  SCA during the period at issue was headquartered in Birmingham, Alabama.  Does that sound right?

A.    That sounds right.

Q.    And I apologize, but I don't remember the specific city, but USPI -- let me start this over.

USPI was headquartered in Dallas, Texas. Does that sound, right?

A.    Yeah, yes.

Q.    Okay.  And for the most part -- well, let me back up.

This case is focused on alleged mobility restrictions for senior-level employees of the defendants; correct?

A.    That's correct.

Q.    And that's directors and above; correct?

A.    Correct.

Q.    With a disproportionate portion of those senior-level employees operating at the headquarter locations of the firms; correct?

ATTORNEY HARVEY:  Objection to forms.

THE WITNESS:  If you'll just give

Evan P. Starr Volume III Highly Confidential
July 15, 2025

me one moment, I just -- I have the numbers here.

So in figure 41 of my updated report on page 243, I look at the effect of the conduct according to the state in which the -- is reported in the data.

I'll make one small caveat, which is that I think this is the state that is where the individuals reported working. I don't know where they're actually living. So if you live in the D.C. area like I do, you know that people can work in D.C. but live in Maryland or Virginia or even farther.

So my understanding is this data is coming from the state where the individual is working. And you can see in Colorado there's 3,175 individuals. In Alabama there's 2,637. California also has a disproportionate amount, 3,584. In fact, that may be the largest single entity. Washington is also very

large at 1861.

So if you were to look at some of these numbers, it does seem like there's some -- I see Texas here, Texas has 5,737.  That's probably the highest among all of these.  You know, it looks like they're spread out, you know, to some degree, but there's -- but it looks like there's a concentration in the headquarter states.

BY ATTORNEY EVERETT:

Q.    Okay.  And going back to the Gibson paper, if you look on page 55, so at the top of this page, which is referring back to the paragraph that bridges page 54 to 55, which is talking about the proximity of the headquarters of the firms alleged to have been involved in the no-poach agreements in the high tech industry, with the driving distance between the headquarters and in this group only 9.4 miles.

Do you see that, first of all?

A.    I see that sentence, yes.  That's

between headquarters.  If you live in New York, it's not 9.4 miles to get to headquarters.

Q.    Between headquarters, which is a point that Dr. Gibson makes and focuses on, is that the headquarters of these eight companies were all in the San Francisco Bay area and very close to one another; correct?

A.    The headquarters are close.

Q.    And Dr. Gibson goes on to say that "insofar as intra or interurban distances removed some firms or vacancies from the choice sets at Silicon Valley workers, they contributed to the labor market power of the colluding firms."

Did I read that correctly?

A.    You did.

Q.    So what Dr. Gibson is saying is that some potential alternatives to the colluding firms, significant ones were headquartered elsewhere, which contributed to the labor market power of the colluding firms; correct?

ATTORNEY HARVEY:  Objection to form.

analysis doesn't include CSI exchanges, to the best of my knowledge.

And so here we have an added issue which is that not only do we have these no-poach agreements which prohibit the direct solicitations, we also have companies regularly reaching out to exchange salary information, bonus information, specific jobs, merit pools regularly.

And so the effect of those could be spread out against geographic areas on how compensation is set. Here we know specific examples saying hey, what do you pay this type of job in this particular location. That's part of the CSI exchanges that are happening here.

And so in my mind to the extent that those information -- that information is being incorporated into pay practices, the effect of the challenged conduct would be similar

across geographies.

BY ATTORNEY EVERETT:

Q.    Okay.  So here in part because we're talking about senior-level employees, your opinion is that there was a national, national competition for these employees.  Is that correct?

A.    To be clear, individual workers can have specific references about exactly where they want to live and where they don't want to live.  But when recruiters are reaching out to individuals, if you have an opening you might reach out to somebody who is far away versus who is only local.

So my understanding is that the no-poach agreements were national.  They weren't circumscribed by geography, to the best of my knowledge.  Recruiters would recruit from all over the place to find the best workers.  They might want workers who are local because they are more likely to get them, but in their search, they would broadly a national -- a national search.

Q.    You had alluded to this before when

we were talking about the Callaci et al paper, but Dr. Gibson does utilize the Glassdoor data for his data set here; correct?

A.    That's right.

Q.    And again, that is self-reported data from users of the Glassdoor platform or advertising platform?

A.    Yes, and Glassdoor has a specific give-to-get policy.  So if you want to search for more jobs on Glassdoor, at some point you have to share your information.

Q.    And the information is provided anonymously at least by workers?

A.    It's provided anonymously by workers.

Q.    The users who supply data to Glassdoor are not randomly selected, are they?

A.    They're not randomly selected, who goes to Glassdoor and therefore who supplies their information.  And this is why I think it's important that Gibson studies first and foremost the representativeness of this dataset relative to

the population that he cares about.

Q.    So that the fourth paper that studied the effects of no-poach agreements on compensation was the Kruger and Ashenfelter paper from 2022.

Does that sound right?

A.    I don't think that studies the effect on compensation.  That paper when it first came out revealed these no-poach agreements and then developed a theory about how no-poach agreements might influence compensation.

Q.    Okay.

A.    I don't recall there's an empirical analysis linking no-poach agreements to a reduction in compensation.  That paper is important, though, because it sets the foundation for the Washington Attorney General's investigation, which then allowed for these other papers to use that variation.  And so that paper is included here because it was a precursor to these other papers.

Q.    Got you.  So the three papers that form the literature analyzing the effects of

STATE OF MARYLAND:                                    SS

I, Barbara Moore, a Registered Court Reporter of the State of Maryland, do hereby certify that these proceedings took place before me at the time and place herein set out, and the proceedings were recorded stenographically by me and this transcript is a true record of the proceedings.

I further certify that I am not of counsel to any of the parties, nor an employee of counsel nor related to any of the parties, nor in any way interested in the outcome of this action.

_____

BARBARA MOORE, CRR, RMR

_____

My Commission Expires:

February 8, 2026

ACKNOWLEDGMENT OF DEPONENT

I, EVAN P. STARR, Ph.D., do hereby acknowledge I have read and examined the foregoing pages of testimony, and the same is a true, correct and complete transcription of the testimony given by me, and any changes or corrections, if any, appear in the attached errata sheet signed by me.

September 3, 2025             _____

        DATE                      EVAN P. STARR, Ph.D.

Subscribed and sworn to

before me on this_____ day

of _____, _____.


_____

        Notary Public

**Errata for Volume III of the Expert Deposition of Evan P. Starr, Ph.D.**
*In Re Outpatient Medical Center Antitrust Litigation* (N.D. Ill.)
July 15, 2025

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---|---|---|---|---|
| 1. | 526 | 14 | "Collaci paper" | "Callaci paper" | Typographic error |
| 2. | 528 | 6–7 | "the Plaintiff" | "the Plaintiffs" | Clarification; to conform the record to the facts |
| 3. | 529 | 20 | "or DaVita hired from another company," | "or DaVita hired them from another company," | Clarification |
| 4. | 530 | 6–7 | "reveal preference" | "revealed preference" | Typographic error |
| 5. | 530 | 15 | "typically confused" | "typically introduced in" | Typographic error |
| 6. | 530 | 16 | "workers" | "consumers" | Clarification |
| 7. | 530 | 17–18 | "they reveal those preferences based on what you choose" | "they reveal their preferences based on what they choose" | Typographic error |
| 8. | 531 | 10–11 | "Their choices can be used to ranks." | "Their choices can be used as ranks." | Typographic error |
| 9. | 531 | 22 | "approving every single" | "recruiting every single" | Typographic error |
| 10. | 532 | 4-5 | "But certainly many workers are making advanced options. They're also all" | "But certainly many workers are, if they have options," | Typographic error |
| 11. | 533 | 3 | "then a weighted labor" | "then creates a weighted labor" | Typographic error |
| 12. | 533 | 13-14 | "I can't think of a recent paper" | "I can think of a recent paper" | Typographic error |
| 13. | 533 | 15–16 | "I have to be specific about exactly what paperwork we're talking about." | "I have to be specific about exactly what paper we're talking about." | Typographic error |
| 14. | 533 | 16-17 | "about. I've done this" | "about. In the work I've done that is" | Typographic error |
| 15. | 533 | 20–21 | "really trying just to identify at the causal effect of a non-compete clause" | "really trying just to identify the causal effect of a non-compete clause" | Typographic error |
| 16. | 534 | 21 | "those positions." | "those decisions." | Typographic error |
| 17. | 535 | 2 | "two workers" | "two companies" | Clarification |
| 18. | 535 | 4–5 | "and then one of the companies that announces this policy." | "and then one of the companies announces this policy." | Typographic error |

1

3304935.2

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---|---|---|---|---|
| 19. | 535 | 6–8 | "And so—and so the question is who do you identify which company's workers are indifferent between." | "And so the question is how do you identify which companies workers are indifferent between." | Typographic error; clarification |
| 20. | 535 | 11 | "job search section" | "job search session" | Typographic error |
| 21. | 537 | 9 | "simultaneous job succession" | "simultaneous job search session" | Typographic error |
| 22. | 537 | 13 | "clicked on in examining" | "clicked on and is examining" | Clarification |
| 23. | 538 | 9–11 | "Indeed will tell you, you know, how many percentage will land jobs from searching Indeed" | "Indeed will tell you, you know, what percentage will land jobs from searching on Indeed" | Clarification |
| 24. | 538 | 19 | "what was the pitch" | "but that was the pitch" | Typographic error |
| 25. | 539 | 6–7 | "on potential employers job postings?" | "on potential employers' job postings?" | Typographic error |
| 26. | 541 | 2 | "the data" | "the Indeed data" | Typographic error |
| 27. | 541 | 19 | "cooperative" | "coauthorship" | Typographic error |
| 28. | 541 | 22 | "from Indeed and their chief" | "from Indeed, including their chief" | Typographic error; clarification |
| 29. | 542 | 7–9 | "they were the ones who initially did the initial jobs because it was their internal data." | "they were the ones who initially did the initial draws because it was their internal data." | Typographic error; clarification |
| 30. | 542–543 | 542:21–543:5 | "And so what we're doing is we're taking two companies that work as kind of indifferent between, and then the ideal experiment is to say okay, one of these companies announces this policy, what happens on worker interest on Indeed, as a result, or what happens to workers on Glassdoor?" | "And so what we're doing is we're taking two companies that workers are kind of indifferent between, and then the ideal experiment is to say okay, one of these companies announces this policy, what happens to worker interest on Indeed, as a result, or what happens to worker reviews on Glassdoor?" | Typographic error; clarification |
| 31. | 543 | 9 | "this click." | "this click one." | Typographic error |
| 32. | 544 | 1 | "self-report" | "have to report" | Typographic error |
| 33. | 544 | 10 | "That I'm running." | "Surveys that I'm running." | Clarification |

2

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---|---|---|---|---|
| 34. | 545 | 13–14 | "I've used survey data collected by myself by governments." | "I've used survey data collected by myself and by governments." | Clarification |
| 35. | 546 | 5 | "and phase a" | "and it's a" | Typographic error |
| 36. | 546 | 11–13 | "so we thought we kind of use this to study whether firms valued the ability enforce noncompetes." | "so we thought we could use this to study whether firms valued the ability to enforce noncompetes." | Clarification |
| 37. | 546 | 14 | "So they did those papers very simple." | "So the idea of the paper is very simple." | Typographic error; clarification |
| 38. | 546 | 20 | "As far as if they have to leave there" | "And so the idea of the paper is that firms don't have to leave their pay there" | Typographic error |
| 39. | 547 | 4–5 | "So we would see small mass at 100,000 in 2020 and after than before." | "So we would see excess mass at 100,000 or just above in 2020 and after relative to before 2020." | Typographic error; clarification |
| 40. | 547 | 18 | "it would have made that decide harder to pass" | "it would have made that design harder to pass" | Typographic error |
| 41. | 549 | 18 | "what we –" | "what we purchased from them –" | Typographic error; clarification |
| 42. | 552 | 1–2 | "So based on my understanding of defendant expert reports," | "So based on my understanding of defendants' experts' reports," | Typographic error; to conform the record to the facts |
| 43. | 553 | 4 | "And so I think that's fundamental." | "And so I think that's a fundamental problem." | Clarification |
| 44. | 554 | 4–5 | "And so this happening in that data set." | "And so this is happening in that data set." | Typographic error |
| 45. | 554 | 12–13 | "Defendants' experts didn't study how represented it was" | "Defendants' experts didn't study how representative it was" | Typographic error |
| 46. | 555 | 15–16 | "I want to make sure I didn't hear you." | I want to make sure I didn't mishear you." | Typographic error |
| 47. | 556 | 2–3 | "and I think this is right that we eventually figured out that to get the hash SSNs correct, yes." | "and I think this is right that we eventually figured out that to get the hashed SSNs correct across Defendants, yes." | Typographic error; clarification |
| 48. | 556–557 | 556:22–557:1 | "I think the earliest one was 1979 was in the data." | "I think the earliest one was 1979 in the data." | Clarification |
| 49. | 558 | 7–8 | "If I put on LinkedIn, I don't know if they scraped in LinkedIn." | "If I put the profile on LinkedIn, I don't know if they scraped LinkedIn." | Typographic error; clarification |

3

3304935.2

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 50. | 558 | 10-11 | "I have no way to figure out what websites –" | "I have no way to figure out which websites they are pulling from – " | Typographic error |
| 51. | 560 | 4-7 | "So if you have a DaVita SCA or USPI employee you don't have the information online, I don't know how Lightcast would have got it." | "So if you have a DaVita, SCA, or USPI employee where you don't have their resume online, I don't know how Lightcast would have gotten it." | Typographic error; clarification |
| 52. | 561 | 8–9 | "I should say my reaction I was just responding to Defendants," | "I should say my first reaction is that I was just responding to Defendants' experts" | Clarification |
| 53. | 562 | 8–9 | "Alan Spradling" | "Allen Spradling" | Typographic error; to conform the record to the facts |
| 54. | 562 | 13 | "Alan Spradling" | "Allen Spradling" | Typographic error; to conform the record to the facts |
| 55. | 562 | 20 | "eight employees in the Lightcast data" | "employees in the Lightcast data" | Typographic error; clarification |
| 56. | 563 | 15–16 | "the errata that was served yesterday this report" | "the errata that was served yesterday to this report" | Typographic error; clarification |
| 57. | 565 | 17 | "Paragronrx" | "ParagonRX" | Typographic error; to conform the record to the facts |
| 58. | 565 | 19–20 | "Corizon Health in the state of Tennessee?" | "Corizon Health, and the state of Tennessee?" | Typographic error; to conform the record to the facts |
| 59. | 571 | 12 | "I couldn't tell you if I" | "I could tell you if I" | Clarification |
| 60. | 572 | 3-5 | "I think my critique was that there are employees that were written down that were clearly defendants." | "I think my critique was that there are employers that were written down that were clearly defendants." | Typographic error; clarification; to conform the record to the facts |

4

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---|---|---|---|---|
| 61. | 572 | 5-8 | "It was either written in the USSCA or the USPI or DaVita something or other that was measured as something other than DaVita or USPI or some other defendants." | "It was either written SCA, USPI or DaVita or something or other that was measured as something other than DaVita or USPI or SCA by Defendants' Experts." | Typographic error; clarification |
| 62. | 572 | 10–11 | "you can determine how many in which the employees moved between Defendants" | "you can determine how many and which of the employees moved between Defendants" | Typographic error; clarification |
| 63. | 573 | 1 | "Yes, I would say it's small." | "Yes, I would say it's small--" | Clarification |
| 64. | 573 | 16-19 | "I don't know whether the Lightcast data represents what fraction of that 90 percent the Lightcast data could even possibly represent" | "I don't know whether the Lightcast data is representative, what fraction of that 95 percent the Lightcast data could even possibly represent." | Clarification |
| 65. | 575 | 8–9 | "recognizing that Kaiser Permanente are the same company," | "recognizing that Kaiser and Kaiser Permanente are the same company," | Typographic error; to conform the record to the facts |
| 66. | 577 | 19 | "keeping track of them" | "keeping track of that" | Typographic error |
| 67. | 580 | 1 | "Paragronrx" | "ParagonRx" | Typographic error; to conform the record to the facts |
| 68. | 582 | 2 | "It was a busy month." | "Yes. It was a busy month." | Clarification |
| 69. | 582 | 7–10 | "In total, you know, 300 sounds high for this 92, and I'd have to go back and look at my records.  It could have been, I don't know, another hundred, something like that. It was a lot of work." | "In total, you know, 300 sounds high for DX-92, and I'd have to go back and look at my records. It could have been, I don't know, another hundred for DX-90, something like that.  It was a lot of work." | Typographic error; clarification; to conform the record to the facts |
| 70. | 582 | 13-14 | "I work with the same assistants that I worked on in the initial report." | "I worked with the same assistants that I worked with on the initial report." | Typographic error |
| 71. | 582 | 16 | "Augustus Herschel and Madeline Bow." | "Augustus Urschel and Madeleine Bowe." | Typographic error |

5

3304935.2

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 72. | 585 | 19–21 | "I'm just referencing the academic literature on firm specific ^^monopsony power." | "I'm just referencing the academic literature on firm-specific monopsony power." | Typographic error |
| 73. | 586 | 5–6 | "There is many sources of monopsony power." | "There are many sources of monopsony power." | Typographic error |
| 74. | 586 | 19 | "acquired in the labor market" | "squared in the labor market" | Typographic error |
| 75. | 586 | 19–21 | "So there's many soures of monopsony power. There's manpower induced by the companies themselves." | "So there are many sources of monopsony power, some natural, some induced by the companies themselves." | Typographic error; clarification |
| 76. | 587 | 8-9 | "one of the kind of matching friction to the others as" | "one of the kind of natural frictions, I am sure there are others as" | Typographic error; clarification |
| 77. | 588 | 14 | "there's a one mining company" | "there's one mining company and they employee everybody" | Typographic error; clarification |
| 78. | 588 | 17 | "Monopsony is" | "Monopsony power is" | Typographic error |
| 79. | 589 | 3–4 | "but in nearly all context I imagine that's true." | "but in nearly all contexts I imagine that's true." | Typographic error; clarification |
| 80. | 589 | 5–6 | "So in nearly all context for labor markets," | "So in nearly all contexts for labor markets," | Typographic error; clarification |
| 81. | 589 | 14–15 | "They find that in the gig worker marketplace, workers have monopsony power." | "They find that in the gig worker marketplace, companies have monopsony power." | Clarification |
| 82. | 589 | 22 | "The modern economics, the elaborate" | "The modern economics, the labor" | Typographic error |
| 83. | 591 | 5 | "intramicro" | "intro to micro" | Typographic error; clarification |
| 84. | 592 | 16 | "bothboth" | "both" | Typographic error; clarification |
| 85. | 593 | 20-21 | "search all matching frictions" | "search and matching frictions" | Typographic error; clarification |
| 86. | 595 | 6–7 | "I said 'extended,' I believe where I used the word 'actualized,'" | "I said 'extended,' and I believe I also used the word 'actualized,'" | Typographic error; clarification |

6

3304935.2

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---|---|---|---|---|
| 87. | 596 | 10 | "listing letter" | "existing literature" | Typographic error; clarification |
| 88. | 599 | 14–17 | "you go on to say that the way that monopsony power is often measured in the economic literature by the elasticity of labor supplied to the firm; correct?" | "you go on to say that the way that monopsony power is often measured in the economic literature is by the elasticity of labor supplied to the firm; correct?" | Clarification; to conform the record to the facts |
| 89. | 601 | 5 | "maximize" | "actualize" | Typographic error |
| 90. | 601 | 11-12 | "I have many analysis here" | "I have many analyses here" | Typographic error |
| 91. | 602 | 15–16 | "I took the industry organization class in graduate school." | "I took the industrial organization class in graduate school." | Typographic error; clarification |
| 92. | 604 | 12 | "high-tech no-poach case" | "High-Tech No-Poach case" | Typographic error; to conform the record to the facts |
| 93. | 606 | 14 | "can contribute. There's" | "can contribute if there's" | Typographic error |
| 94. | 607 | 14 | "case when I signed," | "case, one of my assignments," | Typographic error |
| 95. | 609 | 17–18 | "the High Tech case" | "the High-Tech case" | Typographic error; to conform the record to the facts |
| 96. | 610 | 18-19 | "the perspective that Defendants' experts do hear that you have to" | "the perspective that Defendants' experts do here that you have to" | Typographic error |
| 97. | 611-612 | 611:22-612:1 | "That's four papers." | "It's a handful of papers and if" | Typographic error |
| 98. | 612 | 13 | "Collaci" | "Callaci" | Typographic error; to conform the record to the facts |
| 99. | 613 | 4 | "Collaci," | "Callaci," | Typographic error; to conform the record to the facts |

7

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 100. | 615 | 6–10 | "I imagine that in this case we have, you know, equity is like DaVita especially, I don't imagine that the fast food workers are getting equity compensation." | "I imagine that in this case we have, you know, equity is used at DaVita especially. I don't imagine that the fast food workers are getting equity compensation." | Typographic error; clarification |
| 101. | 616 | 13–15 | "Some of them I believe Lafontaine will look at managers differently from other workers in this context," | "Some of them, I believe--Lafontaine will look at different types of workers. For example, they look at managers differently from other workers in this context," | Clarification |
| 102. | 616 | 21 | "buy us their estimates" | "bias their estimates" | Typographic error |
| 103. | 620 | 3–6 | "I do not think this is a cross-sectional. This has longitudinal elements as well. It's not a purely cross-sectional empirical design." | "I do not think this is a cross-sectional design. This has longitudinal elements as well. It's not a purely cross-sectional empirical design." | Clarification |
| 104. | 620 | 21-22 | "I think Lafontaine caused a long difference in differences" | "I think Lafontaine called this a long difference in differences" | Typographic error |
| 105. | 621 | 13–14 | "they could have been salaries." | "they could have been paid salaries." | Clarification |
| 106. | 621 | 14–16 | "been salaries. You know, they talk to us in the abstract and tell me later about that, you know," | "been salaried. You know, they talk at least here in the abstract, and study later that, you know," | Typographic error |
| 107. | 624 | 8 | "more apples to apples." | "more apples to apples comparison." | Typographic error |
| 108. | 624 | 17 | "I believe –" | "I believe you said –" | Typographic error |
| 109. | 626 | 9 | "Collaci" | "Callaci" | Typographic error; to conform the record to the facts |
| 110. | 628 | 12 | "9.4 percent" | "9.4 percentage points" | Clarification |

8

3304935.2

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---|---|---|---|---|
| 111. | 629 | 2–6 | "Based on my understanding of the way that Defendants processed the data and what they provided to us that the stock data was provided to us based on the value on which the employee received it." | "Based on my understanding of the way that Defendants processed the data and what they provided to us that the stock data was provided to us based on the value at which the employee received it." | Clarification |
| 112. | 629 | 16 | "figure our" | "figure out" | Typographic error |
| 113. | 630 | 4–5 | "15.8 divided by 17.2 is less than .5" | "7.8 divided by 17.2 is less than .5" | Typographic error |
| 114. | 632 | 2 | "is that data is using from" | "is that data is coming from" | Typographic error |
| 115. | 635 | 8–10 | "Gibson is focused on the high tech no-poach case, which are relatively high-earning workers," | "Gibson is focused on the High-Tech No-Poach case, which involved relatively high-earning workers," | Typographic error; clarification; to conform the record to the facts |
| 116. | 635 | 13 | "low-income workers like in the Gibson case" | "more low-income workers than in the Gibson case" | Typographic error |
| 117. | 639 | 13–14 | "who were not paid to equity" | "who were not paid with equity" | Typographic error |
| 118. | 640 | 21 | "high tech workers" | "high-tech workers" | Typographic error |
| 119. | 641 | 5 | "Ebay," | "eBay," | Typographic error; to conform the record to the facts |
| 120. | 641 | 18–19 | "I'll tell you I know Google and all these companies, obviously it has lots of places," | "I'll tell you, I mean I know Google and all these companies have offices in lots of places," | Typographic error |
| 121. | 641 | 22 | "bay area" | "Bay Area" | Typographic error |
| 122. | 642 | 6 | "Bay area" | "Bay Area" | Typographic error |
| 123. | 644 | 7 | "San Francisco Bay area" | "San Francisco Bay Area" | Typographic error |

9

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 124. | 644 | 13 | "San Francisco Bay area" | "San Francisco Bay Area" | Typographic error |
| 125. | 647 | 3–6 | "So in figure 41 of my updated report on page 243, I look at the effect of the conduct according to the state in which the—is reported in the data." | "So in figure 41 of my updated report on page 243, I look at the effect of the conduct according to the state in which the individual is reported to work in the data." | Clarification |
| 126. | 648 | 18 | "high tech industry" | "high-tech industry" | Typographic error; to conform the record to the facts |
| 127. | 649 | 6 | "San Francisco Bay area" | "San Francisco Bay Area" | Typographic error |
| 128. | 650 | 14 | "in the high tech no-poach case," | "in the High-Tech No-Poach case," | Typographic error; to conform the record to the facts |
| 129. | 652 | 2–3 | "depending on whether the workers is in the Bay area versus elsewhere." | "depending on whether the workers are in the Bay Area versus elsewhere." | Typographic error; clarification |
| 130. | 653 | 9–13 | "And I think that it's important to emphasize that the labor market here is generally natural." | "And I think it's important to emphasize that the labor market here is generally national." | Typographic error |
| 131. | 653 | 18 | "differ. For" | "differ for" | Typographic error |
| 132. | 654 | 6 | "direct solicitations," | "direct solicitations and include the tell your boss provision," | Typographic error |
| 133. | 654 | 9 | "information, specific jobs," | "information, including for specific jobs," | Typographic error |
| 134. | 654 | 12 | "against geographic areas on" | "across geographic units depending on" | Typographic error |
| 135. | 655 | 8 | "references" | "preferences" | Typographic error |
| 136. | 655 | 21 | "broadly a national" | "broadly consider a national" | Clarification |
| 137. | 659 | 17–18 | "It's not like these are one-off." | "It's not like these are one-offs." | Clarification |

10

3304935.2

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 138. | 661 | 2 | "Dr. McCray's" | "Dr. McCrary's" | Typographic error |
| 139. | 662 | 4 | "Dr. McCray" | "Dr. McCrary" | Typographic error |
| 140. | 662 | 8 | "SCA DaVita" | "SCA, DaVita, and USPI" | Typographic error; clarification |
| 141. | 662 | 9 | "lost three people." | "lost three people, one each to SCA, DaVita, and USPI." | Clarification |
| 142. | 663 | 3–7 | "And if you did this for SCA and DaVita and USPI, they would have two defendants employers so you would divide their numbers by two and you would get back to a number of two, and you would find that these are the same on a per defendant basis." | "And if you did this for SCA and DaVita and USPI, they would have two defendants' employers they could hire from so you would divide their numbers by two and you would get back to a number of two, and you would find that these are the same on a per defendant basis." | Clarification |
| 143. | 666 | 9–10 | "we only have really conduct period data for SCA." | "we only really have conduct period data for SCA." | Clarification |
| 144. | 666 | 22 | "Dr. McCray's" | "Dr. McCrary's" | Typographic error |
| 145. | 671 | 3 | "top five competitor" | "top five competitors" | Typographic error |
| 146. | 671 | 13 | "same number" | "same rank" | Clarification |
| 147. | 677 | 7-11 | "if USPI is not losing a lot of workers in those years and not doing a lot of hiring, then it would be surprising that that rank would not be high." | "if USPI is not losing a lot of workers in those years and not doing a lot of hiring, then it would not be surprising that that rank would not be high." | Clarification |
| 148. | 679 | 7-10 | "lots of companies that didn't hire or have workers leave two defendants in a given year." | "lots of companies that didn't hire or have workers leave to defendants in a given year." | Typographic error |

11

3304935.2

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---|---|---|---|---|
| 149. | 679 | 21–22 | "They should be included in the zero if we were going this thing correctly." | "They should be included in the zero if we were doing this thing correctly." | Typographic error |
| 150. | 682 | 14–18 | "I believe in this section what I'm responding is to Defendants' experts across their reports, want to try to say that the mobility patterns alone are responsible for the wage suppression efforts that I get." | "I believe in this section I'm responding to Defendants' experts' arguments across their reports that the mobility patterns alone are responsible for the wage suppression effects that I get." | Typographic error; clarification |
| 151. | 683 | 4 | "move, in fact" | "move. In fact" | Clarification |
| 152. | 683 | 17 | "company effects" | "company fixed effects" | Typographic error |
| 153. | 684 | 11 | "Defendants' experts claims that" | "Defendants' experts' claims that" | Typographic error |
| 154. | 684 | 22 | "in this case" | "in this case the conduct" | Typographic error |
| 155. | 686 | 10 | "question of whom reached out to whom" | "question of who reached out to whom" | Clarification |
| 156. | 687 | 13 | "analysis" | "empirical analysis" | Clarification |
| 157. | 687 | 17 | "cause of the conduct" | "causal effect of the conduct" | Typographic error |
| 158. | 688 | 14 | "I believe it's on page 16, 17, and 18." | "I believe it's on pages 16, 17, and 18." | Clarification |
| 159. | 688 | 16 | "Stiroh saying" | "Dr. Stiroh saying" | Typographic error |
| 160. | 689 | 1-2 | "Honig Bastrom, co-authored" | "Honey Batra and co-authors" | Typographic error |
| 161. | 689 | 14-15 | "offers from Defendants and non-defendants" | "offers from non-defendants" | Clarification |

12

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---|---|---|---|---|
| 162. | 690–691 | 690:20–691:4 | "You're asking me have I examined what's available from—and job offers from non-defendant employers in this case? And how that might relate to what job offers would have came from Defendants, is that what you're saying?" | "You're asking me have I examined what's available from job offers from non-defendant employers in this case? And how that might relate to what job offers would have contained from Defendants, is that what you're saying?" | Typographic error; clarification |
| 163. | 693 | 18–19 | "They are switching costs to jobs, yes." | "There are switching costs to jobs, yes." | Typographic error |
| 164. | 695 | 15 | "labor is an experience" | "labor is an experience good" | Typographic error |
| 165. | 697 | 5 | "But I think" | "But the modal situation I think" | Typographic error |
| 166. | 700 | 2 | "different style" | "differenced out" | Typographic error |
| 167. | 701 | 1 | "different in" | "differenced out in" | Typographic error |
| 168. | 701 | 3–5 | "So I also want to know what percent of Defendants' employees are remote work at any given point in time." | "So I also want to know what percentage of Defendants' employees are working remotely at any given point in time." | Clarification |
| 169. | 701 | 19–21 | "And then to examine the robustness to looking at different cuts of that data to ensure sure that we get similar results either way." | "And then to examine the robustness, looking at different cuts of that data to ensure that we get similar results either way." | Clarification |
| 170. | 702 | 15 | "versus after" | "versus absent" | Typographic error |
| 171. | 703 | 18 | "empirical regression" | "empirical question is" | Typographic error |
| 172. | 704 | 7 | "differences," | "difference is" | Typographic error |
| 173. | 704 | 17 | "defendants' experts claims" | "defendants' experts' claims" | Typographic error |

13

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 174. | 707 | 10 | "bothboth" | "both" | Typographic error |
| 175. | 712 | 3–8 | "The issue is that you have—you have pay on both sides, so you have—you have some being granted before during the pay factor and the same during versus after. The question is what do you get, the regression is looking at all of that variation." | "The issue is that you have—you have pay on both sides, so you have—you have some stock equity being granted before that pays out during and the same during versus after. The question is what do you get—the regression is looking at all of that variation." | Clarification |
| 176. | 714 | 15 | "together of what" | "pulling out or what" | Typographic error; clarification |
| 177. | 715 | 8 | "biometrics" | "econometrics" | Typographic error |
| 178. | 715 | 11 | "utilize" | "residualize out" | Typographic error |
| 179. | 717 | 6 | "some of them don't do it all together." | "some of them don't do it altogether." | Typographic error |
| 180. | 717 | 16 | "Dr. Seravia," | "Dr. Saravia," | Typographic error |
| 181. | 718 | 7–8 | "Dr. McCrary and Dr. Stiroh's attempt to do it," | "Dr. McCrary's and Dr. Stiroh's attempts to do it," | Clarification |
| 182. | 718 | 9 | "Johnson's attempt to do it" | "Johnson's doesn't even attempt to do it" | Typographic error |
| 183. | 719 | 5 | "2007" | "2011" | Typographic error |
| 184. | 719 | 15–16 | "he actually never received at no point in time." | "he actually never received at any point in time." | Clarification |
| 185. | 720 | 6 | "offering" | "altering" | Typographic error |
| 186. | 721 | 20–21 | "that this are the appropriate models to run" | "that these are the appropriate models to run" | Typographic error |

14

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 187. | 723 | 7 | "stock price" | "strike price" | Typographic error |
| 188. | 723 | 20 | "see here" | "see the disconnect here" | Typographic error |
| 189. | 726 | 6-7 | "establish what Defendants have been paid but for the conduct." | "establish what Defendants' employees would have been paid but for the conduct." | Clarification |
| 190. | 726 | 10 | "reports" | "results" | Typographic error |
| 191. | 727 | 16 | "time" | "harm" | Typographic error |
| 192. | 727 | 17 | "tax policy" | "tax policy is" | Typographic error |
| 193. | 728 | 6 | "if the conduct still is suppressed" | "if the compensation is suppressed by then conduct" | Clarification |
| 194. | 729 | 1–2 | "the no-poach agreement" | "the no-poach agreements" | Clarification |
| 195. | 729 | 6–8 | "The no-poach agreement is my understanding that was between DaVita and SCA and then SCA and USPI." | "My understanding is that the no-poach agreements were between DaVita and SCA and then SCA and USPI." | Clarification |
| 196. | 729 | 9 | "recruiting and hiring" | "recruiting and hiring from other companies" | Typographic error |
| 197. | 729 | 18 | "I'm not sure" | "I'm not sure to the extent" | Typographic error |
| 198. | 730 | 8 | "Give me a second." | "Let me give an example." | Typographic error |
| 199. | 732 | 15–16 | "with reference to" | "relative to" | Typographic error |
| 200. | 736 | 15 | "a new analysis" | "a new hire analysis" | Clarification |
| 201. | 738 | 3-5 | "more broadly restrictions can affect even studying" | "mobility restrictions can affect even starting" | Typographic error |

15

3304935.2

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 202. | 738 | 12–13 | "post-Bell and" | "post-Bellum" | Typographic error; clarification |
| 203. | 739 | 21 | "suppressed" | "increased" | Clarification |
| 204. | 740 | 2–3 | "he doesn't review best literature." | "he doesn't review this literature." | Clarification |
| 205. | 740 | 17–20 | "If you review the compensations that are made in this case and you consider now pay is set at these companies" | "If you review the compensation decisions that are made in this case and you consider how pay is set at these companies" | Typographic error; clarification |
| 206. | 741 | 10–12 | "Look, the academic literature this is inconsistent with Dr. McCrary," | "Look, the academic literature is inconsistent with Dr. McCrary," | Clarification |
| 207. | 742 | 9–10 | "I did a separate analysis how long in the first year in the data" | "I did a separate analysis looking only at the first year in the data" | Typographic error; clarification |
| 208. | 744 | 9 | "incumbent higher pay" | "incumbent pay" | Clarification |
| 209. | 744 | 16 | "Column 1 and 2" | "Columns 1 and 2" | Clarification |
| 210. | 745 | 6 | "may have" | "only has" | Typographic error |
| 211. | 745 | 17 | "partial data" | "partial data in 2007" | Typographic error |
| 212. | 746 | 13–14 | "the first year, was 2025" | "the first year, was 2005" | Typographic error |
| 213. | 746 | 17–19 | "in the 2025 data that is a senior-level employee in your analysis, the year 2025 is the first year" | "in the 2005 data that is a senior-level employee in your analysis, the year 2005 is the first year" | Typographic error |
| 214. | 747 | 14 | "efficient" | "coefficient" | Clarification |
| 215. | 748 | 15 | "10" | "tenure" | Typographic error |
| 216. | 748 | 20 | "effect for tenure" | "effect of conduct for tenure" | Typographic error |

16

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 217. | 751 | 9–10 | "they were a manager maybe before years and now they just got promoted." | "they were a manager maybe for years and now they just got promoted." | Typographic error |
| 218. | 751 | 11 | "first in the" | "first full year in the" | Typographic error |
| 219. | 755 | 12 | "Mortinson" | "Mortensen" | Typographic error |
| 220. | 755 | 13 | "economical" | "canonical" | Typographic error |
| 221. | 757 | 14–15 | "So in a pure monopsony, you converge two." | "So in a pure monopsony, you converge to -- " | Typographic error |
| 222. | 757 | 22 | "ladder" | "labor" | Typographic error |
| 223. | 758 | 14 | "hiring an elastic" | "highly inelastic" | Typographic error |
| 224. | 758 | 15 | "So it's a type" | "So to tie it back" | Typographic error |
| 225. | 765 | 8 | "overtime" | "over time" | Typographic error |
| 226. | 773 | 10 | "discussing pulling" | "discussing gathering merit pool" | Typographic error |
| 227. | 773 | 18 | "Peter Clemons" | "Peter Clemens" | Typographic error |
| 228. | 774 | 10 | "emergency" | "internal" | Typographic error |
| 229. | 778 | 7 | "Ken Thiry" | "Kent Thiry" | Typographic error |
| 230. | 778 | 18–19 | "And Bridie Fanning in his deposition" | "And Bridie Fanning in her deposition" | Typographic error |
| 231. | 780 | 20 | "Ken Thiri well. Ken Thiri has" | "Kent Thiry well. Kent Thiry has" | Typographic error |
| 232. | 786 | 11 | "quantitative" | "qualitative" | Typographic error |

17

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---|---|---|---|---|
| 233. | 788 | 8–9 | "Defendant's Exhibit 90," | "Defendants' Exhibit 90," | Typographic error |
| 234. | 788 | 14 | "Brian Rasko" | "Brian Rasco" | Typographic error |
| 235. | 790 | 2 | "Defendant's experts" | "Defendants' experts" | Typographic error |
| 236. | 792 | 14 | "bilateral" | "unilateral" | Typographic error |
| 237. | 792 | 16 | "And then analyze the qualitative evidence" | "And then analyze the quantitative evidence" | Typographic error |
| 238. | 792 | 19 | "bilateral" | "unilateral" | Typographic error |
| 239. | 793 | 8 | "consistent" | "inconsistent" | Typographic error |
| 240. | 794 | 7–8 | "which is to assess access that the qualitative evidence is" | "which is to assess that the qualitative evidence is" | Typographic error |
| 241. | 794 | 12–13 | "My opinion is in that qualitative evidence is consistent with" | "My opinion is that qualitative evidence is consistent with" | Typographic error |
| 242. | 796 | 2 | "consistent" | "inconsistent" | Typographic error |
| 243. | 796 | 16–17 | "The evidence that I saw in the initial report of all this CSI exchanges" | "The evidence that I saw in the initial report of all these CSI exchanges" | Typographic error |
| 244. | 797 | 6 | "things about" | "thinking about" | Typographic error |
| 245. | 797 | 10–11 | "what we don't observe as relevant because" | "what we don't observe is relevant because" | Typographic error |
| 246. | 802 | 2 | "Brian Rasko." | "Brian Rasco." | Typographic error |
| 247. | 802 | 19 | "Brian Rasko;" | "Brian Rasco;" | Typographic error |
| 248. | 804 | 15 | "relevant amount of documents" | "relevant documents" | Typographic error |

18

| # | Page(s) | Line(s) | Original Text | Change To | Reason |
|---|---------|---------|---------------|-----------|--------|
| 249. | 806 | 19 | "in the" | "and the" | Typographic error |
| 250. | 809 | 2 | "difference" | "differencing" | Typographic error |
| 251. | 811 | 18–19 | "and saw how many CEOs and how many CEOs there were at SCA." | "and saw how many CEOs there were at SCA." | Typographic error |
| 252. | 816 | 18 | "Brian Rasko," | "Brian Rasco," | Typographic error |

3304935.2

# ZIELINSKI EXHIBIT 8 (FILED UNDER SEAL)

John Johnson, Ph.D.

May 07, 2025

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

- - - - - - - - - - - - - - - - - X

IN RE OUTPATIENT MEDICAL       :   Docket No.

CENTER EMPLOYEE ANTITRUST      :   1:21-cv-00305

LITIGATION                     :

- - - - - - - - - - - - - - - - X

                      Wednesday, May 7, 2025

         Videoconference Deposition of JOHN

JOHNSON, Ph.D., an expert witness herein, called for

examination by counsel for Plaintiffs in the

above-entitled matter, pursuant to notice, the

witness being duly sworn by Desirae S. Jura, a Notary

Public in and for the District of Columbia, held at

McGuireWoods, LLP, 888 16th Street, NW, Washington,

DC, at 9:02 a.m., ET, Wednesday, May 7, 2025, and the

proceedings being taken down by Stenotype by Desirae

S. Jura, RPR, CSR (CA), and transcribed under her

direction.

P R O C E E D I N G S

THE VIDEOGRAPHER:  We are on the record at 9:02 a.m., on May 7th, 2025.  This is the video recorded deposition of Dr. John Johnson, in the matter of In Re:  Outpatient Medical Center Employee Antitrust Litigation.  This proceeding is being held at the offices of McGuireWoods in Washington, DC.  My name is Jason Levin.  I am the videographer of behalf of U.S. Legal Support.  The court reporter is Desirae Jura, also on behalf of U.S. Legal Support.

Will counsel please state their appearances for the record, and then the court reporter will swear in the witness.

MR. HARVEY:  Dean Harvey of Lieff Cabraser for the Plaintiffs.

MS. HARWELL:  Emily Harwell from Lieff Cabraser for the Plaintiffs.

MS. ZIELINSKI:  Sarah Zielinski from McGuireWoods for the SCA Defendants.

MR. TALBOT:  Andrew Talbot from McGuireWoods on behalf of the SCA Defendants.

MS. MANNING:  Amy Manning of McGuireWoods for the SCA Defendants.

MR. KLIEBARD:  Good morning.  Ken Kliebard of Morgan Lewis on behalf of DaVita, Inc.

John Johnson, Ph.D.
May 07, 2025

MR. EVERETT:  Clay Everett from Morgan Lewis on behalf of DaVita.

MS. DURAN:  Good morning.  Julianne Duran from King & Spalding on behalf of USPI and Tenet.

MS. STEINER:  Good morning.  Jordanne Steiner from Wilson, Sonsini, Goodrich & Rosati on behalf of Defendant Andrew Hayek.

MR. MOHRAZ:  Andrew Mohraz, M-O-H-R-A-Z, with DaVita.

THE VIDEOGRAPHER:  And the people on Zoom?

MR. SHAKOW:  This is Peter Shakow with SCA Optum.

THE VIDEOGRAPHER:  Someone just stated their appearance.  We couldn't hear you.

MS. O'CONNOR:  Katharine O'Connor of McDermott Will & Emery.

MR. SEIDEL:  Good morning.  David Seidel of the Joseph Saveri Law Firm on behalf of the Plaintiffs.

MS. MOYE:  Good morning.  Veronica Moye, King & Spalding, USPI and Tenet.

MS. NEWTON:  Good morning.  Emily Newton from King & Spalding on behalf of USPI and Tenet.

MR. BREWER:  Connor Brewer from King & Spalding on behalf of USPI and Tenet.

MR. CHRESTIONSON:  Jason Chrestionson, Morgan Lewis, DaVita.

MS. LOU:  Melissa Lou, in-house counsel with DaVita.

MS. ASHUR:  Tanya Ashur, Lieff Cabraser on behalf of Plaintiffs.

Whereupon,

JOHN JOHNSON, Ph.D.,

having been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFFS

BY MR. HARVEY:

Q.    Good morning, Dr. Johnson.

A.    Good morning, Mr. Harvey.

Q.    Could you please define a no poach agreement?

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  That is a very vague question.  You would have to do it the context of a very specific case or set of facts and circumstances.  So are you talking about what is alleged in this case?  Are you talking about anything I've ever seen about a no poach?  You'd have to give me more specificity.

BY MR. HARVEY:

John Johnson, Ph.D.
May 07, 2025

competition in labor markets, is particularly

relevant.

BY MR. HARVEY:

Q.    The commentary that you attribute to the

U.S. Department of Justice, these were comments not

by the Department of Justice, but by Dr. Patrick

Greenlee and Dr. Kevin Murphy as they sat on a panel

that occurred at the U.S. Department of Justice,

correct?

A.    That is correct.  And I did not mean to

imply otherwise.

Q.    Was there another panel that day about

market definition and labor markets?

A.    I think there was, yes.

Q.    Did you look at that?

A.    I have looked at the whole panel before,

yes, I have.  I don't believe I cited it here, but I

have looked at that before.

Q.    So the first article you mentioned was the

Levenstein and Suslow article, I believe?

A.    Yes.

Q.    What you term as cartel success?

A.    Yes.

Q.    Does that article say anything about labor

markets?

John Johnson, Ph.D.
May 07, 2025

A.   Labor markets explicitly?  No.  It talks about markets and cartels.  This is, in fact, one of the primary sources Dr. Starr cited in his report.

Q.   Okay.  And you said the Matthew Gibson paper was potentially relevant?

A.   Yes.

Q.   Why is it potentially relevant?

A.   Well, it's a purported study of a series of cases, high tech employee cases in Silicon Valley. I think it's particularly relevant here because Dr. Gibson in his study does several things when he tries to study these issues, which I think are important here.

One is, he's very cautious about the use of stock data in which he actually says that one has to be very careful and cannot rely upon the stock data he relied upon for drawing conclusions about the magnitude of the effects of this purported conduct in that case.  I think that's particularly salient because Dr. Starr points to that particular paper as justification for the size of the effect in his report without referencing that the author itself said you can't use it for that purpose.

Second, Dr. Gibson, in his study, goes out of his way to study other companies outside of the

John Johnson, Ph.D.
May 07, 2025

alleged defendants in his econometric methodologies as a way to control for outside competition in a context where he's trying to study the exertion of market power. That is particularly salient here since a large part of my report is about the failures of Dr. Gerhart and Dr. Starr to do any serious assessment of outside competitive opportunities in the labor market.

So how does one study market power in a labor context if you don't study the range of outside opportunities in that case? Even the paper that Dr. Starr cites does that. So that's also a really important salient piece to the study. So in those reasons, that's why I think it's particularly relevant to the work here. There's probably other reasons, too, but that's what I can recall sitting here right now.

Q. You also list a publication by the U.S. Department of Treasury, the State of Labor Market Competition. Does that cite -- does that publication on which you rely for your opinions say anything about the extent of employer market power in the economy?

A. I'm sure it does. It's a fairly long study. I don't have all of it memorized, but, yes,

John Johnson, Ph.D.
May 07, 2025

that's an entire -- look, the focus of that particular study is about different elements of the labor market and how we're thinking about it the way we assess how employers interact with employees, and how in different contexts, studying that bargaining relationship or that matching relationship matters.

And so my take on the broad Treasury studies are about exploring these issues more thoughtfully, and trying to think about, are there circumstances where market power could exist, how does it apply. And that a little bit, again, this mismatch between the way certain labor economists speak about this and the way antitrust economists speak about that. But I think that paper is definitely relevant, yes.

Q. Do you believe that the state of labor market competition document from the U.S. Department of Treasury is consistent with your opinions in this case?

A. You'd have to show me what you're speaking about, but I don't believe the state of labor market document speaks to my opinions in this case. So I have very specific opinions about a very specific set of facts and circumstances. If there's something specific you'd like me to comment on, you'd have to

John Johnson, Ph.D.
May 07, 2025

A.    Yes.

Q.    But sitting here, you have no idea what that is?

A.    No.

Q.    Have you ever done an empirical study of how no poach agreements affect workers?

A.    I guess I'm only -- I'm hesitating for two reasons.  First, we talked about earlier, I think no poach is a bit of a broad term.  I can think about another case, several cases I did that would be in the broad rubric of employment restrictions that I have worked on, where I have done empirical work in those cases.

Q.    Did any of that work result in a peer reviewed publication?

A.    No.

Q.    Have you ever had a peer reviewed publication that attempts to estimate the impact of some phenomena under study on employee pay?

A.    I don't think so.  We went through the peer reviewed publications.  I don't remember there being -- I mean, obviously, I talked a bit about the divorce study, where there was the offsetting income effects, which obviously matters.  But I don't think -- I went into kind of gory detail earlier this

John Johnson, Ph.D.
May 07, 2025

morning on my studies.  I think they stand as what they are.

Q.    Okay.  Are you familiar with the academic literature on no poach agreements?

A.    I am broadly familiar, yes.

Q.    What are the typical estimates of how no poach agreements affect employee compensation?

A.    Well, again, as I've said before, I think that's a little bit of a misleading question.  No poach has a fairly broad definition, and can be used imprecisely.

What I have seen with respect to the various papers is a whole host of papers, none of which get even close to what Dr. Starr has estimated the effect is in this case.  The particular papers I'm thinking of, there have been studies of noncompetes which have generally been smaller, 4, 5, 6 percent.

The particular study by Gibson, which is on a specific set of circumstances, is still nowhere near as large as Dr. Starr's estimate.  Those are the ones I can think of.  But I still think this is an area that's quite wide open.  And I do not think that Dr. Starr's estimate, since I looked at the papers he cited, are even close to what he estimated here to

John Johnson, Ph.D.
May 07, 2025

what's in the literature.

Q.    Does the literature find that no poach agreements reduce non-equity compensation?

A.    Well, again, I think we need to be very precise.  You keep using the term no poach.  I think no poach is a term that has different meanings.  What I will talk to is there is a paper by Dr. Gibson that purported to study a particular set of agreements in the high tech industry that Dr. Starr cites about the magnitude of the effects on stock -- of stock compensation and says the data he relied on through Glassdoor is noisy and inappropriate to assess for the purposes of any magnitudes at all.

So that's the paper that I think is closest to that.  I don't know that I've seen other papers.  There could be others, but again, we have to be very precise about what do we mean when we say no poach, and what do we mean by the specific papers.

Q.    So your understanding of the Gibson paper is that he threw up his hands and said, there's no way to tell what the effect of the no poach agreements at issue were on employee pay?

A.    No, that's not what I said at all.  What I said is with a specific part of the Gibson paper that has to deal with stock compensation.  And that part

John Johnson, Ph.D.
May 07, 2025

is based on noisy Glassdoor data, where there is about 50 percent of the data is potentially missing. And he's very cautious in what he says you can conclude about stock from the data he relies upon.

Q.   Sir, my question was about non-equity compensation.

A.   With respect to non-equity compensation, I believe he also caveats about the Glassdoor data, but he does find some effects from that.  Yes, I don't think he threw his hands in the air on that, no.

Q.   In that paper, did Dr. Gibson calculate the defendants' market shares of the relevant labor markets?

A.   You would have to show me the paper for that level of detail.  What I recall is Dr. Gibson used several benchmark companies in his assessment to try to account for what was outside opportunities.

But I also thought there was some section where he talked about the more narrow set of jobs at issue.  But again, if we're going to talk in specificity, you'll have to show me the paper.

Q.   Dr. Gibson found that the no poaching agreements reduced salaries at the colluding firms by 5.6 percent, correct?

A.   That sounds like you're reading something

John Johnson, Ph.D.
May 07, 2025

to me.  I don't have a photographic memory, so I want to be precise.  As I remember the paper, it talked about a specific set of no -- what it's calling no poach agreements, which were agreements in a specific case involving the high tech industry about a certain set of employers and certain different potential agreements.

I don't remember the exact magnitude, but 5.6 percent sounds like in a range that I recall. And I will note is very -- much smaller than 14.5 percent, Dr. Starr's preferred estimate.

Q.    Did Dr. Gibson conclude that the defendants in the Silicon Valley no poach case had considerable market power over their employees?

A.    Yeah, I don't recall the precise contours of his opinion in that paper.  I believe you're reading something to me.  You'd have to show me exactly what it is.

All I do recall, though, is that even in a context -- again, I'm not assuming you're trying to trick me.  If you're reading something, you're reading it.  He still also accounted for other non-defendant firms in his assessment to determine the magnitudes in his study.

Q.    I'll show you the paper.  I'm not trying

John Johnson, Ph.D.
May 07, 2025

to trick you, just to be clear.

A.    Thank you.  And I just don't have that kind of photographic memory.

Q.    I certainly don't.

SPEAKER:  This is tab 7?

MS. HARWELL:  Correct.

(PX No. 592 was identified for the record.)

BY MR. HARVEY:

Q.    Did Dr. Gibson in this paper define what the relevant labor market was?

A.    I'm looking.

MS. ZIELINSKI:  Dean, did you say into the record what exhibit this is?

MR. HARVEY:  I don't believe I did.  Thank you.  That's Plaintiffs' Exhibit 592, which is a paper by Dr. Gibson called Employer Market Power in Silicon Valley.

THE WITNESS:  I do not see an assessment of market definition in this paper.

BY MR. HARVEY:

Q.    Does he calculate the defendants' shares of a relevant labor market?

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  Given I don't see that he

John Johnson, Ph.D.
May 07, 2025

A.    I don't know that -- I wasn't involved with this case.  I don't know the numbers.  I'll just have to take your representation, sir.

Q.    In that case, the vast majority of employees in that class worked for companies that allegedly only had a no solicitation agreement with one or perhaps two competing employers, correct?

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  I'm actually looking for the description again.  I'm aware of the case obviously.  I don't know the details of the -- I thought when I read this paper I actually read that there was a non-solicit between certain pairs and there was a don't-tell-your-boss provision.  That's what I thought I recalled.  But I don't have it -- I'm saying I don't have a photographic memory of the case because, again, I didn't work on it.  So I just don't know more than what I've read in this paper and what I've seen generally.

BY MR. HARVEY:

Q.    So there was seven defendants in that case, right?  It was Pixar, Lucas Film, Apple, Adobe, Google, Intel and Intuit, correct?

A.    It looks like eight according to him.  Adobe, Apple, eBay, Google, Intel, Intuit, Lucas

John Johnson, Ph.D.
May 07, 2025

Films, and Pixar.

Q. eBay was part of the California AG investigation. But maybe Gibson includes it in his study. Sure, so take eBay. Except for the restraints between Pixar and Lucas Film, the rest of the restraints were just no solicitation agreements.

Is that your understanding?

A. I'll have to take your representation.

Q. Okay. So here, Dr. Gibson estimates suppression of 5.6 percent based almost entirely on only no solicitation agreements. What do you think would happen to that percent if you layered on top a tell your boss and if you layered on top exchanges of confidential compensation information?

MS. ZIELINSKI: Object to the form.

THE WITNESS: Hold on. I'm not going to speculate. I think this is one of my other critiques of Dr. Starr is that I thought you had to separate out the effect of the conduct. But I guess I'm a little confused because, again, is reading this, let's go to table A8. Most frequently observed control group firms. Here is a list of major firms, all of which you use as a control group outside of the alleged coconspirators. Amazon, Microsoft, Cisco, Qualcomm, Epic, Cerner, Tata, Yahoo, and about

John Johnson, Ph.D.
May 07, 2025

20-odd others.

Here's a study that Dr. Starr cites which accounts for outside labor opportunities.  Dr. Starr didn't try to do that.  This paper recites does and it still only finds a 5 percent effect.  That tells me that the failure to control for outside opportunities is another salient factor with why that 14.5 percent is so unrealistic.

BY MR. HARVEY:

Q.    Well, Dr. Starr actually conducts a regression that he stands behind that provides a number estimate.  You on the other hand are just looking at the number, referring to articles you don't understand, and saying, well, that number is too high because it's more than 5.6 percent, right?

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  First of all, sir, I would have to take objection to your idea that I don't understand the papers.  I am a professional economist.  I do understand them, I read them and I read Dr. Starr's work very closely.  So I don't think you meant to be that disparaging, but that's not correct.  So let's start with that.

Second, that's not just what I did with Dr. Starr's work.  I took Dr. Starr's work and I

John Johnson, Ph.D.
May 07, 2025

systemically first replicated the work, I identified multiple data errors that moved the damages by over $170 million. That is just in -- a basic mistake with his treatment of the data. So that immediately flags for me something about the quality of the work that I'm looking at.

Then I systemically reran his results both by studying the economics and studying the sensitivity of the results and report all of the sensitivities in my report. So I take objection to your characterization of my understanding of the papers and I take objection to your characterization of what my opinion is or isn't.

BY MR. HARVEY:

Q.   Are you aware of any study of agreements like this that estimates the combined effect of a no solicitation agreement, a tell-your-boss agreement, and exchanging confidential pay information?

A.   No, I'm not.

Q.   So why do you dismiss out of hand the idea that the combined effect of all three forms of misconduct could suppress pay by 14-1/2 percent?

A.   Well, I dismiss it out of hand first of all because the model has reliability problems. But further, Dr. Starr in no place actually addresses how

John Johnson, Ph.D.
May 07, 2025

A.    Yeah, in fact DaVita -- I cite to the Black-Scholes Theorem in DaVita's calculation of their option plan in my report.

Q.    This was in DaVita's compensation data. That's how DaVita's own compensation data system records when an employee realizes a gain from equity compensation?

A.    No.  The Black-Scholes Theorem is what is used by DaVita when they talk about their financials with respect to the grants.  I cite that in my expert report.

Q.    So what is a better proxy for the number of job opportunities at a particular company?  The number of employees at that time or the number of job vacancies?

A.    I think it depends on the particular industry, the particular company, what type of jobs you're talking about.

Q.    Which do you use?

A.    It depends on the circumstances.  I could imagine using both in different circumstances.

Q.    But what did you do for your analysis in this case when you tried to estimate the job opportunities available to class members?

A.    When I estimated job opportunities, what

John Johnson, Ph.D.
May 07, 2025

I -- I don't think I have an ultimate estimate of that. What I did I looked at actual places where I could find employees went and I looked at the job opportunities with respect the to Lightcast data and where people are hired from. If what you're talking to is the analysis in Exhibit -- I'm trying to help you, I'm trying to think of other places -- in Exhibit 23, which is where I took the Caldwell and Danielli. There, I used Dr. Starr's wage suppression estimate to back out what the outside opportunities were based on that study. That's what I did.

Q. Are you aware of studies that use -- that assess labor market concentration by using job vacancies, postings in Lightcast data?

A. I'm aware that there are studies that try to look at job vacancy and the like and I'm aware of different studies that use Lightcast data. I'm not sure I know the intersection of the two things you just described. That doesn't mean it may not exist. It's just not coming to mind as I sit here.

Q. Why didn't you combine the earnings data and mobility events from the Lightcast data to estimate the extent of market power defendants had?

A. First of all, I'm not sure that that would -- at least for me I did not think that that

John Johnson, Ph.D.
May 07, 2025

was something that I would do with the Lightcast data. To do that I think I would need to do more assessment of the totality of the samples. Because of the nature of the Lightcast data which are online resumes, you can only identify certain people. It's not clear you would have the universe. And so I wanted to use it for the purpose of -- that I felt I could, which was here are examples of outside employees. It's necessarily an underestimate because I can't capture everybody. But if we're going to try to get to issues of market power or market concentration, I don't think I -- at least I didn't consider using it for that purpose and I would need to explore far more if I was comfortable with the data for that purpose. That -- those are the kind of sensitivities I would have for using the data for that purpose.

Q.   Why didn't you estimate labor supply elasticities for the defendants?

A.   Because I didn't think it was necessary to offer the opinions I did here.

Q.   Do you know whether the defendants took any steps to monitor, enforce, maintain internal equity of their companies?

A.   I have seen some references to internal

John Johnson, Ph.D.
May 07, 2025

CERTIFICATE OF REPORTER.

UNITED STATES OF AMERICA    ) ss:

DISTRICT OF COLUMBIA        )

I, Desirae S. Jura, RPR, CSR (CA), the officer before whom the foregoing proceedings were taken, do hereby certify that the foregoing transcript is a true and correct record of the proceedings; that said proceedings were taken by me stenographically to the best of my ability and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any parties to this case and have no interest, financial or otherwise, in its outcome.

_____

Notary Public in and for

The District of Columbia

My commission expires:  1/31/2030

## John Johnson, Ph.D. May 7, 2025 Deposition
## Errata Sheet

I, John Johnson, Ph.D., having read the foregoing deposition, Pages 1 through 270, taken May 7, 2025, do hereby certify said testimony is a true and accurate transcript, with the following changes:

| Page | Line(s) | Correction | Reason |
|---|---|---|---|
| 11 | 8 | Change "terminology" to "terminologies" | Correct typographical error |
| 11 | 19–20 | Change "either agreement, understanding" to "either agreement or understanding" | Correct typographical error |
| 12 | 11 | Change "obligations" to "allegations" | Correct typographical error |
| 13 | 12 | Change "terminology that what I've seen is in this case" to "terminology that I've seen in this case" | Correct typographical error |
| 13 | 16 | Change "I understand the allegations are is about a set" to "I understand the allegations are, which is about a set" | Correct typographical error |
| 13 | 19 | Change "one would be, could" to "one would be, could one" | Correct typographical error |
| 14 | 17 | Change "I guess as I would say is" to "I guess as I would say it" | Correct typographical error |
| 14 | 24 | Change "the don't tell your boss provision" to "the tell your boss provision" | Clarify intended meaning |
| 14 | 25 | Change "agreement" to "agreements" | Correct typographical error |
| 15 | 10 | Change "Dr. Starr" to "Dr. Starr's" | Correct typographical error |
| 19 | 22 | Change "Written" to "I've written" | Correct typographical error |
| 20 | 1 | Change "certainly" to "certain" | Correct typographical error |
| 20 | 9 | Change "understand" to "understanding" | Correct typographical error |
| 21 | 3 | Change "on" to "in" | Correct typographical error |
| 21 | 5–6 | Change "San Antonio versus Garcia" to "Garcia versus San Antonio" | Clarify intended meaning |
| 21 | 13–15 | Change "which was called Do Long Work Hours -- How Do Long Work Hours Contribute Or Cause Divorce." to "which was called Do Long Work Hours Contribute to Divorce?" | Clarify intended meaning |
| 22 | 24 | Change "it was the" to "it was in the" | Correct typographical error |
| 24 | 3 | Change "some significant" to "some statistically significant" | Correct typographical error |
| 24 | 4 | Change "Could" to "I could" | Correct typographical error |
| 25 | 24 | Change "with a work" to "with work" | Correct typographical error |
| 27 | 16 | Change "a" to "an" | Correct typographical error |
| 28 | 21 | Change "were" to "was" | Correct typographical error |
| 29 | 7 | Change "difference" to "differences" | Correct typographical error |
| 30 | 19 | Change "others" to "other's" | Correct typographical error |
| 31 | 7 | Change "were" to "was" | Correct typographical error |
| 31 | 15 | Change "Could" to "I could" | Correct typographical error |
| 34 | 12 | Change "Universities" to "universities" | Correct typographical error |
| 36 | 3 | Change "you's" to "you'd" | Correct typographical error |

1

| Page | Line(s) | Correction | Reason |
|---|---|---|---|
| 37 | 13 | Change "New Jersey?" to "New Jersey." | Correct typographical error |
| 37 | 17 | Change "labor theory market" to "labor market theory" | Correct typographical error |
| 38 | 9 | Change "minimum wage" to "minimum wage increased" | Clarify intended meaning |
| 38 | 14 | Change "worker" to "workers" | Correct typographical error |
| 40 | 15 | Change "are" to "is" | Correct typographical error |
| 40 | 23 | Change "methodological at least possible problems" to "at least possible methodological problems" | Correct typographical error |
| 41 | 15 | Change "employment would go up" to "employment would go down" | Correct typographical error |
| 43 | 10–11 | Change "talk about" to "talk" | Correct typographical error |
| 45 | 23 | Change "Danielli" to "Danieli" | Correct typographical error |
| 48 | 13–14 | Change "So in those reasons" to "So for those reasons" | Correct typographical error |
| 49 | 3 | Change "about it the" to "about the" | Correct typographical error |
| 50 | 3 | Change "an" to "as" | Correct typographical error |
| 52 | 4 | Change "is thinking about" to "thinking about" | Correct typographical error |
| 52 | 18–19 | Change "I think some might call spunk" to "I think some might call it spunk" | Correct typographical error |
| 53 | 11 | Change "My Moneties Rule" to "Maimonides' Rule" | Correct typographical error |
| 54 | 25 | Change "So I'm not sure we hit on" to "So I'm sure we hit on" | Correct typographical error |
| 55 | 16 | Change "case" to "class" | Correct typographical error |
| 58 | 4–5 | Change "Here's how you think it as a statistics and as an everyday person" to "Here's how you think about it as a statistician and as an everyday person" | Correct typographical error |
| 59 | 8 | Change "thing" to "things" | Correct typographical error |
| 59 | 10 | Change "so decided" to "so I decided" | Correct typographical error |
| 69 | 17–18 | Change "the methodologies used applied to those class definitions apply" to "the methodologies used apply to those class definitions" | Correct typographical error |
| 82 | 25 | Change "has to deal" to "has to do" | Correct typographical error |
| 83 | 2 | Change "data is" to "data that is" | Correct typographical error |
| 83 | 17 | Change "was" to "were" | Correct typographical error |
| 86 | 15 | Change "there was a section on here" to "there was a section on that here" | Correct typographical error |
| 86 | 23–24 | Change "it's just you keep saying no poach, is that any given study is going to depend" to "it's just you keep saying no poach, and any given study is going to depend" | Correct typographical error |
| 88 | 23 | Change "undermines" to "that undermines" | Correct typographical error |
| 91 | 10 | Change "Dr. Starr" to "Dr. Starr's" | Correct typographical error |

2

| Page | Line(s) | Correction | Reason |
|---|---|---|---|
| 91 | 17 | Change "with the actual data I have, is" to "what the actual data I have is" | Correct typographical error |
| 93 | 14 | Change "whatever their critiques of my approach" to "whatever their critiques are of my approach" | Correct typographical error |
| 96 | 14 | Change "detailed" to "detailed ways" | Correct typographical error |
| 96 | 16 | Change "saying is, it's" to "saying, it's" | Correct typographical error |
| 97 | 3 | Change "plaintiff" to "plaintiff's" | Correct typographical error |
| 97 | 20 | Change "you have generally" to "you generally" | Correct typographical error |
| 100 | 5–6 | Change "causal link" to "a causal link" | Correct typographical error |
| 100 | 10 | Change "failure to do a sensitivity with respect to" to "failure to do a sensitivity analysis with respect to" | Correct typographical error |
| 100 | 17 | Change "has" to "have" | Correct typographical error |
| 101 | 2 | Change "consequences" to "consequence" | Correct typographical error |
| 104 | 5 | Change "there's part if it" to "there's part of it" | Correct typographical error |
| 106 | 3 | Change "interfering with or your" to "interfering with your" | Correct typographical error |
| 109 | 12 | Change "how it effects" to "how it affects" | Correct typographical error |
| 109 | 22–23 | Change "Since you're asking me a statement" to "Since you're asking me about a statement" | Correct typographical error |
| 112 | 17 | Change "Danielli" to "Danieli" | Correct typographical error |
| 114 | 1 | Change "my expert reports" to "my expert report" | Correct typographical error |
| 115 | 1–2 | Change "I divide in terms of" to "I can't divide it in terms of" | Clarify intended meaning |
| 116 | 2 | Change "issues" to "opinions" | Correct typographical error |
| 121 | 5 | Change "Now, if there's more than that" to "Now, there's more than that" | Correct typographical error |
| 121 | 19 | Change "would testified to" to "would testify to" | Correct typographical error |
| 122 | 7–10 | Change "I just don't want to give the misleading impression that if I were to testify on damages, I would be saying, this is what the consequences of these particular assumptions are." to "I just don't want to give a misleading impression. If I were to testify on damages, I would be saying, this is what the consequences of these particular assumptions are." | Clarify intended meaning |
| 124 | 16 | Change "no tell your boss provision" to "tell your boss provision" | Clarify intended meaning |
| 125 | 16 | Change "the plaintiff Mr. Sprattling" to "the named plaintiff Mr. Spradling" | Correct typographical error |
| 125 | 21–22 | Change "Mr. Keech, who started before working at certain hospitals, after" to "Mr. Keech, who before worked at certain hospitals, and after" | Correct typographical error |
| 128 | 3–4 | Change "hundreds of employees left during the time period, which is a very small number" to "hundreds of employees left during the time period, which is a very large number" | Clarify intended meaning |

3

| Page | Line(s) | Correction | Reason |
|---|---|---|---|
| 129 | 4 | Change "between DaVita and class CA" to "between DaVita and SCA" | Correct typographical error |
| 131 | 1 | Change "failure to include for outside opportunities" to "failure to account for outside opportunities" | Correct typographical error |
| 131 | 2–3 | Change "All of my econometric error apply with full force" to "All of my econometric testing applies with full force" | Correct typographical error |
| 131–132 | 25–1 | Change "impact of damages" to "impact and damages" | Correct typographical error |
| 132 | 7 | Change "failure to include for a firm performance controls" to "failure to include firm performance controls" | Correct typographical error |
| 135 | 3 | Change "biased on the same inputs" to "based on the same inputs" | Correct typographical error |
| 136 | 13 | Change "analyses" to "analysis" | Correct typographical error |
| 137 | 21 | Change "specification in included sample" to "specification and included sample" | Correct typographical error |
| 138 | 3–4 | Change "robustness checks that he calls them" to "robustness checks as he calls them" | Correct typographical error |
| 142 | 6 | Change "Dr. Gerhardt" to "Dr. Gerhart" | Correct typographical error |
| 142–143 | 25–1 | Change "Dr. Gerhart and I offer opinions on this, offers a theory" to "Dr. Gerhart and I offer opinions on this, he offers a theory" | Correct typographical error |
| 143 | 17–18 | Change "might have helped driven it" to "might have helped drive it" | Correct typographical error |
| 144 | 10–11 | Change "as I go to in the data" to "as I go into the data" | Correct typographical error |
| 144 | 23 | Change "is" to "it" | Correct typographical error |
| 151 | 23 | Change "employer" to "employee" | Correct typographical error |
| 152 | 10–11 | Change "I know there's less" to "I know there's some that are less" | Correct typographical error |
| 154 | 6 | Change "degree" to "degrees" | Correct typographical error |
| 156 | 20–21 | Change "prior to January 20 of '21" to "prior to January 2021" | Correct typographical error |
| 156 | 22 | Change "effectively I" to "effectively why I" | Correct typographical error |
| 161 | 12–13 | Change "I think part of what CEOs is they do try to control costs" to "I think part of what CEOs do is they try to control costs" | Correct typographical error |
| 162 | 4 | Change "demand in" to "demand" | Correct typographical error |
| 162 | 11–12 | Change "I don't want to speak for the entire of the company" to "I don't want to speak for the entirety of the class period" | Correct typographical error |
| 162 | 13–14 | Change "it is true that they have a large proportion of their compensation is in variable comp" to "it is true that they have a large proportion of their compensation in variable comp" | Correct typographical error |

4

| Page | Line(s) | Correction | Reason |
|---|---|---|---|
| 163 | 8 | Change "one part of a" to "one" | Correct typographical error |
| 163 | 13 | Change "generate the revenue for your count" to "generate the revenue for your account" | Correct typographical error |
| 163 | 25 | Change "anymore" to "any more" | Correct typographical error |
| 164 | 7–8 | Change "no tell your boss provision" to "tell your boss provision" | Clarify intended meaning |
| 165 | 21 | Change "no tell your boss provision" to "tell your boss provision" | Clarify intended meaning |
| 168 | 8 | Change "about page" to "about this, page" | Correct typographical error |
| 171 | 20 | Change "what" to "that" | Correct typographical error |
| 175 | 9 | Change "of" to "on" | Correct typographical error |
| 175 | 23 | Change "don't tell your boss" to "tell your boss" | Clarify intended meaning |
| 175 | 25 | Change "don't tell your boss" to "tell your boss" | Clarify intended meaning |
| 185 | 18 | Change "that respect to that" to "respect to the" | Correct typographical error |
| 187 | 17–18 | Change "let's assume that you're a single labor market" to "let's assume that you have a single labor market" | Correct typographical error |
| 189 | 14–15 | Change "I don't we think" to "we don't think" | Correct typographical error |
| 189 | 21 | Change "magic markets" to "matching markets" | Correct typographical error |
| 193 | 21–22 | Change "that it is controlled for" to "that it has controlled for" | Correct typographical error |
| 199 | 1–2 | Change "the experiences that named plaintiffs" to "the experiences of the named plaintiffs" | Correct typographical error |
| 204 | 11 | Change "Denied they exist" to "He didn't deny they exist" | Correct typographical error |
| 205 | 3–4 | Change "both which" to "both of which" | Correct typographical error |
| 205 | 5–6 | Change "just say it's just across the same across everything" to "just say it's just the same across everything" | Correct typographical error |
| 206 | 5 | Change "is" to "are" | Correct typographical error |
| 206 | 21 | Change "period includes" to "period that includes" | Correct typographical error |
| 208 | 6–7 | Change "the inconsistent methodologically" to "the inconsistent methodology" | Correct typographical error |
| 209 | 22–23 | Change "assignment was to" to "assignment to" | Correct typographical error |
| 210 | 5 | Change "data making" to "data, making" | Correct typographical error |
| 212 | 3 | Change "in deposition" to "and deposition" | Correct typographical error |
| 212 | 5 | Change "Danielli" to "Danieli" | Correct typographical error |
| 213 | 14 | Change "don't-tell-your-boss provision" to "tell-your-boss provision" | Clarify intended meaning |
| 214 | 20 | Change "is" to "in" | Correct typographical error |
| 215 | 4 | Change "This paper recites" to "This paper he cites" | Correct typographical error |
| 217 | 6 | Change "dismiss" to "dismissed" | Correct typographical error |
| 217 | 8 | Change "in part in sync" to "in part because it is in sync" | Correct typographical error |

5

| Page | Line(s) | Correction | Reason |
|---|---|---|---|
| 217 | 12 | Change "Danielli" to "Danieli" | Correct typographical error |
| 220 | 2–3 | Change "no subset of any worker or maybe there was market power" to "no subset of any workers where maybe there was market power" | Correct typographical error |
| 222 | 2–3 | Change "the Dr. Starr" to "Dr. Starr's" | Correct typographical error |
| 223 | 5 | Change "So I'm offering the opinion. The opinion is for" to "So I'm offering the opinion that for" | Correct typographical error |
| 225 | 1 | Change "that Levenstein and Suslow" to "that Levenstein and Suslow paper" | Correct typographical error |
| 229 | 5 | Change "effect wages" to "affect wages" | Correct typographical error |
| 229 | 19 | Change "Dr. Starr" to "Dr. Starr's" | Correct typographical error |
| 229 | 23–24 | Change "when you think about SCA and DaVita or DaVita and SCA and USPI" to "when you think about SCA and DaVita or SCA and USPI" | Correct typographical error |
| 231 | 20–21 | Change "Because I don't think every study of no poach study is ever conducted" to "Because I don't think every study of no poach studies their theory" | Clarify intended meaning |
| 235 | 14 | Change "changes overtime" to "changes over time" | Correct typographical error |
| 235 | 22 | Change "confidential that they shared" to "confidential information that they shared" | Correct typographical error |
| 237 | 22 | Change "Might" to "He might" | Correct typographical error |
| 238 | 6 | Change "they were doing in it" to "they were doing with it" | Correct typographical error |
| 238 | 13–14 | Change "which would have been by what would have been affected" to "which would have been what would have been affected" | Correct typographical error |
| 241 | 6–7 | Change "My understanding is they were about base salary and bonuses" to "My understanding is they were about base salary" | Clarify intended meaning |
| 242 | 5 | Change "in" to "and" | Correct typographical error |
| 244 | 4 | Change "the to" to "to the" | Correct typographical error |
| 244 | 9 | Change "Danielli" to "Danieli" | Correct typographical error |
| 248 | 13 | Change "at" to "on" | Correct typographical error |
| 253 | 12 | Change "very vice presidents" to "senior vice presidents" | Correct typographical error |
| 255 | 5 | Change "is" to "are" | Correct typographical error |
| 257 | 1 | Change "is" to "as" | Correct typographical error |
| 261 | 8 | Change "title's" to "title is" | Correct typographical error |
| 262 | 19–20 | Change "within the sample of companies that where employees that fit within that" to "within the sample of companies where employees fit within that" | Correct typographical error |
| 263 | 8 | Change "as" to "is" | Correct typographical error |
| 264 | 6 | Change "IA" to "Aya" | Correct typographical error |
| 265 | 10 | Change "Sprattling" to "Spradling" | Correct typographical error |

6

| Page | Line(s) | Correction | Reason |
|---|---|---|---|
| 268 | 22 | Change "offer, the" to "offer the" | Correct typographical error |
| 269 | 3–4 | Change "the range maxed them in" to "the range max and min" | Correct typographical error |
| 269 | 22 | Change "were" to "was" | Correct typographical error |

Date: June 6, 2025

_____
Dr. John H. Johnson, IV

7

# ZIELINSKI EXHIBIT 9 (FILED UNDER SEAL)

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


IN RE OUTPATIENT MEDICAL      )

CENTER EMPLOYEE ANTITRUST     )   No. 1:21-cv-00305

LITIGATION                    )


* DESIGNATED HIGHLY CONFIDENTIAL *


The videotaped discovery deposition of CELESTE SARAVIA, Ph.D., called as a witness for examination, taken stenographically before Michelle M. Yohler, a Certified Shorthand Reporter, Registered Merit Reporter, and Certified Realtime Reporter for the State of Illinois, CSR No. 84-4531, appearing at King & Spalding LLP, 110 North Wacker Drive, Suite 3800, Chicago Illinois 60606, on the 9th day of May, 2025, at 9:15 a.m. CST.

Celeste Saravia, Ph.D.   Highly Confidential
May 09, 2025

APPEARANCES:


        MR. ERICH P. SCHORK

        DR. KELLY RINEHART

        ROBERTS LAW FIRM

        330 North Wabash Avenue, Suite 23-132

        Chicago, Illinois 60611

        erichschork@robertslawfirm.us

        kellyrinehart@robertslawfirm.us

-and-

        MR. WILLIAM CASTILLO GUARDADO

        (Remotely)

        JOSEPH SAVERI LAW FIRM

        601 California Street, Suite 1505

        San Francisco, California 94108

        415.500.6800

        wcastillo@saverilawfirm.com

            Appeared on behalf of Plaintiffs;







            (Continued)

Celeste Saravia, Ph.D.   Highly Confidential
May 09, 2025

APPEARANCES CONTINUED:

MS. VERONICA MOYE

MS. EMILY SHOEMAKER NEWTON

MS. JULIANNE LEE DURAN (Remotely)

MR. CONNOR BREWER (Remotely)

KING & SPALDING

2601 Olive Street, Suite 2300

Dallas, Texas 75201

214.764.4600

vmoye@kslaw.com

        Appeared on behalf of Defendants USPI

        and Tenet Healthcare;


MS. SARAH A. ZIELINSKI

MS. AMY B. MANNING

MR. ANDREW E. TALBOT (Remotely)

McGUIRE WOODS LLP

77 West Wacker Drive, Suite 4100

Chicago, Illinois 60601

312.849.8100

szielinski@mcguirewoods.com

        Appeared on behalf of Defendant

        Surgical Care Affiliates;

              (Continued)

Celeste Saravia, Ph.D.   Highly Confidential
May 09, 2025

APPEARANCES CONTINUED:


          MR. KENNETH M. KLIEBARD

          MR. JASON L. CHRESTIONSON (Remotely)

          MS. MOLLY MORIARTY LANE (Remotely)

          MR. J. CLAYTON EVERETT, JR. (Remotely)

          MORGAN LEWIS

          110 North Wacker Drive

          Chicago, Illinois 60606-1511

          312.324.1774

          kenneth.kliebard@morganlewis.com

               Appeared on behalf of Defendant

               DaVita, Inc.;


          MR. BRIAN SMITH (Remotely)

          WILSON SONSINI GOODRICH & ROSATI

          1700 K Street NW, Fifth Floor

          Washington, D.C. 20006-3814

          202.973.8800

          brian.smith@wsgr.com

               Appeared on behalf of Defendant

               Andrew Hayek;


                    (Continued)

Celeste Saravia, Ph.D.   Highly Confidential
May 09, 2025

APPEARANCES CONTINUED:

        MS. KATHARINE O'CONNOR (Remotely)

        McDERMOTT WILL & EMERY

        444 West Lake Street, Suite 4000

        Chicago, Illinois 60606-0029

        312.372.2000

        koconnor@mwe.com

            Appeared on behalf of Defendant

            Kent Thiry.


ALSO PRESENT:

    Mr. Anthony Micheletto, Videographer

    Mr. Zach Czerenda, Remote Technician

    Mr. Kavan Kucko, Cornerstone (Remotely)

    Ms. Wendy Petropopulous, Cornerstone (Remotely)






                REPORTED BY:

        MICHELLE M. YOHLER, CSR, RMR, CRR

            Illinois CSR No. 84-4531.

Celeste Saravia, Ph.D.  Highly Confidential
May 09, 2025

E X A M I N A T I O N S

WITNESS                                                    PAGE

CELESTE SARAVIA, PH.D.

    By Mr. Schork............................          8




                    E X H I B I T S

PLAINTIFFS' EXHIBITS                                       PAGE

No. 592      (Previously Marked)

             "Employer Market Power in

             Silicon Valley" by Matthew

             Gibson.........................          39

No. 593      April 16, 2025 Expert Report of

             Celeste Saravia, Ph.D...........          10

THE VIDEOGRAPHER:  We are now on the record at 9:15 a.m. as indicated in the video screen.  Today's date is May 9, 2025.

Audio and video recording will continue to take place until all parties agree to go off the record.

Please note that microphones are sensitive and may pick up whispering and private conversations.

This is the video-recorded proceeding of Celeste Saravia, Ph.D., taken by counsel for the plaintiff in the matter of In Re Outpatient Medical Center Employee Antitrust Litigation.

This proceeding is being held at King & Spalding located at 110 North Wacker Drive, Chicago, Illinois.

My name is Anthony Micheletto.  I'm the videographer on behalf of U.S. Legal Support, located at 16825 Northchase Drive, Houston, Texas. I am not related to any party in this action, nor am I financially interested in the outcome.

Our court reporter today is Michelle Yohler on behalf of U.S. Legal Support.

All counsel appearances will be noted on

the stenographic record.

Will the court reporter please swear in the witness.

(WHEREUPON, the witness was duly sworn.)

CELESTE SARAVIA, Ph.D.,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. SCHORK:

Q  Good morning, Dr. Saravia.  My name is Erich Schork, and I'll be taking your deposition today.

Now, you've been deposed before, correct?

A  Correct.

Q  And about how many times?

A  Maybe about a dozen.

Q  Okay.  So I assume that you understand the ground rules, but, just for clarity sake, I'm just going to go through them real quick.  Okay?

A  Okay.

Q  Now, the court reporter to my right is creating a transcript of what's being said today, so I will ask that you answer all of my questions verbally.

Celeste Saravia, Ph.D.   Highly Confidential
May 09, 2025

BY MR. SCHORK:

Q  Can you let me know when you've had a chance to review the document?

A  So this is a 77-page academic paper.  I'm happy to continue to review it.  I just want to be --

Q  I'm just going to ask you regarding the conclusions.  I know that you said you needed to see it.

MS. MOYE:  I'm sorry.  I didn't hear what you said.

MR. SCHORK:  I said:  I'm just going to ask you regarding the conclusions of the report.

BY THE WITNESS:

A  Okay.  If you want to ask me a question, I can see if I have reviewed it enough to answer it.

BY MR. SCHORK:

Q  Sure.

Now, in this paper Gibson concluded that a single no-poach agreement for one year reduced salaries by 5.6 percent; is that correct?

A  Where -- what are you pointing to in the paper?  Again, it's 77 pages.

Q  Well, let's go to the first page in the

Celeste Saravia, Ph.D.   Highly Confidential
May 09, 2025

abstract.

It states, "On average the no-poaching agreements reduced salaries at colluding firms by 5.6 percent."

Correct?

A  You read that correctly.

Q  And then it goes on to say:  "Consistent with considerable employer market power."

Correct?

A  You read that correctly.

Q  And you've seen this article before, right, you stated?

A  Yes, I've looked at this before.

Q  And you have no reason to dispute its conclusions, right?

A  I would not agree with that.

Q  Okay.  And what -- can you elaborate on that?

A  So I'd really need to review it in more detail, but empirical work, the -- empirical work and the results from this type of empirical work, in order to really assess it, I'd have to look at it all very carefully, maybe even look at the backup like we would do in this case.

So I need to remind myself of what he did, if there are clear omitted variables that would affect it, what are his controls.  I don't remember what his -- he said he was doing a difference-in-differences, but I don't remember what his control group was.

So there's just a lot of stuff I'd would have to look at to really assess -- to assess the result.

And then, also -- I would just need to do more to say that I have no reason to disagree with it.  I just need to really look at the paper more to see how he sets it up and what he's done, and, also, what he bases his conclusions on, I think.

Yeah, so I just need to spend some more time with it.

Q  Okay.  Now, so based on the empirical literature estimating the effects of no-poach agreements, do you know what a typical average effect of removing a no-poach agreement on a workers' compensation is?

MS. MOYE:  Objection to the form.

BY THE WITNESS:

A  So I don't think there's -- you showed me

Celeste Saravia, Ph.D.   Highly Confidential
May 09, 2025

one paper.  We'd have to look at different papers

to see.  And then we also have to look at the --

how they have identified any potential effect.

So out of -- just pulling it out of a hat,

I don't know, you know, which other papers would

state what they're doing as referring to a

no-poach, and I don't know, sitting right here,

what are all the possible effects that they found.

BY MR. SCHORK:

Q  Okay.  Sitting here today, are you aware

of any studies that analyze the effects of

removing no-poach agreements on reported wages?

MS. MOYE:  Objection to the form.

BY THE WITNESS:

A  Well, that is what this page -- paper

claims to do.

BY MR. SCHORK:

Q  Are you aware of any other studies?

A  Sitting here, I don't remember any studies

that -- off the top of my head that state that

they were assessing the impact of removing what

you call -- what you said, a no-poach.

I can look to see -- let me see.

So, as I mentioned, I don't remember any

which I show the people who leave USPI outside the

conduct period, again, only a very small portion

of them go to OCCs or ASCs, which would include

SCA.

BY MR. SCHORK:

Q  What is your understanding of where the

Lightcast data set comes from?

A  So what the Lightcast data set is it's --

it's from a private company.  It's really scraped

information -- it's -- so Lightcast is a

proprietary data provider.

And what they've done is, they've

constructed a database of job histories that's

based on résumés that are posted online and online

review websites, résumé websites.

And so -- so that's what it is.  It's a

proprietary data set that basically collects

information online about people's work histories

and creates a data set.

Q  You'd agree that not all of the senior

employees of USPI and SCA would have a résumé

online, correct?

A  That -- yes, that seems reasonable.  The

Lightcast data set is -- or the data that

Celeste Saravia, Ph.D.   Highly Confidential
May 09, 2025

Lightcast has been able to combine, I do not see -- it's over the relevant time period, does not include as many employees as the -- the defendants' compensation data.

Q  And when you received the data from Lightcast, did you receive it in the aggregate, or did you receive the actual resumes and the pages of the -- that the data was being pulled from?

A  No.  No, it's -- they create it into a data set so they create it into -- I can't remember right now.  I think it's -- I'm trying to remember what the raw data looked like.

But I don't -- we do not receive a million pages of PDFs; we receive a data set where the -- where that information has already been created into rows of data.

Q  But given that you just received the aggregate data, there's no way for you to check whether the source of the information was real; is that true?

A  Source of...

I have no -- am I trusting that Lightcast, which is used in academic papers and which is used in many industries and which sells its data, am I

Celeste Saravia, Ph.D.   Highly Confidential
May 09, 2025

trusting that they actually scraped data and --
and then made it into a data set?  Yes.

I have not gone and tried to replicate the
creation of their data set by finding the resumes
online, and so I have to trust that, when they
have found the resumes and turned them into data,
that -- that Lightcast has done that correctly.

Q  And, in fact, there's no way to check
whether the resumes that Lightcast was scraping
actually relate to real people; is that correct?

A  Is it --

MS. MOYE:  Let me object to the form of
that one.  I'm sorry.

Go ahead, Dr. Saravia.

THE WITNESS:  Okay.

BY THE WITNESS:

A  It plausible that there are a lot of fake
resumes out there that had stents in the OCC
industry that do not have anything to do with a
real person?  I guess that's plausible.

It seems a little bit unlikely, but -- and
all data has errors, so maybe -- maybe Lightcast
did pick up a fake person writing up a fake
résumé.  I guess -- I guess that's plausible.

Celeste Saravia, Ph.D.   Highly Confidential
May 09, 2025

C E R T I F I C A T E   O F   R E P O R T E R

I, MICHELLE M. YOHLER, a Certified Shorthand Reporter within and for the County of Will, State of Illinois, do hereby certify:

That previous to the commencement of the examination of the witness, the witness was duly sworn to testify the whole truth concerning the matters herein;

That the foregoing deposition transcript was reported stenographically by me, was thereafter reduced to typewriting under my personal direction and constitutes a true record of the testimony given and the proceedings had;

That the said deposition was taken before me at the time and place specified;

That I am not a relative or employee or attorney or counsel, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor interested directly or indirectly in the outcome of this action.

Celeste Saravia, Ph.D.    Highly Confidential
May 09, 2025

IN WITNESS WHEREOF, I do hereunto set my

hand and affix my seal of office at Chicago,

Illinois, this 12th day of May, 2025.


_____

Michelle M. Yohler, CSR, RMR, CRR

Certified Shorthand Reporter

CSR No.:   84-4531

*In Re Outpatient Medical Center Employee Litigation*
United States District Court, Northern District of Illinois, Eastern Division, No. 1:21-cv-00305

**\*\*\* Celeste Saravia, Ph.D. May 9, 2025 Errata Sheet\*\*\***

Pursuant to Federal Rule of Civil Procedure 30(e)(1)(b) the deponent in the above-entitled action makes the following changes to her deposition testimony:

| Page | Line | Original | Correction | Reason |
|------|------|----------|------------|--------|
| 10 | 15 | I'm vice president | I'm a vice president | Correct typographical error |
| 14 | 3 | competition energy markets | competition in energy markets | Correct typographical error |
| 14 | 18 | And then for the under | And then for the other | Correct typographical error |
| 14 | 22 | used more other materials. | I used more other materials. | Correct typographical error |
| 18 | 24 | use and written about | use and write about | Clarify intended meaning |
| 32 | 24 | joint development agreements, the alleged competitive effects. | joint development agreements and their alleged competitive effects. | Clarify intended meaning |
| 42 | 7 | So there's just a lot of stuff I'd would | So there's just a lot of stuff I would | Correct typographical error |
| 44 | 8 | that they have committed the effect of a no-poach | that they have captured the effect of a no-poach | Clarify intended meaning |
| 45 | 12 | that's the way we think about in the antitrust. | that's the way we think about it in antitrust. | Correct typographical error |
| 49 | 23 | Which this doesn't happen | This didn't happen | Clarify intended meaning |
| 51 | 2 | whether you're monopsony for monopoly | whether you're monopsony or monopoly | Correct typographical error |
| 51 | 15 | now you're | now you're asking | Correct typographical error |
| 54 | 19 | they prefer an MDA | they prefer an MBA | Correct typographical error |
| 55 | 10-11 | and then what are the experience. | and then what are the experiences. | Correct typographical error |

| Page | Line | Original | Correction | Reason |
|---|---|---|---|---|
| 56 | 6 | assessing whether or not the USPI | assessing whether or not USPI | Correct typographical error |
| 57 | 23 | competing different labor markets | competing in different labor markets | Correct typographical error |
| 58 | 4-5 | could any agreement among the mobility restrictions | could an agreement over mobility restrictions | Correct typographical error / Clarify intended meaning |
| 60 | 2 | what I know that it cannot have the effect of is a large effect on the | what I know is that it cannot have a large effect on | Clarify intended meaning |
| 61 | 5 | part of the punitive class | part of the putative class | Correct typographical error |
| 62 | 2 | but his overall CEO. | but its overall CEO. | Correct typographical error |
| 66 | 20 | in the employees that | to the employees that | Correct typographical error |
| 69 | 5-7 | a senior vice president, on average, maybe less that a manager. | a senior vice president, on average, more than a manager. | Clarify intended meaning /Transcription error |
| 75 | 14 | variation and compensation | variation in compensation | Correct typographical error |
| 76 | 4 | there can be long-step | there can be lock-step | Correct typographical error |
| 77 | 4-5 | compete," and, yet - - for a certain type of employee | compete for a certain type of employee" | Clarify intended meaning |
| 77 | 14 | being able to suppress pages | being able to suppress wages | Correct typographical error |
| 77 | 20-23 | And so this would undermine the fact that the two - - the two firms that were trying to suppress wages would lose their employees, this would undermine | And so this - - the fact that the two firms that were trying to suppress wages would lose their employees - - this would undermine | Clarify intended meaning |
| 79 | 23 | hundreds of employees | hundreds of employers | Correct typographical error |

2

| Page | Line | Original | Correction | Reason |
|---|---|---|---|---|
| 81 | 13 | that have either | that it either | Correct typographical error |
| 81 | 23 | show that USCA [sic] also | show that SCA also | Clarify intended meaning |
| 82 | 7-8 | outside all defendants | outside the conduct period | Clarify intended meaning |
| 82 | 14 | out of outside | out of employers outside | Clarify intended meaning |
| 91 | 8-9 | from another firm or who is promoted to a senior employee position or whom - - if they were | from another firm or was | Clarify intended meaning |
| 92 | 12 | to hundreds of employees. | to hundreds of employers. | Correct typographical error |
| 95 | 3 | employers besides | employers | Clarify intended meaning |
| 95 | 22 | calculate mark shares | calculate market shares | Correct typographical error |
| 96 | 7 | literature in order to | literature. In order to | Correct typographical error |
| 96 | 16 | something's wrong with my progression | something's wrong with my regression | Correct typographical error |
| 96 | 22 | empirical work | empirical model | Clarify intended meaning |
| 97 | 15 | some challenge restraint | some challenged restraint | Correct typographical error |
| 99 | 8 | mobility restrictions | mobility restriction periods | Clarify intended meaning |
| 101 | 5 | even outside | going to and from outside | Clarify intended meaning |
| 101 | 7 | industry by itself are huge | industry by itself is huge | Correct typographical error |
| 101 | 16 | a number of employees | a number of employers | Correct typographical error |
| 104 | 17 | It plausible | Is it plausible | Correct typographical error |
| 104 | 18 | that had stents in the OCC | that had stints in the OCC | Correct typographical error |

3

| Page | Line | Original | Correction | Reason |
|---|---|---|---|---|
| 104 | 20-24 | Plausible | Possible | Clarify intended meaning |
| 105 | 4 | plausible | possible | Clarify intended meaning |
| 105 | 8 | compensation, | compensation data, | Clarify intended meaning |
| 105 | 12 | resumes out there that includes stents in the OCCs | résumés out there that include stints in the OCC | Correct typographical error |
| 109 | 20 | there are academic | there is academic | Clarify intended meaning |
| 111 | 2 | putting out the steps | pointing out the steps | Clarify intended meaning |
| 111 | 7-8 | are these are the steps | are the steps | Correct typographical error |
| 112 | 18 | your Tell Your Boss | the Tell Your Boss | Clarify intended meaning |
| 113 | 5 | For all of the opinions | All of the opinions | Correct typographical error |
| 113 | 14 | we have 40 percent moving | we have 40 percent of employees moving | Clarify intended meaning |
| 113 | 15 | in or out of even the health care industry | in or out of industries other than the health care industry | Clarify intended meaning |
| 115 | 11-12 | on what do you mean by that | on what you mean by that | Clarify intended meaning |
| 115 | 21-22 | what I mean it's not enough | what I mean by it's not enough | Clarify intended meaning |
| 115 | 22 | really want to do is | really want to know is | Clarify intended meaning |
| 116 | 8 | Figure 8 | Section 8 | Clarify intended meaning |
| 117 | 6 | that he likes, that does that mean | that he likes, does that mean | Clarify intended meaning |
| 117 | 9 | pick up effect | pick up an effect | Correct typographical error |
| 124 | 15 | alleged and omitted conduct | alleged and admitted conduct | Correct typographical error |

4

| Page | Line | Original | Correction | Reason |
|------|------|----------|------------|--------|
| 124 | 16 | switch from USPI to SCA | switch between USPI and SCA | Clarify intended meaning |
| 125 | 5 | a one-guy | that one guy | Correct typographical error |
| 127 | 23 | Exhibit F | Appendix F | Clarify intended meaning |
| 128 | 9 | soliciting each other's. | soliciting each other's employees. | Correct typographical error |
| 128 | 10 | alleged, admitted, and agreed to | alleged, admitted, and assessed | Clarify intended meaning |
| 131 | 19 | heterogeneity compensation and differentials over | heterogeneity in compensation and differential changes over | Correct typographical error |
| 134 | 16 | the they stopped | that they stopped | Correct typographical error |
| 138 | 22-23 | So here I'm testing doctors - - what are we - - so here - - no, I don't - - I don't have that | So here I'm testing Dr. Starr's theory – so here - - no, I don't - - I don't have that | Clarify intended meaning |
| 139 | 15 | to determine why the basis on which | to determine the basis on which | Correct typographical error |
| 142 | 9 | implemented structure compensation systems | implemented structured compensation systems | Correct typographical error |
| 142 | 17 | data. | data." | Correct typographical error |
| 142 | 24 | So that's your experts'. | So that's your experts' claim. | Clarify intended meaning |
| 143 | 10 | So plaintiffs' experts' claim | So plaintiffs' experts claim | Correct typographical error |
| 143 | 11 | implemented structure compensation systems | implemented structured compensation systems | Correct typographical error |
| 144 | 10 | implication for the quote | implication of the quote | Correct typographical error |
| 149 | 2 | some directors who pay increased | some directors whose pay increased | Correct typographical error |

| Page | Line | Original | Correction | Reason |
|---|---|---|---|---|
| 149 | 3 | their total compensation was over 40 percent | their total compensation increased over 40 percent | Clarify intended meaning |
| 150 | 8 | are supposedly have | are supposed to have | Correct typographical error |
| 161 | 19 | controlling for something that is time and variant. | controlling for something that is time invariant. | Correct typographical error |
| 169 | 5 | which one. | which ones. | Correct typographical error |
| 177 | 4 | there's a treatment of facts | there's a treatment effect | Correct typographical error |
| 177 | 8 | variables in, | variables in the regression | Clarify intended meaning |
| 177 | 20 | interested on the effect | interested in the effect | Correct typographical error |
| 178 | 12 | For a certain effect is really | For a certain effect it is really | Correct typographical error |
| 186 | 22 | variable is zero | variable is not zero | Clarify intended meaning |
| 188 | 20 | interactive model | interacted model | Correct typographical error |
| 189 | 14 | interactive model | interacted model | Correct typographical error |
| 189 | 23 | is this set of coefficients are the same as this | is this set of coefficients the same as this other set of coefficients | Clarify intended meaning |
| 190 | 19 | interactive model | interacted model | Correct typographical error |
| 190 | 20 | fully interactive models | fully interacted models | Correct typographical error |
| 192 | 2 | the co-founders. | the confounders. | Correct typographical error |
| 193 | 12 | a specific omit variable | a specific omitted variable | Correct typographical error |
| 196 | 21 | January 1st, 2021 | January 1st, 2022 | Clarify intended meaning |
| 197 | 7 | which are what relevant | which are what is relevant | Correct typographical error |
| 197 | 8 | number of data sets | number of deaths | Correct typographical error |

6

| Page | Line | Original | Correction | Reason |
|------|------|----------|------------|--------|
| 198 | 1 | great recession | Great Resignation | Correct typographical error |
| 198 | 5 | an additional dummy for 2021 to allow for slight but more flexibility. | an additional dummy for 2022 to allow for slightly more flexibility. | Clarify intended meaning |
| 198 | 7 | So I'm not forcing 2021 | So I'm not forcing 2022 | Clarify intended meaning |
| 200 | 2 | increased demand for SCA | increased demand for ASC services | Clarify intended meaning |
| 201 | 1 | of not trying to assess how COVID affect pay. | of not trying to assess how COVID affected pay. | Correct typographical error |
| 201 | 17 | or a law of compensation. | or a loss of compensation | Correct typographical error |

06/10/2025

Celeste Saravia

7

# ZIELINSKI EXHIBIT 10 (FILED UNDER SEAL)

UNITED STATES DISTRICT COURT
THE NORTHERN DISTRICT OF ILLINOIS
-----------------------------------------X
IN RE OUTPATIENT MEDICAL CENTER EMPLOYEE
ANTITRUST LITIGATION,

                               Plaintiffs,


        -against-              Index No. 1:21-cv-00305



THIS DOCUMENT RELATES TO:

ALL ACTIONS,

                               Defendants.

-----------------------------------------X

                               May 29, 2025

                               9:08 a.m.



   AN IN PERSON VIDEOTAPED DEPOSITION of

Lauren Stiroh, taken by the respective

parties, pursuant to Order, before Larin

Kaywood, a Notary Public for and within the

State of New York.

Lauren Stiroh
May 29, 2025

A P P E A R A N C E S:

Lieff, Cabraser, Heimann & Bernstein, LLP

   Attorneys for Plaintiff
   275 Battery Street, 29th floor
   San Francisco, California 94111

BY:  DEAN M. HARVEY, ESQ.
   E-mail:  Dharvey@lchb.com
NUSSBAUM LAW GROUP, P.C.
   1133 Avenue of the Americas, 31st Floor
   New York, New York 10036
BY:   JONATHAN ROSS, ESQ.
    EMILY HARWELL, ESQ.
   E-mail:  Jross@nussbaumpc.com
   E-mail:  Eharwell@nussbaumpc.com


MORGAN LEWIS
   Attorneys for Defendants
   101 Park Avenue
   New York, New York  10178
BY:  CLAYTON EVERETT, ESQ.
   E-mail:  Clay.everett@morganlewis.com
MCGUIREWOODS, LLP
Attorney for SCA
   77 West Wacker Drive
   Suite 4100
   Chicago, Illinois 60601-1818
BY:  SARAH A. ZIELINSKI, ESQ.
E-mail:  Szielinski@mcguirewoods.com

KINGS & SPALDING
   1180 Peachtree Street N.E.
   Atlanta, Georgia 30309
BY: EMILY NEWTON, ESQ.
E-mail:  Enewton@morganlewis.com


Also Present:  Jose Rivera, the
Videographer


      *    *    *    *    *

Lauren Stiroh
May 29, 2025

C O N T I N U E D
A P P E A R A N C E S

VIA ZOOM:

Lauren Stiroh
May 29, 2025

Lauren Stiroh

THE VIDEOGRAPHER: We are on the record at 9:08 a.m. on May 29th, 2025. This is the video recorded deposition of Dr. Lauren Stiroh in the matter of In re Outpatient Medical Center Employee Antitrust Litigation, filed in the United States District Court for the Northern District of Illinois, Eastern Division.

This deposition is being held at Morgan, Lewis & Bockius LLP located at 101 Park Avenue, New York, New York.

My name is Jose Rivera. I am the videographer on behalf of US Legal Support.

The court reporter is Larin Kaywood, also on behalf of US Legal Support.

I am not related to any party in this action, nor am I financially interested in the outcome.

All counsel have been noted on

Lauren Stiroh
May 29, 2025

Lauren Stiroh

the stenographic record.

Will the court reporter please swear in the witness?

L A U R E N   S T I R O H, having first been duly sworn by a Notary Public for and within the State of New York, upon being examined, testified as follows:

THE REPORTER:  Please state your name for the record.

THE WITNESS:  Lauren Stiroh.

THE REPORTER:  And your address, please?

THE WITNESS:  My business address is 360 Hamilton Avenue in White Plains, New York 10601.

EXAMINATION BY

MR. ROSS:

Q.   Yeah.  Good morning, Dr. Stiroh.

My name is Jonathan Ross from Nussbaum Law Group.  One of the counsel for plaintiffs in this action.

Who is your current employer?

A.   NERA Economic Consulting.

Lauren Stiroh
May 29, 2025

Lauren Stiroh

data that I understand Cornerstone is also using.

Q.   So is it your understanding that NERA and Cornerstone are using the same dataset?

A.   Yes.  I don't know differently from that, but you would have to ask the -- I don't know actually -- yeah.  We are using Lighcast data.  I understand it is the same data that Cornerstone has.  I don't know if they are doing analysis with different data.

Q.   And who is -- what is Cornerstone?

A.   It is an economic consulting company.

Q.   And which defendants experts are associated with Cornerstone?

A.   I don't know.

Q.   Do you know if Dr. Johnson used the same Lighcast dataset?

A.   I don't know.

Q.   And what was purchased from Lighcast?

Lauren Stiroh
May 29, 2025

Lauren Stiroh

A.    We -- I have a footnote in my report that I will refer to.

Q.    Are you referring to Footnote 60 on Page 15?

A.    I was going to refer to Footnote 59.

Q.    Okay.

A.    There might be additional information in 60, but in Footnote 59, it describes the resume data that I use from the Lighcast profile database.

Q.    Okay.  Now, what did you do to verify the accuracy of those resume profiles in the Lighcast database?

A.    We did various things to evaluate whether the Lighcast data and what we were seeing is reasonable in view of information in the record.  So that includes, as listed in my report, reviewing testimony that DaVita hires from and loses employees to hundreds of companies, and that is what I see in the Lighcast data as well.

I am able to evaluate the

Lauren Stiroh
May 29, 2025

Lauren Stiroh

magnitudes of the data, and including the numbers of people who came from SCA or went to SCA and the Lighcast data generally matches what we see from what we see in the databases produced by SCA and DaVita.

There may be other things described in my report, but generally I have information up front on the magnitude of employees, the magnitude of hiring, and a rough number of what -- the number of companies from which DaVita hires, and that's what I see reflected in the data as well.

Q.   Okay.  My question was, what did you do to verify the accuracy that of the data that Lighcast provided to you? I.e, that the resumes that they purport to have scraped off of the web contain accurate information.

MR. EVERETT:  Object to the form.  Asked and answered.

A.   The answer that I gave you was what I did and my team did that is consistent what we do with data that comes

Lauren Stiroh

from public sources or parties to a litigation.

It is not part of what we do to rebuild the dataset ourselves in the sense of looking at all of the CVs and the other sources in addition to publicly available information that Lighcast gets its data from. But we evaluate whether the general scope of it is reasonable given other available information.

And the conclusions that I draw from the Lighcast data are also supported by other information in the record.

Q. Did those Lighcast provide to you copies of the actual resumes?

A. I don't believe so. I have not seen copies of the actual resumes.

Q. Have you done anything to verify, either by sampling or any other way, whether those resumes were real?

MR. EVERETT: Object to the form.

A. I have not looked at the underlying resumes or information that is

Lauren Stiroh

part of the Lighcast database.  I'd looked at whether what the -- for the conclusions that I am drawing forward or the opinions that are in form, whether they are reasonable in light of other information that is available.

Q.   Okay.  And did anyone on your team -- just to make sure we can button this down, did anyone on your team do anything to verify whether the resumes were real?

MR. EVERETT:  Same objection.

A.   To the best of my recollection, the verification process is looking at what is revealed by the Lighcast data and how that accords with other information in the record.  I do not believe anyone on my team had access to the underlying resumes that were part of what Lighcast uses.

Q.   And did anyone on your team do its own independent research to determine whether those resumes were real?

MR. EVERETT:  Object to the form.

Lauren Stiroh

May 29, 2025

Lauren Stiroh

out that Webber concluded that firms in the healthcare center -- sector wield significant wage setting power?

MR. EVERETT:  Object to the form.  Foundation.

A.    I don't have a basis to be surprised or not without having an understanding of what he found or what he based it on.  I have not, to my recollection, analyzed that paper.

I have analyzed the opinions of Dr. Starr.  I'm familiar with the data that Dr. Starr relied upon and the structural form that he used for his analysis and I find that it is flawed.  I don't have access to the similar types of data for other academic researchers and the works that they put forward.

Q.    So I take it then you did not review as part of your preparation of your report Douglas Webber's paper?

A.    I don't know that that is true. I -- if it is in my materials relied upon, I have reviewed it.  If it is not but is

Lauren Stiroh
May 29, 2025

Lauren Stiroh referenced in Dr. Starr's report, I read his report. But I don't have a recollection of the name or his works.

Q. But independent of this action, do you have a recollection of ever reviewing or seeing or discussing Dr. Webber's report?

MR. EVERETT: Object to the form?

A. I don't as I sit here. It's not impossible that I have reviewed it and I'm just not recalling it, but I don't have a recollection as I sit here.

Q. Now, how about a report by Gibson looking at Silicon Valley market power, and in particular, the high-tech litigation?

A. I believe I have reviewed a working paper by an economist named Gibson on I -- I can't remember what the overall context is, but I think wage suppression in Silicon Valley firms.

Q. Okay. And isn't it true that Gibson's data pool for that analysis was

Lauren Stiroh
May 29, 2025

Lauren Stiroh

wage and salary reports not --

MR. EVERETT:  Object --

Q.    -- wage and salary reports?

MR. EVERETT:  -- object to the form.

A.    I don't think I could tell you what his database was without looking at it.  I have not made the same study of any academic researcher's paper that I have made of Dr. Starr's analysis.

Q.    And did you -- so did you review the Gibson paper in connection with preparing your report in this case?

MR. EVERETT:  Just to be clear, is your question whether she relied on Dr. Gibson's paper?

Q.    Well, my question was reviewed, but we can start with relying on since she's looking at the relied on materials.

A.    I did not rely on anything from Dr. Gibson's paper.

Q.    Did you review Dr. Gibson's paper in connection with this?

MR. EVERETT:  And I think that

Lauren Stiroh
May 29, 2025

Lauren Stiroh

that's excluded by the -- again, our expert discovery stipulation which limits discovery to materials relied upon.

Q.    Do you have a recollection of ever reviewing Dr. Gibson's paper?

A.    I do.

Q.    And in -- for what context did you review?

A.    In the context of preparing for this deposition.

Q.    Okay.  So it's -- I'm going to hand you a copy of his report which has been previously marked in this action as PX592.

Now -- well, you ready?

A.    I am.

Q.    Okay.  So if you turn to Page 11, just getting back to when I asked you what he had relied on in coming to his conclusions here.  Isn't it a fact that his primary data came from Glassdoor, an online aggregator of wage and salary reports contributed by workers, correct?

Lauren Stiroh
May 29, 2025

Lauren Stiroh

A.   That is what he writes on Page 11.

Q.   As far as you recall, he did not review online resumes as part of this report, did he?

MR. EVERETT:  Object to the form.

A.   I don't know what he reviewed or looked at.  The federal rules of evidence do not apply to working papers.  So I don't know that he felt any obligation to list his materials considered or relied upon the way one would for an expert report.

Q.   Okay.  And do you recall that Gibson concludes in this report that there was a 5.8 percent wage suppression due to the do not cold call agreements in the high-tech litigation?

MR. EVERETT:  Object to the form.

A.   I don't have a specific recollection of his findings.  I have paged through his report and -- including that

Lauren Stiroh
May 29, 2025

Lauren Stiroh

one of his findings that appears in Table A20, appears to be different effects of what he is calling no-poaching agreements by firm, including no effects or positive coefficients for three of the seven -- eight firms listed.

Q. Well, if you turn to Page 16 at the bottom, the last full sentence in a session titled "Primary Results and Robustness." He states, "The estimated no-poaching effect on annual salary is approximately 5.8 percent."

So isn't it correct that he found that the do not cold call agreements in high tech had an effect of 5.8 percent salary suppression?

A. I can only agree with you that that is what he writes. It appears that what he found as listed in A -- Page A20 is -- that he finds that result for eBay which I don't actually remember being one of the defendants, but potentially it was. But he does not find it for any other company, and in fact he finds no effect for

Lauren Stiroh
May 29, 2025

Lauren Stiroh

Adobe, Lucasfilm and Pixar.

Q.    Okay.  Now, he does find it for some, correct?  5.8 percent is what he's saying is the estimated no-poaching effect on annual salary, is 5.8 percent, is what he writes in his text?  And that is based upon solely a do not cold call agreement, correct?

MR. EVERETT:  Object to the form.

A.    I don't think that is correct, but I don't have the benefit of any testimony from Mr. -- Dr. Gibson on what it is based on.  I don't see the table, and maybe you've read it more closely than I have, that shows his regression results other than what -- some of the coefficients are for some of his analysis.

I can see the sentence that he writes, but it is my experience from having worked on the High Tech Antitrust Litigation that there was an analysis put forward by plaintiff's expert in that matter.  And when I had the benefit of

Lauren Stiroh

being able to look at the data that were used and the specification that was used, there were flaws that were apparent in the analysis.

With a working paper, I don't have that ability.  So I know from experience that there are things that may be said in the paper that are not always borne out by robust analysis.  I can agree with you of what is written here, but what is written on this page of what he is reporting as a no-poach effect on annual salary is not supported by the materials that he does include in his report.

Q.    Well, do you recall that when you reviewed this report, did you find his -- did you conclude that his findings were implausible?

MR. EVERETT:  Object to the form.

A.    I didn't review it with the same mindset that I do when reviewing a -- I mean, we both, I think, called it a report, but it is a working paper.  It's

Lauren Stiroh

not a report.  That when I am reviewing what is being put forward as an expert report, I am also able to review the materials that are relied on the underlying database.

I typically am able to see what the programs were from which conclusions are being drawn.  We just don't have that ability with a working paper like this. But for this particular subject, I do have some additional information from having worked on a case involving most of these firms and I am -- can tell you from my work there that what a researcher may do with the data and reach a conclusion is not always supported by the data that is being relied upon.

Q.   Okay.  Now, in this working paper by Gibson and in the reports that you worked on and also reviewed in the high-tech litigation, did anyone do an analysis based upon resumes?

A.   I can't tell you what Mr. Gibson did because I don't have to the

Lauren Stiroh
May 29, 2025

Lauren Stiroh

information that he looked at.  I can tell you it would be irrelevant data point to understand what the scope of competition is before drawing an inference from statistical analysis.

And then for the work that I have done in matters that involve allegations of compensation suppression, there have been, to the best of my recollection, some information available about where employees come from and where they go to.

Q.   Okay.  So now let's -- we go back to your report, and turn to Page 9, Section D.

So in this session, you proffer the opinion that Dr. Starr finds impact where there is none.  And you provide numerous alternative potential start and end dates for the alleged conspiracy.

Do you have any opinion in this case as to what are the correct start and end dates to use?

A.   I do not.  I understand that

Lauren Stiroh
May 29, 2025

Lauren Stiroh

those are allegations that are in the complaint.  My observation is that Dr. Starr's model does not use the same period as was alleged in the complaint.  And for an economist to draw an inference about what the competitive impact is of conduct that's alleged to be anti-competitive, it is reasonable to have in mind an economic model that traces the path where some conduct can have an impact on wages or salaries.

Dr. Starr does not have that economic model in his report.  And from the materials that I have reviewed, it is apparent that if there is an agreement that is reached in May of 2008 that the timeframe for when an economist would expect there to be an impact if any, because of the calendar periods when wages are determined at the defendant firms, the earliest you would expect that would be calendar year 2009 or later.

And I think it is either Dr. Gerhart or Dr. Starr himself who has

Lauren Stiroh

May 29, 2025

CERTIFICATE

STATE OF NEW YORK )

:ss

COUNTY OF SUFFOLK )

I, LARIN KAYWOOD, a Notary Public within and for the State of New York, do hereby certify:

That the witness whose examination is hereinbefore set forth was duly sworn and that such an examination is a true record of the testimony given by such a witness.

I further certify that I am not related to any of these parties to this action by blood or marriage, and that I am not in any way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 29th day of May, 2025.

_signature_

Highly Confidential
Attorneys' Eyes Only

**Lauren Stiroh, Ph.D. May 29, 2025 Deposition**
**Errata Sheet**

I, Lauren Stiroh, Ph.D., having read the foregoing deposition, Pages 1 through 173, taken May 29, 2025, do hereby certify said testimony is a true and accurate transcript, with the following changes:

| Page | Line(s) | Correction | Reason |
|---|---|---|---|
| 15 | 9 | Change "Douger" to "Dogar" | Correct typographical error |
| 15 | 10 | Change "Sumida Bala" to "Sumedha Bhalla" | Correct typographical error |
| 20 | 12 | Change "data bases" to "databases" | Correct typographical error |
| 24 | 11 | Change "Mae Image Likeness" to "Name, Image, Likeness" | Correct typographical error |
| 26 | 24 | Change "where" to "was that" | Clarification |
| 27 | 11-12 | Change "an illegal" to "a legal" | Correct typographical error |
| 28 | 14 | Insert "at" after "back" | Correct typographical error |
| 30 | 10-12 | Change "will informed but" to "will be informed" | Correct typographical error |
| 32 | 1 | Change "seem" to "it seems" | Correct typographical error |
| 32 | 21 | Insert "there were" after "believe" | Clarification |
| 33 | 11 | Change "recalling" to "recall" | Clarification |
| 35 | 12 | Insert "was" after "acronym" | Clarification |
| 38 | 5 | Change "becoming" to "became" | Correct typographical error |
| 49 | 7 | Insert "that" after "disputes" | Correct typographical error |
| 55 | 5 | Change "it" to "it's" | Correct typographical error |
| 56 | 6 | Change "off" to "often" | Correct typographical error |
| 57 | 11 | Delete "the" | Clarification |
| 65 | 13 | Change "DaVita" to "defendant | Clarification |
| 65 | 16 | Change "there's" to "there" | Correct typographical error |
| 65 | 22 | Change "as" to "or" | Correct typographical error |
| 65 | 25 | Change "as" to "or" | Correct typographical error |
| 75 | 5 | Delete "done" | Clarification |
| 80 | 9 | Change "DaVita" to "DaVita's" | Correct typographical error |
| 102 | 24 | Insert "by" after "used" | Correct typographical error |
| 106 | 23 | Change "applies" to "implies" | Correct typographical error |
| 107 | 1 | Delete second "the" | Clarification |
| 107 | 2 | Insert "in" after "are" | Clarification |
| 110 | 17 | Change "Aaron" to "Erin | Correct typographical error |
| 110 | 18 | Change "Lou" to "Lew" | Correct typographical error |
| 129 | 7 | Delete "an" | Correct typographical error |
| 142 | 3 | Change "irrelevant" to "a relevant" | Correct typographical error |

Date:  July 01, 2025

_____
Dr. Lauren J. Stiroh

# ZIELINSKI EXHIBIT 11 (FILED UNDER SEAL)

UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION
------------------------------------------X
IN RE OUTPATIENT MEDICAL CENTER EMPLOYEE

ANTITRUST LITIGATION,

                         Plaintiffs,


     -against-        Index No. 1:21-cv-00305


THIS DOCUMENT RELATES TO:

ALL ACTIONS

                         Defendants.

------------------------------------------X

                         June 12, 2025

                         9:01 a.m.



     ** HIGHLY CONFIDENTIAL **



     AN IN PERSON DEPOSITION OF Dr. Justin

McCrary, taken by the respective parties,

pursuant to Order, before Larin Kaywood, a

Notary Public for and within the State of

New York.

Dr. Justin McCrary, Highly Confidential
June 12, 2025

Dr. Justin McCrary

THE VIDEOGRAPHER: We are now on the record, beginning 9:10 a.m. on June 12th, 2025. Audio and video recording will continue to take place until all parties agree to go off the record.

Please note that the microphones are sensitive and may pick up whispering or private conversations.

This is the video recorded deposition of Dr. Justin McCrary taken by counsel for plaintiffs in matter of Outpatient Medical Center Employee Antitrust Litigation, filed in the United States District Court for the Northern District of Illinois, Eastern Division.

This deposition is being held at the offices of McGuireWoods LLP located at 1251 Avenue of the Americas in New York, New York.

My name is Michael Bennett. I am the videographer on behalf of US

Dr. Justin McCrary

Legal Support with headquarters located at 16825 Northchase Drive, Suite 900, Houston, Texas.

The court reporter is Larin Kaywood, also on behalf of US Legal Support.

I am not related to any party in this action, nor am I financially interested in the outcome.

I would ask counsel to please identify themselves beginning with counsel in the room.

MR. SAVERI:  Good morning. Joseph Saveri for the plaintiffs.

MR. CASTILLO:  Good morning. William Castillo Guardado for the plaintiffs.

MR. KLIEBARD:  Good morning. Ken Kliebard, on behalf of DaVita Inc.

MR. EVERETT:  Clay Everett for Morgan Lewis, on behalf of DaVita.

MR. SHAPIRO:  David Shapiro, on behalf of DaVita.

Dr. Justin McCrary, Highly Confidential
June 12, 2025

Dr. Justin McCrary

MS. ZIELINSKI: Sarah Zielinski from McGuireWoods, on behalf of the SCA, defendants.

MS. MOYE: Veronica Moye, King & Spalding, on behalf of Tenet and USPI.

MR. TALBOT: Morning. Andrew Talbot from McGuireWoods, on behalf of the SCA, defendants.

MS. NEWTON: Emily Newton from King & Spalding, on behalf of USPI and Tenet.

MR. MOREZ: Andrew Morez with DaVita.

THE VIDEOGRAPHER: And counsel appearing via Zoom?

MR. CAMPBELL: Dan Campbell, McDermott Will & Emery, on behalf of Defendant Kent Thiry.

MS. STEINER: Jordanne Steiner, Wilson Sonsini Goodrich & Rosati, on behalf of Defendant Andrew Hayek.

MS. MANNING: Amy Manning from McGuireWoods, on behalf of the SCA,

Dr. Justin McCrary

defendants.

MR. SAVERI:  Is there anybody else on Zoom?

MR. PAOLILLO:  Jay Paolillo for Defendant USPI and Tenet.

MR. SAVERI:  Is there anybody else?

MS. SMITH:  Lauren Smith from King & Spalding, on behalf of the USPI and Tenet.

MR. SAVERI:  Is there anybody else?

MS. PETROPOULOS:  Wendy Petropoulos from Cornerstone Research.

MR. SAVERI:  I'm sorry.  Who's that?

THE VIDEOGRAPHER:  Wendy Petropoulos.

MR. SAVERI:  Okay.

THE REPORTER:  I'll get the spelling of the names later.

THE VIDEOGRAPHER:  I think that is it.

Dr. Justin McCrary

MR. SAVERI:  Is there anybody else?  Thank you.  Excellent.

THE VIDEOGRAPHER:  Will the court reporter please swear in the witness?

J U S T I N   M C C R A R Y, having first been duly sworn by a Notary Public for and within the State of New York, upon being examined, testified as follows:

THE REPORTER:  Please state your name for the record.

THE WITNESS:  Dr. Justin McCrary.

THE REPORTER:  And your address, please?

THE WITNESS:  435 West 116th Street, New York, New York 10027.

EXAMINATION BY

MR. SAVERI:

Q.    Good morning.

Would you prefer Dr. McCrary, Professor McCrary, or Mr. McCrary.  You tell me?

A.    I have no preference.

Dr. Justin McCrary, Highly Confidential
June 12, 2025

Dr. Justin McCrary

Q.    And then you go on in the statements to say or that in each of the relevant antitrust labor markets that do exist.  Do you see that?

A.    Yes.

Q.    Which are the relevant antitrust markets that do exist that you refer to here?

A.    So I think you're trying to slice and dice the sentence in a way that's leading to distortions in the meaning.  And What I'm describing in the sentence instead is the following, which is that I don't think it's plausible that there is a single relevant antitrust labor market in this case just given this proposed class.  I think that's correct.

It's also true that if it were instead the case that there were different relevant antitrust labor markets, it's also implausible that the defendants would have market power in any such set of markets.

Q.    So it's your testimony there is no antitrust market that you can conceive

Dr. Justin McCrary

of?  Well, let me ask the question differently.

From your last answer, I guess what I'm trying to determine is, is it your opinion that there is, to your mind, no relevant antitrust labor market for the proposed class in this case?

MR. KLIEBARD:  Objection to form.

A.    Well, what I've described in my report is probably more consistent with a slightly different idea, which is that the evidence on labor market competition is consistent with the set of alternative employers being different for different members of the proposed class.

So in my view, the labor markets in which proposed class members participate are different from class member to proposed class member.  And in connection with the analysis that I have done, however, I haven't seen any articulation by your experts of what they think the boundary of the claimed antitrust

Dr. Justin McCrary, Highly Confidential
June 12, 2025

Dr. Justin McCrary

labor market might be.

But in connection with my work, I've seen evidence of switching far outside of the three defendants and indeed in many cases outside of outpatient medical centers, and even outside of medical altogether. And I have specific analysis that substantiate that.

Q. And that --

A. So my view is simply that the available evidence is inconsistent with any claim of market power and any of the labor markets in which proposed class members might participate.

Q. And the test that you ran to determine -- well, strike that.

Now, it's your opinion that the defendants in this case had no market power; is that correct?

A. Well, what I'm addressing is something that's addressing market power from an antitrust perspective. So there's actually -- you introduced earlier this monograph monopsony in motion in which

Dr. Justin McCrary, Highly Confidential
June 12, 2025

Dr. Justin McCrary

Professor Manning talks about frictions as conveying something like market power, which is a different idea.

So in the specific sense in which I'm using the term, I would say the following, which is the evidence that I've seen is inconsistent with the three defendants having market power, either in any overall claimed market. Which I don't think is sustainable and also is consistent with the three defendants not having market power in any series of markets which might be claimed.

Q. And what test did you run to determine whether or not the defendants had market power?

A. Well, what I'm doing is I'm starting with the way that we approached the question. Do I need to pause about the ding? Okay.

So what I'm doing is I'm applying the framework that economists apply when we think about market definition, which is the hypothetical

Dr. Justin McCrary

Q.    And in Paragraph 6, there's a bulleted I guess subparagraph entitled "Lightcast Data."

Do you see that?

A.    That's correct.

Q.    And to the best of your knowledge, does that accurately describes the Lightcast data that you relied on for your report?

A.    You know, looking back over it, I'm certainly not -- nothing is catching my eye that's incorrect about the statement. Is there something that you think is imprecise or missing?

Q.    Well, let me start here.  How do you know that that description of the Lightcast data is correct?

A.    Which aspect is it that you think is wrong?

Q.    All of it.  Let me ask you a question.  Is any of that, to your knowledge -- let me ask the question a different way.

What did you do to determine

Dr. Justin McCrary, Highly Confidential
June 12, 2025

Dr. Justin McCrary

what was contained in the Lightcast data that you relied on?

A.     Many different things.  Let's see.  At the highest level, I'd say I obtained the data, I reviewed its contents, I double checked it against record evidence.  For example, if you look -- the named plaintiffs' resumes are present as well in the data.  The data is anonymized, so you can't say that with 100 percent certainty.

But their specific career histories show up.  If you look as well, there is a basic statistic, which is the fraction of people who leave the employee of one of the three defendant's.  What are the chances that they go to work at one of the other defendants and that number is the same between record evidence and what the Lightcast data shows.

So just listening to your question as to how it went to about verifying what it contained, I suppose there's also a higher level of answering

Dr. Justin McCrary, Highly Confidential
June 12, 2025

Dr. Justin McCrary

that, which is a review of the basic code

book for what's contained and the

discussion with employees at Lightcast

about how the data is structured and things

along those lines.

Q.    And did you speak with those

individuals?

A.    Yes.  Not in connection with

this case, but in prior discussions with

them.

Q.    Okay.  And who are those

people?

A.    I couldn't tell you off the

memory test, the names.  It's basically

somebody who's either in sales or -- I'm

not sure of their exact title.  But it's

somebody who is responsive with respect to

the question as to what is the data

contained and how is it structured and what

are the terms of agreement.

Q.    And so you -- in order to

determine what was contained in the

Lightcast data, your testimony is that it's

based on personal communications or

Dr. Justin McCrary, Highly Confidential
June 12, 2025

Dr. Justin McCrary

conversations that you had with

representatives of Lightcast; is that

correct?

MR. KLIEBARD: Objection.

Mischaracterizes.

A.    Well, that was when I first

came to understand that as an academic, you

could obtain the Lightcast data.  I can't

tell you offhand when exactly that was, but

I think it would've been around maybe 2023.

It was definitely post pandemic.  Could

have been 2022, but I'm not sure of the

exact year.

Q.    And so just so I'm clear, the

conversations that you are referring to

were before you were engaged in this case,

correct?

A.    That's correct.  I knew about

the Lightcast data before my retention in

this case.

Q.    Okay.  And in this case, you

relied on the subset of Lightcast data,

correct?

A.    That's correct.

Dr. Justin McCrary

that using name, but you can do that using the set of prior employers. And that happens very rarely in the data, which is consistent with that.

As to more which is to say do they place a phone call or something along those lines to confirm the resume? No. The resume is the resume that Lightcast takes and then they take that information in the same way that you would take in, for example, a household survey, the respondent's information as the underlying data value.

Q. And so the basis of your information was conversations that you had with Lightcast prior to your engagement in the case, and the Lightcast website; is that correct? As well as some of these operations you did yourself on the data once you had obtained --

MR. KLIEBARD: Objection.

Q. -- is that accurate?

MR. KLIEBARD: Misstates prior testimony.

Dr. Justin McCrary, Highly Confidential
June 12, 2025

Dr. Justin McCrary

A.     You know, it actually sounds mostly inaccurate.  I'd say the following, which is I'm an academic, this is a data set that I knew of from my work as an academic.

The way in which I went about informing myself as to the contours of this particular data collection is what I would normally do.  The process that I followed, you're right as to that part of your question, that I had initially encountered the Lightcast data in an academic paper, was curious about it, placed an e-mail, I believe first, and then a follow up phone call with employees at Lightcast.  I believe that was before it was known as Burning Glass, but I'm not 100 percent sure about that.

And then in this case, I obtained the manner and exactly the way that I laid out in Appendix D.  As to the basis that I've got, I'd say this is exactly how academics analyze data.

Q.     Now, did -- other than the

Dr. Justin McCrary, Highly Confidential
June 12, 2025

                    Dr. Justin McCrary

website in your -- which you looked at and

your conversations with Lightcast, did you

obtain any other information from Lightcast

about how they obtained the information,

where they obtained the information or any

other efforts they made to process or clean

up or validate the information?

        A.    I'm not really sure that I'm

tracking your question.  As I listen to it,

I don't think that there is anything

missing in the description that I gave you,

which might be consistent with a yes.

                I think as I hear the question,

I think you've probably figured out from

the testimony what my process was.  And I'm

not sure what you're driving at really.

                MR. SAVERI:  Could you read the

    last question back, please?

                (Whereupon, the above record

    was read back by the court reporter.)

        Q.    Would you answer the question,

please?

        A.    I think I did.

        Q.    Other than those efforts, did

Dr. Justin McCrary, Highly Confidential
June 12, 2025

Dr. Justin McCrary

Q.    Are you familiar with a website called indeed.com?

A.    Yes.

Q.    Do you know if Lightcast scraped data from indeed.com?

A.    I don't know.

Q.    Are you familiar with the a website called monster.com?

A.    Yes.

Q.    Do you know if Lightcast scraped data from monster.com?

A.    Same answer.  And I could probably save you time in your outline, which is, I think this series of questions is the same as a line of earlier questions, which is, I'm drawing upon the Lightcast data for my empirical analyses, but I'm not in a position to tell you about the details of their process.  To me, that sounds like maybe something that somebody at Lightcast could answer.

But sitting here right now, that sounds like a question where I don't have a basis for answering you.

Dr. Justin McCrary, Highly Confidential
June 12, 2025

Dr. Justin McCrary

Q.    And do you know if the defendants or anyone in this case took a deposition or got any sworn testimony from Lightcast to discuss their methodology for putting together the Lightcast data you obtained?

A.    I don't think they would've needed to.  I'm comfortable relying upon datasets such as Lightcast in the same way that I would in an academic publication. The conclusions that I've drawn here are consistent with other pieces of evidence.

The dataset itself checks out with respect to things that I observed from the record.  I'm happy to tell you that I consider this to be a reliable dataset upon which academics would draw and I have observed academics drawing upon.

Q.    Now, before the break, I asked you a couple of questions about the relationship between the membership and the class and the Lightcast data.  Let me try to clarify, and I guess, my understanding of your understanding.

Dr. Justin McCrary, Highly Confidential
June 12, 2025

Dr. Justin McCrary

Do you know what percentage of the class as defined in this case is included in the Lightcast data that you used for your analysis?

A.    Well, I don't remember the number for you off the top of my head, but it's many thousands of resumes.  For the resumes that are observed in the record, that is to say in particular from named plaintiffs, I think I found them in the Lightcast data.

I can't be 100 percent sure because they're anonymized.  But in general, my conclusion is that the Lightcast data are indicative of what's true for the proposed class.

Q.    Well, my question, sir, is, do you know -- have -- or have you made any calculation of what percentage of the class is included in the Lightcast data?

A.    Well, then you've heard me describe to you twice now that I don't have -- I believe that calculation in my report, and I can't tell you what it is off

Dr. Justin McCrary, Highly Confidential
June 12, 2025

C E R T I F I C A T E

STATE OF NEW YORK)

                    :ss

COUNTY OF SUFFOLK  )


        I, LARIN KAYWOOD, a Notary Public

within and for the State of New York, do

hereby certify:

        That the witness whose examination is

hereinbefore set forth was duly sworn and

that such an examination is a true record

of the testimony given by such a witness.

        I further certify that I am not

related to any of these parties to this

action by blood or marriage, and that I am

not in any way interested in the outcome of

this matter.

        IN WITNESS WHEREOF, I have hereunto

set my hand this 12th day of June, 2025.



                              _signature_

**Justin McCrary, Ph.D. June 12, 2025 Deposition**
**Errata Sheet**

I, Justin McCrary, Ph.D., having read the foregoing deposition, Pages 1 through 406, taken June 12, 2025, do hereby certify said testimony is a true and accurate transcript,[1] with the following changes:

| Page | Line(s) | Correction | Reason |
|---|---|---|---|
| 5 | 24 | Change "David Shapiro" to "Nathan Shapiro" | Correct typographical error |
| 6 | 4 | Change "SCA, defendants" to "SCA defendants" | Correct typographical error |
| 6 | 10 | Change "SCA, defendants" to "SCA defendants" | Correct typographical error |
| 6 | 14 | Change "MR. MOREZ: Andrew Morez" to "MR. MOHRAZ: Andrew Mohraz" | Correct typographical error |
| 7 | 10 | Change "on behalf of the" to "on behalf of" | Correct typographical error |
| 11 | 8-9 | Change "out of my memory" to "out in my memory" | Correct typographical error |
| 12 | 10 | Change "out of my mind" to "out in my mind" | Correct typographical error |
| 13 | 2 | Change "experienced" to "experience" | Correct typographical error |
| 13 | 24 | Change "you or as" to "you was as" | Correct typographical error |
| 14 | 7 | Change "Now off the top of my head," to "Not off the top of my head." | Correct typographical error |
| 15 | 2-3 | Change "that something jogs a recollection" to "something jogs my recollection" | Correct typographical error |
| 15 | 13 | Change "somewhat" to "a somewhat" | Correct typographical error |
| 20 | 10 | Change "and that's" to "that's" | Correct typographical error |
| 20 | 17-18 | Change "representing" to "represented" | Correct typographical error |
| 21 | 14 | Change "the expert" to "any expert" | Correct typographical error |
| 23 | 17 | Change "consulting expert" to "a consulting expert" | Correct typographical error |
| 24 | 17 | Change "PHD." to "Ph.D." | Correct typographical error |
| 26 | 9 | Change "staying on tenure at Michigan" to "staying untenured at Michigan," | Correct typographical error |
| 26 | 10 | Change "taking tenure job at Wisconsin" to "taking a tenured job at Wisconsin," | Correct typographical error |
| 27 | 11 | Change "terms when" to "terms of when" | Correct typographical error |
| 28 | 19 | Change "filed" to "wrote" | Clarify intended meaning |
| 29 | 4 | Change "appears to be" to "appears to me" | Correct typographical error |
| 29 | 11-12 | Change "McCray, PHD." to "McCrary, Ph.D." | Correct typographical error |
| 29 | 25 | Change "filing" to "service" | Clarify intended meaning |
| 31 | 3 | Change "you more" to "you a more" | Correct typographical error |
| 32 | 21 | Change "PHD." to "Ph.D." | Correct typographical error |
| 33 | 7 | Change "waiver of" to "labor" | Correct typographical error |
| 33 | 16 | Change "various to entry" to "barriers to entry" | Correct typographical error |
| 34 | 22 | Change "any competitive" to "anticompetitive" | Correct typographical error |

---

[1] The changes in this errata sheet are made with respect to the version of the transcript provided by U.S. Legal on June 19, 2025.

1

| Page | Line(s) | Correction | Reason |
|---|---|---|---|
| 34 | 24-25 | Change "consistent with just" to "consistent with that, just" | Correct typographical error |
| 35 | 5-6 | Change "any competitive" to "anticompetitive" | Correct typographical error |
| 35 | 20 | Change "fixed" to "fix" | Correct typographical error |
| 35 | 24 | Change "agreement" to "agreement to fix prices" | Correct typographical error |
| 36 | 9 | Change "facts" to "effects" | Correct typographical error |
| 36 | 11 | Change "defective" to "effective" | Correct typographical error |
| 36 | 12 | Change "notion of distinction" to "notion of a distinction" | Correct typographical error |
| 38 | 4 | Change "So I think is" to "So I think this is" | Correct typographical error |
| 38 | 8-9 | Change "think it's still true" to "think it's still incomplete" | Correct typographical error |
| 38 | 18 | Change "treaties" to "treatises" | Correct typographical error |
| 39 | 22 | Change "teach of" to "teach out of" | Correct typographical error |
| 40 | 4 | Change "1900s" to "the 1900s" | Correct typographical error |
| 40 | 12-13 | Change "any competitive" to "anticompetitive" | Correct typographical error |
| 41 | 15 | Change "team" to "teach" | Correct typographical error |
| 42 | 14 | Change "GT Slovenia" to "GTE-Sylvania" | Correct typographical error |
| 42 | 18 | Change "any competitive" to "anticompetitive" | Correct typographical error |
| 44 | 20 | Change "boundary of market" to "boundary of the market" | Correct typographical error |
| 44 | 23 | Change "product, may" to "product, it may" | Correct typographical error |
| 45 | 7 | Change "the substitute" to "a substitute" | Correct typographical error |
| 45 | 9 | Change "an" to "a" | Correct typographical error |
| 46 | 24 | Change "nobility" to "no ability" | Correct typographical error |
| 46 | 25 | Change "up" to "set" | Correct typographical error |
| 47 | 9-10 | Change "considered Dr. Justin McCrary a price setter" to "considered a price setter" | Correct typographical error |
| 49 | 4 | Change "and output markets" to "in output markets" | Correct typographical error |
| 49 | 5 | Change "and" to "in" | Correct typographical error |
| 49 | 7-11 | Change "buyers of labors" to "buyers of labor" | Correct typographical error |
| 49 | 19 | Change "labor market" to "a labor market" | Correct typographical error |
| 49 | 22 | Change "right the" to "right that" | Correct typographical error |
| 52 | 12 | Change "textbooks" to "textbook's" | Correct typographical error |
| 55 | 4-9 | Change "monopsony's a decision" to "monopsony's decision" | Correct typographical error |
| 60 | 14-20 | Change "marginal cost of society" to "marginal cost to society" | Correct typographical error |
| 61 | 9 | Change "roughly" to "a roughly" | Correct typographical error |
| 61 | 23-24 | Change "a few" to "few" | Correct typographical error |
| 62 | 19 | Change "more general terms" to "in more general terms" | Correct typographical error |
| 67 | 24 | Change "supply forces," to "supply force," | Correct typographical error |

| Page | Line(s) | Correction | Reason |
|---|---|---|---|
| 68 | 13-16 | Change "would have said" to "would say" | Correct typographical error |
| 68 | 19 | Change "to" to "two" | Correct typographical error |
| 69 | 9 | Change "same and indirect notion the" to "same indirect notion as the" | Correct typographical error |
| 69 | 15 | Change "contents" to "contexts" | Correct typographical error |
| 69 | 23 | Change "affect" to "effect" | Correct typographical error |
| 71 | 3 | Change "paid" to "pay" | Correct typographical error |
| 71 | 22 | Change "sentence" to "question" | Correct typographical error |
| 72 | 24 | Change "something" to "have something" | Correct typographical error |
| 74 | 25 | Change "that's almost" to "it's almost" | Correct typographical error |
| 75 | 3 | Change "from another" to "from any other" | Correct typographical error |
| 76 | 5 | Change "standard models" to "standard in models" | Correct typographical error |
| 77 | 5 | Change "probably not" to "probably no" | |
| 78 | 18 | Change "KLIEBARD" to "CASTILLO GUARDADO" | Correct typographical error |
| 80 | 12 | Change "out of my mind" to "out in my mind" | Correct typographical error |
| 80 | 15 | Change "probably is" to "probably it's" | Correct typographical error |
| 81 | 13 | Change "Labour of market" to "Labour market" | Correct typographical error |
| 82 | 18 | Change "out" to "at" | Correct typographical error |
| 83 | 25 | Change "assumption" to "an assumption" | Correct typographical error |
| 84 | 11 | Change "particular" to "in particular" | Correct typographical error |
| 84 | 15 | Change "sensation" to "cessation" | Correct typographical error |
| 84 | 2 | Change "a bed rock" to "a bedrock" | Correct typographical error |
| 84 | 11 | Change "And particular" to "And in particular" | Correct typographical error |
| 84 | 15 | Change "at its sensation" to "at its cessation" | Correct typographical error |
| 84 | 25 | Change "the opinion in your case" to "your opinion in this case" | Correct typographical error |
| 85 | 4 | Change "What do you thinking of" to "What are you thinking of" | Correct typographical error |
| 87 | 21-22 | Change "have you written on the topic the answer? Would have been no." to "have you written on the topic? The answer would have been no." | Correct typographical error |
| 88 | 24 | Change "former" to "far more" | Correct typographical error |
| 89 | 18-19 | Change "being counting" to "bean counting" | Correct typographical error |
| 91 | 13-14 | Change "Noble Prize" to "Nobel Prize" | Correct typographical error |
| 92 | 24 | Change "such is work" to "such work" | Correct typographical error |
| 94 | 8 | Change "overtime" to "over time" | Correct typographical error |
| 94 | 15 | Change "scaring" to "scarring" | Correct typographical error |
| 95 | 19 | Change "about of some" to "about some" | Correct typographical error |
| 96 | 21 | Change "layout" to "lay out" | Correct typographical error |
| 97 | 17 | Change "anymore" to "any more" | Correct typographical error |
| 99 | 2 | Change "define" to "divine" | Correct typographical error |
| 99 | 12 | Change "rear" to "rare" | Correct typographical error |

3

| Page | Line(s) | Correction | Reason |
|---|---|---|---|
| 99 | 16 | Change "meetings" to "meeting" | Correct typographical error |
| 101 | 6 | Change "in firm" to "infirm" | Correct typographical error |
| 108 | 18 | Change "have sense" to "have a sense" | Correct typographical error |
| 110 | 18 | Change "in total" to "a total" | Correct typographical error |
| 110 | 20-21 | Change "have a less" to "have less" | Correct typographical error |
| 111 | 6 | Change "also" to "all so" | Correct typographical error |
| 111 | 7 | Change "that it's" to "that is" | Correct typographical error |
| 111 | 10 | Change "association" to "in association" | Correct typographical error |
| 115 | 2 | Change "goodnight sleep" to "good night's sleep" | Correct typographical error |
| 117 | 12 | Change "define term there, and it's if" to "defined term there, and it's" | Correct typographical error |
| 118 | 4 | Change "get" to "information" | Correct typographical error |
| 118 | 17-18 | Change "is statement is saying" to "statement is saying" | Correct typographical error |
| 118 | 25 | Change "trier fact" to "trier of fact" | Correct typographical error |
| 120 | 16-19 | Change "any competitive" to "anticompetitive" | Correct typographical error |
| 122 | 10 | Change "analysis" to "analyses" | Correct typographical error |
| 123 | 7 | Change "sensitivity" to "a sensitivity" | Correct typographical error |
| 123 | 19 | Change "Finish my work" to "Finished my work" | Correct typographical error |
| 124 | 8 | Change "question is" to "question" | Correct typographical error |
| 124 | 24 | Change "properly disclosed" to "'properly disclosed'." | Correct typographical error |
| 125 | 13 | Change "that that" to "that — that" | Correct typographical error |
| 126 | 7 | Change "what the contours" to "what's the contours" | Correct typographical error |
| 128 | 16 | Change "now" to "no" | Correct typographical error |
| 128 | 25 | Change "selected," to "'selected,'" | Correct typographical error |
| 129 | 4 | Change "search" to "a search" | Correct typographical error |
| 129 | 11 | Change "memory task" to "memory test" | Correct typographical error |
| 130 | 10 | Change "leads" to "leaps" | Correct typographical error |
| 131 | 2 | Change "documents consistent" to "document and that's consistent" | Correct typographical error |
| 136 | 2 | Change "we're talking" to "were talking" | Correct typographical error |
| 136 | 5 | Change "the conduct occurred" to "whether the conduct occurred" | Correct typographical error |
| 139 | 5 | Change "plaintiff's" to "plaintiffs" | Correct typographical error |
| 143 | 16 | Change "articulate relevant" to "articulate any relevant" | Correct typographical error |
| 146 | 12 | Change "AptDeco" to "opt out" | Correct typographical error |
| 146 | 24-25 | Change "defendant's" to "defendants'" | Correct typographical error |
| 148 | 24 | Change "that is" to "that it is" | Correct typographical error |
| 151 | 14 | Change "SSNIP" to "A SSNIP" | Correct typographical error |
| 151 | 14-15 | Change "come up. And" to "come up — and" | Correct typographical error |
| 156 | 5 | Change "set" to "a set" | Correct typographical error |

4

| Page | Line(s) | Correction | Reason |
|---|---|---|---|
| 156 | 9 | Change "drawings" to "drawing" | Correct typographical error |
| 156 | 20-22 | Change "heterogeneity, that also might come up. I'll give you the spelling in the break, across" to "heterogeneity — that also might come up, I'll give you the spelling in the break — across" | Correct typographical error |
| 161 | 8-9 | Change "analysis" to "analyses" | Correct typographical error |
| 161 | 13 | Change "and" to "in" | Correct typographical error |
| 162 | 10-11 | Change "any overall claimed market. Which I don't think is sustainable and also is consistent" to "any overall claimed market, which I don't think is sustainable, and also is consistent" | Correct typographical error |
| 162 | 19 | Change "approached" to "approach" | Correct typographical error |
| 165 | 17 | Change "Lightcast" to "Lightcast data" | Correct typographical error |
| 169 | 8 | Change "this the" to "this" | Correct typographical error |
| 169 | 11 | Change "have seen that is" to "have seen is" | Correct typographical error |
| 169 | 13 | Change "information, that" to "information. That" | Correct typographical error |
| 170 | 16 | Change "that there were" to "that were" | Correct typographical error |
| 171 | 10 | Change "generally aggregated nature" to "generally aggregate in nature" | Correct typographical error |
| 171 | 15-16 | Change "any competitive" to "anticompetitive" | Correct typographical error |
| 172 | 17 | Change "any competitive" to "anticompetitive" | Correct typographical error |
| 173 | 15 | Change "that you're" to "that if you're" | Correct typographical error |
| 176 | 13 | Change "to be that" to "to that" | Correct typographical error |
| 179 | 2-3 | Change "as we have in the past" to "'as we have in the past'" | Correct typographical error |
| 179 | 23-24 | Change "like an alleged conspiracy" to "an alleged conspiracy to suppress pay" | Correct typographical error |
| 180 | 22 | Change "control have it" to "control F" | Correct typographical error |
| 185 | 19 | Change "again, is about" to "again, this is about" | Correct typographical error |
| 188 | 24 | Change "conspiracy" to "a conspiracy" | Correct typographical error |
| 190 | 3 | Change "piece" to "pieces" | Correct typographical error |
| 191 | 18 | Change "the overall" to "overall" | Correct typographical error |
| 191 | 21 | Change "fixed price" to "fix prices" | Correct typographical error |
| 192 | 9-10 | Change "opinion. So" to "opinion, so" | Correct typographical error |
| 194 | 24 | Change "The professor starts" to "Professor Starr's" | Correct typographical error |
| 195 | 2 | Change "any competitive" to "anticompetitive" | Correct typographical error |
| 195 | 11 | Change "and" to "can" | Correct typographical error |
| 196 | 3 | Change "additions" to "editions" | Correct typographical error |
| 197 | 19 | Change "that. In" to "that, in" | Correct typographical error |
| 197 | 23 | Change "confirming" to "confirm" | Correct typographical error |
| 202 | 16 | Change "th" to "the" | Correct typographical error |
| 203 | 5 | Change "form" to "from" | Correct typographical error |
| 205 | 15 | Change "the Hayek" to "Hayek" | Correct typographical error |

| Page | Line(s) | Correction | Reason |
|---|---|---|---|
| 208 | 2-7 | Change "I can point" to "I can't point" | Correct typographical error |
| 209 | 15 | Change "there is" to "there are" | Grammatical correction |
| 212 | 5 | Change "Yes. I think is" to "'Yes' I think is" | Correct typographical error |
| 217 | 14 | Change "and" to "in" | Correct typographical error |
| 218 | 25 | Change "There are not" to "There is not" | Correct typographical error |
| 219 | 14 | Change "McCray" to "McCrary" | Correct typographical error |
| 219 | 17 | Change "in Waive 1, Dr. McCray" to "in Wave 1, Dr. McCrary" | Correct typographical error |
| 219 | 22 | Change "McCray" to "McCrary" | Correct typographical error |
| 219 | 23 | Change "at risks" to "at risk" | Correct typographical error |
| 221 | 8 | Change "judge," to "judge" | Correct typographical error |
| 221 | 10 | Change "statistic" to "statistics" | Correct typographical error |
| 221 | 20 | Change "is" to "are" | Correct typographical error |
| 223 | 16 | Change "Court" to "core" | Correct typographical error |
| 223 | 17 | Change "And" to "In" | Correct typographical error |
| 223 | 19 | Change "is labor market" to "is a labor market" | Correct typographical error |
| 223 | 25 | Change "is retrospective" to "is a retrospective" | Correct typographical error |
| 224 | 6 | Change "carer" to "career" | Correct typographical error |
| 224 | 22 | Change "typically" to "typical" | Correct typographical error |
| 227 | 14-17 | Change "leave the employee" to "leave the employ" | Correct typographical error |
| 227 | 17 | Change "defendant's" to "defendants" | Correct typographical error |
| 227 | 23 | Change "how it went to about" to "how I went about" | Correct typographical error |
| 228 | 14 | Change "the" to "a" | Correct typographical error |
| 229 | 23 | Change "the subset" to "a subset" | Correct typographical error |
| 230 | 5 | Change "worked one" to "worked at one" | Correct typographical error |
| 231 | 24 | Change "Lightcast process" to "Lightcast's process" | Correct typographical error |
| 232 | 6 | Change "extend" to "extent" | Correct typographical error |
| 232 | 10 | Change "scrapping" to "scraping" | Correct typographical error |
| 233 | 9 | Change "asked" to "ask" | Correct typographical error |
| 233 | 19 | Change "from" to "for" | Correct typographical error |
| 234 | 18 | Change "collaborate" to "corroborate" | Correct typographical error |
| 235 | 16 | Change "scrapping" to "scraping" | Correct typographical error |
| 235 | 23 | Change "scrapping" to "scraping" | Correct typographical error |
| 236 | 3 | Change "questions" to "question is" | Correct typographical error |
| 236 | 4 | Change "scrapping" to "scraping" | Correct typographical error |
| 236 | 6 | Change "the memory test whether it's web scrapping" to "a memory test whether it's web scraping" | Correct typographical error |
| 236 | 8 | Change "the" to "a" | Correct typographical error |
| 238 | 21 | Change "obtained the manner and exactly" to "obtained the data in the manner and in exactly" | |

6

| Page | Line(s) | Correction | Reason |
|---|---|---|---|
| 241 | 25 | Change "we'll" to "will" | Correct typographical error |
| 242 | 21 | Change "disjunct if not conjunct" to "disjunctive not conjunctive" | Correct typographical error |
| 244 | 13-14 | Change "wasn't looking at the three defendants" to "wasn't looking just at employees of the three defendants" | Clarify intended meaning |
| 245 | 20 | Change "NEX" to "NAICS" | Correct typographical error |
| 246 | 6 | Change "two digit, mixed codes" to "two digit NAICS codes" | Correct typographical error |
| 247 | 10 | Change "this" to "thing" | Correct typographical error |
| 248 | 18 | Change "the memory" to "a memory" | Correct typographical error |
| 250 | 14-15 | Change "It's exactly the paragraph that's on Appendix D." to "It's exactly as described in the paragraph that's in Appendix D." | Correct typographical error / Clarify intended meaning |
| 251 | 4 | Change "that they thought that their" to "that their" | Correct typographical error |
| 251 | 23 | Change "at Central Banks" to "at central banks" | Correct typographical error |
| 253 | 7 | Change "ruining" to "is running" | Correct typographical error |
| 258 | 14 | Change "it in my direction. It was either Michelle" to "at my direction. It was either Michele" | Correct typographical error |
| 260 | 5 | Change "the" to "a" | Correct typographical error |
| 264 | 15 | Change "No, not all" to "No, not the only basis" | Correct typographical error / Clarify intended meaning |
| 264 | 20 | Change "describes" to "describe" | Correct typographical error |
| 265 | 14 | Change "and precisely" to "imprecisely" | Correct typographical error |
| 265 | 20 | Change "structure database" to "structured database" | Correct typographical error |
| 266 | 13 | Change ""resumes as."" to "resumes as." | Correct typographical error |
| 267 | 7-10 | Change "but I don't take Lightcast to be at least in connection with the resumes data collection. I don't take it to be" to "but I don't take Lightcast to be -- at least in connection with the resumes data collection -- I don't take it to be" | Correct typographical error |
| 267 | 14-15 | Change "does Lightcast base on data" to "is the Lightcast data based on data" | Correct typographical error |
| 268 | 13 | Change "which I don't" to "which -- I don't" | Correct typographical error |
| 269 | 8-9 | Change "provider of data as to the details of what exact process they follow. What I can tell" to "provider of data. As to the details of what exact process they follow, what I can tell" | Correct typographical error |
| 269 | 11 | Change "scrapping" to "scraping" | Correct typographical error |
| 269 | 17 | Change "scrapping" to "scraping" | Correct typographical error |
| 277 | 23 | Change "like it" to "like" | Correct typographical error |
| 278 | 9 | Change "answer. If" to "answer, if" | Correct typographical error |
| 279 | 2 | Change "the Lightcast" to "that Lightcast" | Correct typographical error |
| 279 | 7 | Change "providence" to "provenance" | Correct typographical error |
| 280 | 21 | Change "duplicate" to "deduplicate" | Correct typographical error |

7

| Page | Line(s) | Correction | Reason |
|---|---|---|---|
| 281 | 20 | Change "code" to "codes" | Correct typographical error |
| 282 | 2 | Change "report, stress" to "report the stress" | Correct typographical error |
| 288 | 22 | Change "batched-based" to "batch-based" | Correct typographical error |
| 289 | 23-25 | Change "6124" to "6214" | Typographical error |
| 292 | 21 | Change "were" to "or" | Correct typographical error |
| 293 | 13 | Change "defendant's " to "Defendants'" | Correct typographical error |
| 294 | 2 | Change "and" to "in" | Correct typographical error |
| 297 | 11 | Change "overdetermined," to "overly determinative for" | Correct typographical error |
| 301 | 4 | Change "may" to "my" | Correct typographical error |
| 301 | 4-10 | Change "proposed numbers" to "proposed members" | Correct typographical error |
| 302 | 10-20 | Change "firms that defendant's" to "firms that defendants'" | Correct typographical error |
| 304 | 8 | Change "resumes and" to "resumes in" | Correct typographical error |
| 307 | 20 | Change "issues" to "issue" | Correct typographical error |
| 307 | 25 | Change "significance level. That's at the" to "significance level that's at the" | Correct typographical error |
| 308 | 17 | Change "KLIEBARD" to "EXHIBIT TECHNICIAN" | Correct typographical error |
| 308 | 19 | Change "EXHIBIT TECHNICIAN" to "MR. CASTILLO GUARDADO" | Correct typographical error |
| 308 | 20 | Change "KLIEBARD" to "EXHIBIT TECHNICIAN" | Correct typographical error |
| 311 | 23 | Change "more of a yes or no" to "more of a yes than a no" | Correct typographical error |
| 314 | 13 | Change "licensed" to "license" | Correct typographical error |
| 315 | 15 | Change "and analysis" to "analysis" | Correct typographical error |
| 316 | 14 | Change "edged" to "etched" | Correct typographical error |
| 317 | 5 | Change "years '20 and '21. His pay" to "years 2020 and 2021, his pay" | Correct typographical error |
| 318 | 6-7 | "necessary would've been appropriate" to "necessarily would've been inappropriate" | Correct typographical error |
| 318 | 8-16 | Change "somehow is over the end" to "somehow is over at the end" | Correct typographical error |
| 318-319 | 25-4 | Change "openings quits and layoffs and discharge rates from the Bureau of Labor Statistics, job openings, and labor turnover survey effects, Professor Starr's" to "openings, quits, and layoffs and discharges rates from the Bureau of Labor Statistics' Job Openings and Labor Turnover Survey affects Professor Starr's" | Correct typographical error |
| 320 | 21 | Change "uptake" to "uptick" | Correct typographical error |
| 321 | 3 | Change "is putting" to "is that putting" | Correct typographical error |
| 321 | 12-14 | Change "openings/quits" to "openings, quits" | Correct typographical error |
| 322 | 23 | Change "progression" to "regression" | Correct typographical error |

8

| Page | Line(s) | Correction | Reason |
|---|---|---|---|
| 324 | 13 | Change "answers" to "answer" | Correct typographical error |
| 324 | 14 | Change "gotten" to "got in" | Correct typographical error |
| 325 | 24 | Change "over time. Is I" to "over time is I" | Correct typographical error |
| 326 | 2 | Change "and precisely" to "imprecisely" | Correct typographical error |
| 331 | 20 | Change "conduct" to "indicative of conduct" | Correct typographical error |
| 331 | 23 | Change "members conduct" to "members' conduct" | Correct typographical error |
| 333 | 9 | Change "is maybe" to "it's maybe" | Correct typographical error |
| 338 | 7 | Change "noble" to "knowable" | Correct typographical error |
| 339 | 19 | Change "cant" to "can't" | Correct typographical error |
| 339 | 23 | Change "SCI" to "SCA" | Correct typographical error |
| 340 | 2 | Change "parallel to Exhibit 11. That's for SCA" to "parallel to Exhibit 11 that's for SCA" | Correct typographical error |
| 341 | 9 | Change "a basis for a view about" to "a basis or a view about a" | Correct typographical error |
| 342 | 2 | Change "member's" to "members'" | Correct typographical error |
| 342 | 4 | Change "defendant's " to "defendants' " | Correct typographical error |
| 344 | 11 | Change "challenge" to "challenged" | Correct typographical error |
| 344 | 13 | Change "defendant's" to "defendants'" | Correct typographical error |
| 346 | 3 | Change "publically" to "publicly" | Correct typographical error |
| 346 | 18 | Change "variety" to "variety of reasons" | Correct typographical error |
| 348 | 17 | Change "hard" to "hard time" | Correct typographical error |
| 350 | 17 | Change "frivole" to "frivolity" | Correct typographical error |
| 351 | 9 | Change "effected" to "affected" | Correct typographical error |
| 353 | 21 | Change "challenge" to "challenged" | Correct typographical error |
| 355 | 20 | Change "That's not my" to "That's my" | Correct typographical error |
| 358 | 12-13 | Change "what I understood his claims to be pertaining" to "that I understood his claims as pertaining" | Correct typographical error |
| 359 | 17 | Change "their atmospheric" to "they're atmospheric" | Correct typographical error |
| 359 | 22-23 | Change "what I'm trying to communicate. As to why, I don't think" to "what I'm trying to communicate as to why I don't think" | Correct typographical error |
| 360 | 24 | Change "pure" to "peer" | Correct typographical error |
| 362 | 6 | Change "propogation?" to "propogation." | Correct typographical error |
| 363 | 20 | Change "is" to "from" | Correct typographical error |
| 364 | 3 | Change "there" to "there being" | Correct typographical error |
| 366 | 25 | Change "anything, " to "anything " | Correct typographical error |
| 368 | 14 | Change "team may pay" to "teammate pay" | Correct typographical error |
| 369 | 12 | Change "off" to "of" | Correct typographical error |
| 373 | 13 | Change "reference and their" to "reference in their" | Correct typographical error |
| 373 | 15 | Change "Gerhart, to" to "Gerhart -- to" | Correct typographical error |

9

| Page | Line(s) | Correction | Reason |
|---|---|---|---|
| 375 | 9 | Change "cast stout" to "casts doubt" | Correct typographical error |
| 378 | 13 | Change "aggravated" to "aggregated" | Correct typographical error |
| 378 | 15 | Change "affect" to "effect" | Correct typographical error |
| 379 | 15-21 | Change "tying" to "trying" | Correct typographical error |
| 381 | 18-20 | Change "supposing that it did occur, that information was shared. The type of information" to "supposing that it did occur and that information was shared, that the type of information" | Correct typographical error |
| 381 | 24 | Change "constrains" to "constraints" | Correct typographical error |
| 387 | 2 | Change "isn't" to "is" | Correct typographical error |
| 387 | 3 | Change "I" to "it" | Correct typographical error |
| 387 | 9 | Change "form on my" to "form my" | Correct typographical error |
| 388 | 7 | Change "maybe right" to "it may be right" | Correct typographical error |
| 394 | 14 | Change "loosing" to "losing" | Correct typographical error |
| 399 | 13 | Change "recording" to "recounting" | Correct typographical error |
| 400 | 15 | Change "accessing" to "assessing" | Correct typographical error |
| 402 | 8 | Change "which as" to "which is" | Correct typographical error |
| 403 | 10 | Change "out of my" to "out in my" | Correct typographical error |
| 403 | 13 | Change "and" to "in" | Correct typographical error |

Date:  July 21, 2025

_____
Justin McCrary, Ph.D.

10

# ZIELINSKI EXHIBIT 15 (FILED UNDER SEAL)

Docusign Envelope ID: 1-16B2650-DC55-4C67-8919-FF81B18C7984

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

IN RE OUTPATIENT MEDICAL CENTER
EMPLOYEE ANTITRUST LITIGATION

THIS DOCUMENT RELATES TO:

ALL ACTIONS

Master Docket No. 1:21-cv-00305-SRH-YBK

## DECLARATION OF ALEXA JONES

I, Alexa Jones, pursuant to 28 U.S. § 1746, declare as follows:

1. I am over the age of eighteen and have personal knowledge of the information contained in this Declaration. I make this declaration voluntarily and, if called upon to do so, could testify competently to the statements herein.

2. Since May 2021, I have been an employee of DaVita Inc. From May 2021 until October 2023, I was Senior Director of Compensation & Analytics. Since October 2023, I have been Vice President of People Services. ███████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████

3. One of the first things that I did when I arrived at DaVita, in May 2021, was evaluate DaVita's compensation practices across the company. Through that process, I determined that DaVita's employee compensation was decentralized, flexible, differentiated, and discretionary. DaVita determined its employees' compensation based on a number of factors including, among other things, performance, geography, experience, and responsibilities.

4. For all roles at the Director level and above ("Director+"), DaVita did not maintain prescribed pay ranges. Leaders within the company (e.g., Vice Presidents, Division Vice

HIGHLY CONFIDENTIAL—OUTSIDE COUNSEL/EXPERTS ONLY

Docusign Envelope ID: 1:16B2650-DC55-4C67-8919-FF81B18C7984

2

Presidents, Group Vice Presidents, and Senior Vice Presidents) had significant discretion to determine the compensation of the employees on their teams.  DaVita encouraged its leaders to differentiate Director+ employees' compensation, which included base salary, bonuses, and equity compensation, based on the performance of each individual employee and their team.

2

HIGHLY CONFIDENTIAL—OUTSIDE COUNSEL/EXPERTS ONLY

██████████████████████████████

████████████████████████

█  ████████████████████████████

████████████████████████

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 13th day of November, 2025, in ___Broomfield, CO_____.

_____  *Alexa Jones*  _____
DocuSigned by:
1655118BCEAB421...

Alexa Jones

3

HIGHLY CONFIDENTIAL—OUTSIDE COUNSEL/EXPERTS ONLY

# ZIELINSKI EXHIBIT 16 (FILED UNDER SEAL)

Docusign Envelope ID: A7033C3E-8C19-439C-A2E6-F9D879D0BC95

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE OUTPATIENT MEDICAL CENTER EMPLOYEE ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | Master Docket No. 1:21-cv-00305-SRH-YBK |

**DECLARATION OF SHANNON MOSLEY IN SUPPORT OF**
**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO CERTIFY THE CLASS**

I, Shannon Mosley, declare as follows:

1.      I am over the age of eighteen and have personal knowledge of the information contained in this Declaration.  I make this Declaration voluntarily, and, if called upon to do so, could testify competently to the statements herein.

2.      I am a former employee of United Surgical Partners International, Inc. ("USPI").  I worked in recruiting at USPI from April 2003 to October 2020.  I served as Director of Recruiting and Retention from 2003 to 2007.  From 2008 to 2020, I served as Vice President of Talent Acquisition.

3.      I make this Declaration to provide the Court with true and correct copies of the following documents cited in Defendants' Opposition to Plaintiffs' Motion to Certify the Class:

4.      Attached hereto as **Exhibit A** is a true and correct copy of an email sent by me in the ordinary course of business on January 7, 2014 and that was produced by USPI in this matter at bates number USPI_CIV_000021255.

1

5. Attached hereto as **Exhibit B** is a true and correct copy of an email sent by me in the ordinary course of business on April 15, 2016 and that was produced by USPI in this matter at bates number USPI_CIV_000900796.

6. Attached hereto as **Exhibit C** is a true and correct copy of an email sent by me in the ordinary course of business on September 24, 2014 and that was produced by USPI in this matter and bates-numbered USPI_CIV_000019909.

7. Attached hereto as **Exhibit D** is a true and correct copy of an email received by me in the ordinary course of business on November 27, 2013 and that was produced by USPI in this matter at bates number USPI_CIV_000441337.

8. Attached hereto as **Exhibit E** is a true and correct copy of an email sent by me in the ordinary course of business on August 6, 2018 and that was produced by USPI in this matter at bates number USPI_CIV_000214742.

9. Attached hereto as **Exhibit F** is a true and correct copy of an attachment to **Exhibit E** that was sent by me in the ordinary course of business on October 24, 2018 and that was produced by USPI in this matter at bates number USPI_CIV_000214746.

10. Attached hereto as **Exhibit G** is a true and correct copy of an email sent by me in the ordinary course of business on June 4, 2014 and that was produced by USPI in this matter at bates number USPI_CIV_000452281.

11. Attached hereto as **Exhibit H** is a true and correct copy of an email sent by me in the ordinary course of business on January 14, 2014 and that was produced by USPI in this matter at bates number USPI_CIV_000338903.

Docusign Envelope ID: A7033C3E-8C19-439C-A2E6-F9D879D0BC95

12.     Attached hereto as **Exhibit I** is a true and correct copy of an email received by me in the ordinary course of business on February 14, 2018 and that was produced by USPI in this matter at bates number USPI_CIV_000030396.

13.     Each of the attached documents are true and correct copies of records that were:

a.      Made at or near the time of the occurrence of the matters set forth therein, by, or from information transmitted by, a person with knowledge of those matters;

b.      Kept in the course of regularly conducted business activity; and

c.      Made by the regularly conducted business activity as a regular practice.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: November 13, 2025

DocuSigned by:

*Shannon Mosley*

7C9103BFFCD747D...

Shannon Mosley

3

# Exhibit A

**From:** Mosley, Shannon
**To:** Wilcox, Bill; Karrmann, Sandi
**Sent:** 1/7/2014 11:50:27 AM
**Subject:** RE: Terri Seidel - STL RVP Offer

Sandi, I didn't cc: you – I told Bill I thought Terri was stronger than Vaughn. I say this due to her strong clinical, operations and solid ASC experience.

---

**From:** Wilcox, Bill
**Sent:** Tuesday, January 07, 2014 11:22 AM
**To:** Mosley, Shannon; Karrmann, Sandi
**Subject:** RE: Terri Seidel - STL RVP Offer

Is she stronger than the Idaho guy?

---

**From:** Mosley, Shannon
**Sent:** Tuesday, January 07, 2014 10:14 AM
**To:** Wilcox, Bill
**Cc:** Hartshorn, Chris; Bond, Jonathan
**Subject:** Terri Seidel - STL RVP Offer

Bill,
I wanted to send you a quick note to let you know that we extended a verbal offer to Terri Seidel (with SCA) for our RVP position in STL. Terri has accepted our verbal offer and is going to meet with Andrew today at 5pm and I wanted to give you a heads up that he may contact you. I believe Chris informed both you and Niels about this when she first contacted him.

Terri came to Chris regarding the position, we did not poach her. She's a great fit for our St. Louis market and we are all very excited to have her join our team. If you have any questions, please let me know. I was going to come down to speak with you, but you're in a meeting right now.

Thanks,
Shannon

---

**From:** Mosley, Shannon
**Sent:** Friday, January 03, 2014 9:41 AM
**To:** Vernegaard, Niels; Karrmann, Sandi; Miller, Greg; Garvin, Mark
**Cc:** Siedelmann, Kim; Smith, Janice
**Subject:** Terri Seidel Interview schedule - STL RVP candidate - please review

All,
Terri Seidel is here today interviewing for the St. Louis RVP position. I will assign your interview questions in a separate email.

Terri Seidel has known USPI and Chris Hartshorn for many years. She contacted Chris about the RVP position. Terri scored very well on her assessment and has a solid multi-site operations background. She brings over 15 years of strong healthcare management experience.

---

**Interview Schedule:**

Niels Vernegaard, COO – 1030am

CONFIDENTIAL

USPI_CIV_000021255
20180419_020-000278155

Shannon Mosley, VP Talent Acquisition – 1130am
Greg Miller, VP Talent Development & Leadership – 100p
Sandi Karrmann, CHRO – 130pm
Mark Garvin, Group President – 200pm
Air Car pick up at 230pm

Please let me know if you have any questions.
Thanks,
Vice-President of Talent Acquisition
**United Surgical Partners International**
www.uspi.com
ph: 972-763-3820
fax: 972-692-8099
smosley@uspi.com

CONFIDENTIAL

USPI_CIV_000021256
20180419_020-000278155

# Exhibit B

| | |
|---|---|
| **From:** | Brodnax, Brett </O=UNITED SURGICAL PARTNERS/OU=UNITEDSURGICAL /CN=RECIPIENTS/CN=BBROADNAX> |
| **To:** | Karrmann, Sandi |
| **Sent:** | 4/19/2016 4:50:08 PM |
| **Subject:** | RE: Oaks Amanda Offer Letter 4 2016.docx |

Sounds good. thanks

**From:** Karrmann, Sandi
**Sent:** Tuesday, April 19, 2016 4:49 PM
**To:** Brodnax, Brett
**Subject:** RE: Oaks Amanda Offer Letter 4 2016.docx

Ok. So we agree that we can give her more options in July, to partially offset the fact that she missed the biggest grant. I would rather not commit to a specific amount, since we will need to see how many options we have available and how many more people we have added to the pool since last July, but we can at least tell her that she will receive a larger grant in a few months.

**From:** Brodnax, Brett
**Sent:** Tuesday, April 19, 2016 4:44 PM
**To:** Karrmann, Sandi
**Subject:** RE: Oaks Amanda Offer Letter 4 2016.docx

Yes.

**From:** Karrmann, Sandi
**Sent:** Tuesday, April 19, 2016 4:44 PM
**To:** Brodnax, Brett
**Subject:** RE: Oaks Amanda Offer Letter 4 2016.docx

## Redacted – Privileged

**From:** Brodnax, Brett
**Sent:** Tuesday, April 19, 2016 4:38 PM
**To:** Bickham, Brad; Karrmann, Sandi; Cagle, Jason
**Subject:** RE: Oaks Amanda Offer Letter 4 2016.docx

## Redacted – Privileged

**From:** Bickham, Brad
**Sent:** Tuesday, April 19, 2016 4:33 PM
**To:** Karrmann, Sandi; Brodnax, Brett; Cagle, Jason
**Subject:** RE: Oaks Amanda Offer Letter 4 2016.docx

# Redacted – Privileged

W. Bradley Bickham
Chief Legal Officer
United Surgical Partners International, Inc.
(972) 581-7822
(972) 584-9948 (fax)

CONFIDENTIAL

USPI_CIV_000900796
20180307_051-000056786

CONFIDENTIALITY NOTICE: This message and any attachments are for the sole use of the intended recipient(s). This message (including any attachments) is confidential and may also be privileged. If you are not the intended recipient, please contact the sender immediately, delete the contents of this message and do not use it for any purpose.

**From:** Karrmann, Sandi
**Sent:** Tuesday, April 19, 2016 4:25 PM
**To:** Brodnax, Brett; Cagle, Jason; Bickham, Brad
**Subject:** RE: Oaks Amanda Offer Letter 4 2016.docx

# Redacted – Privileged

**From:** Brodnax, Brett
**Sent:** Tuesday, April 19, 2016 4:12 PM
**To:** Karrmann, Sandi; Cagle, Jason; Bickham, Brad
**Subject:** Re: Oaks Amanda Offer Letter 4 2016.docx

## Redacted – Privileged

Sent from my BlackBerry 10 smartphone on the Verizon Wireless 4G LTE network.

**From:** Karrmann, Sandi
**Sent:** Tuesday, April 19, 2016 4:07 PM
**To:** Cagle, Jason; Bickham, Brad
**Cc:** Brodnax, Brett
**Subject:** RE: Oaks Amanda Offer Letter 4 2016.docx

# Redacted – Privileged

**From:** Cagle, Jason
**Sent:** Tuesday, April 19, 2016 3:36 PM
**To:** Bickham, Brad
**Cc:** Brodnax, Brett; Karrmann, Sandi; English, Cindy
**Subject:** Re: Oaks Amanda Offer Letter 4 2016.docx

## Redacted – Privileged

On Apr 19, 2016, at 3:27 PM, Bickham, Brad <bbickham@uspi.com> wrote:

## Redacted – Privileged

W. Bradley Bickham
Chief Legal Officer
United Surgical Partners International, Inc.

CONFIDENTIAL

(972) 581-7822
(972) 584-9948 (fax)

CONFIDENTIALITY NOTICE: This message and any attachments are for the sole use of the intended recipient(s). This message (including any attachments) is confidential and may also be privileged. If you are not the intended recipient, please contact the sender immediately, delete the contents of this message and do not use it for any purpose.

**From:** Brodnax, Brett
**Sent:** Tuesday, April 19, 2016 3:26 PM
**To:** Bickham, Brad; Karrmann, Sandi; English, Cindy
**Cc:** Cagle, Jason
**Subject:** Re: Oaks Amanda Offer Letter 4 2016.docx

## Redacted – Privileged

Sent from my BlackBerry 10 smartphone on the Verizon Wireless 4G LTE network.

**From:** Bickham, Brad
**Sent:** Tuesday, April 19, 2016 3:14 PM
**To:** Karrmann, Sandi; Brodnax, Brett; English, Cindy
**Cc:** Cagle, Jason
**Subject:** RE: Oaks Amanda Offer Letter 4 2016.docx

## Redacted – Privileged

W. Bradley Bickham
Chief Legal Officer
United Surgical Partners International, Inc.
(972) 581-7822
(972) 584-9948 (fax)

CONFIDENTIALITY NOTICE: This message and any attachments are for the sole use of the intended recipient(s). This message (including any attachments) is confidential and may also be privileged. If you are not the intended recipient, please contact the sender immediately, delete the contents of this message and do not use it for any purpose.

**From:** Karrmann, Sandi
**Sent:** Tuesday, April 19, 2016 3:12 PM
**To:** Brodnax, Brett; English, Cindy
**Cc:** Bickham, Brad; Cagle, Jason
**Subject:** RE: Oaks Amanda Offer Letter 4 2016.docx

# Redacted – Privileged

**From:** Brodnax, Brett
**Sent:** Monday, April 18, 2016 11:55 AM
**To:** Karrmann, Sandi; English, Cindy
**Cc:** Bickham, Brad; Cagle, Jason

CONFIDENTIAL

USPI_CIV_000900798
20180307_051-000056786

**Subject:** Re: Oaks Amanda Offer Letter 4 2016.docx

<div style="border: 1px solid black; text-align:center">

**Redacted – Privileged**

</div>

Sent from my BlackBerry 10 smartphone on the Verizon Wireless 4G LTE network.

**From:** Karrmann, Sandi
**Sent:** Monday, April 18, 2016 11:46 AM
**To:** English, Cindy
**Cc:** Bickham, Brad; Cagle, Jason; Brodnax, Brett
**Subject:** Re: Oaks Amanda Offer Letter 4 2016.docx

<div style="border: 1px solid black; text-align:center">

# Redacted – Privileged

</div>

Sandi

On Apr 18, 2016, at 9:34 AM, English, Cindy <CEnglish@uspi.com> wrote:

Sandi –
What I can state is that no option agreements have been issued since the 3/1/16 grant date. So there should be ████ remaining as unissued. If however there are other letters with commitments similar to the one you are inquiring about that would already have the ████ or a portion thereof reserved, I may not be aware of this as I am not sure how you are keeping me in the loop on "commitments".
Cindy

<image001.png>

**From:** Karrmann, Sandi
**Sent:** Monday, April 18, 2016 10:28 AM
**To:** English, Cindy
**Subject:** Re: Oaks Amanda Offer Letter 4 2016.docx

Okay so we have enough available to give Amanda the same amount, correct? Just want to make absolutely sure.

Sandi

On Apr 18, 2016, at 8:13 AM, English, Cindy <CEnglish@uspi.com> wrote:

████

**From:** Karrmann, Sandi
**Sent:** Monday, April 18, 2016 10:11 AM
**To:** English, Cindy
**Subject:** Re: Oaks Amanda Offer Letter 4 2016.docx

Can you tell me how much we have Alex Bolanos, Chris Sucha and Amy Lowry?

CONFIDENTIAL

USPI_CIV_000900799
20180307_051-000056786

Sandi

On Apr 18, 2016, at 4:58 AM, English, Cindy <CEnglish@uspi.com> wrote:

16,059

<image003.png>

**From:** Karrmann, Sandi
**Sent:** Saturday, April 16, 2016 12:18 PM
**To:** English, Cindy
**Subject:** Fwd: Oaks Amanda Offer Letter 4 2016.docx

Can you tell me how many of the July 2015 options are left?

Sandi

Begin forwarded message:

**From:** "Mosley, Shannon" <smosley@uspi.com>
**Date:** April 16, 2016 at 10:03:36 AM PDT
**To:** "Karrmann, Sandi" <skarrmann@uspi.com>, "Brodnax, Brett" <BBrodnax@uspi.com>
**Cc:** "Finnegan, Rob" <RFinnegan@uspi.com>
**Subject: Re: Oaks Amanda Offer Letter 4 2016.docx**

Thanks, Sandi. Can I tell her about how many? That's a specific question she had.

Sent on the new Sprint Network

----- Reply message -----
From: "Karrmann, Sandi" <skarrmann@uspi.com>
To: "Brodnax, Brett" <BBrodnax@uspi.com>
Cc: "Mosley, Shannon" <smosley@uspi.com>, "Finnegan, Rob" <RFinnegan@uspi.com>
Subject: Oaks Amanda Offer Letter 4 2016.docx
Date: Sat, Apr 16, 2016 9:32 AM

Options - we will have the grant in July for the next 20%. One thought - I need to confirm, but we so have a few options from last grant that we could also use.

Sandi

On Apr 16, 2016, at 6:37 AM, Brodnax, Brett <BBrodnax@uspi.com> wrote:

That's good news.

1. Sandi, do we have the stock to provide VP level options? I assume the timing would be summer?

2. She will need to subject to a noncompete related to the options as we all are.

3. Up to Rob.

BB

Sent from my BlackBerry 10 smartphone on the Verizon Wireless 4G LTE network.

**From:** Mosley, Shannon
**Sent:** Friday, April 15, 2016 4:00 PM

CONFIDENTIAL

USPI_CIV_000900800
20180307_051-000056786

**To:** Finnegan, Rob; Brodnax, Brett; Karrmann, Sandi
**Subject:** RE: Oaks Amanda Offer Letter 4 2016.docx

Amanda and I spoke today & she's excited about the offer, however she has some questions and a negotiation related to the bonus. She's going to pull together an outline related to what she'd like to propose and send it on Tuesday next week (she's on vacation w/family until then).

Questions:

Can she get an estimate on how much stock she will receive?

When will the stock be awarded (estimation)?

Will she have to sign a non-compete? I told her I did not think so, but wanted to double check to see if this is something we have people sign after they've started working for us. Please clarify.

One note – she prefers to come in to the Brentwood office at least once a week & work from home as well when not traveling because the office is an hour drive one-way. I didn't think we'd be opposed to that since she will likely be traveling quite a bit.

Thanks,

Shannon Mosley
Vice President, Talent Acquisition
<image001.jpg>
15305 Dallas Parkway, Ste 1600
Addison, TX 75001
Phone Number (972) 763-3820 Fax (972) 692-8099
smosley@uspi.com

---

**From:** Karrmann, Sandi
**Sent:** Sunday, April 10, 2016 3:26 PM
**To:** Mosley, Shannon
**Cc:** Finnegan, Rob; Brodnax, Brett
**Subject:** Re: Oaks Amanda Offer Letter 4 2016.docx

This looks good -

Sandi

On Apr 9, 2016, at 11:07 AM, Mosley, Shannon <smosley@uspi.com> wrote:

All:
Please review Amanda's offer letter.

Sandi – I used the verbiage from Chris' letter for the stock. Alex did negotiate different terms --more specific and I think Amanda will do the same, but we can start here if you'd like.

Thank you,
Shannon
<Oaks Amanda Offer Letter 4 2016.docx>

CONFIDENTIAL

USPI_CIV_000900801
20180307_051-000056786

# Exhibit C

| | |
|---|---|
| **From:** | Mosley, Shannon |
| **To:** | Mosley, Shannon; 'Jimmy Tanner'; 'megan fox' |
| **Sent:** | 9/24/2014 4:37:41 PM |
| **Subject:** | FYI: Reid Jackson - offer, relo, repayment memo |

Hope to connect w/him tonight.

**From:** Mosley, Shannon
**Sent:** Wednesday, September 24, 2014 4:37 PM
**To:** 'Jimmy Tanner'; 'megan fox'
**Subject:** FW: Reid Jackson - offer, relo, repayment memo
**Importance:** High

**From:** Mosley, Shannon
**Sent:** Wednesday, September 24, 2014 4:22 PM
**To:** Karrmann, Sandi
**Cc:** 'Bateman, Alex'
**Subject:** FW: Reid Jackson - offer, relo, repayment memo
**Importance:** High

Sandi,
We need your approval on stock for Reid. We are proposing ███ please approve, thanks!

Shannon Mosley
Vice President of Talent Acquisition

United Surgical Partners
INTERNATIONAL

Ph. 972-763-3820/Fax 972-692-8099
smosley@uspi.com

CONFIDENTIAL

**From:** Mosley, Shannon
**Sent:** Wednesday, September 24, 2014 4:19 PM
**To:** 'Bateman, Alex'
**Subject:** Reid offer, relo, repayment memo
**Importance:** High

Alex,
Not sure If you can open and read this – I've copied it into this email.  Please review and approve.

Reid Jackson
2257 Southampton Dr.
Birmingham, AL  35226

Dear Reid:

I am pleased to confirm USPI's desire for you to join our company as Regional Vice President in the Atlanta region.   In this capacity, you will be a key member of USPI's Management team focusing on optimizing the facility partnerships and overseeing facilities in your area.  Accordingly, below is an outline of our offer terms:



CONFIDENTIAL

USPI_CIV_000019910
20180419_020-000213288

We conduct a pre-employment background check and drug screen for all prospective USPI employees and your employment will be contingent upon the satisfactory results of both. We also require that you review and acknowledge the contents of the USPI Employee Handbook.

We are very excited about you joining us and appreciate your consideration of this offer.

Sincerely,

*Alex Bateman*
Alex Bateman

Market President

**ACCEPTED:**

_____

CONFIDENTIAL

Reid Jackson                     / Date


Shannon Mosley
Vice President of Talent Acquisition

United Surgical Partners
INTERNATIONAL

Ph. 972-763-3820/Fax 972-692-8099
smosley@uspi.com

CONFIDENTIAL

USPI_CIV_000019912
20180419_020-000213288

# Exhibit D

From:       Karrmann, Sandi </O=UNITED SURGICAL PARTNERS/OU=EXCHANGE ADMINISTRATIVE
                    GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=SKARRMANN>
To:           Mosley, Shannon
Sent:        11/27/2013 4:34:46 PM
Subject:    Fwd: USPI HRD - C. Hodges

Can we revise offer letter to include ████████████████ - let's also send her Mina's résumé and contact
information.

Should I invite her to the Christmas party at Niels' home? We should also see if she could attend our HR offsite
on the 19th.

Well-done Shannon! I am very excited to have her on our team and you've played a huge role in landing her.

Sandi

Begin forwarded message:

**From:** "Karrmann, Sandi" <skarrmann@uspi.com>
**Date:** November 27, 2013 at 4:30:35 PM CST
**To:** "crystalsansbury@gmail.com" <crystalsansbury@gmail.com>
**Subject: Re: USPI HRD - C. Hodges**

Congratulations - I am SOOO excited!!

Let me address your questions:

- Compensation: We do not have salary ranges and levels . . . and titles aren't necessarily reflective of level of
responsibility relative to others with the same title. Therefore, there's a wide range of pay for each title (which is
the closest equivalent to levels). Suffice it to say, you will have room to grow your base pay as you deliver and
perform and you are paid competitively.

- Vacation: I will provide ████████████████ of vacation per year. All I ask is that you don't talk about it with
others, as others may not have gotten this much.

- Start Date: As soon as you can! As far as I'm concerned, the sooner the better, as you'll spend the first 90 days
orienting to the company. Please make sure Shannon has your paperwork to initiate your background check and
drug test first thing on Monday.

- Orientation: We will start working on this and welcome your ideas and thoughts. It would also be helpful to
have personal dates/considerations through April as we plan your calendar.

- Mina Okafor started last Wednesday. She is our new Employee Relations Specialist that will report to you. She
is going to be in orientation for about 2 months as well before we start giving her things to do. Once you give
notice at JCP, I suggest you connect with her and perhaps meet her for lunch before you start, just to begin
developing your relationship. She knows you have an offer and hopefully will accept, and knows she will be
working for you.

I will revise the offer letter with the additional vacation days on Monday and you can sign that one.

I am thrilled - you've made my week!! :)

CONFIDENTIAL

USPI_CIV_000441337
20180419_020-000165707

Have a wonderful Thanksgiving with your family!

Sandi

On Nov 27, 2013, at 1:47 PM, "crystalsansbury@gmail.com" <crystalsansbury@gmail.com> wrote:

Sent via BlackBerry by AT&T

---

**From:** "Hodges, Crystal L" <csansbur@jcp.com>
**Date:** Wed, 27 Nov 2013 19:43:09 +0000
**To:** crystalsansbury@gmail.com<crystalsansbury@gmail.com>
**Subject:** USPI HRD - C. Hodges

Sandi,

Just a few questions regarding the offer:

**Compensation**
I am very happy and my expectation has been met. I know this is a new role, but I am curious to know where my compensation falls in comparision to my peers. Am I being placed at the minimum or the mid-point of the pay band for a Director?

**Vacation**
Having worked at JCPenney for ███ years, I currently receive ██████ of vacation. At USPI that is equivalent for working for the company for ████ years, (very similar guidelines). I'd like to know if you would consider providing me with ████████████████████ to help off set the PTO I will be loosing coming to USPI.

**Start Date**
I will provide my notice to JCPenney once the backround check and drug screen is complete. Shannon has sent me the required documents that I will complete promptly. I will email my signed and dated offer letter as well. What did you have in mind for a start date?

**Orientation**
Both Bill and Niels referenced that you and Greg Miller were not to make any changes for 90 days. My understanding is that this gave you both an opportunity to build relationships and learn the business. I have a few ideas about what my 1st 90 days will look like, and wanted to get your thoughts and ideas.

**Benefits**
The information is pretty straight forward and comparable to the current benefits my family has currently.

I think that are all of my questions for now. As additional questions come up, I will reach out to you and Shannon.

I am very excited for this opportunity and am "officially" accepting the offer to become USPI's Human Resources Director.

Crystal Hodges, MHRM
949-243-6518 - cell #

CONFIDENTIAL

USPI_CIV_000441338
20180419_020-000165707

The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. If the reader of this message is not the intended recipient, you are hereby notified that your access is unauthorized, and any review, dissemination, distribution or copying of this message including any attachments is strictly prohibited. If you are not the intended recipient, please contact the sender and delete the material from any computer.

CONFIDENTIAL

USPI_CIV_000441339
20180419_020-000165707

# Exhibit E

| | |
|---|---|
| **From:** | Mosley, Shannon </O=UNITED SURGICAL PARTNERS/OU=UNITEDSURGICAL /CN=RECIPIENTS/CN=SMOSLEY> |
| **To:** | Mosley, Shannon |
| **Sent:** | 10/24/2018 10:45:04 PM |
| **Subject:** | Fwd: USPI pay ranges |
| **Attachments:** | ATT00001.htm; Pay Ranges.xlsx |

Sent from my iPhone

Begin forwarded message:

**From:** "Wharton, Marie-Claire" <mwharton@uspi.com>
**Date:** October 23, 2018 at 3:49:38 PM CDT
**To:** "Mosley, Shannon" <smosley@uspi.com>
**Cc:** "McGarry, Shannon" <smcgarry@uspi.com>
**Subject: RE: USPI pay ranges**

J

**From:** Mosley, Shannon
**Sent:** Tuesday, October 23, 2018 1:11 PM
**To:** Wharton, Marie-Claire <mwharton@uspi.com>
**Cc:** McGarry, Shannon <smcgarry@uspi.com>
**Subject:** FW: USPI pay ranges

Please add to our spreadsheet, thanks. -s

**From:** Goodwin, Trish
**Sent:** Tuesday, October 23, 2018 12:47 PM
**To:** Mosley, Shannon <smosley@uspi.com>
**Cc:** McGarry, Shannon <smcgarry@uspi.com>
**Subject:** RE: USPI pay ranges

| | Min | Avg | Max |
|---|---|---|---|
| Clinical Directors | 61443.20 | 98979.25 | 144185.60 |
| BOMs | 39728.00 | 68985.92 | 144200.00 |
| RN (Full-time) | 44928.00 | 77222.85 | 135200.00 |
| RN (PRN) | 15177.60 | 19258.83 | 27289.60 |
| RN (Part-time) | 17810.00 | 56184.16 | 77851.28 |
| RN (Regular Part-time) | 39800.00 | 60138.00 | 80475.20 |

Trish Goodwin
Payroll and Benefits Analyst
United Surgical Partners International
15305 Dallas Parkway, Suite 1600
Dallas, Texas 75001
Phone: 972-763-3851
Efax : 972-767-0630

CONFIDENTIAL

USPI_CIV_000214742
20230123_362-000608493

**From:** Mosley, Shannon
**Sent:** Wednesday, October 17, 2018 5:27 PM
**To:** Goodwin, Trish <TGoodwin@uspi.com>
**Cc:** McGarry, Shannon <smcgarry@uspi.com>
**Subject:** Re: USPI pay ranges

Ok thanks!

Sent from my iPhone

On Oct 17, 2018, at 5:01 PM, Goodwin, Trish <TGoodwin@uspi.com> wrote:

Shannon,

Yes, I should be able to get to you by next week. I was going to try for this week but things just kept coming up. I'm off tomorrow and Friday.

Trish Goodwin
Payroll and Benefits Analyst
United Surgical Partners International
15305 Dallas Parkway, Suite 1600
Dallas, Texas 75001
Phone: 972-763-3851
Efax : 972-767-0630

**From:** Mosley, Shannon
**Sent:** Monday, October 15, 2018 2:39 PM
**To:** Goodwin, Trish <TGoodwin@uspi.com>
**Cc:** McGarry, Shannon <smcgarry@uspi.com>
**Subject:** RE: USPI pay ranges

Trish,
Thanks again for supplying this information.

Greg is requesting that I get salary information for all Clinical Directors or Directors of Nursing, Business Office Managers and all RNs.

I know this may take some time, please let me know if you can get it to me by next week?
Thanks,

Shannon Mosley |Vice President, Talent Acquisition
**United Surgical Partners International | www.uspi.com**
office: 972-763-3820      fax: 972-692-8099
<image002.jpg>

**From:** Goodwin, Trish
**Sent:** Wednesday, August 15, 2018 11:40 AM
**To:** Mosley, Shannon <smosley@uspi.com>
**Subject:** RE: USPI pay ranges

Here you go....

CONFIDENTIAL

USPI_CIV_000214743
20230123_362-000608493

**From:** Mosley, Shannon
**Sent:** Tuesday, August 14, 2018 3:48 PM
**To:** Goodwin, Trish <TGoodwin@uspi.com>
**Subject:** Re: USPI pay ranges

Thank you!!

Sent from my iPhone

On Aug 14, 2018, at 3:35 PM, Goodwin, Trish <TGoodwin@uspi.com> wrote:

Shannon,

Yes, I'll have something by this week.

Trish

**From:** Mosley, Shannon
**Sent:** Thursday, August 09, 2018 7:45 PM
**To:** Goodwin, Trish <TGoodwin@uspi.com>
**Cc:** Reinert, Sherri <sreinert@uspi.com>
**Subject:** RE: USPI pay ranges

Trish,
Sorry, but the data that David has won't work. I see you're out until Tuesday, so am I. Do you think you could get me the information by Monday, the 20th? Thanks -sm

**From:** Goodwin, Trish
**Sent:** Tuesday, August 07, 2018 10:40 AM
**To:** Mosley, Shannon <smosley@uspi.com>
**Subject:** RE: USPI pay ranges

Shannon,

I'm working on payroll this week and then I am out Friday and Monday. We don't have job codes that differentiate between hospital vs. ASC; only CFO, etc.

If I get a chance I will look to see what I can provide; otherwise, it will be next week. Have you tried getting with David Behr? Maybe his team can help.

Thank you,

Trish Goodwin
Phone: 972-763-3851
Efax : 972-767-0630

**From:** Mosley, Shannon
**Sent:** Monday, August 06, 2018 4:25 PM
**To:** Goodwin, Trish <TGoodwin@uspi.com>
**Cc:** Reinert, Sherri <sreinert@uspi.com>; McGarry, Shannon <smcgarry@uspi.com>
**Subject:** USPI pay ranges
**Importance:** High

Trish,
I've been tasked with getting salary range info (by Greg) on the following positions:

CONFIDENTIAL

USPI_CIV_000214744
20230123_362-000608493

- Administrator
- Regional VP
- Regional Director
- Market President
- Hospital CFO
- Hospital CEO
- Hospital CNO
- Assistant CNO
- Hospital COO

Can I please get min/mid/max information? I know you're busy, but please let me know when you can turn this around? I need it ASAP. Thanks! -sm

CONFIDENTIAL

USPI_CIV_000214745
20230123_362-000608493

# Exhibit F

| Position | USPI | | | TENET | | |
|---|---|---|---|---|---|---|
| | Minimum | Average | Maximum | Minimum | Average | Maximum |
| RVP | $ 140,000.00 | $ 198,691.90 | $ 300,000.00 | | | |
| Market President | $ 245,000.00 | $ 300,451.11 | $ 346,006.00 | | | |
| Administrator | $ 69,875.00 | $ 124,650.73 | $ 211,160.98 | | | |
| CFO | $ 98,800.00 | $ 151,100.43 | $ 271,294.40 | $ 134,200.00 | $ 230,150.00 | $ 362,000.00 |
| CNO | $ 122,387.20 | $ 137,843.41 | $ 159,764.80 | $ 128,600.00 | $ 206,450.00 | $ 308,900.00 |
| CEO | $ 163,000.03 | $ 188,193.90 | $ 250,016.00 | $ 237,000.00 | $ 371,450.00 | $ 547,300.00 |
| COO | $ 111,758.40 | $ 132,904.51 | $ 154,999.94 | $ 152,100.00 | $ 229,533.30 | $ 326,300.00 |
| CSO | | | | $ 121,300.00 | $ 198,516.67 | $ 301,300.00 |
| CHRO | | | | $ 139,400.00 | $ 199,116.67 | $ 270,800.00 |
| CMO | $ 22,184.00 | $ 221,846.00 | $ 221,846.00 | $ 238,600.00 | $ 348,216.67 | $ 481,800.00 |
| AA | | | | $ 127,000.00 | $ 182,533.30 | $ 249,800.00 |
| Director of Nursing | $ 68,744.00 | $ 106,912.00 | $ 158,600.00 | $ 67,912.00 | $ 122,033.60 | $ 245,440.00 |
| Director of Operations | | | | $ 91,561.60 | $ 116,750.40 | $ 141,918.40 |
| Clinical Director | $ 61,443.20 | $ 98,979.25 | $ 144,185.60 | | | |
| BOM | $ 39,728.00 | $ 68,985.92 | $ 144,200.00 | | | |
| RN (Full Time) | $ 44,928.00 | $ 77,222.85 | $ 135,200.00 | | | |
| RN (PRN) | $ 15,177.60 | $ 19,258.83 | $ 27,289.60 | | | |
| RN (Part Time) | $ 17,810.00 | $ 56,184.16 | $ 77,851.28 | | | |
| RN (Regular Part-Time) | $ 39,800.00 | $ 60,138.00 | $ 80,475.20 | | | |

*Confidential*

| Function | Family | Master Job Code | Master Job Title | Use Limited To/Special Notes | Job Summary | Job Responsibilities | Education | Experience | Certifications |
|---|---|---|---|---|---|---|---|---|---|
| Manager/Director | Office/Clinic/Practice | W4640 | DIR, OPERATIONS | | Establishes and enforces policies, procedures, standards and objectives. Responsible for budget and ongoing effective operation of assigned department of facility 24/7 by exerting a leadership role which supports facility's mission, vision, goals and objectives while focusing on patients, physicians, employees, volunteers and community as customers. | | Bachelor Degree in Business Management, Administration and/or related field. Prefer Master Degree in Health Care Administration or related health care field. | 5 years in leadership role within health care field. | Not Applicable. |
| **Function** | **Family** | **Master Job Code** | **Master Job Title** | **Use Limited To/Special Notes** | **Job Summary** | **Job Responsibilities** | **Education** | **Experience** | **Certifications** |
| Manager/Director | Nursing | W8000 | DIR, NURSING | Used OR Director | This role provides leadership and support to the senior executive position (CNO) responsible for all nursing and other designated patient care functions/services within the hospital organization. The role will assume responsibility for assisting in assessing, planning, coordinating, implementing and evaluating nursing practice on a multi-unit level. Role assumes 24/7 responsibility of Director's assigned areas. The role is accountable to support CNO to ensure high quality, safe and appropriate nursing care, competency of clinical staff, and appropriate resource | Active and current registered nurse license in the state of residence/practice -Highly effective interpersonal and communication skills -Proven leadership ability and hospital operational ability -Ability to serve as role model and advocate for the professional discipline of nursing | Required: Academic degree in nursing Preferred: Bachelors or Masters degree | Required: 2 Years of progressive management experience in a hospital environment as a manager or full time charge nurse/related position | Required: Must be currently licensed, certified or registered to practice profession as required by law, regulation in state of practice or policy. CPR |
| **Function** | **Family** | **Master Job Code** | **Master Job Title** | **Use Limited To/Special Notes** | **Job Summary** | **Job Responsibilities** | **Education** | **Experience** | **Certifications** |
| Manager/Director | Nursing | W8010 | DIR, NURSING PROCEDURAL | (Periop) | This role provides leadership and support to the senior executive position (CNO) responsible for all nursing and other designated patient care functions/services within the hospital organization. The role will assume responsibility for assisting in assessing, planning, coordinating, implementing and evaluating nursing practice on a multi-unit level. Role assumes 24/7 responsibility of Director's assigned areas. The role is accountable to support CNO to ensure high quality, safe and appropriate nursing care, competency of clinical staff, and appropriate resource | Active and current registered nurse license in the state of residence/practice -Highly effective interpersonal and communication skills -Proven leadership ability and hospital operational ability -Ability to serve as role model and advocate for the professional discipline of nursing | Required: Academic degree in nursing Preferred: Bachelors or Masters degree | Required: 2 Years of progressive management experience in a hospital environment as a manager or full time charge nurse/related position | Preferred: RN License |

# Exhibit G

| From: | Blach, Peter </O=UNITED SURGICAL PARTNERS/OU=UNITEDSURGICAL/CN=RECIPIENTS /CN=PBLACH> |
|---|---|
| To: | Mosley, Shannon |
| Sent: | 6/4/2014 12:53:23 PM |
| Subject: | RE: FW: Todd interview with Andy |

ok

**From:** Mosley, Shannon
**Sent:** Wednesday, June 04, 2014 12:53 PM
**To:** Blach, Peter
**Subject:** RE: FW: Todd interview with Andy

She said he asked for ███ first.  He may negotiate.  That's reality.

**From:** Blach, Peter
**Sent:** Wednesday, June 04, 2014 12:53 PM
**To:** Mosley, Shannon
**Subject:** RE: FW: Todd interview with Andy

Didn't Kim say he would take ███ ?

**From:** Mosley, Shannon
**Sent:** Wednesday, June 04, 2014 12:52 PM
**To:** Blach, Peter
**Subject:** RE: FW: Todd interview with Andy

OK, and if we need to go up we can.  I think he'll want ███ to close.  I'm with you.

**From:** Blach, Peter
**Sent:** Wednesday, June 04, 2014 12:51 PM
**To:** Mosley, Shannon
**Subject:** RE: FW: Todd interview with Andy

I would be ok at ███ if that's what it takes to get him.  I thing he is that good.
Peter

**From:** Mosley, Shannon
**Sent:** Wednesday, June 04, 2014 12:47 PM
**To:** Blach, Peter
**Subject:** FW: FW: Todd interview with Andy

See below  Thoughts?

**From:** Kim Kephart [mailto:kkephart@novotus.com]
**Sent:** Wednesday, June 04, 2014 11:32 AM
**To:** Mosley, Shannon
**Subject:** Re: FW: Todd interview with Andy

Originally he said ███ and he brought it down to ███ base.  He needs to see a ████████ to make the move from DaVita.

**KIM ELIZABETH KEPHART**
Novotus | Senior Recruiter | 5508 Parkcrest. Suite 100, Austin, TX  78731
[w] 214-329-9819  [m] 972-977-5860  [e] kkephart@novotus.com

CONFIDENTIAL

On Wed, Jun 4, 2014 at 10:53 AM, Mosley, Shannon <smosley@uspi.com> wrote:
Can you please confirm what Todd is looking for to close him on an offer?

**From:** Blach, Peter
**Sent:** Wednesday, June 04, 2014 10:52 AM
**To:** Mosley, Shannon
**Subject:** RE: Todd interview with Andy

I will ask for pardon on Dallas trip……

**From:** Mosley, Shannon
**Sent:** Wednesday, June 04, 2014 10:47 AM
**To:** Blach, Peter
**Subject:** RE: Todd interview with Andy

Yep and after the GB, Andy will need to email Niels/Sandi to skip Dallas – otherwise, we'll need to get Todd to Dallas before offer.

**From:** Blach, Peter
**Sent:** Wednesday, June 04, 2014 10:24 AM
**To:** Mosley, Shannon
**Subject:** RE: Todd interview with Andy

My thought is [redacted] offer (once the other GB docs approve) with [redacted] bonus potential. Also, will he be eligible for [redacted]? We still doing that?
Peter

**From:** Kim Kephart [mailto:kkephart@novotus.com]
**Sent:** Tuesday, June 03, 2014 5:35 PM
**To:** Blach, Peter
**Cc:** Mosley, Shannon
**Subject:** Re: Todd interview with Andy

Current Base: [redacted].
I've contacted Todd to get his references but haven't heard back yet.

**KIM ELIZABETH KEPHART**
Novotus | Senior Recruiter | 5508 Parkcrest, Suite 100, Austin, TX 78731
[w] 214-329-9819 [m] 972-977-5860 [e] kkephart@novotus.com
LinkedIn | Facebook | Twitter

On Tue, Jun 3, 2014 at 5:23 PM, Blach, Peter <PBlach@uspi.com> wrote:
Greg Haralson (CEO MHSL) and Dr. Pham liked Todd a lot. He meets with Drs. Shannon and Skaribas on Thursday. I anticipate they will like him as well. Please check references and also, what are his comp expectations? I'm sure you've sent it but can you tell me again.

Sent from my iPhone

CONFIDENTIAL

> On Jun 3, 2014, at 3:52 PM, "Mosley, Shannon" <smosley@uspi.com> wrote:
>
> Will you f/up w/Todd or should Kim do it? Good news!
>
> Kim - can you please get references ASAP?
>
> Thx
>
> -----Original Message-----
> From: Blach, Peter
> Sent: Tuesday, June 03, 2014 10:58 AM
> To: Mosley, Shannon
> Subject: Todd interview with Andy
>
> Andy liked him....now onto the GB docs
>
> Sent from my iPhone

CONFIDENTIALITY NOTICE: This message and any attachments are for the sole use of the intended recipient(s). This message is confidential and may also be privileged. If you are not the intended recipient, please contact the sender immediately, delete the contents of this message and do not use it for any purpose.

CONFIDENTIALITY NOTICE: This message and any attachments are for the sole use of the intended recipient(s). This message is confidential and may also be privileged. If you are not the intended recipient, please contact the sender immediately, delete the contents of this message and do not use it for any purpose.

CONFIDENTIAL

USPI_CIV_000452283
20180419_020-000193622

# Exhibit H

| | |
|---|---|
| **From:** | Mosley, Shannon </O=UNITED SURGICAL PARTNERS/OU=UNITEDSURGICAL /CN=RECIPIENTS/CN=SMOSLEY> |
| **To:** | Johnston, Andy |
| **Sent:** | 1/14/2014 4:56:06 PM |
| **Subject:** | RE: O Leary Erin Offer Ltr 01142014.docx |

Agree, I'll type that up and send.

**From:** Johnston, Andy
**Sent:** Tuesday, January 14, 2014 4:33 PM
**To:** Mosley, Shannon
**Subject:** RE: O Leary Erin Offer Ltr 01142014.docx

Perhaps we should match the offer then? Reimburse her, but ask for a longer commitment?

**From:** Mosley, Shannon
**Sent:** Tuesday, January 14, 2014 4:28 PM
**To:** Johnston, Andy
**Subject:** RE: O Leary Erin Offer Ltr 01142014.docx

She hasn't asked her current employer to cover because they wanted the 3 year commitment from her. She told me they'd reimburse her 100% for her schooling though.

**From:** Johnston, Andy
**Sent:** Tuesday, January 14, 2014 4:25 PM
**To:** Mosley, Shannon
**Subject:** RE: O Leary Erin Offer Ltr 01142014.docx

What is her deal on tuition with her current employer?

**From:** Mosley, Shannon
**Sent:** Tuesday, January 14, 2014 4:07 PM
**To:** Johnston, Andy
**Subject:** O Leary Erin Offer Ltr 01142014.docx

Andy,
Attached is a draft of Erin's offer letter.

I highlighted the ███████████████████████████████████████████████
████████████████████████████████████████. She graduates in Nov. 2014.

Let me know if you want to handle the school reimbursement another way?

Thanks,

Shannon Mosley
Vice President of Talent Acquisition

United Surgical Partners
INTERNATIONAL
Ph. 972-763-3820/Fax 972-692-8099
smosley@uspi.com

CONFIDENTIAL

USPI_CIV_000338903
20180309_060-000888333

CONFIDENTIAL

USPI_CIV_000338904
20180309_060-000888333

# EXHIBIT I

| | |
|---|---|
| **From:** | McGarry, Shannon </O=UNITED SURGICAL PARTNERS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS /CN=65865EE6CA19482BAFD0CC679382263A> |
| **To:** | Steen, Marc |
| **CC:** | Mosley, Shannon |
| **Sent:** | 2/14/2018 3:49:05 PM |
| **Subject:** | RE: USPI Employment Offer |

Hi Marc,

I spoke to Julianne earlier and she is good with the ███████████████. She is going to have to buy herself out of the contract that she's in. She just got the numbers from legal just now and she needs to figure out if she can afford it. She is going to go through all the numbers tonight and will give me an answer tomorrow morning at 8:00 AM.

**From:** Steen, Marc
**Sent:** Wednesday, February 14, 2018 10:29 AM
**To:** McGarry, Shannon <smcgarry@uspi.com>
**Cc:** Mosley, Shannon <smosley@uspi.com>
**Subject:** Re: USPI Employment Offer

Agree w ██████████. Even giving her █████ is a lot.

MAS

On Feb 14, 2018, at 10:13 AM, McGarry, Shannon <smcgarry@uspi.com> wrote:

Marc,

We offer three weeks of PTO to new hires. We have adjusted PTO for some candidates but we usually try to meet in the middle. I would suggest going up to ████████████████. I think that's fair and reasonable. The █████ is off the table so if she can't accommodate the █████ we will have to rescind the offer.

Let me know your thoughts.

Shannon

**From:** Steen, Marc
**Sent:** Wednesday, February 14, 2018 9:56 AM
**To:** McGarry, Shannon <smcgarry@uspi.com>
**Cc:** Mosley, Shannon <smosley@uspi.com>
**Subject:** RE: USPI Employment Offer

Agree. Bummer. Not going to offer ████████████████. That's a lot of PTO. How much do we offer new hires? And ████████████████. Might have go back to David, who I think is a good candidate as well.

**From:** McGarry, Shannon
**Sent:** Wednesday, February 14, 2018 9:53 AM
**To:** Steen, Marc <msteen@uspi.com>
**Cc:** Mosley, Shannon <smosley@uspi.com>
**Subject:** RE: USPI Employment Offer

Hi Marc,

CONFIDENTIAL

USPI_CIV_000030396

20180307_051-000259705

She was traveling back to Charlotte yesterday and sent me a note last night. Here is what she's asking for now.



She is going to get back to me today on this. In the meantime, I am going to start working on this again because there are too many variables and I think we may have to rescind her offer based on the fact that she can't get out of her contract.

Thanks,

Shannon


**From:** Mosley, Shannon
**Sent:** Wednesday, February 14, 2018 9:15 AM
**To:** Steen, Marc <msteen@uspi.com>
**Cc:** McGarry, Shannon <smcgarry@uspi.com>
**Subject:** Re: USPI Employment Offer

I agree 100%.
Shannon let her know we must have an answer by the end of the day. When it takes this long to close, there's a problem.

Thanks,
Shannon

Sent from my iPhone

On Feb 14, 2018, at 9:07 AM, Steen, Marc <msteen@uspi.com> wrote:

Her lack of response is starting to worry me.  Maybe she is negotiating the 30-45 notice instead of 60 with her current employer?  We really need to know soon or start looking at our other candidate.

**From:** McGarry, Shannon
**Sent:** Tuesday, February 13, 2018 9:48 AM
**To:** Steen, Marc <msteen@uspi.com>
**Cc:** Mosley, Shannon <smosley@uspi.com>
**Subject:** RE: USPI Employment Offer

Hi Marc,

She told me that she would get back to me today. She has been out of town and is traveling back to Charlotte.  I will reach out to her today if I don't hear back within a few hours.

Thanks,

Shannon


**From:** Steen, Marc
**Sent:** Tuesday, February 13, 2018 9:18 AM
**To:** McGarry, Shannon <smcgarry@uspi.com>

CONFIDENTIAL

USPI_CIV_000030397
20180307_051-000259705

**Cc:** Mosley, Shannon <smosley@uspi.com>
**Subject:** Re: USPI Employment Offer

Any update from her? I need to get back to David on an update and would like to confirm w him that we selected someone else. But will obviously keep him in mind for other opportunities.

MAS

On Feb 9, 2018, at 1:06 PM, McGarry, Shannon <smcgarry@uspi.com> wrote:

Hi Marc,

She was super excited. She said she is going to look over everything this weekend and she would send me the offer and relocation letter back on Monday. She has a trip planned this weekend and will be out of town. I feel pretty confident that she will accept.

Let me know if you have any additional questions.

Thanks,

Shannon

**From:** Steen, Marc
**Sent:** Friday, February 09, 2018 12:15 PM
**To:** McGarry, Shannon <smcgarry@uspi.com>
**Cc:** Mosley, Shannon <smosley@uspi.com>
**Subject:** RE: USPI Employment Offer

Have we heard back from her yet?

**From:** McGarry, Shannon
**Sent:** Thursday, February 08, 2018 3:59 PM
**To:** 'Julianne Christy' <jromesburg0928@gmail.com>
**Cc:** Steen, Marc <msteen@uspi.com>; Mosley, Shannon <smosley@uspi.com>
**Subject:** USPI Employment Offer

Dear Julianne,

It is my pleasure to welcome you to USPI! We are excited that you have decided to make USPI your home. I am sending you a copy of your offer letter and USPI benefit information. **Please sign your offer letter, then scan and send it to me via e-mail. United Surgical Partners International has partnered with HireRight for the background verification process. You will receive an email from HireRight Customer Support with Login and Password to guide you through your background verification. You will also receive an electronic employment application from SilkRoad/OpenHire, our applicant tracking system, so please be on the look-out for the email and fill out your employment application on-line.** We will also need the original paperwork, so please bring your signed paperwork with you on your first day.

Our objective is to complete this process quickly. Please make every effort to accurately provide all of the information requested on the application. A HireRight associate may contact you for additional information during the verification process. Please return the associate's call or e-mail promptly to ensure that a timely and accurate verification enables you to begin work as scheduled.

**You will receive an email with the drug testing procedure information once I receive your completed application and signed offer letter. You will need to take your drug screen form with you along with your ID, for your drug test. Please turn in your paperwork BEFORE you take your drug screening so that your information can be recorded and your test results will be matched with your data.**

CONFIDENTIAL

**I will be your main contact throughout the on-boarding process.**

Please let us know if you have any questions or concerns. I can also be reached via my cell phone at 972-978-1606.

Thank you,


Shannon McGarry, MS, CDR |Executive Recruiter, Talent Acquisition
**United Surgical Partners International |** www.uspi.com
E-mail - smcgarry@uspi.com
ph: 469-779-3754 fax: 972-755-6794
<image001.jpg>@USPIcareers
 <image002.jpg>

CONFIDENTIAL

USPI_CIV_000030399
20180307_051-000259705

# ZIELINSKI EXHIBIT 20 (FILED UNDER SEAL)

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE OUTPATIENT MEDICAL            )
CENTER EMPLOYEE ANTITRUST           )
LITIGATION,                         )
                                    )
                                    ) Master Docket No.
                                    ) 1:21-cv-00305
THIS DOCUMENT RELATED TO:           )
ALL ACTIONS                         )
                                    )
_____

    CONFIDENTIAL VIDEO DEPOSITION OF:   COLLEEN ARTHUR
                    May 23, 2024

_____


        PURSUANT TO SUBPOENA, the deposition of
COLLEEN ARTHUR was taken on behalf of the Plaintiffs
at 370 17th Street, Suite 4500, Denver, Colorado, on
May 23, 2024, at 9:07 a.m., before Kirsten M.
Thorngate, Registered Professional Reporter and Notary
Public within Colorado.

WHEREUPON, the following proceedings were taken pursuant to the Federal Rules of Civil Procedure.

          *     *     *     *     *

THE VIDEOGRAPHER:  We are on the record at 9:07 a.m. on May 23, 2024.

This is the video-recorded deposition of Colleen Arthur regarding Outpatient Medical Center Employee Antitrust Litigation, filed in the United States District Court for the Northern District of Illinois.  This deposition is being held at 370 17th Street, Denver, Colorado.

My name is Michael Banks.  I'm the videographer on behalf of U.S. Legal Support.  The court reporter is Kirsten Thorngate on behalf of U.S. Legal Support.

I'm not related to any party in this action, nor am I financially interested in the outcome.

Counsel will please state their appearances for the record, after which the court reporter will swear in the witness.

MS. CHAN:  Lin Chan from Lieff Cabraser Heimann & Bernstein for Plaintiffs.

MS. ZANDI:  Sarah Zandi from Lieff

Colleen Arthur   Confidential
May 23, 2024

Cabraser Heimann & Bernstein for Plaintiffs.

MS. LANE:  Molly Lane from Morgan, Lewis & Bockius on behalf of Defendant DaVita, Inc.

MR. SHAPIRO:  Nathan Shapiro, also of Morgan Lewis, on behalf of DaVita.

MS. LOU:  Melissa Lou, in-house counsel for DaVita.

MR. WADE:  Joshua Wade at McGuireWoods for Surgical Care Affiliates.

And my colleague Amy Manning will be joining remotely.

MS. O'CONNOR:  Catherine O'Connor from McDermott Will & Emery on behalf of Defendant Kent Thiry.

MS. DURAN:  Julianne Duran of King & Spalding on behalf of the USPI defendant.

MS. STEINER:  Excuse me.  Sorry, I need to enter an appearance as well.

My name's Jordanne Steiner.  I'm from Wilson Sonsini Goodrich & Rosati, and I am here on behalf of Defendant Andrew Hayek.

COLLEEN ARTHUR, having been first duly sworn to state the whole truth, was examined and testified as follows:

with that information?

MS. LANE: Objection as to form.

A. Can you be more specific in . . .

Q. (BY MS. CHAN) Well, what was the CEO reviewing that information for?

MS. LANE: Objection as to form.

A. The CEO, like any leader, would be looking to make decisions for their team or recommendations for their team related to this process.

Q. (BY MS. CHAN) What kind of decisions?

MS. LANE: Objection as to form.

A. This process related to recommendations for merit and bonus.

Q. (BY MS. CHAN) So would they say, Oh, the merit increases are too high; let's reduce our merit increases?

Or, you know, what kind of decisions was the CEO making related to HRSoft data?

MS. LANE: Objection as to form.

A. Individual recommendations.

Q. (BY MS. CHAN) So the CEO was looking at individual recommendations for compensation that came out of the HRSoft data?

MS. LANE: Objection as to form.

Colleen Arthur   Confidential
May 23, 2024

A.   For their direct reports.

Q.   (BY MS. CHAN)  How about for their indirect reports?

MS. LANE:  Objection as to form.

A.   It depends.

Q.   (BY MS. CHAN)  Sometimes?

MS. LANE:  Same objection.

A.   Can you give me a more specific example?

Q.   (BY MS. CHAN)  So did the CEO sometimes look at individual recommendations for compensation for indirect reports that came out of the HRSoft data?

A.   I think I need to be more specific.  It depends on the situation.

Q.   Okay.  In what situations would the CEO look at individual recommendations for compensation for indirect reports that came out of the HRSoft data?

MS. LANE:  Objection as to form.

A.   Is there a specific time period that you're --

Q.   (BY MS. CHAN)  For any time period in which you served as director of compensation.

MS. LANE:  Same objection.

A.   It depended on the situation and the --

Q.   (BY MS. CHAN)  Can you remember any situation in which the CEO looked at individual

Colleen Arthur  Confidential
May 23, 2024

recommendations for compensation for indirect reports that came out of the HRSoft data?

          MS. LANE:  Objection as to form.

     A.   There was a strong interest in differentiating reward by performance.

     Q.   (BY MS. CHAN)  Can you remember any other situation in which the CEO looked at any individual recommendations for compensation for indirect reports that came out of the HRSoft data?

          MS. LANE:  Objection as to form.

     A.   Really related to high performance, high performers.

     Q.   (BY MS. CHAN)  Now, with respect to performance, were there certain ratings that were applied to individuals within a particular job to show how they were performing?

     A.   Yes.

     Q.   What were those?

     A.   It depended on the level of the position.

     Q.   How about for VPs?

     A.   For vice presidents, there were two performance ratings.  One was the -- what was referred to as the PDR performance.  The other was referred to as the 9 Box.

     Q.   What does PDR refer to?

Colleen Arthur   Confidential
May 23, 2024

A.   I don't remember.  I believe the P is for performance.

Q.   Okay. and what's 9 Box?

A.   That was a performance rating scale.

Q.   So there was an interest in making sure that within a particular job category, the higher performers were being compensated more, correct?

MS. LANE:  Objection as to form.

A.   It depends on the situation.  Generally, when I was at DaVita, there was a strong philosophy to pay for performance.

Q.   (BY MS. CHAN)  So for those doing the same job, the higher performers were, in theory, supposed to make more than the lower performers, correct?

MS. LANE:  Objection as to form.

A.   I can't answer in theory, but the philosophy was to differentiate pay based on performance.

MS. LANE:  Lin, we've been going for over an hour.  So when you get to a natural stopping point, if we could just take a break.

MS. CHAN:  All right.  We can take a break now.  That works.

THE VIDEOGRAPHER:  Off the record.  The

Colleen Arthur  Confidential
May 23, 2024

time is 10:21 a.m.

(Recess taken, 10:21 a.m. to 10:40 a.m.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 10:40 a.m.

Q.  (BY MS. CHAN)  Ms. Arthur, before the break, you mentioned something called the Executive Compensation System; is that right?

A.  Yes.

Q.  What was that?

A.  That was a system that was built in-house at DaVita and used for executive compensation.

Q.  When you say "used for executive compensation," what do you mean?

A.  There were two purposes.  The initial purpose was for holistic reporting that included equity as well as cash compensation at an individual level.

The secondary purpose, for a period of time, it was also used as a recommendation system, where leaders could go in and make recommendations related to the annual compensation process.

Q.  When was that period of time?

A.  I don't remember exactly.  However, that system was not used for very long.

Q.  So less than six months?

Colleen Arthur   Confidential
May 23, 2024

A.   It was used for the annual process, so just during the annual process.

And if I remember correctly, there were two or maybe three years that it was used during that process.

Q.   When you said "holistic reporting," does that mean reporting on all types of compensation?

A.   Yes.

Q.   Okay.  And what were the types of compensation?

A.   Base pay, which would be their cash compensation; their annual bonus; any other bonuses that the individual received; and any long-term incentive or equity.

Q.   These are the four broad types of compensation paid to executives at DaVita, correct?

MS. LANE:  Objection as to form.

A.   Can you read back the four, the four types?  Sorry.

Q.   (BY MS. CHAN)  Oh, I'm sorry.  So the four types of compensation that could be paid to executives included base pay; annual bonus; other types of bonuses; and the L-T-I-P, LTIP, correct?

A.   Yes.  I believe that's correct.

Q.   And when you say "executives," what types

Colleen Arthur  Confidential
May 23, 2024

of positions were you talking about?

A.   I believe -- I cannot remember exactly.
I believe that any individual who -- any role a
director level and above was included in that system.

Q.   By that system, you mean the Executive
Compensation System?

A.   That's correct.

Q.   All right.  So you served as director of
compensation from 2015 to 2018; is that right?

A.   That's correct.

Q.   Who did you report to?

A.   When I started, I reported to Cynthia
Baxter.

Q.   What was her title?

A.   I don't 100 percent remember.  It was
vice president, and it may have been vice president of
Total Rewards.

Q.   Who else did you report to?

A.   I reported to Faisal Rashid.

F-a-i-s-a-l, I believe.

Q.   What was his title?

A.   His title was vice president of
compensation and analytics.

Q.   Who else did you report to?

A.   That was it for that position.

Colleen Arthur   Confidential
May 23, 2024

Q.   As director of compensation, who reported to you?

A.   It varied during that time period.  There were analysts and managers on the team, some of whom reported to me.

Q.   At any one time, roughly how many people reported to you?

A.   In that role, roughly two to five.

Q.   After serving as director of compensation, you went on to become the senior director of compensation, correct?

A.   That's correct.

Q.   You served in that role from 2018 to 2021, right?

A.   That's correct.

Q.   What were your job duties at that time?

A.   In that position, I led the compensation function.

Many of the other -- many of the duties I already described continued to be my responsibility.

Q.   What extra duties did you pick up as senior director of compensation?

A.   Additional responsibility for our equity, stock equity team.

Q.   Anything else?

A.   I do.

Q.   Do you have any understanding of why there was a decrease?

MS. LANE:  Objection as to form.

A.   I did not work or was responsible for anything in HealthCare Partners, so I can't answer that question.

Q.   (BY MS. CHAN)  Did you track percentages of employees receiving merit increases for any other part of DaVita?

MS. LANE:  Objection as to form.

A.   On the kidney care side, there were times where we did look at that information.

Q.   (BY MS. CHAN)  And do you recall whether on the kidney care side there was a decrease in the percentage of employees at the director level receiving merit increases?

MS. LANE:  Objection as to form.

A.   I don't have any memory of that.

Q.   (BY MS. CHAN)  Can you please turn to the page Bates-stamped DVA_OMCEAL_001383304 of Exhibit 71. It has the heading Corporate Vice President.

Do you see that page?

A.   I do.

Q.   Okay.  On this page, there is a chart

Colleen Arthur  Confidential
May 23, 2024

with total cash comp listed in thousands on the X axis, and number of VPs on the Y axis.

Do you see that?

A.    I do.

Q.    Then there's a bar graph and a line.

Do you see that?

A.    I do.

Q.    Do you have any understanding of what this refers to?

MS. LANE:  Objection as to form.

A.    I do not.

Q.    (BY MS. CHAN)  Did this graph come out of a template that you had created and sent to Jimmy Wong?

MS. LANE:  Objection as to form.

A.    I don't have any memory of this slide.

Q.    (BY MS. CHAN)  Do you have any memory of similar graphs in compensation slides?

A.    I do not.

Q.    Did DaVita use pay ranges?

MS. LANE:  Objection as to form.

A.    I can speak to the practices when I was with DaVita.

Q.    (BY MS. CHAN)  All right.

A.    We had pay ranges defined for our

Colleen Arthur  Confidential
May 23, 2024

clinical field teammates or positions for PCT, R.N.,

social worker, dietician, and the administrative

assistant in the clinic.

We did not have formal pay ranges for

most of the time for any other positions that I'm

aware of.

Q.   Did you have informal pay ranges for

other positions?

MS. LANE:  Objection as to form.

A.   I can't speak of what was used by

individual teams or managers.  The compensation team

did not manage any other pay ranges.

Q.   (BY MS. CHAN)  For field pay ranges,

those pay ranges were meant to help managers make pay

decisions, correct?

MS. LANE:  Objection as to form.

A.   The intention of the pay ranges while I

was on the compensation team was to provide guidance

to individual managers who were making decisions

around pay practices that were appropriate for the

position, for the level of experience, for the

geography.

Q.   (BY MS. CHAN)  And those pay ranges

helped managers think about the relative value of

different jobs within DaVita, correct?

Colleen Arthur  Confidential
May 23, 2024

MS. LANE:  Objection as to form.

A.    I can't speak to what individual managers used to determine relative value.

MS. CHAN:  Tab 8.

REMOTE TECHNICIAN:  This will be Exhibit 72.

(Deposition Exhibit 72 was marked.)

MS. CHAN:  For the record, the exhibit marked Tab 72 is a document Bates-stamped DVA_OMCEAL_001070295 to 300.

Q.    (BY MS. CHAN)  Ms. Arthur, let me know when you're ready to discuss the document.

A.    Okay.

Q.    Ms. Arthur, for field pay ranges, pay ranges were meant to help managers make pay decisions, right?

MS. LANE:  Objection as to form.

A.    As stated, that's one of the intentions of pay ranges, to support managers with guidance.

Q.    (BY MS. CHAN)  This exhibit, Exhibit 72, is an email with an attachment dated November 17, 2015, at 7:21 p.m.

Do you see that?

A.    I do.

Q.    And you were copied on this email,

A.   I can't speak to what it most likely refers to.  I can just speak that we did not have established pay ranges or pay bands for these positions.  There might be -- so I don't know what he's referring to.

Q.   (BY MS. CHAN)  He asks to gather the range on base salaries for home group leads, doesn't he?

A.   Yes.

Q.   And so you are then asked to pull that range, right?

A.   Yes.  So I'm asked to pull the existing pay for individuals in that position.

Q.   And you're asking to pull that pay because this person, ▮▮▮▮▮, is concerned that her compensation is not in line with others within her organization, correct?

MS. LANE:  Objection as to form.

A.   Based on the email from Cat that she is asking me to pull existing comp for those specific positions.

Q.   (BY MS. CHAN)  And the reason is because ▮▮▮▮▮ is concerned that her compensation is not in line with others within her organization, correct?

MS. LANE:  Objection as to form.

A. That's what the email states, yes.

I think similar to some of the other examples we looked at, from time to time, our team was asked for information around the current pay practice, but it was not a formal band. It was ad hoc reporting that we would pull the information upon request and provide.

Q. It was informal, not formal, correct?

A. It was -- it was on demand, depending on what data was -- was requested. And leaders were -- had full discretion to make decisions.

Q. Can you take a look at the email dated November 27, 2017, at 10:18 a.m., from Marcus Catsouphes.

A. 10:18 a.m.?

Q. Yes.

A. Yes.

Q. Do you see where he says "I assume we need a vice president non-compete to go along with this letter?"

A. I do see that. Yes.

Q. Do you know what "noncompete" refers to?

MS. LANE: Objection as to form.

A. I was not involved in offer letters or noncompete agreements.

Colleen Arthur  Confidential
May 23, 2024

Q.   (BY MS. CHAN)  Who would you ask if you had a question about noncompetes?

A.   I would do what Cat is saying later in the email thread of working with Keely on the offer letter and noncompete.  Keely was the head of recruiting for that business unit.

Q.   How do you spell that?

A.   It's at the top of that page.  K-e-e-l-y. The second page of the email.

Q.   Thank you.

MS. CHAN:  Do you want to take a break?

MS. LANE:  Sure.

THE VIDEOGRAPHER:  Going off the record. The time is 3:44 p.m.

(Recess taken, 3:44 p.m. to 4:08 p.m.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 4:08 p.m.

MS. CHAN:  Tab 26.

REMOTE TECHNICIAN:  Yes, ma'am.  This will be Exhibit 81.

(Deposition Exhibit 81 was marked.)

MS. CHAN:  For the record, Exhibit 81 is a document Bates-stamped DVA_OMCEAL_001068250 to 52.

Q.   (BY MS. CHAN)  Okay.  Ms. Arthur, you received this email, correct?

Q.   And she's looking for market and internal DaVita compensation comparison information, correct?

MS. LANE:  Objection as to form.

A.   It -- according to this message, she is requesting market and internal compensation information.

Q.   (BY MS. CHAN)  Thu Nguyen responds that she can get the internal DaVita compensation ranges to her by the end of next week, correct?

A.   I see that response.  Yes.

Q.   And then there's a further email from Emma Gage to others, including Thu Nguyen, with numbers for DVPs, GRODs, and RODs in the Chicago area.

Do you see that?

A.   I see that email.  Yes.

Q.   And there's a table included in that email, correct?

A.   Yes.

Q.   That table includes ROD, GROD, and DVP base and maximum bonus potential information for the 25th, 50th, and 75th percentiles, correct?

MS. LANE:  Objection as to form.

A.   Yes.  That is what is included in that table.

Q.   (BY MS. CHAN)  The table separates out

Colleen Arthur   Confidential
May 23, 2024

Village and Fusion.

Do you see that?

A.   I do.  Yes.

Q.   What's the difference?

MS. LANE:  Objection as to form.

A.   I -- I don't remember this ad hoc request.

The Village refers to all of kidney care, and Fusion refers to a -- the operating unit.

Q.   (BY MS. CHAN)  So Fusion refers to a smaller subset of the Village, correct?

A.   Yes.  That's correct.

Q.   And Village was lingo for DaVita, correct?

A.   Yes.  It was lingo for DaVita.

I will also just point out that this is another example of an ad hoc request that the team would have received.  And so although I don't remember this specific instance, the data would have been pulled at the time of the request and then summarized in response to this specific data request.

But it was not a requirement of recruiters or people services directors to request this information regarding compensation decisions.

MS. CHAN:  Tab 10.

Colleen Arthur   Confidential
May 23, 2024

REMOTE TECHNICIAN:  Yes, ma'am.  This will be Exhibit 81 -- Exhibit 82.

(Deposition Exhibit 82 was marked.)

MS. CHAN:  For the record, tab 82 is a document Bates-stamped DVA_OMCEAL_001170440 to 41.

Q.   (BY MS. CHAN)  Ms. Arthur, let me know when you're ready.

A.   Okay.

Q.   Ms. Arthur, you sent this email, correct?

MS. LANE:  Objection as to form.

A.   I did send the final email.  Yes.

Q.   (BY MS. CHAN)  And that final email was dated February 16, 2016, at 2:57 p.m., correct?

A.   Yes.

Q.   And it was sent to Sherri Hurley and copying Shannon Gibbons, correct?

A.   Yes.

Q.   Who is Sherri Hurley?

A.    If I flip to the other side of the page, Sherri Hurley was in our people services department. If I remember correctly, she was a people services manager or generalist.

Q.   Who is Shannon Gibbons?

A.    Shannon Gibbons was a people services director or business partner for a portion of the

REPORTER'S CERTIFICATE

STATE OF COLORADO            )
                             )  ss.
CITY AND COUNTY OF DENVER    )

I, KIRSTEN M. THORNGATE, a Registered Professional Reporter, do hereby certify that previous to the commencement of the examination, the witness was duly sworn or affirmed by me to testify to the truth.

I further certify that this deposition was taken in shorthand by me at the time and place herein set forth and thereafter reduced to a typewritten form; that the foregoing constitutes a true and correct transcript.

I further certify that I am not related to, employed by, nor of counsel for any of the parties or attorneys herein, nor otherwise interested in the result of the within action.

_____
Kirsten M. Thorngate
Registered Professional Reporter

Docusign Envelope ID: C625BBF9-164D-4BD7-A29F-AB40F11E2062

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

IN RE OUTPATIENT MEDICAL CENTER EMPLOYEE ANTITRUST LITIGATION

Master Docket No. 1:21-cv-00305-SRH-YBK

THIS DOCUMENT RELATES TO:

ALL ACTIONS

## ERRATA TO TRANSCRIPT OF MAY 23, 2024
## DEPOSITION OF COLLEEN ARTHUR

| Page | Line | From | To | Reason |
|------|------|------|-----|--------|
| 46 | 5 | A. No. The system managers would go to the | A. No. The managers would go to the | Transcription Error |
| 50 | 12 | A. I think I need to be more specific. It | A. I think you need to be more specific. It | Transcription Error |
| 68 | 22-23 | data uploads into the Harvest system, the new system. It was easier to get the information into it. | data uploads into the Harvest system. With the new system, it was easier to get the information into it. | Clarification |
| 98 | 7 | policy or philosophy to suppress wage compression. | policy or philosophy to avoid wage compression. | Clarification |
| 107 | 12 | decision-makers. Yes. | decision-makers. | Clarification |
| 108 | 25 | remembering a kind of metropolitan salary vary that we | remembering a kind of metropolitan salary survey that we | Transcription Error |
| 110 | 24 | A. That's correct. | A. That's correct, with the clarification that the table would have shown information about DaVita's actual pay practice, not prescriptive ranges. | Clarification |
| 121 | 7 | A. Yes. I do not remember the specific | A. I do not remember the specific | Clarification |

| Page | Line | From | To | Reason |
|------|------|------|-----|--------|
| 126 | 2 | Q. (BY MS. CHAN) And later, you also and | Q. (BY MS. CHAN) And later, you also ask | Transcription Error |
| 132 | 1 | Yes. | [Deleted] | Clarification |
| 132 | 22 | A. As to document. Yes. It would show up | A. According to this document, yes, it would show up | Clarification |
| 159 | 9 | A. Decision for how merit dollars were spent | A. Decisions for how merit dollars were spent | Transcription Error |
| 161 | 20 | senior leaders and would use this type of report to | senior leaders and they would use this type of report to | Transcription Error |
| 192 | 18 | would have access to, but it looks like there was -- | would have access to, but it looks like she was | Clarification |
| 195 | 19 | A. That is correct. | A. That is correct, with the clarification that the range I provided would have reflected DaVita's actual pay practice, not a prescriptive range. | Clarification |
| 196 | 5 | A. Yes. | A. Yes, with the clarification that the range I provided would have reflected DaVita's actual pay practice, not a prescriptive range. | Clarification |

## DECLARATION UNDER PENALTY OF PERJURY

I, COLLEEN ARTHUR, do hereby certify under penalty of perjury that I have read the foregoing transcript of my deposition taken on May 23, 2024; that I have made such corrections as appear noted herein; and that my testimony as contained herein, as corrected, is true and correct to the best of my knowledge.

Dated this 31st day of July, 2024, at _____Arvada_____, Colorado.



DocuSigned by:

Colleen T Arthur

F4660609482B4DF...

_____
Colleen Arthur

2

# ZIELINSKI EXHIBIT 21 (FILED UNDER SEAL)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

--o0o--

|  |  |
|---|---|
| | ) |
| IN RE OUTPATIENT MEDICAL CENTER | ) No. 1:21-cv-00305 |
| EMPLOYEE ANTITRUST LITIGATION | ) |
| _____ | ) |

—————————————————————————————————————

VIDEO DEPOSITION OF

BRETT BRODNAX

September 12, 2024

—————————————————————————————————————

DEPOSITION OF BRETT BRODNAX, produced as a witness, duly sworn by me at the instance of the PLAINTIFFS, was taken in the above-styled and numbered cause on September 12, 2024, from 10:03 A.M. to 6:19 P.M., before BRANDON D. COMBS, CSR, RPR, in and for the State of Texas, reported by computerized machine shorthand at:

2323 Ross Avenue, 19th Floor, Dallas, Texas

Brett Brodnax
September 12, 2024

THE VIDEOGRAPHER: Good morning. We're now on the record at 10:02 A.M., on September 12, 2024.

This is the video-recorded proceeding of witness Brett Brodnax, taken by counsel for Plaintiff, in the matter regarding Outpatient Medical Center Employee Antitrust Litigation.

Filed in the United States District Court for the Northern District of Illinois, Eastern Division.

This proceeding is being held at Jones Day in Dallas, Texas.

My name is Erica Taylor, the court reporter is Brandon Combs, both on behalf of U.S. Legal Support.

Will counsel please state their appearances for the record.

MS. NUSSBAUM: Linda Nussbaum, Nussbaum Law Group, for the class plaintiffs.

MR. ROSS: And Jonathan Ross from Nussbaum Law Group, also for the class plaintiffs.

MS. MOYE: Veronica Moye, King & Spalding, for USPI and the witness.

MS. BARRETT: Julia Barrett, King & Spalding, on behalf of USPI and the witness.

Brett Brodnax
September 12, 2024

MR. BREWER:  Connor Brewer on behalf of King & Spalding on behalf of USPI and the witness.

MS. STEINER:  Jordanne Steiner from Wilson Sonsini Goodrich & Rosati on behalf of Defendant Andrew Hayek.

MR. KLIEBARD:  Good morning, everyone. It's Ken Kliebard from Morgan Lewis, representing DaVita, Inc.

MS. GILBERT:  Good morning.  This is Amy Gilbert from McGuire Woods on behalf of Surgical Care Affiliates.  My colleague Chris Karamanos is also on, joining on behalf of SCA.

MS. O'CONNOR:  Good morning.  This is Katharine O'Connor with McDermott, Will & Emery on behalf of Kent Thiry.

THE VIDEOGRAPHER:  Okay.  And our court reporter will now swear in the witness.

BRETT BRODNAX,
having been first duly sworn, testified as follows:

EXAMINATION

Q.   (BY MS. NUSSBAUM)  Good morning, Mr. Brodnax.

A.   Good morning.

Q.   Would you please state your full name and your home address for the record.

Brett Brodnax
September 12, 2024

Mr. Hayek that in the Burke/Ward litigation these agreements were alleged?

MS. MOYE: Objection to the form.

THE WITNESS: I don't know what Bill talked to Andrew about.

Q. (BY MS. NUSSBAUM) Now, who at USPI knew about the explicit agreement not to solicit each other's employees between SCA and USPI?

MS. MOYE: Objection to the form.

THE WITNESS: I don't know all of the people that may have known. I think the people that knew were Shannon, and Bill, Mark Garvin, and there may have been others.

Q. (BY MS. NUSSBAUM) And when did you first learn about the agreement?

A. I learned about it from Bill.

Q. And approximately when was that?

A. It was about 2010.

Q. And what was the context of Bill telling you about the agreement, and to the best of your recollection what did he say to you and what did you say to him?

MS. MOYE: Objection to the form.

THE WITNESS: To the best of my recollection, he said that Andrew and he had a

Brett Brodnax
September 12, 2024

conversation and we agreed not to solicit each other's people.

Q. (BY MS. NUSSBAUM) Did he say anything else to you?

A. That was the -- I think that was the initial. And I don't even think it was in person, I think it was via email.

Q. And do you know what the context of the conversation was between Bill and Andrew?

A. I don't.

Q. Do you know or did Bill ever tell you how this agreement came about?

A. I don't know.

Q. Did he ever tell you the purpose of the agreement?

A. He didn't tell me -- not that I recall, him telling me the purpose of the agreement. So I inferred.

Q. And what did you infer?

A. Basically that SCA and USPI also have considered business transactions in the past, and likely would consider business transactions in the future. And, therefore, we wanted to maintain a relationship with the company.

Q. Okay. But this agreement was separate and

Brett Brodnax
September 12, 2024

apart from any business transaction; is that right?

A. That's correct. But my inference was that the reason we were doing this is to maintain the business relationship, related to potential transactions.

Q. And what was said to you to have you infer that?

A. That was my own inference.

Q. So Mr. Wilcox never said that to you?

A. No, not that I recall.

Q. And during the course of your work at USPI and in times when this agreement came up with Ms. Mosley, with others, it was not in the context of another business agreement, or another business relationship, was it?

MS. MOYE: Objection to the form.

THE WITNESS: I don't recall every instance where it came up. But the ones I can think about, yeah, it was not in the context of a business -- specific business transaction.

Q. (BY MS. NUSSBAUM) And is it fair to say when people on the administrative level and above leave their employment to go to another company, typically this happens through a recruiter?

MS. MOYE: Objection to the form.

Brett Brodnax
September 12, 2024

CERTIFICATE OF REPORTER

I, BRANDON D. COMBS, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth, and nothing but the truth in the within-entitled cause;

That said deposition was taken in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of the said witness was thereafter reduced to typewriting, by computer, under my direction and supervision;

That before completion of the deposition, review of the transcript was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the event of this cause, and that I am not related to any of the parties thereto.

DATED: September 24, 2024

*Brandon D. Combs*

BRANDON D. COMBS
RPR, Texas CSR 10927, California CSR 12978

Docusign Envelope ID: E3364086-6D50-44E7-82D9-7EC639F7542B

*** ERRATA SHEET ***

NAME OF CASE: OUTPATIENT MEDICAL CENTER
DATE OF DEPOSITION:  September 12, 2024
NAME OF WITNESS:  BRETT BRODNAX

PAGE  LINE FROM         TO         REASON

12|23|add "was" between "that primarily"|transcription error

13|18|change "Cerus" to "Cirrus"|transcription error

29|24|change "There's no else" to "There's no place else"|transcription error

62|18|change "Sharon" to "Shannon"|transcription error

74|16|change "anonymously" to "unanimously"|transcription error

87|8|change period to a question mark|transcription error

172|16-18|delete sentence: "And I said -- went to early church. I'm heading up to the club for lunch around noon, join me."|transcription error

172|21|change "email" to "text"|transcription error

203|21|change "Cable" to "Cagle"|transcription error

243|6|change "Sharon" to "Shannon"|transcription error

Signed by:

*Brett Brodnax*
EE6309433E0D491...

_____

Subscribed and sworn before me

this 25th day of October, 2024.

_____        _____

# ZIELINSKI EXHIBIT 22 (FILED UNDER SEAL)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

--o0o--

)
IN RE OUTPATIENT MEDICAL CENTER   ) No. 1:21-cv-00305
EMPLOYEE ANTITRUST LITIGATION     )
_____)

_____

VIDEO DEPOSITION OF

JASON CAGLE

August 6, 2024

_____

DEPOSITION OF JASON CAGLE, produced as a
witness, duly sworn by me at the instance of the
PLAINTIFFS, was taken in the above-styled and numbered
cause on August 6, 2024, from 9:10 A.M. to 2:19 P.M.,
before BRANDON D. COMBS, CSR, RPR, in and for the State
of Texas, reported by computerized machine shorthand
at:

2323 Ross Avenue, 19th Floor, Dallas, Texas

THE VIDEOGRAPHER: We're now on record at 9:10 A.M., August 6, 2024. This is the video-recorded proceeding of Jason Cagle, taken by Nussbaum Law Group in the matter of In Re Outpatient Medical Center Employee Antitrust Litigation.

This proceeding is being held at Bell Nunnally, 2323 Ross Avenue, Dallas, Texas.

My name is Anthony Marlar of U.S. Legal Support. The court reporter is Brandon Combs of U.S. Legal Support.

Would counsel state appearances.

MS. NUSSBAUM: Good morning. Linda Nussbaum of the Nussbaum Law Group for the class action plaintiffs.

MR. ROSS: And Jonathan Ross, also from Nussbaum Law Group, for the plaintiffs.

MR. TROWBRIDGE: Good morning. Chris Trowbridge here, Bell Nunnally & Martin, here on behalf of Jason Cagle.

MR. RIEMER: Ben Riemer also on behalf of the witness, Jason Cagle.

MS. STEDMAN: Olivia Stedman, also on behalf of Jason Cagle.

MS. MOYE: Veronica Moye, King & Spalding, on behalf of USPI.

Jason Cagle
August 06, 2024

MS. DURAN:  Julianne Duran, also King & Spalding, on behalf of USPI.

MS. SHARP:  And Karen Sharp with Wilson Sonsini on behalf of Andrew Hayek.  I also have my colleague Jordanne Steiner on the phone.

MR. RUSSO:  Angelo Russo, McGuire Woods, on behalf of Surgical Care Affiliates and SCA Holdings, Inc.  And I also have my colleague on the phone, Andrew Talbot, from McGuire Woods.

MR. TROWBRIDGE:  Could we have the other people appearing by Zoom make announcements as well.

Looks like Ms. Holthus is trying to say something.  But it looks like you're on mute.

(Off the record.)

MR. TROWBRIDGE:  Staci Holthus of Morgan Lewis & Bockius on behalf of DaVita, Inc.

MS. SIEGEL:  Glenna Siegel of McDermott Will & Emery on behalf of Kent Thiry.

MS. STEINER:  Jordanne Steiner from Wilson Sonsini Goodrich & Rosati on behalf of Andrew Hayek.

MR. TALBOT:  Andrew Talbot of McGuire Woods on behalf of the SCA defendants.

JASON CAGLE, having been first duly sworn, testified as follows:

EXAMINATION

Q. (BY MS. NUSSBAUM) Good morning, Mr. Cagle. Could you please state for the record your full name, your home address, and to the extent that you have a business address?

A. Jason Brad Cagle. And my home address is ██████████████████████. Sorry, do you need more?

Q. Dallas, Texas?

A. Dallas, Texas.

Q. Okay. And are you presently employed?

A. I own my own business.

Q. And do you have a business address?

A. No.

Q. Mr. Cagle, I want to thank you for being here today. Now, were -- was your testimony subpoenaed by the plaintiffs in this litigation?

A. Yes, it was.

Q. Okay. And how did you first become aware that you were going to be subpoenaed in this action?

A. They left a notecard on my door.

Q. Who left a notecard?

A. Process server.

number on those pages. So the third and fourth physical page. What does that information reflect?

A. It appears to reflect aggregate same store or same site system-wide case growth.

Q. Okay. And that's from 2009 all the way through July of 2013?

A. Correct.

Q. And what did you do with this information when you received it?

A. I don't recall as I sit here today what I would have done with this.

Q. Do you recall if you shared it with anybody else at USPI?

A. I don't recall today.

Q. Do you recall if you used this as part of the process that USPI did for budgeting or forecasting?

A. I don't recall that.

Q. Now, let me show you what we're marking as Exhibit 225.

And that is under Tab 41.

THE TECHNICIAN: 41 or 31?

MS. NUSSBAUM: 41. 41.

THE TECHNICIAN: Understood.

MS. NUSSBAUM: Thank you.

Jason Cagle
August 06, 2024

(Whereupon, Exhibit PX225 was marked for identification.)

MS. NUSSBAUM:  And that's USPI 000016562.

Q.   (BY MS. NUSSBAUM)  This is an email from you to Brian Mathis dated March 18, 2013.  And it says, USPI March 2013 forecast.  And your email says, hi Brian, here is our March mid month forecast.

Do you see that?

A.   I do.

Q.   And the email beneath that is from Mr. Walker to you, with a copy to Mr. Kopser.  And it says, file to share with SCA.

Do you see that?

A.   I do.

Q.   And these are emails kept in the ordinary course of business while you were employed by USPI; is that correct?

A.   That is correct.

Q.   Now, Mr. Cagle, why was USPI sharing their forecast information with SCA?

A.   I expect for the same reason that we would compare aggregate volume information with others in the industry, to judge if our business was looking the same as theirs.  This is not financial

Jason Cagle
August 06, 2024

information again.  And certainly not material nonpublic information.

Q.   Well, it is nonpublic information; is that right?

A.   That is correct.

Q.   Okay.  Now, was Mr. Wilcox aware that you were sharing this type of information with SCA?

MS. MOYE:  Object to the form.

THE WITNESS:  I can't speak for Bill.

Q.   (BY MS. NUSSBAUM)  What about Mr. Brodnax? Was he aware that you were sharing forecasting information with SCA?

MS. MOYE:  Objection to the form.

MR. TROWBRIDGE:  Objection.  Form.

THE WITNESS:  I can't speak for Brett either.

Q.   (BY MS. NUSSBAUM)  Now, in 2009, which is when JJ indicates that the information sharing between USPI and SCA began, were you in the general counsel's office at that time?

MS. MOYE:  Objection to the form.

THE WITNESS:  Yes.

Q.   (BY MS. NUSSBAUM)  And were you aware that folks in the finance department were sharing nonpublic information with SCA?

Jason Cagle
August 06, 2024

MR. TROWBRIDGE:  I'm going to object and just caution the witness.

She's now, Ms. Nussbaum, is asking you a question about information you knew when you were legal counsel internally for USPI.

So if you were -- you cannot reveal any substantive legal communications or analysis while you were USPI general counsel in answering the question.

MS. MOYE:  And I object to the form of the question as well.

THE WITNESS:  Okay.  I'm sorry, could you please restate the question or read it back.

MS. NUSSBAUM:  Would you repeat the question, sir.  Thank you.

(Record read by the reporter as follows:

"Q.  Now, in 2009, which is when JJ indicates that the information sharing between USPI and SCA began, were you in the general counsel's office at that time?

"A.  Yes.

"Q.  And were you aware that folks in the finance department were sharing nonpublic information with SCA?")

THE WITNESS:  I don't recall what I was

And I think it speaks for itself.

Q. (BY MS. NUSSBAUM) Okay. And this is an email that you sent and received in the ordinary course of your employment as the CFO of USPI; is that right?

A. Yes.

MS. NUSSBAUM: Let's look at Tab 13. This is USPI 000114065.

(Whereupon, Exhibit PX231 was marked for identification.)

Q. (BY MS. NUSSBAUM) And this is an email between you and Mr. Kopser, and the date of this is 3/17/2013. So this is shortly after you assumed the CFO position; is that right?

A. I don't know about shortly, I think I started late 2012, but I see the date.

Q. Okay. And you are asking Mr. Kopser, do we exchange mid month data with them, referring to SCA.

Do you see that?

A. Yes, I see what the email says.

Q. And Mr. Kopser says yes. And then you respond, just them; right? No one else?

Do you see that?

A. I do.

Jason Cagle
August 06, 2024

Q.   Okay.  And this again is a business record kept in the ordinary course of your business, is an email between you and Mr. Kopser?

A.   It appears to be, yes.

MS. NUSSBAUM:  Did we mark this as --

THE REPORTER:  231.

MS. NUSSBAUM:  231, yeah.

MR. TROWBRIDGE:  We've been going a little over an hour now, so we could break for lunch if it's a convenient time.

MS. NUSSBAUM:  It's up to Mr. Cagle. Whatever Mr. Cagle would like to do is absolutely fine with me.

MR. TROWBRIDGE:  Okay.  Why don't we take a break and we'll go off the record.

THE VIDEOGRAPHER:  Now off record, 11:45 A.M.

(Off the record.)

THE VIDEOGRAPHER:  Now on record, 12:31 P.M.

Q.   (BY MS. NUSSBAUM)  Mr. Cagle, I want to mark as Exhibit 232, it's under Tab 24, it's a one-page document, 000016100.

THE TECHNICIAN:  Pardon, Ms. Nussbaum, if it's Tab 24, that would be previous Exhibit 37.

Jason Cagle
August 06, 2024

MS. NUSSBAUM: Thank you.

THE TECHNICIAN: Yes, ma'am.

Q. (BY MS. NUSSBAUM) And this is an email from Mr. Mathis to you, and then from you to Mr. Mathis and Mr. Walker and Mr. Martin. Both emails are dated August 9, 2013.

Do you recognize this document?

A. I do.

Q. Okay. And is this an email that you sent and received in the ordinary course of your employment while the CFO of USPI?

A. Yes, it appears to be.

Q. So first we have Mr. Mathis emailing you, and the subject is 2014 wage increases. And Mr. Mathis says, Jason, one of the things we've shared in the past is plans for the following year wage increases.

Have you all started, set a number yet that you're planning to budget?

And you email back to him about an hour later and you say, hey, Brian. Not yet, but probably will nail down the second half of August. We'll remember to share with you when we do.

Do you see that?

A. I do.

U.S. Legal Support | www.uslegalsupport.com

Jason Cagle
August 06, 2024

Q.   And does this document make clear that plans for the following year wage increases were shared between SCA and USPI?

MS. MOYE:  Objection to the form.

MR. TROWBRIDGE:  Objection.  Form.

MR. RUSSO:  Objection to the form.

THE WITNESS:  I don't agree with that characterization.

Q.   (BY MS. NUSSBAUM)  Mr. Mathis says to you, one of the things we have shared in the past is plans for the following year wage increases.

Do you see that?

A.   I do.

Q.   And he then asks if you've started to plan a budget yet.

Do you see that?

A.   I do.

Q.   And you say, not yet, but probably will nail down the second half of August.  We'll remember to share with you when we do.

Do you see that?

A.   I do.

Q.   So you're saying to Mr. Mathis at SCA that you, on behalf of USPI, would share with SCA, when you do it in the second half of August, your wage

U.S. Legal Support | www.uslegalsupport.com

Do you see that?

MS. MOYE: Objection to the form.

MR. TROWBRIDGE: Objection. Form.

THE WITNESS: I'm sorry, are you asking me about what is Tab 25?

MR. ROSS: And Tab 24.

Q. (BY MS. NUSSBAUM) And -- yeah. Yeah, that's right, Tab 24 and Tab 25.

A. Okay. Could you repeat the question, please.

Q. Sure. Mr. Mathis of SCA in the beginning of August tells you that in the past the two companies have shared their plans for the following year wage increases, and he asks if you've done that budgeting yet.

You say no, not yet, but you'll probably nail it down the second half of August, and you'll share it with him when you do. That's the email between yourself and Mr. Mathis.

The email between yourself, Katrina Gross, and Mr. Wilcox in fact is doing just what you told Mr. Mathis you would do.

It's at the end of August, you're, quote, nailing down the wage increases for 2014 and you're determining what the wage increase will be, just as

you told Mr. Mathis you would.

Now, subsequent to your, with your colleagues at USPI, determining the 2014 budget increases, did you share that information with Mr. Mathis as you promised to do in your email to him dated August 9, 2013?

MR. TROWBRIDGE: Objection. Form.

MS. MOYE: Objection to the form.

MR. RUSSO: Object to the form.

THE WITNESS: Not that I recall.

Q. (BY MS. NUSSBAUM) Now, during the time period that you and Mr. Mathis were sharing information, did you have telephone calls?

MR. TROWBRIDGE: Objection. Form.

MS. MOYE: Objection. Form.

MR. RUSSO: Objection. Form.

THE WITNESS: I don't recall that we did.

Q. (BY MS. NUSSBAUM) Well, do you recall we looked at earlier the introductory email that Mr. Kopser made between you and Mr. Mathis and the two of you exchanged your phone numbers?

MS. MOYE: Objection to the form.

THE WITNESS: I'm sorry, which one was that?

Q. (BY MS. NUSSBAUM) That was an earlier

Jason Cagle
August 06, 2024

email.  I'll tell you which one in a moment.

But it was at or about in early 2013 when Mr. Kopser introduces you to Mr. Mathis and he tells Mr. Mathis that you're the new CFO and you're going to take over the information sharing.

MS. MOYE:  Is there a question?  Is that the question?  Well, object to the form if that's the question.

MR. TROWBRIDGE:  Objection.  Form.

Q.   (BY MS. NUSSBAUM)  It's Tab 17.  It's Exhibit 224.

A.   Okay, I have it.

MR. TROWBRIDGE:  And what's the question?

MS. NUSSBAUM:  Does he recall sharing phone information and having calls with him.

THE WITNESS:  I do see what the email says, it does include our phone numbers.  I don't recall speaking with him by phone.

Q.   (BY MS. NUSSBAUM)  Now, didn't you share the wage increase information with Mr. Mathis that you promised to share with him in your email dated August 9, 2013?

MS. MOYE:  Objection to the form.

MR. RUSSO:  Objection to the form.

THE WITNESS:  No, I don't recall that I

Jason Cagle
August 06, 2024

did.

Q.   (BY MS. NUSSBAUM)  Do you recall discussing it with Mr. Walker?

A.   I'm sorry, discussing what?

Q.   Sharing the wage increase information, do you recall discussing that with Mr. Walker?

A.   I do not.

Q.   Do you recall discussing that with Mr. Martin?

A.   I do not.

Q.   Now, Mr. Martin and Mr. Walker are both on the email in which you promised to share the wage increase information with Mr. Mathis when you, quote, nail it down in the second half of August.

Do you see that?

MR. TROWBRIDGE:  Objection to the form.

MS. MOYE:  Objection to the form.

THE WITNESS:  I don't believe it says exactly that.

Q.   (BY MS. NUSSBAUM)  What does it say?

A.   Says, will nail down the second half of August.

Q.   Okay.  And then you say, we'll remember to share with you when we do; is that right?  That's your language?

Jason Cagle
August 06, 2024

A.  That is what this email says, yes.

Q.  Okay.  Now, did Mr. Walker or Mr. Martin have any discussion with you about your agreeing to share wage increase information with Mr. Mathis?

MS. MOYE:  Objection to the form.

MR. RUSSO:  Object to the form.

THE WITNESS:  Not that I recall.

Q.  (BY MS. NUSSBAUM)  And subsequent to the emails reflected in Exhibit 226, when you and Ms. Gross and Mr. Wilcox agree on the budget for the wage increases as you told Mr. Mathis that you would, did you share that information with Mr. Mathis?

MS. MOYE:  Object to the form.

THE WITNESS:  Not that I recall.

MS. NUSSBAUM:  Let's look at what we're marking as Exhibit 227, and that --

THE TECHNICIAN:  Pardon, the next would be 232.

MS. NUSSBAUM:  232?  Sorry.  Thank you. Okay.  And this is under Tab 27.

(Whereupon, Exhibit PX232 was marked for identification.)

Q.  (BY MS. NUSSBAUM)  And it is emails from you to Mr. Mathis and from Mr. Mathis to you, and

this is dated one year later.  This is now in August of 2014.

MR. TROWBRIDGE:  I think you asked the question before he was handed the exhibit.  Is there a pending question?

MS. NUSSBAUM:  Yeah, okay.  I thought he was looking at it, I'm sorry.  I didn't want to interrupt his thoughts.

THE WITNESS:  Thank you.

Q.  (BY MS. NUSSBAUM)  So Mr. Cagle, we've marked this as Exhibit 232.  It's CIV 000021155.  And this is emails from you to Mr. Mathis and Mr. Mathis to you.  And it says wage increase budgets.

This is dated August 19 and 20 of 2014, so it's approximately one year after the prior emails that also concerned wage increase budgets.

Do you see that?

A.  I see the email, yes, and I see the date.

Q.  And do you recognize it as emails that you received and sent in the ordinary course of your business at USPI?

A.  Yes.

Q.  And so, as promised in the previous exhibit prior, Exhibit 37, which was Tab 24, when

Jason Cagle
August 06, 2024

you informed Mr. Mathis that USPI did its wage increase budgets in August.

Mr. Mathis writes to you on August 19, 2014, at 10:19 at night, and he says to you, Jason, are you all willing to swap wage increase budgets as we have in the past? Best, Brian.

And you respond at 6:40 A.M. and you say, that works, whenever you're ready. Thanks, Brian.

Do you see that?

MS. MOYE: Objection to the form.

MR. TROWBRIDGE: Objection. Form.

THE WITNESS: I believe -- I don't believe that's what the email says.

Q. (BY MS. NUSSBAUM) Sorry. Okay. You then say -- I'm sorry. You say then -- I am correct. You say, sure. We're just heading into budgets. When were you hoping to see it? I may be a few weeks out.

And then he says, that works, whenever you're ready. Thanks, Brian. Is that correct?

A. Yes, that is what the email says.

Q. Okay. So once again, now we're one year later, Mr. Mathis is asking you to again swap wage increase budgets as you have in the past. And you say, sure. We're just heading into budgets. When

Jason Cagle
August 06, 2024

were you hoping to see it?  And he, says whenever you're ready.

Does this refresh your recollection that as CFO of USPI, you shared with SCA your wage increase budgets?

MR. TROWBRIDGE:  Objection.  Form.

MS. MOYE:  Objection.  Form.

MR. RUSSO:  Object to the form.

THE WITNESS:  No, I don't believe we did.

Q.   (BY MS. NUSSBAUM)  Well, then what --
Mr. Mathis is saying to you, are you willing to swap wage increase budgets as we have in the past.
Right?  Your response is, sure.

Your response is, I don't know what you're talking about.  Your response is, we've never shared wage increase budgets.  Your response is, no, I'd never do anything like that.

Your response is, sure.  We're just heading into budgets.  That's your email, that's your language; isn't that right?

MR. TROWBRIDGE:  Objection.  Form.

MS. MOYE:  Objection.  Form.

THE WITNESS:  That is what the email says.

Q.   (BY MS. NUSSBAUM)  Okay.  And then
Mr. Mathis says to you, that works, whenever you're

Jason Cagle
August 06, 2024

ready.  Whenever you're ready, he's ready to exchange wage increase budgets, as the two of you have done in the past.

That's what this document says, isn't it, Mr. Cagle?

MR. RUSSO:  Objection.  Form.

MS. MOYE:  Objection to the form.

MR. TROWBRIDGE:  Objection.  Form.

THE WITNESS:  The document says what it says.

Q.   (BY MS. NUSSBAUM)  Okay.  And this is a document that you sent and received in the ordinary course of your business as the CFO of USPI; is that right?

A.   That is correct.

Q.   Okay.  Now, let's look at -- so let us look at what's under Tab 26.  And this is going to be marked as 253?

THE TECHNICIAN:  233.

MS. NUSSBAUM:  233.  Thank you.

THE TECHNICIAN:  Yes, ma'am.

(Whereupon, Exhibit PX233 was marked for identification.)

Q.   (BY MS. NUSSBAUM)  This is USPI 000021120, and it's an email from Mr. Mathis to you.  And it

Jason Cagle
August 06, 2024

Thank you very much for your time. We really do appreciate it.

THE WITNESS: Sure. Thank you.

MS. NUSSBAUM: And we're going to follow up with you with respect to the production issue that we had talked about earlier today.

MR. TROWBRIDGE: I'll be available.

MS. NUSSBAUM: Perfect. Thanks again.

MS. MOYE: And, for the record, USPI's position is the deposition is concluded. And again, it is designated as confidential.

THE VIDEOGRAPHER: Okay. Now off the record. Time is 2:19 P.M.

(Whereupon, the deposition adjourned at 2:19 P.M.)

--oOo--

I declare under penalty of perjury that the foregoing is true and correct. Subscribed at Dallas County, TX_____, this 9th day of October_____, 2024.

_____
JASON CAGLE

ANDREA SELLERS
Notary Public, State of Texas
Comm. Expires 06-18-2025
Notary ID 1546713

Jason Cagle
August 06, 2024

CERTIFICATE OF REPORTER

I, BRANDON D. COMBS, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth, and nothing but the truth in the within-entitled cause;

That said deposition was taken in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of the said witness was thereafter reduced to typewriting, by computer, under my direction and supervision;

That before completion of the deposition, review of the transcript was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the event of this cause, and that I am not related to any of the parties thereto.

DATED: August 14, 2024

_____
BRANDON D. COMBS
RPR, Texas CSR 10927, California CSR 12978

Jason Cagle
August 06, 2024

*** ERRATA SHEET ***

NAME OF CASE: IN RE: OUTPATIENT MEDICAL CENTER
DATE OF DEPOSITION: 8-6-24
NAME OF WITNESS:  JASON CAGLE

| PAGE | LINE | FROM | TO | REASON |
|------|------|------|----|--------|
| | | see attached correction sheet | | |
| 121 | 2 | | | 2 |

Subscribed and sworn before me

this 9th day of October ,2024.

Andrea Sellers                    06/18/2025
(Notary Public)          My Commission Expires:

ANDREA SELLERS
Notary Public, State of Texas
Comm. Expires 06-18-2025
Notary ID 1546713

**CORRECTION TO JASON CAGLE'S ERRATA SHEET – DEPOSITION TAKEN AUGUST 6, 2024**

**Revision in Bold – Page 121, Line 2**

A.  I'm not sure what I meant at the time, **but it is not all my handwriting. Mr. Wilcox wrote "Bill" and I must have added the rest**.

# ZIELINSKI EXHIBIT 23 (FILED UNDER SEAL)

Robert Chipman   Confidential
August 07, 2024

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


Civil Action No. 1:21-cv-00305-ARW-SRH


In re: Outpatient Medical Center
Employee Antitrust Litigation,

_____/




C O N F I D E N T I A L

REALTIME

VIDEOTAPED DEPOSITION OF


ROBERT CHIPMAN




Wednesday, August 7, 2024
9:10 a.m. - 5:39 p.m.




GREENBERG TRAURIG, P.A.
401 East Las Olas Boulevard, Suite 2000
Fort Lauderdale, Florida 33301
(954)765-0500



Stenographically Reported By:
Shirley D. Frazier, CPR, FPR, RPR,
Certified Realtime Reporter

Robert Chipman  Confidential
August 07, 2024

The following proceedings began at 9:10 a.m.:

THE VIDEOGRAPHER:  Good morning.  We are now on the record at 9:10 a.m. on August 7th, 2024.  Audio and video recording will continue to take place until all parties agree to go off the record.  Please note that microphones are sensitive and may pick up whispering and private conversations.  This is the video-recorded deposition of Robert Chipman, being taken by counsel for plaintiff, in the matter of In Re:  Outpatient Medical Center Employee Antitrust Litigation, filed in the United States District Court for the Northern District of Illinois.

This deposition is being held at Greenberg Traurig, LLP, located at 401 East Las Olas Boulevard, Suite 2000, Fort Lauderdale, Florida 33301.

My name is Carlos Coello.  I am the videographer on behalf of U.S. Legal Support.  The court reporter is Shirley Frazier, on behalf of U.S. Legal Support.  I am not related to any party in this action, nor am I financially interested in the outcome.

Counsel will state their appearances for

Robert Chipman  Confidential
August 07, 2024

the record, after which the court reporter will swear in the witness.

MS. ZANDI:  Sarah Zandi of Lieff, Cabraser, Hyman and Bernstein.

MR. HARVEY:  Dean Harvey of Lieff, Cabraser, for the plaintiffs.

MS. LANE:  Molly Lane, appearing on behalf of DaVita, Inc., and I am representing Mr. Robert Chipman.

THE STENOGRAPHER:  Sir, if you'd raise your right hand, please.

Do you solemnly swear or affirm the testimony you are about to give in this case shall be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

THE STENOGRAPHER:  Thank you.

Thereupon:

ROBERT CHIPMAN, a witness named in the notice heretofore filed, being of lawful age and having been first duly sworn, testified under oath as follows:

DIRECT EXAMINATION

BY MS. ZANDI:

Q.  Hi, Mr. Chipman.  I am Sarah Zandi, and

Robert Chipman  Confidential
August 07, 2024

But generally speaking, that was the territory.

Q.   And the dream team was a palmer, correct?

A.   That's correct.

Q.   And palmers refer to divisions of DaVita?

A.   That's correct.

Q.   While you were at DaVita, there were five palmers?

A.   When I first started, yes.

Q.   Did that change over time?

A.   It expanded to seven or eight.  I don't remember the number.

Q.   There were seven or eight palmers by the time you left DaVita?

A.   That's correct.

Q.   So you were responsible, as people services group director, for helping managers decide what to pay current employees, correct?

MS. LANE:  Objection as to form.

A.   My role would be to advise counsel on some best practices for pay.  It was their decision on what they actually paid.

BY MS. ZANDI:

Q.   Just to clarify, Mr. Chipman, did you say "advise and counsel" or "advise counsel"?

Robert Chipman   Confidential
August 07, 2024

A.   Advise and counsel.

Q.   Thank you.

How did you advise and counsel managers on best practices for pay?

A.   So I would work with the compensation team at DaVita headquarters to get their best thinking on what pay was for a particular role, and then I would share that with the leader and talk about the incumbent's performance, potential geography, things like that.

Q.   What was the compensation team?

A.   They did comp and benefits.  So they did the systems and structure on comp and benefits.

Q.   Were you on the compensation team?

A.   I was not.

Q.   When you say, you would share information from the compensation team on pay for a particular role with a leader, what leader are you referring to?

A.   So within -- it could be the palmer, the leader of that division, or it could be one of the division vice presidents, who oversaw a more localized territory.

Q.   Mr. Chipman, when managers decided what to pay employees who reported to them, did those

Robert Chipman  Confidential
August 07, 2024

decisions need to be approved by anyone?

MS. LANE:  Objection as to form.

A.    So when you worked with a palmer, they pretty much had carte blanche to make decisions about pay.  If you worked for a division vice president and that person reported to the palmer, sometimes the palmer would have to approve that for the division vice president.

BY MS. ZANDI:

Q.    So a palmer could decide to pay all men 20 percent more than all women?

MS. LANE:  Objection as to form.

A.    They could.

BY MS. ZANDI:

Q.    And there was no process by which that decision could be altered?

MS. LANE:  Objection as to form.

A.    I don't -- I'm not aware of a particular process.  That is where my counsel and my advice would come in and recommend against such practice.

BY MS. ZANDI:

Q.    Did the palmers have labor budgets?

MS. LANE:  Objection as to form.

A.    The only budgets that I can remember them having would be for the clinics, the individual

Robert Chipman   Confidential
August 07, 2024

clinics.

BY MS. ZANDI:

Q.   Who set the clinic budgets?

MS. LANE:  Objection as to form.

A.   That, I don't know.

BY MS. ZANDI:

Q.   How often were the clinic budgets set?

MS. LANE:  Objection as to form.

A.   I don't know.

BY MS. ZANDI:

Q.   Did the clinic budgets have to be approved by the CEO?

MS. LANE:  Objection as to form.

A.   I don't know.

BY MS. ZANDI:

Q.   Did the clinic budgets have to be approved by the COO?

MS. LANE:  Objection as to form.

A.   I don't know.

BY MS. ZANDI:

Q.   Did the clinic budgets have to be approved by the board of directors?

A.   I don't know.

MS. LANE:  Objection as to form.

Robert Chipman  Confidential
August 07, 2024

BY MS. ZANDI:

Q.   As people services group director --
strike that.

So you did not try to ensure that DaVita
paid similar employees for similar work?

MS. LANE:  Objection as to form.

A.   That was outside of my scope of
responsibilities.

BY MS. ZANDI:

Q.   Was it something you thought about in this
position?

MS. LANE:  Objection as to form.

A.   I can't say that I specifically had that
thought.

But as an HR professional, I do want to
make sure that similar roles are within a relevant
range.

BY MS. ZANDI:

Q.   What does that mean?

A.   That means that there is a range of pay
for individuals based on their experience, skill
sets, expertise, geography, and that you can
compensate individuals within that range based on
the performance and potential.

Q.   That range would also be based on job

title, right?

MS. LANE:  Objection as to form.

A.   So we're talking hypothetically here. DaVita didn't have this when I was there.

But the way I do it today and the way I did it in past roles, yes, it would be based on specific positions.

BY MS. ZANDI:

Q.   When you say "DaVita didn't have this," what are you referring to?

A.   When I first started, we didn't have pay ranges or bands.

Q.   Are you referring to formal pay ranges and bands?

A.   I didn't have any tools to be able to understand or know what those pay ranges or bands were, if there were any.

Q.   Could you otherwise look at data to determine what individuals in a certain job title were being paid?

MS. LANE:  Objection as to form.

A.   When I was there, that data was not in a system that I had access to.

BY MS. ZANDI:

Q.   But there was a system that had that data?

Robert Chipman  Confidential
August 07, 2024

A.   I am not completely sure.

Q.   Did you ever request that data?

A.   I requested recommendations from the compensation team occasionally for certain roles, yes.

Q.   What would you -- what data would you ask for in those recommendations?

A.   I would ask for within the role, the salary and bonus for similar roles within my palmer group, and to have some sort of comparison against what the company overall was doing.  Ideally, I'd like a market perspective, too, external.

Q.   How did you -- strike that.

How did DaVita figure out what to offer new employees with respect to compensation?

MS. LANE:  Objection as to form.

A.   As my role, a people services director, I didn't know.

BY MS. ZANDI:

Q.   As people services group director, did you have any responsibilities with respect to deciding what compensation to offer new hires?

A.   Other than when we were either promoting a regional director -- and I would provide counsel or advice on that -- I did not set or direct pay for

A.   So when I was there, it would have been each of the palmer people services directors.

BY MS. ZANDI:

Q.   Anyone else?

A.   Not to my knowledge.

Q.   Okay.  This email attaches a document titled, "DaVita's Compensation Philosophy," correct?

A.   Yes.

Q.   Okay.  Please take a look at the document Bates stamped ending in 906133 of PX-249.

Do you see that?

A.   Yes.

Q.   Did you draft this document?

A.   I did not.

Q.   Who did draft this document?

MS. LANE:  Objection as to form.

A.   I'm not sure.  I'm not sure I know.

BY MS. ZANDI:

Q.   Who would have approved the final version of this compensation philosophy?

A.   Anything related to people would have ultimately been -- had to have been approved by Laura Mildenberger, the chief people officer.

Q.   And you're referring to people services?

A.   Yes.

Robert Chipman  Confidential
August 07, 2024

Q.   Okay.  As vice president, what was your understanding of what DaVita's compensation philosophy was?

MS. LANE:  Objection as to form.

A.   I don't remember exactly what my understanding was at the time.  I do know just colloquial that we were a pay-for-performance organization.

BY MS. ZANDI:

Q.   Anything else?

A.   Nope.

Q.   You said Laura Mildenberger would have had to approve this, right?

MS. LANE:  Objection as to form.

A.   That's my belief, given the fact that she was the chief people officer.

BY MS. ZANDI:

Q.   Would Kent Thiry have had to approve this?

MS. LANE:  Objection as to form.

A.   I don't know if Kent would have or not.

BY MS. ZANDI:

Q.   What about the COO?

MS. LANE:  Objection as to form.

A.   I don't know if he would have either.

BY MS. ZANDI:

Q.   What about the board of directors?

MS. LANE:  Objection as to form.

A.   I don't know if they would either.

BY MS. ZANDI:

Q.   Okay.  If you could please turn to page Bates stamp ending in 906134.

Do you see that?

A.   Yes.

Q.   Okay.  Do you see in the middle of the page where it says, "Total Compensation Counts"?

A.   I do.

Q.   So this document states that "Total compensation includes salary, bonus, and equity and/or other long-term incentives," right?

MS. LANE:  Objection as to form.

A.   That is what's on the document, but it also has six other bullet points.

BY MS. ZANDI:

Q.   What, apart from equity, are other long-term incentives?

MS. LANE:  Objection as to form.

A.   I don't remember any other long-term incentive that would have been there when I was there.

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF BROWARD

I, Shirley D. Frazier, CRR, FPR, RPR, Notary Public, State of Florida, certify that ROBERT CHIPMAN personally appeared before me on August 7, 2024 and was duly sworn.

Signed this 20th day of August, 2024.

_____
SHIRLEY D. FRAZIER, CRR, FPR, RPR
Notary Public, State of Florida
My Commission No. HH 197130
Expires: 7/26/2025

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

IN RE OUTPATIENT MEDICAL CENTER      Master Docket No. 1:21-cv-00305-SRH-YBK

EMPLOYEE ANTITRUST LITIGATION

THIS DOCUMENT RELATES TO:

ALL ACTIONS

### ERRATA TO TRANSCRIPT OF AUGUST 7, 2024
### DEPOSITION OF ROBERT CHIPMAN

| Page | Line | From | To | Reason |
|---|---|---|---|---|
| 16 | 3 | A. I did. | A. I did, to my lawyers. | Clarification |
| 24 | 22 | A. There was the transcript from the | A. There was the summary from the | Clarification |
| 33 | 5 | A. By "managing," are you defining that as | A. By "managers," are you defining that as | Transcription Error |
| 48 | 25 | Q. So you had eight people, services | Q. So you had eight people services | Transcription Error |
| 55 | 18 | A. Yeah, I don't know why an employee stays | A. I don't know why an employee stays | Clarification |
| 64 | 4 | compensation. But Kathy Aarondale was her manager | compensation. But Cathy Arrendale was her manager | Transcription Error |
| 64 | 9 | Q. -- and Kathy Aarondale, or they would give | Q. -- and Cathy Arrendale, or they would give | Transcription Error |
| 64 | 15 | Cynthia Baxter or Kathy Aarondale. | Cynthia Baxter or Cathy Arrendale. | Transcription Error |
| 67 | 21 | referring to Ken Thiry? | referring to Kent Thiry? | Transcription Error |
| 79 | 3 | A. I can either affirm or deny. I don't | A. I can neither affirm or deny. I don't | Transcription Error |
| 84 | 9 | A. The -- I'm aware of what additional | A. The -- I'm not aware of what additional | Transcription Error |
| 89 | 2 | A. Dennis Kogod when I left. Dennis Kogod | A. Dennis Kogod when I arrived. Dennis Kogod | Clarification |
| 89 | 24 | deploy now HRIS system to condense seven separate | deploy new HRIS system to condense seven separate | Transcription Error |
| 93 | 10 | Q. Would Ken Thiry have had input into that? | Q. Would Kent Thiry have had input into that? | Transcription Error |
| 106 | 8 | A. Very rarely. Surfacy. A couple of them | A. Very rarely. Surface-level. A couple of them | Clarification |
| 106 | 17 | A. Kristie Deal would be one. That's all I | A. Christy Diehl would be one. That's all I | Transcription Error |
| 108 | 8 | Q. And who was Kristie Deal? | Q. And who was Christy Diehl? | Transcription Error |

| Page | Line | Original | Corrected | Reason |
|---|---|---|---|---|
| 108 | 9 | A. Kristie oversaw our talent-management | A. Christy oversaw our talent-management | Transcription Error |
| 137 | 15 | the department heads in the HNHQ. | the department heads. | Clarification |
| 139 | 8 | the average bonus potential percentage, but it was | the average percentage of bonus potential that was awarded, but it was | Clarification |
| 141 | 1 | A. Yeah, I don't remember. | A. I don't remember. | Clarification |
| 163 | 23 | A. Yeah, I don't know for sure. | A. I don't know for sure. | Clarification |
| 168 | 12 | A. Yeah, I'm not certain of that either. | A. I'm not certain of that either. | Clarification |
| 173 | 9 | a vice president, they're just a field, so they're | a vice president, they're just in the field, so they're | Clarification |
| 188 | 6 | A. Yeah, I don't know; sometimes they are. | A. I don't know; sometimes they are. | Clarification |
| 194 | 1 | A. Yeah, I don't -- I don't know if that was | A. I don't -- I don't know if that was | Clarification |
| 208 | 10 | A. Yeah, it would depend based on the role. | A. It would depend based on the role. | Clarification |
| 208 | 15 | A. Yeah, it would depend on the role. | A. It would depend on the role. | Clarification |
| 212 | 8 | A. Yeah, I don't -- that's not what this | A. I don't -- that's not what this | Clarification |
| 222 | 7 | of the markets. Probably CR Pacific, the Bay area. | of the markets. Probably Sierra Terrific, the Bay area. | Transcription Error |
| 222 | 25 | A. Yeah, it depends on the role and the | A. It depends on the role and the | Clarification |
| 223 | 24 | A. Yeah, I don't remember. | A. I don't remember. | Clarification |
| 224 | 25 | A. Yeah, it would depend, based on the role. | A. It would depend, based on the role. | Clarification |
| 228 | 17 | A. Yeah, I don't know. | A. I don't know. | Clarification |
| 255 | 18 | A. Yeah, I don't remember the exact details | A. I don't remember the exact details | Clarification |
| 264 | 1 | A. Yeah, I -- this is not my writing. I | A. This is not my writing. I | Clarification |
| 268 | 1 | marked Exhibits 256. | marked Exhibit 256. | Transcription Error |

## DECLARATION UNDER PENALTY OF PERJURY

I, ROBERT CHIPMAN, do hereby certify under penalty of perjury that I have read the foregoing transcript of my deposition taken on August 7, 2024; that I have made such corrections as appear noted herein; and that my testimony as contained herein, as corrected, is true and correct to the best of my knowledge.

Dated this 18 day of September, 2024, at Boca Raton , Florida.

Robert Chipman

*Robert Chipman*

# ZIELINSKI EXHIBIT 24 (FILED UNDER SEAL)

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

IN RE OUTPATIENT MEDICAL      )
CENTER EMPLOYEE ANTITRUST     )
LITIGATION,                   )
                              ) Master Docket No.
                              ) 1:21-cv-00305
                              )
THIS DOCUMENT RELATES TO:     )
ALL ACTIONS                   )


* * *CONFIDENTIAL* * *

VIDEOTAPED DEPOSITION OF WARREN JOSEPH CINNICK

Chicago, Illinois

November 22, 2024


Reported by:

KATHY S. KLEPFER, RMR, RPR, CRR, CLR, CSR

JOB NO. 6744811-001

VIDEOGRAPHER: We are now on the record. Today's date is November 22, 2024, and the time is 9:04 a.m.

This is the video deposition of Warren Cinnick in the matter of Outpatient Medical Center Employee Antitrust Litigation.

All attorneys present will be noted on the stenographic record.

Will the court reporter please swear in the witness.

WARREN JOSEPH CINNICK, called as a witness, having been duly sworn, was examined and testified as follows:

EXAMINATION BY

MR. CASTILLO GUARDADO:

Q. Good morning, Mr. Cinnick. My name is William Castillo Guardado. I represent the plaintiffs in this matter.

Please state your full name and spell it for the record.

A. Warren Joseph Cinnick, and that last name is spelled C-I-N-N-I-C-K.

Q. What is your current address?

A. ████████████████████████, and

So we would also consider outside marketplace at the time.

Q. Uh-huh.

A. So at the time of -- or should we say, gee, have we looked at current data, those benchmark jobs I spoke of? So a lot of things would go into it.

From a process perspective, the manager raises the question, perhaps even raises a proposed number, and then that would be reviewed with Kevin Zaideman or the folks in compensation.

If it was vice president and above, it came to me for review.

Q. Uh-huh.

A. Below that, Kevin would review it with a person that -- you would be in the title of HR business partner. That simply means that they are the person assigned to work with leaders and help them with their HR topics.

Q. Uh-huh.

A. So there were -- clearly, I didn't do all of them in a company of 14,000 employees -- or, clear to me anyway I didn't do them all in a

company of 14,000 employees.

Q.    It would be very difficult.

A.    Right on.

Q.    And so were there parameters to an employee's salary?  When one of the managers would say, hey, you know, I'd like to promote so and so, were there parameters to a salary, like a minimum, a maximum, that you would be looking at based on this information that we discussed?

A.    Great question.

For sure.  All jobs eventually ended up inside of a salary structure.  The salary structure has a minimum and a maximum targeted pay, has a midpoint pay.

Q.    Uh-huh.

A.    And each job resides somewhere in that structure.  So that was the eventual place that it all ended up.

If a manager brought forth a promotion, and -- and the structure was in place, we would reference that.  We would say where is -- you know, where is this in the structure?  Where is your pay with respect to the band, the pay band?

Secondly, we would take that outside marketplace data --

Q.    Uh-huh.

A.    -- and bring that immediately to bear.

Bands are very wide.  Bands give tremendous room to be able to pay what you want. However, you want to tie it down a bit to the outside marketplace.

Q.    Uh-huh.

A.    And so we would also bring that data to bear.  And, of course, the start of the whole conversation really is, where is the performance, where is the change in the job responsibility that this should -- that this should be even considered?

Q.    Uh-huh.

A.    So a lot of factors go into it.  The limitation, though, would be that -- that mid/max of -- of the grade, which is a very common, very common practice.

Q.    And so you're trying to find that sweet spot number within the external benchmark figures that you're looking at and any internal figures, say, well, is that right?

meaningful to your industry, let's be in that survey.

Q. Understood. Makes sense.

A. Okay.

Q. Okay. So, another topic: Do you recall discussing with plaintiff's counsel something that was referred to as a salary structure at SCA?

A. I do. We briefly talked about that, yes.

Q. And you mentioned at a certain -- and do you recall discussing that the salary structure had minimum and maximum targeted pay?

A. I do, yes.

Q. When did that --

A. I don't think I called it "targeted," though.

Q. Okay.

A. Let me just say that my recollection is -- and I would, if this wasn't clear -- it's more about the -- the limits at which you say, gee, you're not paying them enough. Bring them up to the minimum or above. Gee, you're starting to get close to the max. What are you

doing?  Is there something different about that job?  What's going on?

So those are -- I'll call them guidance points.  They have the strong name of "min" and "max" that make them feel like you can't go inside or out of them, but they're really guidance points.  It's a -- you're pretty close here to one end or the other.  What's going on?  Because our -- our data says that, you know, you probably want to be somewhere else on that -- on that list.  So -- so...

Q.   Yeah.  Thank you for that clarification.  It's helpful.

A.   Because when you use the word "target," you don't target the minimum.  You don't target the maximum.  You target the midpoint.

Q.   Under- -- thank you for that clarification.

The salary structure that you were testifying about, when did that go into effect?

A.   Oh.

MR. CASTILLO GUARDADO:  Object to the form.

THE WITNESS: So a couple answers there I think are appropriate to share.

When I joined, there was no discernable salary structure at SCA. It was something we built over time.

We put that in place in the beginning of 2021, and did a lot of work on it in 2019 and 2020 to get to that point. So the first time it was fully utilized was then.

We were beginning practices related to that prior. ███████████████████

███████████████████████████████

█████████████████████████████

██████████████████████████████

███████████████████████

I'm afraid I can't comment on when they put it in. So it's kind of like we were part of a big company, we're all part of the same company, we followed their model and began to use that, and -- and borrowed over.

I don't remember what their origin point was. It could have been 20 years ago, could have been 50, but for SCA to implement

it was beginning of 2021.

Q.    Understood.

A.    Okay.

Q.    Do you also recall some questions about information -- like whether SCA ever made direct outreach to other companies to ask about information related to compensation?

A.    I do.

MR. CASTILLO GUARDADO:  Object to form.

THE WITNESS:  Pardon me.  I'm sorry.

Yes, I do.

BY MS. ZIELINSKI:

Q.    And I believe you mentioned that, in your opinion, that there was some risk associated with that practice.

Do you recall that?

A.    I do.

Q.    And you're not an attorney, correct?

A.    I am definitely not an attorney.

Q.    And --

A.    Trained by attorneys over time and counseled by attorneys over time, but I am definitely not an attorney.

Q.   And you did not conduct a risk assessment or risk analysis related to sharing any sort of competitive information while at SCA, correct?

A.   Try that question again.  I'm not sure I understand it.

Q.   So, again, you were -- you were asked questions by plaintiff's counsel about sharing information, and you said that there was risk associated with that practice, correct?

A.   Yes.  I recall that.

Q.   And you yourself did not conduct a risk assessment associated with information-sharing by SCA, correct?

MR. CASTILLO GUARDADO:  Object to form.

THE WITNESS:  I did not.  I did not do a formal risk assessment.

BY MS. ZIELINSKI:

Q.   Okay.  So, with respect to the degree of risk associated with those practices, you -- with these hypothetical practices, I should say, you don't have any assessment of what that risk would look like, like whether it would be

CERTIFICATE

I, Kathy S. Klepfer, a Registered Merit Reporter and Certified Shorthand Reporter within and for the State of Illinois, do hereby certify:

That WARREN JOSEPH CINNICK, the witness whose deposition is herein before set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

In witness whereof, I have hereunto set my hand this 24th day of November, 2024.

---------------------------------------
KATHY S. KLEPFER, RMR, CRR, CLR, CSR

**Warren Cinnick November 22, 2024**
**Deposition Errata Sheet**

I, Warren Cinnick, having read the foregoing deposition, Pages 1 through 158, taken November 22, 2024, do hereby certify said testimony is a true and accurate transcript, with the following changes:

| Page | Line(s) | Correction | Reason |
|---|---|---|---|
| 30 | 24 | Change "intention" to "compensation" | Edit for typographical error. |
| 31 | 22 | Change "I would have showed if I wasn't subpoenaed" to "I would have showed up if I wasn't subpoenaed" | Edit for typographical error. |
| 35 | 18–20 | Change "And so I am - - I'm aware of that, but I - - not by personal knowledge aware of that by being shared with me" to "And so I am aware of that not by personal knowledge, but by that being shared with me" | Edit for clarity. |
| 41 | 15 | Change "increased plan" to "increase plan" | Edit for typographical error. |
| 43 | 8 | Remove "- - and that level direct" | Edit for clarity. |
| 56 | 19 | Change "8-" to "800" | Edit for clarity |
| 57 | 16 | Change "we had 100 benchmark" to "we had 100 benchmark jobs" | Edit for clarity. |
| 59 | 10–11 | Change "Again, all gets aggregates, all gets put together and reported back" to "Again, all this gets aggregated, put together, and reported back" | Correct tense and edit for clarity. |
| 64 | 17 | Remove " - - you" | Edit for clarity. |
| 71 | 20 | Change "120 and 140,000" to "$120,000 and $140,000" | Edit for clarity |
| 73 | 16 | Change "say" to "saying" | Correct tense for clarity. |
| 74 | 18 | Change "pay" to "paying" | Correct tense for clarity. |
| 90 | 7 | Change "to" to "too" | Edit for clarity. |
| 129 | 21 | Insert "I'm" before first "not" | Edit for clarity. |

DocuSigned by:

Warren Cinnick
January 24, 2025 | 5:10 PM CST

# ZIELINSKI EXHIBIT 25 (FILED UNDER SEAL)

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

```
IN RE OUTPATIENT            )
MEDICAL CENTER EMPLOYEE     )
ANTITRUST LITIGATION,       ) Master Docket No.
                            ) 1:21-cv-00305
                            )
                            ) VIDEOCONFERENCE/
THIS DOCUMENT RELATED       ) VIDEO-RECORDED
TO: ALL ACTIONS             )
                            ) DEPOSITION OF
                            )
_____     ) JOSEPH T. CLARK
```

THE VIDEOCONFERENCE/VIDEO-RECORDED

DEPOSITION OF JOSEPH T. CLARK, taken before

Gale Sweeney Christensen, Certified Shorthand

Reporter, Registered Professional Reporter,

and Notary Public of the State of Iowa,

commencing at 9:24 a.m. MDT, September 11,

2024, at 110 North Guadalupe, suite 1, Santa

Fe, New Mexico, and also being taken by Zoom

platform with some counsel being present

remotely.

Reported by:  Gale Sweeney Christensen,
              CSR, RPR

P R O C E E D I N G S

THE VIDEOGRAPHER: We are on the record at approximately 9:24 a.m., 2024. It's September 11th. Audio and video recording continues to take place until all parties agree to go off the record. This is the video recording of Joseph T. Clark in the matter of In Re Outpatient Medical Center Employee Antitrust Litigation.

This proceeding is being held at Holland & Hart, located at 110 North Guadalupe, suite 1, Santa Fe, New Mexico.

I am Jimm Vest, certified video deponent specialist. I am the videographer on behalf of U.S. Legal Support, located at 16825 Northchase Drive, suite 100, in Houston, Texas. I am not related to any party in this action, nor am I financially interested in the outcome.

Counsel, now please state your appearances for the record.

MR. SEIDEL: Good morning. David Seidel with Joseph Saveri Law Firm on behalf of the plaintiffs.

MR. CASTILLO GUARDADO: Good

Joseph T. Clark
September 11, 2024

morning.  William Castillo Guardado on behalf of the plaintiffs with the Joseph Saveri Law Firm.

MS. ZIELINSKI:  Sarah Zielinski with McGuireWoods on behalf of the SCA defendant and the witness.

MR. RUSSO:  Angelo Russo of McGuireWoods on behalf of the SCA defendants and the witness.

MS. SHARP:  Karen Sharp with Wilson Sonsini on behalf of Andrew Hayek.

MR. RUSSO:  For those on Zoom, can you state your appearance, too, for the videographer.

MS. O'CONNOR:  Sure.  Katharine O'Connor with McDermott, Will & Emery on behalf of Kent Thiry.

MS. DORAN:  Julianne Doran of King & Spaulding on behalf of the USPI defendants.

MR. SHAPIRO:  Nathan Shapiro from Morgan, Lewis & Bockius on behalf of Defendant DaVita, Inc.

THE VIDEOGRAPHER:  Thank you.

Can you now swear in the witness.

JOSEPH T. CLARK, called as a witness, having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. SEIDEL:

Q. Great. Good morning, Mr. Clark. My name is David Seidel. I represent the plaintiffs in this matter. Can you please state your full name, and spell it for the record.

A. Joseph Thomas Clark. That's J-o-s-e-p-h. Thomas is T-h-o-m-a-s, and Clark is C-l-a-r-k.

Q. What is your home address?

A. ████████████████████████████████ ████████.

Q. How old are you?

A. Sixty-eight.

Q. And who are your lawyers representing you here today?

A. Sara and Angelo.

Q. Do you have any other lawyers representing you in this matter?

A. Jenna Dabbs.

Q. Did you say Jenna Dabbs?

Q.

Q.   Who was your counsel ████████████
████████████?

A.   It was a gentleman by the name of
Marshall, and I don't remember his last name.

Q.   Did you pay for his representation?

A.   No.

Q.   Did SCA pay for his representation?

A.   Yes.

Q.   Was he Counsel for SCA at the time he
represented you?

A.   Not to my knowledge.

Q.   ████████████████████████████
████████████████████████████████
████████████████████████
████████
████████████████████████████
████████████████████████████
████████████████████

Q.   In preparing for this deposition, did
anyone tell you or summarize for you what you
████████████████████████████?

          MS. ZIELINSKI:  Objection, that
calls for --

          Don't reveal anything that calls
for the attorney-client privilege.  I would

instruct you not to reveal anything related to what was discussed as we prepared for your interview.

Do you want to ask him other than Counsel?

Q. As we sit here today, have you seen any ███████████████████████████████ ████████████ ?

A. No.

Q. Are you aware of anything that ████████ ██████████████████████████████ that was not true or inaccurate in any way?

A. No.

Q. Is it fair to say that you developed a good understanding of the culture at SCA during the time that you were there from 2007 until 2017?

MS. ZIELINSKI: Object to the form.

A. Generally, yes.

Q. And how would you describe that culture?

A. It was collaborative.

Q. What do you mean by collaborative?

A. People worked well together.

Q. And anything else that jumps out at you about the culture at SCA?

C E R T I F I C A T E

I, Gale Sweeney Christensen, a Certified Shorthand Reporter of the State of Iowa and Registered Professional Reporter, do hereby certify that there came before me at the time, date, and place hereinbefore indicated, the witness named on the caption sheet hereof, who was by me duly sworn to testify to the truth of said witness's knowledge, touching and concerning the matters in controversy in this cause; that the witness was thereupon examined under oath, the examination taken down by me in shorthand, and later reduced to printed form under my supervision and direction, and that the deposition is a true record of the testimony given and of all objections interposed.

I further certify that I am neither attorney or counsel for, or related to or employed by any of the parties to the action in which this deposition is taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in the action.

Dated at Des Moines, Iowa, this 20th day of September, 2024.

-----------------------------
CERTIFIED SHORTHAND REPORTER,
REGISTERED PROFESSIONAL
REPORTER, AND NOTARY PUBLIC

**Joseph Clark September 11, 2024 Deposition**
**Errata Sheet**

I, Joseph Clark, having read the foregoing deposition, Pages 1 through 148, taken September 11, 2024, do hereby certify said testimony is a true and accurate transcript, with the following changes (if any):

| Page | Line(s) | Correction | Reason |
|------|---------|-----------|--------|
| 2 | 9 | Change "800 East Canal Street Richmond, VA 23219-3916" to "77 West Wacker Drive, Suite 4100, Chicago, IL 60601-1818" | Correct attorney address |
| 6 | 6 | Change "defendant" to "defendants" | Correct typographical error |
| 7 | 21 | Change "Sara" to "Sarah" | Correct spelling |
| 15 | 5-6 | Change "It varied whether it was at the most ten hours a week" to "It varied. It was at the most ten hours a week" | Clarify intended meaning |
| 23 | 10-11 | Change "are you talking like rapidly or on a product base" to "are you talking geographically or on a product basis" | Correct typographical error |
| 23 | 21 | Change "Were you assessed whether" to "Were you assessing whether" | Correct typographical error |
| 25 | 5 | Change "CEO" to "CDO" | Correct typographical error |
| 33 | 17 | Change "Sara" to "Sarah" | Correct spelling |
| 35 | 24 | Change "Is" to "Was" | Correct typographical error |
| 39 | 13 | Change "Rutger" to "Rucker" | Correct spelling |
| 39 | 19 | Change "Rutger" to "Rucker" | Correct spelling |
| 39 | 25 | Change "in throughout around" to "in or around" | Correct typographical error |
| 40 | 6 | Change "Correct" to "No" | Clarify intended meaning |
| 57 | 16 | Change "Stuart Bush was recruiting" to "Stuart Bush who was recruiting" | Clarify intended meaning |
| 61 | 2 | Change "enfear" to "interfere with" | Correct typographical error |
| 67 | 2 | Change "them" to "her" | Clarify intended meaning |
| 69 | 10 | Change "was" to "were" | Clarify intended meaning |
| 71 | 9 | Change "that surgical services" to "those surgical services" | Clarify intended meaning |
| 73 | 10 | Change "was" to "were" | Clarify intended meaning |

1

Docusign Envelope ID: 2A1F70AC-86B6-48C9-A087-E9A47E7AAF81

| Page | Line(s) | Correction | Reason |
|---|---|---|---|
| 76 | 3 | Change "intent was try to" to "intent was to try to" | Correct typographical error |
| 79 | 14 | Change "enter" to "entered" | Correct typographical error |
| 79 | 20 | Change "No" to "I don't know" | Clarify intended meaning |
| 80 | 2 | Change "corroborations" to "collaborations" | Correct typographical error |
| 80 | 16 | Change "transaction" to "transactions" | Correct typographical error |
| 82 | 17 | Change "at" to "with" | Correct typographical error |
| 86 | 24 | Change "efficacy" to "advocacy" | Correct typographical error |
| 91 | 2 | Change "was" to "were" | Clarify intended meaning |
| 92 | 16 | Change "discussions" to "discussion" | Correct typographical error |
| 95 | 12-14 | Change "Generally, you know, we could figure out what somebody else was saying, so we knew what it is, were." to "Generally, you know, we could figure out what somebody else was saying, so we knew what they meant." | Clarify intended meaning |
| 127 | 8 | Change "competitive" to "competitors" | Correct typographical error to conform with exhibit |

DocuSigned by:

*Joseph Clark*

——67AC1FDD39E140E...——

Joseph Clark

October 24, 2024 | 11:47 AM MDT

2

# ZIELINSKI EXHIBIT 26 (FILED UNDER SEAL)

UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE OUTPATIENT MEDICAL          )
CENTER EMPLOYEE ANTITRUST         )
LITIGATION,                       )
                                  )
                                  ) Master Docket No.
                                  ) 1:21-cv-00305
                                  )
THIS DOCUMENT RELATED TO:         )
ALL ACTIONS                       )
                                  )
                                  )
---------------------------------

CONFIDENTIAL

Videotaped Deposition of

PETER CLEMENS


Bradley Arant Boult Cummings LLP

1221 Broadway, Suite 2400

Nashville, Tennessee 37203


May 2, 2024

9:02 a.m.


Reported by:
Emily L. Sipe, RPR, LCR

P R O C E E D I N G S

THE VIDEOGRAPHER: We are on the record at 9:02 A.M. Central on May 2nd, 2024. Audio and video recording will continue to take place until all parties agree to go off the record. Please note that microphones are sensitive and may pick up whispering and private conversations.

This is the video recording of Peter Clemens taken by counsel for the plaintiff, William Castillo Guardado, in the matter of Outpatient Medical Center, employee antitrust litigation filed in the United States District Court for the Northern District of Illinois.

This proceeding is being held at Bradley, located at 1221 Broadway, Suite 2400, Nashville, Tennessee.

My name is Travis Temples. I am the videographer on behalf of U.S. Legal Support located at 16825 North Chase Drive, Suite 900, Houston, Texas, 77060. I am not related to any party in this action nor am I financially interested in the outcome.

The court reporter is Emily Sipe on behalf of U.S. Legal Support.

Counsel will state their appearances for the record after which the court reporter will enter

Peter Clemens  Confidential
May 02, 2024

the statement for remote proceedings into the record and swear in the witness.

(Off the record.)

THE VIDEOGRAPHER:  Back on the record at 9:04.

Will counsel state their appearances and then the court reporter will swear in the witness.

MR. CASTILLO GUARDADO:  William Castillo Guardado with the Joseph Saveri Law Firm, appearing for the plaintiffs.

MR. SEIDEL:  David Seidel on behalf of the plaintiff.

MR. LAYTIN:   Dan Laytin, Kirkland, for the witness and the SCA defendants.

MS. ROTHMAN:  Taylor Rothman for Kirkland for the witness and SCA defendants as well.

MS. MANNING:  Amy Manning from McGuireWoods for SCA and the witness.

MS. ZIELINSKI:  Sarah Zielinski from McGuireWoods for SCA and the witness.

MR. DODDS:  Jack Dodds from Morgan Lewis for Davita.

MS. MOYE:  Veronica Moyé, King and Spalding for USPI, defendant.

PETER CLEMENS,

was called as a witness, and after having been first duly sworn, testified as follows:

MR. CASTILLO GUARDADO: Counsel, am I correct in understanding that your client, Mr. Clemens, has reviewed the protective order and agreed to be bound by all of its terms and conditions.

MR. LAYTIN: Yes. And I'll provide you those. I have a copy of the signed protective order.

MR. CASTILLO GUARDADO: Great. Thank you.

E X A M I N A T I O N

BY MR. CASTILLO GUARDADO:

Q. Good morning. My name is William Castillo Guardado. I represent the plaintiffs in this matter. Please state your full name and spell it for the record.

A. Peter Clemens, P-E-T-E-R, C-L-E-M-E-N-S.

Q. And have you ever gone by any other nickname or name?

A. Yeah, Pete. Or Peter. Either one.

Q. And what is your current address?

A. █████████████████████████████████
███████████████████

Q. And have you ever had your deposition taken

A.      They would have, by the way, when you report your public information, you're reporting a number of years and I can't remember if it's two or three, so they would have had it -- we went public in 2013, so they had 2011, 2012, 2013.  If it was three years, it was two years, they would have had 2012 and 2013.

Q.      Prior to going public -- prior to SCA going public in 2013, would you have been comfortable sharing SCA's G&A data with competitors?

A.      We -- I was comfortable sharing what we shared.  I think I've said that before, with Jason.

Q.      Would you have been comfortable sharing that G&A data prior to SCA going public in 2013 with a competitor other than USPI?

A.      Potentially.

Q.      Was SCA's G&A data prior to going public in 2013, was that data material nonpublic information?

A.      I wouldn't have shared it with an investor, if that's what you're asking.  And that's how I think about MNI.  But I don't know if it would be considered material or not.

Q.      So it's okay to share this data with competitors, correct?

A.      We did.  I don't know how long we had been doing it, but we did.  I think we might have talked

Peter Clemens  Confidential
May 02, 2024

about it.

MR. CASTILLO GUARDADO:  Can we go off the record?

THE VIDEOGRAPHER:  Stand by.  End of media five.  We are off the record at 12:56.

(Off the record.)

THE VIDEOGRAPHER:  Stand by.  Beginning of media file six.  We are on the record at 1:32 P.M.

BY MR. CASTILLO GUARDADO:

Q.     Okay, Mr. Clemens, I'd like to introduce an exhibit.  This is going to be Tab 10 and Exhibit.

(Marked Exhibit No. 33.)

BY MR. CASTILLO GUARDADO:

Q.     Okay.  Mr. Clemens, this is a document with Bates No. SCA 002364259.  Would you please take a look at this exhibit?

A.     Okay.

Q.     Okay, Mr. Clemens, do you recognize this exhibit?

A.     I understand what it says.  I don't know what you mean by recognize.

Q.     Sure.  And what I mean is, is that what's in the email chain with various attachments to it.

A.     Yes.

Q.     And this email chain is between Jason Cagle of

USPI, you, and a few others at SCA that you received on or around July 30th to 31st, 2013, while employed at SCA, correct?

A.      Yes.

Q.      Okay.  And you, as the author and recipient, have knowledge about the information contained in this email, correct?

A.      I understand what's in the email.  I acknowledge.

Q.      Okay.  And you sent and received this exhibit as part of your job duties in the ordinary course of your business as an SCA employee, correct?

A.      This was infrequent, I think.  I can take that by his email.  But it was in the ordinary course, but it wasn't like a regular thing.

Q.      Okay.  So the email chain begins with an email from Jason Cagle of USPI where he writes, quote, I know that a few years back we exchanged data of corporate G&A with each other.  I was wondering if you would be interested in repeating that exercise, end quote; is that correct?

A.      Right.  Yes.

Q.      Okay.  And you respond after that.  Quote, sure, I would like to do this again, correct?

A.      Correct.

Q.      So this was not the first time you had exchanged G&A data with Jason Cagle, correct?

A.      I don't know that.  A few years would have been before my time but...

Q.      So you mean that someone else might have shared that data with Jason Cagle?

A.      Yeah.  If you're saying we did it a few years ago, that wouldn't have been with me.  But it could have been if it was a year and a half ago or something.

Q.      Was this the first time on July 30th, 2013, that you were -- that you discussed sharing G&A data with Jason Cagle?

A.      I don't know.

Q.      Okay.  And then going up, James Walker attaches -- let me withdraw that.

        Do you see James Walker there?

A.      Yes.  That is copied.

Q.      Do you know who he is?

A.      I don't know who he is.

Q.      Okay.  Is he a USPI employee?

A.      I don't think he's an employee of SCA.  I don't remember.  I don't remember James Walker at SCA.

Q.      Okay.  And if you look at the first --

A.      Oh, yeah, it says USPI.

During your time as CFO, would sharing wage increase data with USPI impact competition with USPI?

A.     No, I don't believe so.

Q.     And why not?

A.     Where we were competitive mostly with USPI, as I recall, and there would have been other markets, too, but the biggest one was probably Dallas where they had partnered with Baylor and we had partnered with Texas Health Resources.  And I see just no way that a merit increase for the company impacts our ability to compete and grow that market.  And if you looked at the history, I don't remember the numbers exactly, but I think we went from something like zero ASE's to probably 20 within a couple of years, while I was there certainly, but maybe within two to three years.  So we were growing in a market where we were mostly competitive with USPI from no share with our partner, THR, to try to catch them, they're at like 30 or something like that, 30 centers, outpatient centers with Baylor.  So that's the biggest thing that comes to mind is that market in particular.  There was probably other markets where you overlapped as well, but nothing like that one.  That was the biggest one.

Q.     Would you agree that SCA and USPI competed in the market for employees?

Peter Clemens   Confidential
May 02, 2024

MR. LAYTIN:  Object to the form.

THE WITNESS:  It's possible.

BY MR. CASTILLO GUARDADO:

Q.      Okay.  And so wouldn't sharing wage increase data with USPI impact its competition in the market for employees?

A.      It's -- I suppose it's possible.  But consider the way you defined compensation earlier, there's a lot of components to it.  There's a lot of other factors that somebody is going to look at.  And we weren't recruiting the whole workforce.  It was -- if it happened, it was a person.  And us knowing their overall merit increase or USPI knowing our overall merit increase has nothing to do with what that person potentially got from a merit increase standpoint, that component over compensation.  So I really don't see that being reasonable for that to really impact the competitive nature of that employee by recruitment.

Q.      And, again, USPI produced this email chain between you and Jason Cagle and others at SCA.  But SCA did not.

A.      Okay.

Q.      Would you know any reason why this document should not have appeared in your custodial file?

A.      No.

Peter Clemens  Confidential
May 02, 2024

Q.      Okay.  Did you delete this email from your custodial file while you were at SCA?

A.      No.

Q.      Okay.  And so you're unable to explain why USPI produced this email?

A.      I don't work there anymore.  So I have no access to these systems, right?  I mean, so I answered the question.  I don't know what else you want me to say about it.  I don't know.

Q.      Okay.

            MR. CASTILLO GUARDADO:  All right.  We can go off the record.

            THE VIDEOGRAPHER:  Stand by.  End of media file seven.  We are off the record at 3:20.

            (Off the record.)

            THE VIDEOGRAPHER:  Beginning of media file eight.  We are on the record at 3:27.

BY MR. CASTILLO GUARDADO:

Q.      I want to go back to our conversation about recruiting.  If we could start with Tab 3.

            (Marked Exhibit No. 38.)

BY MR. CASTILLO GUARDADO:

Q.      I'm handing you document SCA 001204745, which is being marked as Exhibit 38.

A.      Okay.

REPORTER'S CERTIFICATE

I, Emily L. Sipe, Court Reporter and Notary Public, do hereby certify that I recorded to the best of my skill and ability by machine shorthand all the proceedings in the foregoing transcript, and that said transcript is a true, accurate, and complete transcript to the best of my ability.

I further certify that I am not an attorney or counsel of any of the parties, nor a relative or employee of any attorney or counsel connected with the action, nor financially interested in the action.

SIGNED this 14th day of May 2024.

-----------------------------------
Emily L. Sipe, RPR, LCR
Tennessee LCR No. 608
Expires: 6/30/2024

## Peter Clemens May 2, 2024 Deposition
## Errata Sheet

I, Peter Clemens, having read the foregoing deposition, Pages 1 through 225, taken May 2, 2024, do hereby certify said testimony is a true and accurate transcript, with the following changes (if any):

| Page | Line(s) | Correction | Reason |
|---|---|---|---|
| 5 | 10-11 | Change "Outpatient Medical Center, employee antitrust litigation" to "Outpatient Medical Center Employee Antitrust Litigation". | Correct punctuation and capitalization for clarity. |
| 12 | 5 | At the end of line 5, add "I also met with the SEC while I was the Chief Financial Officer of Caremark RX in 2005 or 2006. This was while Caremark was a standalone public company, prior to merging with CVS. The meeting and any related calls with the SEC concerned stock option expensing." | Additional meeting responsive to this question remembered subsequent to deposition. |
| 16 | 14 | Change "Sanford" to "Samford". | Correct typographical error. |
| 18 | 9 | Change "1995 was called Med Partners" to "In 1995, it was called Med Partners". | Add omitted words and punctuation for clarity. |
| 19 | 20-21 | Change "My title changed it from vice president to senior vice president" to "My title changed from vice president to senior vice president". | Remove extra word for clarity. |
| 19 | 24 | Change "maybe" to "may be". | Correct spacing for clarity. |
| 21 | 5 | Change "industrial relations" to "investor relations". | Replace word for clarity. |
| 24 | 9 | Change "Classen" to "Klassen". | Correct spelling error. |
| 26 | 17 | Change "Brittany Fanning" to "Bridie Fanning". | Correct typographical error. |
| 28 | 11 | Change "who did you report" to "who did you report to". | Add omitted word for clarity. |
| 30 | 1 | Change "tax accounting finance" to "tax, accounting, finance". | Correct punctuation for clarity. |
| 30 | 6 | Change "Classen" to "Klassen". | Correct spelling error. |

1

| Page | Line(s) | Correction | Reason |
|---|---|---|---|
| 37 | 3 | Change "Covenant Position Partners" to "Covenant Physician Partners". | Correct typographical error. |
| 37 | 14 | Change "Were you ever board of directors?" to "Were you ever on Vituro Health's board of directors?" | Add omitted words for clarity. |
| 43 | 17 | Change "I don't know about that" to "I don't know whether DaVita has physician groups". | Replace pronoun for clarity. |
| 71 | 18 | Change "sole" to "soul". | Correct typographical error. |
| 80 | 1 | Change "was that we had somebody" to "was that if we had somebody". | Add omitted word for clarity. |
| 88 | 3-4 | Change "the reason could be expense" to "the reason. Could be expense". | Correct punctuation and capitalization for clarity. |
| 92 | 22 | Change "And so you reviewing" to "And so you are reviewing". | Add omitted word for clarity. |
| 99 | 12-13 | Change "when you joined you then put in" to "when you joined, you then put in". | Correct punctuation for clarity. |
| 105 | 16-18 | Change "There were internal meetings where many times done with video even then" to "There were internal meetings that were many times done with video even then". | Correct typographical error. |
| 107 | 17 | Change "ballot" to "balance". | Replace word for clarity. |
| 124 | 5-6 | Change "There was" to "There were". | Correct verb tense for clarity. |
| 131 | 4-6 | Change "so they would have had it - - we went public in 2013, so they had 2011, 2012, 2013. If it was three years, it was two years, they would have had 2012 and 2013" to "so they would have had it - - we went public in 2013, so they had 2011, 2012, 2013, if it was three years. If it was two years, they would have had 2012 and 2013". | Correct punctuation and capitalization for clarity. |
| 147 | 7-8 | Change "when the budget was kicked off in obvious August or September" to "when the budget was kicked off in August or September". | Remove extra word for clarity. |
| 148 | 1-3 | Change "And those discussions we'd have as a team before that conversation was ultimately ahead of the employees" to "And those discussions we'd have as a team before that conversation were ultimately ahead of the employees". | Correct verb tense for clarity. |

2

| Page | Line(s) | Correction | Reason |
|------|---------|------------|--------|
| 166 | 5 | Change "PureMarks" to "Caremark". | Correct typographical error. |
| 170 | 15-16 | Change "retain the ones you need to make sure they retain that are key" to "retain the ones you need to make sure to retain that are key". | Replace word for clarity. |
| 185 | 22 | Change "lone" to "IOW". | Correct typographical error. |
| 186 | 25 | Change "so I deduced" to "so I deduce". | Correct verb tense for clarity. |
| 188 | 14 | Change "ASE" to "ASC". | Correct typographical error. |
| 203 | 18 | Change "26cth" to "26th". | Correct typographical error. |
| 215 | 3 | Change "sometime" to "some time". | Correct spacing for clarity. |
| 215 | 9-10 | Change "There was things that are very important that were misrepresented" to "There were things that are very important that were misrepresented". | Correct verb tense for clarity. |
| 221 | 1 | Change "was of the BP finance" to "was the VP of finance". | Correct typographical error. |

Peter Clemens

3

# ZIELINSKI EXHIBIT 27 (FILED UNDER SEAL)

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE OUTPATIENT MEDICAL          )
CENTER EMPLOYEE ANTITRUST         )
LITIGATION,                       )
                                  )
                                  ) Master Docket No.
                                  ) 1:21-cv-00305
THIS DOCUMENT RELATED TO:         )
ALL ACTIONS                       )
                                  )
_____

CONFIDENTIAL VIDEO DEPOSITION OF:
KRISTEN DesPALMES - May 21, 2024

_____


PURSUANT TO SUBPOENA, the deposition of KRISTEN DesPALMES was taken on behalf of the Plaintiffs at 370 17th Street, Suite 4500, Denver, Colorado, on May 21, 2024, at 9:14 a.m., before Kirsten M. Thorngate, Registered Professional Reporter and Notary Public within Colorado.

Kristen DesPalmes   Confidential
May 21, 2024

WHEREUPON, the following proceedings were taken pursuant to the Federal Rules of Civil Procedure.

              *      *      *      *      *

THE VIDEOGRAPHER:  We are on the record at 9:14 a.m. on May 21, 2024.  This is the video-recorded deposition of Kristen DesPalmes regarding Outpatient Medical Center Employee Antitrust Litigation, filed in the United States District Court for the Northern District of Illinois.

This deposition is being held at 370 17th Street, Denver, Colorado.

My name is Michael Banks.  I'm the videographer on behalf of U.S. Legal Support.  The court reporter is Kirsten Thorngate on behalf of U.S. Legal Support.

I'm not related to any party in this action, nor am I financially interested in the outcome.

Counsel will please state their appearances for the record, after which the court reporter will swear in the witness.

MS. CHAN:  Lin Chan from Lieff Cabraser Heimann & Bernstein for the plaintiffs.

MS. ZANDI:  Sarah Zandi from Lieff

Kristen DesPalmes   Confidential
May 21, 2024

Cabraser Heimann & Bernstein for the plaintiffs.

MS. LANE:  Molly Lane appearing on behalf of Defendant DaVita, Inc.

MR. SHAPIRO:  Nathan Shapiro on behalf of Defendant DaVita, Inc.

MS. LOU:  Melissa Lou, in-house counsel at DaVita.

MR. WADE:  Joshua Wade for Defendant Surgical Care Affiliates.

MR. CAMPBELL:  Dan Campbell from McDermott, Will & Emery on behalf of Defendant Kent Thiry.

MS. DURAN:  Julianne Duran from King & Spalding on behalf of Defendant USPI.

MS. HARWELL:  Emily Harwell from Lieff Cabraser Heimann & Bernstein on behalf of Plaintiffs.

THE REPORTER:  Ms. Jones, I think you're up next.

MS. JONES:  Sorry.  Karen Jones, Lieff Cabraser Heimann & Bernstein, on behalf of Plaintiffs.

MS. STEINER:  Jordanne Steiner from Wilson Sonsini Goodrich & Rosati on behalf of Defendant Andrew Hayek.

                    KRISTEN DesPALMES,

having been first duly sworn to state the whole truth,

was examined and testified as follows:

                    EXAMINATION

BY MS. CHAN:

        Q.   Good morning, Ms. DesPalmes.  How are

you?

        A.   Good.

        Q.   Can you please state your name for the

record.

        A.   Kristen DesPalmes.

        Q.   And please state your business address.

        A.   Business address?

        Q.   Yes.

        A.   ████████████████████████████████████

████████████

        Q.   I see.  What is your home address?

        A.   ██████████████████████████████████

        Q.   All right.

        MS. CHAN:  Tab C.

        (Discussion off the record.)

        (Deposition Exhibit 40 was marked.)

        Q.   (BY MS. CHAN)  Ms. DesPalmes, I've just

marked a document as Exhibit 40, which is entitled

Subpoena to Testify at a Deposition in a Civil Action.

A.   I would say mostly, the majority.  For military, it was leaders.

Q.   What do you mean?

A.   Our military recruiting initiative wanted to bring former military leaders into leadership -- try to help them transition and have a soft landing in a corporate leadership role.

Q.   Were there any other roles for which you performed recruiting?

MS. LANE:  Objection as to form.

A.   Yeah, I didn't really personally recruit at that time.

Q.   (BY MS. CHAN)  Were there any other roles for which you oversaw recruiting?

MS. LANE:  Objection as to form.

A.   So in attraction strategies, there could be a social worker or, you know, some other clinical roles.  They weren't as high in volume.

Q.   (BY MS. CHAN)  Are there any other roles that you can think of?

A.   There was like a reuse tech, but honestly, I didn't spend time on that.  We didn't -- just most of my time was on R.N. and PCT.

Q.   Okay.  For how long did you serve as senior director of employment strategy?

Kristen DesPalmes   Confidential
May 21, 2024

A.   A few years.  I would guess four or five.

I'm sorry.  I don't know exact.  Maybe more.

Q.   You mentioned you oversaw corporate relocation; is that correct?

A.   No.  The attraction strategies to relocate executives to Colorado.

Q.   So what were the attraction strategies to relocate executives to Colorado?

A.   So there was -- we had some myths we need to bust when -- this was a while ago, before Denver was kind of booming.  And there were some perceptions of great talent that it was like a cow town or -- and we just needed to share about the weather and get them to come visit and maybe get them to bring their families.

So it was an idea, a project I worked on with Kent and others to try to at least get people -- we had them drive around great neighborhoods and, you know, just get a chance to explore the city before we automatically got a no.

Q.   So you were selling the city to people outside of Colorado, correct?

A.   Absolutely.  Trying to sell the city.

Q.   Were you recruiting nationally for

Kristen DesPalmes   Confidential
May 21, 2024

executives?

A.   Do you mean did we want any talent from anywhere in the U.S. to come to Denver?

Q.   Correct.

A.   Yes.

Q.   When you say "executives," what level of employee are you talking about?

A.   VP up for that initiative.

Q.   How long did that initiative last?

A.   Less than a year.  About a year.

Q.   When was that?

A.   I don't know.

Q.   At some point, Denver became more attractive --

A.   Yeah.

Q.   -- to people outside of Colorado, correct?

A.   I think so.

     MS. CHAN:  Tab 1.

     (Deposition Exhibit 41 was marked.)

Q.   (BY MS. CHAN)  Ms. DesPalmes, I've handed you a document that has been marked Exhibit 41 that says Kristen DesPalmes on the top.

     Do you see that?

A.   I do.

Kristen DesPalmes   Confidential
May 21, 2024

Q.   Is this your LinkedIn profile?

A.   No.

Q.   No?

A.   Clarify, I guess.

Q.   What is Exhibit 41?

A.   It looks like a resume.

Q.   Is this a resume that you prepared?

A.   Yes.  And this -- to clarify, this could be information on my LinkedIn profile.  I'm just used to seeing the photo and all the other framing.

Q.   You're used to seeing it in a different format, correct?

A.   Correct.

Q.   I can represent to you that this is a document we pulled just from LinkedIn.

A.   Okay.

Q.   Okay.  Is there anything here that seems incorrect to you?

A.   No.

Q.   All right.  As senior director of employment strategy, who reported to you?

A.   That's a tough question, because it was 14 years.  So people came and went.

Do you want me to -- how do you want me to --

Kristen DesPalmes   Confidential
May 21, 2024

REPORTER'S CERTIFICATE

STATE OF COLORADO          )
                           )  ss.
CITY AND COUNTY OF DENVER  )

I, KIRSTEN M. THORNGATE, a Registered Professional Reporter, do hereby certify that previous to the commencement of the examination, the witness was duly sworn or affirmed by me to testify to the truth.

I further certify that this deposition was taken in shorthand by me at the time and place herein set forth and thereafter reduced to a typewritten form; that the foregoing constitutes a true and correct transcript.

I further certify that I am not related to, employed by, nor of counsel for any of the parties or attorneys herein, nor otherwise interested in the result of the within action.

_____
Kirsten M. Thorngate
Registered Professional Reporter

Docusign Envelope ID: 8736A0AA-30A3-4E0B-B3ED-30DD011B9206

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE OUTPATIENT MEDICAL CENTER EMPLOYEE ANTITRUST LITIGATION | Master Docket No. 1:21-cv-00305-SRH-YBK |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**ERRATA TO TRANSCRIPT OF MAY 21, 2024
DEPOSITION OF KRISTEN DESPALMES**

| Page | Line | From | To | Reason |
|---|---|---|---|---|
| 11 | 11 | A. Yes. I didn't have any. | A. I didn't have any. | Clarification |
| 25 | 24 | A. Yeah. I didn't count the recent one | A. Yeah. I didn't count the recent ones | Transcription Error |
| 27 | 24 | you partner with to have jobs show up boards like | you partner with to have jobs show up on boards like | Transcription Error |
| 32 | 2 | not just attract but selection. So my team had the | not just attraction but selection. So my team had the | Clarification |
| 32 | 13 | letting a hire manager ask whatever they want or | letting a hiring manager ask whatever they want or | Transcription Error |
| 44 | 16 | hundred thousand career side visitors a year. When I | hundred thousand career site visitors a year. When I | Transcription Error |
| 62 | 9 | A. Yeah. I mean, I don't even know what | A. I don't even know what | Clarification |
| 62 | 15 | A. I am aware what antitrust is and | A. I believe I am aware of what antitrust is and | Clarification |
| 68 | 5 | A. Yeah. I think it was let me know right | A. I think it was let me know right | Clarification |
| 70 | 8 | A. Yeah. No. That's not my understanding. | A. No. That's not my understanding. | Clarification |

| Page | Line | From | To | Reason |
|------|------|------|----|--------|
| 74 | 23 | like an Evergreen rec, where you would have a position | like an evergreen requisition, where you would have a position | Clarification |
| 75 | 9 | match them to a real rec to make a hire. | match them to a real requisition to make a hire. | Clarification |
| 76 | 7 | recruiter and a PCT recruiter. They merged and update | recruiter and a PCT recruiter. They merged an update | Transcription Error |
| 76 | 18 | reach out PCTs who work for competitors, right? | reach out to PCTs who work for competitors, right? | Transcription Error |
| 80 | 1 | agreement. We self-imposed that we would not start | no agreement. We self-imposed that we would not start | Transcription Error |
| 92 | 2 | A. Yeah. No. That's not what her intent | A. No. That's not what her intent | Clarification |
| 93 | 4 | competition. Yes. | competition. | Clarification |
| 100 | 1 | A. Yeah. No. That's not what I was | A. No. That's not what I was | Clarification |
| 101 | 22 | A. Yeah. No. Not correct. | A. No. Not correct. | Clarification |
| 106 | 2 | A. Yeah. That's not what I read this | A. That's not what I read this | Clarification |
| 107 | 3 | people and take -- you know, be very carefully that | people and take -- you know, be very careful that | Transcription Error |
| 116 | 11 | A. I think he did not want make a hard | A. I think he did not want to make a hard | Transcription Error |
| 118 | 13 | A. Yeah. I don't think that there was an | A. I don't think that there was an | Clarification |

Docusign Envelope ID: 8736A0AA-30A3-4E0B-B3ED-30DD011B9206

| Page | Line | From | To | Reason |
|---|---|---|---|---|
| 122 | 19-20 | A. I mean, as an HR professional in 2024, I know today -- I would not advise that today. | A. I mean, as an HR professional in 2024, I know, after having to appear for a deposition today, and after everything I saw DaVita go through in the criminal case and now in this case -- I would not advise that today. | Clarification |
| 134 | 4 | A. Yeah. All I know is it sounds very | A. All I know is it sounds very | Clarification |

## DECLARATION UNDER PENALTY OF PERJURY

I, KRISTEN DESPALMES, do hereby certify under penalty of perjury that I have read the foregoing transcript of my deposition taken on May 21, 2024; that I have made such corrections as appear noted herein; and that my testimony as contained herein, as corrected, is true and correct to the best of my knowledge.

Dated this 11th day of July, 2024, at Denver, Colorado.

DocuSigned by:

*Kristen DesPalmes*

81B7F505AE94436...

Kristen DesPalmes

3

# ZIELINSKI EXHIBIT 28 (FILED UNDER SEAL)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE OUTPATIENT MEDICAL    )  Master Docket

CENTER EMPLOYEE ANTITRUST    )  No. 1:21-cv-00305

LITIGATION    )

-----------------------------------------------

"CONFIDENTIAL"
ORAL, VIDEOTAPED AND VIDEOCONFERENCED
DEPOSITION OF
CINDY ENGLISH
June 12, 2024
VOLUME I
(Reported remotely in Denton County, Texas)

-----------------------------------------------

ORAL, VIDEOTAPED AND VIDEOCONFERENCED DEPOSITION OF CINDY ENGLISH, produced as a witness at the instance of the Plaintiff, was taken in the above-styled and numbered cause on June 12, 2024, from 9:10 a.m. to 11:18 a.m., before Jamie K. Israelow, Certified Shorthand Reporter in and for the State of Texas, Registered Merit Reporter and Certified Realtime Reporter, reported by machine shorthand, with the witness appearing remotely in the City of Frisco, County of Collin and State of Texas, and the provisions stated on the record or attached hereto; that the deposition shall be read and signed before any notary public

PROCEEDINGS

(On the record at 9:10 a.m.)

THE VIDEOGRAPHER: Hello. We are going on the record at 14:10 UTC on Wednesday, June 12th, 2024. Audio and video recording will continue to take place unless all parties agree to go off the record. Please note that microphones are sensitive and may pick up whispering and private conversations.

This is the video-recorded proceeding of Cindy English in the matter of In Re Outpatient Medical Center Employee Antitrust Litigation. This proceeding is being held by a remote videoconference.

My name is Chelsea Gilchrist. I am the videographer on behalf of U.S. Legal Support, located at 16825 Northchase Drive, Suite 900, Houston, Texas 77060. I am not related to any party in this action, nor am I financially interested in the outcome.

The court reporter is Jamie Israelow on behalf of U.S. Legal Support.

Counsel will state their appearances for the record, after which the court reporter will swear in the witness.

MR. ROSS: Jonathan Ross from Nussbaum Law for the plaintiffs. Also with me from my office are Brian Wright and Cam Brody.

MS. NEWTON: This is Emily Newton from King & Spalding. I'm here with Connor Brewer, also from King & Spalding. We represent USPI and Tenet.

MS. MANNING: Amy Manning of McGuireWoods, here with my colleague Chris Karamanos, and we represent the SCA entities.

MR. KLIEBARD: Hold on one second.

And good morning. Ken Kliebard of Morgan Lewis in Chicago on behalf of defendant DaVita, Inc.

MS. STEINER: Good morning. This is Jordanne Steiner from Wilson Sonsini Goodrich & Rosati on behalf of defendant Andrew Hayek.

MR. CAMPBELL: Good morning. Dan Campbell on behalf of defendant Kent Thiry from McDermott Will & Emery.

CINDY ENGLISH, having been first duly sworn, testified as follows:

EXAMINATION

BY MR. ROSS:

Q. Good morning, Ms. English. Thank you for coming in.

Can you state your full name and home address for the record, please.

A. Yes. Cindy English, ███████████████████ ██████████████████████ .

the form, but the substance of the way it was done did not change.

Q. (By Mr. Ross) And during the 2007-2012/2013 period, do you know who was involved in determining the salary increases for USPI's employees?

A. Well, there was a budgeted percentage that was recommended. It was based on performance. And it was provided to the department heads, so I received one for accounts payable and payroll, and then the controller over the operational accounting side would have received, for her department, the same with the corporate accounting and so on.

Q. And do you know who determined what those percentages were?

MS. NEWTON: Objection to form.

A. And by "determine," do you -- I'm not sure what you mean.

Q. (By Mr. Ross) Well, if I understand correctly, you were given -- let's go back.

MR. ROSS: Can you read back her last answer, please?

(The reporter read back the requested text.)

Q. (By Mr. Ross) So my question is: Do you know who determined the recommended percentage that you

Cindy English Volume I
June 12, 2024

received?

MS. NEWTON:  Objection to form.

A.    Not specifically.  It would have been determined during the budgeting process.

Q.    (By Mr. Ross)  And who was involved in the budgeting process, if you know?

A.    I do not.

Q.    Again, sticking with that same time period, 2007 to 2013 or so, were salary increases implemented on a regular basis?

MS. NEWTON:  Objection to form.

A.    Yes.  They were typically annually.

Q.    (By Mr. Ross)  Annually.

And when -- when specifically during the year?

A.    I believe it was in March.

Q.    And for the March increase, when would the process start to determine what the salary increases would be?

A.    Late January/early February.

Q.    And what would happen in late January or early February?

MS. NEWTON:  Objection to form.

A.    We would -- the payroll department would download the employees into a spreadsheet with their

current salary.  The recommended percentage -- let's just say 2 percent -- was applied to each salary to show what the increase would be at the budgeted 2 percent.

Q.   (By Mr. Ross)  So at that point -- oh, I'm sorry.  Are you done?

A.   No.  Go ahead.

Q.   So at that point, in late January, the recommended percentage had already been determined?

A.   It would have been determined in the prior year, when the budget for the next year was determined, yes.

Q.   And do you know when the budgeting process for the next year would begin?

A.   Late third quarter/early fourth quarter.

MR. ROSS:  If we could pull up Tab 3.

THE VIDEOGRAPHER:  One moment.

This will be Exhibit 109.

(Exhibit PX109 was marked.)

Q.   (By Mr. Ross)  Okay.  So I'm showing you what's been marked as PX109.  It's an email dated September 10, 2013.  It's a couple of emails from September of 2013, bearing Bates Stamp Number USPI -- USPI_CIV_810693.

So first, do you recognize this email, Ms. English?

A.   Yes.

corporate environment.

Q. And were those also provided annually?

A. My recollection is that they were evergreen unless they were updated.

Q. What do you mean by "evergreen"?

A. That once they were in place, they stayed in place until there was a change to a document, and then it would have been redistributed by the HR department.

Q. Are you talking -- what type of compensation are you referring to?

A. A bonus.

Q. And are we -- are you talking specifically about administrators or everybody?

MS. NEWTON: Objection to form.

Q. (By Mr. Ross) My initial -- the reason I said -- my initial question is -- I'm just dealing with administrators at this point. So would administrators receive bonuses?

A. Yes.

Q. What was the process of determining what the bonus would be for an administrator?

A. I was not involved in that part of the decision-making.

Q. Do you know who was involved?

A. I believe that it would have been Kelly Barker,

who was the controller over the surgery centers division, and that would have been operations personnel above the administrator level that was their supervisor.

Q. And was there any other forms of compensation that was provided to administrators?

A. Not that I can recall.

Q. So now moving over to the corporate employees. Did they receive any form of compensation other than salary?

A. There would have been bonus plans for certain -- I believe it was director and -- actually, I'm not sure the level of person, but there were corporate bonuses.

Q. And were you involved in determining bonuses?

A. I would have been involved in determining bonuses for my staff.

Q. And was that done on a -- would you do that on an annual basis?

A. Yes.

Q. And generally, if you could describe what your process was in determining the bonuses for your staff.

A. I believe it was based on -- if an EBITDA target was met, different titles would get a different percentage of their salary. If they did something that was over and above the normal cause --

the call of duty, so to speak, we could request a discretionary amount.

THE REPORTER: I'm sorry. A discretionary --

THE WITNESS: Amount.

THE REPORTER: -- amount.

Q. (By Mr. Ross) And who would you make that request to?

A. It would have gone up to my supervisor at that point in time.

Q. That was Mr. Welling?

A. Well, Mr. Wellik was there, yes. He was my supervisor. Subsequent to that, it would have been Sandi Karrmann.

Q. Do you know specifically who ultimately approved bonuses for your staff?

A. It would have either -- it would have been the CFO at the time, so it could have been Mark Kopser or Jason Cagle, in addition to the CEO.

Q. That's Mr. Welling?

A. That is correct.

Q. Okay. Moving along with our exhibits, if we could pull up Tab 9.

THE VIDEOGRAPHER: One moment.

This will be Exhibit 115.

Cindy English Volume I
June 12, 2024

(Exhibit PX115 was marked.)

Q.   (By Mr. Ross)  Ms. English, we're showing you what's been marked as Exhibit PX115, which is emails from February of 2015 with Bates Stamp Number USPI_CIV_39752.  And reading up from the bottom, the first email is from you to a Mr. Alex Bateman.  And you say:  Attached is the master worksheet for the March 1st "PMP driven" salary adjustments proposed for staff members at the VP level or above.

Could you tell me -- and "PMP driven" is in quotes.  What is that referring to?

A.   I don't remember exactly what the acronym was represented by the letters.  It was basically performance driven.

Q.   And was this a new process that was being implemented at the company?

A.   Yes.  This would have been something that Sandi Karrmann initiated.

Q.   And was this initiated -- is this the first year when it was implemented?

MS. NEWTON:  Objection to form.

A.   I don't recall specifically.

Q.   (By Mr. Ross)  And if you just look down a couple of paragraphs in that same email, you say:  Please note that the increases are "pro-rated" from the

Cindy English Volume I
June 12, 2024

last increase date in order to transition to a company-wide effective date of March 1st.

So am I correct that in 2015, the time for salary increases was changed to March 1st?

A.   Yes, according to this email.

Q.   Is that your recollection?

A.   Yes.  I think that's why I was confused earlier.  I didn't remember the transition.

Q.   And then in the next paragraph, you say:  The proposed increases will be accumulated for calibration discusses with the EVP/SVP Leads, Jason Cagle and Sandi Karrmann.

So who was Jason Cagle?

A.   He was the CFO.

Q.   Sandi Karrmann was the head of resources, correct?

A.   Human resources, yes.

Q.   And the reference to "EVP/SVP Leads," what is that referring to?

A.   Executive vice presidents and senior vice presidents.

Q.   So these would be the people involved in approving the salary increases; is that correct?

A.   The EVPs and the SVPs would have been specific to their area of responsibility.  Jason and Sandi would

Cindy English Volume I
June 12, 2024

have been at the higher level after the EVP/SVP approvals.

Q. Now, just a little bit up from that, in the Bullet Number 3, you inform Mr. Bateman that the spreadsheet that you're enclosing is defaulted to a proposed increase of 2.5 percent.

A. Yes.

Q. Do you know who -- do you know who determined that proposed increase of 2.5 percent?

A. It would have been part of the budgeting process for that calendar year.

Q. Do you recall, in 20- -- in early 2015 and late 2014, who specifically would have been involved in the budgeting process?

A. Specifically everyone involved? No.

Q. Generally, do you have an idea?

MS. NEWTON: Objection to form.

A. Generally, my assumption would have been the CFO, the CEO, the CHRO, and the -- potential, one of the executive vice presidents.

Q. (By Mr. Ross) And if I'm reading this correctly, the process was a default 2.5% increase for everyone VP and above, which could then be adjusted depending on the supervisor's analysis; is that correct?

A. The intent was to be adjusted based on

performance, yes.

Q.   So the salary increases in the prior years, were those merit increases, cost of living increases or something else?

MS. NEWTON:  Objection to form.

A.   They were referred to as "merit."

Q.   (By Mr. Ross)  Were there separate cost of living increases, or were those salary increases the sole increase in salary for each employee?

MS. NEWTON:  Objection to form.

A.   The supervisor would have had the ability to potentially request a market increase in addition to, for example, the 2.5%.

Q.   (By Mr. Ross)  And who would approve the market increase or -- or reject the market increase?

A.   The people that would approve the overall increase.  It didn't change.

MR. ROSS:  So if we could pull up Tab 10.

THE VIDEOGRAPHER:  One moment.

This will be Exhibit 116.

(Exhibit PX116 was marked.)

Q.   (By Mr. Ross)  So we're showing you, Ms. English, Exhibit 116, which is an Excel spreadsheet Bates Stamp Number USPI_CIV_39754, entitled Base Salary - Proposed Increases Effective 3/1/15 For

Supervisor Approval.

So is this the spreadsheet that you sent to Mr. Bateman with respect to the prior email?

A.   Yes.

Q.   And you would have sent the -- a similar spreadsheet to all the other supervisors -- is that correct? -- with their staff?

A.   Correct.

MR. ROSS:  If we could pull up Tab 13.

THE VIDEOGRAPHER:  One moment.

This will be Exhibit 117.

(Exhibit PX117 was marked.)

Q.   (By Mr. Ross)  Ms. English, I'm showing you Exhibit PX117, an email dated February 16, 2017, bearing Bates Stamp Number USPI_CIV_22038, which appears to be an email from you to Sandi Karrmann enclosing various spreadsheets for the March '17 salary increase proposals.

Do you see that email?

A.   I do.

Q.   And is this an email that you would send in the normal course of your business?

A.   Yes.

Q.   So the various spreadsheets you've enclosed, you -- you've enclosed one for Corporate Only, Number 3,

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE OUTPATIENT MEDICAL      )  Master Docket

CENTER EMPLOYEE ANTITRUST     )  No. 1:21-cv-00305

LITIGATION                    )


REPORTER'S CERTIFICATION OF THE "CONFIDENTIAL"

ORAL, VIDEOTAPED AND VIDEOCONFERENCED

DEPOSITION OF

CINDY ENGLISH

June 12, 2024

I, Jamie K. Israelow, a Certified Shorthand Reporter duly commissioned and qualified in and for the State of Texas, Registered Merit Reporter and Certified Realtime Reporter, do hereby certify to the following:

That the witness, CINDY ENGLISH, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness:

That the original transcript was delivered to Jonathan J. Ross, Esq.

That a copy of the certificate was served on all parties and/or the witness shown herein on _____.

I further certify that pursuant to FRCP Rule

30(f)(1) that the signature of the deponent:

___ was requested by the deponent or a party before the completion of the deposition and that signature is to be before any notary public and returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature Page contains any changes and the reasons therefor;

_X_ was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither attorney or counsel for, nor related to or employed by any of the parties to the action in which this deposition is taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in the action.

That the amount of time used by each party at the deposition is as follows:

Jonathan J. Ross, Esq. - 1:45
Emily Shoemaker Newton, Esq. - 0:00
Connor Brewer, Esq. - 0:00
Kenneth M. Kliebard, Esq. - 0:00
Amy B. Manning, Esq. - 0:00
Christopher J. Karamanos, Esq. - 0:00
Daniel R. Campbell, Esq. - 0:00
Jordanne M. Steiner, Esq. - 0:00

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of

Cindy English Volume I
June 12, 2024

record:

Jonathan J. Ross, Esq., Attorney for Plaintiff.

Emily Shoemaker Newton, Esq. and Connor Brewer, Esq., Attorneys for Defendants USPI and TENET.

Kenneth M. Kliebard, Esq., Attorney for Defendant DAVITA, INC.

Amy B. Manning, Esq. and Christopher J. Karamanos, Esq., Attorneys for Defendant SCA ENTITIES.

Daniel R. Campbell, Esq., Attorney for Defendant KENT THIRY.

Jordanne M. Steiner, Esq., Attorney for Defendant ANDREW HAYEK.

CERTIFIED TO BY ME on this 13th day of June, 2024.

_____
Jamie K. Israelow, CSR, RMR, CRR
Texas CSR 3801
Expiration Date: 4/30/2025
US LEGAL SUPPORT, INC.
Firm Registration No. 122
16825 Northchase Drive, Suite 900
Houston, Texas 77060
713.653.7100

Docusign Envelope ID: 727BE089-1D94-4409-98E5-D505E3740DBE

CHANGES AND SIGNATURE

WITNESS NAME:  CINDY ENGLISH

DATE OF DEPOSITION:  JUNE 12, 2024


                    *** ERRATA SHEET ***


PAGE/LINE          CORRECTION          REASON FOR CHANGE

13/8     | Versa to Person | transcription error

14/23    | Stan Midas to Van Neinast | transcription error

14/23    | Krista to Kristin | transcription error

14/24    | McGarry to Mosley | transcription error

23/17    | Welling's to Wellik's | misspoke

23/19    | Welling to Wellik | misspoke

23/22    | Welling to Wellik | misspoke

26/13    | their to they  | transcription error

26/14    | returned to return it | transcription error

37/25    | AP to ADP  | transcription error

44/5     | AFC to ASC | transcription error

48/11    | Welling to Wellik | misspoke

48/20    | Welling to Wellik | misspoke

50/11    |discusses to discussions | transcription error

58/8     | cage to 10Ks | transcription error

58/8     | cues to 10Qs  | transcription error

_____

_____

Docusign Envelope ID: 727BE089-1294-4409-98E5-D505E3740DBF

I, CINDY ENGLISH, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted on the previous page(s), and that I am signing under penalty of perjury.



DocuSigned by:

Cindy English

CINDY ENGLISH, VOLUME I

_____ No changes made ___X___ Amendment Sheet(s) attached

IN RE OUTPATIENT MEDICAL CENTER EMPLOYEE ANTITRUST

LITIGATION

SERVICE NO. 6628884-001

# ZIELINSKI EXHIBIT 29 (FILED UNDER SEAL)

Bridget A. Fanning, Ph.D.
July 17, 2024

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

* * * * * * * * * * * * * * * * * * * * * * * *

IN RE OUTPATIENT MEDICAL CENTER EMPLOYEE
ANTITRUST LITIGATION

Master Docket No. 1:21-cv-00305

THIS DOCUMENT RELATES TO ALL:

ALL ACTIONS

* * * * * * * * * * * * * * * * * * * * * * * *

VIDEOTAPED DEPOSITION OF BRIDGET A. FANNING, PhD

TAKEN AT:  BEST WESTERN MILWAUKEE AIRPORT HOTEL &
CONVENTION CENTER

LOCATED AT:  5105 South Howell Avenue
Milwaukee, Wisconsin

July 17, 2024
8:10 a.m. to 2:38 p.m.

* * * * * * * * * * * * * * * * * * * * * * * *

REPORTED BY ANNICK M. JAQUET, RMR, CRR

TRANSCRIPT OF PROCEEDINGS

THE VIDEOGRAPHER:  Good morning. We're going on the record.  The time is 8:10 a.m.  Today's date is July 17, 2024.  This is the video-recorded proceeding of Bridie Fanning taken in the matter of Outpatient Medical Center Employee Antitrust Litigation.  This is filed in the United States District Court for the Northern District of Illinois, Eastern Division, Case No. 1:21-cv-305.

Our proceeding is being held at 5105 South Howell Avenue.  That's Milwaukee, Wisconsin 53207.

My name is J. Church.  I'm the videographer today.  Counsel has agreed to have the appearances noted on the stenographic record.  If we could have our reporter swear in the witness and then we can start.  Sorry.  Do you need to go off the record?

THE REPORTER:  I do, yes, please.

THE VIDEOGRAPHER:  Just a second.  We are going off the record.  The time is 8:11 a.m.

(A discussion was held off the stenographic record.)

MR. ZIRPOLI:  Last night counsel,

Bridget A. Fanning, Ph.D.
July 17, 2024

defense counsel and plaintiff's counsel, spoke and we were informed for the first time yesterday that the witness had approximately 30,000 documents on a thumb drive for each side and it was the witness's understanding that she was to bring those documents here. However, the subpoena had a performance date of the 10th of July and neither side received those documents, and still at this point in time my understanding is no parties have received those documents. We made an inquiry with the judge in this matter and he informed us to proceed with the deposition today with the understanding that if after we've received these documents and had opportunity to review them that there could be a request made to the court to bring this witness back for further questioning with respect to those documents. Counsel on the other side, defense counsel, do you agree with my summary there?

MR. TARRY:  Yes.

MR. CAMPBELL:  Just to clarify that it was the magistrate judge, but agreed.

MR. ZIRPOLI:  Very well.  And, Mr. Hahn, do you agree with that as well?

Bridget A. Fanning, Ph.D.
July 17, 2024

MR. HAHN:  I agree, yes, to the extent that I was privy to those conversations. I was not on the call with the judge.

MR. ZIRPOLI:  But you agree with my representations that the subpoena requested a production of July 10 and at this point in time no parties have received those documents?

MR. HAHN:  That is correct.  And it was due to oversight on my part and along with the understanding on Ms. Fanning's part.

MR. ZIRPOLI:  Thank you.  Does anyone else want to put anything on the record with respect to that issue?

MR. TARRY:  Nothing further.

MR. ZIRPOLI:  Thank you.

THE VIDEOGRAPHER:  Annick, are we all set?

THE REPORTER:  Yes.

(Videotaping resumes.)

THE VIDEOGRAPHER:  Stand by.  We're going back on the video record.  If we could swear in the witness we could get started.

BRIDGET A. FANNING, PhD, called as a witness herein, having been first duly sworn on oath, was examined and testified as follows:

Bridget A. Fanning, Ph.D.
July 17, 2024

Q    And when you first started at SCA in 2014, did they -- at SCA did they have a lot of vacancies in their senior employment that needed to be filled?

MR. CAMPBELL:  Object to form.

THE WITNESS:  They did have -- they -- they did have a lot of vacancies.  I mean, "a lot" is relative, but they had a number of vacancies, yes.

BY MR. ZIRPOLI:

Q    And were you brought on in part to assist SCA in filling those job openings?

A    Yes.  Although I would say Michael Rucker continued to be responsible for recruitment for some considerable time after I joined.  He did eventually transition it to me, but Michael was still very much responsible initially.

Q    Was one of your primary responsibilities as chief talent officer to engage with executive recruiters or search firms to assist in locating candidates --

A    Yes.

Q    -- for the positions that needed to be filled at SCA?

A    Yes.

Bridget A. Fanning, Ph.D.
July 17, 2024

Q    And while you were the chief talent officer at SCA, do you recall which search or recruiting firms you used in finding candidates?

A    Yes.

Q    And what were those?

A    When I started at SCA Michael Rucker was responsible for recruiting and the two firms predominantly that SCA were using were Caldwell and CTPartners, and they used them for quite a considerable length of time.  And then as I started to get involved in recruitment we brought on different recruiters and we used Russell Reynolds, Heidrick & Struggles, Spencer Stuart, Parnassus Group, and to a lesser extent for executives Cielo Search.

Q    And as the chief talent officer were you the primary point of contact with those search firms?

A    Yes.

Q    And when you were hired by SCA do you recall that you made a comprehensive list of target companies that you thought would be good candidates to try and recruit from?

A    Yeah.  It wasn't when I joined.  It was sometime after when I became -- in fact, it

Bridget A. Fanning, Ph.D.
July 17, 2024

could even be a year after, I can't remember exactly -- but it was some considerable time after because I -- there was a lot of discussion about me arguing that this was something we needed to do. But I wasn't responsible for it, so it wasn't something I could do straight away. But eventually when I did start to take responsibility it was one of the things I started to do with the leadership team, but it was about a year in, I think. And I was only there like less than two years, so -- but, yes.

Q   Okay. And once you had that list would you provide the list of target companies to the search firms you were using?

A   Yes.

Q   Okay. And would the search terms have their own target lists sometimes?

A   Well, here was the thing. Usually a search firm gives you a target list, but as I just articulated, we were using several search firms. So the idea that this search firm is looking at this -- these firms and this one is looking at these firms it's not very efficient or effective. So I created one consolidated

list.  What was different is that each of those search firms have their own off-limits with clients that they have.  So, for example, Caldwell and CT both had DaVita as off-limits. They couldn't recruit from DaVita.

Q  Okay.  And do you recall testifying that part of your approach to developing the recruiter list was to create the best bullseye to recruit candidates from?

A  Bullseye?

Q  Yeah.

A  That's an odd word.  Did I actually use that in the testimony or did someone suggest that to me?

Q  Your testimony at page 314 was you want the best targets, the best bullseye to recruit candidates from.

A  Certainly the best targets.  "Bullseye" just seems like an odd word.

Q  That's in PX158.  I don't know if you're looking at 157 or 158.  But, in any event, you -- you would agree with me that you were -- your objective was to find the best target is that correct?

A  Yeah.  I mean, there was about 4- or 500

companies on that list.

Q    Okay.

A    Which is why I'm saying --

Q    We don't need to go there.  We don't need to go there.

A    Okay.

Q    While you were employed by SCA from 2014 to 2016, were you familiar with a company called DaVita, Inc.?

A    Yes.

Q    And would a company like DaVita -- if I use "DaVita" throughout the day will you understand I'm referring to DaVita, Inc.?

A    Yes.

Q    Okay.  And would a company like DaVita have been a desirable company for you to target for potential talent in the recruiting you were doing for SCA?

A    Yes.

Q    Okay.  And would they have been one of the top places you would have looked for talent?

A    Yes.

Q    It would have been an important source of talent if you were able to recruit from them for SCA; is that correct?

Bridget A. Fanning, Ph.D.
July 17, 2024

A   For business development roles, yes.

Q   All right.  At the criminal trial you were asked, "If you were starting on a blank slate where would DaVita have fallen in the realm of companies with comparable talent?"  And you responded, "It would have been a priority company."  Is that correct?

A   Yes.

Q   And you went on to say that it might have even been in your top three.  Isn't that correct?

A   For business development roles, yes.

Q   And why would DaVita have been such a desirable place for you to recruit candidates from for SCA?

A   They had a very similar approach to talent that Andrew had created and was trying to create at SCA.  Both Andrew Hayek and Michael Rucker came from DaVita.

Q   And while you were the chief talent officer at SCA from 2014 to 2016, did you try and recruit DaVita's senior employees or executives for employment at SCA?

            MR. CAMPBELL:  Object to form.

            MR. ZIRPOLI:  What's the basis of the objection?

Bridget A. Fanning, Ph.D.
July 17, 2024

MR. CAMPBELL: The definition of "senior employee."

BY MR. ZIRPOLI:

Q   Do you understand what I mean by that?

A   I would say executives. I was responsible for mainly VP and above. I occasionally got involved in director-level recruiting, but the ones that I personally got involved in was senior jobs, which I would class as vice president and above.

Q   Okay.

A   And the answer to the question is "yes."

Q   So while you were the chief talent officer at SCA from 2014 to 2016 did you try and recruit --

A   No.

Q   -- senior-level people from DaVita?

A   No.

Q   So the answer to my question is "no"?

A   Yes. Sorry.

Q   Just so we have a clear record --

A   Sorry.

Q   -- I'm going to ask the question one more time.
    While you were the chief talent officer at SCA from 2014 to 2016 did you try and recruit

Bridget A. Fanning, Ph.D.
July 17, 2024

any senior-level employees from DaVita?

A    No.

Q    Okay.  Why not?

A    There was an agreement between Kent Thiry and Andrew not to hire, and they were off-limits to a number of the recruitment firms that we were working with.

Q    Okay.  What was your understanding of the agreement between SCA and DaVita not to hire?

A    Well, it changed over time.  So my understanding was the initial agreement was a standard no-poach agreement, which are actually common in the industry.  I would say they are not so common now at all, but certainly at the time, which was we won't recruit your senior -- approach your senior -- not recruit.  We won't approach, proactively approach your senior executives if you don't proactively approach our senior executives.

Q    Okay.  And you said it changed over time?

A    Uh-huh.

Q    And --

         MR. HAHN:  "Yes"?

         THE WITNESS:  Yes.

BY MR. ZIRPOLI:

Bridget A. Fanning, Ph.D.
July 17, 2024

Q    And how did it change?

A    Well, when I originally discussed it with Andrew, which was not long along [sic] when I joined, he just said they had an agreement.  We didn't go into the ins and outs of what that was, what it meant.  Didn't really matter because they were off-limits to Caldwell and CT who were both the two recruiters that Michael Rucker had hired and engaged.  But then over time it was right, we won't proactively approach them, but if they are interested in opportunities they have to go and talk to their boss and notify their boss that they're thinking of applying for a job with Surgical Care Affiliates, and I didn't understand that at the beginning.  I mean, that came like a year later.  It was like, oh, that's different.

Q    Okay.  Did you ever hear the agreement between SCA and DaVita referred to as a no-poach agreement?

A    Well, it's a common industry term.  I just called it a no-poach agreement.  It's a common industry term.  Can I say that they specifically referred to it?  I mean, "off-limits" was probably the term I heard used

Bridget A. Fanning, Ph.D.
July 17, 2024

most frequently.  "No poach" is an industry term.

Q    And how did you first learn about the agreement between SCA and DaVita?

A    Andrew talked to me about it not long after I joined.

Q    Do you know who at DaVita and SCA entered into this agreement?

A    It was Andrew Hayek and Kent Thiry.

(Reporter clarification.)

BY MR. ZIRPOLI:

Q    And do you know when Mr. Hayek and Mr. Thiry entered into the agreement not to hire each other's employees?

A    No.  We never discussed a date.

Q    But it's your understanding that the agreement was reached prior to you joining SCA in 2014?

A    For sure.  It was -- it was a long-standing agreement.  How long, I don't know.

Q    And was the agreement still in place between SCA and DaVita not to hire each other's employees when you left in 2016?

A    Yes.

Q    During your time as chief talent officer at SCA did you ever oversee the hiring of a DaVita

Bridget A. Fanning, Ph.D.
July 17, 2024

senior-level employee to fill a position at

SCA?

A    By "hiring" you mean an actual offer and accept

offer?

Q    Yes.

A    Not that I can recall.  I can't recall hiring

any senior executives from DaVita.

Q    And DaVita is a large company, correct?

A    Yes.

Q    So DaVita must have had hundreds of candidates

in the director-and-above category for you to

try and hire; is that correct?

A    No.  I --

MR. KLIEBARD:  Object to form.

MR. HAHN:  Hold on.

THE WITNESS:  -- need to clarify.

So, yeah.

MR. TARRY:  There's a leading

objection.

MR. KLIEBARD:  Yes.

THE WITNESS:  So, firstly, I was more

directly involved in the business development

recruitment, which was VP and above.  I don't

know how many people DaVita had, but these

people were in short supply and highly

talented.  There certainly were not hundreds of them.  I don't know how many.  I couldn't count.  I don't know.  But I wouldn't ever categorize it as that kind of number.

BY MR. ZIRPOLI:

Q    Okay.  Are you aware of any SCA employees that were hired by DaVita while you were the chief talent officer in a senior-level position?

A    Not that I'm aware of or can recall for sure.

Q    And so just to be clear, while you were the chief talent officer at SCA you're not aware of any DaVita employees being hired by SCA, correct?

            MR. KLIEBARD:  Object to form.

            THE WITNESS:  I can't recall any.

BY MR. ZIRPOLI:

Q    And you're not aware of any SCA employees being hired by DaVita?

            MR. TARRY:  Objection, leading.

            MR. KLIEBARD:  Object to form.  Could you stop with the leading questions, please?

BY MR. ZIRPOLI:

Q    Go ahead.  You can answer.

A    I can't recall any SCA senior executives joining DaVita in the time I was there.

Bridget A. Fanning, Ph.D.
July 17, 2024

MR. TARRY:  We need to pause the clock quickly.  The real-time is locked up again.

THE VIDEOGRAPHER:  Do we need to go off the record?

MR. ZIRPOLI:  Yes.

THE VIDEOGRAPHER:  We're going off the record.  The time is 8:47 a.m.

(A discussion was held off the record.)

THE VIDEOGRAPHER:  We are going back on the record.  The time is 8:49 a.m.

BY MR. ZIRPOLI:

Q   Dr. Fanning, are you also familiar with a company named United Surgical Partners International, Inc.?

A   USPI, yes.

Q   Okay.  If I use the shortened version "USPI" today, will you understand that I'm referring -- referring to United Surgical Partners International, Inc.?

A   Yes.

Q   Okay.

MR. TARRY:  Cadio, I'm sorry, it's locked up again and if we could take another brief -- but I don't want this to be disruptive

Bridget A. Fanning, Ph.D.
July 17, 2024

because it's not his fault.

THE VIDEOGRAPHER:  We're going off the record.  The time is 8:49 a.m.

(A discussion was held off the record.)

THE VIDEOGRAPHER:  We are going back on the record.  The time is 8:51.

BY MR. ZIRPOLI:

Q    Dr. Fanning, would USPI have been on your list of potential companies that SCA would have targeted for recruiting candidates?

A    It wouldn't have been a priority.

Q    Okay.  Do you recall --

A    On a long list, yes.

Q    Okay.  Do you recall USPI was also on your list of potential target companies for candidates; is that correct?

A    Yes.  I even offered an executive at USPI in my time at SCA.

Q    Do you know if SCA had an agreement with USPI not to hire its employees?

A    Yes.

Q    Okay.  What was your understanding of the agreement between SCA and USPI not to hire each other's employees?

MR. TARRY:  Objection.  Foundation.

Bridget A. Fanning, Ph.D.
July 17, 2024

You can answer.

THE WITNESS:  To not proactively hire each other's executives unless they spoke to their manager about it.

BY MR. ZIRPOLI:

Q    Did you believe that the agreement SCA had with DaVita not to hire its employees was the same agreement that SCA had with USPI?

MR. KLIEBARD:  Object to form.

MR. HAHN:  You can answer.

BY MR. ZIRPOLI:

Q    You can answer.

A    Over time, yes.

Q    Over time it became your understanding that the agreement between SCA and DaVita was the same agreement that SCA had with USPI?

A    Yes.

MR. CAMPBELL:  Object to form.

THE WITNESS:  Sorry.

BY MR. ZIRPOLI:

Q    And that was with respect to the hiring of which employees?

A    Executives.

Q    Did Mr. Hayek ever tell you that he had an agreement with USPI not to hire each other's

employees?

A   Yes.

Q   Okay.  And when did you first have that conversation with Mr. Hayek about the agreement with USPI not to hire each other's employees?

A   He sent me an email about it, and I didn't really remember it very well.  And then maybe a year later also we talked about it.  But I actually offered an executive at USPI to come and work for Surgical Care Affiliates.  He turned the offer down.  And then sometime afterwards I learned about the agreement with USPI.  And I had already been told about it, but it hadn't resonated because they weren't a particularly targeted company.  It wasn't a priority company.  So I hadn't really recalled it and then on that too, to place an exec, that would have gotten me into a lot of trouble.

Q   Did you learn at any point in time who Mr. Hayek reached the agreement with at USPI?

A   We talked about it.

Q   And what -- what did you talk about?

A   He said that he had an agreement with the CEO.

Q   Of USPI?

A   Yes.

another job if they wanted to be considered as a candidate at SCA?

A    I can't recall a discussion about needing to notify their boss or having a conversation with their boss prior to this email.  I can't say for certain that I absolutely didn't know.  I can't recall it.  I do -- I can recall that I knew of the agreement with DaVita but just thought it was a standard no-poach agreement and I learned about this "tell your boss" thing at a much later time.  So maybe it was this email that I first heard about that.  But I can't confirm for certain, but it's clearly here in black and white in October 2015.

Q    And why is this agreement here as set forth in this exhibit different than a standard no-solicitation agreement or no-poach agreement?

         MR. CAMPBELL:  Object to form.

         THE WITNESS:  Oh, I mean, we could talk a long time about no-poach and nonsolicit agreements and the form they take and don't take and, I mean, we could spend a long time on that -- on that question.  I think -- and you're going to have to help me clarify here --

Bridget A. Fanning, Ph.D.
July 17, 2024

is what you're referring to is that the off-limits agreement, the -- that's made between these CEOs, what is different about the off-limits agreement between these CEOs that are common to such agreements that used to be common across many, many industries is this notification about told their boss already that they want to leave and are looking.  Is that correct?

BY MR. ZIRPOLI:

Q   In your -- it's your -- it's your testimony. In your 30-plus years in recruiting had you ever seen a provision between companies where an employee is required to inform their boss that they are leaving and looking for a new job before they can be considered for employment at another company?

A   No.

Q   Okay.  So is that what is different about this agreement than a standard no-solicitation agreement?

MR. KLIEBARD:  Object to form.

THE WITNESS:  I'm struggling with standard nonsolicitation agreement.  I mean, as I said, these are highly complex arrangements

Bridget A. Fanning, Ph.D.
July 17, 2024

between companies.  They take multiple forms, different, so I can't -- I just cannot say standard.  What I can say is that it is -- used to be common across industries for CEOs to agree between each other not to proactively reach out and recruit each other's executives.  What is unusual here about such agreements -- I can't say nonsolicit because there are just too many forms and complex arrangements of them -- is this notify their boss that they have told their boss already they want to leave and are looking.  I haven't seen that before, but I would also say these agreements, if someone's already leaving or being laid off, they generally don't apply.  It's like it's -- it's like you're not going to proactively reach out to someone to recruit them if they're gainfully employed with that company.  That's the piece that makes this unusual.  But even with these other agreements between CEOs if someone's already leaving, they've accepted a severance package or they've got a leave date, then you would expect that to be the case.  What's different here is that there is explicit and it -- it directly relates to these kind of

Bridget A. Fanning, Ph.D.
July 17, 2024

agreements.

BY MR. ZIRPOLI:

Q   So was this the first time you'd ever seen companies have a no-solicitation agreement coupled with an agreement where the employee had to tell their boss they were leaving and looking for a new job before they could be considered?

MR. CAMPBELL:  Object to the form.

THE WITNESS:  Yes.

BY MR. ZIRPOLI:

Q   And as far as you were aware at the time, this agreement that SCA had with DaVita as set forth here in Exhibit 159 was entered into before you were hired by SCA; is that correct?

MR. KLIEBARD:  Objection. Foundation.  Speculation.

BY MR. ZIRPOLI:

Q   You can answer.

A   I know it was long before I was hired.  I don't know how long, but I know it was long.

Q   Okay.  And it's your understanding that this agreement was in place after you left working for SCA; is that correct?

A   Yes.

Bridget A. Fanning, Ph.D.
July 17, 2024

Q   And the same question with respect to USPI, is it your understanding that this agreement referenced here in PX159 was in place prior to you being hired by SCA?

A   Yes.

Q   And is it your understanding that the agreement with SCA and USPI was in place after you left working for SCA?

A   Yes.

Q   Okay.  As far as you are aware, were the agreements limited in time in any way?

A   Not that I'm aware.

Q   And as far as you knew were the agreements limited in geographic scope in any way?

A   Not that I am aware.

Q   And as far as you are aware were the agreements limited to a specific employee or an individual?

A   No.

Q   And do you know were the employees who were the subject of the these agreements aware of them?

A   The -- some of the executives who were subject to this executive agreement, yes, would have been aware of it and some of them -- many of them would not.

Bridget A. Fanning, Ph.D.
July 17, 2024

this cold and this is what I know from this agreement, no, I'm not saying that. I don't believe that they have to resign to be able to do that.

BY MR. ZIRPOLI:

Q But do you believe there was a chilling effect, as you put it?

A Yes.

Q Okay. Can you explain that?

A The judge, actually, used those terms. But you go to your boss and you say, "Hey, I'm looking around, I'm thinking of leaving," your boss might say to you, "Well, you go then." Or they might say, "Oh, God, you know" -- and some of Andrew's executives did that a lot and got substantial pay rises for doing so. Or your boss might turned around and say, "No, no, no, I want to give you more money; please don't go." Or they might question their loyalty and they might let them carry on working there, but they might find their career opportunities limited going forward. So it's a very dangerous game to play. Lots of people play it. But it's generally not a good idea in my professional opinion, in my view. Lots of

Q    And that's why you testified that it would have a chilling effect?

A    Correct.

Q    What is your experience with candidates wanting to tell their boss that they're planning to leave without having another job lined up?

A    It's not usual to do that and, in fact, if you do do that you're just putting yourself at risk, unless you have a high expectation that you can use it to negotiate with your boss. And I did see some of the SCA executives do that quite successfully with Andrew multiple times.

Q    Do you think that the notify your boss provision alters the leverage the employee would have in trying to advance --

BY MR. ZIRPOLI:

            MR. KLIEBARD:  Objection.

Q    -- their opportunities?

            MR. TARRY:  Calls for speculation.

            THE WITNESS:  Advance their opportunities with who?  Their current employer?

Bridget A. Fanning, Ph.D.
July 17, 2024

BY MR. ZIRPOLI:

Q    Yes.

A    I just said that it could limit their career opportunities going forward, yes.

Q    And do you believe that this "tell your boss" provision takes the choice away from the employee -- employee about how they might leverage their own interest?

MR. TARRY:  Same objection.

THE WITNESS:  I mean, yes.

BY MR. ZIRPOLI:

Q    Because they no longer have a choice, correct?

MR. TARRY:  Objection.

MR. KLIEBARD:  Objection to form. Leading.  Speculation.

MR. HAHN:  You can answer.

THE WITNESS:  Yes.

BY MR. ZIRPOLI:

Q    Okay.  So if a candidate at DaVita or USPI did not want to inform their boss that they were leaving and looking for a new job, did it mean that they were not considered for job opportunities at SCA?

A    Yeah.

MR. CAMPBELL:  Objection.

Bridget A. Fanning, Ph.D.
July 17, 2024

MR. KLIEBARD: Object to form.

THE WITNESS: -- would have been off-limits of the recruiters, and some of it would have been these agreements.

BY MR. ZIRPOLI:

Q Okay. Are you aware of any reason other than the agreement that SCA had with DaVita that the employees were off-limits?

MR. KLIEBARD: Objection to form. Asked and answered multiple times now.

THE WITNESS: Can you clarify that question?

BY MR. ZIRPOLI:

Q Sure. Other than the agreement that's referenced here in Exhibit 159, are you aware of any reason other than that the employees would have been off-limits for SCA to hire?

MR. KLIEBARD: Objection. Calls for --

THE WITNESS: Yes. The recruiters we were using to proactively reach out, many of them, I think even all of them, had off-limits agreements with DaVita for sure.

BY MR. ZIRPOLI:

Q Okay. And so those off-limit agreements with

Bridget A. Fanning, Ph.D.
July 17, 2024

the recruiters and this agreement is what prevented SCA from hiring their senior-level employees; is that correct?

MR. TARRY:  Objection.  Leading.

MR. CAMPBELL:  And vague.

BY MR. ZIRPOLI:

Q    You may answer.

A    Yes.

Q    If we turn now to the attachment that is on Exhibit 159, the only two companies that are put in italics are USPI on page 1, correct?

A    Yes.

Q    And DaVita Health Partners on page 4, correct?

A    Yes.  And that's consistent with what Andrew says in his email.

Q    Okay.  That's consistent with the direction to you in Bullet Point 2; is that correct?

A    Correct.

Q    And did you understand DaVita Healthcare Partners as referred to on page 4 to be DaVita?

A    Yes.

Q    And did you understand from this email that by placing DaVita and USPI in italics, employees at those companies were off-limits to recruit from unless they first told their boss that

they wanted to leave and were looking for new employment?

A    This says senior executives.  We can recruit junior people below director.

Q    So you understood that the senior people were off-limits to recruit from unless they first told their boss if they wanted to leave and were looking for new employment?

A    Correct.

Q    By having this "tell your boss first" provision, do you believe this allowed SCA, DaVita, and USPI to monitor whether their agreements were being followed?

          MR. KLIEBARD:  Object to form. Speculation.

          THE WITNESS:  You know, it's really hard to say that, because if you are not hearing from anybody, like silence, how do you know?  I mean...

BY MR. ZIRPOLI:

Q    Well, under the agreement the companies would have been made aware that their employees were looking to leave before they took a job at SCA, correct?

A    But we just had a conversation where I

Bridget A. Fanning, Ph.D.
July 17, 2024

explained that it had a chilling effect, and most people are not going to go to their boss and say, "Hey, I'm looking at leaving." So I am -- my personal opinion, I am struggling to believe that monitoring whether the agreement is working is if people are going to their bosses and asking them, I don't think that's a good way of monitoring that agreement at all, in my personal opinion.

Q    But the effect of this agreement was that nobody from DaVita was hired by SCA, correct?

MR. KLIEBARD:  Objection to form.

THE WITNESS:  Well, we --

MR. HAHN:  Hold on.

THE WITNESS:  I've already answered that question like three times, and every time I've answered it I've said there was an agreement. We've talked about the agreement. And I've said recruitment companies off-limits. And I'm going to say the same thing again.

BY MR. ZIRPOLI:

Q    And the result was that nobody from DaVita was hired, correct?

MR. TARRY:  Objection. Leading.

MR. CAMPBELL:  Foundation.

Bridget A. Fanning, Ph.D.
July 17, 2024

A    The --

MR. CAMPBELL:  Objection.  Calls for speculation.

THE WITNESS:  The executives?

BY MR. ZIRPOLI:

Q    Yes.

A    Some of them were obviously aware of it.  And do they choose?  I don't know.  They choose to work for SCA, they're aware of it, but a number of them, many of them, no, they wouldn't have been aware of it and they wouldn't have had a choice about it.  And I think we've seen enough emails when people are trying to get considered, what that looks like.

Q    Do you think these agreements benefited the companies that imposed them on their employees?

MR. KLIEBARD:  Objection.  Vague.  Speculation.

THE WITNESS:  You know, I do believe I answered that in my testimony, if I recall, and, yeah, I think they benefit companies.  I actually think, quite frankly, DaVita was the one that is benefited.  Certainly didn't benefit SCA.

BY MR. ZIRPOLI:

Bridget A. Fanning, Ph.D.
July 17, 2024

Q    And it didn't benefit the employees that were subject to them, correct?

A    The executives that were subject to them.  I don't think it benefited them.  The question is did it harm them?  The court case found that it didn't.  I mean, these are highly skilled, highly talented, highly paid people with lots of opportunities.

Q    Do you recall testifying that the no-poach agreements are harmful to employees because it restricts their mobility?

A    That would have been in the context of a storyline.  Do you want to go through the storyline and we can talk about it?

Q    You testified, "I think they are harmful to employees.  QUESTION:  How so?  Because it restricts their mobility.  It meant that you didn't see executives moving from SCA to DaVita and from DaVita moving to SCA."

A    Yup.  And do you want to do the two questions above it?

              MR. CAMPBELL:  Counsel, what are you reading from?

              MR. ZIRPOLI:  There's the transcript at 276, lines 13 through 22.  PX157.

MR. KLIEBARD:  Did you say 276?

MR. ZIRPOLI:  276, I did, yup.

MR. TARRY:  276.

BY MR. ZIRPOLI:

Q   So can you answer the question of whether you believed that these agreements were harmful to employees?

A   I think we said you were going to go back two questions.

Q   It's there.

A   Okay.  Can we just overlook?  Because I want to do it in context.

Q   Sure.  276.

MR. KLIEBARD:  I'll make an objection to your question.  Form.  Completeness.

BY MR. ZIRPOLI:

Q   Sure.  If we start on page 275 it says, "And which organization benefited more from this agreement?  SCA or DaVita?"  You said, "I believe DaVita did."

A   Yup.  I just said that too.

Q   And then, "QUESTION: Why do you say that?"  Do you see that?

A   And then you give an answer and then you say, "I think they're harmful to employees."

Bridget A. Fanning, Ph.D.
July 17, 2024

A     And we're talking executives.

Q     Yes.  Okay.  While you were the chief talent officer at SCA were you involved in the process of setting compensation for employees of SCA?

A     Yes.  It was part of my overall responsibilities.  I didn't necessarily set the compensation.  It was a discussion, you know, it wasn't like -- I mean, I didn't have authority to hire, fire.  I didn't have authority to set compensation.  But I certainly influenced it and had discussions about it.

          MR. ZIRPOLI:  Could you tell me a time check, please?

          THE VIDEOGRAPHER:  2:51.

BY MR. ZIRPOLI:

Q     Okay.  What do you consider the different components of an employee's compensation?

A     Oh, gosh.

          MR. TARRY:  Objection.  Vague.  Any employee?

BY MR. ZIRPOLI:

Q     The employees you were --

A     Okay.  We're talking about VPs and above.

Q     Okay.

A     Right.  We're talking execs, really, so base

pay --

Q    Uh-huh.

A    -- benefits.

Q    Uh-huh.

A    Voluntary benefits, all sorts of benefits around that, might be perks.  Variable pay, which could be made up of a cash component and an equity component.  The more senior executives, equity will usually be -- I mean, I could spend hours on this.  So I'll just be brief.  Equity for more senior executives is a big part of their pay, and it's very much wealth accumulation and generation.

Q    And would a bonus be included in there as well?

A    Okay.  So that was back to the incentives, and I talked about variable pay, which is incentives.  Cash component and an equity component.

Q    Okay.  And who else at SCA was involved in setting VP and above compensation while you were the chief talent officer?

A    Andrew, Michael, all the cabin team.  You know, anyone gets involved in compensation for their own direct team.  They're very often given a budget, 3 percent, wow, and they get to give 1

Bridget A. Fanning, Ph.D.
July 17, 2024

percent to this person and 2 percent to that person.  So directors would set pay.  You'd even find managers setting pay for their teams.  Lots of people would set pay at all different levels, right, it's a hierarchy of how it works.  But lots of people have involvement in setting pay.  Very few people have absolute authority.  I mean, even Michael couldn't just adjust pay.  I mean, he'd have to sit and go through it with Andrew.  By the way, for the executives it required the compensation committee board approval, market-based studies.  I mean, I could go on.  I mean, pay is a very complex issue.

Q    Was there an annual process the company used to determine compensation?

A    We looked at it more than annually, I can tell you that, but, yeah, there was an annual process.

Q    And what was that process, please?

A    Oh, my God.  Okay.  Do you want to be more specific?  Because we could spend a long time here.  So I want to give you what you're looking for.

Q    Sure.  Was there a particular time of year when

Bridget A. Fanning, Ph.D.
July 17, 2024

the annual compensation setting process happened?

A    Yeah.  I believe we really went into it big time around about October or November, December.  It was a January to December calendar year.  I think the compensation committee approved the incentives and pay levels and everything probably -- I mean, I'm going from memory, but it would have been around -- I mean, a lot of companies have the same cycle.  It depends on the fiscal year.  But around February, March time with April being effective, there would be compensation committees, the board would sign off the budget, the amounts for all the individuals, the equity, but that would roughly be the calendar.  But it's over many months.

Q    And are you aware of SCA increasing compensation off cycle, outside of that?

A    Oh, God.  They did it all the time.  I mean, as I said before, there were a number of executives at SCA that were always going to Andrew about, "Hey, I've been approached for job, I'm thinking about it," and then all hell would break loose and they'd get big pay

Bridget A. Fanning, Ph.D.
July 17, 2024

increases.  Some of them I found quite
frustrating, quite frankly.

Q    Other than the one-offs, was there ever a time
when SCA increased compensation sort of
company-wide or director-level above off cycle?

A    Yeah.

Q    And what would be the reason for that have
been?

A    We reviewed all the benefits and we did market
adjustments on benefits.  Like we improved the
401(k) plan for all the nurses and all the
hourly employees and everybody else.

Q    Did SCA set pay ranges for different positions?

A    We had compa-ratios that became sophisticated
under my time there as we put in better
processes, to be frank.  But, yeah, there were
ranges for different levels for different jobs
for different markets, geographies.  You know,
that kind of thing, yeah.

Q    Did SCA consider market rates for similar
positions in setting compensation?

A    Yeah.  It was all part of the process.

Q    Did SCA consider or try to achieve internal
equity in its pay for employees?

A    To an extent.  To an extent.  But as I said,

Bridget A. Fanning, Ph.D.
July 17, 2024

there were a lot of people that just negotiated their one-offs at the executive level.

Q    Did SCA have a ranking system for its employees for purposes of determining compensation?

A    No.  Didn't -- didn't rank.  Certainly had priority groups like the -- the regional managers, they -- the Gorans of the world and all these pay group, I mean, they would have been priority people.  The business development people would have been priority people.  But ranking as far as one, two, three, four, no, they didn't do that.

Q    Were employees paid according to pay bans according to their job title?

A    You know, we're talking employees.  Who specifically are we talking about?

Q    Well, let's talk about the senior-level employees.  The VP and above.

A    They were paid according to their job.  So you might be a VP of technology, right, and your market rate for that specific job might be this kind of range.  If you're a VP of HR then you're going to have a different range.  If you're a VP of business development you're going to have a different range again.  So it's

by job skill set.  It's not just by level.

Q    So does -- did pay bans that were used at SCA apply to directors and below as well?

A    Not so much.  Not so much.  It's really complex.  You have to understand, all these individual surgery centers were like their own individual companies.  So it was less done centrally.  It was done in all these individual 200 decentralized surgery centers.  And they competed in their local markets for their nurses and things.

Q    Did SCA have a software system to assist in setting wages?

A    Setting wages, no.  That was very much judgmental.  Did we use Excel spreadsheets and technology to help us manage the process?  Yeah.  But not in setting wages, no.  That was -- that was a human decision.

Q    Do you know what the Economic Research Institute is, known as ERI?

A    No.

Q    Have you ever heard of ERI's salary assessor?

A    No.

Q    Okay.  Did SCA use a system called Ceridian that you're aware of?

Bridget A. Fanning, Ph.D.
July 17, 2024

Q   And even in Mr. McKessar's example where you discussed having so many concerns about that, you don't know whether Mr. McKessar had conversations with his supervisor or not?

A   Correct.

MR. ZIRPOLI:  Object to the form.

THE WITNESS:  Correct.

BY MR. TARRY:

Q   And the same is true for Jordan Thau?

MR. ZIRPOLI:  Object to the form.

THE WITNESS:  Correct.

BY MR. TARRY:

Q   And the same is true for Mr. Kay?

MR. ZIRPOLI:  Object to the form.

THE WITNESS:  Correct.

BY MR. TARRY:

Q   I want to clarify a couple of other things because terms matter.  The words we use we need to be precise.  There were a series of questions that used the term "not-to-hire agreement."  As you understood, whether we're talking about USPI's understanding with SCA or DaVita, you did not understand these were not-to-hire agreements, did you?  That's not a precise way to define it?

Bridget A. Fanning, Ph.D.
July 17, 2024

MR. ZIRPOLI: Object to the form.

THE WITNESS: I understood do not proactively reach out and approach these people with executive job opportunities.

BY MR. TARRY:

Q   And you explained more than one time earlier today the exceptions to that where if you -- if they were to tell their boss and have a conversation with their boss and come back and say they would like to explore, then the process could move forward, correct?

A   Correct.

MR. ZIRPOLI: Object to the form.

BY MR. TARRY:

Q   Similarly, we used the term "employees" at times, but I want to make sure that I understand you correctly. So if you could reiterate your understanding of this agreement when you were answering questions earlier about employees, which employees were covered by these agreements?

MR. ZIRPOLI: Object to the form.

THE WITNESS: I was really referring to executives. Andrew defined them as director level and above.

Bridget A. Fanning, Ph.D.
July 17, 2024

BY MR. TARRY:

Q    Okay.

A    These are the more senior people at Surgical Care Affiliates and DaVita.

Q    Dr. Fanning, you don't have any firsthand knowledge of the agreements you described between USPI and SCA other than what Mr. Hayek explained, correct?

MR. ZIRPOLI:  Object to the form.

THE WITNESS:  Yes.  And what was in the emails that he sent or the Bill Wilcox email, whatever, but, correct.

BY MR. TARRY:

Q    And to clarify, we've used the term "agreements," but these were two different agreements as you understood them.  One with --

A    Uh-huh.

Q    -- SCA and DaVita; one with SCA and USPI. Correct?

A    Correct.

Q    I think you made this clear, but I just want to make sure.  You don't have any firsthand knowledge about these agreements prior to September 2014 or after 2016, first week of July?

Bridget A. Fanning, Ph.D.
July 17, 2024

MR. CAMPBELL:  Vague.

THE WITNESS:  I -- no, it didn't discuss job relevance, but the fact they're in the same industry recruiting the same jobs makes them job relevant.  You know, if they were in totally different industries -- let's say one was a burger shop and one was ambulatory surgery centers -- then I'd say not directly relevant to the job.  The fact that they were both clearly in the same industry, even DaVita, right, there was job relevancy there.

BY MR. ZIRPOLI:

Q    But the agreement that you were aware of didn't set forth job titles or job descriptions; is that correct?

MR. KLIEBARD:  Object to the form.

THE WITNESS:  Correct.  But I wouldn't see that stated in a noncompete anyway.  I would say relevant to the job is because you're dealing with things relevant to the industry.  I mean, I could go on and explain it further, but I wouldn't expect to see that written down in a noncompete agreement.

Bridget A. Fanning, Ph.D.
July 17, 2024

BY MR. ZIRPOLI:

Q    The third factor you said was not impacting a person's employability, period.  Correct?

A    Correct.  You couldn't say you must never work in any financial services company ever or something like that.  I mean, that's just whoa, right?  They'll never get a job anywhere, right, or if you're a nurse in a hospital you can't work in any hospital system within a 100-mile radius.

Q    And you didn't think that these agreements that DaVita had with -- I'm sorry.  Strike that.

       You didn't think that the agreement that you are aware of that SCA had with DaVita, you didn't think it was a reasonable agreement. You didn't like it.  Correct?

             MR. CAMPBELL:  Objection.  Compound. Foundation.

             MR. KLIEBARD:  Objection.

             THE WITNESS:  Okay.  There are two questions there.  Okay.  Let's go back to employability.  I did not feel that these agreements impacted people's employability. And if you go to the criminal trial I think one of the reasons why it wasn't successful is it

Bridget A. Fanning, Ph.D.
July 17, 2024

didn't really impact people's employability. There were hundreds of places that people could go and work. It wasn't that they could only ever go and work for USPI or they could only ever go and work for DaVita. They had hundreds of choices they could go work for. So employability, this agreement really didn't impact it. It impacted it with regards to these two separate agreements between these two separate companies and the traffic between these two companies. But it didn't impact what I would call employability, which is, you know, they can go get a job somewhere else.

BY MR. ZIRPOLI:

Q But -- exactly. But it did impact their employability between SCA and DaVita, correct?

MR. CAMPBELL: Object to form.

THE WITNESS: Yes.

BY MR. ZIRPOLI:

Q And it did impact their employability between SCA and USPI, correct?

MR. CAMPBELL: Same objection.

THE WITNESS: Yes. But when I said "employability" I was referring to people's ability to go and earn income. It -- it

Bridget A. Fanning, Ph.D.
July 17, 2024

doesn't -- it didn't impact their ability to go and earn income from other places.

BY MR. ZIRPOLI:

Q    I understand that.  But it did impact the employability of SCA employees to go to DaVita and DaVita employees to go be able to go to SCA, correct?

        MR. CAMPBELL:  Objection. Mischaracterizes the testimony.

        THE WITNESS:  I was just going to say but when I said "employability" that isn't what I was referring to.

BY MR. ZIRPOLI:

Q    Well, I'm asking you that question now.  Isn't it true that these agreements affected the employability of SCA employees to go to DaVita?

        MR. CAMPBELL:  Same objection.

        THE WITNESS:  You know, I'm going to have to go back to the agreement and say what it did was impact a candidate's ability to proactively be considered or respond to opportunities at DaVita or USPI.

BY MR. ZIRPOLI:

Q    Or get solicited in the first place, correct?

A    Yes.

Bridget A. Fanning, Ph.D.
July 17, 2024

STATE OF WISCONSIN     )
                       ) ss.
COUNTY OF MILWAUKEE    )

          I, ANNICK M. JAQUET, RMR, CRR, Notary

Public in and for the State of Wisconsin, do

hereby certify that the preceding deposition

was recorded by me and reduced to writing under

my personal direction.

          I further certify that said deposition

was taken remotely before me on the 17th day of

July, 2024, commencing at 8:10 a.m. and

concluding at 2:38 p.m.

          I further certify that I am not a

relative or employee or attorney or counsel of

any of the parties, nor a relative or employee

of such attorney or counsel, or financially

interested directly or indirectly in this

action.

          In witness whereof, I have hereunto set

my hand at Milwaukee, Wisconsin, this

29th day of July, 2029.

_____
ANNICK M. JAQUET, RMR, CRR
Notary Public
in and for the State of Wisconsin

My commission expires September 29, 2025.

# ZIELINSKI EXHIBIT 30 (FILED UNDER SEAL)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

--o0o--

```
                                    )
IN RE OUTPATIENT MEDICAL CENTER   ) No. 1-21-cv-00305
EMPLOYEE ANTITRUST LITIGATION     )
_____   )
```

_____

VIDEO DEPOSITION OF

MARK GARVIN

May 30, 2024

_____

DEPOSITION OF MARK GARVIN, produced as a witness, duly sworn by me via videoconference at the instance of the PLAINTIFFS, was taken in the above-styled and numbered cause on May 30, 2024, from 9:19 A.M. to 3:51 P.M., before BRANDON D. COMBS, CSR, RPR, in and for the State of Texas, reported by computerized machine shorthand via videoconference.

THE VIDEOGRAPHER: Good morning. We are on the record at 14:19 UTC Time on May 30, 2024.

Audio and video recording will continue to take place until all parties agree to go off the record. Please note that microphones are sensitive and may pick up whispering and private conversations.

This is the video-recorded proceeding of Mark Garvin, taken in the matter of In Re Outpatient Medical Center Employee Antitrust Litigation. This proceeding is being held via remote videoconference.

My name is Dan Acosta. I'm the videographer on behalf of U.S. Legal Support, located at 16825 North Chase Drive, Suite 900, Houston, Texas 77060. I'm not related to any party in this action, nor am I financially interested in the outcome.

The court reporter is Brandon Combs, on behalf of U.S. Legal Support.

Counsel will state their appearances for the record, after which the court reporter will enter the statement for remote proceedings into the record and swear in the witness.

MS. NUSSBAUM: Good morning. This is Linda Nussbaum for the Nussbaum Law Group on behalf

Mark Garvin
May 30, 2024

of the class plaintiffs.  And along with me today are my colleagues Jonathan Ross and Susan Schwaiger.

MS. HOLTHUS:  This is Staci Holthus of Morgan, Lewis & Bockius on behalf of DaVita, Inc.

MR. RUSSO:  This is Angelo Russo of McGuireWoods on behalf of Surgical Care Affiliates, LLC and SCAI Holdings, LLC, and I will be joined by my colleague Amy Manning, also of McGuireWoods.

MS. STEINER:  Good morning.  This is Jordanne Steiner from Wilson Sonsini Goodrich & Rosati on behalf of Mr. Hayek.

MS. O'CONNOR:  Good morning.  This is Katharine O'Connor with McDermott Will & Emery on behalf of Defendant Kent Thiry.

MS. MOYE:  And in the room we have Veronica Moye and Connor Brewer from King & Spalding.  We also have on the line Julia Barrett from King & Spalding.  We are counsel for Tenet, USPI and for the witness today, Mr. Garvin.

MARK GARVIN,

having been first duly sworn, testified as follows:

EXAMINATION

Q.   (BY MS. NUSSBAUM)  Good morning, Mr. Garvin.

A.   Good morning.

to what you were told about a description of the investigation?

A. Again, I don't have any recollection of what I was told.

Q. And what is your recollection as to what you were told about the consequences of lying to a federal agent?

A. Well, in reading this, it says that's a crime.

Q. Do you recall being told that?

A. I do not.

Q. What does that mean to you, that that is a crime?

A. That would be against the law and punishable.

Q. ███████████████████████████████ ███████████████████████████████ ███████████████████

A. I don't know. I don't recall that. I would have to read this in its entirety.

Q. Okay. What was your role in the hiring process at USPI?

A. Can you be more specific. We had 18,000 employees.

Q. Okay. With respect to the employees that

you played a role in the hiring of, what role did you play?

A. I was responsible for hiring my direct reports and played a role of interviewing them and proposing compensation plans and onboarding. I played a role in interviewing regional vice presidents and approving proposed compensation plans.

Q. And is it fair to say that the vast majority of candidates that you interviewed and considered were through recruiters?

A. No, I wouldn't say that's fair. The vast -- the majority were internal promotions.

Q. Okay. Not considering internal promotions, considering hirings from outside of the company. Were the vast majority of those individuals from outside recruiters?

A. I don't know the answer to that question. It was some combination of outside recruiters and internal recruiters.

Q. Looking at page 2, at the last complete paragraph.

[REDACTED]

Do you see that?

A.   I do.

Q.   [REDACTED]

[REDACTED]

MS. MOYE:  Object to the form.

THE WITNESS:  [REDACTED]

[REDACTED]

Q.   (BY MS. NUSSBAUM)  And that is true.  Yes.

A.   That is my personal opinion, yes.

Q.   Now, over the course of your career, have you received inquiries from recruiters?

A.   Yes.

Q.   And have you considered those opportunities?

A.   Considered them at what level?

Q.   Do you think it is fair to say that opportunities at different companies could offer more stability, more income, and a greater role at another company?



Is that accurate?

A. That is accurate, yes.

Q. Now, going to the last paragraph on the page,

A. That is correct.

A. Correct.

A. That is correct.

Q. Now, looking at the first full paragraph on page 8, it says,

Is that correct?

A.

Q.

MS. MOYE:  Object to the form.

THE WITNESS:

Q.  (BY MS. NUSSBAUM)  Okay.

A.

Q.

A.

A.    Yes.

Q.    Do you recall that?

A.    I do recall that, yes.

Do you see that?

A.    I do see that, yes.

Q.    And that is accurate and correct?

A.    That would be accurate and correct for any and all employees and any search firm for any role.

MS. MOYE:  Objection to the form.

MS. NUSSBAUM:  That is correct.

MS. MOYE:  I ask this because are the Bates numbers the same?

MS. NUSSBAUM:  No, the Bates numbers are not the same.  I think that when they were produced to the Government, you gave them different Bates numbers.

But if you look at the description, it's an email chain which starts on December 1, 2015 and ends on January 7, 2016.  And it is the exact document.

And, you know, it's really, I think, that the numbers are just not the same.  The numbers that we have are the civil litigation numbers.

MS. MOYE:  Okay.  And 11A is --

MS. NUSSBAUM:  11A is the document referred to in the next paragraph of the 302 summary of his sworn discussions.  And that is that certain individuals are highlighted in highlight, that he recommended increases for those individuals.

Which has now marked as Plaintiff's 90.

MS. MOYE:  Okay.  So your question for the witness is whether 11 and 11A are what you believe them to be, are these the right documents?

MS. NUSSBAUM:  No, that's not my question

Mark Garvin
May 30, 2024

to the witness.  As soon as he reviews it and he's ready, I'll ask my questions.

MS. MOYE:  Okay.

Q.  (BY MS. NUSSBAUM)  Mr. Garvin, have you had an opportunity to review the first document, Plaintiff's 89?

A.  I don't know what Plaintiff's 89 is.  If that's the email correspondence which is marked Tab 11 for me --

Q.  Yes.

A.  -- yes, I have had a chance to review that, yes.

Q.  Okay.  And so can you tell us, do you recognize this document, first of all?

A.  I do.

Q.  And are you one of the participants in the email chain?

A.  I am.

Q.  And did you write these emails and read these emails in the ordinary course of your business as an executive at USPI?

A.  I did.

Q.  And are the other people who are part of this email chain, Sandi Karrmann, Andy Johnston, Brett Brodnax, also executives at USPI who wrote

their emails in the ordinary course of their business?

MS. MOYE:  Object to the form.

THE WITNESS:  Yes.

Q.  (BY MS. NUSSBAUM)  Okay.  Now, Mr. Garvin, what is this chain of emails referring to?

A.  It is referring to, initially, Aric Burke, and then me worrying about losing Aric Burke, and then a general review of others' compensation relative to one another.

Q.  Okay.  So let us look at the next to the last page of the email.  And you say on December 1, 2015, quote, this worries me.

Do you see that?

A.  I do see that.

Q.  Okay.  And what is worrying to you, if you then look at the December 4, 2015, email, you are considering his compensation.

You're told he's currently at ▮▮▮▮ and is the lowest paid MP.  And you then say, quote, yikes, do you think we should do something now.

Do you see that?

A.  I do see that.

MS. MOYE:  Objection to form.

THE WITNESS:  Sorry.  I do see that.

knowledge you have about this agreement is information that was given to you by others?

A.   That's correct.

Q.   And the end of that paragraph, the last sentence that carries over to the next page, in Garvin's understanding the agreement lasted until roughly three to five years prior to this interview.

Do you see that?

A.   I do see that.

Q.   Was that your best recollection at the time of this interview?

A.   At the time best I could do.

Q.   Okay.  And three to five years prior to May 28, 2020, is May 28, 2015 to May 28, 2017; is that correct?

A.   That is correct.

Q.   Thank you, sir.

Are you aware of any other agreements or have any knowledge -- let me restate.

Do you have any knowledge of any other agreements related to recruiting between anyone at USPI and anyone at any company other than SCA?

A.   I am not.

Q.   Do you have any knowledge of any agreement between USPI and DaVita with respect to recruitment?

Mark Garvin
May 30, 2024

A.   I do not.

Q.   Has anyone ever suggested to you that there was any agreement or understanding with DaVita related to employee recruitment?

A.   No.

Q.   Thank you.

Let's talk a little bit about competition. Competitors were referred to a few times during the course of this deposition, so I want to turn to that subject.

This lawsuit involves employee recruitment practices.  Is that your understanding, sir?

A.   That is my understanding.

Q.   Now, with respect to competitors for employees, who would you consider to be competitors for the senior level type of employees who were involved in the SCA agreement to your understanding?

A.   Competitors to USPI for employees in general?

Q.   Correct.

A.   Any and all health systems in the United States of America, any and all ambulatory surgery center companies in the United States of America, private equity firms employing physician practice management with various ancillary subs.

And a host of multi-state, multi-site business operators, healthcare or not.

Q. In your view, given those competitors for employees, would an agreement with SCA not to actively solicit employees possibly impact compensation to employees of USPI and SCA?

A. I don't see how it could have had any material effect.

Q. You were also asked a series of questions about an occasion on which you recommended compensation increases for some of the people who reported to you.

Do you recall that line of questioning?

A. I do.

Q. Let's look at page 11 of 15 in this PX88,

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

Do you see that?

A. I do.

Q. ████████████████████████████████████████

████████████████████████████████████

A. ██████

Q. ████████████████████████████████████████



Do you see that?

A. I do.

Q.

A.

Q.

A.

Q. Are you aware of any occasion, sir, in which any employee's wages were decreased or impacted in any way as a result of any agreement USPI had with anyone else?

A. I am not.

Q. And then I just want to show you PX91 quickly, which is the letter that Ms. Nussbaum spent a lot of time with you on, you said you had not seen before.

A. This one?

Q. Yeah. I believe this is PX91. It's the Department of Justice letter addressed to me and to

CERTIFICATE OF REPORTER

I, BRANDON D. COMBS, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth, and nothing but the truth in the within-entitled cause;

That said deposition was taken in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of the said witness was thereafter reduced to typewriting, by computer, under my direction and supervision;

That before completion of the deposition, review of the transcript was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the event of this cause, and that I am not related to any of the parties thereto.

DATED: June 3, 2024

*Brandon D. Combs*

BRANDON D. COMBS
RPR, Texas CSR 10927, California CSR 12978

```
                        *** ERRATA SHEET ***

NAME OF CASE: IN RE: OUTPATIENT
DATE OF DEPOSITION:  May 30, 2024
NAME OF WITNESS:  MARK GARVIN

PAGE  LINE  FROM          TO          REASON

__28_|_13__|__take____|____takes__|
____transcription error_____

__74_|__6__|___were___|____was____|
_____transcription error_____
```

Subscribed and sworn before me
this____day of_____,20__.

_____        _____

(Notary Public)          My Commission Expires:

# ZIELINSKI EXHIBIT 31 (FILED UNDER SEAL)

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

IN RE OUTPATIENT MEDICAL )
CENTER EMPLOYEE ANTITRUST )
LITIGATION, )
                                ) Master Docket No.
                                ) 1:21-cv-00305
                                )
THIS DOCUMENT RELATES TO: )
ALL ACTIONS )

* * *HIGHLY CONFIDENTIAL* * *

VIDEOTAPED DEPOSITION OF ANDREW PATRICK HAYEK

Chicago, Illinois

September 18, 2024

Reported by:

KATHY S. KLEPFER, RMR, RPR, CRR, CLR, CSR

JOB NO. 6616478-001

VIDEOGRAPHER: We are now on the record. The time is 9:11 a.m., according to the video monitor, on September 18, 2024. This is the video-recorded proceeding of Andrew Hayek, taken in the matter of In re Outpatient Medical Center Employee Antitrust Litigation filed in the United States District Court for the Northern District of Illinois.

This proceeding is being held at 70 West Madison Street in Chicago, Illinois. My name is Peter Prezzano, the videographer on behalf of U.S. Legal Support located in Houston, Texas. The court reporter is Kathy Klepfer, also on behalf of U.S. Legal Support.

The court reporter has noted counsels' appearances for the record. Will the court reporter please administer the oath, and you may proceed.

* * *

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

ANDREW PATRICK HAYEK,  called as a

witness, having been duly sworn,

was examined and testified as

follows:

EXAMINATION BY

MR. SAVERI:

Q.    Good morning, Mr. Hayek.

A.    Good morning.

Q.    I introduced myself to you before we started, but, once again, my name is Joseph Saveri, and I'm one of the lawyers for plaintiffs in this matter.

Could you please state your name, full name, and spell it for the record, please.

A.    Andrew, A-N-D-R-E-W, Patrick, P-A-T-R-I-C-K, Hayek, H-A-Y-E-K.

Q.    Mr. Hayek, are you presently employed?

A.    Yes.

Q.    And where are you employed?

A.    Triple Aim Partners.

Q.    And what is your title at Triple Aim Partners?

A.    I'm the chief executive officer.

Q.    And how long have you been the CEO at Triple Aim Partners?

reaction -- what -- what Mr. Thiry's reaction was when you started to have that conversation?

"A When I shared that I was leaving, he was upset, he was sad, frustrated. So there was a range of emotions.

"Q Was he angry?

"A There was probably some anger. I think mostly sad and upset."

Was that a truthful response, sir?

A. Yes.

Q. Okay. And you said a minute ago that you -- he didn't tell you that he knew you were leaving at that time, correct?

A. You're asking me did he share that he knew that I was planning to leave when I was in that conversation we're talking about?

Q. Yeah, on the jet with him?

A. Correct, he did not share that he knew.

Q. And did you come to know subsequently that in fact he did know?

A. Yes.

Q. Okay. Now, you said that he offered you a promotion; is that correct?

A. Yes.

Andrew Patrick Hayek  Highly Confidential
September 18, 2024

Q.    So he was trying to get you to stay?

A.    My interpretation was the promotion. And there are other parts to it.  It was compensation and role and, you know, several things.  My interpretation is that was an effort to -- to convince me to stay.

Q.    So, in addition to a promotion, he also offered you more money, correct?

A.    That was part of the promotion offer.

Q.    Okay.  Other than the offer of a promotion and more money, what -- what else did Mr. Thiry say to try to convince you to stay with DaVita and not join SCA?

MR. BANK:  Objection.

THE WITNESS:  He talked about my long-term opportunity at DaVita, that I had the opportunity to -- to eventually become CEO, to take on more responsibility, to learn and grow and be mentored.

There was a range of things he talked about, but it was predominantly all the reasons why staying at DaVita would be very good for me and my career and my family.

BY MR. SAVERI:

Q.    And ultimately, you turned that down,

Andrew Patrick Hayek  Highly Confidential
September 18, 2024

correct?

A.    Yes.

Q.    And you did so, at least in part, because you thought the -- the -- the new opportunity was better for you and your career; is that right?

MR. BANK:  Objection.

THE WITNESS:  Yes.

BY MR. SAVERI:

Q.    And that included better or enhanced professional opportunities; is that correct?

A.    Yes.  Part of it was the opportunity for me to be a CEO.

Q.    And also, as we discussed, higher compensation, including base and -- and bonus and stock, correct?

A.    Yes, there was, I believe, a higher base.  I don't recall how much.

The new opportunity had a lot of risk to it, but, yes, compensation was a part of it.

Q.    And after you took that job, you subsequently received another job, correct?

A.    Can you --

MR. BANK:  Objection.

THE WITNESS:  -- clarify?

employees?

"A    Yes, we did."

Was that a -- was that testimony correct?

A.    Yes.  And as I referenced, when we recruited a DaVita executive, Mr. Thiry or someone else might reach out, as I shared with you, and -- and there'd be some similar attributes to the Mr. Rucker situation, but it varied person by person.

Q.    Well --

A.    And then, as -- as I also shared, in early 2012, a discussion around soliciting senior executives.

Q.    Do you recall testifying, a little bit farther down on page 473, lines 14 to 16:

"Q    And what did you discuss, if anything, with regard to solicitation and recruiting?"

Do you see where I'm reading -- reading from?

MR. BANK:  Objection.

THE WITNESS:  Yes, I do.

BY MR. SAVERI:

Q.    "Q    And what did you discuss, if

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

anything, with regard to solicitation and recruitment?

"A    We agreed not to solicit each other's senior executives."

Mr. Hayek, that testimony that you gave under oath was truthful when you gave it, correct?

A.    Yes.  And as I shared here, there's a further aspect to it.

Q.    Now, when did you and -- when did you and Mr. Thiry agree not to solicit each other's executives?

MR. BANK:  Objection.

THE WITNESS:  To clarify, in early 2012, we agreed not to solicit senior executives unless they were already looking at jobs, and then there were -- there was a further clarification, which we can talk about.

BY MR. SAVERI:

Q.    And when was that first agreement or understanding reached?

A.    I believe approximately January 2012.

Q.    Could you turn to the Exhibit 483, sir.  It's the -- it's the second -- it's the

U.S. Legal Support | www.uslegalsupport.com

Andrew Patrick Hayek  Highly Confidential
September 18, 2024

second trial testimony.

A.    Yes.

Q.    Would you turn to page 535.

Tell me when you're there.

A.    I'm on 535.

Q.    7 -- line 7:

"Q    And it's in 2012, around February, that you described entering into this agreement or understanding with Mr. Thiry about how solicitations would be conducted, right?

"A    Yes.  The agreement was approximately around January of 2012."

Was that testimony accurate and truthful?

MR. CAMPBELL:  Object to the form.

THE WITNESS:  Yes.

BY MR. SAVERI:

Q.    So, to the best of your recollection, the agreement began in approximately January of 2012?  I want to be as clear as I can be.

A.    That's the question?

Q.    Is that your understanding?

Yes.  Is that your understanding?

A.    Yes.

Q.    Great.  Now, at the time, that is, in

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

January of 2012, were you aware of any other agreements by SCA at this time not to solicit each other's senior executives?

MR. BANK:  Objection.

THE WITNESS:  To clarify, in January of 2012, was I aware of another agreement regarding solicitation of senior executives?

BY MR. SAVERI:

Q.    Yes.

A.    Yes.

Q.    And what agreement was that -- or, excuse me.  Which agreements were that -- were those?

A.    It was one.  And it was an agreement with Mr. Wilcox and a company called USPI.

Q.    Okay.  We'll -- we'll get back to that.

So just focusing on the SCA/DaVita piece of this, so was it your understanding that SCA was not allowed to directly solicit DaVita employees?  Is that correct?

MR. BANK:  Objection.

THE WITNESS:  A couple things to clarify.  First, it was regarding senior executives, which are about 1 percent of the

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

employees.

Second, you could solicit if that executive was already considering outside opportunities, and then it was -- there was a further aspect added subsequent to January 2012.

BY MR. SAVERI:

Q.    And was that understanding reciprocal, that is, that DaVita was not allowed to do the same things with respect to SCA's senior employees?

MR. BANK:  Objection.

MR. KLIEBARD:  Objection to form.

MR. CAMPBELL:  Foundation.

THE WITNESS:  I can speak to what I -- I knew or I expected.

BY MR. SAVERI:

Q.    Understood.  Sure.

A.    My view is that it was reciprocal.

Q.    Do you know what a quid pro quo is?

MR. BANK:  Objection.

THE WITNESS:  Yes, I think I have a general understanding.

BY MR. SAVERI:

Q.    Would you view this understanding,

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

this reciprocal relationship between the two companies, as a quid pro quo?

MR. BANK:  Objection.

THE WITNESS:  I don't recall using that term or thinking in that term.  My view of it was, as I shared, an agreement.

BY MR. SAVERI:

Q.    But it was a reciprocal agreement?

A.    Yes.

Q.    If they agreed to do something, you would agree to do something?

MR. CAMPBELL:  Objection.  Vague.

THE WITNESS:  I viewed it as we're each agreeing to something.

BY MR. SAVERI:

Q.    Okay.  Now, what was the "tell your boss" provision of the agreement between SCA and DaVita?

A.    I think you're referencing the aspect where a senior executive not only needed to be considering outside roles, but have shared that, and that was an idea or a -- a suggestion by Mr. Thiry.  And as I said, it was, not only is the senior executive looking at outside opportunities, but they had shared that they are

U.S. Legal Support | www.uslegalsupport.com

MR. BANK: Objection.

MR. KLIEBARD: Objection. Mischaracterizes.

THE WITNESS: Are you asking about, would there be more than one purposes, or are you asking about effects?

BY MR. SAVERI:

Q. I'm just trying to understand your answer.

I think you said or testified that the reducing -- the reduction of movement was one purpose, and then you added the phrase "among others," and I'm trying to understand what you meant by "among others."

A. Understood.

You had asked about intent or purposes.

Q. Yeah.

A. And the purposes began with a business relationship. And for DaVita, that was a very specific set of business opportunities and relationships different from USPI and Mr. Thiry.

Second, we talked about some threats and the avoidance of risk. And then, third, the reducing the likelihood or probability of losing

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

a senior executive.

So there are multiple purposes.

Q.    And when you say "reducing risk," was the reduction in the risk of those retaliatory or other actions that Mr. Thiry and Mr. Mello had -- had mentioned to you in some of the conversations that you had had or in e-mail communications that you had had previously?

MR. BANK:  Objection.

THE WITNESS:  Is your question, was one of the purposes to avoid the risks of some of what Kent had described?  So suing me or -- or reputational harm to SCA?

BY MR. SAVERI:

Q.    All -- all that -- all those things, yes, sir.

MR. CAMPBELL:  Object to the form.

THE WITNESS:  So can you just re-clarify the question just so I understand?

BY MR. SAVERI:

Q.    Well, let's move on.

Let me ask you a question, sir.  Was this agreement that we've been discussing between SCA and DaVita still in place when you

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

left in 2017 to become the CEO of Optum Health?

A.    I became the CEO of Optum Health
earlier in 2017.

Q.    Yes.

A.    And then I wore a couple hats.  I was
both the CEO of Optum Health and retained the
title and position of CEO of SCA through 2017,
and then transitioned to Mr. Kilgore I believe
in January of 2018.

Q.    Okay.  So let's just take those
points.

So when you first got the position at
Optum Health, was the agreement in place?

A.    Yes, I believe it continued into 2017.

Q.    And did it continue when Mr. Kilgore
succeeded you?

MR. BANK:  Objection.

THE WITNESS:  When I moved out of my
SCA role, it ceased to be something I
thought was in effect or relevant.  I had
moved on, and -- and there were other
transitions.

BY MR. SAVERI:

Q.    Okay.  Before you left and
transitioned, did you ever tell Mr. Thiry or did

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

you notify him, you know, in writing or in a communication, the agreement's over?

A.   As I shared, when I transitioned out of my role, it ceased to be something I thought was relevant or in place, and I did not have a specific communication terminating the agreement.

Q.   Did Mr. Kilgore, to the best of your knowledge, ever communicate to Mr. Thiry or anybody at DaVita that the agreement that we've been discussing was no longer in effect?

MR. CAMPBELL:  Objection.  Foundation.

THE WITNESS:  Can you reask that question?  It was -- I just want to make sure I'm tracking.

MR. SAVERI:  Read it back.

(Record read.)

THE WITNESS:  I don't have specific knowledge or recollection of Mr. Kilgore -- I'm not aware of Mr. Kilgore communicating something specific.

BY MR. SAVERI:

Q.   And was the agreement then in place from the time you formed it in 2012 through the time that you left SCA?

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

MR. BANK:  Objection.

BY MR. SAVERI:

Q.    To the best of your knowledge?

MR. BANK:  Objection.

MR. KLIEBARD:  Objection.  Vague.

THE WITNESS:  To the best of my knowledge, from the time we formed it through continuing into 2017, the agreement was in place.

MR. SAVERI:  Okay.  Thank you.

This is a good time to break.

MR. BANK:  Great.

VIDEOGRAPHER:  This ends media unit 3. Now going off the record at 12:48 p.m.

(Luncheon recess.)

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

AFTERNOON SESSION

VIDEOGRAPHER:  This begins media unit 4.  Now going back on the record at 1:34 p.m.

ANDREW PATRICK HAYEK, resumed and testified further as follows:

EXAMINATION BY (Cont'd.)

MR. SAVERI:

Q.    Good afternoon, Mr. Hayek.

A.    Good afternoon.

Q.    Before lunch, we were talking about some of the aspects of the agreements between -- or the understandings between SCA and DaVita.

First, let me ask you, when -- while you were the CEO of SCA, approximately how many employees worked at SCA?

A.    It depends on the timing or the stage.

Q.    Okay.  Could I give me a little bit more color, more detail to that?

A.    At the beginning, when I joined SCA in the early years, perhaps 6- or 7,000 teammates total.

Q.    When you -- when you say "teammates," what do you mean?

A.    Employees.

MR. BANK:  Objection.

MS. MOYE:  Object to the form.

MR. RUSSO:  Object to the form.

THE WITNESS:  The purposes for the agreement with USPI had a different business context and a different relationship that we had with USPI.  So that part was different.  And then a second part was reducing the likelihood or chance of losing a senior executive.

BY MR. SAVERI:

Q.   And the -- is it fair to say that the -- the risks that were to be avoided by the contract between USPI and SCA were generally the same as the risks to be avoided by the agreement between SCA and DaVita?

MR. BANK:  Objection.

MR. RUSSO:  Objection.  Vague.

MS. MOYE:  Objection to form.

MR. KLIEBARD:  Objection.  No foundation.

MR. BANK:  Objection.

MS. MOYE:  Mr. Saveri, I'm still having difficulty hearing you.

MR. SAVERI:  Okay.

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

THE WITNESS:  To clarify, I think you used the word "contract."  This was an agreement.

BY MR. SAVERI:

Q.    Okay.

A.    And again, as we discussed, an agreement not to solicit senior executives unless they are already considering roles and had shared with their supervisor such.

The business context with USPI was a tremendous amount of work we were doing collaboratively in Washington, D.C., quality reporting, advocacy, and that was what I was, you know, doing with Bill that was kind of foundation of the business relationship that grew.

Q.    Well, did the agreement between USPI and SCA reduce the cost of turnover?

MR. BANK:  Objection.

THE WITNESS:  I don't have any opinion about that.  I don't -- I don't -- I don't believe so.

BY MR. SAVERI:

Q.    Well, wait.  Which is it?  Do you have no opinion, or do you think it did not have that

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

effect?

MR. BANK:  Objection.

THE WITNESS:  You asked me if --

Actually, if you could read it back.

BY MR. SAVERI:

Q.   Well, let me start again.

Did -- did the purpose -- did the agreement between SCA and USPI have the purpose or effect of reducing the cost of turnover?

MR. BANK:  Objection.

MS. MOYE:  Object to the form.

THE WITNESS:  Can you clarify?  Are you asking about the purpose?  Are you asking about effect?  Are you asking about the senior executives?  Are you asking about all employees?

BY MR. SAVERI:

Q.   No, I'm not talking about all employees.

You didn't have an agreement about all employees, did you?

A.   Correct.  The agreement was about senior executives.

Q.   Okay.  So I'm talking about that agreement or understanding, sir.  Okay?

generally described it as I've been sharing it here with you, a non-solicitation agreement regarding senior executives, unless they were already looking and had shared with their supervisor they were already considering outside roles.

BY MR. SAVERI:

Q.    Now, let me read something to you.

████████████████████████████████████

████████████████████████████

█████████████████████████████████████

██████████████████████████████████████

████████████████████████████ ."

                        █████████████████████████████

MR. BANK:  Objection.  I object to the use of the document with the witness in this fashion.

MR. CAMPBELL:  Objection.  Foundation.

THE WITNESS:  Could you restate the question?

MR. SAVERI:  Could you read it back, please?

(Record read.)

MR. CAMPBELL:  Objection.  Foundation.

MR. BANK:  Same objections.

BY MR. SAVERI:

Q. Go ahead.

A. ████████████████████████████
████████████████████████ █
████████████████████████████████
████████████████████████
████████████████████████████████
████████████

I can tell you what I recall, and what I recall is what I told you earlier: That I referred to them as non-solicitation agreements. And again, they applied to senior executives, unless that senior executive was already considering outside roles and had shared such with their supervisor. So consistent with what I've been telling you today.

Q. And again, the fact that they weren't reduced to writing as a -- like a formal agreement, from your perspective, didn't detract from whether they would be enforceable or followed by any of the companies involved?

MR. BANK: Objection.

THE WITNESS: From my perspective, I considered it an agreement with DaVita, and I considered it an agreement with USPI, and

I sought to follow it.

And, you know, as I shared earlier, when I moved on from my role at -- at SCA, I was no longer CEO, neither of the two agreements did I assume were in place or effective or relevant. And so, you know, I just -- the agreements each started and then, you know, they had -- as I shared with you earlier, they ended effectively when I was outside of my role.

BY MR. SAVERI:

Q. Well --

A. When I left my role.

Q. When you left your role, you -- you had nothing more to do with the agreements, is that fair?

A. From my perspective, I moved on from my role, and they were no longer relevant, you know, effective, in place. I moved on. Things changed at DaVita. Things changed at USPI.

So, from my perspective, I had moved on, and they weren't relevant after I left my role.

Q. Okay. But, for example, you don't -- do you know as you sit here today whether your

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

successors, right, whether your successor in the CEO position followed the agreements or not?

A.   As I shared with you earlier, I don't recall any specific conversation with Mr. Kilgore about either agreement, and in my mind, they ceased to be relevant or, you know, in place or -- or, you know, in effect once I had left my role.

Q.   Now, putting aside your experience at SCA, have you ever worked with a company that had similar agreements with any of their competitors?

MR. BANK:  Objection.

THE WITNESS:  Is your question whether I'm aware of or have been a part of a company that had an agreement similar to the agreement I had with DaVita or the agreement I had with USPI?

BY MR. SAVERI:

Q.   Yeah.

A.   No.

Q.   How about currently, do you have any -- a similar agreement with any company?

MR. BANK:  Objection.

THE WITNESS:  No.

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

BY MR. SAVERI:

Q.    Okay, Mr. Hayek.

MR. ZIRPOLI:  This is Tab 14.

CONCIERGE:  Thank you, counsel.

BY MR. SAVERI:

Q.    Now, I have handed you a document which has been previously marked as Exhibit 159 that has the Bates numbers DOJ-PROD001B-00152893.  It's the one in the upper right-hand corner.  And it goes on through the last page that ends in, looks like, 908.

Do you have that in front of you, sir?

A.    Yes, I have the starting number, and then there is an attachment to it.

Q.    So let me ask you, first:  Did -- while Bridie Fanning was the CTO at SCA, did she create a list of companies that recruiters could or could not reach out to for candidates?

MR. BANK:  Objection.

THE WITNESS:  What I recall is she created -- well, I would say compiled a list --

BY MR. SAVERI:

Q.    Fair enough.

A.    -- of types of companies or example

Do you have that in front of you, sir?

A.   Yes.

Q.   And again, this is a document that was produced by USPI.  The SCA production never included this.

MR. BANK:  Objection.

BY MR. SAVERI:

Q.   This is the only copy of it we have.

Now, Mr. Mathis writes on August 19, 2014 to Mr. Cagle again.  "Are you all willing to swap wage increase budgets as we have in the past?"

Do you see that?

A.   Yes.

Q.   And then Mr. Cagle writes, "sure. We're just heading into budgets.  When were you hoping to see it?  I may be a few weeks out."

Do you see that?

A.   Yes, I -- that's Mr. Cagle's response.

Q.   Yeah, and does that refresh your recollection that, in fact, in 2014, SCA and USPI were exchanging wage increase information for the coming year?

MR. BANK:  Objection.

THE WITNESS:  I see this e-mail, but

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

it doesn't refresh my recollection.

MR. SAVERI:  Okay.  Let's go off the record.

VIDEOGRAPHER:  Now going off the record at 5:13 p.m.  This ends media unit 6.

(Recess.)

VIDEOGRAPHER:  This begins media unit 7.  Now going back on the record at 5:35.

BY MR. SAVERI:

Q.    Mr. Hayek, I'm handing you a document which I marked as Exhibit 490.

(Exhibit PX 490, E-mail Bates-stamped HAYEK-000012214 through 216, with attachment, marked for identification as of this date.)

BY MR. SAVERI:

Q.    And do you remember that speech I gave you about metadata, vaguely?

A.    Yes.

Q.    Okay.  If you turn to the back of this document, there's more metadata which shows where it's from and the type of the document.

So let me do it this way:  First, this document has the Bates number HAYEK-00012214 through 216.

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

So, Mr. Hayek, will you take a moment to review the document, and my first is going to be, do you recognize it?

A.   Yes.

Q.   Do you recognize this document, sir?

A.   Yes.

Q.   What is it?

A.   Meaning what are the contents or what's it about?

Q.   Well, fair enough.

Did you prepare the document?

MR. BANK:  Objection.

THE WITNESS:  Yes, I believe I created and, in some cases, copied and pasted information, but kind of compiled or wrote.

BY MR. SAVERI:

Q.   Okay.  Could you just tell me generally what information this is and where you compiled it from, please?

A.   This is information about general average wage growth or wage increase, again, across pools -- broad pools of employees at six different companies.  That's how I would describe it.

Q.   Okay.  And at the top of this -- the

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

first page, there's a section under the word

"KKR."

Do you see that?

A.    Yes, I see the "KKR."

Q.    Okay.  This -- just in terms of dates, do you see that this -- the -- the -- it looks like an e-mail from someone named Scott Wagner to yourself that's dated July 6, 2009?

A.    Yes.

Q.    Is -- does that refresh your recollection about generally when this -- when you compiled this document?

A.    I believe it was around this time frame in the -- 2009.

Q.    Okay.  Great.  And did you -- was Mr. Wagner someone with whom you worked when you were at KKR?

A.    Yes.

Q.    Okay.  And -- and so he provides some information to you regarding some of the companies in the KKR portfolio, correct?

A.    Yes, he provides that kind of average information or median that I referenced.

Q.    Okay.  And he says, "Have anything between 0 and 3 percent, depending on the

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

company's situation.  Median would be approximately 2 percent," correct?

A.   Yes, I see that.

Q.   Okay.  And then -- so this information is information that -- at least this part was provided by Mr. Wagner to you, from information that he received from some of the KKR portfolio companies; is that correct?

A.   I don't know how he received it or compiled it.  I -- I know what he wrote to me.

Q.   Okay.  And there's another section entitled "DaVita."

Do you see that?

A.   Yes.

Q.   Did you get that yourself from Mr. Thiry?

MR. BANK:  Objection.

THE WITNESS:  No.  My recollection is that I spoke with Mr. Rodriguez.

BY MR. SAVERI:

Q.   Javier Rodriguez, the gentleman we've referred to a couple of times throughout the day?

A.   Yes.

Q.   And he was the COO at the -- at the

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

time at DaVita; is that correct?

A.   No, I don't believe so.

Q.   Okay.  But is it fair to say he was a top executive at DaVita at the time?

A.   Yes.

Q.   Okay.  And he indicates that the -- for non-field, they got zero increase this cycle, do you see that?

A.   Yes.  So that would be executives, corporate office, non-field.

Q.   Okay.  And the field got an average of 1.5 percent, correct?

A.   That's what I believe he relayed to me, and I captured in notes.

Q.   Okay.  And he also indicates what they budgeted for the -- for the -- for the year, the 2.2 percent wage increase.

Do you see that?  It's the last line.

A.   I -- yes, I see that.  I'm reading it.

Yeah, it appears to be the budget for 2009, which would have been created in the prior year.  And again, I'm kind of processing this reading it with you.

Q.   Okay.  Fair enough.

And the next section is "TPG."

Andrew Patrick Hayek   Highly Confidential
September 18, 2024

That's, again, the company that, at least, I guess, at this time was a -- the largest shareholder in SCA; is that correct?

A.    Yes, it's a private equity firm, and SCA is a portfolio company of TPG.

Q.    So is it fair to say that at this time both KKR and TPG were able to get information like this across their portfolio companies?

MR. BANK:  Objection.

THE WITNESS:  I don't know how they compiled it.  I know what was shared with me.

BY MR. SAVERI:

Q.    Okay.  Fair enough.

And then the next section below that is "USPI," do you see that?

A.    Yes.

Q.    And did you obtain that information yourself?

MR. BANK:  Objection.

BY MR. SAVERI:

Q.    I draw your attention to the third paragraph that says, "Field raises are driven by divisional leaders."

Do you see where I'm reading from,

CERTIFICATE

I, Kathy S. Klepfer, a Registered Merit Reporter and Certified Shorthand Reporter within and for the State of Illinois, do hereby certify:

That ANDREW PATRICK HAYEK, the witness whose deposition is herein before set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

In witness whereof, I have hereunto set my hand this 19th day of September 2024.

---------------------------------
KATHY S. KLEPFER, RPR, RMR, CRR, CLR

Andrew Patrick Hayek    Highly Confidential
September 18, 2024

NAME OF CASE:  In re Outpatient

DATE OF DEPOSITION:  September 18, 2024

NAME OF WITNESS:  Andrew Patrick Hayek

Reason Codes:

    1.  To clarify the record.
    2.  To conform to the facts.
    3.  To correct transcription errors.

Page _____ Line _____ Reason _____  | See attached chart for corrections
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

_____
ANDREW PATRICK HAYEK

Errata for Deposition of Andrew Patrick Hayek
*In re Outpatient Medical Center Antitrust Litigation*
September 18, 2024

| Transcript Page | Description of Correction | Reason for Correction |
|---|---|---|
| Page 4, line 10 | Add address for Wilson Sonsini Goodrich & Rosati's San Francisco office (One Market Plaza, Spear Tower, Suite 3300, San Francisco, CA 94105) and move the entry of appearance for Karen Sharp, Esq. from under the DC office address to under the San Francisco office address | Transcription error |
| Page 12, lines 6-7 | Change "I retained the Optum CEO role" to "I retained the SCA CEO role" | To clarify the record |
| Page 12, line 21 | Change "although did not use it" to "although I did not use it" | Transcription error |
| Page 13, line 17 | Change "have you report" to "have you, report" | Transcription error |
| Page 14, lines 20-21 | Change "This is 20 years ago" to "That was 20 years ago" | Transcription error |
| Page 28, line 10 | Change "I want to make sure if that's correct" to "I want to make sure that it's correct" | Transcription error |
| Page 28, lines 19-20 | Change "I don't recall the dates and the month. I recall April 2022" to "I don't recall the dates. And the month – I recall April 2022" | Transcription error |
| Page 29, line 12 | Change "and the totality, yes" to "so the totality, yes" | To clarify the record |
| Page 34, line 23 | Change "was – well, yes" to "was with cash" | Transcription error |
| Page 35, line 1 | Change "█████" to "████" | To conform the record to the facts |
| Page 37, line 14 | Change "2010 or '11" to "approximately 2014 or 2015" | To conform the record to the facts |
| Page 39, line 14 | Change "to mine" to "to me" | Transcription error |
| Page 42, lines 15-16 | Change "I did work at KKR. That was 2001 to 2003" to "I did work at KKR, but that was 2001 to 2003" | To clarify the record |
| Page 49, line 8 | Change "meaning through this interaction" to "meaning throughout this interaction" | Transcription error |
| Page 49, line 24 through page 50, line 2 | Change "I think the first interaction would have been in a meeting context with DOJ and FBI, someone was present, but that's my best recollection" to "I think the first interaction would have been in a meeting context with DOJ, and someone from the FBI was present, but that's my best recollection" | To clarify the record |
| Page 53, lines 13-14 | Change "as what I'm doing here today" to "as is what I'm doing here today" | Transcription error |
| Page 53, line 20 | Change "Of a similar answer" to "I'd give a similar answer" | Transcription error |

| Page 55, line 25 | Change "I recall the 'Jackson' and a jury" to "I recall the name 'Jackson' and a jury" | Transcription error |
|---|---|---|
| Page 79, line 10 | Change "Regarding my leaving SCA, right?" to "Regarding my leaving DaVita, right?" | To clarify the record |
| Page 80, lines 1-2 | Change "actually came before I shared that I was leaving SCA." to "actually came before I shared that I was leaving DaVita." | To clarify the record |
| Page 82, lines 2-6 | Change "My interpretation was the promotion. And there are other parts to it. It was compensation and role and, you know, several things. My interpretation is that was an effort to – to convince me to stay." to "My interpretation was the promotion – and there are other parts to it – it was compensation and role and, you know, several things – my interpretation is that it was an effort to convince me to stay." | Transcription error |
| Page 85, lines 19-21 | Change "It's hard to know I would have had a different set of opportunities" to "It's hard to know. I would have had a different set of opportunities." | Transcription error |
| Page 89, lines 3-4 | Change "I remember there being a bit of a time" to "I remember there being a bit of time" | Transcription error |
| Page 95, line 22 | Change "For the deposition" to "For the exhibit tech" | Transcription error |
| Page 125, lines 4-6 | Change "With respect to going to SCA, I had thought it was private, and learned that it was behind my back" to "With respect to going to SCA, I had thought it was private, and learned that it wasn't behind by back" | To clarify the record |
| Page 127, lines 19-21 | Change "There can be circumstances that when the solicitation in a number of – of situations, yes" to "There can be circumstances with non-solicitations in a number of situations, yes" | Transcription error and to clarify the record |
| Page 136, line 13 | Change "asking to withdraw the offer because that" to "asking to withdraw the offer and that" | To clarify the record |
| Page 176, lines 9-10 | Change "I heard that too" to "I heard ten too" | Transcription error |
| Page 185, line 10 | Change "One of the effects is to" to "One of the purposes is to" | To clarify the record |
| Page 185, lines 16-17 | Change "It – one of the effects was to" to "It – one of the purposes was to" | To clarify the record |
| Page 188, line 22 | Change "different from USPI and Mr. Thiry" to "different from USPI and Mr. Wilcox" | To clarify the record |
| Page 229, lines 2-3 | Change "between ourselves and USPI" to "between SCA and USPI" | To clarify the record |
| Page 235, lines 21-22 | Change "one at a time. The purpose, as I shared" to "one at a time. [line break] A. The purpose, as I shared" | Transcription error |
| Page 236, lines 12-15 | Change "So that was the – I can – that was the business context. And then, secondly, you know, the agreement reduced the likelihood of losing senior executives." to "So that was the business context. And then, second, you know, | To clarify the record |

| | the agreement was intended to reduce the likelihood of losing senior executives." | |
|---|---|---|
| Page 239, line 22 | Change "considering outside students" to "considering outside opportunities" | Transcription error |
| Page 253, line 5 | Change "I know that" to "I knew that" | Transcription error |
| Page 255, lines 23-24 | Change "I believe how I use the word 'we do.'" To "I know how I use the words 'we do.'" | To clarify the record |
| Page 258, line 4 | Change "Mr. Thiry and USPI" to "Mr. Thiry and DaVita" | To clarify the record |
| Page 284, line 5 | Change "not soliciting them at DaVita" to "not soliciting them from DaVita" | To clarify the record |
| Page 294, line 25 | Change "promoted into chief operating" to "promoted to chief operating" | Transcription error |
| Page 297, lines 14-15 | Change "everyone knew at director above" to "everyone knew at director and above" | Transcription error |
| Page 311, line 11 | Change "I never recall her" to "I do not recall her" | To clarify the record |
| Page 329, line 1 | Change "I sought to follow it" to "I sought to follow them" | To clarify the record |
| Page 347, line 24 through page 348, line 4 | Change "To clarify – and I think you're saying the same thing – a very minor subset of all the information that you have and information that you use, including with outside parties in the ordinary course of information, is not public" to "To clarify – and I think we're saying the same thing – a very minor subset of all the information that you have and information that you use, including with outside parties in the ordinary course of business, is not public" | To clarify the record |

# ZIELINSKI EXHIBIT 32 (FILED UNDER SEAL)

UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE OUTPATIENT MEDICAL )
CENTER EMPLOYEE ANTITRUST ) Master Docket No.
LITIGATION ) 1:21-cv-00305
)
)
_____ )
)
THIS DOCUMENT RELATES TO: )
)
ALL ACTIONS )
)

-------------------------------------

REMOTE/ ORAL/ VIDEOTAPED/ REALTIME DEPOSITION OF

ANDREW JOHNSTON

SEPTEMBER 6, 2024

RESTRICTED - CONFIDENTIAL

-------------------------------------

REMOTE/ ORAL/ VIDEOTAPED/ REALTIME DEPOSITION OF

ANDREW JOHNSTON, produced as a witness at the instance

of the Plaintiffs and duly sworn, was taken in the

above-styled and numbered cause on September 6, 2024,

from 9:08 a.m. to 11:58 a.m. Central Time, before

Christy Cortopassi, CSR in and for the State of Texas,

reported by machine shorthand remotely via Zoom

videoconference, pursuant to the Federal Rules of Civil

Procedure and any provisions stated on the record

herein.

individually for Mr. Johnston for purposes of this deposition.  I also have Lauren Smith from King & Spalding as well, virtually.

MR. TALBOT:  Good morning.  Andrew Talbot from McGuire Woods on behalf of SCA defendants.

MR. SMITH:  K&L Gates on behalf of defendant Andrew Hayek.

(Simultaneous crosstalk.)

MR. SHAPIRO:  Go ahead, Reese.

MS. PONCIA:  Thanks, Nathan.  This is Reese Poncia from McDermott Will & Emery on behalf of Kent Thiry.

MR. SHAPIRO:  Good morning.  Nathan Shapiro from Morgan Lewis & Bockius on behalf of defendant DaVita.

THE VIDEOGRAPHER:  Will the court reporter swear in the witness.

THE COURT REPORTER:  This is Christy Cortopassi, CSR Number 6222.  I am taking this by stenographic means.

ANDREW JOHNSTON,
having been first duly sworn, testified as follows:

EXAMINATION
BY MR. ROSS:

Q.  Good morning, Mr. Johnston.  Thank you for

coming in.  I wonder if you would just state your full name and home address for the record.

A.  Yes.  It's Andrew Hartman Johnston, home address ▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

Q.  Are you represented by counsel here today?

A.  Yes, I am.

Q.  And who is representing you?

A.  I have Emily Newton and Lauren Smith from King & Spalding.

Q.  And are you paying your lawyers today?

A.  No, I am not.

Q.  Do you know who is paying them?

A.  USPI and/or Tenet, I believe is paying them.

Q.  Have you ever been deposed before?

A.  Yes, I have.

Q.  How many times?

A.  Once, that I recall.

Q.  And what was that case about?

A.  It was a case where a group of physicians had been bought out of a surgery center and were suing USPI related to that buyout.

Q.  So you were testifying on behalf of USPI, I gather?

A.  I was at the time, yes.  That's right.

Q.  And generally, what was the subject matter of

Andrew Johnston    Confidential
September 06, 2024

And allegedly, you know, had some impact on reimbursement -- or I'm sorry, compensation of executives across the companies.

Q.   And when you say that -- you said that they were limited professionally, what did you mean by that?

MS. NEWTON:  Objection to form.

A.   Essentially that there were non-solicit agreements in place between the companies that would limit or would prevent the companies from employing executives or leaders from -- not employing but soliciting leaders from the other companies.

Q.   (BY MR. ROSS)  And when you say leaders, what do you mean by leaders?

A.   Administrators, regional vice presidents.

Q.   So administrators.  Were you aware that USPI had those types of agreements with companies?

A.   I became aware of those arrangements.

Q.   Did you object when you became aware of them?

MS. NEWTON:  Objection to form.

A.   Did I object to the fact that they existed, is that the question?

Q.   (BY MR. ROSS)  Yes.  Did you object to that or did you say, hey, maybe we shouldn't be entering into these agreements?

MS. NEWTON:  Objection to form.

Andrew Johnston   Confidential
September 06, 2024

A.  I don't recall making that sort of objection.

Q.  (BY MR. ROSS)  Do you recall who you first learned about these agreements from?

MS. NEWTON:  Objection to form.

A.  My recollection of these agreements, of -- my first understanding of them was related to a candidate that we were trying to hire for a position in, I believe it was Terre Haute, Indiana.

Q.  (BY MR. ROSS)  And who was that candidate?

A.  Her name was Pat Jepson.

Q.  And did you end up hiring Pat Jepson?

A.  We did not.

Q.  Because of the agreement not to?

MS. NEWTON:  Objection to form.

A.  I don't believe that was the reason we didn't hire Pat.  Pat reached out to us about the opportunity.  So it was not really a solicitation of Pat because she reached out to us.  I believe that would have fallen outside of the agreement.  And there were other reasons that she chose not to come work for us.

Q.  (BY MR. ROSS)  Okay.  So going back to the subpoena, when you reviewed the subpoena did you notice that there were a number of document requests attached to it for you to review your personal documents to see if you had anything responsive to the request; is that

Andrew Johnston  Confidential
September 06, 2024

correct?

A.  Yes.  Yes, I did.

Q.  What did you do to search for documents?

A.  I looked at my email records, personal email records, on my desktop at home.  I have looked at any documents that I had in my files at home.

Q.  And did you find any responsive documents?

A.  No.

Q.  What types of files did you have at home that you searched through?

A.  Most of what I have at home is personal records, employment agreements, equity agreements, that sort of thing.

Q.  Employment agreements with USPI?

A.  Correct.

MR. ROSS:  Well, to the extent that those employment agreements have not already been produced by USPI, I would request that they be produced.

Q.  (BY MR. ROSS)  Did you also search your smartphone?

MS. NEWTON:  And hold on just a second. Let me state, well, we do not believe that those are responsive.  They are outside of the time period in this case, which I believe the document cutoff is January 2019.  But we'll take that request under

Andrew Johnston   Confidential
September 06, 2024

MS. NEWTON:  Objection to form.

A.  Yeah, my hiring and my role.

Q.  (BY MR. ROSS)  And who was the president and CEO of USPI at this time?

A.  Saum Sutaria was the CEO of USPI.

Q.  And when did Brett Brodnax leave USPI?

A.  Brett was in a temporary role, ongoing temporary role, when I was there.  And since I left I don't know.

Q.  During your time at USPI, did you receive any type of antitrust training?

A.  Not that I recall.

Q.  Anything -- type of compliance training?

A.  We had the annual compliance training.

Q.  And what was entailed in the annual compliance training?

MS. NEWTON:  I would just like to caution the witness that to the extent this training came from lawyers, I would caution you not to reveal the contents of those conditions.  But if you can answer it without revealing that then you may.

A.  The compliance training was fairly general. But focused on, you know, physician of Stark law anti-kickback law, physician and referral relationships, that sort of thing.

Andrew Johnston  Confidential
September 06, 2024

Q.  (BY MR. ROSS)  Was there any compliance training about hiring or employment issues?

MS. NEWTON:  Objection to form.

A.  I don't recall.

Q.  (BY MR. ROSS)  Did you receive any training about discrimination in hiring, that type of thing?

MS. NEWTON:  Objection to form.

A.  I don't know.

MR. ROSS:  Why don't we take a two-minute break, five-minute break and we'll move on to some other topics.  If that's okay?

MS. NEWTON:  Okay.

THE VIDEOGRAPHER:  We are going off the record, the time is 15:06 UTC.

(Break taken from 10:06 a.m. to 10:18 a.m.)

THE VIDEOGRAPHER:  We are going back on the record.  The time is 15:19 UTC.

Q.  (BY MR. ROSS)  Okay.  Welcome back, Mr. Johnston.

A.  Thank you.

Q.  I want to switch gears now to the compensation process at USPI, during your time there in senior positions in operations.  Was there a labor budget for managers and above that was set once a year as part of a company policy process?

Andrew Johnston   Confidential
September 06, 2024

MS. NEWTON:  Objection to form.

A.  I'm not sure I would describe it exactly that way.  There were budgets for increases each year, or targets for increases.

Q.  (BY MR. ROSS)  And how would those targets get set?

A.  Typically, the CFO would communicate targets out to the field.  I wasn't involved in setting them.  I received them.  I was not a setter.

Q.  Do you know who was involved in setting the targets?

A.  I know I received them typically from the CFO.

Q.  Do you know if Bill Wilcox had input into the labor budget?

A.  As the president of the company, I suspect he did.  But I wasn't involved in that process.

Q.  What was your involvement in the setting of the labor budget for the year?

A.  I wasn't involved in setting the labor targets, as I have described, for increases.

Q.  Well, okay.  So what would you do once you received the targets?

A.  Yeah.  The process that I'm talking about is the annual increase process, essentially, where we gave increases to the leaders in the field based on various

Andrew Johnston   Confidential
September 06, 2024

factors.  And the overall increases, you know, we tried to make consistent with a target that had, you know, come from the CFO.

Q.  So you were given a percentage increase as a target and then you tried to fit in your salary increases within that percentage increase, correct?

(Simultaneous crosstalk.)

MS. NEWTON:  Objection to form.

A.  Sorry.  That's correct.

Q.  (BY MR. ROSS)  And who would actually -- who would approve your recommendation?

MS. NEWTON:  Objection to form.

A.  It depends on the role that I was in and the role that was being considered.  But for the senior most roles that reported to me, I would make recommendations and submit those to the CFO, chief people officer, for approval.

Q.  (BY MR. ROSS)  And was there a pay structure at USPI?

A.  I'm not sure what you mean by pay structure.

Q.  Well, did USPI or did you in setting your salary recommendations, consider internal equity issues?

MS. NEWTON:  Objection to form.

A.  We looked at pay across like-positions at the company so that we knew who was on the high end and who

was on the low end and that would be a factor in our decisions on increases.

Q.  (BY MR. ROSS)  And were there any external factors that were considered?

MS. NEWTON:  Objection to form.

A.  Externally, from time to time we might have market data on different positions.  Or we would have anecdotal external information that we had received from interviews or, you know, people that we had hired and what rates we might have to pay to attract them.

Q.  (BY MR. ROSS)  And would you consider new hires as opposed to current employees in setting pay?

MS. NEWTON:  Objection to form.

A.  I'm not sure I understand your question.

Q.  (BY MR. ROSS)  Well, would -- in offering a new hire a salary, would you consider how that would fit into the structure of your current employees?

MS. NEWTON:  Objection to form.

A.  When we hired people in from the outside we obviously had to make an offer that they would accept, so that was a part of the process thinking.  And we would also make sure we understood where that offer fit relative to the internal ranges at the company.

Q.  (BY MR. ROSS)  And would the new hire salaries need to be approved by anybody above you?

stamp number USPI CIV 58068. And do you recognize this as a series of emails from the ordinary course of business at USPI?

A. Yes.

Q. Okay. So in the -- going up the chain from the bottom up, in the first email Niels Vernegaard notes to you that -- he asks you to get back with recommendations for salary increases and they need to be limited to two percent. So here it is not so much a target as a cap; isn't that correct?

MS. NEWTON: Objection to form.

A. I would call that a target. You can call it a cap but --

Q. (BY MR. ROSS) Would you work it to try to keep it limited to the two percent?

MS. NEWTON: Objection to form.

A. Yes. We tried to make recommendations that were consistent with this request.

Q. (BY MR. ROSS) Okay. And in the next sentence Mr. Vernegaard says, "As Bill needs to approve any final changes please don't set any expectations with anyone."

The Bill is Bill Wilcox; is that correct?

A. That's correct.

Q. So Bill would need to approve any final changes, including any that would go above the two

percent, correct?

MS. NEWTON:  Objection to form.

A.   This reads that Bill would need to approve any final changes.

Q.   (BY MR. ROSS)  Well, is that your understanding at the time?

MS. NEWTON:  Objection to form.

A.   I'm sure when I received this email in 2014 I understood what was written.

Q.   (BY MR. ROSS)  Well, if you had set a salary above the two percent, did you think it would go into effect without Bill's approval?

MS. NEWTON:  Objection to form.

A.   No.  I always felt like there were exceptions that could be made and those needed to be obviously requested and validated, justified.  And they would be considered.

Q.   (BY MR. ROSS)  Yes.  Certainly, but they would only go into effect if Bill approved, correct?

A.   Correct.

Q.   Now in the top email, which is from you to Cindy English and CC'g Sandi Karrmann and Niels Vernegaard.  Who was Cindy English at this time?

A.   Cindy was in our payroll group.

Q.   Now in the email you say to Niels and Sandi, "I

Andrew Johnston   Confidential
September 06, 2024

would like to find a way to increase Marcy, Vanessa, and Alex.  Marcy is ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ in my opinion and we could lose her."

During this time period did you find, generally, that USPI's employees were under market?

MS. NEWTON:  Objection to form.

A.   No.

Q.   (BY MR. ROSS)  You did feel that Marcy was at this time, correct?

A.   Yes.

Q.   And what was Marcy's position?

A.   She was a regional vice president.

Q.   And then you also go on in this email to say that the OrthoLink practices are hiring administrators that make more than Alex.  And who was Alex?

A.   Alex Bateman was a regional vice president for us.

Q.   So OrthoLink was certainly paying more than USPI at this point, correct?

MS. NEWTON:  Objection to form.

A.   No.  That's not exactly true.  The practices were hiring administrators that make more than Alex, not OrthoLink.

Q.   (BY MR. ROSS)  And Alex was an RVP at this point, right?  He was above administrators; is that

Andrew Johnston  Confidential
September 06, 2024

salaries of administrators as against each other, as well as external factors in determining what their salary should be?

MS. NEWTON:  Objection to form.

A.  This email chain appears to be specific to how to address those employees who are at the top of the range and what sort of increases or bonuses to provide to those employees.

Q.  (BY MR. ROSS)  And part of the process is to give them, employees that are at the top of the range, to give them smaller increases to keep them within a range of other administrators, correct?

MS. NEWTON:  Objection to form.

A.  The -- yeah, the thought process here is if they're at the top of the range we would give them smaller percentage increases, which might actually be larger dollar increases but would grow their earnings at a lower percentage rate, their base salaries at a lower percentage rate than the rest of the administrators in the region or market.

Q.  (BY MR. ROSS)  And what would -- what's the purpose behind that?

A.  Several purposes.  One to control the growth. If you provide smaller percentages to those that are at the top of the range then you can provide larger

percentages to others and still fit within the overall targeted percentage increase.  That would be one benefit.

And then the other benefit would be to, you know, just keep from paying them more than market where they're already at or above market.

Q.  Now in the top email you make a mention of pay scales and you say that -- well, first of all, what do you mean by pay scales?

A.  I believe what I meant here by pay scales is a specific documented scale for, you know, where an administrator position or any position would fall in a specific market.

Q.  You say that USPI doesn't have specific pay scales for administrators; is that correct at the time?

A.  Yes.  That's correct.

Q.  But you did, in setting salaries for your administrators, you did keep in mind their salaries against each other that would be within a range, correct?

MS. NEWTON:  Objection to form.

A.  Yes.  That was the information we had, was the range of salaries that we were paying to current administrators in the position.

Q.  (BY MR. ROSS)  Okay.

Andrew Johnston  Confidential
September 06, 2024

MR. ROSS: Why don't we just take another five-minute break and come back and then we'll continue on.

THE VIDEOGRAPHER: We are going off the record. The time is 15:48 UTC.

(Break from 10:48 a.m. to 11:01 a.m. CDT)

THE VIDEOGRAPHER: We are going back on the record. The time is 16:01 UTC.

Q. (BY MR. ROSS) And welcome back, Mr. Johnston.

MR. ROSS: If we could pull up tab six.

THE VIDEOGRAPHER: One minute.

MR. ROSS: I believe this is Exhibit PX 457; is that right?

THE VIDEOGRAPHER: Correct.

(Exhibit PX 457 marked.)

Q. (BY MR. ROSS) And this document is some emails from February of 2016 bearing Bates stamp number USPI CIV 11955.

A. Okay.

Q. Okay. So first, do you recognize this as a series of emails that were exchanged in the ordinary course of business at USPI in February 2016?

A. Yes.

Q. Now going from the bottom up, it starts with an email from you to Rob Finnegan and Shannon Mosley with

I, ANDREW JOHNSTON, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_____
ANDREW JOHNSTON

__X__ No changes made _____ Amendment sheet(s) attached

IN RE OUTPATIENT MEDICAL CENTER EMPLOYEE ANTITRUST LITIGATION

_____

THIS DOCUMENT RELATES TO:

ALL ACTIONS

JOB NO.  6677464

Andrew Johnston   Confidential
September 06, 2024

UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE OUTPATIENT MEDICAL          )
CENTER EMPLOYEE ANTITRUST         ) Master Docket No.
LITIGATION                        ) 1:21-cv-00305
                                  )
_____   )
                                  )
THIS DOCUMENT RELATES TO:         )
                                  )
ALL ACTIONS                       )

REPORTER'S CERTIFICATION
DEPOSITION OF ANDREW JOHNSTON
SEPTEMBER 6, 2024

I, Christy Cortopassi, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, ANDREW JOHNSTON, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on _____ to the witness or to the attorney for the witness for examination, signature and return to me by _____;

That the amount of time used by each party at the deposition is as follows:

Mr. Jonathan Ross...............01:24
Ms. Marisa E. Poncia............00:00
Mr. Nathan T. Shapiro...........00:00
Ms. Emily Newton................00:03
Mr. Brian J. Smith..............00:00

Andrew Johnston    Confidential
September 06, 2024

Mr. Andrew E. Talbot............00:00

I further certify that pursuant to FRCP No. 30(f)(i) that the signature of the deponent:

__X__ was requested by the deponent or a party before the completion of the deposition and that the signature is to be returned within 30 days from date of receipt of the transcript.  If returned, the attached Changes and Signature Page contains any changes and the reasons therefor;

_____ was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this 10th day of September, 2024.

Christy Cortopassi, Texas CSR 6222
Expiration Date: 10/31/2026

Firm Registration No. 343
U.S. LEGAL SUPPORT, INC.
8144 Walnut Hill, Suite 350
Dallas, Texas  75231
214.741.6001

# ZIELINSKI EXHIBIT 33 (FILED UNDER SEAL)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

--o0o--

IN RE OUTPATIENT MEDICAL CENTER   ) No. 1:21-cv-00305
EMPLOYEE ANTITRUST LITIGATION     )
_____ )
                                  )

CONFIDENTIAL

_____

VIDEO DEPOSITION OF

SANDI KARRMANN

August 14, 2024

_____

DEPOSITION OF SANDI KARRMANN, produced as a witness, duly sworn by me via videoconference at the instance of the PLAINTIFFS, was taken in the above-styled and numbered cause on August 14, 2024, from 9:12 A.M. to 11:49 A.M., before BRANDON D. COMBS, CSR, RPR, in and for the State of Texas, reported by computerized machine shorthand via videoconference.

Sandi Karrmann  Confidential
August 14, 2024

THE VIDEOGRAPHER:  Good morning.  We're going on the record at 14:12 UTC on Wednesday, August 14, 2024.

Audio and video recording will continue to take place until all parties agree to go off the record.  Please note that microphones are sensitive and may pick up whispering and private conversations.

This is the video-recorded proceeding of witness Sandi Karrmann in the matter of In Re Outpatient Medical Center Employee Antitrust Litigation.  This proceeding is being held via remote videoconference.

My name is Maggie Kane.  I'm the videographer on behalf of U.S. Legal Support, located at 16825 North Chase Drive, Suite 900, Houston, Texas 77060.  I'm not related to any party in this action, nor am I financially interested in the outcome.

The court reporter is Brandon Combs, on behalf of U.S. Legal Support.

Counsel will state their appearances for the record, after which the court reporter may swear in the witness.

MR. ROSS:  This is Jonathan Ross from

Nussbaum Law Group for the plaintiffs.

MS. MOYE:  Veronica Moye, King & Spalding, for the witness, USPI and Tenet.

MR. BREWER:  Connor Brewer for USPI and Tenet.

MR. TALBOT:  Morning.  This is Andrew Talbot and Amy Manning from McGuire Woods on behalf of the SCA defendants.

MR. HASSANI:  Good morning.  This is Al Hassani from Morgan, Lewis & Bockius, on behalf of Defendant DaVita, Inc.

MS. PONCIA:  Good morning.  This is Reese Poncia from McDermott Will & Emery on behalf of Kent Thiry.

MS. SHARP:  And, good morning, this is Karen Sharp with Wilson Sonsini, on behalf of Defendant Andrew Hayek.

                 SANDI KARRMANN,
 having been first duly sworn, testified as follows:
                   EXAMINATION

Q.    (BY MR. ROSS)  Good morning, Ms. Karrmann. Thank you for coming in today.  Can you please state your full name and home address for the record.

A.   It's Sandra Rieko Arai Karrmann, ███████████████ ██████████ ████████.

Kimberly-Clark.

Q. Were you looking to leave USPI in 2020?

A. No.

Q. How did you become aware of the opportunity with Kimberly-Clark?

A. Through a search firm.

Q. You were recruited by a search firm?

A. Yes.

Q. And you are --

MS. MOYE: Jonathan, I have to ask, are your files really purple? They look purple on the screen, the files next to you. I'm sorry, I've wanted to ask that for a while. I'm sorry.

MR. ROSS: No, they're not purple. It must just be the purple light of New York glowing on it.

MS. MOYE: Sorry, I know it's off topic.

MR. ROSS: That's all right. In fact, I was going to suggest we take a five-minute break right now.

THE VIDEOGRAPHER: We're off the record. The time is 15:06 UTC.

(Off the record.)

THE VIDEOGRAPHER: Back on the record. The time is 15:18 UTC.

Sandi Karrmann   Confidential
August 14, 2024

Q.   (BY MR. ROSS)   Welcome back, Ms. Karrmann. I want to switch gears to the labor budgets at USPI during your time as chief human resources officer for USPI.

Was there a labor budget for managers and above set once a year as part of a large company budget process?

MS. MOYE:   Object to the form.

THE WITNESS:   There was a merit budget set each year.

Q.   (BY MR. ROSS)   And did Bill Wilcox have input into that merit budget?

A.   Bill reviewed the merit budget, yes.

Q.   And did he have to approve the merit budget?

A.   Yes.

Q.   And when you're saying merit, what distinction are you making between a merit budget and a labor budget?

A.   I wasn't exactly sure what you meant by labor budget, because labor could be a big number, could be overall SG&A labor.

Or merit is specifically related to increases considered based on performance of the centers, of the individuals, and any market

adjustments based on cost of labor changes in the market.

Q.   We're talking about compensation, salary and benefits for employees?

A.   Yes.

Q.   And were the pay levels evaluated at least once a year company-wide to determine the raises for the next year?

A.   There was an overall merit budget established each year.

Q.   Can you describe the process for doing that?

A.   We would look at overall projected merit budgets, we would look at merit budgets that companies were projecting based on compensation surveys.

And we would also evaluate our performance as a company and establish an appropriate merit budget balancing all the different factors.

Q.   What factors would go into that?

A.   Performance of the centers, performance of the company and marketplace changes in wages.

Q.   Can you describe for me the pay structure at USPI?

MS. MOYE:  Object to the form.

Sandi Karrmann   Confidential
August 14, 2024

THE WITNESS:  USPI did not have established salary ranges.  Are you specifically -- are you referencing a specific population?

Q.   (BY MR. ROSS)  For the employees, managers and above?

A.   So managers and above -- administrators and above?  Because there are managers underneath the administrator.

Q.   You can go with administrators and above?

MS. MOYE:  Could you just state a full question, please.

Q.   (BY MR. ROSS)  Well, the question was can you describe the pay structure at USPI?

MS. MOYE:  For administrators and above.  That's the question now?

MR. ROSS:  Sure.

THE WITNESS:  For administrators and above, we did not have established salary ranges.  We evaluated performance of centers, performance of the individuals.

And based on marketplace changes and cost of labor, we looked at those different factors and determined salary increases and compensation for administrators and above.

Q.   (BY MR. ROSS)  Did you also consider

internal equity in setting salaries for employees?

A. Yes.

Q. And what is your understanding of internal equity?

A. Based on size and scope of the center for an administrator, the center they were in, the complexity of the center. All centers are different.

Based on an administrator's performance, based on the length of time they've been in the role and based on that local market, because different markets pay differently across the country.

Q. So in what sense would you consider -- take internal equity into account?

A. For people with comparable size, scope, complexity of centers and similar performance results, and performance of their position.

You would expect that people would move generally at the same rate, taking into account differences in market.

Q. So you would also consider external equity in setting raises?

A. We would look at the marketplace.

Q. And so that would include obtaining compensation surveys or pay surveys?

Sandi Karrmann   Confidential
August 14, 2024

A.   Yes.

Q.   Now, when you were considering internal equity, that would be among different employees with the same title; correct?

A.   Yes.

Q.   And would it also be among employees at different locations?

A.   Yes.

Q.   And would you consider that between new hires and current employees?

A.   Yes.

Q.   And between newly promoted people and existing people with that title?

A.   Yes.

Q.   And also between people with different titles.  For example, with the RVPs and market presidents, would you consider internal equity between -- to maintain different pay structures for RVPs and then market presidents?

MS. MOYE:  Object to the form.

THE WITNESS:  We wouldn't specifically compare an administrator to an RVP's pay.  We would look at administrators within their job classification, or job title.  And we would look at RVPs within RVPs.

Sandi Karrmann   Confidential
August 14, 2024

Q.   (BY MR. ROSS)   And would you take care to make sure RVPs weren't being paid more than market presidents?

A.   We wouldn't specifically compare a market president to an RVP's pay, but we would look at RVPs against RVPs and market presidents against market presidents.

Q.   Now, just give me a general description of how merit increases were instituted at USPI?

A.   To clarify, for any specific population or in general?

Q.   Well, were there different processes for different populations?

A.   We had one approach and we had different processes.  One approach was there was an overall merit budget for the organization.

But centers looked at their own pay and determined their own pay.  The corporate office determined their own.  And we had a process for administrators and above.

Q.   And who was involved in setting the merit budget for the year?

A.   Myself, Bill Wilcox, Brett Brodnax, Jason Cagle.

Q.   And who had the final approval over the

Sandi Karrmann   Confidential
August 14, 2024

merit budget increase?

A.   Ultimately, Bill Wilcox.

Q.   And when you say the merit budget for the year, that would be something like 2 percent or 1 percent, something like that; correct?

MS. MOYE:  Object to the form.

THE WITNESS:  It would be a percent, yes.

Q.   (BY MR. ROSS)  And when you said the centers could determine their individual increases, within that budget; correct?  They could have an overall 2 percent increase, which they could divvy up amongst their employees as they deemed fit; is that fair?

MS. MOYE:  Object to the form.

THE WITNESS:  Yes.  However, at individual centers, physician owners also had input.  And I can't speak to -- we didn't manage centrally, ultimately, the decisions that each center made about their employee increases.

Q.   (BY MR. ROSS)  Now, with respect to administrators and above, I think you said that was a separate population.  What was the process with respect to administrators and above?

MS. MOYE:  Objection to the form.

THE WITNESS:  RVPs would make

recommendations for their administrators, review with their market presidents.  They're also reviewing with their physician owners in the centers to get feedback and input.  All of that rolled up to us at the center.

I reviewed it, as did Bill, Brett, and Jason.

Q.    (BY MR. ROSS)  And again, they were given a percentage increase, overall percentage increase within which to work; correct?

A.    Yes.

MR. ROSS:  If we could pull up Tab 9, which we will mark as PX -- that's Exhibit PX297?

THE VIDEOGRAPHER:  Yes.  Pulling that up.

(Whereupon, Exhibit PX297 was marked for identification.)

MR. ROSS:  Which is a document bearing Bates stamp number USPI_CIV_58049 and 58050.

MS. MOYE:  This is 297, PX297?

MR. ROSS:  Correct.

Q.    (BY MR. ROSS)  And you can look at the first email, the bottom email on May 15, 2014, from Sandi Karrmann to Bill Wilcox, Brett Brodnax, Jason Cagle, Niels Vernegaard, and Phil Spencer. And the subject is VP plus increases.

Sandi Karrmann   Confidential
August 14, 2024

MS. MOYE:  You should take the time and review the whole document.

Q.    (BY MR. ROSS)  Yes.  Yes, please review.

A.    Yes, I have.

Q.    Is this an email that you sent during your normal course of business at USPI?

A.    Yes.

Q.    First of all, who is Niels Vernegaard?

A.    Niels was the COO.  He left.  I don't recall specifically when he left, but he left early on in my tenure.

Q.    And who was Phil Spencer?

A.    Phil Spencer led all of the sales organization.  So he didn't have oversight into the administrator pay, but he oversaw the sales piece.

Q.    So the people you're sending this to are the people who oversaw the VPs at USPI?

A.    Correct.

Q.    And in this email you say, it's that time of year for pay increases for VPs and above.  We are targeting 2 percent for all increases, so as you assess and pull together recommendations for your team, please use 2 percent as your overall raise budget.

So this is what we were discussing before.

Sandi Karrmann  Confidential
August 14, 2024

The 2 percent increase was set for the company and then individual managers had some discretion to individualize increases within that 2 percent budget; correct?

MS. MOYE:  Objection to the form.

THE WITNESS:  Yes.

Q.  (BY MR. ROSS)  And you say, it's that time of year again, so were pay increases done on an annual basis?

A.  Yes.

Q.  And you would send similar emails to the managers of other departments at USPI?

MS. MOYE:  Objection to the form.

THE WITNESS:  Cindy would send them out.

Q.  (BY MR. ROSS)  At your direction?

A.  Yes.

Q.  And the email above that one is from Cindy English to you, and she's sending to you the people under your -- the people you manage; is that correct?

A.  Correct.

Q.  And the process then would be the managers would return their proposed recommendations and those would be reviewed by you, Bill, and Jason for final approval; is that correct?

A.   Correct.

Q.   And Bill being Bill Wilcox and Jason being Jason Cagle; correct?

A.   Yes.

Q.   And the same type of process would occur for administrators?

MS. MOYE:   Objection to the form.

THE WITNESS:   Yes.

Q.   (BY MR. ROSS)   And again, that would be on an annual basis?

A.   Yes.

Q.   And again, that would then -- and who would make the recommendations for the administrators?

A.   RVPs recommended to market presidents, who would have then submitted it to Niels.

Q.   And would it ultimately go to --

MS. MOYE:   I'm sorry, I'm sorry.  I think the witness wasn't finished with her --

THE WITNESS:   Sorry.  So RVPs made recommendations to the market presidents, who made recommendations to the group presidents, who made recommendation to Niels.  Until Niels left, and then we eliminated his role, his level.

Q.   (BY MR. ROSS)   And then it would

Sandi Karrmann   Confidential
August 14, 2024

ultimately go up to you, Bill, and Jason for final approval?

MS. MOYE:  Objection to the form.

THE WITNESS:  Yes.

Q.    (BY MR. ROSS)  And actually, in the final approval would be Bill Wilcox; correct?

A.    Yes.

Q.    I believe you mentioned that you would look at pay surveys and compensation surveys as part of the process of setting the merit increase budgets?

A.    Yes.

MR. ROSS:  Let's take another quick five-minute break.  I'll be right back.

THE VIDEOGRAPHER:  Okay.  We're off the record.  The time is 15:38 UTC.

(Off the record.)

THE VIDEOGRAPHER:  Back on the record. The time is 15:48 UTC.

Q.    (BY MR. ROSS)  And welcome back, Ms. Karrmann.  During your time at USPI as the chief human resources officer, did you have an understanding as to the legality of nonsolicitation agreements between companies?

MS. MOYE:  So this is a question

Sandi Karrmann   Confidential
August 14, 2024

specifically asking you about your knowledge of legal issues.

So once again I have to caution you that if your only knowledge of that is from communications with counsel, please let us know, so that we keep that off the record and I can direct you.

THE WITNESS:  Any knowledge I have would have been with counsel and discussions with counsel.

MS. MOYE:  So I direct the witness not to answer.

Q.   (BY MR. ROSS)  During the course of your time as the chief human resources officer at USPI, did you occasionally receive alerts or memos from the Department of Justice?

A.   I would occasionally receive unsolicited trade magazine -- or trade articles or magazines with information.

Q.   And do you recall receiving such information about no poach agreements?

A.   I recall receiving some trade flyer or newsletter about the change in the Department of Justice guidance around no solicitation agreements.

Q.   And what was that change?

A.    That there was very specific guidance that that was not allowed.

Q.    And you had that understanding from that point forward?

A.    Yes.

Q.    Do you recall about when you reviewed that guidance?

A.    I don't recall the specific date.  It would have been right before or shortly before sending an email with that information.

Q.    Who did you send that email to?

A.    I don't recall specifically.  I believe Brett and Bill were on the email.  I don't recall if I had additional recipients.

Q.    Are you referring to an email in October of 2017 regarding the potential poaching of Riley Orr from USPI by SCA?

A.    Yes.

Q.    Okay.  So let's pull up Tab 16, which we'll mark as -- what exhibit are we up to, I'm sorry?

THE VIDEOGRAPHER:  It will be 298.

MR. ROSS:  Exhibit PX298.  The document bearing Bates stamp number USPI_CIV_1260.

Sandi Karrmann   Confidential
August 14, 2024

(Whereupon, Exhibit PX298 was marked for identification.)

Q.   (BY MR. ROSS)   If you could review that document, please.

Are these emails an email exchange that occurred in the ordinary course of business at USPI?

A.   Yes.

Q.   And in the top email you write to Mr. Wilcox, Jeff Andrews, and Brett Brodnax, FYI, we really can't push these kinds of gentleman's agreements.  The DOJ has cracked down on these as a violation of antitrust laws.

That's the email you were referring to just a moment ago?

A.   Yes.

Q.   And you are writing that in response to -- if you turn to the second page there's an email from Jeff Andrews.  If you could scroll down just a little bit.

Jeff writes to Bill Wilcox, Riley -- I guess referring to Riley Orr -- Riley Orr has been recruited by SCA and Brett mentioned that there's a gentleman's agreement that we won't recruit each other's talent.

We don't want to lose Riley and they

Sandi Karrmann   Confidential
August 14, 2024

recruited him.  If we can push SCA that would be appreciate.  Appreciated, I imagine he meant.

So your email advising that the DOJ is cracking down on those types of agreements is in response to Jeff Andrews suggesting that they use the agreements to stop Mr. Orr from being poached by SCA; correct?

MS. MOYE:  Objection to the form.

THE WITNESS:  I can't speak to Jeff's intent behind it.  I just clarified that these are not allowed.

Q.   (BY MR. ROSS)  Now, prior to sending this email, had you spoken with Mr. Wilcox about the illegality of no poach agreements?

MS. MOYE:  Objection to the form.

THE WITNESS:  Yes.

Q.   (BY MR. ROSS)  And when was that?

A.   I don't recall.

Q.   Was it during one of the Monday morning meetings of senior management at USPI?

A.   I recall having a conversation with Bill. I recall making mention of this in one of the Monday morning meetings.

Q.   Is your recollection that those are two separate things, that you had a separate

Case: 1:21-cv-00305 Document #: 742-23 Filed: 04/10/26 Page 681 of 688 PageID #:39338

conversation with Bill outside of the Monday morning meetings?

A.   Yes.

Q.   And what is your recollection of that conversation?

A.   That we shouldn't be adhering to any type of agreement.

Q.   And what was Mr. Wilcox's response?

A.   I don't specifically recall.

Q.   What do you recall?

A.   I recall what I said.  I can't remember his response.

Q.   Well, did he agree with you?  Did he not agree with you?  Did he say don't worry about it?  Do you have any recollection of what his response was?

A.   I don't recall his response to me.

Q.   And approximately when was that conversation?

A.   I do not remember.

Q.   Was it before you sent the October 22, 2017, email?

A.   Yes.

Q.   Was it before this issue was discussed at the Monday morning meetings?

Q.   And during that deposition, did you answer the questions truthfully to the best of your ability on that day?

A.   Yes.

Q.   And have you ever reviewed this transcript of your deposition?

A.   No, I've never seen it.

MR. ROSS:  I don't have any further questions today, pending if there are any documents produced in the future.  I'm done for the day, and pass on the baton to Ms. Moye, if you have any questions.

MS. MOYE:  Let's take a quick break.

MR. ROSS:  Certainly.

THE VIDEOGRAPHER:  Okay.  We're off the record.  The time is 16:40 UTC.

(Off the record.)

THE VIDEOGRAPHER:  We're back on the record.  The time is 16:43 UTC.

MS. MOYE:  Okay.  Thank you.

EXAMINATION

Q.   (BY MS. MOYE)  Ms. Karrmann, just a couple of questions for you.

You talked earlier and you were questioned earlier about the process of same pay for

Sandi Karrmann   Confidential
August 14, 2024

administrators.

Q.   Do you recall that line of questioning?

A.   Yes.

Q.   And you mentioned that doctors played a role in setting that administrator pay.

Do you remember that?

A.   Yes.

Q.   Let me back up and ask why would doctors be involved in setting the pay of administrators?

A.   Well, physicians, not all, but some of the physicians were owners in the center.

Q.   Were most of USPI's facilities owned by doctors and USPI jointly?

A.   Yes.

Q.   And did the doctors who were co-owners play an active role in setting administrators' salaries?

A.   The doctors had input, yes.

Q.   And did they sometimes have input that led to decreased salary pay for administrators?

A.   Yes.

Q.   One other issue.  While you were employed by USPI did you ever see any information about SCA salaries or SCA merit increases that you understood came directly from SCA?

Sandi Karrmann  Confidential
August 14, 2024

A.  No, I did not.

Q.  Did you ever use any information that you believe came directly from SCA to set USPI salaries or USPI budget increases?

A.  No.

Q.  Did Jason Cagle ever share any information with you about SCA salaries?

A.  No.

Q.  And you mentioned that Mr. Cagle, Brett Brodnax, Bill Wilcox, and you participated in the merit increase budget process.

Do you remember that testimony?

A.  Yes.

Q.  In the course of setting those merit increase budgets, was there ever any discussion of any information obtained directly from SCA?

A.  No.

Q.  Or any other?

A.  No.

MS. MOYE:  No further questions for the witness.

MR. ROSS:  Okay.  I just have a couple of follow-ups, Ms. Karrmann.

FURTHER EXAMINATION

Q.  (BY MR. ROSS)  So the doctors may have had

input into administrators' salaries.  Who had final approval over the administrators' salaries?

A.  USPI.  However, the administrator input, we would typically align and agree.

Q.  And who specifically at USPI had final approval over salary increases for administrators? Wasn't it --

A.  Bill Wilcox, CEO.  Then CEO.

Q.  And any input that the doctors would or would not provide had to fit within the contours of the set budget increase that was set during the budget process; correct?  For example, a 2 percent overall increase?

MS. MOYE:  Objection to the form.

THE WITNESS:  We sent guidance out as to what we recommended.  That didn't necessarily mean the physicians always agreed.

Q.  (BY MR. ROSS)  Correct.  But they had to fit within the budget provided to the regional vice president over that facility; correct?

MS. MOYE:  Objection to the form.

THE WITNESS:  They could recommend above that or below that.

Q.  (BY MR. ROSS)  Certainly, they could make their recommendations, yes.  And who would have

(Whereupon, the deposition adjourned at

11:49 A.M.)

--oOo--

I declare under penalty of perjury that the

foregoing is true and correct.  Subscribed at

Denton County, Texas _____, this _30th_ day of

September _____, 2024.

SANDI KARRMANN

Sandi Karrmann   Confidential
August 14, 2024

CERTIFICATE OF REPORTER

I, BRANDON D. COMBS, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth, and nothing but the truth in the within-entitled cause;

That said deposition was taken in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of the said witness was thereafter reduced to typewriting, by computer, under my direction and supervision;

That before completion of the deposition, review of the transcript was not requested.  If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the event of this cause, and that I am not related to any of the parties thereto.

*Brandon B. Combs*   DATE: August 26th, 2024

_____
BRANDON D. COMBS
RPR, Texas CSR 10927, California CSR 12978

```
                           *** ERRATA SHEET ***

     NAME OF CASE: OUTPATIENT MEDICAL
     DATE OF DEPOSITION:  August 14, 2024
     NAME OF WITNESS:   SANDI KARRMANN
     PAGE   LINE   FROM            TO            REASON


   22:23 Delete "other" - transcription error

   72:25 Change "same" to "setting" - transcription error
```

Subscribed and sworn before me

this____day of_____,20__.

_____         _____

(Notary Public)             My Commission Expires: