# ZIELINSKI EXHIBIT 39 (FILED UNDER SEAL)

UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE OUTPATIENT MEDICAL        )
CENTER EMPLOYEE ANTITRUST       )
LITIGATION                      ) Master Docket No.
                                ) 1:21-cv-00305
_____  )
                                )
THIS DOCUMENT RELATES TO:       )
                                )
ALL ACTIONS                     )

-------------------------------------

ORAL AND VIDEOTAPED REALTIME DEPOSITION OF

ANTHONY MARTIN

JUNE 27, 2024

REPORTED REMOTELY

RESTRICTED - CONFIDENTIAL

-------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF ANTHONY MARTIN, produced as a witness at the instance of the Plaintiffs and duly sworn, was taken in the above-styled and numbered cause on June 27, 2024, from 9:04 a.m. to 2:51 p.m. Central Time, before Christy Cortopassi, CSR in and for the State of Texas, reported by machine shorthand remotely via Zoom videoconference, pursuant to the Federal Rules of Civil Procedure and any provisions stated on the record herein.

Anthony Martin  Confidential
June 27, 2024

P R O C E E D I N G S

THE VIDEOGRAPHER/EXHIBIT TECH:  We are on the record at 14:04 UTC on June 27, 2024.  Audio and video recording will continue to take place until all parties agree to go off the record.  Please note that microphones are sensitive and may pick up whispering and private conversations.

This is the video-recorded proceeding of Anthony Martin in the matter of In Re Outpatient Medical Center, Employee Antitrust Litigation.  This proceeding is being held via remote videoconference.

My name is Chris Azoff.  I'm the videographer on behalf of U.S. Legal Support located at 16825 North Chase Drive, Suite 900, Houston, Texas 77060.  I am not related to any party in this action nor am I financially interested in the outcome.

The court reporter today is Christy Cortopassi, also on behalf of U.S. Legal Support.  All appearances have been noted on the stenographic record.

Will the court reporter please swear in the witness.

THE COURT REPORTER:  Okay.  First, my name is Christy Cortopassi, CSR Number 6222.

Sir, if you'll just raise your right hand, I'll administer the oath.

ANTHONY MARTIN,

having been first duly sworn, testified as follows:

EXAMINATION

BY MS. NUSSBAUM:                                    09:06AM

Q.  Good morning, Mr. Martin.  Can you state your   09:06AM
home address for the record, please.                09:06AM

A.  Good morning.  It's ███████████████            09:06AM
█ ███████  █████████.                              09:06AM

Q.  And are you presently employed?                09:06AM

A.  No.                                             09:06AM

Q.  When were you last employed?                   09:06AM

A.  I left my past job November 2023.              09:06AM

Q.  Do you have a business or other address, other 09:06AM
than the address that you just gave us as your home 09:06AM
address?                                            09:06AM

A.  I do not.                                       09:06AM

Q.  Now are you being represented today in this    09:06AM
deposition?                                         09:06AM

A.  Yes.                                            09:06AM

Q.  And who is representing you?                    09:06AM

A.  The two attorneys present or...                09:07AM

THE WITNESS:  Remind your name.                    09:07AM

A.  King & Spalding.                               09:07AM

Q.  (BY MS. NUSSBAUM)  Okay.  And are they present 09:07AM
in the room with you?                              09:07AM

Q. Well, are we talking ██████████████, are we talking ████████?

MS. NEWTON: Objection to form.

A. Yeah. I don't recall.

Q. (BY MS. NUSSBAUM) Do you recall if it was more than ██████████████████?

MS. NEWTON: Objection to form.

A. I don't recall.

Q. (BY MS. NUSSBAUM) And this was post-2019; is that correct?

A. Yes.

Q. Do you recall if it was more than a ████████ ████████?

MS. NEWTON: Objection to form.

A. I don't recall.

Q. (BY MS. NUSSBAUM) Well, Mr. Martin, would you have tax records or other records that would refresh your recollection as to the proceeds that you received from selling or other wise transferring your stock ownership of USPI subsequent to your leaving at the end of 2019?

MS. NEWTON: Objection to form.

A. Yes.

Q. (BY MS. NUSSBAUM) And can you review those documents and if we leave a space in the transcript,

when you receive this transcript and you are asked to review it for accuracy, can you let us know the amount that you received for your transfers, sales, and settlement of your equity interest in USPI?

A. Yes. Subject to what was discussed earlier about whether that is subject to any confidentiality agreement that I have signed.

MS. NEWTON: We'll -- for the record we'll take that request under advisement.

Q. (BY MS. NUSSBAUM) Now at the time you left USPI in 2019, what was your annual compensation?

A. I don't recall that either.

Q. Do you recall, approximately?

A. I think the base pay was somewhere from ███████ ███████████████████████████████████████████████, I think.

Q. And in addition to base pay, what else did you receive?

A. I was eligible to receive a bonus at the end of each year, which, you know, wasn't a guarantee in terms of whether there would be one at all or whether -- of what amount it would be. I also participated in benefit programs like the 401(k) and received contributions from the company through that. And of course the equity awards.

Q. Now with respect to the annual bonus, were there particular criteria that were used by USPI to determine whether an individual received an annual bonus, and if so, what that bonus would be?

MS. NEWTON: Objection to form.

A. Yes.

Q. (BY MS. NUSSBAUM) And what were those criteria?

A. There was some variation from year to year but generally it was what I kind of understand to be a common industry practice, which would be -- some percentage of the bonus would be based solely on company earnings for the year and whether they met certain targets.

And the other portion would be based on whether the individual employee met certain performance milestones that they agreed with their supervisor at the start of the year.

Q. So who determined the second part of this? Who determine the performance milestones?

A. The milestones were agreed by the employee with the approval of their supervisor at the beginning of the year. And then they were evaluated by the employee and the supervisor at the end of the year as to whether they were met.

Q.  Were there particular categories of employees who had the opportunity to get the annual bonus as you just described it?

MS. NEWTON:  Objection to form.

A.  Can you rephrase that?  I'm not sure I understood.

Q.  (BY MS. NUSSBAUM)  Yeah.  I'm trying to understand what categories of employees were eligible to receive an annual bonus as you just described it?

A.  That was not an -- that was something the HR department determined.  Based on my experience in the accounting department that I supervised and was responsible for, there was a version of a bonus plan for all employees.

So there were variations in that, you know, and how that affected different roles and different levels.  But some bonus plan was available to everyone.

Q.  And is -- was that in writing?

A.  Yes.

Q.  And that was a document that would have been both created, maintained, and updated by the HR department; is that right?

MS. NEWTON:  Objection to form.

A.  Yes.  There were years prior to the HR department existing at USPI, that finance was

Anthony Martin  Confidential
June 27, 2024

responsible for that.  But I think by the time we kind of got to the 20- -- I can't remember when Sandi Karrmann joined the company.  But 2014, 2015, it became solely the responsibility of the HR department.

Q.  (BY MS. NUSSBAUM)  Now did you have any responsibilities related to employee compensation at any time during your employment with USPI?

MS. NEWTON:  Objection to form.

A.  Throughout my tenure, I was responsible for knowing and making recommendations related to the compensation of my own employees in the accounting department.  That was consistent throughout.  Beyond that, finance under me had a role preparing mechanical computations based on compensation decisions provided by the HR department.

So we weren't involved in making the decisions but we were enlisted to help because of our prowess with Excel and the need to link up those computations with the amount of expense we were accruing in our financial statements.

Q.  (BY MS. NUSSBAUM)  Now let's break that into the two parts as you have done it.  So the first is your personal involvement in the compensation of employees in the accounting department.  Now with respect to that, what information did you look at and gather to determine

Anthony Martin  Confidential
June 27, 2024

compensation of employees in accounting?   10:33AM

MS. NEWTON:  Objection to form.   10:33AM

A.  Yeah.  I would look at third-party accounting   10:33AM
salary surveys, which were available from time to time   10:33AM
from external recruiting firms.  This provided very   10:33AM
underline information, aggregated at a very high level.   10:34AM
So it had limited use.  But I would start with that as   10:34AM
something objective outside of the company.   10:34AM

This was particularly important for   10:34AM
accountants because certainly during the time I was at   10:34AM
USPI, the majority of that time accountants were in high   10:34AM
demand.  And the inflationary increases to what it took   10:36AM
to hire and retain an accountant were somewhat high.  So   10:34AM
I made a strong effort to keep up with that by using   10:34AM
external surveys.   10:34AM

And then the other two factors would have   10:34AM
been if we had just hired someone into the org in a   10:34AM
competitive situation and that served to inform whether   10:34AM
we were paying someone else the right amount I would   10:34AM
make note of that.   10:35AM

And also from time to time employees who   10:35AM
worked for me received other offers of employment and   10:35AM
asked if I wanted to match it in order to keep them.  So   10:35AM
those sources that -- the recommendations and requests I   10:35AM
made on behalf of the accounting staff.   10:35AM

Anthony Martin  Confidential
June 27, 2024

MS. NEWTON:  And not to break up your flow, but we have been going for about an hour and a half, when you are at a good stopping point if we could just take a five-minute break, that would be great.

MS. NUSSBAUM:  Sure.

Q.  (BY MS. NUSSBAUM)  Now, Mr. Martin, looking at your answer with respect to these third-party external surveys, can you tell us specifically which ones you looked at on a regular basis?

MS. NEWTON:  Objection to form.

A.  Regular basis.  I'm trying to think if there were any that were always available.  I think I received them from a few different recruiting firms over the years.  Not always the same one.  SNI Financial was one I looked at.  At times I had accessed information from Robert Half.  Those are the two that come to mind.

Q.  (BY MS. NUSSBAUM)  Okay.  And did you work with any recruiters?

A.  Yes.  Yes.  We did from time to time.

Q.  And which recruiters did you work with?

A.  Over my tenure there, 21 years, I used probably close to a dozen at different times.  Just depending on, you know, who was having success at the time identifying candidates that were a good fit for us.

Q.  As you sit here today, is there any specific

Do you see that?

A. Yes.

Q. So Mr. Walker apparently also is able to locate the file. So you worked with Mr. Walker; is that right?

A. Yes.

Q. And you -- did you have a shared drive or a shared archived information with Mr. Walker?

A. Some of our documents were in shared drives. Some would have been in our -- just our own drive.

Q. Okay. And can you tell from looking at this email and looking at this document where Mr. Walker located this document from?

A. I can't tell. I would have observed that one possibility is that he simply hung on to it from the email in December where Jason said hang on to this. Because the email above, it appears that James Walker is giving it to Jason three months later.

That's -- I have no knowledge of that. That's just an observation of mine that I would make looking at this email string, that that is a possibility.

Q. Now these emails say, "Regarding Matt Herman."

Who is Matt Herman; do you know?

A. I do not.

Q. Do you know what the issue was with respect to

Anthony Martin   Confidential
June 27, 2024

Mr. Herman?

A. I do not.

Q. Okay.

MS. NUSSBAUM: Let's mark Exhibit 138 and that's under tab 10.

Q. (BY MS. NUSSBAUM) Once you have looked in it, please, let me know.

A. Okay.

Q. Okay. And first, you have Mr. Mathis sending Jason Cagle a draft template as a starting point. And he tells Mr. Cagle that he should suggest any changes or review it. And Mr. Cagle then says -- and the subject here is Overhead Benchmarking -- "I want to compare G&A with SCA, see their starting point for categories, any changes you would suggest."

And Mr. Cagle says that to Megan Belknap, James Walker and yourself. Do you see that?

A. Yes.

Q. And then Megan responds to your group and she says, "Hey, Jason, here's the team's first stab at this. Probably not a hundred percent perfect but it's definitely directionally correct."

Okay. Do you see that?

A. I do.

Q. Now first, what does Overhead Benchmarking mean

to you?

A.  Well, it can mean a lot of things.  But in general it just means trying to understand whether either the total amount for all overhead or total amount for key large components of it, compared favorably versus unfavorably with others in the industry.

Q.  And would compensation certainly be a key factor, payroll and compensation?

MS. NEWTON:  Objection to form.

A.  It would be contained in the totals that a person would look at.  In my experience, overhead benchmarking would not include breaking out compensation information from the other costs, nor would it include head count or things like that, in my personal experience.  That's what it means to me.

Q.  (BY MS. NUSSBAUM)  Okay.

MS. NUSSBAUM:  Well, let's mark what's under tab 10A as 138A.  And this says "Expense Comparison."  And it says, "Red added by USPI."

So this is the attachment that was sent over by SCA, sent over by Mr. Mathis that it's then supplemented by Ms. Belknap at USPI.  Do you see that?

A.  Yes.

MS. NEWTON:  And I'll just note for the record, our copy doesn't have red.  I don't know if it

was produced with red but we are not seeing that.

VIDEOGRAPHER/EXHIBIT TECH:  The one on -- the digital one will be online.

MS. NEWTON:  We are not seeing it up on the screen.

VIDEOGRAPHER/EXHIBIT TECH:  It will if that's in a portal, later in the portal.

(Simultaneous crosstalk.)

MS. NUSSBAUM:  Okay.  So, Ms. Reporter [sic], if you can please pull up what's under tab 10A.

VIDEOGRAPHER/EXHIBIT TECH:  10A will be up on the screen momentarily.

MS. NUSSBAUM:  Excellent, Thank you.

VIDEOGRAPHER/EXHIBIT TECH:  Let me know where you would like me to navigate.  Let me see here. Now which tab would you like me to navigate to?

MS. NUSSBAUM:  Right there.  That's fine.

VIDEOGRAPHER/EXHIBIT TECH:  Okay.

Q.  (BY MS. NUSSBAUM)  Now, Mr. Martin, looking at Exhibit 140A where it says, "Expense Comparison."

A.  Okay.

Q.  I'm sorry.  138A where it says "Expense Comparison."  And it's the 2014 Forecast and the 2015 Budget.  Do you see that?

A.  Yes.

UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE OUTPATIENT MEDICAL          ) Master Docket No.
CENTER EMPLOYEE ANTITRUST         ) 1:21-cv-00305
LITIGATION                        )
                                  )
_____     )
                                  )
THIS DOCUMENT RELATES TO:         )
ALL ACTIONS                       )


REPORTER'S CERTIFICATION
REMOTE DEPOSITION OF ANTHONY MARTIN
JUNE 27, 2024

I, Christy Cortopassi, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, ANTHONY MARTIN, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on _____ to the witness or to the attorney for the witness for examination, signature and return to me by _____;

That the amount of time used by each party at the deposition is as follows:

Ms. Linda P. Nussbaum..........04:46
Ms. Katharine O'Connor.........00:00
Mr. Nathan T. Shapiro..........00:00
Ms. Emily Shoemaker Newton.....00:00
Ms. Karen Sharp................00:00

Mr. Andrew E. Talbot..........00:00

I further certify that pursuant to FRCP No. 30(f)(i) that the signature of the deponent:

__X__ was requested by the deponent or a party before the completion of the deposition and that the signature is to be returned within 30 days from date of receipt of the transcript.  If returned, the attached Changes and Signature Page contains any changes and the reasons therefor;

_____ was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this _____ of_____, 2024.

_____
Christy Cortopassi, Texas CSR 6222
Expiration Date:  10/31/2024

Firm Registration No. 343
U.S. LEGAL SUPPORT, INC.
8144 Walnut Hill, Suite 350
Dallas, Texas  75231
214.741.6001

Anthony Martin
June 27, 2024

CHANGES AND SIGNATURE

WITNESS: ANTHONY MARTIN

DATE: JUNE 27, 2024

PAGE LINE          CHANGE                    REASON

43:1 - Remove "now"; transcription error

59:6 - Replace "underline" with "general"; transcription error

59:24 - "those are the sources that informed"; misspoke

66:11 - Delete "in"; transcription error

84:25-85:1 - Replace "it's disparate" with "is dispersed"; transcription error

85:20 - Replace "Bexar" with "Behr"; transcription error

86:7 - Replace "information" with "understanding"; transcription error or misspoke

87:16 - Delete quotation marks; transcription error

91:20 - Replace "interacted" with "interacting"; transcription error

94:1 - Delete "that"; transcription error

109:14 - Replace "that" with "net"; transcription error

148:6 and 149:4 - Replace "advertising" with "amortizing"; transcription errors

164:10 - Replace "effected" with "affected"; transcription error

165:5 - Replace "moral" with "morale"; transcription error

165:9 - Replace "Brian" with "Ryan"; transcription error

166:1 - Delete "day"; transcription error

166:2 - Delete "two"; transcription error

I, ANTHONY MARTIN, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_____
ANTHONY MARTIN

_____ No changes made  _____ Amendment sheet(s) attached

IN RE OUTPATIENT MEDICAL CENTER EMPLOYEE ANTITRUST LITIGATION

_____

THIS DOCUMENT RELATES TO:

ALL ACTIONS

JOB NO. 6629535

# ZIELINSKI EXHIBIT 40 (FILED UNDER SEAL)

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

------------------------------  )

IN RE OUTPATIENT MEDICAL        )Case No.

CENTER EMPLOYEE ANTITRUST       )1:21-cv-00305

LITIGATION                      )

------------------------------  )

CONFIDENTIAL


DEPOSITION OF BRIAN TODD MATHIS

WASHINGTON, D.C.

SEPTEMBER 20, 2024


REPORTED BY:  Tina Alfaro, RPR, CRR, RMR

THE VIDEOGRAPHER:  We are on the record at 10:06 a.m. Eastern on September 20th, 2024.  This is the video-recorded deposition of Brian Mathis in the matter of In Re Outpatient Medical Center Employee Antitrust Litigation.  This deposition is being held at the offices of McGuireWoods in Washington, D.C.

My name is Jason Levin.  I'm the videographer on behalf of U.S. Legal Support.  The court reporter is Tina Alfaro, also on behalf of U.S. Legal Support.

Will counsel please state their appearances for the record and then the court reporter will swear in the witness.

MR. SEIDEL:  David Seidel on behalf of the Plaintiffs.

MR. GUARDADO:  William Castillo Guardado, the Joseph Saveri Law Firm on behalf of the Plaintiffs.

MS. ZIELINSKI:  Sarah Zielinski with McGuireWoods on behalf of the witness and the SCA Defendants.

MR. RUSSO:  Angelo Russo with McGuireWoods on behalf of the SCA Defendants and the witness.

MS. NEWTON:  Emily Newton from King &

Spalding on behalf of USPI and Tenet.

MS. DURAN:  Julianne Duran, also King & Spalding on behalf of USPI and Tenet.

MS. STEINER:  Jordanne Steiner, Wilson Sonsini Goodrich & Rosati on behalf of Andrew Hayek.

THE REPORTER:  Folks on Zoom.

MS. LANE:  Molly Lane appearing on behalf of Defendant DaVita, Inc.

MS. SCHWAIGER:  Susan Schwaiger from Nussbaum Law Group on behalf of the Plaintiffs.

MS. SHARP:  Karen Sharp with Wilson Sonsini on behalf of Mr. Hayek.

THE VIDEOGRAPHER:  Would the court reporter please swear in the witness.

(Witness sworn.)

WHEREUPON:

BRIAN TODD MATHIS,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. SEIDEL:

Q.  Good morning, Mr. Mathis.  My name is David Seidel.  I represent the Plaintiffs.

A.  Good morning.

Brian Todd Mathis   Confidential
September 20, 2024

Q.   Can you please state your full name and spell it for the record.

A.   It is Brian Todd Mathis, B-R-I-A-N, T-O-D-D, M-A-T-H-I-S.

Q.   What is your current home address?

A.   ████████████████████████████████,
████████████████████████.

Q.   Are you currently employed?

A.   Yes.

Q.   Where are you currently employed?

A.   Oasis Health Partners.

Q.   What is your title at Oasis Health Partners?

A.   CEO.

Q.   When did you become the CEO of Oasis?

A.   We founded the company in August of 2022.

Q.   Were you one of the founders?

A.   Yes.

Q.   What did you do prior to August 2022?

A.   I worked for a company called Sevita health.

Q.   How do you spell that?

A.   S-E-V-I-T-A.

Q.   And what was your title at Sevita health?

Brian Todd Mathis   Confidential
September 20, 2024



Q. Did you have counsel present with you during ▮▮▮▮▮▮▮▮?

A. ▮▮▮▮▮▮▮▮▮▮▮▮

Q. Who was your counsel ▮▮▮▮▮▮▮?

A. Marshall. I don't recall Marshall's last name.

Q. Do you remember what firm they worked for?

A. I believe he works -- worked at the time for Kaplan Hecker.

Q. Did you pay for your counsel's services

Brian Todd Mathis  Confidential
September 20, 2024



Q.  And who is that?

A.  My attorney.

Q.   When did -- when did those conversations occur?

A.   I don't recall the specific time.

Q.   Was that during the prep session for this -- for this deposition?

MS. ZIELINSKI:  Objection.  That calls for privileged, what we talked about during our prep session.  So I'm instructing you not to answer.

MR. SEIDEL:  Did you -- did you talk with your lawyers about ███████████████ other than in preparation for this deposition testimony and other than these -- these lawyers that are representing you here today?

A.   I spoke to Marshall about it.

Q.   After ███████████?

A.   Yes.

Q.   And other than speaking to Marshall about it, you haven't discussed ████████████████████ in any other time?

A.   Not that I recall.

Q.   When you worked for SCA, whom did you consider to be SCA's competitors in the outpatient medical center industry?

A.   It varied a lot by market.

Q.   What markets was SCA in?

A.  I do not.

Q.  Who at -- who at SCA exchanged information with USPI?

A.  I don't know the entire list of who would have exchanged information with USPI.

Q.  Do you know anybody other than yourself that exchanged information with USPI?

A.  Yes.

Q.  Who else?

A.  Leslie Wachsman.

Q.  Anybody else?

A.  Not that I specifically can recall.

THE REPORTER:  Was that Waxman or Wexman?

THE WITNESS:  Wachsman, W-A-C-H-S-M-A-N.

THE REPORTER:  Thank you.

Q.  What information did Ms. Wachsman exchange with USPI?

A.  The thing that I recall her exchanging was around same-site case volume growth.

Q.  Did you also exchange with USPI same-site case volume growth data?

A.  I did.

Q.  How regularly did you exchange that data with USPI?

A.  We did that twice a month I believe in the

beginning of my tenure at SCA and later I believe we did so monthly.

Q. Do you know if that type of exchange of information was occurring prior to your arrival at SCA?

A. I believe it was not.

Q. When did it -- when did that type of exchanging of information start?

A. I believe it started in late 2008 or early 2009.

Q. Around the time that you came to SCA?

A. Yes.

Q. Were you the first person that began exchanging this information with USPI?

A. I believe so.

Q. Whose idea was it to exchange this information with USPI?

A. I don't recall.

Q. Did Andrew Hayek ever instruct you to exchange that information?

A. He did.

Q. Was he the first person to suggest exchanging this information with USPI?

A. I don't recall.

Q. What other type of information did you

Brian Todd Mathis  Confidential
September 20, 2024

exchange with USPI?

A.    We exchanged benchmarking information.

Q.    What is benchmarking information?

A.    Information that would allow us to compare the efficiency of our operations to others.

Q.    What do you mean the efficiency of your operations?

A.    The overall cost and quality.

Q.    And what information would be exchanged as part of that benchmarking process?

A.    I don't recall all the things that we might have exchanged while I was there.

Q.    Would it include corporate overhead costs?

A.    I don't know whether it was the specific total corporate overhead.  There were elements of corporate overhead that I do recall.

Q.    What is included in corporate overhead?

A.    The definition of corporate overhead at SCA evolved over time.

Q.    What's your definition of corporate overhead?

A.    I'm not sure I -- what's the difference what my definition of it is?

Q.    What's your understanding of what corporate overhead is?

A.   In general terms?

Q.   Uh-huh.

A.   Corporate overhead is cost of running a business outside of specific market-level costs.

Q.   Is that what -- how SCA defined corporate overhead?

MS. ZIELINSKI:  Object to the form.

A.   I'm not sure SCA ever applied a very specific definition to it.

Q.   So you said you did exchange corporate overhead information with USPI, correct?

A.   Yes.

Q.   What information did that contain?

A.   It contained elements of what did it cost to run certain functions.

Q.   And departments?

A.   Function or department could be synonymous.

Q.   What are in those costs in corporate overhead?

A.   Can you restate the question?

Q.   Yeah.  You said that corporate overhead included costs to run certain functions or departments?

A.   Yes.

A.  I did.

Q.  Did you attend cabin team meetings?

A.  Yes.

Q.  Regularly?

A.  Yes.

Q.  Did you prepare the agenda for the cabin team meetings?

A.  At certain points in time I did.

Q.  Do you remember when you did not prepare the agendas for the cabin team meeting?

A.  I do not.

Q.  Do you remember, were there any periods of time when you were at SCA that you did not regularly attend the cabin team meetings?

A.  I believe there was a period within one year.  I don't recall which year.

Q.  Do you remember why it was that you weren't attending the cabin team meetings regularly for that year?

A.  It had to do with the growth in the leadership team that we had.

Q.  When was that generally?

A.  It could have been around 2011 or 2012.

Q.  Did SCA implement yearly wage increases to its employees?

A.   We did.

Q.   Are those called the merit pool wage increases?

A.   I believe so.

Q.   And what generally were the merit pool wage increases?

A.   Meaning define it or --

Q.   Yeah.

A.   Every year we would think about what is the labor inflation likely to be, what do we need to do in order to remain competitive for labor as a company, and we would set a budget accordingly.

Q.   When you say "we," do you mean the cabin team and the senior leadership?

A.   I don't recall who specifically would make the decision on the final number.

Q.   Would the cabin team discuss it?

A.   I recall discussions about it on the cabin team.  I don't know that that would have happened every year.

Q.   Did Andrew Hayek have ultimate authority in setting those merit pool wage increases?

MS. STEINER:  Object to form.

A.   I don't know whether he or the compensation committee of the board of directors

had the ultimate say on that.

Q. When were the budget for wage increases set?

A. As part of the overall budgeting process.

Q. When would that happen each year?

A. Typically late in the calendar year for the following year.

Q. So in the fall or early winter time you would set the budget for the following year's wage increases?

A. I believe so. Some years that may have slipped into the first quarter before it was finalized.

Q. Did you have any role in setting those wage increases?

MS. ZIELINSKI: Object to the form.

A. I don't believe I had any decision-making authority around it.

Q. Did you have any role other than decision-making authority in setting the yearly wage increases?

MS. ZIELINSKI: Object to the form.

MR. SEIDEL: What's the basis?

MS. ZIELINSKI: So your -- do you want me

Brian Todd Mathis  Confidential
September 20, 2024

A.  I do.

Q.  And then you respond "That works. Whenever you're ready.  Thanks, Brian"; do you see that?

A.  I do.

Q.  In this e-mail you and Jason Cagle agreed to swap wage increase budgets with each other, correct?

MS. ZIELINSKI:  Object to the form.

THE REPORTER:  I'm sorry.

MS. NEWTON:  Same objection, objection to form.

A.  Yes, it appears that way.

Q.  And you two agreed to swap wage increase budgets in August of 2014, correct?

MS. ZIELINSKI:  Object to the form.

A.  Yes.

Q.  And the fall of 2014 would have been when SCA was deciding what to set its budget for the following year's wage increase, correct?

MS. ZIELINSKI:  Object to the form.

A.  Typically the late fall or early winter.

Q.  In August of 2014 it would not have been typical for SCA to have already set its 2015 wage increase budget, correct?

Brian Todd Mathis   Confidential
September 20, 2024

MS. ZIELINSKI:  Object to the form.

A.   I don't recall exactly when we would start the process.

Q.   Did -- following this e-mail did you and Jason Cagle exchange wage increase budgets?

A.   I don't know.

Q.   You don't remember?

A.   I do not.

Q.   Did Jason Cagle ever agree to swap wage increase budgets with you but then not follow through?

MS. NEWTON:  Objection to form.

MS. ZIELINSKI:  Same objection.

A.   I'm not sure.

Q.   You don't remember?

A.   I do not.

Q.   Did you ever agree to exchange wage increase budgets with Jason and then not follow through?

MS. ZIELINSKI:  Object to the form.

A.   I'm not sure.

Q.   Do you have any memory of you doing that one way or another?

MS. ZIELINSKI:  Object to the form.

A.   Regarding me or regarding him?

Q. Regarding you.

A. I do not.

Q. Do you have any memory regarding him?

A. I do.

Q. And what is that memory?

A. I recall us talking about sharing something and it not happening.

Q. When did that happen?

A. I'm not sure.

Q. What was that about?

A. I'm not sure.

Q. And what was the conversation you had with him when that occurred?

A. I'm not sure I had a conversation.

Q. Do you recall anything else about that time you say you spoke to him and it did not -- about sharing something and it did not happen?

MS. ZIELINSKI: Object to the form.

A. I don't believe I said I spoke to him. I may have asked him something by e-mail, but I don't recall anything specific.

Q. Did you previously agree to exchange wage increase budgets with Jason Cagle or anyone else at USPI?

MS. ZIELINSKI: Object to the form.

A.   Previous to this e-mail?

Q.   Correct.

A.   Related to that specific year?

Q.   No.  Any time.

A.   I believe we had previously.

Q.   Did you do the -- did you also agree to swap wage increase budgets the year before?

MS. ZIELINSKI:  Object to the form.

A.   I don't recall.

Q.   But you do recall swapping wage increase budgets sometime prior to this e-mail?

MS. ZIELINSKI:  Object to the form.

A.   Yes.

THE REPORTER:  Make sure you let her object.

MS. ZIELINSKI:  Sorry.

Q.   When you sent this e-mail to Jason Cagle were you communicating to him in your personal capacity or you were you communicating with him as an employee of SCA?

MS. ZIELINSKI:  Object to the form.

A.   Can you please explain the difference?

Q.   Sure.  Were -- was this e-mail sent in the regular course of your business as an employee of SCA?

appears"?

A. That's what the piece of paper seems to indicate.

Q. In August of 2013 did you and Mr. Cagle agree to share the plans for the following year wage increases?

MS. ZIELINSKI: Object to the form.

A. It appears so.

Q. And if you look at your e-mail to Mr. Cagle, you say "One of the things we have shared in the past is plans for the following year wage increases"; do you see that?

A. I do.

Q. Did you and Jason share the following year wage increases in the past prior to this e-mail?

MS. ZIELINSKI: Object to the form.

A. I believe so.

Q. And what is that belief based on?

A. My recollection.

Q. What do you recall about sharing the following year wage increases with USPI previous to this e-mail?

MS. ZIELINSKI: Object to the form.

A. I recall occasionally sharing a expected budgeted number for wage increases.

Brian Todd Mathis  Confidential
September 20, 2024

Q.  And you would share SCA's budgeted expected increases of wages for the following year with USPI?

MS. ZIELINSKI:  Object to the form.

A.  I believe so.

Q.  And USPI would share the same information with you?

MS. NEWTON:  Objection to form.

MS. ZIELINSKI:  Same objection.

A.  I believe so, and the information flow may not have been consistent in that there could have been a year where maybe SCA -- maybe we shared it and they forgot to share it back or vice versa or a year that we didn't at all.

Q.  In this e-mail you refer to the following year wage increases; do you see that?

A.  I do.

Q.  Would that have been a number in dollars or a percentage?  How would that -- how would the following year wage increases be represented when you exchanged it with USPI?

MS. NEWTON:  Objection to form.

MS. ZIELINSKI:  Same objection.

A.  I believe it would be a percentage increase.

Brian Todd Mathis  Confidential
September 20, 2024

Q.  A percentage of what?

A.  A percentage of the hourly or annual salary budget.  So the total dollar increase.  Let me restate that.

Q.  Sure.  Yeah.

A.  I don't think that was clear.

A percentage that we would increase individuals' compensation in aggregate.

Q.  And that was for compensation of base pay, correct?

A.  I believe so, yes.

Q.  You mentioned that you recalled exchanging this information with USPI previously.  Did you -- did you do so with Jason Cagle in particular or somebody else at USPI?

MS. NEWTON:  Objection to form.

MS. ZIELINSKI:  Same objection.

A.  I'm not sure whether it was Jason or could have been his predecessor as CFO, Mark Kopser.

THE REPORTER:  What's the last name?

THE WITNESS:  Kopser, K-O-P-S-E-R.

Q.  Jason Cagle was the CFO of USPI?

A.  At this time I believe he was.

Q.  And his predecessor was Mark Kopser, correct?

Brian Todd Mathis  Confidential
September 20, 2024

this exemplar document, Plaintiffs' Exhibit 37, was only produced by USPI and not by SCA and not by yourself.  Can you think of any reason other than perhaps you deleted this e-mail that this e-mail was not produced from your iCloud account or by SCA?

MS. ZIELINSKI:  Object to the form.

A.  No.

Q.  Is it fair to assume that you deleted this e-mail?

MS. ZIELINSKI:  Object to the form.

A.  I don't know whether I deleted it or it simply got deleted by SCA's IT servers after some period of time.

MR. SEIDEL:  Okay.  I think I have no further questions.

MS. ZIELINSKI:  We'll take a quick break.

MR. SEIDEL:  That's fine.  Let's go off the record.

THE VIDEOGRAPHER:  Going off the record at 6:09 p.m.

(A break was had.)

THE VIDEOGRAPHER:  We are going back on the record at 6:21 p.m.

EXAMINATION

Brian Todd Mathis   Confidential
September 20, 2024

BY MS. ZIELINSKI:

Q.   For the record, I am Sarah Zielinski, counsel for SCA Defendants and the witness. Mr. Mathis, thank you so much for being here with us today.  I just have a few questions for you.

So Plaintiffs' counsel asked you a series of questions today referring to SCA's wage increase budget; do you recall that?

A.   Yes.

Q.   And is another way to refer to that number that Plaintiffs' counsel was asking you about is SCA's merit pool budget?

A.   Yes.

Q.   And in general terms could you please tell us what is the merit pool budget?

A.   It would be the budget that we would set for pay increases in a given year and that was a general starting point across the entire company behind which we would really try to drive a lot of differentiation amongst the actual increases that we gave out to any individual.

Q.   And you testified today that that number is reflected as a percentage; is that correct?

A.   Yes.

Q.   So, for instance, the merit pool budget

for a given year could be reflected as 2 percent, something like that, correct?

A. It could.

Q. And you were asked questions today about benchmarking with other companies regarding their merit pool budget percentage; do you recall that?

A. Yes.

Q. And does knowing another company's merit pool budget percentage tell you anything about the compensation paid to individual employees?

A. No.

Q. Does knowing another company's merit pool budget percentage tell you anything about a compensation increase that might be paid to an individual employee?

MR. SEIDEL: Objection, leading.

A. No.

Q. Why is it that knowing the merit pool budget percentage would not tell you anything about individual compensation?

A. Every individual's compensation was set at the individual level. A merit pool increase was an overall number across, in the instance of SCA, more than 5,000 people, each of whom would be individually evaluated every year through our

Brian Todd Mathis   Confidential
September 20, 2024

C E R T I F I C A T E

I, TINA M. ALFARO, Registered Professional Reporter, Certified Realtime Reporter, and Registered Merit Reporter, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that reading and signing was requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand on this 25th day of September, 2024.

_____

Tina M. Alfaro, RPR, CRR, RMR

**Brian Mathis September 20, 2024 Deposition**
**Errata Sheet**

I, Brian Mathis, having read the foregoing deposition, Pages 1 through 253, taken September 20, 2024, do hereby certify said testimony is a true and accurate transcript, with the following changes:

| Page | Line(s) | Correction | Reason |
|------|---------|-----------|--------|
| 10 | 22-23 | Change "acquisition of Optum, of SCA" to "acquisition of SCA by Optum" | Clarify intended meaning |
| 38 | 11-12 | Change "assigned as primary responsibility" to "assigned the primary responsibility" | Clarify intended meaning |
| 45 | 3-4 | Change "is cost of running a business" to "is the cost of running a business" | Clarify intended meaning |
| 68 | 24 | Change "a expected" to "an expected" | Correct typographical error |
| 75 | 2-3 | Change "People would have been a point of view that could be helpful in setting it" to "People that would have had a point of view that could be helpful in setting it. | Clarify intended meaning |
| 93 | 23-24 | Change "not a specific to SCA" to "not specific to SCA" | Correct typographical error |
| 98 | 11 | Change "we exchange" to "we exchanged" | Correct typographical error |
| 98 | 12-13 | Change "for a company-wide standpoint" to "from a company-wide standpoint" | Correct typographical error |
| 102 | 13-14 | Change "Knowing one individual at another company's salary information" to "Knowing one individual's salary information at another company" | Clarify intended meaning |
| 129 | 13-14 | Change "I would have said that as it is the agenda for the meeting on Monday" to "I would have said that it is the agenda for the meeting on Monday" | Clarify intended meaning |
| 143 | 13 | Change "is what the e-mail says that says" to "is what the e-mail says, and that says" | Clarify intended meaning |
| 164 | 11-12 | Change "At one time he was responsibility -- had responsibility for our HR department" to "At one time he had responsibility for our HR department" | Clarify intended meaning |
| 173 | 17-18 | Change "under the antitrust and business competition that we're looking at" to "under the antitrust and business competition section that we're looking at" | Clarify intended meaning |
| 175 | 7-8 | Change "The first bullet also has the word "competitor" in there to set prices" to "The first bullet also has the word "competitors" in there." | Clarify intended meaning |

1

| Page | Line(s) | Correction | Reason |
|---|---|---|---|
| 178 | 10-12 | Change "I don't see SCA and USPI winning or losing in a market because of understanding of a very narrow datapoint" to "I don't see SCA and USPI winning or losing in a market because of an understanding of a very narrow datapoint" | Correct typographical error |
| 182 | 6 | Change "One is a actual number" to "One is an actual number" | Correct typographical error |
| 192 | 24 | Change "I would not say that broadly" to "I would not say it that broadly" | Clarify intended meaning |
| 233 | 10-11 | Change "I don't think I had an SCA -- at that time" to "I don't think I had an SCA device at that time" | Correct typographical error |

Brian Mathis

2

# ZIELINSKI EXHIBIT 41 (FILED UNDER SEAL)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

--o0o--

)
IN RE OUTPATIENT MEDICAL CENTER    ) No. 1-21-cv-00305
EMPLOYEE ANTITRUST LITIGATION      )
_____)

_____

VIDEO DEPOSITION OF

SHANNON McGARRY

June 11, 2024

_____

DEPOSITION OF SHANNON McGARRY, produced as a witness, duly sworn by me via videoconference at the instance of the PLAINTIFFS, was taken in the above-styled and numbered cause on June 11, 2024, from 9:04 A.M. to 12:20 P.M., before BRANDON D. COMBS, CSR, RPR, in and for the State of Texas, reported by computerized machine shorthand via videoconference.

THE VIDEOGRAPHER: Hello. We're going on the record at 14:04 UTC, on Tuesday, June 11, 2024.

Audio and video recording will continue to take place unless all parties agree to go off the record. Please note that microphones are sensitive and may pick up whispering and private conversations.

This is the video-recorded proceeding of Shannon McGarry in the matter of In Re Outpatient Medical Center Employee Antitrust Litigation. This proceeding is being held via remote videoconference.

My name it Chelsea Gilchrist. I'm the videographer on behalf of U.S. Legal Support, located at 16825 North Chase Drive, Suite 900, Houston, Texas 77060. I'm not related to any party in this action, nor am I financially interested in the outcome.

The court reporter is Brandon Combs, on behalf of U.S. Legal Support.

Counsel will state their appearances for the record, after which the court reporter will swear in the witness.

MR. ROSS: Good morning, everybody. This is Jonathan Ross from Nussbaum Law Group for the plaintiffs. And I have with me my colleague Cameron

09:03:54
09:03:56
09:04:03
09:04:05
09:04:08
09:04:12
09:04:15
09:04:16
09:04:18
09:04:23
09:04:26
09:04:31
09:04:34
09:04:37
09:04:44
09:04:50
09:04:53
09:04:54
09:04:56
09:04:59
09:05:02
09:05:03
09:05:06
09:05:07
09:05:11

Brody.

MS. HOLTHUS:  Staci Holthus on behalf of Defendant DaVita, Inc.

MS. O'CONNOR:  Katharine O'Connor from McDermott, Will & Emery on behalf of Defendant Kent Thiry.

MS. MANNING:  Amy Manning and Chris Karamanos from McGuireWoods on behalf of SCA.

MS. STEINER:  Good morning.  This is Jordanne Steiner from Wilson Sonsini Goodrich & Rosati, on behalf of Mr. Andrew Hayek.

MS. MOYE:  Good morning.  Veronica Moye, King & Spalding, for Defendant USPI.  I have with me Julia Barrett, also from King & Spalding, and on the line Julianne Duran.

THE VIDEOGRAPHER:  Will the court reporter swear in the witness.

SHANNON McGARRY,

having been first duly sworn, testified as follows:

EXAMINATION

Q.    (BY MR. ROSS)  Good morning, Ms. McGarry.  Thank you for coming in today.  Can you please state your full name and home address for the record.

A.    Shannon Dolores McGarry.  My address is ██████████████ ████████ ██████████.

Shannon McGarry
June 11, 2024

Q. And are you represented by counsel at this deposition?

A. Yes.

Q. And who is representing you?

A. Veronica Moye.

Q. And are you currently employed by USPI?

A. I am currently employed by Tenet Healthcare.

Q. Are you on any medication or is there any other reason why you could not give truthful testimony today?

A. No.

Q. Have you ever been deposed before?

A. No.

Q. Have you ever given testimony under oath in a trial or at a hearing in a courtroom?

A. Yes.

Q. And when was that, or how many times was that?

A. It was one time, in 2009.

Q. And what kind of case was that about?

A. It was a murder case. Well, manslaughter, I'm sorry.

Q. And you were a witness?

A. I was a character witness.

Shannon McGarry
June 11, 2024

that those journals be produced.

THE WITNESS:  Can I take a quick break?

MS. MOYE:  Yes, we can.  We don't have a question pending.  We want to take a break now, please.

MR. ROSS:  Certainly.

THE VIDEOGRAPHER:  I'll take us off the record.  We're going off the record.  The time is 15:52 UTC.

(Off the record.)

THE VIDEOGRAPHER:  Going back on the record.  The time is 15:57 UTC.

Q.  (BY MR. ROSS)  Okay.  And welcome back, Ms. McGarry.  So going back to when Ms. Mosley handed you the Post-it and told you about not to solicit from these companies, do you recall if she said why you shouldn't solicit from these companies?

A.  At that time she did not.

Q.  At a later time did she?

A.  Maybe later.  I believe when I was informed that I needed to speak with attorneys regarding -- in regards to the DOJ case, I believe we may have spoke at that time about it.

Q.  And what is your recollection of that conversation?

A.   She just spoke of a gentleman's agreement in regards to the companies.  In regards to like AMSURG, SCA there was some type of gentleman's agreement that we weren't to solicit their employees, and that was pretty much the gist of the conversation.

Q.   Did she say why you weren't -- beyond the fact that there was this agreement, did she say why these companies had this gentleman's agreement?

A.   Not to my recollection, no.

Q.   And do you recall anything further about what the gentleman's agreement was that Ms. Mosley described to you?

A.   No, and I did not ask.

Q.   After having that conversation, did you have any conversations with anyone else, any other colleagues about those gentleman's agreements?

A.   Not to my knowledge, no, I did not.

Q.   So from that point forward, if a candidate from SCA applied for a position that you were recruiting, looking to fill, what would you do?

A.   You asked at what point, what date?  You said, at that point.  I'm not sure --

Q.   I'm sorry.  After you had this conversation with Ms. Mosley two weeks after you

Shannon McGarry
June 11, 2024

started your job there, if an SCA candidate would respond to a posting, what would you do?

A. I would reach out to that candidate if they met the minimum requirements for that role.

Q. If that candidate was from SCA would you reach out to them?

A. Yes.

Q. Even though SCA is on this Post-it list?

A. That's correct.

Q. You would defy what Ms. Mosley told you?

MS. MOYE: Objection to the form.

THE WITNESS: She never told me that -- to not -- I wasn't to solicit. But if a candidate actually applied or expressed interest in USPI, then that was fine, I could actually talk to them.

Q. (BY MR. ROSS) Okay. So if you were searching through SilkRoad for potential candidates for a position and you came across an SCA resume, what would you do?

A. If it was in SilkRoad, which means they actually applied to the role, so I could actually reach out and talk to them.

Q. What if it was for a role that they hadn't applied for? What if it's a year later?

A. It would not be in SilkRoad, so...

Shannon McGarry
June 11, 2024

Q. SilkRoad did not maintain the resumes of everyone who put in -- who responded to an ad?

A. Yes. So if they actually applied to a position, I could actually talk to them.

Q. So they applied for Position X. A year later you're looking through SilkRoad for potential candidates for Position Y, a new position, not the one that they applied for. What would you do if you came across an SCA resume?

A. I rarely, if ever, looked for administrator candidates or CEO candidates in SilkRoad, so that would not have happened.

Q. How would you go about sourcing candidates for administrators and CEOs?

A. Typically, I would utilize either CareerBuilder or LinkedIn.

Q. And if you came across a candidate on LinkedIn or CareerBuilder that was working at SCA, what would you do?

A. Working at SCA in what capacity?

Q. In a capacity that you thought was a good candidate for the administrator position you were looking to fill.

A. I would not reach out to that candidate.

Q. Because of the gentleman's agreement with

MR. ROSS: Sure.

THE WITNESS: And she also worked at a hospital, so that was in a surgery department, so that was very attractive as well.

Q. (BY MR. ROSS) Now, can you point out to me what you're referring to as previous surgical experience?

A. So she worked as the interim business director in the division of plastic surgery at Cincinnati Children's Hospital.

Which is definitely -- we definitely want to look at folks who have had experience kind of running an operations in a hospital, especially on the surgery side. As well as she worked in a previous role at SCA as an administrator.

Q. So is it fair to say that but for the restriction on sourcing SCA candidates, you would have considered Katherine for an administrator position?

MS. MOYE: Object to the form.

THE WITNESS: Possibly, but I can't say for sure until I actually do my initial screen or phone screen on candidates.

Q. (BY MR. ROSS) Did you ever do an initial phone screen on Katherine?

Shannon McGarry
June 11, 2024

A. I can't recall if I did or not. In this case I probably did not, but I maybe later down the line could have screened her, interviewed her, but I can't recall.

Q. Do you recall if you were ever informed that the gentleman's agreement with SCA had ended?

MS. MOYE: Objection to the form.

THE WITNESS: I was informed that I could now solicit candidates from SCA.

Q. (BY MR. ROSS) And how were you informed that?

A. My manager told me that we could now solicit candidates from SCA.

Q. By manager you mean Ms. Mosley?

A. Yes.

Q. And how did she tell you that?

A. Via email.

MR. ROSS: All right. So let's pull up Tab 8, which will be Exhibit PX103.

(Whereupon, Exhibit PX103 was marked for identification.)

Q. (BY MR. ROSS) And it is an email exchange from October 24, 2017 -- well, October 23 and 24, 2017, with Bates number USPI_CIV_3394. Is this the email you received from Ms. Mosley?

Shannon McGarry
June 11, 2024

A.   Yes.

Q.   And after she informs you that you can now recruit administrators from SCA, your response is, great, yay, exclamation point, exclamation point; correct?

A.   Yes.

Q.   Why were you so happy?

A.   Because it opened a larger pool of candidates.

Q.   And if you recall, after October 24, 2017, did you find that it was easier to fill positions with a larger pool of candidates?

A.   It was the same.  It didn't help and it didn't hinder, so it was about the same.

Q.   Well, wasn't there a larger pool of candidates to recruit from?

A.   There were.  Not every person at SCA was eligible to be an administrator.  So I would say it opened up a larger pool.  However, are those candidates -- do we want those candidates to work for us?

And that comes down to screening, interviewing, making sure that they are, you know, the right fit.  Because not -- everybody with the same skill set is not the right fit for your

Shannon McGarry
June 11, 2024

organization.

Q.   But did you find that the SCA pool did in fact have people with the skill sets you were looking for?

A.   Some SCA people did, candidates did have the skill set, yes.

MR. ROSS:  Let's pull up Tab 9.

THE VIDEOGRAPHER:  One moment.

And this will be Exhibit 104.

(Whereupon, Exhibit PX104 was marked for identification.)

Q.   (BY MR. ROSS)  This is PX Exhibit 104, which is an email exchange, with Bates stamp number USPI_CIV_1842.

And in the first email, reading from the bottom to the top, Shannon writes to you, Shannon Mosley writes to Ms. McGarry.

Saying, I'm on the phone with Jeff now and he suggested that we look at the following companies listed below to pull from for our Dallas RVP opening.

And then if you look down you'll see the companies to target at the bottom includes SCA.

So is it fair to say that in January 2018 SCA was a company that people were looking to target

Shannon McGarry
June 11, 2024

CERTIFICATE OF REPORTER

I, BRANDON D. COMBS, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth, and nothing but the truth in the within-entitled cause;

That said deposition was taken in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of the said witness was thereafter reduced to typewriting, by computer, under my direction and supervision;

That before completion of the deposition, review of the transcript was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the event of this cause, and that I am not related to any of the parties thereto.

DATED: June 13, 2024

*Brandon D. Combs*

BRANDON D. COMBS
RPR, Texas CSR 10927, California CSR 12978

MS. MOYE: And our position is the same, all responsive documents have been produced, and the deposition is concluded.

MR. ROSS: Thank you very much for coming in, Ms. McGarry.

THE WITNESS: Thank you.

MR. ROSS: Thank you, Mr. Reporter.

THE VIDEOGRAPHER: And I'll take us off the record. We're going off the record at 17:20 UTC, and this concludes today's testimony given by Shannon McGarry.

(Whereupon, the deposition adjourned at 12:20 P.M.)

--oOo--

I declare under penalty of perjury that the foregoing is true and correct. Subscribed at 3905 Iron Gate Pl Mesquite, TX 75181 this 15 day of July , 2024.

_Shannon McGarry_____

SHANNON McGARRY

DEPOSITION ERRATA SHEET

Page No.22 Line No. 17

Change: Cut "for"

Reason for change: Typographical error

Page No. 25 Line No. 23

Change: Make "center" plural

Reason for change: Typographical error

Page No. 71 Line No. 23

Change: Add "n" to "spoke"

Reason for change:Typographical error

Page No._____ Line No._____

Change:_____

Reason for change:_____

Page No._____ Line No._____

Change:_____

Reason for change:_____

Page No._____ Line No._____

Change:_____

Reason for change:_____

Page No._____ Line No._____

Change:_____

Reason for change:_____

_Shannon McGarry_____        7/15/2024
                                     _____

SHANNON McGARRY                              Dated

# ZIELINSKI EXHIBIT 42 (FILED UNDER SEAL)

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE OUTPATIENT MEDICAL CENTER      )
EMPLOYEE ANTITRUST LITIGATION,       )
                                     )
          Plaintiffs,                )
                                     )Master Docket
                                     )No. 1:21-cv-00305
THIS DOCUMENT RELATED TO:            )
ALL ACTIONS                          )
_____)

CONFIDENTIAL


          The videotaped deposition of CLARE METCALF,

called by the Plaintiffs for examination, pursuant to

subpoena and pursuant to the Federal Rules of Civil

Procedure for the United States District Courts

pertaining to the taking of depositions, taken before

Michelle A. Duzan, Certified Shorthand Reporter and

Registered Merit Reporter, at U.S. Legal Support,

200 West Jackson Boulevard, Suite 600, Chicago,

Illinois, commencing at the hour of 9:04 a.m. on the

14th day of August, A.D., 2024.

THE VIDEOGRAPHER:  We are on the record at 9:04 a.m. on August 14th, 2024.  This is the videorecorded deposition of Clare Metcalf taken by counsel for plaintiff in the matter of In Re Outpatient Medical Center Employee Antitrust Litigation, filed in the United States District Court for the Northern District of Illinois.

This deposition is being held at 200 West Jackson Boulevard, Suite 600, Chicago, Illinois 60606.  My name is Josh Dominiak.  I'm a videographer on behalf of U.S. Legal Support.  The court reporter is Michelle Duzan on behalf of U.S. Legal Support as well.

Counsel will state their appearances for the record after which the court reporter will swear in the witness.  Then we may proceed.

MR. SCHORK:  Erich Schork from the Roberts Law Firm U.S. Legal Support, 200 West Jackson Boulevard, Suite 600, PC, on behalf of plaintiffs.

MR. CYPRYS:  Jonathan Cyprys from the law firm of Greenberg Traurig, LLP, on behalf of Russell Reynolds Associates and Clare Metcalf.

MS. GILBERT:  Good morning.  Amy Gilbert from McGuireWoods on behalf of Surgical Care

Affiliates.

MS. SIEGEL:  Glenna Siegel from McDermott Will & Emery on behalf of Kent Thiry.

MR. KLIEBARD:  Good morning.  Ken Kliebard of Morgan Lewis on behalf of DaVita.

And good morning, Ms. Metcalf.

MS. NEWTON:  Good morning.  It's Emily Newton from King & Spalding on behalf of the USPI and Tenet Healthcare defendants.

MR. BANK:  Good morning.  This is Jeffrey Bank from Wilson Sonsini on behalf of Defendant Andrew Hayek.

MR. SCHORK:  Do you want to swear in the witness?

(Witness duly sworn.)

CLARE METCALF,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. SCHORK:

Q.   Good morning, Mrs. Metcalf.  My name is Erich Schork, and I represent the plaintiffs in this litigation.  I'll be taking your deposition today.

Can you please state and spell your name for

the record?

A.   Clare Metcalf, C L A R E, M E T C A L F.

Q.   And what's your current home address?

A.   ████████████████████████████.

Q.   Okay.  And who is your current employer?

A.   Russell Reynolds Associates.

Q.   And what is your current job title?

A.   Managing director.

Q.   And how long have you been in that role?

A.   11 years.

Q.   Do you have a work address?

A.   155 North Wacker, Suite 4100, Chicago, Illinois.

Q.   Now, are you represented by an attorney today?

A.   Yes.

Q.   Who -- who is representing you?

A.   The gentleman to my right.

Q.   Okay.  And are you paying for the attorney yourself, or --

A.   No.

Q.   -- is Russell Reynolds paying for the attorney?

A.   Russell Reynolds.

more about what you're referring to?

A.    Those can have a lot of different structures depending on the type of company.  But typically it's a third element of compensation tied to long-term goals of a company, typically three to five years, and compensation either in the form of equity grants, cash payments, most typically that are based on the achievement of those long-term incentives.

Q.    Okay.  Now, in your experience, when you're discussing compensation for a search, the compensation range and the elements of compensation, do clients typically base their position on what employees in similar positions within their organization are being paid?

MR. CYPRYS:  Objection.

MS. GILBERT:  Object to form.

BY MR. SCHORK:

Q.    You can answer.

MR. CYPRYS:  Objection, calls for speculation.

To the extent you know.

THE WITNESS:  They're typically multiple factors.  So one is internal equity, which is how this position paid relative to others in the

organization.  They often take in market data, so there are certain organizations that will do market scans or market collection to understand what that position is paid for in the overall market.  So that's typically what they look at.

BY MR. SCHORK:

Q.   But in your experience, internal equity is typically a consideration?

A.   Yes.

Q.   Now, I think you previously testified that during the kickoff meeting, you would typically discuss the requirements for a qualified candidate. Can you elaborate on what you mean by "qualified candidate"?

A.   So it would typically include what functional expertise they come with, that's related to the position that -- at hand.  Oftentimes how many years of experience they have, could include how many people they've managed, could include what size organization they've -- what revenue size they've been involved in, could include what geography they have experience in, could include specific initiatives they've led.  Those would probably be the main -- the key ones.

Q.   Now, during these kickoff meetings, is it common for clients to provide details on the sort of candidates they're not interested in?

MR. CYPRYS:  Objection, form.

To the extent you know.

BY MR. SCHORK:

Q.   You can answer.

A.   Yes.

Q.   And can you describe how that typically unfolds?

A.   It might go to the nuances of a geography. For example, we are a U.S. focused company.  This -- candidates have a lot of experience outside the U.S. That's not useful to us.  So we're not interested in that.  It may be organizations -- like organizations they don't respect, they don't think that they're strong competitors in the market and don't think their talent therefore is of interest.  It may be that some organizations are too big and they're concerned the person won't be hands-on enough.  It might be that the organization the person has been with is too small and they don't have the breadth of experiences.  There's sort of an infinite number of permutations on that.

STATE OF ILLINOIS   )

)   SS:

COUNTY OF C O O K   )

I, Michelle A. Duzan, CSR No. 084-004270, a Notary Public within and for the County of Cook, State of Illinois, and a Certified Shorthand Reporter of said state, do hereby certify:

That previous to the commencement of the examination of the witness, the witness was duly sworn to testify the whole truth concerning the matters herein;

That the foregoing deposition transcript was reported stenographically by me, was thereafter reduced to typewriting under my personal direction and constitutes a true record of the testimony given and the proceedings had;

That the said deposition was taken before me at the time and place specified;

That I am not a relative or employee or attorney or counsel, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor interested directly or indirectly in the

outcome of this action.

IN WITNESS WHEREOF, I do hereunto set my hand and affix my seal of office at Orland Park, Illinois, this 19th day of August, 2024.

_Michelle Duzan_
_____

Notary Public, Cook County, Illinois.

My commission expires 11/01/27.

Michelle A. Duzan, CSR, RMR

CSR No. 084-004270

# ZIELINSKI EXHIBIT 43 (FILED UNDER SEAL)

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE OUTPATIENT MEDICAL
CENTER EMPLOYEE ANTITRUST
LITIGATION,                          )
                                     )
                                     )
                                     ) Master Docket No.
                                     ) 1:21-cv-00305
THIS DOCUMENT RELATED TO:            )
ALL ACTIONS                          )
                                     )
                                     )

_____

VIDEOTAPED DEPOSITION OF:
LAURA MILDENBERGER - July 30, 2024

_____

PURSUANT TO SUBPOENA, the videotaped deposition of LAURA MILDENBERGER was taken on behalf of the Plaintiffs at 1144 15th Street, Suite 3400, Denver, Colorado 80202, on July 30, 2024 at 9:08 a.m., before Tracy R. Stonehocker, Certified Realtime Reporter, Registered Professional Reporter and Notary Public within Colorado.

Laura Mildenberger
July 30, 2024

WHEREUPON, the following proceedings were taken pursuant to the Colorado Rules of Civil Procedure.

* * * * *

THE VIDEOGRAPHER: We are on the record on July 30, 2024. The time is now 9:08 a.m. Audio and video-recording will continue to take place until all parties agree to go off the record. This is the video-recorded deposition of Laura Mildenberger regarding Outpatient Medical Center Employee Antitrust Litigation filed in the United States District Court for the Northern District of Illinois.

This deposition is being held at 1144 15th Street, Denver, Colorado. My name is Michael Banks. I'm the videographer on behalf of U.S. Legal Support. The court reporter is Tracy Stonehocker on behalf of U.S. Legal Support. I'm not related to any party in this action, nor am I financially interested in the outcome.

Counsel will state their appearances for the record, after which the court reporter will swear in the witness.

MR. HARVEY: Dean Harvey, Lieff, Cabraser, Heimann & Bernstein for the plaintiffs.

MS. HARWELL: Emily Harwell, Lieff,

Cabraser, Heimann & Bernstein for the plaintiffs.

MR. MURPHY:  Martin Murphy, Manatt Phelps & Phillips for the witness.

MR. DODDS:  Jack Dodds, Morgan Lewis for DaVita.

MR. CAMPBELL:  Dan Campbell, McDermott Will & Emery for Defendant Kent Thiry.

\*　　　\*　　　\*　　　\*

LAURA MILDENBERGER,

having been first duly sworn to state the whole truth, testified as follows:

(Deponent's reply to oath:  I do.)

EXAMINATION

BY MR. HARVEY:

Q.　Good morning.

A.　Good morning.

Q.　Is this your first deposition?

A.　No.

Q.　How many times have you been deposed before today?

A.　Probably three or four times.

Q.　What were those depositions in connection with in terms of the claims at issue in the cases?

A.　I actually don't recall the first one or

Laura Mildenberger
July 30, 2024

remember maybe a couple of sections that were new, or somebody that was, you know, had been in the role for quite some time and somebody who had extensive experience that was actually providing additional duties in a facility beyond just their PCT responsibilities, so. . .

Q. Was there a yearly process by which DaVita assessed pay levels throughout the company and determined what the -- the labor budgets and guidance for the next year should be?

A. Not that I recall. I think most of that stuff was done locally. So, again, we could provide information and data and then operators would make their own choices and decisions as to what was best for their market and what they needed to do to make their own particular market successful.

Q. What do you mean by operator? Could you define --

A. Sure.

Q. -- what kind of employee you mean by that?

A. Sure. So, gosh, to the best of my recollection, we had divisions across the country and those divisions were led by an operating vice president. I think there were somewhere between, I

Laura Mildenberger
July 30, 2024

don't know, 12 and 15 divisions at the time. And generally, those divisions were certain markets of the country and certain territories of the country and the decision-making on compensation was local because they knew their markets. They knew the competition. They knew, you know, how difficult it was to recruit. They knew their turnover rates, if they were really having trouble keeping people because people were going to competitors for more funds. So it was definitely a local decision in terms of what was best in their own specific market in terms of compensation.

Q. These 12 to 15 divisions, these are defined by geographic regions?

A. Largely, yes.

Q. So these operator vice presidents -- if an operator vice president wanted to double the pay of everyone in their division, could they do that?

MR. DODDS: Object to form.

A. I don't recall specifically, but what I do know is they had a tremendous amount of latitude to pay what they needed to pay to be successful in their market and to work within whatever budget they had been agreed to -- had agreed to work within, you know, during budgeting season, and so there was a great deal of autonomy. You know, their obligations was to make

Laura Mildenberger
July 30, 2024

sure and, you know -- I had this role at one point -- was to make sure that, number one, clinically, that you had outstanding clinical results and, number two, that you hit your budget. And so, again, there was a great deal of latitude on a market-by-market-by-market basis to meet those goals.

Q. (BY MR. HARVEY) Who determined their labor budgets?

MR. MURPHY: Objection.

A. My recollection -- and, again, this is many years ago and I'm only speaking from the time, you know, of my own experience. I have no clue as to what has occurred since I left 10 years ago, but the -- my recollection, when I was in that role, was that I would prepare a budget for my territory and then that budget approval came from the group vice president, and I believe at the end of the day from the COO.

Q. (BY MR. HARVEY) What do you mean by your "territory"?

A. My territory, I'm speaking of when I was in the role of a vice president -- an operating vice president.

Q. So this is with respect to the employees you supervised?

Laura Mildenberger
July 30, 2024

A.   No.  I think I've confused the situation here, but if I can clarify.

Q.   Yeah.  Please do clarify.

A.   Okay.  When I was -- you had asked who controls the budget, I think was your question --

Q.   Sure.

A.   -- initially.

Q.   Yeah.

A.   So what I was explaining -- attempting to explain -- apparently not very well -- when I was an operating vice president, because that is the role that I held before I became the CPO, I was responsible for preparing a budget and getting that -- that budget was approved, then, by my group vice president who then I think had approval from the COO at the end of the day that that would be the budget that I was going to be held to for that budget year.

Q.   Okay.  So this is during the time period before you were the chief people officer?

A.   Correct.

Q.   Okay.  While you were chief people officer, could you explain the -- you refer to budget season.  First let me ask, did budget season occur once per year?

A.   Yes.

Laura Mildenberger
July 30, 2024

the time, so it was a particular challenge.  So I do think, on occasion, there would be functions that would experience some -- were experiencing something similar.  Again, always -- you know, it wasn't universal for the whole organization.  It would be, you know, you have a pocket of a challenge here because of, you know, lack of labor for that particular category that they needed to hire, so in that context, I suppose, yes.

Q.    Do you recall whether DaVita provided retention bonuses on occasion to employees who were at particular risk of leaving?

A.    It's pretty vague.  If you could refresh my recollection with documents, that might help.

Q.    I'm just trying -- you know, why don't we -- I don't want to get hung up on terminology or anything.

A.    Right.

Q.    Generally, do you recall at DaVita whether something came up, a retention concern during the year, you know, outside of the budget season where something needed to be done to address retention, such as providing compensation of some kind in addition to what that person was already receiving, if you want to call it retention bonus, whatever you want to call it?

Laura Mildenberger
July 30, 2024

A.   Yes.  Again, I think -- I think that we had -- we gave operators a tremendous amount of latitude to run their business and, you know, these businesses were complicated and ever-changing and always different in every market.  A problem in Wichita was not the same problem in LA as in Denver.  It just was always different, so the -- you know, again the guidelines that the business is, yeah, we can put in guardrails and give you guidance and give you some information, we had a lot of data, but at the end of the day, the operator is accountable for running their business, and so did they have the latitude to do a retention bonus if they had a particular situation that warranted that in order to keep that clinic open, and they were having people, you know, leave right and left for whatever reason that they needed to do whatever they needed to do, again, it was within their latitude because at the end of the day, the accountability was to provide outstanding patient care, number one, and, number two, hit your numbers.  And there's no way from an HR perspective that given the number of facilities we had that we're going to run that from HR.  We provided guidance, we tried to provide a lot of information, but I to -- to the best of my recollection, there was

Laura Mildenberger
July 30, 2024

universally always the ability for the operators and

their leaders to make exceptions to do what they

needed to do to make sure that the overall objectives

of the company in terms of clinical results and

financial performance were met.

Q.   Could an operator decide to pay women 10

percent less than men if he wanted to?

A.   I think we would flag that and I think

then there would be accountability to fix that.

Again, that was -- I'm sorry, you know, we discussed

this previously.  It was quite rare.  I don't even

really recall very many circumstances where we would

flag that.

Q.   And you had the data and the processes

in place to figure out whether something like that was

happening, right?

A.   Yes.  Yes.

(Deposition Exhibit 199 was marked.)

Q.   I'm introducing a document stamped

exhibit -- sorry.  I'm introducing Plaintiffs' Exhibit

199.  It's a document produced as DVAOMCEAL 1216301.

Was this an e-mail exchange you were included on at

the dates indicated?

A.   Let me take a quick look.  Okay.

Q.   Do you recall who Ray Follett was at the

Laura Mildenberger
July 30, 2024

time?

A.   I do.  Not with a lot of specificity, but I believe he was an operator.

Q.   Do you recall the -- where in the company he was located in terms of the people under his supervision?

A.   I want to say California, but that's a guess.

Q.   I direct your attention to the second page and the e-mail written by Mr. Follett at 2:26 p.m. and he wrote:  "The team could use some tools to be strategic in allocating the wage increase merit pool."  Let me stop there.  What wage increase merit pool is he referring to here?

A.   I don't remember.

Q.   Do you recall the concept of a wage increase merit pool at DaVita?

MR. DODDS:  Object to form.

A.   Not specifically.

Q.   (BY MR. HARVEY) You don't recall that there was a wage increase merit pool that operators and groups at DaVita needed to allocate?

MR. DODDS:  Objection.

A.   Yeah, it's -- this is pretty fuzzy to me.  It wouldn't surprise me if each division was

11:32:36
11:32:36
11:32:41
11:32:43
11:32:48
11:32:52
11:32:53
11:32:57
11:32:57
11:33:06
11:33:12
11:33:18
11:33:21
11:33:26
11:33:28
11:33:30
11:33:35
11:33:39
11:33:40
11:33:41
11:33:46
11:33:53
11:33:58
11:33:59
11:34:02

Laura Mildenberger
July 30, 2024

MR. CAMPBELL: Objection to form.

A. I have, again because of review of the documents, a vague recollection of such, yes.

Q. (BY MR. HARVEY) Which companies do you recall Mr. Thiry having such conversations with?

A. Independent of the documents, I don't recall the names of the companies.

Q. But you saw documents to prepare for today that refresh your recollection about the identities of some of these companies?

MR. MURPHY: Objection.

A. Yes.

Q. (BY MR. HARVEY) Which companies are those?

A. Without looking at the documents, I can't tell you. I don't recall.

Q. Okay. Are you aware of the criminal trial?

A. I am.

Q. Sorry. I don't actually think I mentioned this at the outset, but I said to use this as a reminder, to please wait until I complete my question before responding and I will do my best not to cut you off in the middle of an answer.

A. My apologies. I'm sorry.

Laura Mildenberger
July 30, 2024

Q.   Trying to make the record as clean as possible.

So what do you recall the criminal trial being about?

A.   I recall that the trial was about were there inappropriate labor practices amongst Kent and former employees.

Q.   And as that -- as you became aware of the U.S. Department of Justice's criminal trial against Mr. Thiry and DaVita, did that jog any memory of conversations Mr. Thiry had with labor market competitors about recruiting?

MR. MURPHY:  Objection.

A.   I think the memory that it jogged was just that Kent -- specifics, no, in answer to your question, but what it did jog for me was that content kept was extremely passionate about when people would leave the organization that he believed that he had mentored, that he had helped them in their careers, et cetera.  He was very emotional about it, so I have a vague overall recollection of high emotion on this particular topic.  But without information, I really don't recall details.  I just remember that or my --

MR. DODDS:  Sorry, that was me.

A.   Is that he really valued loyalty and I

Laura Mildenberger
July 30, 2024

think he felt -- or my impression was that he felt a

deep sense of betrayal if people that he had worked

closely with and mentored went off and did other

things.

Q. (BY MR. HARVEY) By going off and do other things, you mean leave DaVita and join a competitor?

A. Yes. Or start their own thing, you know, start their own organizations.

Q. So I want to make a distinction here because I want to make sure I understand your testimony.

A. Sure.

Q. Between leaving DaVita and joining a competitor, and doing that, and then recruiting from DaVita, did Mr. Thiry have feelings about whether a senior executive of his should leave DaVita and join a competitor, you know, before we start talking about recruiting just the act of joining a competitor?

MR. CAMPBELL: Objection.

MR. MURPHY: Objection.

MR. DODDS: Objection, form.

A. Okay. Can you repeat your question? Because I'm not quite getting where you're going here. I'm not understanding the question.

| | |
|---|---|
| 01:24:32 |
| 01:24:36 |
| 01:24:40 |
| 01:24:43 |
| 01:24:44 |
| 01:24:47 |
| 01:24:50 |
| 01:24:50 |
| 01:24:54 |
| 01:24:58 |
| 01:25:00 |
| 01:25:02 |
| 01:25:02 |
| 01:25:03 |
| 01:25:05 |
| 01:25:10 |
| 01:25:18 |
| 01:25:24 |
| 01:25:27 |
| 01:25:30 |
| 01:25:31 |
| 01:25:32 |
| 01:25:33 |
| 01:25:35 |
| 01:25:38 |

example, whether in connection with recruiting or not, when Mr. Thiry became very upset and raised his voice?

A. I can't really provide you with a specific example with much clarity this many years later.

Q. How often did Mr. Thiry get very angry?

MR. DODDS: Objection.

A. I'd be guessing.

Q. (BY MR. HARVEY) Are we talking about a handful of times that you were -- that you witnessed? Was it more than 10, more than 20?

A. I'm not sure.

Q. It was more than once, though, correct?

A. Yes.

Q. Did he make these views on loyalty to DaVita known to DaVita's senior executives?

MR. DODDS: Objection.

A. I don't know to the extent that he did that.

Q. (BY MR. HARVEY) Did he ever talk about this in your presence?

A. Not specific circumstances that I could tell you X, Y and Z happened. I just don't recall.

Q. Did he ever talk about his beliefs or feelings around employee loyalty in your presence?

A.   I don't recall.

Q.   What was your understanding at the time of what Mr. Thiry expected from the senior executives when it came to joining or not joining competing firms?

MR. CAMPBELL:   Objection, vague.

A.   Yeah, I'm struggling with the -- with the question.  If you can --

Q.   (BY MR. HARVEY) What did you understand was Mr. Thiry's hope in the sense of that his senior executives would never leave DaVita, that if they left, they wouldn't join a competing company?  Are there anymore details about what you understood his desire to be when it came to senior executives who left DaVita?

MR. DODDS:   Objection.

A.   You know, my -- again, my overall impression of this whole entire topic is just that he was extremely emotional about this particular circumstance -- these circumstances because there were I believe more than one, and very offended if he felt that he was betrayed by somebody that he had helped and coached and moved along the way.

Q.   (BY MR. HARVEY) And how -- how do you know or where does your understanding come from that

Laura Mildenberger
July 30, 2024

Mr. Thiry was extremely emotional about this topic?

A. I have, you know, a vague recollection that that was a hot button for him, again, without being able -- you know, 15, 16 years later to give you examples. My memory has also been refreshed by some documents that I have read.

Q. Did Mr. Thiry communicate to you about this topic in means other than in an e-mail, that is by speaking to you directly, calling you, so forth?

A. I don't recall.

Q. Did Mr. Thiry have a practice of being careful about copying lawyers on communications so that the communications were attorney-client privilege and would not be produced in a case like this one?

MR. DODDS: Objection.

A. I don't -- I don't know.

Q. (BY MR. HARVEY) Did Mr. Thiry ever talk to you about the concept of attorney-client privilege?

MR. DODDS: Objection.

A. Not that I can recall.

Q. (BY MR. HARVEY) Did Mr. Thiry have a practice of copying lawyers sometimes in communications on this topic?

MR. DODDS: Objection, asked and answered.

01:32:05
01:32:14
01:32:20
01:32:23
01:32:28
01:32:32
01:32:34
01:32:54
01:33:00
01:33:07
01:33:08
01:33:17
01:33:21
01:33:25
01:33:28
01:33:29
01:33:31
01:33:33
01:33:40
01:33:40
01:33:44
01:33:47
01:33:51
01:33:53
01:33:55

Laura Mildenberger
July 30, 2024

appropriate or inappropriate, I had a lot of good
labor attorneys and would not hesitate to seek their
counsel and their guidance on, you know, is this
crossing the line, is this not crossing the line, is
there anything we need to do about this, is there not.
I'm not an employment lawyer.  And so that -- that
guidance was quite helpful.

Q.  Did you talk to anyone at DaVita other
than lawyers about this topic of agreements,
understandings, communications between DaVita and
labor market competitors with respect to recruiting?

MR. MURPHY:  Objection.

A.  I don't recall.

Q.  (BY MR. HARVEY) What was your
understanding of the time of what conduct would push
the red button as you put it that would make Mr. Thiry
upset?

MR. CAMPBELL:  Objection,
mischaracterizes testimony and vague.

A.  Okay.  Can you repeat your question?
I'm sorry.

Q.  (BY MR. HARVEY)  What was your
understanding of the time of what conduct by labor
market competitors would push Mr. Thiry's red button?

MR. CAMPBELL:  Same objection.

01:35:28
01:35:31
01:35:37
01:35:40
01:35:43
01:35:45
01:35:49
01:35:51
01:35:58
01:36:02
01:36:05
01:36:07
01:36:08
01:36:10
01:36:19
01:36:30
01:36:33
01:36:35
01:36:36
01:36:38
01:36:41
01:36:41
01:36:42
01:36:48
01:36:53

Laura Mildenberger
July 30, 2024

A.    I think that one of the things, again, without being able to give you any specific examples because of the passage of time is that when somebody had left the company that Kent was close to and then somebody else within DaVita went to join that company, that -- that created what, again, I had characterized as it was a hot button, and I think because of the value of being loyal and feeling betrayed did create reactions that which I cannot give you specific examples because of, you know, it being so very, very long ago, but sitting here today, that was my general impression is that that was really tough for him.

Q.    (BY MR. HARVEY)  Were other members of the senior executive team other than you and Mr. Thiry, aware to your knowledge of Mr. Thiry's thoughts and emotions on this topic?

MR. DODDS:  Objection.

A.    I'm not sure.

Q.    (BY MR. HARVEY) Did this topic ever come up at an in-person meeting that involved you, Mr. Thiry and others?

A.    Not to my recollection.

Q.    Do you deny that it happened?

MR. MURPHY:  Objection.

A.    I'm not denying, but I'm not confirming.

Laura Mildenberger
July 30, 2024

I just really don't remember.

Q. (BY MR. HARVEY) Did Mr. Thiry sometimes avoid putting things in writing and instead called you or met with you in person?

MR. CAMPBELL: Objection to form.

A. I don't know what he did or did not do in that regard.

Q. (BY MR. HARVEY) Well, but I'm asking about what he did with respect to you. That is, did he sometimes talk to you live, either in person or over the phone on topics he felt were important that were never reduced to writing, that were never put into an e-mail?

A. I don't know. I don't know.

Q. (BY MR. HARVEY) Did Mr. Thiry share his high emotions, his views on this topic with you directly?

A. From the documents that I have reviewed, I do recall that there had been only from the documents, not from my personal recollection of the time, that after the fact when he would have these, you know, challenging conversations with people that have left and that people had then recruited, you know, from DaVita, many times or sometimes it appears from the documents, that we -- many members of the

Laura Mildenberger
July 30, 2024

REPORTER'S CERTIFICATE

STATE OF COLORADO          )
                           )  ss.
CITY AND COUNTY OF DENVER  )


                I, TRACY R. STONEHOCKER, Certified Realtime Reporter, Registered Professional Reporter and Notary Public ID 19924009337, State of Colorado, do hereby certify that previous to the commencement of the examination, the said LAURA MILDENBERGER was duly sworn or affirmed by me to testify to the truth in relation to the matters in controversy between the parties hereto; that the said deposition was taken in machine shorthand by me at the time and place aforesaid and was thereafter reduced to typewritten form; that the foregoing is a true transcript of the questions asked, testimony given, and proceedings had.

                I further certify that I am not employed by, related to, nor of counsel for any of the parties herein, nor otherwise interested in the outcome of this litigation.

                IN WITNESS WHEREOF, I have affixed my signature this 2nd day of August, 2024.

                My commission expires June 12, 2028.


__X__  Reading and Signing was requested.

_____  Reading and Signing was waived.

_____  Reading and Signing is not required.

_Tracy Stonehocker_

_____
Tracy R. Stonehocker
Registered Professional Reporter
Certified Realtime Reporter

# ZIELINSKI EXHIBIT 44 (FILED UNDER SEAL)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

--o0o--

|  |  |  |
|---|---|---|
| IN RE OUTPATIENT MEDICAL CENTER EMPLOYEE ANTITRUST LITIGATION | ) ) ) ) | No. 1:21-cv-00305 |

CONFIDENTIAL

_____

VIDEO DEPOSITION OF

SHANNON MOSLEY

August 13, 2024

_____

DEPOSITION OF SHANNON MOSLEY, produced as a witness, duly sworn by me via videoconference at the instance of the PLAINTIFFS, was taken in the above-styled and numbered cause on August 13, 2024, from 9:18 A.M. to 3:05 P.M., before BRANDON D. COMBS, CSR, RPR, in and for the State of Texas, reported by computerized machine shorthand via videoconference.

Shannon Mosley   Confidential
August 13, 2024

APPEARANCES


NUSSBAUM LAW GROUP, PC, 1133 Avenue of the Americas, 31st Floor, New York, NY 10036, represented by JONATHAN J. ROSS, Attorney at Law, appeared via videoconference as counsel on behalf of the Plaintiffs.

Email: jross@nussbaumpc.com



KING & SPALDING, 500 West 2nd Street, Suite 1800, Austin, TX 78701, represented by VERONICA MOYE & JULIA C. BARRETT, Attorneys at Law, appeared via videoconference as counsel on behalf of USPI and Tenet.

Email: vmoye@kslaw.com



MORGAN, LEWIS & BOCKIUS LLP, 110 North Wacker Drive, Chicago, IL 60606-1511, represented by STACI M. HOLTHUS, Attorney at Law, appeared via videoconference as counsel on behalf of DaVita.

Email: staci.holthus@morganlewis.com

Shannon Mosley    Confidential
August 13, 2024

WILSON SONSINI GOODRICH & ROSATI, One Market Plaza, Spear Tower, San Francisco, CA 94105, represented by KAREN J. SHARP, Attorney at Law, appeared via videoconference as counsel on behalf of Andrew Hayek.

Email: karen.sharp@wsgr.com

McGUIRE WOODS, 77 West Wacker Drive, Suite 4100, Chicago, IL 60601-1818, represented by ANDREW E. TALBOT and AMY B. MANNING, Attorneys at Law, appeared via videoconference as counsel on behalf of Surgical Care Affiliates.

Email: atalbot@mcguirewoods.com

McDERMOTT WILL & EMERY, 444 West Lake Street, Chicago, IL 60606-0029, represented by GLENNA SIEGEL, Attorney at Law, appeared via videoconference as counsel on behalf of Kent Thiry.

Email: gsiegel@mwe.com

ALSO PRESENT:

Maggie Kane, Videographer

                              INDEX

                                                        PAGE

    Examination by MR. ROSS                              6

    Examination by MS. MOYE                            141

    Further Examination by MR. ROSS                    145

    Further Examination by MS. MOYE                    155

    Further Examination by MR. ROSS                    156


EXHIBITS                                                PAGE

Exhibit PX279  Subpoena                                  9

Exhibit PX280  ███████████                              33

Exhibit PX281  ██████████                               45

Exhibit PX282  Email to Megan Fox, 10/23/17,          126

               re SCA

Exhibit PX283  Wellman Market Recruiting              132

               Forecast Q1 2015

Exhibit PX284  Email to Shannon Mosley,               149

               10/11/13, re clinical directors

               / Redding?

EXHIBITS (PREVIOUSLY MARKED)    PAGE

Exhibit PX91                        22

Exhibit PX220                      111

Exhibit PX99                       115

Exhibit PX239                      130

Shannon Mosley  Confidential
August 13, 2024

THE VIDEOGRAPHER:  Good morning.  We're on the record at 14:18 UTC, on Tuesday, August 13, 2024.

Audio and video recording will continue to take place until all parties agree to go off the record.  Please note that microphones are sensitive and may pick up whispering and private conversations.

This is the video-recorded proceeding of witness Shannon Mosley, in the matter of In Re Outpatient Medical Center Employee Antitrust Litigation.  This proceeding is being held at the remote videoconference.

My name is Maggie Kane.  I'm the videographer on behalf of U.S. Legal Support, located at 16825 North Chase Drive, Suite 900, Houston, Texas 77060.  I'm not related to any party in this action, nor am I financially interested in the outcome.

The court reporter is Brandon Combs, on behalf of U.S. Legal Support.

Counsel will state their appearances for the record, after which the court reporter will swear in the witness.

MR. ROSS:  This is Jonathan Ross from

Nussbaum Law Group for the plaintiffs.

MS. MOYE: Veronica Moye for the witness and for USPI/Tenet, King & Spalding.

MS. BARRETT: Julia Barrett, also with King & Spalding, on behalf of USPI/Tenet and the witness.

MS. HOLTHUS: Staci Holthus of Morgan, Lewis & Bockius on behalf of DaVita, Inc.

MR. TALBOT: Andrew Talbot and Amy Manning from McGuire Woods on behalf of the SCA defendants.

MS. SIEGEL: Glenna Siegel from McDermott, Will & Emery on behalf of Kent Thiry.

MS. SHARP: Karen Sharp with Wilson Sonsini Goodrich & Rosati on behalf of Andrew Hayek.

SHANNON MOSLEY,

having been first duly sworn, testified as follows:

EXAMINATION

Q. (BY MR. ROSS) Good morning, Ms. Mosley. Thank you for coming in today. To start, if you could just state your full name and home address for the record.

A. Yes. My name is Shannon January Mosley, and my home address is ███████████████████████ ███████████████ .

Q. And are you represented by counsel here

Uh-huh, yes.

Q.   And what positions above administrators and CEOs were you recruiting at that point?

A.   As stated before, regional vice presidents and operations and vice presidents of development, which would be acquisitions.

Q.   So let's break those down a little.

So regional vice presidents, what was their function at USPI?

A.   Regional vice presidents would have oversight for multiple facilities.  So the administrators reported to the regional vice presidents.

The number of facilities that a regional vice president would be responsible for would depend on the region and their capacity, and the need of the company.

Q.   And who did the regional vice presidents report to?

A.   Market presidents.  At one time they were called group presidents, but the current name is market president.

Q.   And approximately how many regional vice presidents were there during your time as director of recruiting and retention?

Shannon Mosley  Confidential
August 13, 2024

A.   I have no idea.

Q.   Do you have an approximation?

A.   I couldn't even tell you.

Q.   Was it 100?

A.   I'm not going to guess.

Q.   Were there more than five?

A.   Yes.

Q.   Were there more than 10?

A.   I don't know, because I can't remember. Again, I don't want to guess.

Q.   And then you also mentioned vice presidents of development.  What specific titles -- or was that the specific title of the position?

A.   You're asking me if vice president of development was the title?

Q.   Correct.

A.   Yes, for individuals in acquisition.

Q.   Did you recruit for any other positions in the acquisitions area?

A.   I don't recall.  I mainly remember recruiting for VPs of development.

Q.   And when the SCA no poach agreement was in place, did you apply it to VP development positions?

MS. MOYE:  Object to the form.

THE WITNESS:  Well, the agreement was in

Shannon Mosley  Confidential
August 13, 2024

place when I was recruiting.  So they would have fallen under the umbrella.

Q.  (BY MR. ROSS)  So that's a yes?

A.  That's a yes.

Q.  Of course, the RVPs would also fall under that umbrella?

A.  Correct.

Q.  And the administrators fell under that umbrella?

A.  Correct.

Q.  And the CEOs fell under that umbrella?

A.  Yes.

Q.  As you sit here today, do you recall any other positions that fell under the umbrella of the SCA no poach agreement?

MS. MOYE:  Object to the form.

THE WITNESS:  The main areas of focus were operators, as I mentioned before, administrators, and above.  That's the main focus.

Q.  (BY MR. ROSS)  So it would include other positions at USPI other than the ones I just mentioned, VP development, RVPs, administrators, CEOs, plus anything else that was above the administrator level; correct?

MS. MOYE:  Object to the form.

Shannon Mosley   Confidential
August 13, 2024

THE WITNESS:  So above the regional vice president was the market president.  And then you got into the C-suite.  So I didn't recruit for the C-suite of USPI.

Q.   (BY MR. ROSS)  Right.  That wasn't my question.

The question was, for anything you recruited for a position that was above administrator, any position above administrator, you would apply the SCA no poach agreement to it; correct?

MS. MOYE:  Object to the form.

THE WITNESS:  Yeah, I think -- I don't agree with the question.

Q.   (BY MR. ROSS)  What don't you agree about?

A.   It's too general.

Q.   Well, what's general about it?  Any position -- administrators and above is the demarcation I believe you're placing down here.  So any position above administrator that you recruited for, you applied the SCA no poach agreement to; correct?

MS. MOYE:  Object to the form.

THE WITNESS:  Yes.

Q.   (BY MR. ROSS)  So now when your position

Q.   And would you often use that tool, the LinkedIn Recruiter tool, to --

A.   Yes.

Q.   -- find candidates?

And on the LinkedIn Recruiter tool, how did that work?  Did you perform searches on the tool?

A.   Yes, you could perform searches for candidates and companies.

Q.   And what type of searches would you utilize to look for an administrator?

A.   You're able to -- in the -- it's an app as well.  It's just a plug-in website.

You could type in a certain series of words, which would be typically surgery center administrator or whatever I was recruiting for.  If they preferred a nurse, I'd add nurse and search that way.

Q.   Now, at what point in the process would you have -- would you obtain a salary range for the position?

A.   Well, because a lot of those roles had an administrator in it before, most of them were replacements, we would have an idea already of what the range could be, you know, based on the budget of

the facility for that role.

Q.   So, I mean, correct me if I'm wrong, but generally for an administrator position, an RVP would come to you, to say, we need to fill an administrator at Facility X; is that about right?

A.   I don't agree with your --

Q.   Okay.  Explain to me --

A.   -- question because -- yeah.  Can you restate it.

Q.   Well, you don't agree with -- so what was wrong with how I stated it?  What is the correct way to state it?

A.   What I'm trying to convey is there was a multi-pronged approach.  It wasn't just one approach.  There were different levers to pull to come to that decision other than just pulling a report.

Q.   How would you become aware that an administrator position needed to be filled?

A.   Typically, from the regional vice president.

Q.   Okay.  So the regional vice president would reach out to you and say, we need an administrator at such-and-such facility; correct?

A.   Yes.

Shannon Mosley   Confidential
August 13, 2024

Q.   Would he or she at that point provide to you a salary range that USPI would be willing to pay for that position?

A.   At times they may give me a range, at times they wouldn't.

Q.   Well, do you have an approximation of how often they would give you a range and how often they wouldn't?

A.   I don't, because our -- okay.

MS. MOYE:  Were you finished with your question?  Can you restate it, please, Jonathan.

Just got to slow down.

THE WITNESS:  Okay.

MR. ROSS:  Repeat the question for me, please, Brandon.

(Record read by the reporter as follows:

"Do you have an approximation of how often they would give you a range and how often they wouldn't?")

THE WITNESS:  And the answer is no because I wasn't keeping a running tab of that information. It was all situational.

Q.   (BY MR. ROSS)  And in the instances when they would not give you a pay range, did you have some understanding of what the pay range was?

Shannon Mosley   Confidential
August 13, 2024

A.   Again, we would have probably placed an administrator in that facility before.

And we would look at the range that we were offering before, maybe coupled with data from pay scale or -- but typically it was we knew the range that we'd paid before when it was a replacement position.

Q.   So then even if the regional vice president did not provide you with a specific pay range, you still had in mind a pay range for the position that you were looking to fill?

A.   Yes, we would use historical information from what was -- what the range was prior.

Q.   Now, when you would use an outside recruiting agency, how would that process go about to fulfill an administrative position?

MS. MOYE:  Object to the form.

THE WITNESS:  Okay.  To restate, you're saying what was the process when I connected with agencies to assist with administrator positions.

Q.   (BY MR. ROSS)  Yes.

A.   It would be similar to having a recruiter in-house.  I would share information with the individual about the job, any nuances, challenges. And, you know, I would have to provide a range in

Shannon Mosley  Confidential
August 13, 2024

salary.

If it was a firm I'd worked with before they would already know the bonus structure.  And so they would know the full package in order to help us to land the right candidate.

Q.  And if you recall, what were the names of the outside recruiting agencies that you used?

A.  Right.  I used several.  I'll tell you who I remember.  So it was Kaye/Bassman, Navitas, Catapult, and Doug Swope.  I can't remember, I think his company was SCPA, Surgical Care Partners.  I can't remember.

But those were the main companies that I would reach out to.

Q.  Did you have a set process with each of those companies?  By that I mean, were there weekly meetings, or did they give you periodic status reports?  How did you keep in touch with each of them?

MS. MOYE:  Object to the form.

THE WITNESS:  From what I can recall, it would depend on the agency and how, you know, large or small they were.  But I typically would request weekly reports -- or weekly updates, not reports.

Q.  (BY MR. ROSS)  And is it your recollection

Shannon Mosley  Confidential
August 13, 2024

that you advised each of the recruiting agencies that you used of the no poach agreements that USPI had?

MS. MOYE:  Objection to the form.

THE WITNESS:  So specifically to SCA and USPI, the no poach agreement was shared with the firms.  Yeah.

Q.  (BY MR. ROSS)  Well, let's take a step back.

You said Kaye/Bassman.  Who in particular at Kaye/Bassman do you recall communicating with?

A.  Just for the record, it's Bassman.

Q.  Bassman.

A.  Or you can put KBIC.

Who did I interface with?

Q.  Correct.

A.  Greg Zoch.

Q.  And at Navitas who would you interface with?

A.  It was Kim Kephart.  And there were others, I just don't remember their names.

Q.  And at Catapult who would you interface with?

A.  It was Jimmy Tanner, and there was a woman, I just can't see her name right now.

U.S. Legal Support | www.uslegalsupport.com

Shannon Mosley    Confidential
August 13, 2024

Q.    Was it Megan Fox?

A.    Yes, thank you.  I should have remembered that.

Q.    And then finally -- well, Doug Swope I guess was the person you interfaced with at Doug Swope's firm?

A.    Yes, that's correct.

Q.    Now, with respect to Greg Zoch, do you recall when you first informed him of the SCA/USPI no poach agreement?

MS. MOYE:  Objection to the form.

THE WITNESS:  Yeah, honestly, I don't recall when I -- the first time I told him.

Q.    (BY MR. ROSS)  What do you recall telling him about the SCA/USPI no poach agreement?

MS. MOYE:  I'm sorry, Jonathan, your voice went down and I didn't hear the whole question.  Can you repeat it.

Q.    (BY MR. ROSS)  I understand, you know, you don't recall when you first informed him of it. What do you recall of telling him -- what do you recall telling him about the SCA/USPI no poach agreement?

MS. MOYE:  Object to the form.

THE WITNESS:  What I shared with Greg was

Shannon Mosley   Confidential
August 13, 2024

my interpretation or my understanding of what the no poach agreement with SCA specifically meant.  And that was that we would not solicit SCA candidates.

If they applied or if he presented someone from SCA, we needed to convey that in order to move forward with the interview process, the individual at SCA would need to inform their supervisor that they were talking with a firm that, you know, represented USPI.

Q.   (BY MR. ROSS)  And with respect to that, informing their employer, that would have to occur before you would go forward with the recruitment process with that individual; correct?

MS. MOYE:  Objection to the form.

THE WITNESS:  In most cases, yes.

Q.   (BY MR. ROSS)  That was the general rule; correct?

MS. MOYE:  Objection to the form.

THE WITNESS:  From what I understood.

Q.   (BY MR. ROSS)  And what do you recall telling Kim Kephart about the SCA/USPI no poach agreement?

A.   The same thing that I told Greg.  I repeated the same thing, which is that we would need the individual that was interested in USPI to be

Shannon Mosley   Confidential
August 13, 2024

comfortable with telling their supervisor they were speaking with USPI.

Q.   And was that the same instructions that you gave to Jimmy Tanner and Doug Swope?

A.   Yes.

Q.   Now, other than the SCA agreement, were there other companies that you were told you could not actively recruit from?

MS. MOYE:  Objection to the form.

THE WITNESS:  The answer is yes.

Q.   (BY MR. ROSS)  And actually, taking a step back, just to nail down a few things.

So who told you that you could not actively solicit employees from SCA?

A.   My recollection is Kristin Blewett and also Bill Wilcox.

Q.   And do you recall if you were told orally or otherwise?

A.   Years ago, I don't recall.

Q.   Is it possible that you were told via email by Ms. Blewett?

MS. MOYE:  Objection to the form.

THE WITNESS:  I do not recall.

Q.   (BY MR. ROSS)  And the same for Mr. Wilcox, do you recall if you received any email

Shannon Mosley  Confidential
August 13, 2024

from Mr. Wilcox advising you of the SCA no poach agreement?

A.   I do not recall.

Q.   Now, as we sit here today what companies do you recall that you had -- that USPI would not actively recruit from?

A.   It would be -- and can you make that more specific.

Q.   Sure.  Other than SCA, what other companies were you told by personnel at USPI that you were not to actively recruit from?

MS. MOYE:  Object to the form.

THE WITNESS:  Woodrum, ASCOA, AMSURG, Foundation.  Those are the ones that come to -- oh, and then SCD, which was Surgical Care Development or something like that.

Q.   (BY MR. ROSS)  What was the one before SCD?

A.   Foundation.

Q.   Foundation?

A.   Yeah.

Q.   And approximately when were you told not to recruit from Woodrum?

A.   I don't remember the date.

Q.   Do you recall who told you that?

THE WITNESS: Yeah, when Greg told me, from what I can recall, there wasn't mention of that particular document at that time.

Q. (BY MR. ROSS) And is it fair to say that a number of months had gone by between the time that Ms. Karrmann gave you that article and you were told that you could now solicit from SCA?

MS. MOYE: Objection to the form.

THE WITNESS: And again, the time frame is fuzzy. And to be clear, the document was placed on my desk, but, you know, I didn't see Sandi set it on my desk, it was just sitting there and I read it.

So, and I don't remember the time frame to be honest. I do not remember the time frame in between.

Q. (BY MR. ROSS) Do you recall discussing that document with Ms. Karrmann around the time that it was placed on your desk?

A. I'm really trying to remember whether or not I talked to Sandi. I did talk with counsel. I can't remember if I spoke with Sandi about it.

Q. And I don't want to know anything about your discussions with counsel. And you don't recall discussing it with Sandi. Do you recall discussing it with anyone else who was not an attorney?

Shannon Mosley  Confidential
August 13, 2024

MS. MOYE:  And the "it" is the document itself?  Is that what you're asking about?

MR. ROSS:  Yes, the article that was placed on her desk by Sandi concerning the illegality of no poach agreements.

MS. MOYE:  Object to the form.

THE WITNESS:  So, Greg reported to Sandi, so Greg knew about the document, I knew about the document.  Outside of that, I don't recall who else it was circulated to.  Again, when it came up, came back up, it was through legal counsel.

Q.  (BY MR. ROSS)  Okay.  But my question was, did you discuss that document, the article, after it was placed on your desk, did you discuss that article with anyone other than an attorney?

A.  I do not recall.

Q.  It's possible that you did?

MS. MOYE:  Object to the form.  Don't speculate.

THE WITNESS:  Don't recall.

MR. ROSS:  Okay.  So let's pull up Tab 12, which will be marked as PX282; is that correct?

THE VIDEOGRAPHER:  Yes, that's correct. I'm pulling that up.

Shannon Mosley  Confidential
August 13, 2024

(Whereupon, Exhibit PX282 was marked for identification.)

MS. MOYE:  What exhibit number again?

MR. ROSS:  PX282.  That is Tab 12.

Q.   (BY MR. ROSS)  Do you have that document in front of you, Ms. Mosley?

A.   Yes.

Q.   And do you recognize this document as an email that was sent during the normal course of your business at USPI?

A.   Yes.

Q.   And this is an email dated October 23, 2017, from you to Megan Fox and Miles Freeman, who I believe are both at Catapult.

And you tell them, please disregard the nonpoaching agreement between USPI and SCA.  I give you permission to recruit out of SCA going forward.

So is this the first time that you advised Catapult that they could now recruit from SCA?

A.   To the best of my recollection, yes.

Q.   And do you recall if you sent similar communications to other outside recruiting agencies about their ability to now recruit from SCA?

A.   I'm certain that I may have done that, let them know, just like I'm letting Catapult know.  I

Shannon Mosley  Confidential
August 13, 2024

don't specifically remember when, but yes, I would have informed the agencies because they are recruiting for USPI.

Q.   And from the time that Ms. Karrmann placed the article on your desk concerning the illegality of no poach agreements, through October 23, 2017, you continued to apply the SCA/USPI no poach agreement; correct?

MS. MOYE:  Objection to the form.

THE WITNESS:  So the way that I'll answer that is I was waiting on directive from my supervisor, you know, regarding what to do in response to that memo.  Paper.

Q.   (BY MR. ROSS)  So while you were waiting to be told what to do, you did not advise Catapult or any other recruiting agency that they could now solicit from SCA?

A.   To the best of my recollection, I don't believe I did.

Q.   And you did not inform Ms. McGarry that she could now recruit from SCA?

A.   I don't believe I did, to the best of my recollection.

Q.   And do you recall ever telling any other recruiting agencies that they could now recruit from

Shannon Mosley  Confidential
August 13, 2024

AMSURG?

A.   No, I don't recall that.

Q.   Or from SCD?

A.   Don't recall.

Q.   Or from Woodrum?

A.   Same answer, I do not recall.

Q.   Or from ASCOA?

A.   I do not recall.

Q.   Or from Foundation?

A.   I don't recall.

Q.   Ms. Mosley, do you recall ever obtaining wage information concerning SCA's employees?

MS. MOYE:  Object to the form.

THE WITNESS:  I need more context.

Q.   (BY MR. ROSS)  Context is, do you recall ever seeking wage information of SCA employees?

MS. MOYE:  Object to the form.

THE WITNESS:  Me personally, did Shannon solicit information, the answer is Shannon did not do that.

Q.   (BY MR. ROSS)  Are you aware of anybody at USPI doing that?

MS. MOYE:  Object to the form.

THE WITNESS:  At USPI.  I'm pausing because I'm trying to...

CERTIFICATE OF REPORTER

I, BRANDON D. COMBS, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth, and nothing but the truth in the within-entitled cause;

That said deposition was taken in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of the said witness was thereafter reduced to typewriting, by computer, under my direction and supervision;

That before completion of the deposition, review of the transcript was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the event of this cause, and that I am not related to any of the parties thereto.

DATED: August 26, 2024

_____

BRANDON D. COMBS
RPR, Texas CSR 10927, California CSR 12978

Docusign Envelope ID: B269A9E9-49DC-4CDB-876C-10F8CDAAC139

Shannon Mosley  Confidential
August 13, 2024

```
                    *** ERRATA SHEET ***


   NAME OF CASE: OUTPATIENT MEDICAL
DATE OF DEPOSITION:  8-13-24
   NAME OF WITNESS:  SHANNON MOSLEY
    PAGE  LINE  FROM          TO          REASON
   74|18|"leader"|"leader's"|transcription error

   76|20|"witness"|"witness's"|transcription error

   92|10|"site"|"job"|transcription error

   ____|____|_____|_____|_____

   ____|____|_____|_____|_____

   ____|____|_____|_____|_____

   ____|____|_____|_____|_____

   ____|____|_____|_____|_____

   ____|____|_____|_____|_____

   ____|____|_____|_____|_____

   ____|____|_____|_____|_____

   ____|____|_____|_____|_____

   ____|____|_____|_____|_____

   ____|____|_____|_____|_____

   ____|____|_____|_____|_____



                        _____

Subscribed and sworn before me

this____day of_____,20__.
                              Signed by:
_____    Shannon Mosley_____

(Notary Public)          My Commission Expires:
```

# ZIELINSKI EXHIBIT 45 (FILED UNDER SEAL)

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE OUTPATIENT MEDICAL          )
CENTER EMPLOYEE ANTITRUST         )
LITIGATION,                       )
                                  )
                                  ) Master Docket No.
                                  ) 1:21-cv-00305
THIS DOCUMENT RELATED TO:         )
ALL ACTIONS                       )
                                  )
_____

          CONFIDENTIAL VIDEO DEPOSITION OF:
          JAVIER RODRIGUEZ - August 12, 2024
_____

          PURSUANT TO NOTICE, the deposition of JAVIER RODRIGUEZ was taken on behalf of the Plaintiffs at 370 17th Street, Suite 4500, Denver, Colorado, on August 12, 2024, at 9:08 a.m., before Kirsten M. Thorngate, Registered Professional Reporter.

Javier Rodriguez  Confidential
August 12, 2024

A P P E A R A N C E S

FOR PLAINTIFFS:
        LIN Y. CHAN, ESQ.
        LINDSAY CARR, ESQ. (Via Zoom)
        Lieff Cabraser Heimann & Bernstein, LLP
        275 Battery Street, 29th Floor
        San Francisco, California 94111
        Phone:  415.956.1000
        Email:  lchan@lchb.com
                lcarr@lchb.com

        EMILY HARWELL, ESQ.
        Lieff Cabraser Heimann & Bernstein, LLP
        250 Hudson Street, 8th Floor
        New York, New York 10013
        Phone:  212.355.9500
        Email:  eharwell@lchb.com


FOR DaVITA:
        JOHN C. DODDS, ESQ.
        ERICA A. JAFFE, ESQ. (Via Zoom)
        Morgan, Lewis & Bockius LLP
        2222 Market Street
        Philadelphia, Pennsylvania 19103-3007
        Phone:  215.963.4942
        Email:  john.dodds@morganlewis.com
                erica.jaffe@morganlewis.com

        MOLLY MORIARTY LANE, ESQ.
        Morgan, Lewis & Bockius LLP
        One Market, Spear Street Tower, 28th Floor
        San Francisco, California 94105-1596
        Phone:  415.442.1333
        Email:  molly.lane@morganlewis.com


FOR SURGICAL CARE AFFILIATES:
        JOSHUA D. WADE, ESQ. (Via Zoom)
        McGuireWoods
        800 East Canal Street
        Richmond, Virgina 23219-3916
        Phone:  804.775.4388
        Email:  jwade@mcguirewoods.com

Javier Rodriguez  Confidential
August 12, 2024

          AMY B. MANNING, ESQ. (Via Zoom)
          McGuireWoods
          77 West Wacker Drive, Suite 4100
          Chicago, Illinois 60601-1818
          Phone:  312.849.8100
          Email:  amanning@mcguirewoods.com


FOR ANDREW HAYEK:
          MARK ROSMAN, ESQ.
          Proskauer Rose LLP
          1001 Pennsylvania Avenue, NW, Suite 600 South
          Washington, D.C. 20004-2533
          Phone:  202.416.5868
          Email:  mrosman@proskauer.com

          JORDANNE STEINER, ESQ. (Via Zoom)
          Wilson Sonsini Goodrich & Rosati
          1700 K Street NW, 5th Floor
          Washington, D.C. 20006-3814
          Phone:  202.920.8703
          Email:  jordanne.miller@wsgr.com


FOR USPI and TENET:
          JULIANNE DURAN, ESQ. (Via Zoom)
          King & Spalding
          1700 Pennsylvania Avenue NW, Suite 900
          Washington, D.C. 20006
          Phone:  202.626.9625
          Email:  jduran@kslaw.com


FOR KENT THIRY:
          DANIEL R. CAMPBELL, ESQ.
          McDermott, Will & Emery LLP
          444 West Lake Street
          Chicago, Illinois 60606-0029
          Phone:  312.984.2167
          Email:  dcampbell@mwe.com

Also Present:
          Michael Banks, Videographer
          Amy Lou, Esq. (Via Zoom)
          Andrew Mohraz, Esq.

Javier Rodriguez  Confidential
August 12, 2024

I N D E X

EXAMINATION:                                                PAGE

     By Ms. Chan                                              9


DEPOSITION EXHIBITS:

Exhibit PX 258    Notice of 2024 Annual Meeting       4
                  and Proxy Statement

Exhibit PX 259    Q1 2020 DaVita Inc. Earnings       41
                  Call - Final

Exhibit PX 260    Q1 2023 DaVita Inc. Earnings       43
                  Call - Final

Exhibit PX 261    Q4 2022 DaVita Inc. Earnings       46
                  Call - Final

Exhibit PX 262    DaVita Inc 2019 Capital Markets    48
                  Day - Final

Exhibit PX 263    Email to Priest, et al., From      51
                  Rodriguez, 8/16/10, subject:
                  RE: ****ACTION NEEDED **** FW:
                  (for your review and approval)
                  Modern Healthcare annual
                  compensation list facts

Exhibit PX 264    Email to Rodriguez and Romania     65
                  from Mildenberger, 3/5/13,
                  Subject:  BOD and Exec Comp
                  Decks with Appendix and Notes

Exhibit PX 265    Email to Kogod, et al., from       85
                  Mildenberger, 11/18/11, Subject:
                  Fwd:  Avg. Starting Wages

Exhibit PX 266    Email to Cohen from Rodriguez,     92
                  2/22/09, Subject:  Fw:  Comp
                  Philosophy

Exhibit PX 267    Email to Arthur from Larsen,      102
                  1/30/18, Subject:  FW:  comp
                  recommendations

Javier Rodriguez   Confidential
August 12, 2024

| Exhibit PX 268 | Email to Rodriguez from Arthur, 12/13/18, Subject:  FW:  Materials for Comp Cmte Prep call w KT | 105 |
| Exhibit PX 269 | Email to Wiedman and Rodriguez from Baxter, 2/19/13, Subject: Compensation deck for Javier's presentation tomorrow | 115 |
| Exhibit PX 270 | Email to Rodriguez from Connor, 7/2/15, Subject:  RE: Hilton deck | 119 |
| Exhibit PX 271 | Email to Rodriguez and Staffieri from Stephanus, 2/24/15, Subject:  RE:  Comp Recommendations | 124 |
| Exhibit PX 272 | Email to Farish from Rodriguez, 10/31/16, Subject:  Re:  Pam Hardy Comp Recommendation | 128 |
| Exhibit PX 273 | Email to Mildenberger from Rivera, 4/14/13, Subject:  Fwd: | 147 |
| Exhibit PX 274 | Email to Mildenberger from Rodriguez, 1/10/12, Subject: Re:  catching up | 153 |
| Exhibit PX 275 | Email to Kogod, et al., from Waldman, 5/15/12, Subject: update and pipeline | 159 |
| Exhibit PX 276 | Email to Rodriguez, et al., from Thiry, 12/14/13, Subject: RE:  follow up to our conversation last week | 159 |
| Exhibit PX 277 | Email to Whitney from Thiry, 3/26/14, Subject:  RE:  Appears they had John Nehra | 177 |
| Exhibit PX 278 | Email to Priest from Thiry, 7/13/17, Subject:  quick recap | 184 |

Javier Rodriguez  Confidential
August 12, 2024

DEPOSITION EXHIBITS (Previously Marked:)

Exhibit 123                                         137

Exhibit GX 255                                      147

Exhibit GX 595                                      159

Javier Rodriguez  Confidential
August 12, 2024

WHEREUPON, the following proceedings were taken pursuant to the Federal Rules of Civil Procedure.

*       *       *       *       *

THE VIDEOGRAPHER:  We are on the record at 9:08 a.m. on August 12, 2024.  This is the video-recorded deposition of Javier Rodriguez regarding Outpatient Medical Center Employee Antitrust Litigation, filed in the United States District Court for the Northern District of Illinois.

This deposition is being held at 370 17th Street, Denver, Colorado.

My name is Michael Banks.  I'm the videographer on behalf of U.S. Legal Support.  The court reporter is Kirsten Thorngate on behalf of U.S. Legal Support.

I'm not related to any party in this action, nor am I financially interested in the outcome.

Counsel will please state their appearances for the record, after which the court reporter will swear in the witness.

MS. CHAN:  Lin Chan from Lieff Cabraser Heimann & Bernstein for the plaintiffs.

MS. HARWELL:  Emily Harwell from Lieff

Javier Rodriguez  Confidential
August 12, 2024

Cabraser Heimann & Bernstein for the plaintiffs.

MR. DODDS:  Jack Dodds from Morgan Lewis for DaVita and the witness.

MS. LANE:  Molly Lane from Morgan Lewis for DaVita and the witness.

MR. MOHRAZ:  Andrew Mohraz, in-house counsel for DaVita.

MR. CAMPBELL:  Dan Campbell, McDermott Will & Emery, for Defendant Kent Thiry.

MR. ROSMAN:  Mark Rosman from Proskauer Rose for Defendant Andrew Hayek.

MS. JAFFE:  Erica Jaffe from Morgan Lewis for DaVita and the witness.

MS. DURAN:  Julianne Duran from King & Spalding on behalf of the USPI defendant.

MS. STEINER:  Jordanne Steiner from Wilson Sonsoni Goodrich & Rosati on behalf of Defendant Andrew Hayek.

MS. LOU:  Melissa Lou, in-house counsel for DaVita.

MR. WADE:  Joshua Wade of McGuireWoods for Surgical Care Affiliates; and my colleague Amy Manning, also from McGuireWoods, will be joining as well.

Javier Rodriguez   Confidential
August 12, 2024

JAVIER RODRIGUEZ,

having been first duly sworn to state the whole truth,

was examined and testified as follows:

EXAMINATION

BY MS. CHAN:

Q.   Good morning, Mr. Rodriguez.

A.   Good morning.

Q.   My name is Lin Chan.  I'll be taking your
deposition today.

Can you please state your name and
business address for the record.

A.   It's Javier Rodriguez, 2000 16th Street,
Denver, Colorado.

Q.   How many times have you been deposed?

A.   I don't know.  Several.

Q.   Several.

More than five times?

A.   Around five times.

Q.   Okay.  And were these proceedings against
DaVita?

A.   They were employment cases or something
against DaVita.  Yes.

Q.   Aside from employment cases, what types
of cases have you been deposed in?

A.   I can't recall.  It's been more than a



their assignments; you look at their geography.

And then you propose a compensation for the next year.

Q.  Is there an initial recommendation phase?

A.  Yes.

Q.  Who does that?

A.  The person that directly is the supervisor.

Q.  And does anyone flag outliers?

MR. DODDS:  Object to the form.

Q.  (BY MS. CHAN)  What do you mean by

A.

Q.   And then what happens?

A.   We review it.  And sometimes we agree with the conclusion, and sometimes we make changes.

MR. DODDS:  Lin, just so the record is clear, you're asking about now, today, right, present day?

MS. CHAN:  Now.

MR. DODDS:  I just want to make sure. Thank you.

Q.   (BY MS. CHAN)  Did the process change or was it any different when you were head of Kidney Care?

A.   For directors and above, a couple of things that have changed, where we used to have profit share, and now we have 401(k) match or, let's call it, conventional compensation.  And for directors and above, the rest of the components have stayed similar.

Q.   How about for managers and above?

A.   For managers and above, there's been some changes, ██████████████████████████████████

███████████████████████████████████████████████

███████████████████

███████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████



Q. All right. So earlier, you described the steps in determining annual compensation for people at the director level and above.

███████████████████████████████

Q.   All right.

MS. CHAN:  Tab 47.  This document is going to be labeled PX 267.

(Deposition Exhibit PX 267 was marked.)

MS. CHAN:  For the record, Exhibit 267 is Bates-stamped DVA_OMCEAL_001238616 -- wait.  Sorry.  Strike that.

It's DVA_OMCEAL_001238631.

A.   Okay.

Q.   (BY MS. CHAN)  Okay.  Mr. Rodriguez, you received this email, correct?

A.   I was copied on it.  Yes.

Q.   This email is sent by Jamie Larson.

Do you see that?

A.   Yes.

Q.   Who is Jamie Larson?

A.   He's a finance executive.

Q.   And Colleen Arthur was copied on this?

A.   Yes.

Q.   Who is Colleen Arthur?

A.   She is a person in the human resources department in compensation.

Q.   And this email was sent on January 30, 2018, with the subject heading "Forward:  Compensation

recommendations," correct?

A. Yes.

Q. So this is an email chain discussing compensation recommendations for Jamie Larson's team, correct?

A. Yes.

Q. All right. And the first email in time is an email from Jamie Larson to you providing a summary of his compensation recommendations, correct?

A. Yes.

Q. Can you please read for me the first sentence after "In summary" that Jamie Larson wrote to you.

A. "We solved for the 65 percent bonus pool, which I believe was lower than you originally targeted for our team, but is consistent with all of finance and accounting."

Q. What does "65 percent bonus pool" refer to?

A. I think it's expressing that he will be within the range he was allocated.

Q. So each team was allocated a bonus pool, correct?

A. Yes.

Q. All right. And he was also able to solve

A.   I don't have it to be untrue, but I've never actually seen how it's used.

Q.   (BY MS. CHAN)  According to this document, "Survey participants reflect companies of a similar size and in a similar industry," correct?

A.   That's what it says.  Yes.

Q.   And "The Company," meaning DaVita, "reviews market data closely and has a good understanding of how DaVita's compensation compares to market norms," correct?

MR. DODDS:  Object to the form.

A.   I would disagree with that.

A couple things.

Number one, companies of similar size and similar industry by the pure -- it doesn't exist. There's not many companies that are like us in our similar industry.  So even that kind of is a bit confusing.

But I think to your point, we're just wanting to benchmark some data.

Q.   (BY MS. CHAN)  When you received this document, did you go back and take issue with this point that "Survey participants reflect companies of a similar size and in a similar industry"?

A.   I don't believe I did.

Javier Rodriguez   Confidential
August 12, 2024

Q.   Let's look at page 4 of this presentation under the heading "Base Salary."

Do you see that?

A.   Yes.

Q.   Okay.  So it says "Salaries and merit increases are reviewed annually at Director and below levels."

Do you see that?

A.   Yes.

Q.   Is that consistent with what your understanding is of the company practice?

A.   That -- well, a manager or a supervisor is supposed to review compensation for their teams once a year.  Yes.

Q.   And merit increase pools are allocated to each group within the Company, and they range from 1 to 2.5 percent per year in most years, correct?

MR. DODDS:  Object to form.

A.   That's what it says.  This is not an individual level, but to the groups.

Q.   (BY MS. CHAN)  Overall, that's how it works, correct?

A.   You allocate it to a group, and then the individuals can have a range.

Q.   Let's look at the next page with the

Javier Rodriguez   Confidential
August 12, 2024

title Annual Bonus.

Do you see that page?

A.   Yes.

Q.   Can you read for me the first bullet point next to the subject "Plan Design."

A.   "Bonus is accrued as a pool based on the Company and group performance and allocated between groups based on relative performance among the groups."

Q.   Is that consistent with your understanding of company practice?

MR. DODDS:  Object to form.

A.   Yes.  Groups are differentiated based on their performance.

Q.   (BY MS. CHAN)  All right.  The next bullet says "Each group leader then allocates bonus pool to employees based on individual performance."

Do you see that?

A.   Um-hum.

Q.   Is that consistent with your understanding of company practice?

A.   Yes.

Q.   Beneath that, it says "HR analyzes all allocations and notes ones that are not aligned with performance reviews."

REPORTER'S CERTIFICATE

STATE OF COLORADO          )
                           )  ss.
CITY AND COUNTY OF DENVER  )

I, KIRSTEN M. THORNGATE, a Registered Professional Reporter, do hereby certify that previous to the commencement of the examination, the witness was duly sworn or affirmed by me to testify to the truth.

I further certify that this deposition was taken in shorthand by me at the time and place herein set forth and thereafter reduced to a typewritten form; that the foregoing constitutes a true and correct transcript.

I further certify that I am not related to, employed by, nor of counsel for any of the parties or attorneys herein, nor otherwise interested in the result of the within action.

_____
Kirsten M. Thorngate
Registered Professional Reporter

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE OUTPATIENT MEDICAL CENTER EMPLOYEE ANTITRUST LITIGATION | Master Docket No. 1:21-cv-00305-SRH-YBK |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**ERRATA TO TRANSCRIPT OF AUGUST 12, 2024
DEPOSITION OF JAVIER RODRIGUEZ**

| Page | Line | From | To | Reason |
|---|---|---|---|---|
| 12 | 17-19 | A. There's an investigation to see if there was violation of antitrust, but that's what I -- that's a summary. | A. There's an investigation to see if there was violation of antitrust law, but that's what I -- that's a summary. | Clarification |
| 13 | 16-17 | A. I talked to my attorneys, showed me some emails, and that was that. | A. I talked to my attorneys, they showed me some emails, and that was that. | Clarification |
| 16 | 1-4 | But in this, there was Rich Whitney, who was our executive at DaVita. He had Josh Golomb, Andrew Hayek, Steve Priest, and I think there's a couple others. | But in this, there was Rich Whitney, who was our executive at DaVita. He also had relationships with Josh Golomb, Andrew Hayek, Steve Priest, and I think there's a couple others. | Clarification |
| 23 | 6 | payer contracting | payor contracting | Transcription Error |
| 28 | 18-19 | A. That's the formal reporting, but I reported for him on and off | A. That's the formal reporting, but I reported to him on and off | Transcription Error |
| 31 | 22 | Payer contracting. | Payor contracting. | Transcription Error |
| 33 | 22 | CO-centric | CEO-centric | Transcription Error |

| Page | Line | From | To | Reason |
|---|---|---|---|---|
| 34 | 7-8 | compensation has got to be looked holistically based, plus bonus, | compensation has got to be looked at holistically, at base, plus bonus, | Transcription Error |
| 38 | 25 | I'm five years, and he was 20 years | I've been CEO five years, and he was CEO for 20 years | Clarification |
| 76 | 25 | I would be speculative because it's been so long ago | I would be speculating because it's been so long ago | Transcription Error |
| 79 | 24 | Are you two people, on person, five people? | Are you two people, one person, five people? | Transcription Error |
| 136 | 14 | Bill Myers left to Liberty Media | Bill Myers left to Liberty Global | Clarification |
| 176 | 14 | an addiction -- mental health addiction company. | an addiction -- mental health/addiction company. | Clarification |
| 180 | 12 | And it's a conflict of the board of directors, who is | And it's a conflict of the board of directors member, who is | Clarification |
| 185 | 8 | Steve Fries. | Steve Priest. | Transcription Error |

## DECLARATION UNDER PENALTY OF PERJURY

I, JAVIER RODRIGUEZ, do hereby certify under penalty of perjury that I have read the foregoing transcript of my deposition taken on August 12, 2024; that I have made such corrections as appear noted herein; and that my testimony as contained herein, as corrected, is true and correct to the best of my knowledge.

Dated this _24_ day of September, 2024, at ___Denver___, Colorado.

_____
Javier Rodriguez

2

# ZIELINSKI EXHIBIT 46 (FILED UNDER SEAL)

Case: 1:21-cv-00305 Document #: 742-25 Filed: 04/10/26 Page 146 of 447 PageID #:39623

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

IN RE OUTPATIENT MEDICAL            )
CENTER EMPLOYEE ANTITRUST           )
LITIGATION,                         )
                                    ) Master Docket No.
                                    ) 1:21-cv-00305
                                    )
THIS DOCUMENT RELATES TO:           )
ALL ACTIONS                         )


* * *CONFIDENTIAL* * *

VIDEOTAPED DEPOSITION OF MICHAEL RUCKER

Chicago, Illinois

August 27, 2024


Reported by:

KATHY S. KLEPFER, RMR, RPR, CRR, CLR, CSR

JOB NO. 6616472-001

Michael Rucker   Confidential
August 27, 2024

August 27, 2024

9:04 A.M.

CONFIDENTIAL VIDEOTAPED deposition of MICHAEL RUCKER, held at McGuireWoods, L.L.P., 77 West Wacker Drive, Suite 4100, Chicago, Illinois 60601, before Kathy S. Klepfer, a Registered Professional Reporter, Registered Merit Reporter, Certified Realtime Reporter, Certified Livenote Reporter, and Certified Shorthand Reporter of the State of Illinois.

Michael Rucker  Confidential
August 27, 2024

A P P E A R A N C E S:

JOSEPH SAVERI LAW FIRM

Attorneys for Plaintiffs

        601 California Street

        Suite 1505

        San Francisco, California  94108

BY:  CADIO ZIRPOLI, ESQ.

        JOSEPH SAVERI, ESQ.

        WILLIAM CASTILLO GUARDADO, ESQ. (Remotely)


MORGAN LEWIS & BOCKIUS, LLP

Attorneys for DaVita

        2222 Market Street

        Philadelphia, Pennsylvania  19103

BY:  KENNETH KLIEBARD, ESQ.

Michael Rucker   Confidential
August 27, 2024

A P P E A R A N C E S (Cont'd.)


McGUIREWOODS

Attorneys for Surgical Care Affiliates

        77 West Wacker Drive, Suite 4100

        Chicago, Illinois  60601

BY:  AMY B. MANNING, ESQ.

        SARAH ZIELINSKI, ESQ.


McDERMOTT WILL & EMERY

Attorneys for Kent Thiry

        444 West Lake Street, Suite 4000

        Chicago, Illinois  60606

BY:  DANIEL R. CAMPBELL, ESQ.


KING & SPALDING

Attorneys for USPI and Tenet Healthcare

        1180 Peachtree Street, NE

        Suite 1600

        Atlanta, Georgia  30309

BY:  JULIA C. BARRETT, ESQ.

Michael Rucker   Confidential
August 27, 2024

A P P E A R A N C E S (Cont'd.)

K&L GATES

Attorneys for Andrew Hayek

    70 West Madison Street

    Suite 3300

    Chicago, Illinois  60602-4207

BY:  BRIAN J. SMITH, ESQ.

    - and -

WILSON SONSINI GOODRICH & ROSATI

Attorneys for Andrew Hayek

    1700 K Street, NW

    Fifth Floor

    Washington, D.C.  20006

BY:  JORDANNE STEINER, ESQ. (Remotely)

ALSO PRESENT:
     BEN STANSON, Videographer
     CONCIERGE (Remote)

Michael Rucker   Confidential
August 27, 2024

INDEX

EXAMINATION OF M. RUCKER:                                    PAGE

By Mr. Zirpoli                                           9, 366

By Ms. Zielinski                                           332

By Mr. Kliebard                                            351


PLAINTIFFS' EXHIBITS:                                        PAGE

PX Exhibit 331, Document Bates-stamped                     49
DOJCIV-007-00000050

PX Exhibit 332, Document Bates-stamped                    108
DVA_OMCEAL_000657119

PX Exhibit 333, Document Bates-stamped                    112
DVA_OMCEAL_000658781

PX Exhibit 334, Document Bates-stamped                    131
DVA_OMCEAL_000657138

PX Exhibit 335, Document Bates-stamped DVA00145345 133

PX Exhibit 336, Document Bates-stamped 00158130     145

PX Exhibit 337, Document Bates-stamped                    211
SCA002021140 through 413

PX Exhibit 338, Document Bates-stamped                    223
SCA000862594

PX Exhibit 340, Document Bates-stamped                    283
SCA000540065


EXHIBITS PREVIOUSLY MARKED                                   PAGE

Exhibit 305                                                45

Michael Rucker   Confidential
August 27, 2024

INDEX (Cont'd.)

EXHIBITS PREVIOUSLY MARKED                               PAGE

      Exhibit 306

      Exhibit 158                                         53

      Exhibit 166                                        165

      Exhibit 160                                        184

      Exhibit 36                                         235

DIRECTIONS NOT TO ANSWER

Page 21:1

Michael Rucker   Confidential
August 27, 2024

VIDEOGRAPHER:  We are now on the record on August 27, and the time is 9:04 a.m.  This is the video-recorded deposition of Michael Rucker taken by counsel for plaintiff in the matter of the Outpatient Medical Center Employee Antitrust Litigation, filed in the U.S. District Court for the Northern District of Illinois, Eastern Division.

This deposition is being held at McGuireWoods located at 77 West Wacker Drive in Chicago, Illinois.

My name is Ben Stanson.  I am the videographer on behalf of U.S. Legal Support located in Chicago, Illinois.  Our court reporter today is Kathy Klepfer, also on behalf of U.S. Legal.

I am not related to any party in this action, nor am I financially interested in the outcome.

Counsel of record will be noted on the stenographic record.  Counsel --

Will the court reporter please swear in the witness.

* * *

MICHAEL ALLEN RUCKER, called as a witness, having been duly sworn, was examined and testified as follows:

EXAMINATION BY

MR. ZIRPOLI:

Q. Good morning, Mr. Rucker. We met earlier this morning. My name a Cadio Zirpoli, and I represent the plaintiffs in this matter.

A. Good morning.

Q. Could you please state your full name and spell it for the record.

A. Michael Allen Rucker. M-I-C-H-A-E-L, A-L-L-E-N, R-U-C-K-E-R.

Q. And what is your current home address, sir?

A. ███████████████████████████, ████████████████.

Q. And, Mr. Rucker, are you presently employed?

A. I am.

Q. And where are you employed, sir?

A. At Ivy Rehab.

Q. Is that Ivy Rehab Physical Therapy?

A. Yes.

plans for future wage increases?

A.    I think there was a year or two where we did talk about in high-level, blunt terms what sort of a merit pool they were planning to fund for one or two years forward.

Q.    So you did, for those one or two years, exchange with USPI merit pool information; is that right?

A.    I think so, yeah.

Q.    And did you reach -- ever reach out to any of your competitors to obtain future wage increase information?

A.    I did not reach out to USPI.

There's a chance I would have reached out to one or more other distributed healthcare service providers.

Q.    Okay.  What is merit pool information?

A.    A merit pool would, at a high level, be the amount of raises that we intended to -- to deliver to our workforce.  That would typically happen during the first quarter or at the end of ev- -- at the end of the first quarter every year.

And so it is intended to allow us to make sure that we're appropriately and

Michael Rucker  Confidential
August 27, 2024

competitively paying our workforce.

Q.    And does that include base compensation and bonus?

A.    It's a -- it's a -- it's a tool that is connected directly to base compensation.  So, in other words, if someone was making $100 in their salary or hourly rate, and we established a merit pool of 2 percent that -- and that person were granted an average merit adjustment, they would be making a salary or an hourly wage of $102 after the -- after the merit was applied.

Q.    And who do you recall you reached out to to exchange merit pool information with?

A.    I think I had a -- an informal conversation with -- it could have been Javier at -- Javier Rodriguez at DaVita.

I can't recall other organizations, but I -- I may have reached out to one or two others in each of those one or two years that we did this.

Q.    And what were the years you believe that you reached out to your competitors to share merit pool information?

MS. ZIELINSKI:  Object to the form.

Michael Rucker   Confidential
August 27, 2024

THE WITNESS:  I -- I don't -- I can't accurately answer your question.  I think it may have been 2012, 2013.

BY MR. ZIRPOLI:

Q.    Were the merit pools set annually?

A.    Yes.

Q.    And were they set each year that you worked at SCA?

A.    Yes.

Q.    And were you aware whether DaVita had merit pools?

A.    Yeah, most organizations and certainly most healthcare service providers, in order to keep pace with inflation and to be in a spot where they're paying their people competitively, would run through a similar process.

Q.    While you worked at DaVita, did you reach out to others and exchange merit pool information?

MR. KLIEBARD:  Object to form.

MS. ZIELINSKI:  Same objection.

THE WITNESS:  I can't recall, honestly.  And my role with DaVita was more limited to a certain geography, and I wouldn't have been working at quite the same

Michael Rucker  Confidential
August 27, 2024

level with the HR team.

BY MR. ZIRPOLI:

Q.    Okay.  Do you know if Brian Mathis ever traded future wage information?

A.    I don't know that.

Q.    Are you aware of anyone else at SCA that obtained future wage increase information from other companies?

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  I can't specifically recall who else may have been involved.

BY MR. ZIRPOLI:

Q.    Would you agree with me that contacting a competitor to exchange future wage increase information could be a violation of SCA's standards of legal and regulatory conduct?

MS. ZIELINSKI:  Object to form.

MR. CAMPBELL:  Object to form.

THE WITNESS:  Could it be?  Yes, I suppose it could be.  I don't -- I don't know that it necessarily was.

BY MR. ZIRPOLI:

Q.    Would you -- would you consider SCA's future intended wage increase information to be confidential business information?

correct?

A. Yes; in the past we had attempted to array, you know, whatever information we could.

Q. Okay. So those would have been the sources of information for SCA to obtain its merit pool information information; is that right?

MR. CAMPBELL: Object to the form.

BY MR. ZIRPOLI:

Q. For the future?

MS. ZIELINSKI: Object to the form.

MR. CAMPBELL: Same objection.

THE WITNESS: I think so.

BY MR. ZIRPOLI:

Q. Now, if you turn to the previous -- the next page, the one ending in 6409, Ms. Fanning wrote back to you three minutes later, correct?

A. Yes.

Q. And she wrote, "Michael, yes, I'll take a look at it. It's easily done to set a merit pool." Correct?

A. Yes, that's right.

Q. And if you move up the e-mail chain to the third page, to October 12, 2014 at 4:53, do

Michael Rucker  Confidential
August 27, 2024

you see that's the page ending in 407?

A.    Yes.

Q.    You write again to Ms. Fanning and
suggest getting information on "largely clinical
workforces, example, healthcare services would
also be good to consider," correct?

A.    Correct.

Q.    And you also write, "Let's discuss
when we next connect how we could get even an
informal series of calls out to known comparable
firms to see what they are intending to do in
terms of pool for '15 merit increase."  Correct?

A.    Correct.

Q.    And you wrote this e-mail in October
of 2014, so these calls to comparable firms
would be to get information for the coming year,
the future merit pool, correct?

A.    Yes.

Q.    Okay.  So, Mr. Rucker, you were
suggesting SCA call its competitors to see what
they were intending to do with respect to future
merit pool compensation, correct?

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  Yes.

Among other things, yes.

Michael Rucker  Confidential
August 27, 2024

BY MR. ZIRPOLI:

Q.    Okay.  In the next e-mail up, at 5:25, Ms. Fanning responds to your suggestions by breaking your two points down, points 1 and 2?

A.    Yes.

Q.    And to your first suggestion, Ms. Fanning responds, "On 1) we could, I suspect they'll have the data and it won't need to be a custom report."  Correct?

A.    That's right.

Q.    And then she goes on to inform you that it will cost between $1-5,000 if they have the data or $15-25,000 if they need to do a custom report, correct?

A.    That's correct.

Q.    And here Ms. Fanning is talking about purchasing a report on clinical workforce compensation data from -- from other firms, correct?

A.    Yes.

Q.    Okay.  And next, on point 2, regarding your suggestion to get an informal series of calls out to SCA's competitors, Ms. Fanning says, "We can contact some companies in our space."  Correct?

Michael Rucker   Confidential
August 27, 2024

A.    That's right.

Q.    So she seems to be agreeing with you that -- that we can contact other companies in our space to get this future merit pool information, correct?

A.    Correct.

Q.    Okay.  And then, continuing to the next page in Bates number -- Ms. Fanning -- in 407, Ms. Fanning says, "Usually firms won't talk to other competitors in their space about this kind of data -- it's why we all use the big HR firms -- Aon Hewitt, Mercer, Hay, etc."

Correct?

A.    That's right.

Q.    So if you go back to the page ending in 406, Mr. Rucker, you responded to Ms. Fanning in the morning on October 14, 2014, correct?

A.    That's right.

Q.    And you write, "I suspect we could do something like this that would begin to give us a sense of merit pools across a reasonable representative portion of healthcare services."

Correct?

A.    Yes.

Q.    And then you place initials of SCA

Michael Rucker · Confidential
August 27, 2024

employees next to a series of companies, correct?

A.    Yes.

MS. ZIELINSKI:  Object to the form.

BY MR. ZIRPOLI:

Q.    And you put "AH" --

Was that Andrew Hayek?

A.    Yes.

Q.    -- next to DaVita and Iasis; is that right?

A.    Yes.

Q.    And "RS," is that Rich Shariff [sic], next to the HealthSouth?

A.    Rich Sharff.

Q.    Rich Sharff, yeah.

And "BM," is that Brian Mathis, next to USPI and Amsurg?

A.    Yes.

Q.    And "MR," that's you, Michael Rucker?

A.    Yes.

Q.    Next to Fresenius and IntegraMed [incorrect pronunciation]?

A.    Yes.  IntegraMed.

Q.    IntegraMed.  Sorry.

And then "CZ."  Who is "CZ"?

HCA.

Q.   And then you put "Tenet," question mark, correct?

A.   Yes.

Q.   You didn't have a proposed person to contact them?

A.   No.

Q.   And then you put "Iasis-JC"?

A.   Yes.

Q.   And who is "JC"?

A.   Joe Clark.

Q.   And you put "Kindred-JC," Joe Clark again, correct?

A.   Yes.

Q.   And then you put "CHS-MR," yourself again?

A.   Yes.

Q.   And you put "UHS-JC," that's Joe Clark again?

A.   Yes.

Q.   And then you put "IUH-MR," yourself again?

A.   Yes.

Q.   And then you put "THR-MR," yourself again?

Michael Rucker   Confidential
August 27, 2024

A.    Yes.

Q.    And then at "Memorial," you put "GD"?

A.    Yes.

Q.    And who is "GD"?

A.    Goran Dragolovich.

Q.    Okay.  All right.  And so, again, your proposal here to the Cabin Team was that each of them would be assigned a comparable or competitor company to reach out to to obtain their future projected merit pool compensation information; is that right?

          MS. ZIELINSKI:  Object to the form.

          THE WITNESS:  Yes.

BY MR. ZIRPOLI:

Q.    Okay.  All right.  And were each of these companies that you listed companies that you felt were comparable to SCA, and that's why you wanted to obtain their future merit information?

          MS. ZIELINSKI:  Object to the form.

          THE WITNESS:  They were more closely related to what we did than either of the indices was going to point to, yeah.

BY MR. ZIRPOLI:

Q.    And do you recall that you in fact

Michael Rucker  Confidential
August 27, 2024

reached out to these companies to exchange merit pool planned future wage increases with each one of them?

A.   I don't recall -- I don't have any specific recollection as to whether or not we ultimately did what I outlined here.

Q.   Okay.  Do you know if Brian Mathis reached out to USPI to obtain their future merit pool information?

A.   I don't know if any of these people -- I don't know if we ultimately acted, in whole or or in part, on the suggestion in the third bullet.

Q.   Do you know if Brian Mathis was reaching out to Jason Cagle, as we saw on that previous e-mail, and exchanging information with him?

MS. ZIELINSKI:  Object to the form.

MS. BARRETT:  Object to the form.

THE WITNESS:  I don't know.

BY MR. ZIRPOLI:

Q.   Do you know if Brian Mathis reached out to Amsurge to obtain their future merit pool increases?

MS. ZIELINSKI:  Object to the form.

Michael Rucker  Confidential
August 27, 2024

THE WITNESS:  I don't know.

BY MR. ZIRPOLI:

Q.    So all you can testify to here today is that this was your proposal at that time to your Cabin Team members; is that right?

A.    Yes.

Leslie Wachsman was not a member of the Cabin Team, but, yes.

Q.    All right.  Did you discuss this plan of yours with the Cabin Team, do you recall?

A.    I don't recall discussing this plan with the Cabin Team.  It's likely some -- at some point there was a discussion with the Cabin Team that met regularly.

Q.    Are you aware that the Cabin Team had a meeting the following day on October 24, 2014?

A.    No, I'm not aware of that.

Q.    Okay.  But Brian Mathis, Joe Clark, and Goran Dragolovich, they all attended Cabin Team meetings; is that right?

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  Goran Dragolovich was not a member of the Cabin Team.  I think Brian was at this point in time.

Michael Rucker  Confidential
August 27, 2024

BY MR. ZIRPOLI:

Q.    And Joe Clark was?

A.    And Joe Clark was, yeah.  Sorry.

Q.    Okay.  And Mr. Rucker, SCA had used your plan of obtaining your competitors' future intended wage information several times before, correct?

MS. ZIELINSKI:  Object to the form.

MS. BARRETT:  Object to the form.

MS. ZIELINSKI:  Mischaracterizes testimony.

THE WITNESS:  It's -- it's my recollection that, on at least one occasion, we had reached out to one or more individual companies to exchange information about merit pool.

BY MR. ZIRPOLI:

Q.    Mr. Rucker, after the three bullet points, can you read out loud for the jury what you said in the following sentence?

A.    "My impression, for what it's worth, is that this relatively straightforward and simple process has served us reasonably well over the past several years."

Q.    So you're informing the recipients of

Michael Rucker   Confidential
August 27, 2024

this e-mail that this process that you outlined above, the three bullet points, had served SCA reasonably well over the past several years, correct?

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  Well, I mean, I just read the words.

You're using different words, but it...

BY MR. ZIRPOLI:

Q.    I was actually using the exact same words.

A.    Okay.  What -- what I was intending to convey was that it was my impression, for whatever it was worth, "that this relatively straightforward and simple process had served us well over the past several years."

So some form of this had -- had served us well.

Q.    Okay.  And as you've testified to, including reaching out to your competitors to obtain their future merit pool wage information, correct?

MS. ZIELINSKI:  Object to the form.

THE WITNESS:  Reaching out to other

Michael Rucker   Confidential
August 27, 2024

healthcare service providers, including two here, that were in the business of providing ambulatory surgery centers support.

BY MR. ZIRPOLI:

Q.   I think you testified to before, you're pretty sure that you had reached out to DaVita, Mr. Rodriguez; is that right?

MS. ZIELINSKI:  Object to the form.

MR. CAMPBELL:  Foundation.

THE WITNESS:  Yes.

At one point, yes.  At one point.

BY MR. ZIRPOLI:

Q.   What do you recall about that, sir?

A.   That I -- I recall having a conversation with Javier one time, and we exchanged information about our respective merit pools.

Q.   For the future?

A.   For the -- for the upcoming year.

Q.   Yeah.  Okay.

You go on in this e-mail to state, "It seems to me we should really just be aiming to guide to stay in the range of what is competitive," correct?

A.   Yes.

Michael Rucker  Confidential
August 27, 2024

Q.   So you wanted to gather your competitors' future wage information in order to guide you in order to be able to stay competitive; is that right?

MS. ZIELINSKI:  Object to the form.

MR. KLIEBARD:  Objection.

THE WITNESS:  The whole purpose of a healthy, robust merit process and any other time that we're spending on compensation matters, benefits, all the components of a total compensation package is to make sure that we can secure and retain the workforce that we need to deliver the services that are the economic engine of the business here.

BY MR. ZIRPOLI:

Q.   And it also guided SCA in knowing that it didn't need to pay wages above what your competitors were projecting they were going to compensate their employees, correct?

MS. BARRETT:  Object to the form.

MS. ZIELINSKI:  Object to the form. Mischaracterizes testimony.

THE WITNESS:  We would not, as -- I mean, as a team, we wouldn't want to pay

Q.   Yes.

A.   Yes.

Q.   Okay.  And you don't know whether the sharing of information harmed any DaVita senior-level of employees, correct?

MR. ZIRPOLI:  Object to the form of the question.

THE WITNESS:  Correct.

BY MR. KLIEBARD:

Q.   Is it fair to say -- strike that.

You're not aware of SCA and DaVita sharing any confidential information beyond what you testified to about the single conversation with Mr. Rodriguez, correct?

MR. ZIRPOLI:  Object to the form of the question.  Misstates testimony.

THE WITNESS:  Correct.

BY MR. KLIEBARD:

Q.   We've been talking about a few agreements today, and so I just want to clarify one thing.

There -- you were asked questions about an agreement between SCA and DaVita and also an agreement between SCA and USPI, correct?

A.   Correct.

Q. Okay. Those were separate agreements, right? Those weren't -- in other words, it wasn't part of one huge agreement between DaVita, SCA, and USPI, correct?

MR. ZIRPOLI: Object to the form of the question.

THE WITNESS: Two separate agreements.

BY MR. KLIEBARD:

Q. Okay. There was no overarching agreement where USPI and SCA and DaVita all got together in a smoke-filled room and said, here's what we're going to do?

MR. ZIRPOLI: Object to the form of the question.

THE WITNESS: I'm not aware of any connection between the two.

BY MR. KLIEBARD:

Q. Between the SCA -- when you say "between the two," between the SCA-DaVita agreement and the SCA-USPI agreement?

A. Yes.

Q. Okay. Thank you.

██████████████████████████ which you were shown earlier today, were you shown -- I'm sorry -- did you read or review

those ███████████████ before today?

A.   No.

Q.   Okay.  Do you know ████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████
███████████████████████████████████████
████████████████████████████████████████████
█████████████████████████████████

Q.   ██████████████████████████████████
███████████████████████████████████████████
█████████████████████████████████████████
██████████████████████
█████████████████████████████

Q.   Will you agree that it's possible that
████████████████████████ do not accurately reflect
████████████████████████████████████████
███████████████████████?

MR. ZIRPOLI:  Object to the form of

the question.

THE WITNESS:  I would agree that they

may not accurately reflect ██████████████

██████████████████████████████.

BY MR. KLIEBARD:

Q.    Thank you.

If you could pull up Exhibit 333, which is an e-mail at the top that says -- it's from you, dated July 30, 2011, to Javier Rodriguez.

MR. ZIRPOLI:  Can you give me one sec? Sorry.

MR. KLIEBARD:  I don't know what the tab is.  Sorry.

THE WITNESS:  Yep.

BY MR. KLIEBARD:

Q.    And this is the e-mail where it concerns something about a facility administrator reporting about potentially losing her job if she told her boss she was leaving; is that -- is that right?

A.    Yes.

Q.    Okay.  Do you recall whether you wrote this e-mail to Javier or whether somebody wrote it for you to send to Javier?

A.    I don't recall.

Q.    Okay.  Is it possible someone wrote it for you?

A.    Yes.

Michael Rucker  Confidential
August 27, 2024

Q.    Okay.

MR. ZIRPOLI:  I'm going to object to the form of that last question.

BY MR. KLIEBARD:

Q.    Do you have any personal knowledge of any DaVita employee losing their job because they informed their boss that they were exploring opportunities for employment outside of DaVita?

MR. ZIRPOLI:  I'm sorry.  I didn't hear the question.

Can you say it again?

MR. KLIEBARD:  Are you able to read it back?

(Record read.)

THE WITNESS:  No.  Absolutely not.

BY MR. KLIEBARD:

Q.    Okay.  I just want to switch gears and talk about Jung Lee.

Am I pronouncing that correctly?  Jung Lee?

A.    Jung Lee.

Q.    Jung Lee?  Okay.

A.    Jung Lee.

Q.    And just to clarify, you recall that

Jung Lee notified his supervisor at DaVita that he was exploring opportunities at SCA; is that right?

MR. ZIRPOLI:  Object to the form of the question.

THE WITNESS:  I think that's correct.

BY MR. KLIEBARD:

Q.  Okay.  And you testified that you had knowledge that DaVita then had conversations with Mr. Lee about offering him a better economic package and better opportunities if he stayed at DaVita; is that right?

MR. ZIRPOLI:  Objection to the form of the question.  No foundation.

THE WITNESS:  Yes, I believe that's true.

BY MR. KLIEBARD:

Q.  And that, ultimately, that conversation, that "tell your boss" requirement, ultimately benefited Mr. Jung because DaVita and SCA competed over who was going to be able to employ Mr. Jung for the role, correct?

MR. ZIRPOLI:  Object to the form of the question.

THE WITNESS:  Correct.

Michael Rucker  Confidential
August 27, 2024

BY MR. KLIEBARD:

Q.    You also -- you testified, I think at least a couple times, that your understanding of the agreement between DaVita and SCA was that it ebbed and flowed over time?

A.    Yes.

Q.    What did you mean by "ebbed and flowed"?

A.    That the activity around directly reaching out to one another's teammates at times was -- there was more activity along those lines, and at times, there was less activity and maybe more effort to restrict the amount of that activity.

So I think that's largely what I was talking about.

Q.    Got it.  Thank you.

The agreement between SCA and DaVita, that applied to senior-level employees, correct?

A.    Yes.

Q.    Are senior-level employees VP and above or director and above, or is that the same thing?

MR. ZIRPOLI:  Object to the form of the question.

Michael Rucker  Confidential
August 27, 2024

THE WITNESS:  Well, it's not clear to me sitting here today that it applied to some exact category and not another.

It -- it would be each of the organizations would have been more sensitive to the agreement adhering to more senior members of the team.

BY MR. KLIEBARD:

Q.   Okay.  Is that something that also varied over time?

MR. ZIRPOLI:  Object to the form of the question.

BY MR. KLIEBARD:

Q.   The sensitivity to senior-level employees?

MR. ZIRPOLI:  Object to the form of the question.

THE WITNESS:  Yes, I think so.

BY MR. KLIEBARD:

Q.   In order to understand the ebb and flow or, I should say, ebbs and flows of the agreement between SCA and DaVita, I would need to talk to Mr. Hayek or Mr. Thiry, correct?

MR. ZIRPOLI:  Object to the form of the question.

Michael Rucker   Confidential
August 27, 2024

THE WITNESS:  That would be helpful.

BY MR. KLIEBARD:

Q.    Okay.  Do you know personally how the agreement ebbed and flowed over time?

A.    Only that it was applied more literally at some times and less literally at others.

Q.    Okay.  Do you have any understanding of the ebbs and flows of the agreement between SCA and DaVita after you left SCA in May 2017?

A.    I do not.

Q.    Okay.  Do you recall -- I think I'm almost done.

Do you recall having a conversation with Mr. Hayek back in 2012 when Mr. Hayek told you that, by 2012, he had hired all of the DaVita people that he wanted to hire at that point?

MR. ZIRPOLI:  Object to the form of the question.

THE WITNESS:  I -- I don't remember that.

BY MR. KLIEBARD:

Q.    Okay.  Do you remember him telling you that he had hired more people from DaVita than

from any other company, and there was a risk that SCA would become known as DaVita Part 2 if it continued to hire from DaVita?

MR. ZIRPOLI:  Object to the form of the question.

THE WITNESS:  I -- I don't specifically remember that conversation.

BY MR. KLIEBARD:

Q.   Are you aware that that's what he testified to in the trial, in the criminal trial?

MR. ZIRPOLI:  Object to the form of the question.

THE WITNESS:  No, I'm not aware.

BY MR. KLIEBARD:

Q.   Do you have any reason to doubt his testimony as I represented it to you?

MR. ZIRPOLI:  Object to form of the question.

THE WITNESS:  No, I do not.

MR. KLIEBARD:  Nothing further.  Thank you.

I hope you get to your dinner.  Take Lake Shore Drive.

(Laughter.)

CERTIFICATE

I, Kathy S. Klepfer, a Registered Merit Reporter and Certified Shorthand Reporter within and for the State of Illinois, do hereby certify:

That MICHAEL RUCKER, the witness whose deposition is herein before set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

In witness whereof, I have hereunto set my hand this 30th day of August 2024.

_____
KATHY S. KLEPFER, RPR, RMR, CRR, CLR

**Michael Rucker August 27, 2024 Deposition**
**Errata Sheet**

I, Michael Rucker, having read the foregoing deposition, Pages 1 through 394, taken August 27, 2024, do hereby certify said testimony is a true and accurate transcript, with the following changes (if any):

| Page | Line(s) | Correction | Reason |
|---|---|---|---|
| 8 | 5-7 | Change "in the matter of the Outpatient Medical Center Employee Antitrust Litigation," to "in the matter of Outpatient Medical Center Employee Antitrust Litigation." | Remove extra word for clarity. |
| 15 | 17 | Change "Sidley & Austin" to "Sidley Austin" | Correct phrasing |
| 16 | 15-16 | Change "Sidley & Austin" to "Sidley Austin" | Correct phrasing |
| 21 | 12 | Change "negotiation" to "foundation" | Correct typographical error |
| 39 | 3 | Change "what it first conveyed" to "what was first conveyed" | Correct tense for clarity |
| 61 | 23 | Change "I don't know if what he was trying to do" to "I don't know what he was trying to do." | Remove extra word for clarity |
| 65 | 16-22 | Change "wherein we would be highly sensitive to efforts to solicit a recruit and that any - - anyone that - - that either organization became interested in extending an offer to would first be encouraged or directed back to their supervisor ahead of a - - of a written offer being made" to "wherein we would be highly sensitive to efforts to solicit a recruit and anyone either organization became interested in extending an offer to would first be encouraged or directed back to their supervisor ahead of a written offer being made." | Remove extra words and add missing words for clarity |
| 66 | 17 | Replace "it" with "they" | Correct pronoun usage for clarity |
| 73 | 22 | Omit "but" | Omit extra word for clarity |
| 98 | 22 | Replace "pointing up" with "pointing out" | Replace word for clarity |
| 103 | 13 | Omit "and [sic]" | Omit conjunction to reflect accurate reading of trial transcript |

| Page | Line(s) | Correction | Reason |
|------|---------|-----------|--------|
| 143 | 18-21 | Change "I don't specifically remember asking him to contact Kent, but that's entirely possible that that would have happened" to "I don't specifically remember asking him to contact Kent, but it's entirely possible that it could have happened." | Correct verb tense for clarity |
| 181 | 17 | Omit "at -- you know" | Omit extra words for clarity |
| 191 | 22 | Change "would" to "could" | Correct tense for clarity |
| 251 | 22-25 | Change "And, yes, some of this information was -- you know, referenced the 2015 budget and some of it was – was much more -- based on the fact that this happened in January" to "And, yes, some of this information referenced the 2015 budget and some of it was – was much more – based on the fact that this happened in January" | Remove extra words for clarity |
| 256 | 7-11 | Change "and we established a merit pool of 2 percent that -- and that person were granted an average merit adjustment, they would be making a salary or an hourly wage of $102" to "and we established a merit pool of 2 percent, and that person was granted an average merit adjustment, they would be making a salary or an hourly wage of $102" | Correct tense for clarity |
| 268 | 8 | Change "continue to pay people more in inflation" to "continue to pay people more than inflation" | Correct typographical error |
| 306 | 7-9 | Change "If by "company-wide" do you mean were options and restricted units granted to everyone at the company, the answer is no" to "If by "company-wide" you mean options and restricted units were granted to everyone at the company, the answer is no." | Correct verb and adverb usage |
| 315 | 7-8 | Change "when we first began" to "when I first began" | Correct pronoun usage |
| 316 | 5 | Change "that an employer or teammate" to "that an employee or teammate" | Correct typographical error |
| 319 | 13-15 | Change "So what -- what -- what's the net -- net promoters for -- of our patients in a given region?" to "So what's the net promoter score of our patients in a given region" | Correct typographical error |
| 320 | 19-21 | Change "are you delivering this balance that we forecast you would between the volume of surgeries that you're bringing into your centers" to "are you delivering this balance that we forecast between the volume of surgeries that you're bringing into your centers" | Omit extra words for clarity |

| Page | Line(s) | Correction | Reason |
|---|---|---|---|
| 326 | 4-6 | Change "we thought if the variability got too – too great of an extent, you were at risk of" to "we thought if the variability got too great we were at risk of" | Omit extra words for clarity and pronoun usage |
| 327 | 10 | Replace "that" with "where" | Correct adverb usage |
| 368 | 18 | Change "But you don't as you sit here, do you?" to "But you don't know as you sit here, do you?" | Add missing word for complete question |
| 369 | 1 | Replace "responsibility" with "possibility" | Correct typographical error |
| 374 | 7 | Replace "Kim" with "Smith" | Replace incorrect name to reflect accurate reading of the document in question |
| 375 | 11 | Replace "Kim" with "Smith" | Replace incorrect name to reflect accurate reading of the document in question |

DocuSigned by:

*Michael Rucker*

Michael Rucker

# ZIELINSKI EXHIBIT 48 (FILED UNDER SEAL)

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

- - - - - - - - - - - - - - - - -X

IN RE OUTPATIENT MEDICAL           :

CENTER EMPLOYEES ANTITRUST         : Master Docket No.

LITIGATION                         : 1:21-cv-00305

                                   :

THIS DOCUMENT RELATED TO           :

ALL ACTIONS                        :

- - - - - - - - - - - - - - - - -X


*** HIGHLY CONFIDENTIAL ***


Videotaped Deposition of ALLEN SPRADLING

Birmingham, Alabama

Thursday, July 18, 2024

9:11 a.m. (CDT)


Job No. 6660939

Pages:  1 - 296

Reported by:  Dana C. Ryan, RPR, GCCR

July 18, 2024

9:11 a.m. (CDT)

Videotaped Deposition of ALLEN SPRADLING, held at the law offices of Bradley LLP, One Federal Place, 1861 Fifth Avenue North, 2nd Floor, Birmingham, Alabama, before Dana C. Ryan, Registered Professional Reporter, Certified Realtime Reporter, State of Georgia Certified Court Reporter and Notary Public in and for the State of Alabama and the District of Columbia.

Allen Spradling  Highly Confidential
July 18, 2024

A P P E A R A N C E S


ON BEHALF OF THE PLAINTIFFS AND WITNESS:

RONNIE S. SPIEGEL, Esquire

DAVID SEIDEL, Esquire

Joseph Saveri Law Firm

601 California Street

Suite 1505

San Francisco, California 94108

Telephone:  (415) 500-6800

Email: rspiegel@saverilawfirm.com

Email: dseidel@saverilawfirm.com



ON BEHALF OF SURGICAL CARE ASSOCIATES:

SARAH A. ZIELINSKI, Esquire

AMY S. GILBERT, Esquire

McGuireWoods LLP

77 West Wacker Drive

Suite 4100

Chicago, Illinois 60601

Email: szielinski@mcguirewoods.com

Email: agilbert@mcguirewoods.com

Allen Spradling  Highly Confidential
July 18, 2024

A P P E A R A N C E S   C O N T I N U E D

 ON BEHALF OF DAVITA:

       MOLLY MORIARTY LANE, Esquire

       Morgan, Lewis & Bockius LLP

       One Market

       Spear Street Tower, 28th Floor

       San Francisco, California 94105

       Telephone:  (415) 442-1000

       Email: molly.lane@morganlewis.com


                   - and -


       JASON L. CHRESTIONSON, Esquire

            (Present via Zoom)

       Morgan, Lewis & Bockius LLP

       110 North Wacker Drive

       Chicago, Illinois 60606

       Telephone:  (415) 442-1000

       Email:

            jason.chrestionson@morganlewis.com

Allen Spradling  Highly Confidential
July 18, 2024

A P P E A R A N C E S   C O N T I N U E D


 ON BEHALF OF ANDREW HAYEK:

       JORDANNE M. STEINER, Esquire

            (Present via Zoom)

       Wilson Sonsini Goodrich & Rosati

       1700 K Street, Northwest

       5th Floor

       Washington, D.C. 20006

       Telephone:  (202) 973-8800

       Email: jordanne.miller@wsgr.com


 ON BEHALF OF USPI AND TENET:

       JULIA C. BARRETT, Esquire

       King & Spalding LLP

       500 West Second Street

       Suite 1800

       Austin, Texas 78701

       Telephone:  (512) 457-2000

       Email: jbarrett@kslaw.com

Allen Spradling  Highly Confidential
July 18, 2024

A P P E A R A N C E S   C O N T I N U E D


  ON BEHALF OF KENT THIRY:

        KATHARINE O'CONNOR, Esquire

        McDermott, Will & Emery, LLP

        444 West Lake Street

        Chicago, Illinois 60606

        Telephone:  (312) 372-2000

        Email: koconnor@mwe.com


   Also present:

        Aurelio Roman, Videographer

Allen Spradling   Highly Confidential
July 18, 2024

C O N T E N T S


EXAMINATION OF ALLEN SPRADLING:                PAGE:

By Ms. Zielinski                                 13

By Ms. Lane                                     273

By Ms. Barrett                                  280

By Ms. O'Connor                                 284

By Ms. Spiegel                                  287

By Ms. Zielinski                                290





                    E X H I B I T S

            (Attached to the transcript)

DEPOSITION                                     PAGE:

Exhibit DX005  Allen Spradling Resume;          27

               Sprad000014 Through 000015

Exhibit DX006  Allen Spradling Resume           31

Exhibit DX007  August 19, 2008 Letter With      51

               Attachment; Sprad000171 And

               Sprad000164 Through 000170

Exhibit DX008  SCA Job Posting; Sprad000167     60

               Through 000169

Exhibit DX009  September 8, 2008 Letter;        65

               Sprad000220

Allen Spradling  Highly Confidential
July 18, 2024

E X H I B I T S   C O N T I N U E D

(Attached to the transcript)

DEPOSITION                                           PAGE:

Exhibit DX010 September 9, 2008 Letter;          73

            Sprad000022

Exhibit DX011 February 2013 Email Chain;         86

            SCA001125179 Through

            001125182

Exhibit DX012 SCA Personnel Action Form          100

            Dated October 23, 2009;

            SCA000000198

Exhibit DX013 November 2, 2009 Email Chain       104

            With Attachment; SCA001176733

            Through 001176734

Exhibit DX014 May 7, 2012 Unit Option Grant      115

            Agreement; SCA000000050

            Through 000000061

Exhibit DX015 Documents From Allen               136

            Spradling's SCA HR File;

            SCA000000043 Through

            000000049

Exhibit DX016 October 2015 Email Chain;          144

            SCA001168485 Through

            001168486

Allen Spradling   Highly Confidential
July 18, 2024

                E X H I B I T S   C O N T I N U E D

                (Attached to the transcript)

DEPOSITION                                        PAGE:

Exhibit DX017 February 22, 2016 Email         148

              Chain; SCA001158426

Exhibit DX018 March 8, 2016 Email Chain;      153

              SCA001159697

Exhibit DX019 February 6, 2013 Email With     159

              Attachment; Sprad007617

              Through 007621

Exhibit DX020 February 15, 2013 Email;        168

              Sprad001421

Exhibit DX021 April 10, 2013 Email Chain      171

              With Attachment; Sprad000575

              Through 000590

Exhibit DX022 April 19, 2013 Email Chain      178

              With Attachment; Sprad000571

              Through 000574

Exhibit DX023 April 23, 2013 Email With       181

              Attachment; Sprad000456

              Through 000472

Exhibit DX024 May 30, 2019 Email Chain        185

              With Attachment; Sprad007554

              Through 007559

E X H I B I T S   C O N T I N U E D

(Attached to the transcript)

DEPOSITION                                          PAGE:

Exhibit DX025 March 2, 2018 Bank Of America    188

              Award Agreement; Sprad000065

              Through 000108

Exhibit DX026 April 2013 Email Chain;          193

              Sprad000961 Through 000962

Exhibit DX027 April And May 2019 Email         202

              Chain; Sprad001671 Through

              001673

Exhibit DX028 May 2019 Email Chain;            212

              Sprad000819 Through 000820

Exhibit DX029 May 2019 Email Chain;            214

              Sprad007385 Through 007386

Exhibit DX030 May 11, 2020 Letter;             220

              Sprad000697

Exhibit DX031 February 10, 2021 Email Chain    223

              With Attachments; Sprad007837

              Through 007841

Exhibit DX032 January 8, 2020 Email Chain      228

              With Attachments; Sprad007744

              Through 007746

Allen Spradling  Highly Confidential
July 18, 2024

E X H I B I T S   C O N T I N U E D

(Attached to the transcript)

DEPOSITION                                    PAGE:

Exhibit DX033 Richard M. Day v. ASD Of          262

Alabama, Inc., Answer To

Counterclaim, Filed

February 1, 2021 In The

Circuit Court Of Montgomery

County, Alabama

Allen Spradling  Highly Confidential
July 18, 2024

PROCEEDINGS

THE VIDEOGRAPHER:  Good morning.  Going on the video record.  Today is Thursday, July 18, 2024.  The time on my monitor is 11 minutes after 9:00 a.m.  We're here for the purpose of taking the deposition of Mr. Allen Spradling, being taken by the defense in the matter of Outpatient Medical Center Employee Antitrust Litigation, Case Number 1:21-CV-00305-SRH-YBK, which is filed in the United States District Court for the Northern District Court of Illinois, Eastern Division.

The court reporter is Dana Ryan of U.S. Legal Support.  The videographer is Aurelio Roman of U.S. Legal Support.

Will all counsel please state your appearance for the record?

MS. ZIELINSKI:  And we've stated our appearances before joining the video.  It will be reflected in the stenographic record.

THE VIDEOGRAPHER:  I stand corrected.

Madam Court Reporter, you may now swear in the witness, please.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ALLEN SPRADLING,

having been duly sworn, testified as follows:

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

EXAMINATION BY COUNSEL FOR SURGICAL CARE ASSOCIATES

BY MS. ZIELINSKI:

Q    Good morning.  Could you please state your name and spell it for the record?

A    Yes.  It's Allen Spradling; A-L-L-E- N, S-P-R-A-D-L-I-N-G.

Q    Thank you.

What is your home address?

A    ███████████████████████████████████.

Q    Thank you.

We met a moment ago off the record.  My name is Sarah Zielinski.  I am an attorney with the law firm of McGuire Woods, and I represent Surgical Care Affiliates.  I'll refer to them today throughout this deposition as SCA.

Does that make sense?

A    It does.

Q    You're a former employee of SCA; correct?

A    I am.

the number, so I'm -- I'm shooting in the dark a little bit.

Q     Okay.  Fair enough.

A     It was a significant number.  Let's -- I'm comfortable with that.

Q     Okay.  And what made you decide to exercise that change of control -- exercise that option under your change of control agreement?

MS. SPIEGEL:  Objection.  Vague. Compound.  Asked and answered.

THE WITNESS:  With the change in leadership of the organization including a new CEO, the other company seemed to be taking control of the legacy Regions Financial Corporation, and I was a part of the legacy.  So I just didn't feel like I was a part of the go-forward organization.

BY MS. ZIELINSKI:

Q     When did you start -- well, is it fair to say that then you started searching for another job at that point?

A     It is.

Q     And when did you start that job search?

A     Immediately after my departure from Regions.

Q     What types of positions did you

Allen Spradling  Highly Confidential
July 18, 2024

consider in your search?

A       It was really the one time in my -- my professional organization where I was unemployed. As you know, the best time to search for a job is when you have one, so I was pretty open I guess is what I'm trying to say.

Q       You were open to a lot of different types of opportunities; correct?

A       Correct.

Q       What type of industries did you consider in your search?

A       I leaned upon my experience which said financial services, health care; that's pretty much where I bring value based upon my historical.

Q       At that point in time, had you had health care experience when you were looking for a job after leaving Regions?

A       No, I had not.

Q       Okay.

A       Yeah, I misspoke.  Financial services was my background at that point.

Q       And -- but you were open to considering jobs beyond the financial services industry as well; correct?

MS. SPIEGEL:  Objection.  Asked and

Allen Spradling  Highly Confidential
July 18, 2024

answered.

THE WITNESS:  Absolutely.  Project management arguably is project management regardless of the industry.

BY MS. ZIELINSKI:

Q    Does --

A    More -- more specifically, IT project management.

Q    Those skills are transferable to -- across many industries; correct?

A    Correct.

Q    Did you -- were you focused only on jobs in Birmingham, or did you look broader at that point?

A    Broader.

Q    Were you willing to relocate at that time?

A    We were.

Q    How far were you willing to go?

A    I think we would have considered anywhere the opportunity presented if the right opportunity presented itself.

Q    Okay.  How many jobs did you apply to?

A    Beyond saying many, I don't know how to answer that.

Allen Spradling  Highly Confidential
July 18, 2024

Q      Okay.

A      Yeah.

Q      And -- and how are you primarily going about finding jobs?

A      Although I don't recall that specific time in my life with great detail, the generic answer would be LinkedIn, job boards, headhunters, many -- many local consulting firms.

Q      Did you in that process ever receive any offers that you turned down?

A      I don't recall, but I think I would say, I don't think so.

Q      And you ultimately ended up working for TEKSystems; is that correct?

A      Correct.  Although, I was a contractor for TEKSystems.  It was not a full-time, long-term engagement.

Q      Okay.  What do you mean that you were a contractor?

A      Meaning like I was a W-2 [sic] -- I -- I was -- I didn't have any benefits.  I -- I was hourly labor arguably.

Q      Okay.  And was it the case, then, that they -- were you working for -- did they place you in a position where you were actually providing

came to you through Kevin Page; correct?

A    Correct.

Q    And how did you know Kevin Page?

A    I think I met Kevin through my time at Regions.  I think at one point he was at Regions. I definitely knew Kevin prior to this time.

Q    Understood.

And Kevin was also at SCA?

A    Correct.

Q    Okay.  Okay.  So let me direct you to the first paragraph here.  You say, Brian, it was great to hear from you today.

Do you see that?

A    I do.

Q    Okay.  So it sounds like you had a call with -- or some sort of discussion with Brian on this date; correct?

A    I believe so.

Q    And that was August 19th, 2008; correct?

A    Yes, that's what this says.

Q    Okay.  And you say, As you requested, I have enclosed my resume for your consideration in response to our conversation.

Do you see that?

Allen Spradling  Highly Confidential
July 18, 2024

A     I do.

Q     Okay.  Is that the -- that resume that was attached, that was your resume at this point in time before you got your position at SCA; correct?

A     I think that's a true statement, yes.

Q     Correct.  Great.

Okay.  And at this point in time, you had never worked for a company in the health care industry; correct?

A     Correct.

Q     You had no prior health care experience; correct?

MS. SPIEGEL:  Objection.  Asked and answered.

THE WITNESS:  Correct.

BY MS. ZIELINSKI:

Q     You had no specialized experience or skills that were particular to the health care industry; correct?

MS. SPIEGEL:  Same objection.

THE WITNESS:  Correct.

BY MS. ZIELINSKI:

Q     But yet you still believed you were qualified for this position; right?

Allen Spradling  Highly Confidential
July 18, 2024

A     I did.

Q     Going to the third paragraph of your letter, you say, With my breadth of experience, I will get up be -- I would be able to get up to speed quickly on the complexities of your organization.

Do you see that?

A     I do.

Q     Okay.  So you didn't believe that your lack of health care experience would hinder your ability to do this job at SCA; correct?

MS. SPIEGEL:  Objection.  Vague. Compound.  And asked and answered.

THE WITNESS:  Correct.

BY MS. ZIELINSKI:

Q     In fact, you believed that you would be able to get up to speed quickly in that role; correct?

A     I did.

Q     Now, directing your attention to the next paragraph, you say, My experience at Regions gave me the unique perspective both inside and outside of the technology PMO process.

Do you see that?

A     Sorry.  I lost you.

Allen Spradling  Highly Confidential
July 18, 2024

Q    It's the paragraph -- it's the paragraph right below the one we just looked at.

A    Oh, it's the next paragraph.

Q    Yeah.

A    Oh, yeah.  Now I'm -- I'm with ya.

Q    Great.

And it goes on to say, During my time leading the management consultant group, our efforts were geared toward nontechnology-related initiatives; whereas, my time as the BIO for corporate systems, I was working inside the technology and alongside the technology PMO.

Do you see that?

A    I do.

Q    So you were conveying in this letter that you're qualified in both of how you describe it technology and nontechnology initiatives; correct?

MS. SPIEGEL:  Objection.  Vague. Compound.  And misstates prior testimony.

THE WITNESS:  Correct.

BY MS. ZIELINSKI:

Q    And did those different skill sets mean that you had a broader range of employment opportunities available to you?

Allen Spradling  Highly Confidential
July 18, 2024

A     Well, I was certainly promoting that I did.

Q     But you believe that to be true; right?

A     I did, and I do.

Q     Great.

Okay.  And at the end of the letter -- well, I guess in the next paragraph, you say, In addition to my resume, I have also enclosed professional references for your consideration.

Is that the other attachment that you see that's titled Professional References for Allen Spradling?

A     I do.

Q     Okay.  Is that the list of references that you were referring to?

A     I think so.

Q     Okay.

A     Looks right.

Q     Okay.  Great.

MS. ZIELINSKI:  Tab 5.

ZOOM TECH:  Yes, ma'am.

(Deposition Exhibit DX008 was marked for identification and attached to the transcript.)

BY MS. ZIELINSKI:

Allen Spradling  Highly Confidential
July 18, 2024

Q     Mr. Spradling, I've handed you what's been marked Defendant's Exhibit 8.  Do you recognize this document?

A     (Witness reviews document.)  No.

Q     Is this a job posting for a position at SCA?

A     Looks like it, yes.

Q     Do you see the handwriting on this piece of paper?

A     I do.

Q     Is that your handwriting?

A     I believe it is.

Q     Could you help me decipher the handwriting, please?  On the left --

A     Yeah, maybe.

Q     On the left side at the top, can you see what that says?

A     PMO is IT up to CEO, HealthSouth spinoff, acquisition mode.

Q     And what do you think that meant?

A     I think that meant I was taking notes during my conversation that their PMO reported up to the chief executive officer of the organization and that SCA was a spinoff from HealthSouth.

Q     Okay.  And who was that conversation

A    I -- I don't think there were prerequisites other than experience in PMOs.

Q    And you decided to apply for the position at SCA; correct?

A    Correct.

Q    What was your reasoning for deciding to apply?

A    Well, I was un- -- I was about to say unemployed.  I wasn't unemployed.  I did not have a full-time job so that was certainly reason number one.  I just can't speak with any clarity about how passionate I was or wasn't at the time about this role because I frankly don't remember.

Q    Okay.  You believed you were qualified for this role based on your prior experience; correct?

A    Correct.

Q    And you ultimately interviewed for the position; correct?

A    Correct.

Q    Do you recall any concerns being raised about you not having experience in the health care industry?

MS. SPIEGEL:  Objection.  Vague.

THE WITNESS:  I don't recall.  If I was

Allen Spradling   Highly Confidential
July 18, 2024

to speculate, I would say there were no concerns, but I don't recall.

BY MS. ZIELINSKI:

Q    Okay.  You cannot -- it's fair to say you can't recall any particular concerns coming up?

A    Correct.

Q    And you were ultimately hired by SCA; correct?

A    Correct.

Q    Okay.  So this role at SCA was not a job where health care experience or skills was necessary; correct?

A    I'm sorry.  Could you repeat the question?

Q    This job that you took at SCA was not a job where health care experience or skills was necessary; correct?

        MS. SPIEGEL:  Objection.  Vague.  And lacks foundation.

        THE WITNESS:  I would say correct.

        MS. ZIELINSKI:  Tab 7.

        (Deposition Exhibit DX009 was marked for identification and attached to the transcript.)

Allen Spradling  Highly Confidential
July 18, 2024

BY MS. ZIELINSKI:

Q     Mr. Spradling, you've been handed what has been marked Defendant's Exhibit 9.  Let me give you a moment to take a look at that.

A     (Witness reviews document.)

Q     This is a letter from you; correct?

A     Correct.

Q     To Rachel Frerman; correct?

A     Frerman, yes.

Q     Frerman?

A     Yep.

Q     And this is dated September 8, 2008; correct?

A     It is.

Q     And who is Rachel Frerman?

A     I believe she was my handler at TEKSystems.

Q     And this is your letter to Rachel Frerman resigning from TEKSystems; is that correct?

A     Correct.

Q     And you say your resignation will be effective September 19th, 2008; correct?

A     Yes, I'm sure that's correct.  I'm just trying to find the date on this letter, but I'm

A    I think he did as well, but I'm on a very thin limb here. I just don't recall exactly who reported to who.

Q    Okay.

A    But especially when the CIO chair was vacant, I would argue I was the practical lead of the IT organization. So whether they reported to me or whether they reported to an empty chair, I -- I think I was the lead that Brian counted on to lead that organization.

So keep going. I'm sorry.

Q    Sure. No. Yeah, that makes sense.

Scott Segars?

A    Scott Segars?

Q    Yeah.

A    I'll say yes.

Q    Grayson Hilton?

A    Definitely PMO.

Q    Okay. Alicia Oglesby?

A    She became Perot Systems because Perot Systems picked up our help desk, so I would consider her a contractor. Although she may have been an employee originally, she eventually was a contractor.

Q    Stan Wakefield?

Allen Spradling  Highly Confidential
July 18, 2024

A    Sorry.  I got nothing --

Q    Nothing, okay.  No problem.

Andrew Ryan?

A    Yes.

Q    Matt Dyar?

A    I don't recall.

Q    Okay.  Scott Lysle?

A    I don't recall.

Q    Jonathan Cockran?

A    Yes.

Q    Mark Downing?

A    Yes.

Q    And I'm going to say this -- the name is spelled N-G-Y, the first name, and the last name is E-A.

Do you know what that refers to?

A    I could have swore he was Perot Systems' --

Q    Okay.

A    -- contractor.

Q    Okay.  Got it.

During your time at SCA, were you involved in any aspect of setting compensation?

A    During --

MS. SPIEGEL:  Objection.  Vague.

Allen Spradling  Highly Confidential
July 18, 2024

THE WITNESS:  During annual evaluations, I had the opportunity to influence salaries based upon performance.  I don't know if that counts as a yes or not.

BY MS. ZIELINSKI:

Q    So you were -- were you -- did you play a role in determining annual merit increases for certain individuals at SCA?

A    Correct.

MS. SPIEGEL:  Objection.  Vague.

THE WITNESS:  Correct.

BY MS. ZIELINSKI:

Q    And what group of people did you do that for?

A    Well, I definitely did it for everyone in the PMO.  I didn't do it for any of the direct reports to the CIO, and I did do it for the few individuals that worked directly for me as of my time as IT director.

Q    Okay.  And based on that list that we went through before, are we talking about half a dozen people?

Does --

A    If --

Q    -- that sound right?

Allen Spradling  Highly Confidential
July 18, 2024

A     If that.

Q     Okay.  Who was responsible at SCA for determining -- who was responsible for setting starting salary, like, for people on your team, for instance?

A     HR.

Q     Okay.  Did you have any understanding of how they went about setting that?

A     No.

Q     Did salary -- did those starting salaries vary by position?

A     Significantly.

Q     Okay.  Like by level of experience of the person coming in?

A     Yes.

Q     Okay.  Do you know whether market comps were taken into consideration?

A     No, I don't.

Q     Okay.  Are you aware of anyone at SCA negotiating a higher starting salary than SCA was offering?

A     During my tenure, no.

Q     Okay.  Did salaries vary within departments?

A     I wouldn't have that visibility.

Allen Spradling  Highly Confidential
July 18, 2024

Q    Okay.  Within your -- within your --
like, for instance, the people who reported to
you, was there variability --

A    Oh, by role.

Q    By role?

A    Absolutely, yes, yes.

Q    What about two people with the same or
similar role?  Could there also be variability
among their salaries?

MS. SPIEGEL:  Objection.  Asked and
answered.

THE WITNESS:  Yes.

BY MS. ZIELINSKI:

Q    Okay.  What was your involvement in,
you said, influencing annual merit increases?

What was your involvement in that?

MS. SPIEGEL:  Objection.  Asked and
answered.

THE WITNESS:  I don't recall with any
degree of -- of specificity other than to say I
was responsible for completing the evaluation and
then making a recommendation.

BY MS. ZIELINSKI:

Q    And what -- what would the
recommendation be?  Like, what would the output of

Allen Spradling  Highly Confidential
July 18, 2024

that recommendation be?

MS. SPIEGEL:  Objection.  Vague and compound.

THE WITNESS:  As I recall, I think a percentage based upon their performance evaluation and results.  But given -- to try to give you a percentage as an example, I'd be taking a wild guess.  I don't recall.

BY MS. ZIELINSKI:

Q     Did you ever receive guidance on, you know, parameters for determining that percentage?

MS. SPIEGEL:  Objection.  Vague.

THE WITNESS:  I'm going to say probably, but again I don't recall any specific guidance.

BY MS. ZIELINSKI:

Q     Sure.

A     But I'm sure we had parameters.

Q     Yeah.  Yep.

MS. ZIELINSKI:  Okay.  Tab 16.

(Deposition Exhibit DX011 was marked for identification and attached to the transcript.)

BY MS. ZIELINSKI:

Q     Mr. Spradling, I've handed you what has

Allen Spradling  Highly Confidential
July 18, 2024

been marked Defendant's Exhibit 11, and I'm going to direct you to the second email in this chain that comes from Chris Jennings which is to a bunch of people.

MS. SPIEGEL:  Sarah, sorry to interrupt.  Can you just give him a few minutes to look at the document?

MS. ZIELINSKI:  Sure.

THE WITNESS:  (Reviews document.)

I'm halfway through it.  I'm good if you want to go ahead --

BY MS. ZIELINSKI:

Q    Well, I was going to start by letting -- showing you that this is an email you received.  I know it was probably hard to find that among all the people in the "to" line.

But do you see the -- did you -- did you --

A    I didn't --

Q    -- find it there?

A    I didn't until you pointed it out. Yeah, I got it.

Q    Got it, okay.

So this is an email from Chris Jennings to you and a lot of other people at SCA dated

Allen Spradling  Highly Confidential
July 18, 2024

February 15, 2013; correct?

A     It is; although, I don't recall who Chris Jennings was or is.

Q     Okay.  And do you see that it was addressed to SCA leaders?

A     Yes.

Q     And do you -- what did SCA consider the SCA leaders to whom it would send correspondence like this?

A     I would assume anyone with a direct report, but I'm just guessing.

Q     Okay.  The subject is Compensation Adjustments for Support Services Teammates; correct?

A     Yes.

Q     Okay.  And the email says -- it starts by saying, You've just completed the 2012 performance evaluation phase of the people planning process using Gateway.  During this phase, you assessed your teammates' performance for 2012 and set performance objectives and development goals for 2013.  We now move into the phase of the process where you will submit compensation adjustments (increases to pay) for your teammates.

Allen Spradling  Highly Confidential
July 18, 2024

Do you see that?

A    I do.

Q    Is that consistent with your recollection of this process at SCA?

A    Yes, but put a different way, it's helping me remember what it was.  I just didn't recall until I read this, but now I -- I'm with ya.

Q    And it's -- as you said earlier, you would complete performance evaluations for members of your team; correct?

A    Correct.

MS. SPIEGEL:  Objection.  Asked and answered.

BY MS. ZIELINSKI:

Q    And then the second phase of this process was submitting compensation adjustments; correct?

A    Correct.

Q    Okay.  Going to the second paragraph, it describes that each year SCA earmarks an amount of money to be used to reward performing teammates with compensation adjustments.

Do you see that?

A    I do.

Allen Spradling  Highly Confidential
July 18, 2024

Q    And skipping a sentence, the third sentence there says, This year SCA's compensation adjustment pool is 2.25 percent of eligible payroll.

Do you see that?

A    I do.

Q    And what is that -- what does that mean?

A    I think that is saying that from an overall salary standpoint, we have 2.25 percent to work with where we can give some folks 1 percent and give some folks 4 or 5 percent, but it's all, at the end of the day, got to wash to 2.25 percent.

Q    And do you recall that a percentage -- an adjustment pool percentage was selected every year at SCA?

MS. SPIEGEL:  Objection.  Vague and lacks foundation.

THE WITNESS:  Again, to be quite honest, the answer is, no; but having read this, yes, so . . .

BY MS. ZIELINSKI:

Q    So this -- this refreshed your --

A    Exactly.

Allen Spradling  Highly Confidential
July 18, 2024

Q    -- memory that every year where you had direct reports there would be a compensation adjustment pool that was a percentage of eligible payroll that then you would be responsible for attributing to different teammates on the team; correct?

A    Correct.

Q    Okay.  The beginning of the next paragraph says, At SCA, we pay our teammates based on individual performance.

Do you see that?

A    I do.

Q    And is that consistent with your recollection of how annual merit increases were set at SCA?

MS. SPIEGEL:  Objection.  Vague.

THE WITNESS:  Yes.

BY MS. ZIELINSKI:

Q    You would agree that compensation at SCA was individualized based on performance; correct?

MS. SPIEGEL:  Objection.  Vague.  Lacks foundation.  Asked and answered.

THE WITNESS:  To the extent I had involvement in it, yes.

Allen Spradling   Highly Confidential
July 18, 2024

BY MS. ZIELINSKI:

Q    And staying in that same paragraph but skipping a sentence, it -- it starts -- it says, As you contemplate increases for teammates you manage, it is important that you differentiate increases based on performance.  Top performing teammates should receive higher compensation adjustments than teammates who are not performing to standards.

Do you see that?

A    I do.

Q    And is that consistent with your recollection of how annual merit increases were determined at SCA?

MS. SPIEGEL:  Objection.  Vague.  Lacks foundation.

THE WITNESS:  Yes.

BY MS. ZIELINSKI:

Q    So SCA told you and other leaders to differentiate the increases that people receive based on their performance; correct?

MS. SPIEGEL:  Objection.  Misstates prior testimony.

THE WITNESS:  Correct.

BY MS. ZIELINSKI:

Allen Spradling  Highly Confidential
July 18, 2024

Q     And, so, the merit increase would vary by individual; correct?

A     Correct.

Q     And did you follow that approach when you set annual merit increases for the people that you supervised?

MS. SPIEGEL:  Objection.  Compound. Vague.

THE WITNESS:  I would assume that I did, but, I'm sorry, I just don't recall what I did or didn't do.

BY MS. ZIELINSKI:

Q     All right.  Take a look at the chart. It starts with, "If a teammate's pay is and the performance rating is."

Do you see that chart?

A     I do.

Q     And above that it says, The chart below provides guidance which may help you with this process.

Correct?

A     Yes, correct.

Q     And this chart is suggesting that depending on performance -- or, actually, why don't you tell me what this chart is saying.

Allen Spradling  Highly Confidential
July 18, 2024

A     Yeah.  Exactly like you were saying, that these are guidelines for raters to try and follow based upon the rating they have given to direct reports.  If they were middle-of-the-road performance -- i.e., meets standards -- 1 to 2 percent.  If less performance, less money.  If more performance, more money.

Q     And, so, depending on an employee's individual performance in a given year, this is suggesting that a merit increase can range anywhere from 0 percent up to 4 and a half percent; correct?

MS. SPIEGEL:  Objection.  Vague.  Calls for speculation.  And I will note that Mr. Spradling was not the author of this document.

THE WITNESS:  I would say correct, but I'd have to amend that with, if you have a team of high performers, you can't give everybody an accurate increase based -- you know, you can't give 4 or 5 percent to everybody, right, so it has to wash out to 2.25 percent across the board which is especially difficult given the fact that you don't know what other teams are doing with this larger pool of money.  But, yes, I'm with you in theory.

Allen Spradling  Highly Confidential
July 18, 2024

Q     Right.  Right.

And yet there's not only variation within teams, but as you point out, variation between teams at SCA; correct?

A     Correct.

Q     And each leader at SCA is engaging in this process separately; correct?

MS. SPIEGEL:  Objection.  Vague. Misstates his prior testimony.

THE WITNESS:  Correct, to the extent I remember it.  I don't think we ever met as a larger team and discussed this topic.

BY MS. ZIELINSKI:

Q     And each manager could have different approaches for how they decide to divvy up that -- that budget; correct?

MS. SPIEGEL:  Objection.  Lacks foundation.  Vague.  Calls for speculation.

THE WITNESS:  Correct.  The key is the ratings, right, because the ratings drive the increase.  And to your point, different folks take different approaches to what an "exceeds" employee is.

BY MS. ZIELINSKI:

Q     Are you aware of exceptions ever being

Allen Spradling  Highly Confidential
July 18, 2024

made to that -- that budgeted amount where a manager could give his team more than the budgeted amount in order to account for high performers?

MS. SPIEGEL:  Objection.  Vague.

THE WITNESS:  Yes, I am.

BY MS. ZIELINSKI:

Q    So tell me -- tell me about those circumstances.  When -- when were you aware of that occurring?

A    I don't recall a specific time frame, but I do recall market adjustments that could be available should we try and pursue them, not necessarily in conjunction with an annual evaluation which is really what this is about.

Q    And in what circumstances would those other adjustments be pursued?

A    If a leader wanted to argue that one of their roles were being paid less than the market demanded, they could request a market adjustment which meant HR would go through some process to rebaseline the value of that particular position.

Q    Is that something that ever happened for someone on your team that you advocated for?

A    I don't know.

Q    But you're aware of that happening at

Allen Spradling   Highly Confidential
July 18, 2024

SCA --

    A    Yes.

    Q    -- correct?

        MS. SPIEGEL:  Objection.  Asked and answered.

    BY MS. ZIELINSKI:

    Q    Are you also -- are you aware of circumstances where -- we talked a second ago about particular circumstances where a manager could go above budget.

        Are you also aware of circumstances where a manager could remain in budget but give a particular teammate more than, for instance, this recommended 4 and a half percent?

        MS. SPIEGEL:  Objection.  Vague.  Calls for speculation.  Compound.

        THE WITNESS:  I almost need you to repeat the question back because I'm trying to get my head around what you're asking, but am I aware of a situation where a manager offered more than 4.5 percent to an individual?

    BY MS. ZIELINSKI:

    Q    But stayed in their budget.

        So, in other words, the manager has a budget.  We talked about that.  And they have a

Q    You can take that home and read it.

A    Thank you.

Q    It might put you to sleep.

Did you have any concerns with your compensation while you were at SCA?

A    I did not.

Q    Did you think you were fairly compensated?

MS. SPIEGEL:  Objection.  Vague.

THE WITNESS:  I did.

BY MS. ZIELINSKI:

Q    Are you -- were you ever aware of a circumstance at SCA where someone had a job offer from another company, and when they told their boss about that, SCA offered to match that in order to retain them?

MS. SPIEGEL:  Objection.  Vague and improper hypothetical.

THE WITNESS:  Ever is a very long time.

BY MS. ZIELINSKI:

Q    Are you ever aware of that happening?

MS. SPIEGEL:  Objection.  Asked and answered.

THE WITNESS:  It is highly possible that during my tenure at SCA -- not possible,

Allen Spradling  Highly Confidential
July 18, 2024

probable that someone had an offer from another

company and SCA considered matching it.  Almost

guaranteed that happened.  Just don't ask me for

any specifics because I have none.

BY MS. ZIELINSKI:

Q     Sure.  Sure.

And why are you so confident that

that's something that would have happened?

MS. SPIEGEL:  Objection.  Vague.

THE WITNESS:  The -- the IT skill set

is very in demand and transferable, so in general

IT resources are constantly reassessing their

value to the market, so to speak, and as a result

of that, opportunities present themselves.

BY MS. ZIELINSKI:

Q     What do you mean when you say

"constantly reassessing their value to the

market"?

A     Just every additional year of

experience you get makes you more valuable, and

sometimes that value can't be measured with that

table that we looked at a few minutes ago where

the most you're going to get is 4 percent.

So sometimes outside-market forces are

greater than what the company can do to maintain

Allen Spradling  Highly Confidential
July 18, 2024

the asset.

Q     And is it the case that employees would look outside the company in order to get a sense of what their market rate was?

MS. SPIEGEL:  Objection.  Vague and calls for speculation.

THE WITNESS:  Yes, my experience is that happens all the time.

BY MS. ZIELINSKI:

Q     And did you personally do that during the course of your time at SCA?

A     I don't recall.

Q     What about during the course of your career?

A     Oh, without a doubt, yes.

Q     And it's your -- it's been your experience that that is very common --

MS. SPIEGEL:  Objection.

BY MS. ZIELINSKI:

Q     -- correct?

MS. SPIEGEL:  Vague and misstates prior testimony.

THE WITNESS:  Yeah, within the IT field, correct.

BY MS. ZIELINSKI:

A     Yes.

Q     And what -- how are you familiar with them?

A     Similar to DaVita, I consider them someone else who was in the same field and did the same thing that SCA did for outpatient surgery centers.

Q     And did you know anything more about USPI other than the type of business it was?

MS. SPIEGEL:  Objection.  Asked and answered.

THE WITNESS:  No.

BY MS. ZIELINSKI:

Q     Okay.  Did you ever consider a position at DaVita while you were employed at SCA?

A     I did not.

Q     Did you ever consider a --

A     I -- I -- I don't recall.  I don't think so, I guess, would be my answer.

Q     Okay.  Did you ever consider a job at USPI while you were employed at SCA?

A     I don't think so.

Q     Were you ever solicited by anyone to work at DaVita while you were employed at SCA?

A     Not that I recall.

Allen Spradling  Highly Confidential
July 18, 2024

Q     Were you ever solicited by anyone to work at USPI while you were employed by SCA?

A     Not that I recall.

Q     Are you aware of anyone at SCA pursuing a position at DaVita while you were at SCA?

MS. SPIEGEL:  Objection.  Lacks foundation.  Calls for speculation.

THE WITNESS:  Not that I recall.

BY MS. ZIELINSKI:

Q     Are you aware of anyone at SCA pursuing a job at USPI while you were at SCA?

MS. SPIEGEL:  Same objection.

THE WITNESS:  Not that I recall.

BY MS. ZIELINSKI:

Q     Okay.  You ultimately left SCA to -- and went to Bank of America; correct?

A     Correct.

Q     Why did you decide to leave SCA and go to Bank of America?

A     I was contacted by a mutual friend about the opportunity.

Q     Who is that friend?

A     His name is Andy Schwalb, S-C-H-W-A-L-B.

Q     And what was the opportunity?

Allen Spradling  Highly Confidential
July 18, 2024

A     Off the top of my head, I don't recall anything more than a project manager for their IT group.

Q     At the time you were pursuing this role with Bank of America, were you searching for other job opportunities as well?

A     I don't -- don't think so.

Q     But your friend came to you, if I'm understanding -- I just want to make sure I understand what you're saying.

Your friend came to you with an opportunity and you decided to consider it; correct?

A     Correct.  He was new to Bank of America, and that kind of was the impetus for the offer.

Q     Had you ever considered a prior opportunity to work with him before he joined Bank of America?

A     No.

Q     Okay.  And how do you know Andy Schwalb?

A     Childhood friend.

Q     And I don't think I asked you this before, but where did you grow up?

has been marked as Defendant's Exhibit 19.  Let me know when you've had a chance to take a look at that.

A     (Witness reviews document.)  Okay.

Q     Turning your attention to the cover email, this is an email exchange between you and Andy Schwalb dated February 6th, 2013; correct?

A     Yes.

Q     And he is reaching out to you about the position at Bank of America -- or this references his reach-out to you about the position at Bank of America that we talked about earlier; correct?

A     Yes, I think this is me reaching out to him, but, yes.

Q     Yes.

Turning -- looking at the first sentence, it says, Please use this email address for me going forward.  I'm pleased to submit my resume as requested.

Do you see that?

A     I do.

Q     Did he ask you to submit a resume?

A     Yes.

Q     And is that resume that you submitted what is attached to this document?

Allen Spradling  Highly Confidential
July 18, 2024

A     (Witness reviews document.)

      This or something very close --

Q     Okay.

A     -- to this --

Q     Okay.

A     -- yes.

Q     And do you recall how he described the job opportunity to you?

      MS. SPIEGEL:  Objection.  Vague.

      THE WITNESS:  No, I don't.

   BY MS. ZIELINSKI:

Q     Okay.  Did you believe you were qualified to apply for this position at Bank of America?

A     I did.

Q     Did you believe that the experience and skills that you had gained previously were transferable to Bank of America?

A     I did.

Q     Okay.  Looking at the second paragraph, you say, Although disappointed, I will not initially be working directly for you, I totally understand.  This is my foot in the door.  As long as I'm working with you, I'm happy.

      Do you see that?

Allen Spradling  Highly Confidential
July 18, 2024

A     I do.

Q     What did you mean by "this is my foot in the door"?

A     So as I said in my letter of resignation to Tim Beasley, I wanted to be working for him, but I ended up working with him.  So it was just a direct report thing.

Q     So were you reporting to someone else instead of him?

A     Who reported to him.

Q     I see.

A     That's a true statement.

Q     Understood.

      Okay.  Next paragraph you say, Regarding compensation I wanted to request a little clarity, please.  I think you said that 150K was good, and I wanted to make sure that participation in some bonus program was also available to me.  If you could match my current participation level that was kind of what I assumed when I put the base salary number on the table.

      Do you see that?

A     I do.

Q     So you were seeking $150,000 in

compensation at Bank of America; correct?

A    Correct.

Q    What was your basis for seeking that?

A    It was a promotional opportunity over what I was making at SCA.

Q    And what was the basis for requesting that increase over what you were making at SCA?

MS. SPIEGEL:  Objection.  Asked and answered.

THE WITNESS:  Well, I felt like I had a feeling for the market value of someone with my years of experience and education and certifications was worth.

BY MS. ZIELINSKI:

Q    Did the location of the role at Bank of America play any part in the amount of compensation you received?

A    No.

Q    And why do you say that?

A    Location was a complicated variable in this opportunity because it was in Charlotte and we were in Birmingham.  So I had to agree to relocate to Charlotte within three years, and so that was one of the terms of my new position.

But it didn't impact one way or the

Allen Spradling  Highly Confidential
July 18, 2024

other the value of 150 that I thought I was worth.

Q    Okay.  So it would have been the same -- the -- in your view, the compensation would have been the same whether it was a position in Charlotte or Birmingham; correct?

A    Yes.  Correct.

Q    And you said that the job required you to relocate in three years; is that correct?

A    It is.

Q    And at that point in time, did you believe that you would be able to relocate in that time frame?

A    I did.

Q    Okay.  And what was the reason that you weren't able to relocate immediately?

A    Well, there was never a requirement to relocate immediately.  They were fine with me working remotely.  I just had to have a definite ending to that remote engagement, and I think it was three years.

But during that three years, my personal circumstances changed which caused me not to be able to relocate to Charlotte.

Q    Was -- did the reason for not wanting to relocate even initially or for the delay in

Allen Spradling  Highly Confidential
July 18, 2024

relocation have to do with your children being in school?

MS. SPIEGEL:  Objection.  Vague and lacks foundation.

THE WITNESS:  Yes.

BY MS. ZIELINSKI:

Q    Okay.  All right.  Let's turn back to the letter.  Let's see.

A    The email?

Q    Yes, the email.

A    Got it.

Q    So after you mentioned the $150,000 salary, you say, I want to make sure that participation in some bonus program was also available to me.

And then you say if you could match my current participation level, that's what you assumed when you put your salary number on the table.

So what do you mean when you say your current participation level?

A    I think I was referring to the bonus program at SCA.

Q    Okay.  Which was the 25 percent target bonus?

Allen Spradling  Highly Confidential
July 18, 2024

A     It definitely was initially, and that may have been my exit rate as well.  I -- I don't recall.

Q     Okay.  So you were asking -- or you were hoping at this time that Bank of America would be able to match that participation level; is that correct?

A     That is correct.

Q     Okay.  And was $150,000 ultimately your starting salary at Bank of America?

A     It was.

Q     And what was the ultimate bonus structure at Bank of America that you received?

A     I definitely participated in a management incentive bonus, the rate of which I have no recollection.

Q     Do you recall what a typical bonus that you received was at Bank of America, what amount?

        MS. SPIEGEL:  Objection.  Vague and calls for speculation.

        THE WITNESS:  I'd be guessing.  I don't.

   BY MS. ZIELINSKI:

Q     Do you recall whether it was higher or lower than what you received at SCA?

you were just about to join Bank of America; correct?

A     Correct.

Q     If I could direct your attention to the second page where you write the original email, can you see that this email is to your friend Andy Schwalb?

If you look above, you can see he responded to the email.

A     Oh, yes.  Thank you.  Got it.

Q     Okay.  And if -- the beginning of the email you're talking to Andy Schwalb about have -- getting all your pre-employment paperwork completed; correct?

A     Correct.

Q     And in the second paragraph, your first day with B of A is Monday, May 13th.

Do you see that?

A     Yes.

Q     And at the last paragraph, you said, I'm living the dream, Andy.  I didn't deserve another bite at this apple, yet I got one.  I can't thank you enough, but I'm going to try.

Do you see that?

A     I do.

Allen Spradling  Highly Confidential
July 18, 2024

Q     What does that refer to when you say "I didn't deserve another bite at this apple, yet I got one"?

A     Oh, took a minute for the light to come on, but I got it.

Q     Okay.

A     This is my second potential employee opportunity -- employment opportunity working for Andy.

Q     Okay.  What was the first?

A     The first was for NASCAR.

Q     Okay.  What was the position with NASCAR that you were being considered for?

A     IT project manager something.

Q     Okay.  When was that?

        MS. SPIEGEL:  And you shouldn't guess.

        Objection.  Calls for speculation.

        THE WITNESS:  Yeah, I don't recall. But that's what I'm referring to with the second bite of the apple.

    BY MS. ZIELINSKI:

Q     Okay.  What happened with that opportunity?

A     I think my wife happened.  The employment opportunity required relocation to

Daytona Beach, Florida.

Q    Okay.

A    And that didn't end well.

Q    At the time of the opportunity, you were not -- you and your wife were not able to relocate; is that what you're saying?

A    To Florida, correct.

Q    Okay.

A    We -- we would have considered going north, but we wouldn't -- she wouldn't consider going south.

Q    And why was that?

A    Just comfort desire with the climate, that kind of thing.

Q    Oh, personal preference to be --

A    Yeah, personal preference.

Q    Okay.  And the role with NASCAR you said was also IT project manager position; correct?

        MS. SPIEGEL:  Objection.  Asked and answered.

        THE WITNESS:  To the extent I remember, correct.  I don't remember any specifics about that opportunity, but he was the CIO, so it had to be a PM IT kind of role.

Allen Spradling  Highly Confidential
July 18, 2024

BY MS. ZIELINSKI:

Q     Okay.  All right.  You can set that aside.

Now I want to take a step back and talk a little bit more about -- make sure I understand the timeline of where you lived at various points in times, where you were willing to consider moving as you've made these different -- these different changes in -- in employment.

So I understand that you grew up in Florida; correct?

A     Correct.

Q     And you -- your first two jobs that we talked about earlier today with the Florida Department of Law Enforcement and Florida Protective Services Systems also was in Florida?

A     Correct.  Tallahassee.

Q     Tallahassee.

A     Which is where I went to school.

Q     Okay.  And then your role at ASD of Alabama was in Montgomery, Alabama; correct?

A     Correct.  ASD of Alabama was Tallahassee, Florida, based and wanted to start a branch in Montgomery, Alabama.  That's how I got from Tallahassee to Montgomery.

what's marked as Defendant's Exhibit 29.  Let me know when you've had the chance to take a look at this.

A       (Witness reviews document.)  I'm good.

Q       This is an email exchange between you and Andy Schwalb dated May 2019; correct?

A       Correct.

Q       And this is, again, in the time frame where you were looking for another job after leaving Bank of America; correct?

A       Yes.  Correct.

Q       And referring you down to the bottom email dated May 13, 29 -- 2019, you are asking if you can have a call with Andy; correct?

A       Correct.

Q       And a couple of lines in you say that you're interviewing with local companies.

Do you see that?

A       I do.

Q       And he says, Imagine my surprise that the guy with whom I'm interviewing tomorrow has one common connection with me, and it's you.  The guy's name is Tim Boggess with Hibbett Sports.

Do you see that?

A       I do.

Allen Spradling  Highly Confidential
July 18, 2024

Q     And does that refresh your recollection about the scope of the industries where you were searching for jobs at this time?

MS. SPIEGEL:  Objection.  Vague and asked and answered.

THE WITNESS:  Yes.  As I stated previously, I don't think -- I think my net was pretty wide at that point.

BY MS. ZIELINSKI:

Q     What is Hibbett Sports?

A     It's a local sporting goods -- I say local.  They're national, but I think they're based here in Birmingham.

Q     Sporting goods retailer?

A     Yeah, like a Dick's.

Q     Okay.  So you were exploring a position with them; correct?

A     Correct.

Q     And up above in the email that's dated May 30th, 2019, you give Andy another update.  You say, I have another call today with Regions.  They are my most likely employer, probably.  I have applied for several jobs with them for which my skills align pretty well.

Do you see that?

Allen Spradling  Highly Confidential
July 18, 2024

A     I do.

Q     So you were also exploring returning to Regions at this time; correct?

MS. SPIEGEL:  Objection.  Asked and answered.

THE WITNESS:  Correct.

BY MS. ZIELINSKI:

Q     Do you recall roughly how many places you applied to around this point in time?

MS. SPIEGEL:  Objection.  Calls for speculation.

THE WITNESS:  I do not.

BY MS. ZIELINSKI:

Q     Would you say more than a dozen?

MS. SPIEGEL:  Same objection.

THE WITNESS:  I would.

BY MS. ZIELINSKI:

Q     Would you say more than two dozen?

MS. SPIEGEL:  Same objection.

THE WITNESS:  Possibly.

BY MS. ZIELINSKI:

Q     Would you say more than three dozen?

MS. SPIEGEL:  Same objection.

THE WITNESS:  Over the period of what was probably a couple of months, probably.

CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

I, Dana C. Ryan, Registered Professional Reporter, Certified Realtime Reporter, the officer before whom the foregoing proceedings were taken do hereby certify that the foregoing transcript is a true and correct record to the best of my ability of the proceedings; that said proceedings were taken by me stenographically and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 2nd day of August 2024.

My Commission expires:

November 20, 2024

NOTARY PUBLIC IN AND FOR THE

STATE OF ALABAMA

# ZIELINSKI EXHIBIT 49 (FILED UNDER SEAL)

UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


IN RE OUTPATIENT MEDICAL     Master Docket No. 1:21-cv-00305
CENTER EMPLOYEE ANTITRUST
LITIGATION,


_____


THIS DOCUMENT RELATED TO:
ALL ACTIONS

_____



VIDEOTAPED DEPOSITION OF MICHAEL D. STAFFIERI



600 Anton Boulevard, Suite 1800

Costa Mesa, California


Friday, April 5, 2024

9:24 a.m.



REPORTED BY:
Tifani L. Goetsch, CSR No. 10406
US Legal Support Job No. 6573469

Michael D. Staffieri
April 05, 2024

APPEARANCES:


     For Plaintiffs:

          LIEFF CABRASER HEIMANN & BERNSTEIN LLP
          DEAN M. HARVEY, ESQ.
          SARAH D. ZANDI, ESQ.
          LINDSAY CARR, ESQ. (Zoom)
          275 Battery Street, 29th Floor
          San Francisco, California 94111
          415.956.1000
          415.956.1008 fax
          dharvey@lchb.com
          szandi@lchb.com

          ROBERTS LAW FIRM US, PC
          SARAH DELOACH, ESQ. (Zoom)
          1920 McKinney Avenue, Suite 700
          Dallas, Texas 75204
          501.821.5575
          sarahdeloach@robertslawfirm.us

          JOSEPH SAVERI LAW FIRM, LLP
          DAVID SEIDEL, ESQ. (Zoom)
          601 California Street, Suite 1000
          San Francisco, California 94108
          415.500.6800
          415.395.9940
          dseidel@saverilawfirm.com


     For DaVita:

          MORGAN, LEWIS & BOCKIUS LLP
          MOLLY MORIARTY LANE
          One Market, Spear Street Tower
          San Francisco, California 94105
          415.442.1000
          molly.lane@morganlewis.com

          MORGAN, LEWIS & BOCKIUS LLP
          JOHN C. DODDS, ESQ.
          2222 Market Street
          Philadelphia, Pennsylvania 19103
          215.963.5000
          215.963.5001
          john.dodds@morganlewis.com

Michael D. Staffieri
April 05, 2024

APPEARANCES (CONTINUED):


        For SURGICAL CARE AFFILIATES:

            KIRKLAND & ELLIS LLP
            CATIE VENTURA, ESQ.
            1301 Pennsylvania Avenue, N.W.
            Washington, DC 20004
            202.389.5000
            catie.ventura@kirkland.com


        For KENT THIRY:

            MCDERMOTT, WILL & EMERY LLP
            DANIEL CAMPBELL, ESQ.
            444 West Lake Street, Suite 400
            Chicago, Illinois 60605
            312.372.2000
            dcampbell@mwe.com


        For USPI and TENET:

            KING & SPALDING LLP
            JULIANNE LEE DURAN, ESQ. (Zoom)
            VERONICA MOYE, ESQ. (Zoom)
            1700 Pennsylvania Avenue, NW, Suite 900
            Washington, D.C. 20006
            202.626.9625
            JDuran@KSLAW.com
            VMoye@KSLAW.com


        For ANDREWS HAYEK:

            K&L GATES, LLP
            BRIAN JOSEPH SMITH, ESQ. (Zoom)
            70 West Madison Street
            Chicago, Illinois 60602
            312.807.4202
            brian.j.smith@klgates.com

Michael D. Staffieri
April 05, 2024

APPEARANCES (CONTINUED):


        Also Present:

                MELISSA LOU, in-house counsel, DaVita

                ANDREW MOHRAZ, in-house counsel, DaVita

                ZACHARY SPARKS, U.S. Legal Support

                CHELSEA GILCHRIST, U.S. Legal Support

Michael D. Staffieri
April 05, 2024

INDEX TO EXAMINATION

WITNESS: MICHAEL D. STAFFIERI

                                                    PAGE

EXAMINATION BY MR. HARVEY                             12

Michael D. Staffieri
April 05, 2024

INDEX TO EXHIBITS
MICHAEL D. STAFFIERI
IN RE OUTPATIENT MEDICAL CENTER EMPLOYEE ANTITRUST
LITIGATION
Friday, April 5, 2024
Tifani L. Goetsch, CSR No. 10406, CLR

(Provided electronically to the reporter)

| MARKED | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit PX1 | Federal Bureau of Investigation Official Record dated 06/21/2021 (Bates DOJCIV-008-00000059 - 00000071) | 25 |
| Exhibit PX2 | E-mail exchange, last dated 6/25/2012, Subject:  Re:  Did you give Ronda permission to go to work for Shea? (Bates DVA_OMCEAL_000121290) | 61 |
| Exhibit PX3 | E-mail exchange, last dated 11/2/2013, Subject:  Re:  Bill Hughson (Bates DVA_OMCEAL_001354505 - 001354506) | 64 |
| Exhibit PX4 | E-mail dated 11/2/2013, Subject: Need legal advice, priv (Bates DVA01922502) | 70 |
| Exhibit PX5 | E-mail exchange, last dated 11/4/2013, Subject:  Re:  Just tried to call.  Left vm.  Would be good for us to talk soon.  Left home biz line on vm. (Bates DVA_OMCEAL_000417583 - 000417584) | 75 |
| Exhibit PX6 | E-mail exchange, last dated 3/10/2015, Subject:  Re:  Lisa (Bates DVA_OMCEAL_000208568) | 80 |
| Exhibit PX7 | E-mail exchange, last dated 8/25/2015, Subject:  Re:  Touching base (Bates DVA_OMCEAL_000402263 - 000402264) | 84 |

Michael D. Staffieri
April 05, 2024

INDEX TO EXHIBITS (CONTINUED)

| MARKED | DESCRIPTION | PAGE |
|--------|-------------|------|
| Exhibit PX8 | E-mail dated 6/18/2014, Subject: Fwd:  SVP Ops for Vantage Oncology (Bates DVA_OMCEAL_000336807 -000336808) | 87 |
| Exhibit PX9 | E-mail exchange, last dated 3/23/2015, Subject:  Re:  Vantage (Bates DVA_OMCEAL_000391748) | 89 |
| Exhibit PX10 | E-mail exchange, last dated 7/29/2014, Subject:  Re:  DaVita Opportunities (Bates DVA_OMCEAL_000424554 -000424556) | 93 |
| Exhibit PX11 | E-mail exchange, last dated 12/26/2012, Subject:  Re:  Yo! (Bates DVA_OMCEAL_000402427 -000402428) | 98 |
| Exhibit PX12 | E-mail dated 11/16/2015, Subject: Search firm strategy/etc (Bates DVA_OMCEAL_000387563) | 99 |
| Exhibit PX13 | E-mail exchange, last dated 7/17/2017, Subject:  FW:  Quick recap (Bates DVA_OMCEAL_000397493) | 102 |
| Exhibit PX14 | E-mail exchange, last dated 1/12/2010, Subject:  Re: (Bates DVA_OMCEAL_000122080 -000122081) | 106 |
| Exhibit PX15 | E-mail exchange, last dated 1/25/2010, Subject:  RE:  NL Open Req Report (Bates DVA_OMCEAL_001281685 -001381686) | 108 |
| Exhibit PX16 | E-mail exchange, last dated 1/27/2010, Subject:  Re: Fresenius TV Ads in Philly (Bates DVA_OMCEAL_000130415 -000130417) | 111 |

Michael D. Staffieri
April 05, 2024

INDEX TO EXHIBITS (CONTINUED)

| MARKED | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit PX17 | E-mail exchange, last dated 4/16/2010, Subject:  Re:  PCT certification (Bates DVA_OMCEAL_000133455 -000133457) | 113 |
| Exhibit PX18 | E-mail exchange, last dated 8/24/2016, Subject:  Re:  Wage Question (Bates DVA_OMCEAL_000749426 -000749427) | 121 |
| Exhibit PX19 | Palmer Meeting Roadmaps Update, 2012 Merit Models & Auto-Enroll Communication October 10, 2011 (Bates DVA_OMCEAL_0013399746 - 001399774) | 137 |
| Exhibit PX20 | E-mail exchange, last dated 3/31/2010, Subject:  Re:  2010 merit increases (Bates DVA_OMCEAL_000333110 -000333111) | 146 |
| Exhibit PX21 | E-mail exchange, last dated 10/22/2015, Subject:  Re:  AA (Bates DVA_OMCEAL_001339976 -001339978) | 152 |
| Exhibit PX22 | E-mail exchange, last dated 5/3/2012, Subject:  Fwd:  ROD Compensation analysis (Bates DVA_OMCEAL_001339656) | 154 |
| Exhibit PX23 | E-mail exchange, last dated 3/2/2011, Subject:  RE: (Bates DVA_OMCEAL_001079804 -001079805) | 158 |
| Exhibit PX24 | E-mail exchange, last dated 4/14/2017, Subject:  Re:  Josh Golomb (Bates DVA_OMCEAL_000386711) | 160 |

Michael D. Staffieri
April 05, 2024

INDEX TO EXHIBITS (CONTINUED)

| MARKED | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit PX25 | E-mail exchange, last dated 2/1/2018, Subject:  RE:  Comp Planner for Pioneer (Bates DVA_OMCEAL_001339745 -001339746) | 162 |
| Exhibit PX26 | E-mail dated 12/18/2012, Subject: Drafted 1:  130624 - Group Regional Operations Director - O... (Bates DVA_OMCEAL_000751/501 -000751/502) | 165 |
| Exhibit PX27 | E-mail exchange, last dated 12/17/2014, Subject:  Re:  Keith increase (Bates DVA_OMCEAL_001339898 -001339901) | 167 |
| Exhibit PX28 | E-mail exchange, last dated 4/14/2017, Subject:  RE:  Concern of Employees (Bates DVA_OMCEAL_001079781 -001079782) | 171 |
| Exhibit PX29 | Field Clinic Positions compensation-focused retention operations as of 6.14.2016 DRAFT (Bates DVA_OMCEAL_001340537 -001340549) | 173 |

Michael D. Staffieri
April 05, 2024

REPORTED REMOTELY FROM LONG BEACH, CALIFORNIA

Friday, April 5, 2024, 9:24 a.m.

THE VIDEOGRAPHER:  We are on the record at 9:24 a.m. on April 5th, 2024.

Audio and video recording will continue to take place until all parties agree to go off the record. Please note the microphones are sensitive and may pick up whispering and private conversations.

This is the video-recorded proceeding of Michael D. Staffieri taken by counsel for plaintiff in the matter of Outpatient Medical Center Employee Antitrust Litigation filed in the United States District Court for the Northern District of Illinois, Eastern Division.

This proceeding is being held at 600 Anton Boulevard, 1800, Costa Mesa, California 92626.

My name is Zachary Sparks.  I am the videographer on behalf of U.S. Legal Support located at 16825 Northchase Drive, Suite 900, Houston, Texas 77060.  I am not related to any party in this action, nor am I financially interested in the outcome.

The court reporter is Tifani Goetsch on behalf of U.S. Legal Support.

Counsel will state their appearances for the record, after which, the court reporter will swear in the

Michael D. Staffieri
April 05, 2024

witness.

MR. HARVEY: Dean Harvey of Lieff, Cabraser, Heimann & Bernstein for the plaintiffs.

MS. ZANDI: Sarah Zandi for Lieff, Cabraser, Heimann & Bernstein for plaintiffs.

MR. HARVEY: Why don't we go to the plaintiffs' counsel on Zoom.

MR. SEIDEL: David Seidel with the Joseph Saveri Law Firm on behalf of the plaintiffs.

MS. DELOACH: Sarah DeLoach from the Roberts Law Firm on behalf of the plaintiffs.

MS. CARR: Lindsay Carr on behalf of Lieff, Cabraser, Heimann & Bernstein on behalf of plaintiffs.

MR. HARVEY: I think that's everyone for plaintiffs.

MS. LANE: Molly Lane from Morgan, Lewis & Bockius on behalf of DaVita.

MR. DODDS: Jack Dodds from Morgan Lewis for DaVita.

MR. MOHRAZ: Andrew Mohraz, in-house counsel for DaVita.

MS. VENTURA: Catie Ventura from Kirkland & Ellis for the SCA defendants.

MR. CAMPBELL: Dan Campbell from McDermott, Will & Emery on behalf of defendant, Kent Thiry.

Michael D. Staffieri
April 05, 2024

MR. SMITH:  Brian Smith, K&L Gates, on behalf of defendant, Hayek.

MS. MOYE:  Veronica Moye, King & Spalding, on behalf of defendants, Tenet and USPI.

MS. DURAN:  Julianne Duran from King & Spalding also on behalf of defendants, Tenet and USPI.

MS. LOU:  Melissa Lou, in-house counsel with DaVita.

MR. CAMPBELL:  That looks like everybody on the Zoom.

MICHAEL D. STAFFIERI,

having been first duly sworn,

was examined and testified as follows:

EXAMINATION

BY MR. HARVEY:

Q.  Good morning, sir.

A.  Good morning.

Q.  How many times have you been deposed before today?

A.  Once or twice.

Q.  Just some general ground rules, and if you have any questions, please let me know.

A.  Sure.

particular geographic area or is it -- sorry -- or is it

essentially nationwide?

      MS. LANE:  Objection as to form.

      THE WITNESS:  I think it would depend on the

position that you're talking about.

BY MR. HARVEY:

    Q.  What positions are more local versus more

nationwide?

      MS. LANE:  Objection as to form.

      THE WITNESS:  Well, I would say, to a degree, all

positions are local.  It's just whether the search is

local or nationwide.  Does that make sense?

BY MR. HARVEY:

    Q.  Yeah, kind of like all politics is local?

Sorry.  Let me ask a question.

      Are there certain categories of jobs where

recruits are more likely to be willing to move to get the

job?

      For example, senior employees may be more

willing to move for a senior position versus an

administrative assistant?

    A.  I don't know that I can answer that.

    Q.  And is the reason for that in part that

recruiting really isn't your focus that that reporting

relationship goes around you?

A.  No.  I think it's more that I don't claim to understand who would be willing to move for a job and who wouldn't.  I've seen -- I've seen people move at all levels of the organization.

Q.  What types of jobs within DaVita -- scratch that.

What categories of open positions does DaVita value experience in DaVita's industry when trying to find people to fill that position?

MS. LANE:  Objection as to form.

THE WITNESS:  That would be a long list.  Are there any in particular you're interested in?

BY MR. HARVEY:

Q.  Why don't we do it the opposite, then.  Maybe that's easier.

Are there any categories of employees where DaVita has -- places no value on prior experience in DaVita's industry?

A.  Yes.

Q.  And which positions are those?

A.  That would also be a long list.

Q.  Can you -- okay.  Why don't we start at a high level of generality.

Can you create conceptual buckets where -- I don't know -- for example, clinical technicians or

Michael D. Staffieri
April 05, 2024

something, that would go into the -- let's start with the bucket of jobs for which DaVita values experience in DaVita's industry when hiring people.

A.  I'm trying to be helpful.  I'm just not exactly sure what you're getting at.  Like DaVita has hundreds and hundreds of job titles.  So if you want to put them in the category where we value industry experience or not, I mean, I could give you a list of a lot of jobs in both categories.

Q.  And I'm trying to avoid going through hundreds of job titles.

A.  Yeah, I know.

Q.  And so what I'm trying to do is can you go at a higher level of generality from the individual job title?

For instance, are there entire categories of job titles that would fall into 1 bucket or another?

A.  I don't think so.  Let me give you some examples, and then you can see where you want to take it.

Q.  Sure.

A.  Like if we hire a nurse or a patient care technician, it would be great if they had experience in the industry because then it costs us less to train them to have them be productive and start contributing.

But we don't limit our searches to only people who have experience.  We often train people who don't have

Michael D. Staffieri
April 05, 2024

experience.

Or I can give you another example.  I needed to hire somebody to lead our patient experience team.  I mean, I think of that as customer experience, and I actually wanted somebody from outside of the industry, but we could have taken somebody inside.

So I don't know if there's a blanket characterization that that's helpful.

Q.  I'm starting another category of questions.

MS. LANE:  Lunch is here.

MR. HARVEY:  All right.  Okay.  Let's go off the record.

THE VIDEOGRAPHER:  Going off the record.  The time is 12:50 p.m.

                              * * *

                        (LUNCHEON RECESS)

                              * * *

THE VIDEOGRAPHER:  We are back on the record. The time is 1:27 p.m.

BY MR. HARVEY:

Q.  Good afternoon, sir.

A.  Good afternoon.

Q.  All right.  What are the options available to DaVita on the compensation front to retain an employee who is being recruited by a competitor?

Michael D. Staffieri
April 05, 2024

MS. LANE:  Objection as to form.

THE WITNESS:  I think that that would be a long list.  Is there any --

BY MR. HARVEY:

Q.  Well, for example, could DaVita increase the base pay of the employees being recruited to retain that employee?

A.  Yes.

Q.  Could DaVita increase the bonuses that that employee would receive?

A.  Yes.

Q.  Could DaVita increase the stock award to the employee?

A.  Yes.

Q.  Has DaVita, in fact, done each of these things in different situations to retain employees who are being recruited?

A.  Yes.

MR. HARVEY:  I'm introducing Plaintiffs' Exhibit 18.  It is at Tab 76 Bates-stamped DVA 749426.

(Plaintiffs' Exhibit PX18 marked)

THE TECHNICIAN:  That is in the Chat now.

BY MR. HARVEY:

Q.  Please let me know when you are ready.

A.  Okay.

MS. LANE: Objection as to form.

THE WITNESS: It was just an example.

BY MR. HARVEY:

Q. Does DaVita, while you've been there, determine sort of a baseline merit increase percentage that applies company-wide?

MS. LANE: Objection as to form.

THE WITNESS: That answer would be different over time.

BY MR. HARVEY:

Q. Well, could you tell me, during the years you were at the company, what years in which that were true and which years where it was not true?

A. I probably could not. I've been with the company 25 years. But, look, yeah. So...

Q. Why don't we start, say, from 2010 thereabout -- I'm sorry. Scratch that. Give me a moment.

Before we go down that road, how many alternatives to what I described occurred while you were at DaVita, that is, alternatives to having 1 merit number that applies company-wide?

MS. LANE: Objection as to form.

THE WITNESS: I think my experience is there were times where there wasn't any or a lot of guidance and then there are times where there's been more clear guidance.

Michael D. Staffieri
April 05, 2024

BY MR. HARVEY:

Q. Okay. When you joined in 2000, do you know if there was clear guidance?

A. No.

Q. When was clear guidance first provided, approximately?

A. I would say we've had more clear guidance since approximately 2021.

Q. And before that -- well, let's dive down into guidance.

What guidance are you referring to?

A. Well, we've been -- you asked me about merit pools, so I'm just specifically talking about a merit pool, like a target merit adjustment pool for the year.

Q. Prior to 2021, did DaVita have any centralized mechanism, central group of people, that supervised and managed pay changes over time?

MS. LANE: Objection as to form.

THE WITNESS: I would think our People Services team would have had sort of accountability for that. As a general manager and operator, you were mostly governed by your budget.

BY MR. HARVEY:

Q. And how?

A. And maybe I should clarify, you know, because

you were asking me actually earlier this morning about labor budgets.

I don't know what that means for you. You know, to me, that is if you take things like overtime or skill mix or productivity or wage rates, all that put together is how I think about labor budgets.

Q. Okay. We'll get into that more later.

A. Yeah.

Q. Is the People Services group based in 1 location, 1 physical location?

A. They are predominantly in our Denver headquarters but not exclusively.

Q. Do you know roughly how many people work in People Services right now for DaVita?

A. I don't know.

Q. Okay. Going to switch to talking about pay.

A. Okay.

Q. We've been talking about that a little bit now, but giving you a guidepost here.

if that's what you're asking.

Q. Okay. The next bullet, quote:

> The DVPs would go through their clinics and designate them as 0, 0.5 percent, 1 percent, 1.5 percent, or 2 percent.

Third bullet:

> As long as the overall was 1.5 percent.

A. So now you can see how much structure we had for compensation to just come up with things on the fly.

Q. It's something.

So is the way that he's framing this, Mr. Kogod, familiar with your experience at DaVita, that is, that there is a number, basically a labor budget you're given, and you need to decide how to allocate that among, in this case, different clinics. You're assigning a different -- you know, here each division vice president would assign one of those percentages to each clinic, and DaVita was okay with it as long as the average, the overall, fit in line with the guidance?

MS. LANE: Object as to form.

THE WITNESS: I think that was Dennis's idea for this year in March of 2010. This is -- this is not how it would normally be done.

Michael D. Staffieri
April 05, 2024

I think -- I don't recall this. This is 14 years ago, but this, to me, seems like there's a problem with the internal systems and he's saying, We could -- we could get the system right, but it's going to take a long time. If you want these done sooner, then we'll just do this.

BY MR. HARVEY:

Q. So I'm just trying to use this as a tool to understand how it's normally done.

So if this is not how it's normally done --

A. And that's what I'm trying to tell you, is that before 2021, there was no normal. You know, this is kind of normal, which is there was a lot of chaos in how compensation was done at DaVita.

Q. So comp planner was totally useless?

MS. LANE: Object as to form.

BY MR. HARVEY:

Q. It was chaos?

A. It depends on what outcome you're trying to achieve.

Q. Is it your testimony, sir, that prior to 2021, how DaVita paid its employees was chaotic?

A. I would say that's a pretty good description, yes.

Q. How is that consistent with your earlier testimony that the company cared about pay equity if it

Michael D. Staffieri
April 05, 2024

was just total chaos, you know, wild west?

MS. LANE:  Objection as to form.

THE WITNESS:  Well, I think -- when you say $3 billion is a lot of labor, right, you are picking out 1 component of managing labor, which is how merit increases are done.  So was there a lot of intensity around managing the cost of labor?  Yes.  Was that chaotic?  No.  That was managed well.

When it comes to how merits are decided, how are they allocated, yes, there was not a consistent way of -- standard way of doing that.  It was different every year, intra year, who made the decisions, how they got made, whether we actually hit our budget or not, I would describe as chaotic.

BY MR. HARVEY:

Q.  Let me try to make sure I understand.

A.  Yeah.

Q.  So the process that determined how much a decision maker had, the -- how much money that decision maker had to distribute to the people under her, that was formalized and pretty clear.

But how that decision-maker allocated the money as between -- as among the people under her, that was less clear?

MS. LANE:  Object as to form.

Q. So we're moving from administrative assistants now to directors, and Rob Chipman, director of People Services, is writing an e-mail to Bina Joban-Baxi. I'm sure I'm murdering her name. And he wrote that he's looking at her directors' salaries in Sierra Terrific as compared to Polaris and The Village.

Please remind me. Sierra Terrific is a geographic region?

A. Yes.

Q. And what, roughly, does that -- what area does that encompass?

A. It's changed over time, but it's in Northern California. So most likely Bay Area.

Q. And Polaris?

A. So Sierra Terrific is a division, and Polaris is the bigger Palmer group. So Sierra Terrific is a division inside of Polaris.

Q. And is Polaris defined as a geographic area?

A. Yes.

Q. Could you please remind me again?

A. Yeah. It's Northern California, Oregon, Washington, Idaho, Utah, and at some point in there, we had clinics in Hawaii.

Q. Okay. And The Village, which is everything?

A. Everything.

Q. Okay. Is this something that occurs commonly, in your experience, at DaVita where someone at People Services compares the pay of a category of employees, in this case, directors, in one geographic region versus another?

MS. LANE: Object as to form.

MS. LANE: Object as to form.

BY MR. HARVEY:

Q. Huh-uh. And this is an example of that?

A. Yes.

Q. On the bottom of Rob's e-mail, he says:

Mike will need to approve any

increase greater than 5 percent.

Is that common, that there was some percentage

threshold that would trigger, you know, higher approval

requirements to you and perhaps up to the CEO?

A. I don't know --

MS. LANE: Object as to form.

Sorry. Go ahead.

THE WITNESS: I don't know what they all are, but

programmed within our HR software -- and I was talking to

you earlier about there would be 1-up approvals or 2-up

approvals, so there's different triggers as to whether it would need to go 1 up for approval or 2 up for approval. So 5 percent must have been above some trigger that would make it come to me.

MR. HARVEY: Got you. Okay. You can put that aside. Thank you.

Now I get to introduce Plaintiffs' Exhibit 23. It's from Tab 8, Bates stamp DVA 1079804.

(Plaintiffs' Exhibit PX23 marked)

BY MR. HARVEY:

Q. Please let me know when you are ready.

THE TECHNICIAN: And that is in the Chat.

THE WITNESS: Okay.

BY MR. HARVEY:

Q. So we just talked about directors. This is about vice presidents, as far as I understand it. I'm going to start with Cathy's e-mail to you on February 28th, 2011, Importance: High.

So she provides you with a zip file that contains a spreadsheet that you can use for entering compensation recommendations for each of your VPs and compensation history for each of those VPs to use as reference.

Who needed to approve your recommendations before they were finalized?

REPORTER'S CERTIFICATE


I, TIFANI GOETSCH, CSR No. 10406, Certified Shorthand Reporter, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth.  At which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

The signature of the witness was waived by agreement.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of Illinois that the foregoing is true and correct.

Dated:  April 13, 2024

_____
Tifani L. Goetsch
CSR No. 10406, CLR

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| IN RE OUTPATIENT MEDICAL CENTER EMPLOYEE ANTITRUST LITIGATION | Master Docket No. 1:21-cv-00305-SRH-YBK |
| THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | |

## ERRATA TO TRANSCRIPT OF APRIL 5, 2024
## DEPOSITION OF MICHAEL D. STAFFIERI

| Page | Line | From | To | Reason |
|---|---|---|---|---|
| 30 | 12 | A. Yeah. | [Deleted] | Clarification |
| 30 | 15 | A. Yeah. | [Deleted] | Clarification |
| 30 | 17 | A. Yeah. So, look, you're asking me if like there | A. So, look, you're asking me if, like, there | Clarification |
| 36 | 12 | A. Yeah. | [Deleted] | Clarification |
| 69 | 13-14 | as Small Palmer. So those 9 people who would report in to 2 or 3 people would be Small Palmers. | as Small Palmer. So those 9 people would report in to 2 or 3 people who would be Small Palmers. | Clarification |
| 113 | 14 | THE WITNESS: I don't. I think at this point in | THE WITNESS: It does not. I think at this point in | Clarification |
| 123 | 6-7 | A. I think I'm just asking the team if so many a year where we may have a merit -- just to use an example, | A. I think I'm just asking the team if -- so, maybe in a year where we may have a merit pool -- just to use an example, | Clarification |
| 146 | 17 | THE WITNESS: Yeah, and I'm telling you I don't | THE WITNESS: And I'm telling you I don't | Clarification |

CONFIDENTIAL

## DECLARATION UNDER PENALTY OF PERJURY

I, MICHAEL D. STAFFIERI, do hereby certify under penalty of perjury that I have read the foregoing transcript of my deposition taken on April 5, 2024; that I have made such corrections as appear noted herein; and that my testimony as contained herein, as corrected, is true and correct to the best of my knowledge.

Dated this 15TH day of May, 2024, at SAN JUAN CAPISTRANO , California.

_____
Michael D. Staffieri

2

CONFIDENTIAL

# ZIELINSKI EXHIBIT 50 (FILED UNDER SEAL)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

--o0o--

)
IN RE OUTPATIENT MEDICAL CENTER ) No. 1:21-cv-00305
EMPLOYEE ANTITRUST LITIGATION )
_____)

CONFIDENTIAL

_____

VIDEO DEPOSITION OF

JIMMY TANNER

July 31, 2024

_____

DEPOSITION OF JIMMY TANNER, produced as a witness, duly sworn by me via videoconference at the instance of the PLAINTIFFS, was taken in the above-styled and numbered cause on July 31, 2024, from 9:12 A.M. to 11:42 A.M., before BRANDON D. COMBS, CSR, RPR, in and for the State of Texas, reported by computerized machine shorthand via videoconference.

Jimmy Tanner  Confidential
July 31, 2024

APPEARANCES


        NUSSBAUM LAW GROUP, PC, 1133 Avenue of the

Americas, 31st Floor, New York, NY 10036, represented

by JONATHAN J. ROSS, Attorney at Law, appeared via

videoconference as counsel on behalf of the Plaintiffs.

        Email: jross@nussbaumpc.com




        KING & SPALDING, LLP, 500 West 2nd Street,

Suite 1800, Austin, TX 78701, represented by

JULIA C. BARRETT, Attorney at Law, appeared via

videoconference as counsel on behalf of USPI and Tenet.

        Email: jbarrett@kslaw.com




        MORGAN, LEWIS & BOCKIUS LLP, 110 North Wacker

Drive, Chicago, IL 60606-1511, represented by

KENNETH M. KLIEBARD, Attorney at Law, appeared via

videoconference as counsel on behalf of DaVita.

        Email: kenneth.kliebard@morganlewis.com

Jimmy Tanner  Confidential
July 31, 2024

WILSON SONSINI GOODRICH & ROSATI, 1700 K Street NW, 5th Floor, Washington, DC 20006-3814, represented by JORDANNE M. STEINER, Attorney at Law, appeared via videoconference as counsel on behalf of Andrew Hayek.

Email: jordanne.miller@wsgr.com

McGUIRE WOODS, 77 West Wacker Drive, Suite 4100, Chicago, IL 60601-1818, represented by ANGELO M. RUSSO and AMY STARINIERI GILBERT, Attorneys at Law, appeared via videoconference as counsel on behalf of Surgical Care Affiliates.

Email: arusso@mcguirewoods.com

McDERMOTT WILL & EMERY, 444 West Lake Street, Chicago, IL 60606-0029, represented by HAN CUI, Attorney at Law, appeared via videoconference as counsel on behalf of Kent Thiry.

Email: hcui@mwe.com

ALSO PRESENT:

Chelsea Gilchrist, Videographer

Jimmy Tanner   Confidential
July 31, 2024

INDEX

                                                                  PAGE

Examination by MR. ROSS                                              7

Examination by MS. BARRETT                                          53

Examination by MR. KLIEBARD                                         80

Examination by MS. GILBERT                                          82

Further Examination by MR. ROSS                                     84


EXHIBITS                                                          PAGE


Exhibit DX34    Email to Chris Hartshorn,                           76
                5/8/14, re RVP list


Exhibit PX216   Declaration of Custodian of                         9
                Records


Exhibit PX217   Federal Grand Jury Information                      29


Exhibit PX218   FBI - Official Record                               29


Exhibit PX219   FBI - Official Record                               29

Jimmy Tanner  Confidential
July 31, 2024

Exhibit PX220  Email to Shannon Mosley,                34

8/8/14, re RVP candidate

presentation


Exhibit PX221  Email to Shannon Mosley,                39

11/11/13, re possible RVP

candidate

Jimmy Tanner  Confidential
July 31, 2024

THE VIDEOGRAPHER:  Hello.  We're going on the record at 14:12 UTC on Wednesday, July 31, 2024.

Audio and video recording will continue to take place unless all parties agree to go off the record.  Please note that microphones are sensitive and may pick up whispering and private conversations.

This is the video-recorded proceeding of Jimmy Tanner in the matter of In Re Outpatient Medical Center Employee Antitrust Litigation.

This proceeding is being held by remote videoconference.  My name is Chelsea Gilchrist.  I'm the videographer on behalf of U.S. Legal Support, located at 16825 North Chase Drive, Suite 900, Houston, Texas 77060.

I'm not related to any party in this action, nor am I financially interested in the outcome.  The court reporter is Brandon Combs on behalf of U.S. Legal Support.

Counsel will state their appearances for the record, after which the court reporter will swear in the witness.

MR. ROSS:  This is Jonathan Ross from Nussbaum Law Group for the plaintiffs.

MS. BARRETT:  Julia Barrett with King &

Spalding on behalf of USPI.

MR. KLIEBARD:  Good morning.  And good morning, Mr. Tanner.  I'm Ken Kliebard of Morgan Lewis.  I represent DaVita.

MS. GILBERT:  Good morning.  This is Amy Gilbert and Angelo Russo with McGuire Woods for Surgical Care Affiliates.

MS. STEINER:  Good morning.  This is Jordanne Steiner with Wilson Sonsini Goodrich & Rosati on behalf of Defendant Andrew Hayek.

MS. CUI:  Good morning.  This is Han Cui from McDermott Will & Emery on behalf of Kent Thiry.

THE VIDEOGRAPHER:  Thank you.

Will the court reporter swear in the witness.

JIMMY TANNER,

having been first duly sworn, testified as follows:

EXAMINATION

Q.  (BY MR. ROSS)  Good morning, Mr. Tanner. Thank you for coming in today.  Can you please state your full name and home address for the record.

A.  James Guy Tanner, ████████████████████ ██████████████████████████.

Q.  And are you represented by counsel today during this deposition?

president though.

Q. Okay. But all of those other roles that you just mentioned could have been roles that you all were hired to fill?

A. Yes.

Q. And did the recruiting process differ a little bit depending on what role it was that you were filling?

A. The process was similar, the candidate pool was very different. So like on those partnership liaison roles and sales managers roles, like USPI was kind of unique in that they were one of the only companies that had these sales positions.

I think it's why kind of they were like a leader in the space. They did a really good job with their physician relationships.

So some of those no poach agreements, like we would never run across about that on those searches, because the candidate pool was like a medical device background, someone with physician relationships.

We weren't looking for someone with like a surgery center background per se.

Q. Okay. So the pool, where you would be

looking for candidates would be different, say, if you were looking for an administrator versus a clinical role?

A.   Yes.

Q.   Could the different roles that you would be recruiting for also have maybe a different geographic scope?

A.   100 percent.

Q.   And then I think you also testified that there could be different folks at USPI who might have been involved on the recruitment side, depending on the different role as well?

A.   Yeah.  Each role had a hiring manager, and depending on the role someone maybe a level up might have wanted to be included in submissions to see the type of candidates that we were submitting.

But we would kind of -- Shannon Mosley would make the introduction and then we would just kind of work with them on the search.

And we would include Shannon, but to eliminate the middleman we worked directly with the hiring managers once we were assigned a search.

Q.   And you've mentioned Shannon Mosley and the other Shannon, Shannon McGarry, several times. Is it your understanding that they were, you know,

recruiters who worked at internal recruiting at USPI?

A.    Yeah.  Shannon was the VP of talent acquisition and then Shannon McGarry, I think it is, Shannon Mosley hired her, but she was underneath Shannon.

But when Shannon came aboard, I was kind of transitioning over to our physician side at Catapult, so my interaction with Shannon McGarry was very limited.

Q.   And was it your understanding that the Shannons also did some of their own direct recruiting, so to fill a position without hiring an external recruiter like Catapult?

A.    That's a hundred percent why Shannon McGarry was brought in, to limit their fees to us, so to kind of fill some of those roles.

Q.   So you also testified today that there were certain companies that you were not able to recruit from when you were filling certain positions at USPI.

Do you recall that?

A.    Yes.

Q.   And that included SCA, which you talked about today.  And then I believe we also saw a

the reason was why USPI didn't recruit from these companies. And you testified that you had an opinion but you may not have been told anything from Shannon.

It wasn't clear to me, based on your testimony, if you were actually told or remember someone, Shannon, telling you specifically if there was a reason why USPI could not recruit from these companies?

A. Yeah, my answer is the same. I have an opinion why, but I can't recall if I was specifically told, this is the reason why.

Q. So your testimony earlier today was just your own opinion as to why you think that may have been you couldn't recruit from these companies?

MR. ROSS: Objection to the form.

THE WITNESS: Right.

Q. (BY MS. BARRETT) Okay. I want to talk a little bit more detail about SCA in particular.

And I believe the way that it's been framed is that you weren't permitted to actively recruit from SCA; is that right?

A. Correct.

Q. And that didn't apply to all employees, it only applied to administrator and above positions;

is that right?

A.   I believe so.  I mean, that's where it would come into play.

Q.   And this wasn't an outright prohibition. There were instances where, you know, an executive by SCA could be hired by USPI; is that right?

A.   Yes, yeah.  I think like Terri Seidel, that one candidate, actually went to work for USPI.

Q.   Okay.  You're ahead of me because I was just about to ask you, do you recall a candidate named Terri Seidel.  So sounds like you do recall an instance where she was -- Terri was with SCA?

A.   Yeah.  So I --

Q.   Go ahead.

A.   No, I just remember Terri because it was early on, and I think like we just kind of won the relationship, and I knew this -- I was told the search was going to be really difficult.

I'm a very competitive person, so I want to kind of do great by my clients, and Terri was referred to me, so kind of like recruiting practice is I would reach out to people I knew, so Reid Jackson.

I said, Reid, I'm working on this role in the St. Louis market.  And he was like, hey, I have

Jimmy Tanner  Confidential
July 31, 2024

a great candidate for you.  So I was super excited because everything lined up with Terri.  And when I sent her over that's kind of like that first email.

And long story short, I kind of stopped communication with Terri.  But ironically, like months later, I don't know the exact time frame, but I know Terri went to work for USPI at some point.  It could have been months, it could have been a couple years.

Q.   And do you recall that's because Terri affirmatively reached out to USPI and applied for a job?

A.   I know Terri was very active and it sounded like she let SCA know she was leaving, or so on and so forth.  I don't know the exact details of how it kind of transpired.

I wasn't involved in that, so the only reason I know that Terri kind of took the role is, as I said before, like we were retained on these searches, so that regional vice president for the St. Louis area was a role that we were working on.

And I think Shannon said, hey, by the way, you can take off the RVP from your search.  That role has been filled.  And I said by who, and she said Terri.  I'm like, oh, I'm like, the first

Jimmy Tanner  Confidential
July 31, 2024

candidate I brought to the table.  But it was months later.

Q.   You testified a bit today about what I think was referred to as a requirement that the candidate tell their boss that they were looking for a role before USPI could go after them.

Do you recall that?

A.   Yes.

Q.   Do you know whether that was ever communicated to you as a requirement before USPI could go after an SCA employee?

A.   Yeah, I mean, as a recruiter, I would, I don't want to say -- I would just -- we would talk to Shannon.  And I think I would say, hey, Shannon, like some of the best candidates out there.

I'm like, is there any way these -- we can -- and I think she kind of just communicated and said, hey, if their current company knows they're leaving, or if they apply directly to USPI.

I think that was a case where the -- these limitations wouldn't exist.

Q.   Let's look at, I believe it was entered as PX221.

Can we pull that back up.

THE VIDEOGRAPHER:  One moment.

Jimmy Tanner   Confidential
July 31, 2024

MS. BARRETT:  And I think if you scroll up and kind of let him see the full document.

Q.   (BY MS. BARRETT)  This is -- again, this relates to, I believe Terri, Terri Seidel again.

And then scroll down.

You'll see this is November 2013 --

A.   Yep.

Q.   -- Shannon's email.  And if you see Shannon's email here, she says, do not schedule a call with Terri, thanks.  She would have had to apply for the job first.

Do you see that?

A.   Yes.

Q.   So does this refresh your recollection as to whether, if someone applied to the job first, then USPI would have been able to reach out to them, for the position?

A.   Yeah, correct.  From what Shannon kind of explained to me, that's the way I've kind of -- that's how I kind of took it.

MS. BARRETT:  Okay.  We can take that one down for now.

Q.   (BY MS. BARRETT)  You know, when you testified earlier about a requirement that maybe in some circumstances the candidate would need to tell

Jimmy Tanner  Confidential
July 31, 2024

their boss first, I believe you said that you didn't believe that someone would want to do that.

Do you recall that?

A.   Yes.

Q.   Is that your own opinion?

A.   Yes, that is my own opinion.

Q.   Did you have any specific conversations with people about telling their boss?

A.   Not that I recall.

Q.   Would you agree with me that in some circumstances telling your boss you're considering other options could result in being offered increased compensation to stay?

MR. ROSS:  Objection to the form.

THE WITNESS:  Yes, I would agree with that.

Q.   (BY MS. BARRETT)  Are you aware of that ever happening in your experience recruiting, a candidate tells their company, hey, I'm looking somewhere else, and then they got offered more money to stay?

A.   Yes, it's very common.

Q.   Would you also agree with me that whether an employee would feel comfortable telling their boss, hey, I'm looking somewhere else, could depend

CERTIFICATE OF REPORTER

I, BRANDON D. COMBS, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth, and nothing but the truth in the within-entitled cause;

That said deposition was taken in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of the said witness was thereafter reduced to typewriting, by computer, under my direction and supervision;

That before completion of the deposition, review of the transcript was not requested.  If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the event of this cause, and that I am not related to any of the parties thereto.

DATED: August 14, 2024

*Brandon D. Combs*

BRANDON D. COMBS
RPR, Texas CSR 10927, California CSR 12978

# ZIELINSKI EXHIBIT 51 (FILED UNDER SEAL)

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE OUTPATIENT MEDICAL          )
CENTER EMPLOYEE ANTITRUST         )
LITIGATION,                       )
                                  )
                                  ) Master Docket No.
                                  ) 1:21-cv-00305
THIS DOCUMENT RELATED TO:         )
ALL ACTIONS                       )
                                  )
_____

CONFIDENTIAL VIDEO DEPOSITION OF:
KENT THIRY - August 16, 2024
_____

PURSUANT TO NOTICE, the deposition of KENT THIRY was taken on behalf of the Plaintiffs at 370 17th Street, Suite 4500, Denver, Colorado, on August 16, 2024, at 9:04 a.m., before Kirsten M. Thorngate, Registered Professional Reporter.

Kent Thiry  Confidential
August 16, 2024

A P P E A R A N C E S

FOR PLAINTIFFS:
        DEAN HARVEY, ESQ.
        LIN CHAN, ESQ. (Via Zoom)
        SARAH ZANDI, ESQ.
        KAREN JONES, ESQ. (Via Zoom)
        Lieff Cabraser Heimann & Bernstein, LLP
        275 Battery Street, 29th Floor
        San Francisco, California 94111
        Phone:  415.956.1000
        Email:  dharvey@lchb.com
                szandi@lchb.com
                kjones@lchb.com

        EMILY HARWELL, ESQ. (Via Zoom)
        Lieff Cabraser Heimann & Bernstein, LLP
        250 Hudson Street, 8th Floor
        New York, New York 10013
        Phone:  212.355.9500
        Email:  eharwell@lchb.com


FOR DaVITA:
        JOHN C. DODDS, ESQ.
        ERICA A. JAFFE, ESQ. (Via Zoom)
        Morgan, Lewis & Bockius LLP
        2222 Market Street
        Philadelphia, Pennsylvania 19103-3007
        Phone:  215.963.4942
        Email:  john.dodds@morganlewis.com
                erica.jaffe@morganlewis.com

        MOLLY MORIARTY LANE, ESQ.  (Via Zoom)
        Morgan, Lewis & Bockius LLP
        One Market, Spear Street Tower, 28th Floor
        San Francisco, California 94105-1596
        Phone:  415.442.1333
        Email:  molly.lane@morganlewis.com

        NATHAN T. SHAPIRO, ESQ. (Via Zoom)
        Morgan, Lewis & Bockius LLP
        101 Park Avenue
        New York, NY 10178-0060
        Phone:  212.309.6000
        Email:  nathan.shapiro@morganlewis.com

FOR SURGICAL CARE AFFILIATES:
          ANGELO M. RUSSO, ESQ.
          AMY B. MANNING, ESQ. (Via Zoom)
          McGuireWoods
          77 West Wacker Drive, Suite 4100
          Chicago, Illinois 60601-1818
          Phone:  312.849.8100
          Email:  arusso@mcguirewoods.com
                  amanning@mcguirewoods.com


FOR ANDREW HAYEK:
          MARK ROSMAN, ESQ.
          Proskauer Rose LLP
          1001 Pennsylvania Avenue, NW, Suite 600 South
          Washington, D.C. 20004-2533
          Phone:  202.416.5868
          Email:  mrosman@proskauer.com

          JEFFREY C. BANK, ESQ. (Via Zoom)
          Wilson Sonsini Goodrich & Rosati
          1700 K Street NW, 5th Floor
          Washington, D.C. 20006-3814
          Phone:  202.920.8703
          Email:  jeffrey.bank@wsgr.com

          KAREN SHARP, ESQ. (Via Zoom)
          Wilson Sonsini Goodrich & Rosati
          One Market Plaza
          Spear Tower, Suite 3300
          San Francisco, California 94105-1126
          Phone:  415.947.2000
          Email:  karen.sharp@wsgr.com


FOR USPI and TENET:
          JULIA BARRETT, ESQ.
          King & Spalding LLP
          500 West 2nd Street, Suite 1800
          Austin, Texas 78701
          Phone:  512.457.2000
          Email:  jbarrett@kslaw.com

Kent Thiry  Confidential
August 16, 2024

FOR KENT THIRY:
        DANIEL R. CAMPBELL, ESQ.
        JEFFREY STONE, ESQ.
        KATHARINE O'CONNOR, ESQ.
        McDermott, Will & Emery LLP
        444 West Lake Street
        Chicago, Illinois 60606-0029
        Phone:  312.984.2167
        Email:  dcampbell@mwe.com
                jstone@mwe.com
                koconnor@mwe.com

Also Present:
        Andrew Mohraz, Esq.
        Michael Banks, Videographer
        Corey Wainaina, Remote Technician

```
                          I N D E X

EXAMINATION:                                          PAGE

      By Mr. Harvey                                     9


DEPOSITION EXHIBITS:

Exhibit PX 303    Video, Las Vegas, 2005                60

Exhibit PX 304    FBI Form 302 memo of an FBI           84
                  interview with Hayek, 8/4/20

Exhibit PX 305    FBI Form 302 memo of an FBI           92
                  interview with Rucker, 12/16/19

Exhibit PX 306    FBI Form 302 memo of an FBI          100
                  interview with Rucker, 3/17/22

Exhibit PX 307    Q3 2009 Earnings Call -              111
                  excerpts

Exhibit PX 308    Email to Hancock from Thurman,       121
                  6/20/12, Subject:  Exec Comp
                  Deck

Exhibit PX 309    DaVita Annual Capital Markets        123
                  Day & Q4 2008 Release -
                  excerpts

Exhibit PX 310    2010 Earnings Call - excerpts        126

Exhibit PX 311    Email to Mildenberger from           135
                  Baxter, 2/10/13, Subject:
                  FW:  Exec Comp Deck Changes
                  for Saturday

Exhibit PX 312    Article,  asyousow.org-              138
                  THE100MOSTOVERPAIDCEOs

Exhibit PX 313    ████████████████████████████████

Exhibit PX 314    ████████████████████████████████
```

Exhibit PX 315 ████████████████

Exhibit PX 316     Email to Hayek from Thiry,        182
                   7/19/08, Subject:  RE:  Call -
                   ruminations ......

Exhibit PX 317     Email to Thiry from Usilton,      190
                   6/10/09, Subject:  Hayek

Exhibit PX 318     Email to Hayek from Thiry,        192
                   10/20/14, Subject:  misc

Exhibit PX 319     ████████████████████

Exhibit PX 320     Email to Thiry from Whitney,      210
                   10/23/13, Subject:  Re:
                   targeting our teammates ...
                   i would like to discuss, okay?

Exhibit PX 321     Email to Thiry from Whitney,      213
                   10/23/13, Subject:  Re:
                   follow up to our conversation
                   last week

Exhibit PX 322     Email to Usilton and Gabriel      215
                   from Whitney, 2/8/15, Subject:
                   Fwd:  belinda somone

Exhibit PX 323     Email to Thiry and Karen from      221
                   Hughson, 11/9/10, Subject:  RE:
                   kathy, pls set up a 30 min call
                   with bill and i

Exhibit PX 324     Email to Kogod, et al., from       222
                   Thiry, 6/14/11, Subject:  RE:
                   hughson continues to recruit
                   our people -- private, do not
                   forward

Exhibit PX 325     Email to Thiry from Hughson,       223
                   11/3/13, Subject:  Re:  just
                   tried to call. left vm. would
                   be good for us to talk soon.
                   left home biz line on vm.

Kent Thiry  Confidential
August 16, 2024

Exhibit PX 326    Email to Thiry, et al., from        230
                  Stephanus, 11/10/13, Subject:
                  RE:  Possible Misunderstanding?

Exhibit PX 327    Email to Hughson from Thiry,         234
                  11/11/13, Subject:  continuing
                  our transparent conversations

Exhibit PX 328    Email to Fries from Thiry,           239
                  5/28/18, Subject:  RE:  (blank)

Exhibit PX 329    Email to Thiry from Kogod,           245
                  3/5/20, Subject:  Re:  pct's

Exhibit PX 330    Email to Golomb from Mello,          252
                  3/8/15, Subject:  CONFIDENTIAL

DEPOSITION EXHIBITS (Previously Marked:)

Exhibit PX 11                                          236

Exhibit PX 123                                         102

Exhibit PX 201                                         115

Exhibit PX 203                                         115

Exhibit PX 263                                         118

Exhibit PX 273                                         237

Kent Thiry  Confidential
August 16, 2024

WHEREUPON, the following proceedings were taken pursuant to the Federal Rules of Civil Procedure.

\*       \*       \*       \*       \*

THE VIDEOGRAPHER:  We are on the record at 9:04 a.m. on August 16, 2024.  This is the video-recorded deposition of Kent Thiry regarding Outpatient Medical Center Employee Antitrust Litigation, filed in the United States District Court for the Northern District of Illinois.  This deposition is being held at 370 17th Street, Denver, Colorado.

My name is Michael Banks.  I'm the videographer on behalf of U.S. Legal Support.  The court reporter is Kirsten Thorngate on behalf of U.S. Legal Support.

I'm not related to any party in this action nor am I financially interested in the outcome.

Counsel will please state their appearances for the record, after which the court reporter will swear in the witness.

MR. HARVEY:  Dean Harvey of Lieff Cabraser Heimann & Bernstein for the plaintiffs.

MS. ZANDI:  Sarah Zandi of Lieff Cabraser Heimann & Bernstein for the plaintiffs.

Kent Thiry · Confidential
August 16, 2024

MR. CAMPBELL:  Dan Campbell of McDermott Will & Emery for Mr. Kent Thiry.

MR. STONE:  Jeffrey Stone, McDermott Will & Emery, representing Mr. Thiry.

MR. DODDS:  Jack Dodds, Morgan Lewis, for DaVita.

MR. RUSSO:  Angelo Russo, McGuireWoods, for Surgical Care Affiliates, LLC, and SCA Holdings, LLC.

MS. BARRETT:  Julia Barrett with King & Spalding on behalf of USPI and Tenet.

MR. ROSMAN:  Mark Rosman, Proskauer Rose, for Andrew Hayek.

MR. MOHRAZ:  Andrew Mohraz, in-house counsel for DaVita.

KENT THIRY,

having been first duly sworn to state the whole truth, was examined and testified as follows:

EXAMINATION

BY MR. HARVEY:

Q.   Good morning, sir.

A.   Good morning.

Q.   Are you now fully retired from DaVita?

A.   Yes.

Q.   Do you have a day job?

how to answer that question.  Any specific instance, I'm happy to discuss.  I'm not an expert in what you are calling no-poach agreements.

Q.   Do you have some other term that you like to use with respect to the understandings you reached with labor market competitors that limited their ability to recruit and hire DaVita people?

MR. CAMPBELL:  Objection.  Misstates the record.

You can answer.

A.   Could you repeat that, please?

MR. HARVEY:  Madam Court Reporter, could you please repeat the question.

(The question was read back as follows: "Do you have some other term that you like to use with respect to the understandings you reached with labor market competitors that limited their ability to recruit and hire DaVita people?")

MR. CAMPBELL:  Same objection.

A.   I do not have any special language or word, and every situation is unique.

Q.   (BY MR. HARVEY)  Did you reach some understanding with Surgical Care Affiliates with respect to how they could recruit and hire DaVita people?

Kent Thiry  Confidential
August 16, 2024

A.   We emphasized the desire for mutual transparency so that we could compete to recruit and compete to retain.  So it was more about how we competed.

Q.   So you reached an understanding with Surgical Care Affiliates with respect to how the two companies could compete for each other's employees, correct?

MR. DODDS:  Object to form.

A.   I made my strong preference for transparency in recruiting so that both sides could compete for that person.  I made those preferences very clear.

Q.   (BY MR. HARVEY)  Did your counterpart at Surgical Care Affiliates reach some understanding or agreement with respect to your strong preferences?

MR. CAMPBELL:  Objection.  Calls for speculation.

MR. DODDS:  Object to form.

A.   Yeah, I don't know how anybody from SCA was exactly thinking and what positions they took.

Q.   (BY MR. HARVEY)  In your own mind, did you reach some understanding or receive any kind of commitment from anyone at SCA with respect to the strong preferences you just mentioned?

Kent Thiry  Confidential
August 16, 2024

MR. CAMPBELL:  Objection.  Compound.

A.   Could you read the first part again, please?

Q.   (BY MR. HARVEY)  In your mind, did you reach some understanding or receive any kind of commitment from anyone at Surgical Care Affiliates with respect to the strong preferences you just mentioned?

MR. CAMPBELL:  Objection.  Compound.

A.   I think Andrew Hayek of SCA understood my preference for total transparency in recruiting.

Q.   (BY MR. HARVEY)  Did he agree to follow your strong preferences?

MR. DODDS:  Object to form.

A.   You would have to ask him.

Q.   (BY MR. HARVEY)  In your mind, sir, did you reach an agreement with Mr. Hayek with respect to your strong preferences?

A.   It was never clear to me.  I made my preferences very clear.  I'm absolutely clear that he understood them.  I think he may have had the same philosophy.  I don't know for sure.  It's whether or not he would say he agreed, you would have to ask him.

But I was absolutely sure that he understood how much I -- with respect to close friends

and business associates, people that we were doing business with, that we should have a high degree of transparency with respect to recruiting each other's people, which happened all the time.

Q.   Could you please explain in as much detail as you can what your strong preferences were.

MR. CAMPBELL:  Object to form.  Go ahead.

A.   My preference is, with people that are close friends and/or close business associates doing business together, it is much better when you're recruiting from each other, which happened all the time, to be transparent about that, and so that both companies could compete for that person.

Q.   (BY MR. HARVEY)  Is there anything else?

A.   Again, you would have to go through specific situations.  And exactly -- not just specific companies but specific instances, because we're talking about senior executives here, and so every situation is different.

Q.   When you say "senior executives," do you mean those affected included in the strong preference, or are you referring to your counterpart at the labor market competitor?

MR. DODDS:  Object to form.

A.   Say the question again, please?

Q.   (BY MR. HARVEY)  What did you mean when you said "senior executives"?  Which senior executives?

A.   The executives in a company.  So not just the person I was dealing with, but the executives within our company or their company.

Q.   And those were the people who -- whose recruiting you had strong preferences about?

A.   I was involved in very little recruiting. We had 65,000 teammates and, therefore, we had probably 1,500 executives.  And if you assume 10, 15 percent turnover, which is normal, that means we had, whatever, 180 executives coming and going every year.

I was involved in maybe three or four of those.  So it's just a tiny number.

Q.   Sir, I didn't ask you about the recruiting you personally participated in.  I asked you about your strong preference with respect to how a recruiting of any kind could occur between DaVita and a company led by, as you said, a close friend or a business associate.

So with that clarification, could you please tell me, were the senior executives you mentioned the only category of employees you cared about with respect to your strong preference?

Kent Thiry  Confidential
August 16, 2024

MR. CAMPBELL:  Object to form.

A.   I would be talking -- well, again, I think we have to go situation by situation, because it could be anywhere along the spectrum that you articulated.

So there's no generic answer to that, but I'm happy to talk about any specific situation.

Q.   (BY MR. HARVEY)  Well, and we'll get to those.  But for now, I want to ask as a general matter about this strong preference, as you put it.

Were there any categories of employees at DaVita that were not included in this strong preference of yours?

MR. CAMPBELL:  Objection.  Vague.

A.   All the instances in which I can think about, the emphasis on transparency was at the executive level.

Q.   (BY MR. HARVEY)  Did you ever --

A.   This is over 20 years.  So again, I can't be sure there was not some exception at some point. And, again, we had 1,500 [sic] executives making decisions without me ever knowing how they were recruiting or who they were recruiting, and who was recruiting from us.

So that's why generic answers are just

Kent Thiry   Confidential
August 16, 2024

impossible for me to provide.  I'm sorry.

Q.   Okay.  You mentioned that your strong preference included transparency.  What exactly do you mean by "transparency"?

A.   That -- again, every situation is different, but I'll attempt to be responsive at a generic level, although every situation is different.

It would mean that if you and I were business associates thinking of doing things together, for example, and I was going to be active in recruiting one of your executives that I would let you know, and, of course, the executive would know as well, so that you could compete to keep your person, and I could compete to recruit them, and it was all very above board.  And the executive would benefit from the competition.

Q.   Did you ever make any kind of announcement to your employees that you had this strong preference that would limit or interfere with their ability to get offers from competing companies?

MR. CAMPBELL:  Objection.  Misstates the record.

A.   Could you say it again, please?

Q.   (BY MR. HARVEY)  This transparency you're talking about, was this strong preference transparent

Kent Thiry   Confidential
August 16, 2024

to the employee being recruited?  Did the employee know what was going on?

MR. CAMPBELL:  Object to form.  Calls for speculation.

A.   That my clear preference was for everyone to be above board with one another.  But, again, I was only involved in a very small number of recruiting instances at the executive level each year.  And I have no idea how the other 150 DaVita executives were or were not recruiting people.

So I can only speak to the small number of situations I was in.  And I -- and in those cases, we wanted everyone to be transparent, the executive and both companies, so everybody could compete openly and constructively.

Q.   (BY MR. HARVEY)  So in your view, this strong preference of yours worked to the benefit of DaVita employees?

A.   I think, yes.

Q.   How exactly did it benefit DaVita employees?

A.   Again, very difficult to comment at a generic level.  Could we talk about a specific situation?

I'll give one example, trying to be

responsive here.  It's very common when a company is recruiting someone -- your first name, sir, is?

Q.   Dean.

A.   So, Dean, you and I have had a couple good conversations.  I'd really like you to come and be a vice president at our company.  I'm willing to fly to Denver and give you an offer, but I want you to agree ahead of time, before I make that flight, that if you accept, you're not going to shop it with your current employer, because then I don't want to bother to be used as just a stocking horse and fly all the way to Denver and spend money on a dinner.

That's very common.

Our preference for transparency would mean that that wouldn't happen.  And, in fact, we would be able to counter, and we'd have to enter into a bidding competition with the other company.

So whether we were on the sending or receiving end, we believed in transparency.  And that was a wonderful thing for a lot of executives because then they weren't pressured to agree to keep it secret, and they had a chance of getting higher salaries, things like that.

Q.   Did you express any preferences about how the recruiting could begin?

Kent Thiry  Confidential
August 16, 2024

That is, could companies, you know, labor competitors of DaVita, who were led by friends of yours, business associates, actively recruit DaVita employees?  That is, the first step in the recruitment is the competing firm calling up the employee and saying, for instance, Hey, we have this great job; we think you would be great for it.

MR. CAMPBELL:  Object to form.

A.   Again, I'm happy to discuss any specific situation.  But we had 150 executives doing recruiting.  We had 150 executives being recruited. And so there's no generic answer to these questions. We'll have to tackle the individual ones.

Q.   (BY MR. HARVEY)  So you had no general preference about how companies led by your friends and business associates started the recruiting process with your employees?

MR. DODDS:  Object to form.

A.   Again, we'd have to talk about each situation.  There's no generic answer to that.  I was involved in very little recruiting each year, and it was at the executive level, which is highly customized and highly situation-specific.

So I just can't -- it's impossible for me to give a generic answer because every situation is

Q. (BY MR. HARVEY) So following the law should always trump loyalty within the company, correct?

MR. CAMPBELL: Object to form.

A. Trumping, I don't really know. If you give me a specific situation, I can opine.

But following the law is one of the most important things for any company, and DaVita took it seriously.

Q. (BY MR. HARVEY) Did DaVita take seriously complying with applicable legal regulations with respect to the care it provided to its patients?

A. Yes.

Q. Did DaVita respect the government regulators whose job it was to ensure the safety of -- the safety and efficacy of DaVita's patient care?

MR. CAMPBELL: Objection. Vague. Foundation.

A. We took -- if the question is -- could you repeat the question so I know, when I say yes, that it's to the right words?

Q. (BY MR. HARVEY) You know what, I'll ask it differently.

Dialysis care is a regulated industry, correct?

Kent Thiry  Confidential
August 16, 2024

A.  Highly.

Q.  What government organizations are principally involved in regulating the provision of dialysis care?

A.  Medicare -- CMS is the name of the agency -- and then the Medicaid entities in each individual state were two of the key regulators.

Q.  Are there any other state or federal regulators that had significant responsibility over the oversight of the dialysis care DaVita provided?

A.  I think those are the two main ones.

Q.  Was it important to you that DaVita's culture include respect for government regulators?

A.  Yes.

Q.  Did you create this notion of DaVita as a village?

A.  It came from the team, but I was one of the primary advocates for that concept.  Yes.

Q.  Why did you advocate for that concept?

A.  It fit with my philosophy that we wanted to create not just an effective company but a community where people felt a strong sense of both responsibility but also support and caring; and that we actively invested in our people to help them realize their full potential, which ironically, in

Kent Thiry  Confidential
August 16, 2024

many cases, led to them leaving DaVita to get great jobs, which we were very proud of.

Q.   You were proud when a DaVita employee left to work for another company?

A.   Often, absolutely.  We became known as a place where lots of other companies wanted to come and recruit our executives away, because we were known as a place that invested heavily in general management development and leadership development.  And so it was great for us from a recruiting point of view to point out that you, Dean, were with us for four years, and then you got this great job as a chief operating officer someplace else.

So we were very proud, and we would promote that, all the great places our people went, because it would help us recruit the next generation.  So we were very proud and very vocal.

Q.   Very vocal in how proud you were?

A.   Yeah, we would share that.  Vocal in the sense we'd share the data.  We'd show here's the people that were here with us for two years or four years or six or eight, and here's where they went on to.

So we were vocal in the sense that we gave people the exact facts and so that they would

want to come and join us.

Q.   Going back to this concept of a village, is part of the reason why you advocated for this that you wanted DaVita to be different than a generic company, that you wanted to create a community beyond that?

A.   Our goal, our aspiration, was that we would have a community that was very different than most companies in terms of its sensitivity to people and its investing in people.

Q.   Did you refer to yourself as the mayor of the Village?

A.   Pretty much everyone referred to me as the mayor of the Village.

Q.   Did you yourself use that term?

A.   Absolutely.

Q.   Why did you use the term "mayor" to describe your role at DaVita?

A.   Because it fit with our notion of being a community first and a company second.  And while we had business obligations, that was not a primary driver.  Our primary driver was creating a special place to work and providing highly differentiated care for our patients and the taxpayer.  And so that's the sort of goals that a community holds dear, some of

I would have guessed it.

Q. Okay. So if you could turn to the page -- there are these dark numbers at the bottom which lawyers call Bates stamps.

A. Yes.

Q. I think it's named after someone named Bates, which I've always been curious about him.

Do you recall being angry and making threats when Hayek left DaVita?

MR. CAMPBELL: Object to the form.

A. I was angry with some of the things Andrew did. Yes. Quite angry.

Q. (BY MR. HARVEY) Were you angry at the fact that he left DaVita for another company?

A. I was not angry at him for that. No.

Q. Were there any events around his departure from DaVita to join Surgical Care Affiliates that made you angry?

A. Say the question again, please?

Q. Did anything about Mr. Hayek's move from DaVita to SCA make you angry?

A. Yes.

Q. What was that?

A. It was our impression that he had had conversations with executives while he was still employed by DaVita, that he began recruiting other DaVita folks while he was still a DaVita executive.

Q. Was Mr. Hayek under any contractual objections that limited his ability to do that?

MR. CAMPBELL: Object to the foundation.

A. I know that -- I believe it's a violation of an executive's fiduciary responsibility. While you

Kent Thiry  Confidential
August 16, 2024

were employed by someone, you owe them your best efforts.  And it is inappropriate while you're on the payroll of one company to recruit someone away from that company for a future job that you're going to take.

Now, I don't know if that's written in statute somewhere or not, or if it's just common sense that everyone finds that to be inappropriate behavior.

Q.   (BY MR. HARVEY)  But my question, sir, is was there a contract between DaVita and Mr. Hayek that limited his ability to recruit -- pardon me -- to recruit DaVita employees?

MR. CAMPBELL:  Object to the form.

A.   I don't know the terms of Andrew's employment contract.

Q.   (BY MR. HARVEY)  You mentioned that you believe it's a violation of an executive's fiduciary duties to recruit a company's employees while he's on the payroll.

What about when he's not on the payroll?

MR. CAMPBELL:  Object to the form.

A.   When he's not on the payroll and what?

Q.   (BY MR. HARVEY)  Is it still a violation in your mind of that executive's fiduciary duties to the company not to recruit his former teammates?

full picture of your point of view on recruiting and hiring in this context.

So we just talked about heads-up; you wanted a heads-up. Beyond that, you mentioned this compete-to-keep element. What did you mean by that?

A. Whether it was me or elsewhere in the organization, once you were given a heads-up that the recruiting was going on, you were able to go to the person and try to compete to keep them.

As I mentioned earlier, it's very common recruiting practice for the company going after somebody to say, I'm only going to fly to Denver if you tell me I'm going to give you an offer and, if it's acceptable, that you're not going to shop it and just use me as a vehicle for getting a raise from your existing company. And they wouldn't make the offer unless you agreed not to shop it.

With our transparency philosophy, every executive was going to have the ability to create a bidding war to the extent that they wanted to. Some liked to do that; some don't like to do that.

Q. Did you tell Mr. Hayek that you didn't want SCA to make a firm offer of employment unless the DaVita employee informed their boss they wanted to leave?

Kent Thiry   Confidential
August 16, 2024

A.   First of all, our discussions were about executives, high-paid people with lots of options and lots of sophistication.  And so there was no kind of blanket phrase to capture all that.  It was very situation-specific.

Q.   So were there situations where you discussed with Mr. Hayek the notion that SCA should not make an actual offer of employment unless the DaVita employee told their boss that they wanted to leave?

MR. CAMPBELL:  Objection.  Vague.

A.   Well, again, we're only talking about executives here, so -- because all the rest of everybody was just total free market.

So in that context, could you reword the question so I answer correctly?

Q.   (BY MR. HARVEY)  Did you ever ask Mr. Hayek not to make an offer of employment to a DaVita employee unless that employee told their boss they wanted to leave first?

MR. CAMPBELL:  Same objection.

A.   The transparency can be achieved either by the person talking to their boss or a person from SCA talking to someone at DaVita.  Either way, you can create that openness which leads to DaVita and SCA

Kent Thiry   Confidential
August 16, 2024

competing like hell, one side trying to take away and the other side trying to retain.  But the transparency could come either from the SCA executive or the targeted DaVita executive or just the opposite.

Q.   (BY MR. HARVEY)  Sir, but my question is did you ever ask Mr. Hayek not to make an offer of employment to a DaVita employee unless that employee told their boss he wanted to leave first?

MR. CAMPBELL:  Objection.  Vague.

A.   Yeah, and that's why I say if transparency was accomplished another way, by the SCA executive talking to the DaVita executive, then no, the person being recruited would not ever have to say anything to anyone.

Q.   (BY MR. HARVEY)  What if the heads-up did not take place?  Did you expect --

A.   It --

MR. CAMPBELL:  Let him finish his question.

A.   Yeah.  Sorry.

Q.   (BY MR. HARVEY)  Did you expect Mr. Hayek and SCA to not make an offer of employment unless that DaVita employee told his boss that he wanted to leave first?

MR. CAMPBELL:  Objection.  Asked and

answered.

A.   I think everyone knew that my strong preference was for transparency.  However, because there were all sorts of executives involved, just 150 on DaVita's side alone, there was no standard way that things happened.  There wasn't any kind of rule that everyone understood or had ever heard of.

It was much more situation-intensive and judgment-intensive.  So there are probably a bunch of people recruited from both directions where there never had been a heads-up.  I just wouldn't know, because we were recruiting so many people every year, and I was involved in a very small number of them.

Q.   (BY MR. HARVEY)  Is it your testimony that you never discussed with Mr. Hayek this tell-your-boss requirement?

A.   We did talk about this subject a lot, about this issue of transparency and what counted as transparency.  I'm not going to remember all the details.  This was 15 years ago.  But yes, we had discussions.  It just was never reduced to any kind of set of rules or whatever because we all had so many executives all over the country who were going to be recruiting however the hell they wanted from each other.



██████████

████████████████████████████████

████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

██████████████████████████████

████████████████████████████

████████████

Q. (BY MR. HARVEY) In your conversations with Mr. Hayek about recruiting, did you tell him that any part of DaVita was fair game for his recruiting efforts?

A. Every part of DaVita was fair game for Andrew's recruiting, as they demonstrated by recruiting from us quite a few people.

Q. That's your testimony, that your message to Mr. Hayek was that DaVita was fair game for his recruiting efforts?

MR. CAMPBELL: That's not what he said.

MR. DODDS: Objection. Mischaracterizes his testimony.

A. I was answering your question.

MR. CAMPBELL: Object to form.

Q. (BY MR. HARVEY) Sorry, can you say it

again?

A.   I was answering your question.

MR. CAMPBELL:  Dean, could you let us know when would be a good time for a short break?

THE DEPONENT:  Yeah, I'm kind of getting bathroom-intensive here.

MR. HARVEY:  Yeah, just give me one second, and then we can take a break.

Yeah, why don't we take a break.

THE VIDEOGRAPHER:  Going off the record at 2:22 p.m.

(Recess taken, 2:22 p.m. to 2:35 p.m.)

THE VIDEOGRAPHER:  We're back on the record.  The time is 2:35.

REPORTER'S CERTIFICATE

STATE OF COLORADO          )
                           )  ss.
CITY AND COUNTY OF DENVER  )

I, KIRSTEN M. THORNGATE, a Registered Professional Reporter, do hereby certify that previous to the commencement of the examination, the witness was duly sworn or affirmed by me to testify to the truth.

I further certify that this deposition was taken in shorthand by me at the time and place herein set forth and thereafter reduced to a typewritten form; that the foregoing constitutes a true and correct transcript.

I further certify that I am not related to, employed by, nor of counsel for any of the parties or attorneys herein, nor otherwise interested in the result of the within action.

_____
Kirsten M. Thorngate
Registered Professional Reporter

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

IN RE OUTPATIENT MEDICAL CENTER
EMPLOYEE ANTITRUST LITIGATION

THIS DOCUMENT RELATES TO:
ALL ACTIONS

Civil Action No. 1:21-cv-00305

**ERRATA TO TRANSCRIPT OF AUGUST 16, 2024
DEPOSITION OF KENT THIRY**

| Page | Line | Change From | Change To | Reason |
|------|------|-------------|-----------|--------|
| 11 | 14 | that what I – the | the | To clarify the record |
| 16 | 1 | doing with a | doing a | To clarify the record |
| 24 | 6 | were. | were? | To correct stenographic error |
| 26 | 21-24 | And again, we had 1,500 [sic] executives making decisions without me ever knowing how they were recruiting or who they were recruiting, and who was recruiting from us. | And again, we had 150 executives making decisions without me ever knowing how they were recruiting or who they were recruiting, and who was recruiting from us. | To correct stenographic error |
| 28 | 12 | And I -- and in those | And in those | To clarify the record |
| 35 | 9 | was | were | To clarify the record |
| 38 | 13 | saying that | saying | To clarify the record |
| 38 | 14 | is is so | is so | To clarify the record |
| 46 | 18 | training, training | training | To clarify the record |
| 47 | 22 | with | from | To clarify the record |
| 55 | 19 | was | were | To clarify the record |
| 62 | 5 | mediation | meetings | To correct stenographic error |
| 76 | 3-4 | It also, as such an allegation, would be blatantly untrue and inaccurate. | It also, any such allegation, would be blatantly untrue and inaccurate. | To clarify the record |
| 148 | 7 | would-- | would be | To clarify the record |
| 176 | 4 | to poach | to no poach | To correct stenographic error |
| 179 | 24 | which she | which is she | To clarify the record |
| 187 | 23 | in | and | To clarify the record |
| 200 | 15 | we've | we | To clarify the record |
| 219 | 9 | (BY MR. CAMPBELL) | (BY MR. HARVEY) | To correct stenographic error |

Kent Thiry  Confidential
August 16, 2024

I, KENT THIRY, the deponent in the above deposition, do hereby acknowledge that I have read the foregoing transcript of my testimony and state under oath that it, together with any attached Amendment to Deposition pages, constitutes my sworn testimony.

___X___ I have made changes to my deposition.

_____ I have NOT made any changes to my deposition.

_____
KENT THIRY

Subscribed and sworn to before me this 13TH day of OCTOBER , 20 24 .

My commission expires: FEBRUARY 24, 2027

TAMARA J PATZER
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 19944005968
MY COMMISSION EXPIRES FEBRUARY 24, 2027

_____
Notary Public

7645 E AMHERST AVE
Address DENVER, CO 80231

# ZIELINSKI EXHIBIT 52 (FILED UNDER SEAL)

UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE OUTPATIENT MEDICAL          )
CENTER EMPLOYEE ANTITRUST         )
LITIGATION                        )
                                  )
                                  )    Master Docket No.
                                  )    1:21-cv-00305
_____)

CONFIDENTIAL
Videotaped Deposition of
LESLIE WACHSMAN

McGUIREWOODS
77 West Wacker Drive
Suite 4100
Chicago, Illinois 60601-1818

May 22nd, 2024

9:09 a.m.

Isaiah Roberts, CSR, RPR

Illinois CSR #084-004890

Leslie Wachsman   Confidential
May 22, 2024

                          APPEARANCES:


     JOSEPH SAVERI LAW FIRM, LLP
     By:   MR. DAVID SEIDEL
           MR. WILLIAM CASTILLO GUARDADO
           601 California Street
           Suite 1000
           San Francisco, California 94108
           Phone:  415.500.6800
           Email:  Dseidel@saverilawfirm.com
                   Wguardado@saverilawfirm.com

                 Appearing on behalf of the Plaintiff;


     MORGAN, LEWIS & BOCKIUS, LLP
     By:   MS. STACI HOLTHUS
           MR. KENNETH M. KLIEBARD
           110 North Wacker Drive
           Chicago, Illinois 60606-1511
           Phone:  312.324.1763
                   312.324.1774
           Email:  Staci.holthus@morganlewis.com
                   Kenneth.kliebard@morganlewis.com


                 Appearing on behalf of the Defendant;



     McGUIREWOODS
     By:   MS. SARAH A. ZIELINSKI
           MS. AMY B. MANNING
           77 West Wacker Drive
           Suite 4100
           Chicago, Illinois 60601
           Phone:  312.849.8100
           Email:  Szielinski@mcguirewoods.com
                   Amanning@mcguirewoods.com


                 Appearing on behalf of the Defendant
                 Surgical Care Affiliates;

Leslie Wachsman    Confidential
May 22, 2024

                    APPEARANCES (Continued):


McDERMOTT WILL & EMERY
By:  MS. HAN CUI
     444 West Lake Street
     Chicago, Illinois 60606-0029
     Phone:  312.984.7623
     Email:  Hcui@mwe.com


        Appearing on behalf of the Defendant;



KING & SPALDING
By:  MS. EMILY SHOEMAKER NEWTON
     MR. CONNOR BREWER
     1180 Peachtree Street, NE
     Suite 1600
     Atlanta Georgia 30309
     Phone:  404.572.2745
             713.751.3254
     Email:  Enewton@kslaw.com
             Cbrewer@kslaw.com



ALSO PRESENT:

     Lora Foraj
     Exhibit Technician
     Jordanne Steiner
     Ladd Mark

Leslie Wachsman   Confidential
May 22, 2024

                        I N D E X
                                                    PAGE
WITNESS: LESLIE WACHSMAN

        Direct Examination by Mr. Seidel. . . . . . . . 6

        Cross-examination by Mr. Schwartz. . . . . . .256


                    E X H I B I T S
                                                    PAGE
        Plaintiff's Exhibit 50. . . . . . . . . . . . .28

        Plaintiff's Exhibit 51. . . . . . . . . . . . .44

        Plaintiff's Exhibit 52. . . . . . . . . . . . .71

        Plaintiff's Exhibit 53. . . . . . . . . . . . 133

        Plaintiff's Exhibit 54. . . . . . . . . . . . 137

        Plaintiff's Exhibit 55. . . . . . . . . . . . 148

        Plaintiff's Exhibit 56. . . . . . . . . . . . 156

        Plaintiff's Exhibit 57. . . . . . . . . . . . 184

        Plaintiff's Exhibit 58. . . . . . . . . . . . 189

        Plaintiff's Exhibit 59. . . . . . . . . . . . 193

        Plaintiff's Exhibit 60. . . . . . . . . . . . 201

        Plaintiff's Exhibit 61. . . . . . . . . . . . 209

        Plaintiff's Exhibit 62. . . . . . . . . . . . 213

        Plaintiff's Exhibit 63. . . . . . . . . . . . 218

        Plaintiff's Exhibit 64. . . . . . . . . . . . 223

        Plaintiff's Exhibit 65. . . . . . . . . . . . 225

        Plaintiff's Exhibit 66. . . . . . . . . . . . 240

        Plaintiff's Exhibit 67. . . . . . . . . . . . 250

    Plaintiff's Exhibit 68. . . . . . . . . . . . 252

Leslie Wachsman   Confidential
May 22, 2024

THE VIDEOGRAPHER:  We are now on the record on May 22nd, 2024, and the time is 9:09 a.m.

This is the videorecorded deposition of Leslie Wachsman being taken by counsel for the plaintiff in the matter of the Outpatient Medical Center Employee Antitrust Litigation, filed in the U.S. District Court, Northern District of Illinois, Eastern Division.

This deposition is being held at McGuireWoods at 77 West Wacker Drive in Chicago, Illinois.

My name is Ben Stanson.  I'm the videographer on behalf of U.S. Legal Support located in Chicago, Illinois.

Our court reporter today is Isaiah Roberts, also on behalf of U.S. Legal Support.

I am not related to any party in this action, nor am I financially interested in the outcome.

All counsel and those present will be noted on the stenographic record.

Will the court reporter please swear in the witness.

(The witness was sworn.)

LESLIE WACHSMAN, called as a witness herein, having been first duly sworn, was examined and testified as follows:

Leslie Wachsman  Confidential
May 22, 2024

EXAMINATION

BY MR. SEIDEL:

Q.    Good morning.

A.    Good morning.

Q.    My name is David Seidel.  I'm an attorney with the Joseph Saveri Law Firm.  I represent the plaintiffs in this matter.

Could you please state and spell your name for the record.

A.    Sure.  Leslie Wachsman, L-e-s-l-i-e W-a-c-h-s-m-a-n.

Q.    Are you represented by counsel today?

A.    I am.

Q.    Okay.  And who is your counsel?

A.    McGuireWoods.

Q.    Okay.  And McGuireWoods is also SCA's counsel?

A.    It is.

Q.    And you're not paying for their representation; right?

A.    I am not.

Q.    Okay.  Who is your current employer?

A.    SCA Health.

Q.    And what does SCA stand for?

A.    It's just SCA.

changes we were making so then I could ensure they were planned for properly on the budget.

Q. Uh-huh. So I -- are you saying that before 2018 or 2019 you were not officially on the compensation committee, but you had involvement --

A. I attended.

Q. You attended --

A. I wasn't a voting member, but I was attendant, I attended.

Q. And did you do work for the compensation committee for them to --

A. At times. At times, yes.

Q. At times you did some work for the compensation committee in order to help them do their job of setting compensation of employees at SCA?

A. I did.

Q. Okay. What are -- well, first, who are all -- can you name the people on the compensation committee right now?

A. Jason Strauss, Winborne Macpahil, Ladd Mark, now it will be Kathy Grichnik, Marie Edler, and myself.

Q. And what --

A. Oh, Kerri Milless. Sorry.

Q. And Kerri Milless?

Leslie Wachsman   Confidential
May 22, 2024

A.   Kerri Milless is our head of HR.

Q.   How long has SCA had a compensation committee?

A.   I don't know.

Q.   Was there a compensation committee in place when you came to SCA?

A.   I don't recall.

Q.   Do you ever recall a compensation committee being created at SCA?

A.   Not until I was involved.

Q.   And when did you first start getting involved in the compensation committee, whether you were actually on it or --

A.   I believe it was 2018.

Q.   2018.  And what -- what are the responsibilities of the compensation committee with respect to setting the compensation of SCA employees?

A.   The compensation committee determines benefits, any changes we might make to our benefit plan. The compensation committee reviews and approves our incentive plans, and the compensation committee determines the guidance on merit increases -- or the primary responsibilities.

Q.   What are merit increases?

A.   Annual increases in teammates pay.  It's

typically a cost of living sort of component increase.

Q.    Is there a -- does the compensation committee set an annual merit increase budget for SCA?

A.    The annual -- the compensation committee determines the average of which we will communicate to our employees the merit increase.

Q.    Does the merit increase get applied wholesale across-the-board in

A.    The -- sorry.

Q.    Go ahead.  That's the question.  Go ahead.

A.    It starts as the baseline, and then performance is the biggest component of what that might change by.  Every -- it's a case-by-case basis, teammate-by-teammate, and performance is the biggest driver.

Q.    And who makes the determination about any variance from the merit increases?

A.    The leader of the teammate.

Q.    And what about bonuses, does the compensation committee have any involvement in setting any budgets for bonuses across-the-board?

A.    The compensation committee is involved in reviewing and approving the plan that we role out to our teammates.

Leslie Wachsman   Confidential
May 22, 2024

Q.    And does the plan include any budget for bonuses?

A.    What do you mean does the plan include?  So the plans are set.  The budgeting for those dollars is part of just the normal course of business in an annual plan.

Q.    Uh-huh.

A.    It's the result of the plan.  It doesn't drive the plan.

Q.    Does the compensation committee have involvement in determining the budget for bonuses that will go into the plan?

A.    The compensation committee determines the plan and that drives the dollars that go into the budget.

Q.    Okay.  So I want to talk about three components of compensation in particular, salary, bonuses, and merit increases.

A.    Okay.

Q.    Those are three components of a person's compensation; right?

A.    Correct.

Q.    And does the compensation committee have involvement in setting all three of those components at SCA?

A.    Individual teammate salary, no.

Q.    How is -- but bonuses and merit increases, yes?

A.    The compensation committee is in charge of setting the bonus plan.  Again, the bonuses then can be varied case by case by the teammates leader.

Q.    So just give me a quick description then of what the bonus plan is.

A.    So depending on the time frame you're asking about, right now we have ███████████████    ████████
█████████████████████████████████████████████
██████████████████████████████████████████ut
██████████████████████████████████████████████
██████████████████████████████████████████████
███████
                    ████████████████████████████
██████████████████████████████.  ███████████████
██████████████████████████████████████████
█████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████████,
██████████████████████████████████████████
████████████████████████████████████████

[REDACTED]

Q. Uh-huh. How many levels are there?

A. I believe 21 to 32, plus ELT and SLT, which are the executive team. Well, it's the top leaders of the company, so -- so that's 11 -- so about 13 levels.

Q. 13 levels about?

A. Yeah. Yeah.

Q. What -- how do you -- what do you call the levels? Does each level have a name?

A. So we've adopted UnitedHealth Group's comp structure. Each level is a number.

Q. When did you adopt that from UHG?

A. It was in 2021.

Q. Okay. What was SCA's bonus plan prior to adopting UHG's plan?

A. So, again, it's not bonus plan. We have our own bonus plan. We didn't adopt UHG's bonus plan. We adopted their -- their leveling teammate structure, level structure. So we have our own bonus plan. As I mentioned, it was [REDACTED]

I think we went to the [REDACTED] during COVID. So prior to COVID we had about 9 different plans where it was more -- like, the development team had their own plan. The operations team had their own plan.

Leslie Wachsman  Confidential
May 22, 2024

There was a group of corporate overhead functions, more back-end like IT, finance, accounting, HR that were on another plan.  So we had somewhere between 7 to 8 plans at one point, and then we went to an all for one during COVID and never changed.

Q.    What levels existed as SCA prior to adopting UHG's level?

A.    The levels are more based on title, so all directors.  And, again, it was -- what I would say is prior to us establishing and going through kind of a comp restructuring and adopting UHG's framework, it was very inconsistent and a little bit of the wild, wild west.  So that's, again, one of the things as CFO I wanted to put more structure in place.

Q.    It was sort of like the wild, wild west before you became CFO?

A.    A little bit.

Q.    Well, what -- you said the levels were by title prior to adopting the UHG.  What -- what levels were there or what titles were there?

A.    So like -- I mean, there's -- well, there's lots of titles, but analyst, senior analyst, director, senior directors, VPs.

Q.    Can you slow down a little bit and say each

Leslie Wachsman   Confidential
May 22, 2024

one.

A.   Yeah.  I mean, I'm not going to know all of them.

Q.   Can you list the ones that you know?

A.   Sure.  Analyst, senior analyst, associate, associate director, director, senior director, regional vice president, vice president, chief legal counsel. There's probably 50 different titles.  I -- do you need me to keep going?

Q.   Well, if you have any -- if you have any others --

A.   I mean, there's a development analyst.  I mean -- think that's probably sufficient.

Q.   Okay.  Those are probably all of the ones you can remember?

A.   Paralegal.  I mean, I don't -- HR generalist. I mean, there's -- developer, like, in IT.  I mean, that's --

Q.   No.  That's helpful.

A.   Yeah.  Yeah.

Q.   So each title had its own level?

A.   Yes.  I'm trying to recall, and, again, there was -- there wasn't a great consistent structure, but in general each -- the intention was for titles to have

Q.   Okay.  Do you remember if SCA ever exchanged any other information with USPI?

A.   No.

Q.   Is the site-specific case volume data nonpublic?

A.   So when we were -- when we were a publicly held company, we did exchange case volume information on a quarterly basis as part of our filings.

Q.   And when you --

A.   As a private company, there's no legal obligation to just -- to share.  Sorry.

Q.   And to your knowledge, did SCA ever publicly disclose its site-specific case volume data when it was a private company?

A.   No.  I don't believe we did.

Q.   When did it become a publicly held company?

A.   October 2013.

Q.   And it's still a publicly held company.

A.   No.

Q.   No?  Okay.

A.   We are owned by UnitedHealth Group as of 2017.

Q.   Okay.  So, from 2013 to 2017, it was a publicly held company.  Before 2013, it was a privately held company.  And after UHG bought SCA in 2017, it

became a privately held company again.

A.    It came -- part of a publicly held company. So it's owned by UnitedHealth Group.  So I wouldn't say we're private.  I would say we're a division of a publicly held company.

Q.    Since UHG acquired SCA, does SCA publicly disclose its site-specific case volume data?

A.    We do not.

Q.    Okay.  How often did SCA and USPI exchange case volume data?

A.    My recollection is monthly, possibly.  It could have been quarterly, but monthly or quarterly.

Q.    And that occurred regularly for how long?

A.    I don't recall.

Q.    Do you have any memory of a time when you were at SCA when you weren't exchanging case volume data with USPI?

A.    Yes.  I would say maybe the last five, six years.

Q.    You have not?

A.    Yes.  Correct.

Q.    So you stopped exchanging case volume data with USPI about five years ago?

A.    I believe so.  I'm not sure about the specific

Leslie Wachsman  Confidential
May 22, 2024

date.

Q.    And you no longer exchange that information with USPI?

A.    We do not.

Q.    Do you exchange any information with USPI, currently?

A.    I do not.

Q.    Do you know if you currently exchange any information with any other competitors?

A.    I am not aware.

Q.    Does SCA have an antitrust policy, currently?

A.    It's part of our annual compliance training, and UHG actually has the antitrust policy that we follow.

Q.    And you had testified previously that you get a yearly training on that -- on that policy at SCA?

A.    Correct.

Q.    Does every employee get that training?

A.    Yes.

Q.    Did SCA have an antitrust policy prior to UHG acquiring SCA?

A.    I don't recall.

Q.    Did SCA require yearly trainings of antitrust issues at SCA prior to UHG acquiring them?

Leslie Wachsman   Confidential
May 22, 2024

A.    We had annual compliance training.  I don't recall if antitrust was part of it.  My recollection is it was, but I don't remember.

Q.    If -- if you wanted to review the current SCA antitrust policy, would you know where to find it?

A.    It's UnitedHealth Group, and it's on the website.

Q.    It's on UnitedHealth Group's website?

A.    Yes.

Q.    And that is the policy that is in place that you follow?

A.    Yes.

Q.    Is there any other policies in place that you follow?

A.    Not that I'm aware of.

Q.    Do you know whether the antitrust policy that's currently in place addresses the exchange of nonpublic data with competitors?

A.    I do not.

Q.    Why -- why was SCA exchanging case volume data with USPI?

A.    As a benchmark against -- as -- as we look at our financials, there's many benchmarks we use to determine how the industry's performing, and so having

STATE OF ILLINOIS      )
                       )          SS.
COUNTY OF COOK         )


                  CERTIFICATE OF REPORTER


          I, ISAIAH ROBERTS, a Certified Shorthand
Reporter (IL) and Registered Professional Reporter for
the State of Illinois, do hereby certify that the
witness whose testimony appears in the foregoing
deposition was duly sworn by me; that the testimony of
said witness was taken by me to the best of my ability
and thereafter reduced to typewriting under my
direction; that I am neither counsel for, related to,
nor employed by any of the parties to the action in
which this deposition was taken, and further that I am
not a relative or employee of any attorney or counsel
employed by the parties thereto, nor financially or
otherwise interested in the outcome of the action.


                  _____

                  Isaiah Roberts, CSR, RPR
                  Illinois CSR #084-004890

## Leslie Wachsman May 22, 2024 Deposition
## Errata Sheet

I, Leslie Wachsman, having read the foregoing deposition, Pages 1 through 258, taken May 22, 2024, do hereby certify said testimony is a true and accurate transcript, with the following changes (if any):

| Page | Line(s) | Correction | Reason |
|---|---|---|---|
| 5 | 4-5 | Change "in the matter of the Outpatient Medical Center Employee Antitrust Litigation," to "in the matter of Outpatient Medical Center Employee Antitrust Litigation." | Remove extra word for clarity. |
| 9 | 10 | Change "The cabin tem does not exist anymore," to "The cabin team does not exist anymore." | Correct spelling error. |
| 12 | 16-17 | Change "I am aware that it is an allegation made against SCA Health related to hiring practices," to "I am aware that it is about an allegation made against SCA Health related to hiring practices." | Add omitted word for clarity. |
| 18 | 9-10 | Change "I interned at Caremark and took a full-time job a few months later," to "I interned at Caremark and took a full-time job there a few months later." | Add omitted word for clarity. |
| 19 | 19-21 | Change "I decided to kind of take a leap of faith and quit a job I had been at 19 years to come to SCA," to "I decided to kind of take a leap of faith and quit a job I had been at for 19 years to come to SCA." | Add omitted word for clarity. |
| 25 | 19-20 | Change "I believe there is things that get shared," to "I believe there are things that get shared." | Correct tense for clarity. |
| 34 | 2 | Change "How many does SCA own?" to "How many ambulatory surgery centers does SCA own?" | Replace pronoun for clarity. |
| 34 | 15-19 | Change "We help them run their ASCs, but we also create, like, a management services agreement that sits on top of the practice that we help provide their HR, their accounting, their physician recruiting," to "We help them run their ASCs, but we also create, like, a management services agreement that sits on top of their practice which helps provide their HR, their accounting, their physician recruiting." | Correct typographical error for clarity. |
| 35 | 15 | Change "up on" to "upon." | Correct spacing for clarity. |
| 36 | 5 | Change "SMS" to "Surgical Management Solutions." | Replace acronym for clarity. |
| 36 | 21-22 | Change "We might have one, but 99.9 percent is joint venture," to "We might have one, but 99.9 percent are joint ventures." | Correct tense for clarity. |

| Page | Line(s) | Correction | Reason |
|---|---|---|---|
| 42 | 18-20 | Change "there are several health systems that have JV partnerships, which they own an ASC," to "there are several health systems that have JV partnerships in which they own an ASC." | Add omitted word and correct punctuation for clarity. |
| 43 | 14 | Change "it's" to "there's" | Correct typographical error for clarity. |
| 46 | 8-9 | Change "the CFO at the time that we made the decision," to "the CFO at the time that made the decision." | Remove extra word for clarity. |
| 47 | 6 | Change "he'd" to "he." | Correct typographical error for clarity. |
| 49 | 1 | Change "Wortman" to "Workman." | Correct spelling error. |
| 58 | 16 | Change "now" to "know." | Correct typographical error for clarity. |
| 81 | 5 | Replace "to" with "toward." | Replace word for clarity. |
| 87 | 12 | Change "Depending on what you got from them," to "Depending on what information you got from them." | Add omitted word for clarity. |
| 91 | 21 | Replace "is" with "are." | Change verb tense for clarity. |
| 94 | 6-8 | Change "is -- their ability to go find a role at another company is one of the most important things they have?" to "is – their ability to go find a role at another company one of the most important things they have?" | Omit extra word for clarity. |
| 96 | 18 | Change "do" to "does." | Correct tense for clarity. |
| 96 | 20-22 | Change "I have responsibility for all the accounting team that do all of the general ledger and keep the books for all of the surgery centers," to "I have responsibility for the accounting team that does all of the general ledger and keeps the books for all of the surgery centers." | Omit extra word and correct tense for clarity. |
| 101 | 9-10 | Change "If you're renting the a room to do that training," to "If you're renting a room to do that training." | Omit extra word for clarity. |
| 107 | 16 | Change "FDE" to "FTE." | Correct typographical error. |
| 107 | 17-19 | Change "there's several very high level reports that I look at on a monthly, quarterly basis," to "there's several very high level reports that I look at on a monthly and quarterly basis." | Correct punctuation and add conjunction for clarity. |

| Page | Line(s) | Correction | Reason |
|---|---|---|---|
| 108 | 13 | Change "SWIB" to "SWB." | Correct typographical error. |
| 109 | 5 | Change "expansive" to "expense." | Correct typographical error. |
| 109 | 12-14 | Change "And is ███████ ███████████████ to ███████████ ███████████" | Omit extra words and correct verb tense for clarity. |
| 110 | 4-5 | Change "of which we decide," to "that decides." | Replace extra words for clarity. |
| 110 | 21 | Change "for sales team," to "for the sales team." | Add omitted word for clarity. |
| 111 | 12 | Change "CSA" to "SCA." | Correct typographical error. |
| 111 | 15 | Change "CSA" to "SCA." | Correct typographical error. |
| 113 | 8-9 | Change "but I was attendant, I attended," to "but I attended." | Omit extra words for clarity. |
| 113 | 20 | Change "Macpahil" to "Macphail." | Correct spelling error. |
| 114 | 24 | Change "Annual increases in teammates pay," to "Annual increases in teammates' pay." | Correct punctuation. |
| 117 | 6 | Change "teammates leader," to "teammates' leader." | Correct punctuation. |
| 117 | 17 | Replace "at" with "are." | Correct typographical error. |
| 118 | 5-6 | Replace "13 Levels" with "14 Levels." | Correct typographical error. |
| 124 | 4 | Change "there are some employees at SCA that are not eligible for bonus," to "there are some employees at SCA that are not eligible for a bonus." | Add omitted word for clarity. |
| 125 | 23 | Change "documents" to "documentation." | Correct tense for clarity. |
| 143 | 9 | Change "a leader may give lump sum," to "a leader may give a lump sum." | Add omitted word for clarity. |

| Page | Line(s) | Correction | Reason |
|---|---|---|---|
| 148 | 1 | Change "it was probably 35 people in the team total," to "there was probably 35 people in the team total." | Replace word for clarity. |
| 150 | 16 | Change "all of the director of finance operations were on the same level," to "all of the directors of finance operations were on the same level." | Correct singular to plural for clarity. |
| 153 | 15 | Replace "are" with "have." | Correct possessive tense for clarity. |
| 155 | 20 | Replace "as" with "at." | Correct typographical error. |
| 157 | 1-2 | Change "Samantha cutter" to "Samantha Cutter." | Correct typographical error. |
| 161 | 5 | Change "13" to "14." | Correct typographical error. |
| 175 | 24 | Change "SCA" to "USPI." | Correct proper name. |
| 182 | 21 | Replace "impatient" with "inpatient." | Correct typographical error. |
| 189 | 22 | Replace "USPA" with "USPI." | Correct typographical error. |
| 210 | 16-17 | Change "he help me put in a financial planning into SCA," to "he helped me put in a financial plan into SCA." | Correct typographical errors and correct tense for clarity. |
| 211 | 22 | Change "Ye," to "Yes." | Correct typographical error. |
| 214 | 7-8 | Change "it was total case volume to data broken out by Joint Venture type and surgical hospital and ASC," to "it was total case volume data broken out by joint venture type and surgical hospital and ASC." | Omit extra word for clarity and correct capitalization. |
| 216 | 7-8 | Change "it was because they were included a whole bunch of ancillary activities," to "it was because they included a whole bunch of ancillary activities." | Omit extra word for clarity. |
| 218 | 1-2 | Change "I think I had an individual conversations with one of them," to "I think I had an individual conversation with one of them." | Correct plural to singular. |
| 218 | 13 | Change "Ulendach" to "Ollendick." | Correct spelling error. |

| Page | Line(s) | Correction | Reason |
|---|---|---|---|
| 221 | 3-6 | Change "Object on the basis of privilege. Don't reveal any information about communications about communications with counsel or advice of counsel," to "Object on the basis of privilege. Don't reveal any information about communications with counsel or advice of counsel." | Omit extra words for clarity. |
| 221 | 23 | Change "A Tenant owned USPI," to "Tenet owned USPI." | Omit extra word for clarity and correct spelling. |
| 222 | 1 | Change "Tenant" to "Tenet." | Correct spelling. |
| 227 | 7 | Change "there was many years" to "there were many years." | Correct verb form for clarity. |
| 228 | 18 | Change "GAP" to "GAAP." | Correct typographical error. |
| 228 | 18 | Replace "purport" with "report." | Correct typographical error. |
| 229 | 1 | Change "GAP" to "GAAP." | Correct typographical error. |
| 230 | 8 | Replace "a" with "by." | Correct typographical error. |
| 236 | 8 | Change "But in term of nonpublic data," to "But in terms of nonpublic data." | Correct typographical error. |
| 243 | 15 | Change "Bench marking" to "Benchmarking." | Close space for clarity. |
| 244 | 15 | Change "Tenant" to "Tenet." | Correct spelling. |
| 245 | 18-20 | Change "As part of our assessment of the right of setting a merit increase in any given year, we do do market research," to "As part of our assessment of setting a merit increase in any given year, we do market research." | Omit extra words for clarity. |
| 246 | 16 | Change "what are is the health care market doing," to "what is the healthcare market doing." | Omit extra word for clarity. |
| 248 | 6 | Change "and one of that is looking at" to "and one way of doing that is looking at." | Add missing words for clarity. |
| 251 | 13 | Change "ABITA" to "EBITDA." | Correct typographical error. |

| Page | Line(s) | Correction | Reason |
|------|---------|-----------|--------|
| 255 | 8 | Replace "McPhail" with "Macphail." | Correct spelling. |

Leslie Wachsman

# ZIELINSKI EXHIBIT 53 (FILED UNDER SEAL)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE OUTPATIENT MEDICAL )  MASTER DOCKET NUMBER
CENTER EMPLOYEE ANTITRUST )  1:21-CV-00305
LITIGATION )
 )  CONSOLIDATED AMENDED
 )  CLASS ACTION COMPLAINT
 )
 )  JURY TRIAL DEMANDED

-----------------------------------------------

CONFIDENTIAL

ORAL AND VIDEOTAPED DEPOSITION OF

BILL WILCOX

September 24, 2024

-----------------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF BILL WILCOX, produced as a witness at the instance of the Plaintiffs, was taken in the above-styled and numbered cause on September 24, 2024, from 9:59 a.m. to 5:47 p.m., before Jamie K. Israelow, Certified Shorthand Reporter in and for the State of Texas, Registered Merit Reporter and Certified Realtime Reporter, reported by machine shorthand, at the offices of Jones Day, 2727 North Harwood Street, Suite 600, in the City of Dallas, County of Dallas and State of Texas, and the provisions stated on the record or attached hereto; that the deposition shall be read and signed before any notary public.

Bill Wilcox   Confidential
September 24, 2024

A P P E A R A N C E S

FOR THE CLASS PLAINTIFFS:

    Linda P. Nussbaum, Esq.
    Jonathan J. Ross, Esq.
    NUSSBAUM LAW GROUP, PC
    1133 Avenue of the Americas, 31st FL
    New York, New York  10036
    D: 917.438.9189
    D: 917.438.9102
    lnussbaum@nussbaumpc.com
    jross@nussbaumpc.com


FOR THE DEFENDANT UNITED SURGICAL PARTNERS
INTERNATIONAL, INC.:

    Veronica Moyé, Esq.
    Connor Brewer, Esq.
    KING & SPALDING
    2601 Olive Street, Suite 2300
    Dallas, Texas 75201
    D: 713.751.3254
    vmoye@kslaw.com
    cbrewer@kslaw.com


FOR THE SCA DEFENDANTS:

    Angelo M. Russo, Esq.
    Amy B. Manning, Esq. (By Zoom)
    McGUIREWOODS, LLP
    77 West Wacker Drive, Suite 4100
    Chicago, Illinois  60601
    312.849.8100
    arusso@mcguirewoods.com
    amanning@mcguirewoods.com
    -- and --
    Andrew E. Talbot, Esq. (By Zoom)
    MCGUIREWOODS LLP
    Gateway Plaza, 800 East Canal Street
    Richmond, Virginia  23219-3916
    D: 804.775.1622
    atalbot@mcguirewoods.com

Bill Wilcox  Confidential
September 24, 2024

FOR THE DEFENDANT ANDREW HAYEK:

          Karen Sharp, Esq.
          WILSON SONSINI GOODRICH & ROSATI, P.C.
          One Market Plaza, Spear Tower
          Suite 3300
          San Francisco, California   94105-1126
          D: 415.947.2052
          ksharp@wsgr.com


FOR THE DEFENDANT KENT THIRY:

          Katharine O'Connor, Esq.
          McDERMOTT WILL & EMERY, LLP
          444 West Lake Street
          Chicago, Illinois   60606-0029
          D: 312.984.3627
          koconnor@mwe.com


FOR THE DEFENDANT DAVITA, INC.:

          Staci Holthus, Esq. (By Zoom)
          MORGAN, LEWIS & BOKIUS LLP
          110 North Wacker Drive, Suite 2800
          Chicago, Illinois   60606-1511
          D: 312.324.1763
          staci.holthus@morganlewis.com


ALSO PRESENT:

          Erica Taylor, Videographer
          Chris Azoff, USLS Tech  (By Zoom)

Bill Wilcox  Confidential
September 24, 2024

                              INDEX

                                                        PAGE
     Appearances                                        2-3


     BILL WILCOX


         EXAMINATION BY MS. NUSSBAUM                       9
         EXAMINATION BY MS. MOYE                         229


      Corrections and Signature                         242
      Reporter's Certificate                            244


                       PLAINTIFFS' EXHIBITS
     NO.              DESCRIPTION                        PAGE


     PX503            Subpoena to Testify at a             55
                      Deposition in a Civil Action
     PX506            Letter dated October 2, 2018, to     88
                      William Wilcox from Megan Lewis



                          CONFIDENTIAL
                       PLAINTIFFS' EXHIBITS
     NO.              DESCRIPTION                        PAGE

     PX504            Email dated 2/10/2018, to            79
                      205.306.2662 from William H.
                      Wilcox
     PX505            Email dated 2/13/2018, to Daphne     83
                      Walker from Bill Wilcox
     PX507            Federal Bureau of Investigation,     90
                      Interview dated 11/30/2018
     PX508            Notes from second interview         128
     PX509            Email chain, top email dated        119
                      10/22/2017, to Jeffrey Andrews
                      from Bill Wilcox
     PX510            Email chain, top email dated        148
                      4/7/2010, to Brett Brodnax from
                      Bill Wilcox
     PX511            Letter dated May 2010, to Andrew    151
                      Hayek and others from William H.
                      Wilcox
     PX512            Email chain, top email dated        157
                      5/31/2012, to Andrew Hayek from
                      Bill Wilcox
     PX513            Email chain, top email dated        161
                      11/1/2013, to Andy Johnston from
                      Shannon Mosley


              U.S. Legal Support | www.uslegalsupport.com

Bill Wilcox  Confidential
September 24, 2024

CONFIDENTIAL
PLAINTIFFS' EXHIBITS (CONTINUED)
NO.                 DESCRIPTION                              PAGE

PX514           Email chain, top email dated          168
                12/20/2013, to Bill Wilcox from
                Chris Hartshorn
PX515           Email dated 1/8/2014, to Jonathan      171
                Bond and Chris Hartshorn from Bill
                Wilcox
PX516           Email chain, top email dated          175
                2/12/2010, to Mark Kopser and
                others from Niels Vernegaard
PX517           Email chain, top email dated          187
                5/13/2010, to Bill Wilcox and
                others from Andrew Hayek
PX518           Email chain, top email dated          189
                7/13/2011, to Bill Wilcox and
                others from Jarod Moss
PX519           Email chain, top email dated          191
                9/6/2014, to Bill Wilcox and
                others from Jason Cagle
PX520           Email dated 5/28/2015, to Marian       197
                Lowe and others from Bill Wilcox
PX522           Email dated 1/14/2011, to Cabin        202
                Team and Brian Mathis from Sue
                Seme
PX523           Email chain, top email dated          204
                5/2/2012, to Brian Mathis from
                Mark Kopser
PX524           Email chain, top email dated          208
                9/9/2012, to Lynn Howard from
                Brian Mathis


          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
                    PLAINTIFFS' EXHIBITS
NO.                 DESCRIPTION                              PAGE

PX521           Email dated 8/1/2017, to Bill          200
                Wilcox from Jason Cagle
PX525           Email chain, top email               213
                dated10/21/2012, to Lynn Howard
                and others from Brian Mathis

Bill Wilcox  Confidential
September 24, 2024

DEFENDANT'S EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| DX77 | March 2015 Email chain between Bill Wilcox and Ms. Wellman and others | 238 |

CONFIDENTIAL
PREVIOUSLY MARKED EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| PX37 | Email chain, top email dated 8/9/2013, to Brian Mathis and others from Jason Cagle | 216 |
| PX226 | Email chain, top email dated 9/3/2013, to Jason Cagle from Katrina Gross | 219 |
| PX227 | Email chain, top email dated 5/14/2010, to Brett Brodnax from Bill Wilcox | 155 |
| PX232 | Email chain, top email dated 8/20/2014, to Jason Cagle from Brian Mathis | 223 |
| PX239 | Email chain, top email dated 2/18/2015, to Bill Wilcox from Shannon Mosley | 225 |
| PX298 | Email chain, top email dated 10/22/2017, to Bill Wilcox from Sandi Karrmann | 115 |

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
PREVIOUSLY MARKED EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| PX91 | Letter to Scott Hammond, Esq. And Veronica Lewis, Esq. From Richard A. Powers | 67 |
| PX235 | Email dated 1/11/2015, to Jason Cagle from Bill Wilcox | 194 |

Bill Wilcox   Confidential
September 24, 2024

REPORTER'S NOTE:  Please be advised that an

UNCERTIFIED ROUGH DRAFT version of this transcript

exists.  If you are in possession of said rough

draft, please replace it immediately with this

CERTIFIED FINAL TRANSCRIPT.

Bill Wilcox  Confidential
September 24, 2024

P R O C E E D I N G S

(On the record at 9:59 a.m.)

(Exhibits PX503 to PX508 were marked.)

THE VIDEOGRAPHER:  Good morning.  We are now on the record at 9:59 a.m. on September 24th, 2024. This is the video-recorded proceeding of witness, Bill Wilcox, taken by counsel for plaintiff, in the matter regarding Outpatient Medical Center Employee Antitrust Litigation, filed in the United States District Court for the Northern District of Illinois, Eastern Division.  This proceeding is being held at Jones Day located in Dallas, Texas.

My name is Erica Taylor.  I'm the videographer on behalf of U.S. Legal Support.  The court reporter is Jamie Israelow on behalf of U.S. Legal Support.

Will counsel please state their appearances for the record.

MS. NUSSBAUM:  Good morning. Linda Nussbaum for the class plaintiffs.

MR. ROSS:  And Jonathan Ross for the class plaintiffs as well.

MS. MOYÉ:  Veronica Moyé, King & Spalding, for USPI.

MR. BREWER:  Connor Brewer, King &

Spalding, for USPI.

MS. O'CONNOR: Katharine O'Connor, McDermott Will & Emery, on behalf of Kent Thiry.

MR. RUSSO: Angelo Russo, McGuireWoods, on behalf of the SCA defendants.

MS. SHARP: Karen Sharp, Wilson Sonsini, on behalf Mr. Hayek.

MS. HOLTHUS: Staci Holthus, Morgan, Lewis & Bockius, on behalf of Defendant DaVita, Inc.

MR. TALBOT: Andrew Talbot, McGuireWoods, on behalf of the SCA defendants.

MS. MANNING: Amy Manning from McGuireWoods on behalf of the SCA defendants.

THE VIDEOGRAPHER: The court reporter will now swear in the witness.

BILL WILCOX,

having been first duly sworn, testified as follows:

EXAMINATION

BY MS. NUSSBAUM:

Q. Good morning, Mr. Wilcox. Can you state your full legal name for the record, please.

A. William Holder Wilcox.

Q. What is your date of birth?

A. ███████████████.

Q. And your home address?

Q. And do you have any understanding as to what the Department of -- the Department of Justice inquiry and matter is about other than what you've been told by Ms. Moyé?

A. Yes.

Q. And what is that understanding?

A. Well, if I'm understanding your question correctly, it goes back to the self-reporting that we did, the subsequent interviews with the DOJ.

Q. And what exactly did you self-report?

A. That USPI had an agreement with SCA not to actively solicit each other's executives.

Q. And was there an event or something that happened that caused USPI to self-report that agreement to the Department of Justice?

A. Again, that was -- the answer is yes, but it was within -- all within my legal counsel.

MS. MOYÉ: So saying a reminder: Just leave the substance of communications with counsel out of your responses, Mr. Wilcox.

THE WITNESS: Say it again.

MS. MOYÉ: Please leave the substance --

THE WITNESS: Okay.

MS. MOYÉ: -- of your communications with counsel out of your responses all day today because

Bill Wilcox  Confidential
September 24, 2024

those are privileged communications.

THE WITNESS:  Got it.

MS. MOYÉ:  And if you ever have a question on that privilege issue, we can always break and talk about it before you respond.

THE WITNESS:  Thank you.

Q.   (By Ms. Nussbaum)  Now, did you discuss the self-reporting of the agreement between SCA and USPI with anyone outside of the presence of counsel?

A.   With the exception of my wife, no.

Q.   Again, what did you tell your wife?

A.   Just described to her what was going on.

Q.   What did you tell her?

MS. MOYÉ:  It's irrelevant, Mr. Wilcox, but it's not privileged, so she's entitled to get a response to that.

A.   This was a conversation I had years ago and it had probably been over dinner, and it would have been just giving an overview of what brought about the self-reporting, which would have been -- we were -- at some point, nine or 10 years ago, Andrew and I had a conversation that lasted seconds, I'm sure, and it -- and it was brought about, I believe, because we were talking about a potential acquisition.

And I didn't recall who -- who brought it

Bill Wilcox  Confidential
September 24, 2024

up, but we just had an agreement because of the relationships between the two companies and the strength of the companies in the industry and the potential of doing business together that we wouldn't actively solicit executives.  I probably went into a little more detail than that, but I don't recall the conversation specifically.

Q.   (By Ms. Nussbaum)  Now, did USPI have agreements with any other companies in addition to SCA not to poach or actively solicit their employees?

MS. MOYÉ:  Objection, form.

A.   To -- not to actively solicit, yes.

Q.   (By Ms. Nussbaum)  What other companies?

A.   It was SCD, a small one.  It was Zasa brothers. I don't remember the name of the company.  And I think I'm missing one.

Q.   And did one or more of those agreements take place before the agreement that was reached between yourself and Mr. Hayek?

A.   I don't know.  I was -- the only one that I was aware of at the time was -- that I recall is the one with Andrew.

Q.   When you say "Andrew" --

A.   Oh, I'm sorry.

Q.   -- you're talking of Mr. Hayek of SCA?

Bill Wilcox  Confidential
September 24, 2024

A.  Hayek, yes.  Sorry.

Q.  Now, Mr. Hayek came to SCA from DaVita; is that right?

MS. SHARP:  Objection.

MS. MOYÉ:  Object to the form.

MR. RUSSO:  Object to form.

A.  That's what I recall.

Q.  (By Ms. Nussbaum)  Do you know if Mr. Hayek had a similar agreement with DaVita not to poach each other's employees, not to actively solicit each other's employees?

MR. RUSSO:  Object to the form.

MS. MOYÉ:  Object to the form.

MS. SHARP:  Object to the form.

A.  I only know that through my discussions with counsel.

MS. MOYÉ:  So I instruct you not to answer the question.

Q.  (By Ms. Nussbaum)  You never discussed --

MS. MOYÉ:  Calls for privileged communications.

Q.  (By Ms. Nussbaum)  You never discussed that with Mr. Hayek?

A.  No.

Q.  Now, did USPI represent to the Department of

A.   I assumed, yes.

Q.   And so you were at that time doing the best you could to be accurate as to what had occurred approximately nine to 10 years before; is that right?

MS. MOYÉ:  Objection to the form.

A.   Yeah.  If you rephrased it and said:  In the past, I would say yes.  The nine to 10 -- 10 years may not be important, but it's -- that's just a recollection.

Q.   (By Ms. Nussbaum)  Now, Mr. Wilcox, at the very bottom paragraph on -- on Page 5, it says:

Is that correct?

A.   Yes, other than it was a not-to-actively-solicit agreement.

Q.   Now, do you recall an agreement that USPI had with Tenet with respect to the solicitation of accountants?

MS. MOYÉ:  Object to the form.

A.    Yes.

Q.    (By Ms. Nussbaum)  And what was that agreement?

A.    I don't remember specifically.  I was not personally involved.

Q.    Okay.  Did USPI reach an agreement with Tenet that they would not actively recruit each other's accountants and that Tenet would not actively recruit accountants from USPI?

MS. MOYÉ:  Objection to the form.

A.    I believe so.

Q.    (By Ms. Nussbaum)  Okay.  Let's turn to Page 9 of 13.  Okay.  Let's -- and let's look at the page before the last few sentences, 8 of 13, and ███

████████████████████████████████████████

██████████████████████████████████████.  Do you see that?

MS. MOYÉ:  Are you referring to the last paragraph on Page 8?

MS. NUSSBAUM:  Yes.

Q.    (By Ms. Nussbaum)  It says:  ████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

[REDACTED]

[REDACTED]

[REDACTED].  (As read)

Is that accurate?

MS. MOYÉ:  Object to the form.

A.   Which part?

Q.   (By Ms. Nussbaum)  [REDACTED]

[REDACTED]

A.   Oh, the whole paragraph?

Q.   Yeah, whole paragraph.

A.   Yes.

Q.   So that's accurate; is that correct?

A.   That paragraph is accurate --

Q.   Yeah.

A.   -- yes.

Q.   Let's turn now to the next page, 9 of 13, and that says:  [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

██████████████████████████

A.   I believe so.

Q.   Okay.  And so when we were discussing that earlier, you said that you were not clear on the time frame.  Does the information in Exhibit 507, ████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

refresh your recollection that by the time you learned of the Burke-Ward subpoenas, you were aware of the DOJ guidance on no-poach agreement?

MS. MOYÉ:  Object to the form.

A.   Yes, aware and that we had enacted protocols to address any concerns.

Q.   (By Ms. Nussbaum)  So when you and your colleagues were making the telephone calls to all of the proposed recipients of the Burke-Ward subpoenas, which included your competitors such as SCA and recruiters, you were aware at that time that the agreement, the no-solicit agreement between yourself and SCA, was an agreement that likely violated the DOJ no-poach guidance that Ms. Karrmann had sent you; is that right?

MS. MOYÉ:  Objection to the form.

A.   Well, we had terminated and put in the

a no-poach agreement. And then Mr. Brodnax agrees. He says: Bill had this discussion with Andrew.

And then he says to you: Bill, does our agreement apply if they approach us? Not sure exactly what you and Andrew agreed to.

So, again, Mr. Brodnax is indicating that, yes, there is an agreement, and he's asking you about the specific terms of the agreement; is that right?

MS. MOYÉ: Object to the form.

MS. SHARP: Object to the form.

A. That's how it reads to me.

Q. (By Ms. Nussbaum) And then you -- again, you confirm that there is an agreement, that is, a no-poach agreement. And then you say: If she indeed did approach us and is willing to tell Andrew that, I'm okay.

Do you see that?

MS. MOYÉ: Object to the form.

A. I see that.

Q. (By Ms. Nussbaum) So you're confirming that there is a no-poach agreement and then you are also saying that there is a tell-your-boss requirement.

MS. SHARP: Objection, form.

MS. MOYÉ: Object to the form.

MR. RUSSO: Object to form.

Bill Wilcox  Confidential
September 24, 2024

A.   I read it a little differently, that Mr. Johnston, under the subject, SCA Gentleman's Agreement, said not to poach their folks.  I don't know what Mr. Johnston -- how he defined that.  I was operating under the same assumption we've discussed all day, that we had the agreement not to actively solicit and to treat it as an intracompany matter -- as the same as an intracompany matter.

And so then I reinforced that if she did indeed approach us and is willing to talk to Andrew and clarify above, after we know we want to offer her the job, then I'd be okay with that.

Q.   (By Ms. Nussbaum)  And then the final email on the chain is from Ms. Mosley.  And she says:  I just talked with Bill -- referring to you -- and he wanted me to make double sure that Pat did reach out to Gary and we were -- in no way reached out to her first.

So you had a conversation with Ms. Mosley in which you wanted her to confirm the facts with respect to the situation with Ms. Jepsen to see whether or not it violated your agreement with Andrew; is that right?

MS. MOYÉ:  Object to the form.

MR. RUSSO:  Object to the form.

MS. SHARP:  Object to the form.

A.   Yes.  And I also said that we should not ask her to speak with -- it would have been Andrew or whomever appropriate until we knew we wanted to offer her the job.

Q.   (By Ms. Nussbaum)  So, Mr. Wilcox, is it fair to say that over the years, anytime any issue with respect to the agreement came up, the other executives at USPI -- Mr. Brodnax, Ms. Mosley, others -- reached out to you if there was any question as to clarification or what was covered or not covered by the agreement?

MS. MOYÉ:  Objection to the form.

A.   Well, it certainly happened at least on this occasion.  And again, in those seven years or so, it didn't happen very often.  I couldn't say that it happened every time.  And I don't think it happened -- there weren't many instances and I don't know if they approached me on every instance, but I -- obviously, I was committed to sticking to that nonsolicit agreement and had -- had no intent of hiding it.  I didn't think there was anything inappropriate about it.

Q.   (By Ms. Nussbaum)  Let me show what we're marking as Exhibit 514.  It's under Tab 14.  And it is a series of emails in December of 2013, CIV_0000397215.

(Exhibit PX514 was marked.)

A.   Okay.

Q.   (By Ms. Nussbaum)  Do you recognize this document?

A.   I do.

Q.   And is this one of the documents that you reviewed in preparation for your deposition?

A.   Yes.

Q.   Okay.  Now, this concerns Terri Seidel, who was an employee with SCA and who is being considered as a finalist for a regional vice president position by USPI; is that right?

A.   Yes.

Q.   Okay.  And the first email, which is to you, is from a Chris Hartshorn.  And who is that?

A.   He -- at that point, he was a relatively senior operator over the St. Louis market.  I'm not sure what his title was.

Q.   Okay.  And Mr. Hartshorn, writing to you, says: Shannon wanted me to let all of you know that we did not approach her.

So first, he's letting you know that USPI did not violate your agreement with Mr. Hayek.  USPI did not approach her.

MS. SHARP:  Objection, form.

Q.   (By Ms. Nussbaum)  You see that?

A.   Yes.

Bill Wilcox  Confidential
September 24, 2024

Q.   And Mr. Hartshorn then tells you:  She knows that she will need to discuss with the SCA folks prior to any final decision.

So again, he's informing you that they are abiding by the USPI agreement with SCA that requires, you know, tell your boss, and that she will tell the, quote, SCA folks prior to any final decision.  Do you see that?

MS. MOYÉ:  Object to the form.

MR. RUSSO:  Form.

A.   I do see that.

Q.   (By Ms. Nussbaum)  And then Mr. Brodnax asks whether or not there are any concerns with the process based on your agreement with Andrew.  And you reply:  Only that we need to ask Terri to let them know she approached us, not vice versa.  Thanks, B.

And then you are then told:  She knows. Thanks.

Do you see that?

A.   I do.

Q.   So this is another example of senior people at USPI asking you to approve the way they are moving forward with a new candidate and whether or not the process violates the agreement that you have with Andrew Hayek.

Bill Wilcox  Confidential
September 24, 2024

MS. MOYÉ:  Objection to the form.

A.  Yes, one of a few.

Q.  (By Ms. Nussbaum)  And Mr. Brodnax, who's basically your right hand, says:  Bill, any concerns with the process outlined below based on your agreement with Andrew?

And you say:  Only that we need to ask Terri to let them know she approached us, not vice versa.  Thanks.

So Mr. Brodnax is making certain that the process is okay with you before USPI moves on in the employment process with Ms. Seidel; is that right?

MS. MOYÉ:  Objection to the form.

MS. SHARP:  Objection to the form.

MR. RUSSO:  Object to form.

A.  Yes.

Q.  (By Ms. Nussbaum)  Let's mark what's going to be Exhibit 515, and it's under Tab 16.

(Exhibit PX515 was marked.)

Q.  (By Ms. Nussbaum)  And this is an email now, the next year, in 2014, and it's 0000018231.  And this is also with respect to Terri Seidel.

A.  Yes, I've read it.  Thank you.

Q.  And Mr. Wilcox, is this one of the documents that you reviewed in preparation for your deposition

MS. NUSSBAUM: Okay. We'd like a very short break.

MS. MOYÉ: Okay.

THE VIDEOGRAPHER: We are now off the record at 5:21 p.m.

(A recess was taken from 5:21 p.m. to 5:29 p.m.)

THE VIDEOGRAPHER: We're now back on the record at 5:29 p.m.

MS. NUSSBAUM: Thanks very much. Thanks very much, Mr. Wilcox, for your time today. We have no further questions at this time.

THE WITNESS: You're welcome. I wasn't expecting that.

EXAMINATION

BY MS. MOYÉ:

Q. Okay. I'd now like to ask you a few questions as counsel for USPI, Mr. Wilcox.

The first relates to one of the documents Ms. Nussbaum asked you about earlier today. It is Plaintiffs' Exhibit 227, if you could pull that document out of your stack. This was a document that Ms. Nussbaum marked at the Jason Cagle deposition about a month ago.

Do you -- can you find that in your stack?

If you can't, I can --

A.   Oh, me?  Oh, I thought you were talking to somebody else.  Sorry.  What's the title?

Q.   It's re: Bellville.  PX227.  If you don't -- here, I have another copy of it.  That may help expedite things.

A.   Okay.

Q.   And this is a May 2010 communication between you, Brett and Mark Kopser and Jason Cagle at the top, correct?

A.   Correct.

Q.   And in this May 2010 email, you wrote:  I had a conversation with Andrew re: people and we reached agreement that we would not approach each other's proactively.

Do you see that language?

A.   Yes.

Q.   Mr. Wilcox, was the agreement that you're referencing reached in May of 2010?

A.   Yes.

Q.   And can you tell us, from your point of view, what was the motivation, the purpose for that agreement?

A.   So as I said earlier, it emanated out of -- you could see here the message from Joe Clark at SCA to Brett Brodnax.  It was related to -- the potential M&A

Bill Wilcox  Confidential
September 24, 2024

related to Bellville.  And Mr. Clark goes on to say:  It makes me wonder if we should spend a few minutes to review our respective portfolios to see if there are others that would be better to swap.  (As read)

That is one of the reasons that I wanted to make sure that we had a productive relationship with SCA, related to items like this, the potential acquisition of Bellville, looking at the portfolios to see if there were other areas that we could work on, work together with potential deals to buy or somehow coordinate, merger and acquisition with other companies. One -- One example that comes to mind is the -- Skoal -- I mean, AmSurg later on.

So -- and part of that, you don't -- generally, when you're in merger discussions, it's generally not a good idea to be fighting over employees.

And secondly, it was evident to me, and has proved to be true, that although we're both key players in the ASC industry, we were small.  And you saw some evidence earlier on where some of the key players would come together to promote advocacy for the industry.  And we worked with SCA and others, not only on the advocacy piece, but on the ASC collaboration.

Q.   Thank you, Mr. Wilcox.

And let me refer you to another document

you were asked about earlier today.  This one is PX298.
And unfortunately, I do not have another copy of that
one.  Maybe if you can give me your stack, I can help
you find the right documents.  We may need the court
reporter's stack as well.

A.  Got it.

Q.  Got it.  Thank you.

So this PX298 was marked at the deposition
of Sandi Karrmann, and this is an October 22nd, 2017
email exchange.  Do you see that?

A.  Yes.

Q.  And the top email exchange on this exhibit,
PX298, Sandi Karrmann writes to you and others:  FYI, we
really can't push these kinds of gentleman's agreements.
The DOJ has cracked down on these as a violation of
antitrust laws.

Do you see that, sir?

A.  Yes.

Q.  Was this the first time that you became aware
of any DOJ guidance on the subject of the type of
gentleman's agreements?

A.  Yes.

Q.  And in this email, Ms. Karrmann says:  The DOJ
has cracked down on these as a violation of antitrust
laws.

Is that correct, sir?

A.   Yes.

Q.   Did Ms. Karrmann say in this email that this was an illegal agreement?

A.   No.

Q.   Once you received this communication from Ms. Karrmann and became aware of the DOJ guidance, did USPI stop any no-solicit agreements that it had previously had with other companies?

A.   It's my understanding we stopped all of them.

Q.   And so is it your testimony, sir, that the agreement with SCA was in place between 2010 and 2017?

A.   Correct.

Q.   Now, the agreement with SCA, is that the only agreement you have personal knowledge of?

A.   "Personal knowledge," meaning?

Q.   You actually -- let me back up and rephrase it.

Did you have discussions with anyone outside of USPI about any agreement not to solicit other than SCA?

A.   No.

Q.   Did you ever have any discussions with Tenet about any no-solicit agreement?

A.   No.

Q.   Did you ever have any discussion with SCD about

any no-solicit agreement?

A. No.

Q. Did you ever have any discussion with Woodrum, the Zasa brothers' company --

A. No.

Q. -- about any agreement not to solicit?

A. No.

Q. Is it correct, sir, that your knowledge regarding any such agreements is as a result of communications you received from other USPI employees?

A. And possibly counsel.

Q. Okay. Thank you.

Now I'm going to refer you back to the DOJ's interview notes.

THE WITNESS: You need that back?

(Reporter nods.)

Q. (By Ms. Moyé) This is Exhibit 507. These are the notes from your October 2, 2018 interview. The court reporter has just given you a copy. If you could, turn to Page 6 of 13.

A. Okay.

Q. In the first full paragraph on that page, I'm going to read it to you: ███████████████████

████████████████████████████████████

██████████████████████████████████

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE OUTPATIENT MEDICAL        )  MASTER DOCKET NUMBER
CENTER EMPLOYEE ANTITRUST       )  1:21-CV-00305
LITIGATION                      )
                                )  CONSOLIDATED AMENDED
                                )  CLASS ACTION COMPLAINT
                                )
                                )  JURY TRIAL DEMANDED


REPORTER'S CERTIFICATION OF THE REMOTE ORAL AND

VIDEOTAPED AND VIDEOCONFERENCED

DEPOSITION OF BILL WILCOX

September 24, 2024


I, Jamie K. Israelow, a Certified Shorthand Reporter duly commissioned and qualified in and for the State of Texas, Registered Merit Reporter and Certified Realtime Reporter, do hereby certify that there came before me on the 24th day of September, 2024, located at Jones Day, located at 2727 North Harwood Street, Suite 600, in the city of Dallas, County of Dallas, State of Texas, the following named person, to-wit:  BILL WILCOX, who was duly sworn to testify the truth, the whole truth, and nothing but the truth of knowledge touching and concerning the matters in controversy in this cause; and that he was thereupon examined upon oath and his examination reduced to typewriting under my supervision;

that Volume 1 of the deposition is a true record of the testimony given by the witness, and signature of the witness is to be before any notary public and returned within 30 days from date of receipt of transcript.

I further certify that pursuant to FRCP Rule 30(e) that the signature of the deponent:

___ was requested by the deponent or a party before the completion of the deposition and that signature is to be before any notary public and returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature Page contains any changes and the reasons therefor:

_X_ was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither attorney or counsel for, nor related to or employed by any of the parties to the action in which this deposition is taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in the action.

That the amount of time used by each party at the deposition is as follows:

Linda P. Nussbaum, Esq. - 6:47

Jonathan J. Ross, Esq. - 0:00

Veronica Moyé, Esq. - 0:16

Bill Wilcox  Confidential
September 24, 2024

Connor Brewer, Esq. - 0:00

Angelo M. Russo, Esq. - 0:00

Amy B. Manning, Esq. - 0:00

Andrew E. Talbot, Esq. - 0:00

Karen J. Sharp, Esq. - 0:00

Katharine O'Connor, Esq. - 0:00

Staci Holthus, Esq. - 0:00


That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

Linda P. Nussbaum, Esq. and Jonathan J. Ross, Esq., Attorney for Class Plaintiffs.

Veronica Moyé, Esq. and Connor Brewer, Esq., Attorney for DEFENDANT UNITED SURGICAL PARTNERS INTERNATIONAL, INC..

Angelo M. Russo, Esq. and Amy B. Manning, Esq. and Andrew E. Talbot, Esq., Attorney for the SCA DEFENDANTS.

Karen J. Sharp, Esq., Attorney for Defendant ANDREW HAYEK.

Katharine O'Connor, Esq., Attorney for Defendant KENT THIRY.

Staci Holthus, Esq., Attorney for Defendant DAVITA, INC.

Bill Wilcox  Confidential
September 24, 2024

IN WITNESS WHEREOF, I have hereunto set my hand this 8th day of October, 2023.

_____
Jamie K. Israelow, CSR, RMR, CRR
Texas CSR 3801
Expiration Date:  4/30/2025
US LEGAL SUPPORT, INC.
Firm Registration No. 122
16825 Northchase Drive, Suite 900
Houston, Texas  77060
713.653.7100

Charge for transcript and exhibits $ _____

To be paid by Class Plaintiffs / Linda P. Nussbaum, Esq.

SERVICE NO. 6616480-001

Docusign Envelope ID: 61F3C909-8C49-474B-9ABA-B08E3AC56FA9

CHANGES AND SIGNATURE

WITNESS NAME:  BILL WILCOX

DATE OF DEPOSITION:  September 24, 2024

Please indicate changes on this sheet of paper, giving the change, page number, line number and reason for the change.  Please sign each page of changes.

PAGE/LINE          CORRECTION          REASON FOR CHANGE

30:16 - change "partcipating" to "participation"

30:21 - change "tax taxes" to "taxes"

35:18 - change "came" to "coming"

240:2 - add "of" between "one Plaintiffs'"

[each change above reflects transcription errors]

_____

_____

_____

_____

_____

_____

_____

_____

DocuSigned by:

_WHW_____
5811D18E47AE48B...

Subscribed and sworn before me

this 7th day of November, 2024.

_____     _____

# ZIELINSKI EXHIBIT 54 (FILED UNDER SEAL)

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


IN RE OUTPATIENT MEDICAL CENTER     )
EMPLOYEE ANTITRUST LITIGATION,      )
                                    )
          Plaintiffs,               )
                                    )Master Docket
                                    )No. 1:21-cv-00305
THIS DOCUMENT RELATED TO:           )
ALL ACTIONS                         )
_____)

CONFIDENTIAL


The videotaped deposition of KEVIN ZAIDEMAN, called by the Plaintiffs for examination, pursuant to subpoena and pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Michelle A. Duzan, Certified Shorthand Reporter and Registered Merit Reporter, at McGuireWoods, LLP, 77 West Wacker Drive, Suite 4100, Chicago, Illinois, commencing at the hour of 9:04 a.m. on the 18th day of December, A.D., 2024.

Kevin Zaideman   Confidential
December 18, 2024

A P P E A R A N C E S:

JOSEPH SAVERI LAW FIRM, By
MR. WILLIAM CASTILLO GUARDADO
MR. DAVID SEIDEL
601 California Street, Suite 1505
San Francisco, California  94108
415-500-6800
E-mail:  Wcastillo@saverilawfirm.com
         Dseidel@saverilawfirm.com

     On behalf of the Plaintiffs;


MORGAN, LEWIS & BOCKIUS, LLP, By
MS. STACI HOLTHUS (VIA ZOOM)
110 North Wacker Drive
Chicago, Illinois  60606
312-324-1774
E-mail:  Staci.holthus@morganlewis.com

     On behalf of the Defendant, DaVita, Inc.;


MCGUIREWOODS, By
MS. SARAH ZIELINSKI
MS. AMY STARINIERI GILBERT
77 West Wacker Drive, Suite 4100
Chicago, Illinois  60601
312-750-8673
E-mail:  Szielinski@mcguirewoods.com
         Agilbert@mcguirewoods.com

     On behalf of the Defendant, Surgical Care
     Affiliates;


KING & SPALDING, LLP, By
MS. JULIA BATES (VIA ZOOM)
500 West 2nd Street, Suite 1800
Austin, Texas  78701
512-457-2000
E-mail:  Jbates@kslaw.com

     On behalf of the Defendant, USPI and Tenet
     Healthcare;

Kevin Zaideman  Confidential
December 18, 2024

APPEARANCES (CONTINUED):

McDERMOTT WILL & EMERY, By
MS. MARISA (REESE) PONCIA
The McDermott Building
500 North Capitol Street, NW
Washington, DC 20001-1531
202-756-8000
E-mail:  Mponcia@mwe.com

        On behalf of the Defendant, Kent Thiry;


WILSON SONSINI, By
MS. JORDANNE STEINER (VIA ZOOM)
1700 K Street NW, Fifth Floor
Washington, D.C.  20006
202-920-8703
E-mail:  Jsteiner@wsgr.com

        On behalf of the Defendant, Andrew Hayek;



ALSO PRESENT:

Mr. Lance Parmer, SCA Health,

Mr. Milo Savich, Videographer,

Mr. MJ Zimdahl, Exhibit Technician.


                *    *    *    *

Kevin Zaideman  Confidential
December 18, 2024

                    I N D E X

WITNESS                       DX   CX   RDX   RCX

KEVIN ZAIDEMAN

 By Mr. Castillo Guardado      7


                  E X H I B I T S


DEPOSITION EXHIBIT                    MARKED FOR ID

Exhibit No. PX 581  Email thread;
     SCA001586465 - 550                      62
Exhibit No. PX 582  Email thread;
     SCA001047616 - 621                      73
Exhibit No. PX 583  Email thread;
     SCA000117556 - 558                      81
Exhibit No. PX 584  Email thread;
     SCA001092384 - 387                      89
Exhibit No. PX 585  Email thread;
     SCA001215381 - 383                     103
Exhibit No. PX 586  Email thread;
     SCA000117274 - 276                     112
Exhibit No. PX 587  Email thread;
     SCA000117050 - 051                     127
Exhibit No. PX 588  Email thread;
     SCA001198974 - 979                     145
Exhibit No. PX 589  Email thread;
     SCA000526384 - 389                     158

Kevin Zaideman   Confidential
December 18, 2024

THE VIDEOGRAPHER:  Good morning.  We are now on the record at 9:12 a.m. Central Standard Time on December 18th, 2024.

Audio and video recording will continue to take place until all parties agree to go off the record.

Please note that microphones are sensitive and may pick up whispering and private conversations.  Private conversations and/or attorney-client interactions should be held outside the presence of the remote interface.

For the purpose of creating a witness-only video recording, the witness is being spotlighted or locked on all video screens while in speaker view.  We ask that the witness not remove the spotlight setting during the deposition as it may cause other participants to appear on the final video rather than just the witness.

For anyone who does not want the witness video to take up a large part of your screen, you may click the gallery view button on the upper right-hand corner of the remote

Kevin Zaideman  Confidential
December 18, 2024

depo interface.

This is the video-recorded proceeding of Kevin Zaideman taken by counsel for plaintiffs William Castillo Guardado in the matter of In Re Outpatient Medical Center Employee Antitrust Litigation, filed in the United States District Court for the Northern District of Illinois, Eastern Division.

This proceeding is being held at McGuireWoods LLP, located at 77 West Wacker Drive, Suite 4100, Chicago, Illinois 60601.

My name is Milo Savich, and I am the videographer on behalf of U.S. Legal Support located at 16825 North Chase Drive, Suite 900, Houston, Texas 77060.

I am not related to any party in this action nor am I financially interested in the outcome.

The court reporter is Michelle Duzan, also on behalf of U.S. Legal Support.

Counsel will be reflected in the stenographic record after -- and the court reporter will now please enter the statement

for remote proceedings into the record and swear in the witness.

THE COURT REPORTER:  Will you raise your right hand, please?

(Witness duly sworn.)

KEVIN ZAIDEMAN, called as a witness herein, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. CASTILLO GUARDADO:

Q.    Good morning.  My name is William Castillo Guardado.  I represent the plaintiffs in this matter.

Could you please state your name and spell it for the record?

A.    Good morning, William.  My name is Kevin Zaideman.  That is spelled K E V I N, Z A I D E M A N.

Q.    And what is your current address?

A.    My current address is ██████████ ████████████████████████ .

Q.    And have you ever had your deposition taken before?

A.    No.

But these are kind of the different data points and the things that we look at to help guide and inform setting the strategy and making the decisions around pay for individuals based -- based on job and role.

Q.      And when were these decisions on pay made at SCA?  Was it --

A.      I mean, they happen daily.

Q.      Okay.

A.      Yeah.

Q.      Was there an annual process in which --

A.      So there's --

Q.      -- employee compensation was -- and just going forward, for the court reporter, we have to make sure we finish speaking --

A.      Uh-huh.

Q.      -- so that she can take down everything we're saying.

A.      Got you.

Q.      And so I'll just repeat that question.

        Was there an annual process in which SCA set employee compensation?

A.      So there is an annual cyclical process that is called our annual year-end compensation

planning program or our merit program, so it's not necessarily a process where compensation is set. But basically once a year, there's a budget that is set that gives leaders a pool of funds to then differentiate merit increases.

So it's a review of the prior year's performance.  How is your team's performance?  And then you have the discretion and autonomy to divvy up the pool of your budgeted funds available to individuals on your team, whether you want to provide them an increase to recognize their work or if you don't and you want to send a message that their work needs to improve or if you want to provide them with a -- instead of a base pay increase, you want to provide them with, you know, a one-time lump-sum payment.  There's different parameters in place for the program in terms of eligibility criteria and kind of some guardrails and rules around how to use the funds.  But that's kind of specifically for just that specific program, if you fall into the eligible population for that period of time.

Q.    And what was your role in that annual merit process?

Kevin Zaideman   Confidential
December 18, 2024

A.     So my role in that annual merit process was to -- I was a systems administrator for the compensation system that was used to help managers perform their pay decisions.  So there's a system that -- or there's been systems that we use, and they -- I go in and I configure the tool so that it's usable for the end user, and then I just help facilitate the process of using that tool, helping leaders complete all of their activities, and then compiling the final results, and then passing that over to payroll to execute the final pay actions.

Q.     What is the name of that system that you use?

A.     It depends on the time frame that you're looking at.

Q.     Can you walk me through the different systems you've used?

A.     So the -- when I first started, there was a system that we used that was CMS, which was effectively just a -- that was the name that we used, but it was SAP SuccessFactors and their compensation planning platform tool.  We used that from 2017 through 2020.

And then starting in 2021, we used --

A.   I recall that there was a system we had that was called PAF, which was an abbreviation for personnel action form.  This was not an external system.  It was like an internal proprietary, like just kind of self-built tool that was effectively just a workflow approval platform that would allow managers to go in and execute pay action changes.

They could move somebody from one job to another job, or they could use it to change somebody's pay.  That's what this system was primarily used for because managers did not have access to the payroll system itself directly.  And there was no other kind of technology or platform that enabled leaders to make job changes or pay changes.

If I recall correctly, that system did house bands associated with those grades, but very early in my tenure, that -- the ability to see any band information was removed because those bands were not being used.  And the organization did not want to cause confusion for leaders by having old, unused salary band information visible to leaders.

Q.   And when you discuss salary bands, is that the equivalent of pay bands?

Kevin Zaideman  Confidential
December 18, 2024

A.    I -- those two terms are -- are kind of vague and sometimes can be used interchangeably and also can mean completely different things, depending on the organization.

Q.    And as used in SCA, what was the terminology that was applicable to SCA?

MS. ZIELINSKI:  Object to the form.

Go ahead.

THE WITNESS:  To my knowledge, what was considered like the common vernacular or verbiage for salary bands or pay bands, it would have just been the salary grade range.

But I would like to clarify one thing as well.  So the term "range" has been used a lot at SCA.  And prior to January of 2021, in absence of a bona fide job framework that had salary grades, job families, job functions, a new job code, and common job title structure, prior to that, we -- we didn't have a framework to operate off of. So we weren't using grades.  We weren't using bands.  We weren't using pay ranges associated with those grades or bands.

What we were using was external

Kevin Zaideman   Confidential
December 18, 2024

market data and internal teammate pay data. So oftentimes I would be citing a range in supporting my clients, but I wouldn't be citing the salary grade range.  I would be citing a range of data points.  That range of data points would be compiled or would consist of information that we gathered from salary surveys and external benchmarks and/or specifically just like actual teammate pay. But it would be compiled in -- in a statistical function in Excel where, let's say, I had a leader that asked for an analysis of internal pay for a specific job and there were ten teammates in that job.  I would grab those ten data points and use a percentile function in Excel to display what the 25th, 50th, and 75th percentile of that range of data was.

It's a way to be able to share teammate data with a leader to help them -- to help inform them to make a decision while not actually sharing, one, all of the data; two, the teammates' names.  So you're able to uphold confidentiality, do things in a fair

Kevin Zaideman   Confidential
December 18, 2024

and consistent manner, but you're basically taking an existing data set of actual teammate pay and converting it into a range of data points.

So that's all it is, is effectively just data from a statistical analysis perspective.  I would frequently have to coach leaders on, hey, when I'm using the term "range" here, I'm not using it as an actual salary grade pay range that is associated with pay grades, or that is a -- a true framework that the organization is operating off of for all roles in a job or all roles in general.

Everything that I was doing was using a range of data points for a specific, differentiated instance, case by case, ad hoc for whatever was the task or the pain point at hand based on the leader coming to me for -- for compensation consultation.

BY MR. CASTILLO GUARDADO:

Q.    So as -- as you sit here today, is your testimony that prior to January of 2021, SCA had absolutely no framework for compensation?

Kevin Zaideman   Confidential
December 18, 2024

A.     Correct.

Q.     Were any systems in place prior to January of 2021 to help compensation managers decide what to pay their employees?

A.     Can you just restate that question, please?

Q.     Sure.

Were -- were any systems in place at SCA prior to January 20 of '21 to help managers decide what to pay their employees?

A.     Two-part question.  First part, no. That's effectively why I was there.  That was my job.  So there was no system in place.  Everything came primarily to my email inbox ad hoc.  I was -- would basically be providing compensation consultation services for leaders.

So oftentimes, it would look like they would email me, Hey, here's the situation.  I want to promote somebody or I want to hire somebody. You know, what do you recommend?  And because there was no framework, there were no grades in use, there was no rigid, you know, organized salary structure or salary ranges, I would effectively just have to qualify the job,

Kevin Zaideman   Confidential
December 18, 2024

oftentimes asking the leader, Do you have a job description?  Can you provide me with details of the job?  What is their scope?  What is their span of control?  What are the qualifications that are required of the role?  Things like that.

Then I would ask for additional variables and information about the specific candidate or teammate in question.  What's their overall experience?  How has their performance been?  What's their educational attainment?  Where are they currently paid?  Where are they located?  Is this -- is this job in the same line of work that they currently do?  Is it a new stretch opportunity?  A number of variables that are unique and specific to each individual case but need to be considered when making a recommendation so you can do one that's fair and equitable.

So I -- I would primarily do all of that like day to day with no systems or additional support.  The reason why I say it's two part is because during that annual merit cycle that we talked about earlier, the system that we used, the CMS, I provided data to that system that we then used and loaded into the salary planning

Kevin Zaideman   Confidential
December 18, 2024

worksheets that did help inform leaders on how to make some pay decisions.  That data that was loaded in was external benchmark data.  It would have been the same data that those leaders would receive if they sought my consultative services ad hoc, you know, via email.

Q.    How often did managers reach out to you to conduct compensation analysis for their teammates?

A.    Daily.

Q.    Okay.  And did you provide compensation analysis to -- to all team members at SCA?

A.    I wouldn't say all because that's a lot.  But I would frequently provide compensation recommendations using ranges of data points to inform those recommendations.  Were all teammates provided -- were recommendations made for every single 8,000 teammates while I was there?  No.  Basically it was a very reactive type of role.  I was available.  When leaders would come to me because they needed help, they would receive it.  But also, because there was no bona fide system in place, there was no framework; there were no grades, things like that, leaders oft- --

sometimes leaders would go and just make a pay change directly in that PAF system without seeking counsel or guidance.

Q. And so if a manager wanted to pay one of their employees a hundred thousand dollars more than one of their peers, no one would be able to stop them?

A. There -- if I recall correctly, there were guardrails in that PAF system, like an approval workflow. So like if somebody wanted to say, Hey, I want to give this person a hundred thousand dollars, that will result in a 50 percent pay increase. There was -- if I recall correctly, I don't remember what the number or threshold was, but there was -- well, first of all, so if a leader goes in to do that, the -- they approve it, it automatically goes to their one-up manager for review and approval. So if the manager doesn't agree with that, in this example, you know, large increase, you know, they can -- they can deny it. If they approved it, you know, then -- then it would go through. So there was at least an approval workflow.

Q. Uh-huh.

STATE OF ILLINOIS   )

                    )   SS:

COUNTY OF C O O K   )

          I, Michelle A. Duzan, CSR No. 084-004270, a Notary Public within and for the County of Cook, State of Illinois, and a Certified Shorthand Reporter of said state, do hereby certify:

          That previous to the commencement of the examination of the witness, the witness was duly sworn to testify the whole truth concerning the matters herein;

          That the foregoing deposition transcript was reported stenographically by me, was thereafter reduced to typewriting under my personal direction and constitutes a true record of the testimony given and the proceedings had;

          That the said deposition was taken before me at the time and place specified;

          That I am not a relative or employee or attorney or counsel, nor a relative or employee of such attorney or counsel for any of the parties

Kevin Zaideman   Confidential
December 18, 2024

hereto, nor interested directly or indirectly in the outcome of this action.

IN WITNESS WHEREOF, I do hereunto set my hand and affix my seal of office at Orland Park, Illinois, this 24th day of December, 2024.

Notary Public, Cook County, Illinois.

My commission expires 11/01/27.

Michelle A. Duzan, CSR, RMR, CRR

CSR No. 084-004270

## Kevin Zaideman December 18, 2024 Deposition Errata Sheet

I, Kevin Zaideman, having read the foregoing deposition, Pages 1 through 181, taken December 18, 2024, do hereby certify said testimony is a true and accurate transcript, with the following changes:

| Page | Line(s) | Correction | Reason |
|---|---|---|---|
| 20 | 20 | Delete "like a –" | Edit for clarity. |
| 22 | 2 | Change "this. We" to "this; we" | Edit grammar for clarity. |
| 24 | 1 | Change "around and be slightly confusing" to "around and can be slightly confusing." | Edit for clarity. |
| 24 | 5 | Delete "as a –" | Edit for clarity. |
| 24 | 22 | Delete "like" | Edit for clarity. |
| 27 | 17–20 | Change "that's who we are competing with talent for, and we're competing with talent for -- at hospitals," to "that's who we are competing with for talent, and we're competing for talent with hospitals," | Edit for clarity. |
| 32 | 4 | Change "HRS" to "HRIS" | Edit to correct typographical error. |
| 36 | 13–14 | Delete "here's what – here's the –" | Edit for clarity. |
| 39 | 22 | Change "but" to "so" | Edit for clarity |
| 41 | 6 | Change "of upwards of" to "in upwards of" | Edit to correct typographical error. |
| 44 | 12 | Change "there was -- there was no guardrails" to "there were no guardrails" | Edit for clarity. |
| 44 | 13 | Change "There was no frameworks" to "There were no frameworks" | Edit for clarity. |
| 61 | 6–7 | Change "the fields that you can balance your budget" to "the fields you can use to balance your budget" | Edit for clarity. |
| 64 | 23 | Change "this range penetration" to "this range penetration feature." | Edit for clarity. |
| 66 | 1 | Change "I use" to "I used" | Edit tense for clarity. |
| 69 | 8 | Change "play" to "pay" | Edit to correct typographical error. |
| 69 | 10 | Change "play" to "pay" | Edit to correct typographical error. |
| 86 | 11 | Change "comp" to "compensation" | Edit for clarity. |
| 94 | 5 | Change "visibility to" to "visibility into" | Edit for clarity. |

| Page | Line(s) | Correction | Reason |
|---|---|---|---|
| 94 | 13–14 | Change "kick off middle of February" to "kick off in the middle of February" | Edit for clarity. |
| 99 | 14 | Change "org" to "organization" | Edit for clarity. |
| 125 | 13 | Change "from that framework" to "in that framework" | Edit for clarity. |
| 131 | 10 | Delete "an" | Edit for clarity. |
| 134 | 23–24 | Change "in the system that we knew that there was data" to "in the system in which we knew there was data" | Edit for clarity. |
| 146 | 24 | Change "We—SC—as a" to "As a" | Edit for clarity. |
| 154 | 14–20 | Change "So I would have never had the privilege or opportunity to see from an end user perspective what does the—if I were to go in and use PAF or PRF, what type of information is seen or shown," to "So I would never have had the privilege or opportunity to see from an end user perspective what type of information is seen or shown in PAF or PRF" | Edit for clarity. |
| 155 | 7–8 | Change "some with—overlapped to the" to "with some overlap between the" | Edit for clarity. |
| 156 | 11 | Change "That that plan was—that that plan" to "The planned" | Edit for clarity. |
| 165 | 20–21 | Delete "I am—I refer here—I says" | Edit for clarity. |
| 168 | 14–17 | Change "I would agree based on what my definition just was where there were—there was a pecking order of jobs by title" to "I would agree based on what my definition just was; there was a pecking order of jobs by title" | Edit for clarity. |

Signed by:

*Kevin Zaideman* February 5, 2025 | 10:58 AM EST

Kevin Zaideman

# ZIELINSKI EXHIBIT 56 (FILED UNDER SEAL)

## Scott A. Keech, RN, MBA

*17+ Years of Diverse Healthcare Experience including Direct Patient Care, Nursing Education, Consulting, Clinical Systems Implementation, Leadership, & Administration*

- Dynamic, innovative, results-oriented healthcare executive with significant experience in hospital, outpatient clinic, and ambulatory surgery center operations, and also leading challenging strategic initiatives in complex healthcare environments.
- Natural leader with strong business acumen, expert relationship-building skills, and a reputation for identifying and developing talent.
- Track record of building high performing teams and coaching subordinates to achieve goals and ensure successful execution of corporate strategy.
- Consistently recognized as a strong performer and rewarded with promotions to positions of greater responsibility.

— *Key Areas of Leadership Experience & Expertise* —

Strategic Planning ~ Quality Assurance & Performance Improvement ~ Regulatory Compliance

Teambuilding ~ Leadership Development ~ Physician Relations ~ Patient Satisfaction

HR Management & Labor Relations ~ Budget Development & Management ~ Process Redesign

Program & Business Development ~ Technology Implementation & Optimization

Profit & Productivity Improvement ~ Revenue Cycle Optimization ~ Cost Containment

## EMPLOYMENT HISTORY

**SURGERY CENTER PARTNERS (SCP), Los Altos, CA**          **February 2009 – Present**
**Regional Director of Clinical Operations**
Nurse leader responsible for oversight of nursing practice and the provision of care at ambulatory surgery centers (ASCs) throughout California and Texas. Provide guidance to ASC Administrators and Nurse Managers to ensure consistent delivery of quality clinical care, exceptional customer service, effective resource management, competency of clinical staff, and compliance with Medicare Conditions of Participation and Joint Commission standards. Assist facility leadership with the creation of short and long term strategic, quality, business development, and financial plans.
- Achieved an overall 37% increase in surgical case volume during fiscal year 2009
- Reduced labor cost per case by 19% in fiscal year 2009
- Created and implemented a nursing leadership development program to improve the skill and competency of nursing leaders at the facility level
- Maintained Joint Commission accreditation at all assigned ambulatory surgery centers

**PRESIDIO SURGERY CENTER, San Francisco, CA**          **June 2007 – February 2009**
**Administrator**
Provided executive leadership and direction to a team of business and clinical managers at this 6 room, multi-specialty, ambulatory surgery center. Collaborated with the Governing Body and Medical Staff

CONFIDENTIAL


EXHIBIT
DX41
S. Keech 8/22/24

KEECH_000000320
KEECH_000000320

leadership to develop short and long range strategic, quality, business development, and financial plans. Responsible for executing plans to ensure objectives were met through the delivery of high quality, cost-effective health care. Monitored the services provided by the contracted management company for effectiveness and reported findings to the Governing Body. Represented the surgery center to key customers, industry groups, financial community, representatives of government and regulatory agencies, and the general public.

- Increased non-investor case volume by 120% in 2008
- Implemented a technology based solution to create a virtual medical record which improved quality of care and increased the safety and security of patient medical records.
- Maintained Joint Commission accreditation
- Appointed to the Surgical Care Affiliates' National Information Technology Steering Committee.

**KAISER PERMANENTE/TPMG, Northern California**          November 1999 – May 2007
**Medical Group Administrator,** Regional Office          January 2006 – May 2007
**Assistant Medical Group Administrator,** Regional Office          July 2005– January 2006

Advised department heads, managers, Chiefs of Service and Assistant Physicians-in-Chief on strategic and operational issues. Provided leadership to complex projects/initiatives and collaborated with regional executives, local leadership, and other stakeholders to ensure successful execution of corporate strategy.

**Primary projects:**
- KP HealthConnect (Electronic Health Record) ambulatory care implementation  (Operations Director)
- New hospital and medical center expansion workforce planning
- Renal Transplant Center transition to non-KP transplant centers
- Development and implementation of new post-transplant program

**Clinical Consulting Manager,** Regional Offices          December 2004 – July 2005
Provided support to senior leadership by developing and leading highly visible and multifaceted clinical, operational, and strategic projects across the region.
- Facilitated business process redesign sessions with key stakeholders to transform care and improve service.
- Served as subject matter expert for development of specific service lines and for process redesign associated with new hospital construction.

**Interim Director-Department of OB/GYN,** Santa Clara Medical Center          April 2004 – June 2004
Provided leadership and consulting services during a management transition. This included developing a strategic action plan to reduce risk and improve both operations and labor relations.
- Established strong relationships with labor partners and formed department-based Labor Management Partnership (LMP) Committee, where labor and management worked together to resolve issues and effect positive change.
- Worked with labor partners on expectations for attendance, performance, and behavior, resulting in shared accountability which dramatically improved work environment and service provided to our patients.
- Developed a workplace safety program which included the implementation of a department safety team, monthly safety talks, and publishing safety related articles in every edition of the department newsletter.

**Special Projects Manager,** Walnut Creek and Santa Clara          August 2002 –April 2004
Assisted leadership teams by managing special projects on an as needed basis while attending graduate school.

CONFIDENTIAL

KEECH_000000321
KEECH_000000320

Scott A. Keech – Resume

---

**Director – Dept. of Emergency Medicine,** Santa Clara Medical Center         Dec. 2000 – August 2002
**Assistant Director – Dept. of Emergency Medicine**         November 1999 – December 2000
Directed emergency services operations (24/7) at this suburban hospital with 70,000 Emergency Department visits per year, $7M operating budget, and 150 union employees. Emphasis was in strategic planning, budget development and control, human resource management, and regulatory compliance.
- Improved access by reducing ambulance diversion by 90% during 2nd and 3rd quarters 2001.
- Implemented an electronic patient tracking system.
- Developed a comprehensive recruitment and retention plan; drove RN vacancy rate from 17% to zero.
- Prepared business case and received innovation grant funds to implement a Patient Ambassador in the ED which resulted in a statistically significant increase to satisfaction scores and was identified as a Regional best practice.

**KMAC SOLUTIONS, San Francisco, CA**         June 2004 – March 2005
**Principal/Consultant**
Owned and operated an independent healthcare consultancy.
- Advised hospital executives on strategy, regulatory compliance, business development, and service line expansion. Developed employee and customer satisfaction programs. Assisted clients with business process redesign initiatives.

**Client results achieved include:**
- Improved Press Ganey patient satisfaction score from 49th percentile to 79th percentile over 4 month period.
- Decreased nurse vacancy rate from 50 percent to 18 percent.
- Decreased emergency department average length of stay by 60 minutes via process redesign.
- Achieved Joint Commission accreditation and the successful completion of a CMS Conditions of Participation validation survey.

## EDUCATION

**Master of Business Administration,** University of Toronto, Toronto, ON

**RN with Honors,** Henry Ford Hospital School of Nursing/University of Michigan, Detroit, MI

**Bachelor of Commerce Degree with Honors,** University of Windsor, Windsor, ON

## PROFESSIONAL LICENSES AND AWARDS

- Registered Nurse – State of California - #545033
- Henry Ford Hospital School of Nursing - Academic Excellence Award (1995) (1996).

## PROFESSIONAL ASSOCIATIONS

- Member, American College of Healthcare Executives (ACHE), Health Technology Center, Association for Professionals in Infection Control (APIC)
- Rotman School of Management: Founder, Health Care Management Club; elected as Graduate Business Council Academic Representative
- Past member, Emergency Nurses Association (ENA), American Association of Nurse Executives (AONE)

CONFIDENTIAL

KEECH_000000322
KEECH_000000320

# ZIELINSKI EXHIBIT 57 (FILED UNDER SEAL)

Message

| | |
|---|---|
| From: | ███████████ |
| Sent: | 6/28/2010 6:28:40 PM |
| To: | ███████████ |
| CC: | ███████████ |
| Subject: | Re: Personal Request from Scott Keech |
| Attachments: | Keech Resume 06_2010.pdf |

Hello Scott,

I am happy to help. Please feel free to give me a call at the number below or let me know a good time to contact you. Thank you.

Andrew Carota
Manager, Executive Search/Physician Recruitment Services
███████

**NOTICE TO RECIPIENT:** If you are not the intended recipient of this e-mail, you are prohibited from sharing, copying, or otherwise using or disclosing its contents. If you have received this e-mail in error, please notify the sender immediately by reply e-mail and permanently delete this e-mail and any attachments without reading, forwarding or saving them. Thank you.

Connie Wilson/CA/KAIPERM

| | |
|---|---|
| **Connie Wilson/CA/KAIPERM** | ToScott Keech < ███████████ |
| 06/28/2010 01:52 PM | ccAndrew J Carota/C███████████ |
| | SubjectRe: Personal Request from Scott Keech |

Hi Scott,

Nice to hear from you. By copy of this email, I am forwarding your resume to Andrew Carota. Andrew assists with the hiring of AMGA positions and is the person most likely to know about other opportunities that may be out there or soon to be out there. As you can imagine, our hiring has slowed a bit in the past year but we anticipate more opportunities in the years ahead, particularly if we grow as anticipated as a results of Health Reform.

The best references you will have within KP for the kind of position you would like to land, will be from those for whom you worked in operations. I suggest you reach out to those folks right away and solicit their support. Meanwhile, if I hear of anything that sounds like a fit, I will let you know.

Take care,
Connie



CONFIDENTIAL

KEECH_000000317
KEECH_000000317

**NOTICE TO RECIPIENT:** If you are not the intended recipient of this e-mail, you are prohibited from sharing, copying, or otherwise using or disclosing its contents. If you have received this e-mail in error, please notify the sender immediately by reply e-mail and permanently delete this e-mail and any attachments without reading, forwarding or saving them. Thank you.

Scott Keech ---06/28/2010 01:45:25 PM---Hi Connie I was hoping I could have a few minutes of your time. I am currently working for Joann Zimmerman at a company called



**Scott Keech**

ToConnie Wilson/CA/

06/28/2010 01:45 PM

cc

SubjectPersonal Request from Scott Keech

Hi Connie

I was hoping I could have a few minutes of your time. I am currently working for Joann Zimmerman at a company called Surgery Center Partners in Los Altos, CA. Unfortunately, I have not been very challenged by my position here and, to be honest, I am a little bored. I have been thinking a great deal about my career and future goals and have decided that I would really like to return to work at Kaiser. I truly enjoyed working at Kaiser and I strongly believe that Kaiser is the Northern California leader in quality, service, safety, and care delivery. Eventually I would like to work as a Medical Group Administrator or Chief Operating Officer. I have been reviewing the job postings on kp.org and found a couple of jobs that I thought would position me well to achieve this future goal. One of these is an Assistant Administrator

CONFIDENTIAL

KEECH_000000318
KEECH_000000317

of Support Services (Walnut Creek) and the other is an Assistant Medical Group Administrator (Vallejo). I have attached my resume to this email. I was hoping that you could help my resume find its way into the hands of the hiring managers for these two positions along with a statement of your support. Please let me know if you would be willing to help me in this regard. Also, if you are aware of any other positions that might be a good match I would love to hear about them. I would greatly appreciate any other advice that you may have to offer and I look forward to hearing from you. Thanks so much for your time.

Scott Keech

 *(See attached file: Keech Resume 06 2010.pdf)*

CONFIDENTIAL

KEECH_000000319
KEECH_000000317

## Scott A. Keech, RN, MBA



*17+ Years of Diverse Healthcare Experience including Direct Patient Care, Nursing Education, Consulting, Clinical Systems Implementation, Leadership, & Administration*

- Dynamic, innovative, results-oriented healthcare executive with significant experience in hospital, outpatient clinic, and ambulatory surgery center operations, and also leading challenging strategic initiatives in complex healthcare environments.
- Natural leader with strong business acumen, expert relationship-building skills, and a reputation for identifying and developing talent.
- Track record of building high performing teams and coaching subordinates to achieve goals and ensure successful execution of corporate strategy.
- Consistently recognized as a strong performer and rewarded with promotions to positions of greater responsibility.

*— Key Areas of Leadership Experience & Expertise —*

Strategic Planning ~ Quality Assurance & Performance Improvement ~ Regulatory Compliance

Teambuilding ~ Leadership Development ~ Physician Relations ~ Patient Satisfaction

HR Management & Labor Relations ~ Budget Development & Management ~ Process Redesign

Program & Business Development ~ Technology Implementation & Optimization

Profit & Productivity Improvement ~ Revenue Cycle Optimization ~ Cost Containment

## EMPLOYMENT HISTORY

**SURGERY CENTER PARTNERS (SCP), Los Altos, CA**     **February 2009 – Present**
**Regional Director of Clinical Operations**
Nurse leader responsible for oversight of nursing practice and the provision of care at ambulatory surgery centers (ASCs) throughout California and Texas. Provide guidance to ASC Administrators and Nurse Managers to ensure consistent delivery of quality clinical care, exceptional customer service, effective resource management, competency of clinical staff, and compliance with Medicare Conditions of Participation and Joint Commission standards. Assist facility leadership with the creation of short and long term strategic, quality, business development, and financial plans.
- Achieved an overall 37% increase in surgical case volume during fiscal year 2009
- Reduced labor cost per case by 19% in fiscal year 2009
- Created and implemented a nursing leadership development program to improve the skill and competency of nursing leaders at the facility level
- Maintained Joint Commission accreditation at all assigned ambulatory surgery centers

**PRESIDIO SURGERY CENTER, San Francisco, CA**     **June 2007 – February 2009**
**Administrator**
Provided executive leadership and direction to a team of business and clinical managers at this 6 room, multi-specialty, ambulatory surgery center. Collaborated with the Governing Body and Medical Staff

CONFIDENTIAL

KEECH_000000320
KEECH_000000320

leadership to develop short and long range strategic, quality, business development, and financial plans. Responsible for executing plans to ensure objectives were met through the delivery of high quality, cost-effective health care. Monitored the services provided by the contracted management company for effectiveness and reported findings to the Governing Body. Represented the surgery center to key customers, industry groups, financial community, representatives of government and regulatory agencies, and the general public.

- Increased non-investor case volume by 120% in 2008
- Implemented a technology based solution to create a virtual medical record which improved quality of care and increased the safety and security of patient medical records.
- Maintained Joint Commission accreditation
- Appointed to the Surgical Care Affiliates' National Information Technology Steering Committee.

| **KAISER PERMANENTE/TPMG, Northern California** | **November 1999 – May 2007** |
|---|---|
| **Medical Group Administrator,** Regional Office | January 2006 – May 2007 |
| **Assistant Medical Group Administrator,** Regional Office | July 2005– January 2006 |

Advised department heads, managers, Chiefs of Service and Assistant Physicians-in-Chief on strategic and operational issues. Provided leadership to complex projects/initiatives and collaborated with regional executives, local leadership, and other stakeholders to ensure successful execution of corporate strategy.

**Primary projects:**
- KP HealthConnect (Electronic Health Record) ambulatory care implementation (Operations Director)
- New hospital and medical center expansion workforce planning
- Renal Transplant Center transition to non-KP transplant centers
- Development and implementation of new post-transplant program

**Clinical Consulting Manager,** Regional Offices          December 2004 – July 2005

Provided support to senior leadership by developing and leading highly visible and multifaceted clinical, operational, and strategic projects across the region.

- Facilitated business process redesign sessions with key stakeholders to transform care and improve service.
- Served as subject matter expert for development of specific service lines and for process redesign associated with new hospital construction.

**Interim Director-Department of OB/GYN,** Santa Clara Medical Center          April 2004 – June 2004

Provided leadership and consulting services during a management transition. This included developing a strategic action plan to reduce risk and improve both operations and labor relations.

- Established strong relationships with labor partners and formed department-based Labor Management Partnership (LMP) Committee, where labor and management worked together to resolve issues and effect positive change.
- Worked with labor partners on expectations for attendance, performance, and behavior, resulting in shared accountability which dramatically improved work environment and service provided to our patients.
- Developed a workplace safety program which included the implementation of a department safety team, monthly safety talks, and publishing safety related articles in every edition of the department newsletter.

**Special Projects Manager,** Walnut Creek and Santa Clara          August 2002 –April 2004

Assisted leadership teams by managing special projects on an as needed basis while attending graduate school.

CONFIDENTIAL

KEECH_000000321
KEECH_000000320

**Director – Dept. of Emergency Medicine,** Santa Clara Medical Center    Dec. 2000 – August 2002
**Assistant Director – Dept. of Emergency Medicine**    November 1999 – December 2000
Directed emergency services operations (24/7) at this suburban hospital with 70,000 Emergency Department visits per year, $7M operating budget, and 150 union employees. Emphasis was in strategic planning, budget development and control, human resource management, and regulatory compliance.
- Improved access by reducing ambulance diversion by 90% during 2nd and 3rd quarters 2001.
- Implemented an electronic patient tracking system.
- Developed a comprehensive recruitment and retention plan; drove RN vacancy rate from 17% to zero.
- Prepared business case and received innovation grant funds to implement a Patient Ambassador in the ED which resulted in a statistically significant increase to satisfaction scores and was identified as a Regional best practice.

**KMAC SOLUTIONS, San Francisco, CA**    June 2004 – March 2005
**Principal/Consultant**
Owned and operated an independent healthcare consultancy.
- Advised hospital executives on strategy, regulatory compliance, business development, and service line expansion. Developed employee and customer satisfaction programs. Assisted clients with business process redesign initiatives.

**Client results achieved include:**
- Improved Press Ganey patient satisfaction score from 49th percentile to 79th percentile over 4 month period.
- Decreased nurse vacancy rate from 50 percent to 18 percent.
- Decreased emergency department average length of stay by 60 minutes via process redesign.
- Achieved Joint Commission accreditation and the successful completion of a CMS Conditions of Participation validation survey.

## EDUCATION

**Master of Business Administration,** University of Toronto, Toronto, ON

**RN with Honors,** Henry Ford Hospital School of Nursing/University of Michigan, Detroit, MI

**Bachelor of Commerce Degree with Honors,** University of Windsor, Windsor, ON

## PROFESSIONAL LICENSES AND AWARDS

- Registered Nurse – State of California - #545033
- Henry Ford Hospital School of Nursing - Academic Excellence Award (1995) (1996).

## PROFESSIONAL ASSOCIATIONS

- Member, American College of Healthcare Executives (ACHE). Health Technology Center, Association for Professionals in Infection Control (APIC)
- Rotman School of Management: Founder, Health Care Management Club; elected as Graduate Business Council Academic Representative
- Past member, Emergency Nurses Association (ENA), American Association of Nurse Executives (AONE)

CONFIDENTIAL

KEECH_000000322
KEECH_000000320



CONFIDENTIAL

KEECH_000000323
KEECH_000000323



CONFIDENTIAL

KEECH_000000324
KEECH_000000324

# ZIELINSKI EXHIBIT 58 (FILED UNDER SEAL)

Message

| | |
|---|---|
| **From:** | Clemens, Peter [/O=SURGICALCARE/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=CLEMENP] |
| **Sent:** | 7/31/2013 4:27:30 PM |
| **To:** | Wachsman, Leslie [leslie.wachsman@scasurgery.com]; Smith, Julie [julie.smith@scasurgery.com] |
| **CC:** | Mathis, Brian [brian.mathis@scasurgery.com]; Sharff, Rich [rich.sharff@scasurgery.com] |
| **Subject:** | Attorney Client Priviledged |
| **Attachments:** | G&A Review (June 2013) SCA Comparison.xlsx |

Leslie/Julie.

See below. USPI wants to do some COH benchmarking. Can you fill out this spreadsheet?

**Redacted**

Let me know your thoughts,

Thanks,
Pete




On 7/31/13 3:56 PM, "Walker, James - Corp Acct" <jawalker@uspi.com> wrote:

>Hi, Peter,
>
>Please find attached our G&A details through  June 30, 2013.  We have
>annualized the amounts for our comparisons.
>
>Regards, JJ
>
>
>James Walker, CPA
>Vice President of Technical Accounting
>United Surgical Partners International, Inc.
>972-581-7835 (phone)
>972-767-0698 (efax)
>jawalker@uspi.com
>
>
>
>-----Original Message-----
>From: Cagle, Jason
>Sent: Tuesday, July 30, 2013 8:24 AM
>To: Clemens, Peter
>Cc: Martin, Tony; Walker, James - Corp Acct
>Subject: Re: G&A
>
>Will do.  Tony/JJ: could one of you send the file?
>
>On Jul 30, 2013, at 7:09 AM, "Clemens, Peter"
><Peter.Clemens@scasurgery.com> wrote:
>
>> Jason-
>>
>> Sure, I would like to do this again. Just send what we exchanged the
>>last time we did this.
>>
>> Thanks.
>> Pete
>>
>> Sent from my iPhone
>>
>> On Jul 29, 2013, at 11:33 PM, "Cagle, Jason" <jcagle@uspi.com> wrote:
>>
>>> I know that a few years back we exchanged data on corporate G&A with



EXHIBIT
33

Confidential

SCA002364259

```
>>>each other.  I was wondering if you would be interested in repeating
>>>that exercise.  If so, I can send you what we exchanged before.  I'm
>>>particularly interested in IT as a percentage of revenue.  With all we
>>>have going on in that arena, I want to make sure we're not overdoing
>>>it.  Pls let me know. Nope you're well.
>>>
>>> CONFIDENTIALITY NOTICE: This message and any attachments are for the
>>>sole use of the intended recipient(s).  This message is confidential
>>>and may also be privileged.  If you are not the intended recipient,
>>>please contact the sender immediately, delete the contents of this
>>>message and do not use it for any purpose.
>>>
>>>
>>> ------------------------------------------------------------------
>>> ---- This message was secured by ZixCorp(R).
>>
>>
>>
>>
>> ------------------------------------------------------------------
>> --- This message was secured by ZixCorp(R).
>>
>
>
>CONFIDENTIALITY NOTICE: This message and any attachments are for the sole
>use of the intended recipient(s).  This message is confidential and may
>also be privileged.  If you are not the intended recipient, please
>contact the sender immediately, delete the contents of this message and
>do not use it for any purpose.
>
>
>------------------------------------------------------------------
>This message was secured by ZixCorp(R).
```

Confidential

SCA002364260

Produced in Native Format

Produced in Native Format

Confidential

SCA002364261

**UNITED SURGICAL PARTNERS INTERNATIONAL, INC.**
**GENERAL AND ADMINISTRATIVE EXPENSE ANALYSIS**
**Dollars in Thousands**

Total Facilities     215
Systemwide Revenue (Annualized)    $    2,249,584

|  | Annualized June | Per Facility | % Systemwide |
|---|---|---|---|
| General Corporate Expense | $ 25,288 | $ 117.6 | 1.1% |
| Development | 7,631 | $ 35.5 | 0.3% |
| Field Support | 13,744 | $ 63.9 | 0.6% |
| Field Management | 16,493 | $ 76.7 | 0.7% |
| Total G&A Expense | $ 63,155 | $ 293.7 | 2.8% |

*Excludes WCAS Mgt Fee & OPC*

United Surgical Partners International, Inc.
Schedule of Corporate G and A
June 2013

| | YTD Jun-13 Actual | Annualized | % of Systemwide Revenues |
|---|---|---|---|
| **Corporate G&A:** | | | |
| 00 Rent/Insurance | $2,037,043 | $4,074,086 | 0.2% |
| 20 Administration | 18,039 | 36,078 | 0.0% |
| 66 Legal | 531,775 | 1,063,550 | 0.0% |
| 23 Communications | 345,226 | 690,452 | 0.0% |
| 67 Finance management | 352,991 | 705,982 | 0.0% |
| 80 Exec/administration | 1,495,218 | 2,990,436 | 0.1% |
| 83 Information technology | 3,939,253 | 7,878,506 | 0.4% |
| 84 Finance | 1,794,150 | 3,588,300 | 0.2% |
| 90 Corp admin | 628,414 | 1,256,828 | 0.1% |
| 91 Tax | 209,444 | 418,888 | 0.0% |
| 94 Human resources | 653,441 | 1,306,882 | 0.1% |
| 97 Internal audit | 387,748 | 775,496 | 0.0% |
| 98 Strategic implementation | 251,137 | 502,274 | 0.0% |
| **Total Corporate G&A** | 12,643,879 | 25,287,758 | 1.1% |
| Development | 3,815,389 | 7,630,778 | 0.3% |
| **Field Support:** | | | |
| 86 Business development | 2,367,552 | 4,735,104 | 0.2% |
| 22 Clinical Operations | 1,027,518 | 2,055,036 | 0.1% |
| 29 Accounts Payable | 249,329 | 498,658 | 0.0% |
| 82 Managed care | 957,622 | 1,915,244 | 0.1% |
| 85 Accounting | 1,899,073 | 3,798,146 | 0.2% |
| 92 Business office | 370,885 | 741,770 | 0.0% |
| **Total Field Support** | 6,871,979 | 13,743,958 | 0.6% |
| Field Management | 8,246,489 | 16,492,978 | 0.7% |
| **Totals** | $ 31,577,736 | $ 63,155,472 | 2.8% |

Unaudited - for internal use only

| All Custodians | Clemens, Pete;Wachsman, Leslie | SEMANTIC |
|---|---|---|
| Author | jawalker | SEMANTIC |
| Begin Family | SCA002364259 | SEMANTIC |
| Confidentiality | Confidential | SEMANTIC |
| Custodian | Clemens, Pete | SEMANTIC |
| Date Created | 07/31/2013 2:21 pm | SEMANTIC |
| Date Modified | 07/31/2013 3:55 pm | SEMANTIC |
| Date Printed | 07/31/2013 3:46 pm | SEMANTIC |
| End Family | SCA002364261 | SEMANTIC |
| Extension | XLSX | SEMANTIC |
| File Size | 162555 | SEMANTIC |
| Filename | G&A Review (June 2013) SCA Comparison.xlsx | SEMANTIC |

# ZIELINSKI EXHIBIT 59 (FILED UNDER SEAL)

EXHIBIT

EX 0089
Mark Garvin
05.30.2024

**From:** Garvin, Mark
**To:** Karrmann, Sandi; Brodnax, Brett
**CC:** Johnston, Andy
**Sent:** 1/7/2016 8:05:57 PM
**Subject:** Pay
**Attachments:** MP & RVP Salary Info 12-10-15.xlsx

I have reviewed this and highlighted in red 6 people in my Group (5 RVPs and 1 MP) that I would like to ensure we consider as outliers in the upcoming salary reviews. The criteria used was top performer and, relatively speaking, a bit low on the base salary scale when compared to all others. NOTE: ██████████████, effective 1/1/16 so I think he is okay for now but we committed to give him a ██████████████████████████████████.

Andy, I am sure you have others to add to the list.

Mark

---

**From:** Sandi Karrmann <skarrmann@uspi.com>
**Date:** Thursday, December 10, 2015 at 6:06 PM
**To:** Brett Brodnax <BBrodnax@uspi.com>
**Cc:** Andy Johnston <AJohnston@uspi.com>, Mark Garvin <MGarvin@uspi.com>
**Subject:** Pay

Obviously be careful with this data and do not share with anyone else, but here's the listing of MPs and RVPs, sorted high to low by salary. I'd make changes with the 3/1 merit effective date.

---

**From:** Brodnax, Brett
**Sent:** Thursday, December 10, 2015 5:50 PM
**To:** Karrmann, Sandi
**Cc:** Johnston, Andy; Brodnax, Brett; Garvin, Mark
**Subject:** Re: Aric Burke

Sandi, can we see all of them at once so we can address any issues around the same time? Thanks

Sent from my iPad

On Dec 10, 2015, at 5:41 PM, Karrmann, Sandi <skarrmann@uspi.com> wrote:

██████████

---

**From:** Johnston, Andy
**Sent:** Thursday, December 10, 2015 5:40 PM
**To:** Karrmann, Sandi
**Cc:** Brodnax, Brett; Garvin, Mark
**Subject:** Re: Aric Burke

I agree on Alex, and we also need to give Vanessa another bump. Sandy, do you know Carol's base?

On Dec 10, 2015, at 5:21 PM, Karrmann, Sandi <skarrmann@uspi.com> wrote:

I think there are some we should discuss giving a slightly bigger bump in March. Corey, Jeff and Alex come to mind – they have all been in their positions close to 5 years and are only ███████████████████████ ████████████. Copying Andy to bring him into the loop.

CONFIDENTIAL

Also, Bill sent an email to Andrew about recruiting our people -

---

**From:** Brodnax, Brett
**Sent:** Monday, December 07, 2015 9:58 PM
**To:** Garvin, Mark; Karrmann, Sandi
**Subject:** Re: Aric Burke

Any other MP's that are under market that we should be proactive with? Thanks

Sent from my BlackBerry 10 smartphone on the Verizon Wireless 4G LTE network.

**From:** Garvin, Mark
**Sent:** Monday, December 7, 2015 9:18 PM
**To:** Karrmann, Sandi
**Cc:** Brodnax, Brett
**Subject:** Re: Aric Burke

Thanks very much to you both.

On Dec 7, 2015, at 8:57 PM, Karrmann, Sandi <skarrmann@uspi.com> wrote:

I'll let Bill know - Andrew may not have let Heidrick know.

Thanks for your support - we definitely don't want to lose Aric.

Mark: I'll follow up with you on communication.

Sandi

On Dec 7, 2015, at 7:34 PM, Brodnax, Brett <BBrodnax@uspi.com> wrote:

Makes sense to me. Also, we have a deal with SCA that we won't recruit each other's people. Bill made the deal with Andrew so assume he'll want to follow up with him.

Sent from my BlackBerry 10 smartphone on the Verizon Wireless 4G LTE network.

**From:** Karrmann, Sandi
**Sent:** Monday, December 7, 2015 6:02 PM
**To:** Brodnax, Brett
**Cc:** Garvin, Mark
**Subject:** Aric Burke

As you know, our competitors would love to land our best and brightest. At the bottom of the email trail is Heidrick reaching out to Aric on behalf of SCA. In looking at the Market Presidents, Aric's positioning from a base salary standpoint worries us. Aric is at █████████ ██████ █ The average MP salary is $255k and █████ ████████████ We would like to ██████████████ ██████ effective 1/1/16, then give him a █████ ████████████████ on 3/1. He would still be on the low end, but would have made up some ground. Then we would consider, assuming performance, a mid-year bump in late summer/early fall.

Let us know if you'd like to discuss live or have more questions –

Sandi

---

**From:** Garvin, Mark
**Sent:** Monday, December 07, 2015 5:55 PM
**To:** Karrmann, Sandi
**Subject:** RE: SVP, West - Surgical Care Affiliates (Publicly Traded)

USPI_CIV_000000598

Agree. Like it.

---

**From:** Karrmann, Sandi
**Sent:** Monday, December 07, 2015 5:36 PM
**To:** Garvin, Mark
**Subject:** RE: SVP, West - Surgical Care Affiliates (Publicly Traded)

I recommend a ██████████████████████████████ We would also give him ██████████
████████████████████ Thoughts?

---

**From:** Garvin, Mark
**Sent:** Friday, December 04, 2015 11:12 AM
**To:** Karrmann, Sandi
**Subject:** Re: SVP, West - Surgical Care Affiliates (Publicly Traded)

Yikes. Do you think we should do something now?

On Dec 4, 2015, at 9:52 AM, Karrmann, Sandi <skarrmann@uspi.com> wrote:

He is currently at ████████████████████████

Sandi

On Dec 1, 2015, at 5:00 PM, Garvin, Mark <MGarvin@uspi.com> wrote:

Yes, I would worry more about Aric. Can you tell me his current base?

---

**From:** Karrmann, Sandi
**Sent:** Tuesday, December 01, 2015 4:15 PM
**To:** Garvin, Mark
**Subject:** RE: SVP, West - Surgical Care Affiliates (Publicly Traded)

Ugh. I'd also worry about Peggy Wellman – although the increase we gave her helped A LOT to feel appropriately compensated for the work she does.

We should look at an additional adjustment for Aric during our review/salary adjustments in March.

---

**From:** Garvin, Mark
**Sent:** Tuesday, December 01, 2015 2:54 PM
**To:** Karrmann, Sandi
**Subject:** Fwd: SVP, West - Surgical Care Affiliates (Publicly Traded)

This worries me.


Begin forwarded message:

**From:** "Burke, Aric" <aburke@uspi.com>
**Date:** December 1, 2015 at 2:48:15 PM CST
**To:** "Garvin, Mark" <MGarvin@uspi.com>, "Mosley, Shannon" <smosley@uspi.com>
**Subject: FW: SVP, West - Surgical Care Affiliates (Publicly Traded)**

FYI on SCA. This may be the same search Mark received. It looks like SCA and AmSurg are both gearing up to be more competitive out West.

CONFIDENTIAL

USPI_CIV_000000599

**From:** Alice Bae [mailto:hit-reply@linkedin.com]
**Sent:** Tuesday, December 01, 2015 1:36 PM
**To:** Burke, Aric
**Subject:** SVP, West - Surgical Care Affiliates (Publicly Traded)

Hi Aric -

By way of introduction, I am a member of Heidrick's healthcare services practice, and you were referred to me by a colleague for a search we are conducting. We are partnering with a leading healthcare services company (publicly traded) to recruit a strategic leader to join the organization as a Senior Vice President to drive growth and excellence in delivery of care in the Western United States, including California, New Mexico, Utah, Nevada, Idaho, and Arizona today.

This highly collaborative and consultative leader will have full P&L responsibility for ~50 existing sites. However, unlike traditional day-to-day operations roles, this individual will not only lead existing operations, he/she will build and drive the growth strategy for their markets, targeting innovative new partnerships with health systems, health plans and other risk bearing entities, physician groups and other key stakeholders. He/she will innovate, benchmark, pilot and scale new services and initiatives that will transform the business and clinical delivery.

I have no idea if you are currently keeping your options open, however, I would love to introduce myself more personally and gain your insights on this opportunity and any networking help that you might be able to provide. Please let me know of a good time to spend 10-15 minutes.

Best,
Alice

Alice Bae
Engagement Manager at Heidrick & Struggles
abae@heidrick.com
312-496-1753

 **Reply**     **Not interested**

View Alice's LinkedIn profile

This email was intended for Aric Burke (Market President at United Surgical Partners International). Learn why we included this.

You are receiving InMail notification emails. Unsubscribe
If you need assistance or have questions, please contact LinkedIn Customer Service.

© 2015, LinkedIn Corporation. 2029 Stierlin Ct. Mountain View. CA 94043. USA

‹image001.jpg›

CONFIDENTIAL

# ZIELINSKI EXHIBIT 60 (FILED UNDER SEAL)

| **From:** | McGarry, Shannon |
|---|---|
| **To:** | Mosley, Shannon |
| **Sent:** | 10/24/2017 10:11:05 AM |
| **Subject:** | RE: SCA |

Great. Yay!!

**From:** Mosley, Shannon
**Sent:** Monday, October 23, 2017 6:34 PM
**To:** McGarry, Shannon <smcgarry@uspi.com>
**Subject:** SCA

Shannon,
You can now recruit Administrators from SCA – Surgical Care Affiliates. This should help open up a larger pool.
Thanks,

Shannon Mosley |Vice President, Talent Acquisition
**United Surgical Partners International** | www.uspi.com
ph: 972-763-3820      fax: 972-692-8099



**EXHIBIT**
PX 103
Shannon McGarry
06.11.24