**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| In re Outpatient Medical Center Employee Antitrust Litigation | Case No. 21 CV 305 |
| | Honorable Sunil R. Harjani |

## <u>MEMORANDUM OPINION AND ORDER</u>

**Table of Contents**

Introduction ............................................................................................................. 1

Discussion ............................................................................................................... 2

I.    *Daubert* Motions ............................................................................................ 2

   a.   Legal Standard ........................................................................................ 2

   b.   Defendants' *Daubert* Motion ................................................................. 2

      i.    Dr. Gerhart's and Dr. Starr's Market Power Opinions ...................................... 3

      ii.   Dr. Gerhart's and Dr. Starr's Discussion of Facts ............................................. 3

      iii.   Dr. Gerhart's Other Opinions ......................................................................... 4

         1.    *Incentive to Collude* ......................................................................... 4

         2.    *Recruiting Agreements and Information Sharing Likely Suppressed Compensation* ...................................................................................... 6

         3.    *Defendants' Compensation Systems Would Likely Cause Classwide Impact* ....................................................................................... 8

         4.    *State of Mind Opinions* ..................................................................... 8

      iv.   Dr. Starr's Other Opinions ............................................................................ 9

         1.    *Regression Models* .......................................................................... 9

         2.    *Defendants' Compensation Systems* ................................................ 12

   c.   Plaintiffs' *Daubert* Motion ................................................................. 13

      i.    Defense Experts' Qualifications .................................................................... 13

      ii.   Defense Experts' Opinion that Defendants' Collusion Was Incapable of Suppressing Class Pay .................................................................................. 16

      iii.   Defense Experts' Use of the Lightcast Data .................................................. 18

      iv.   Defense Experts' Treatment of Class Pay Data ............................................. 20

      v.   Defense Experts' Evaluation of Defendants' Pay Structures ........................... 21

II.   Class Certification Motion ........................................................................... 21

   a.   Legal Standard ...................................................................................... 21

   b.   *Per Se* Standard ................................................................................... 22

   c.   Rule 23(a) ............................................................................................. 22

      i.    Numerosity ................................................................................................... 23

      ii.   Commonality ................................................................................................ 23

      iii.   Typicality ...................................................................................................... 23

      iv.   Adequacy of Representation .......................................................................... 23

      v.   Ascertainability ............................................................................................ 24

d.    Rule 23(b)(3) ................................................................................. 24

    i.    Predominance – Antitrust Impact ................................................ 25

      1.    *Wage Suppression* ............................................................... 25

      2.    *Classwide Impact* ............................................................... 29

        a.    *DaVita* ............................................................ 32

        b.    *SCA* ................................................................ 35

        c.    *USPI* .............................................................. 36

      3.    *Conclusions on Structured Compensation Systems* ..................... 37

      4.    *Expert Opinions on Compensation Systems* ................................ 39

    ii.    Predominance – Damages ............................................................. 44

III.    Conclusion ........................................................................................ 45

**Introduction**

Starting in 2008, three outpatient medical centers allegedly reached an agreement not to recruit senior-level employees from each other. These "no-poach" agreements supposedly had two primary features: (1) the agreements barred Defendants SCA and DaVita, and Defendants SCA and USPI, from recruiting director-level or above positions from one another; and (2) the agreements included a "tell-your-boss" provision that required applicants to inform their supervisors they intended to apply at the other company that was party to the agreement. Plaintiffs claim these no-poach agreements prevented a bidding war for talent that would have led to higher compensation, and thus suppressed employee compensation and limited the mobility of the employees. Plaintiffs also assert that, as part of the agreements, Defendants exchanged non-public, sensitive information about employee compensation, which allowed Defendants to coordinate and set them lower.[1]

The named plaintiffs seek to represent a class of over 6,000 senior-level employees from these three defendant companies, alleging a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. The defendant entities operated ambulatory surgery centers, outpatient medical clinics, and other health care facilities, where these senior-level individuals were employed. These centers allow surgical and other procedures for patients without an overnight stay. The directors, vice presidents, and senior vice presidents, who form the putative class, varied in their operational roles, much like any other corporation—information technology, real estate, marketing and communications, finance, accounting and tax, and clinical research, among others. These companies operated at locations within geographic markets nationwide and were all headquartered in different states.

Plaintiffs move to certify this matter as a class action pursuant to Federal Rule of Civil Procedure 23. In connection with the Rule 23 motion, both Plaintiffs and Defendants seek to exclude their opponents' expert witnesses, who offer various quantitative and qualitative conclusions about the no-poach agreements and their alleged impact on the employees. All in all, the parties' filings run hundreds of pages, and so do each of the six expert reports. The entire record submitted, with exhibits, is in the thousands. After reviewing the record, the Court determined that the expert reports and accompanying exhibits and briefing were sufficient, and a *Daubert* hearing was unnecessary as it would largely be repetitive of the reports and depositions submitted, which the Court has reviewed. The Court, however, held oral argument on the class certification motion.

For the reasons stated below, the Court denies Plaintiffs' motion for class certification pursuant to Rule 23(b)(3) because Plaintiffs have failed to demonstrate, by a preponderance of the evidence, that common questions will predominate over the individualized questions. The Court finds that Plaintiffs have failed to show predominance of common issues to assess antitrust impact and damages, including wage suppression and classwide impact. The Court also grants, in part, Defendants' *Daubert* motion to exclude certain expert opinions, but denies Plaintiffs' *Daubert* motion. What follows is a comprehensive examination of the evidentiary record to fulfill this

---

[1] Further details about the allegations in this case can be found in the memorandum opinion and order denying SCA and DaVita's motion to dismiss. *See In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, 630 F.Supp.3d 968 (N.D. Ill. 2022).

Court's responsibility to act as a gatekeeper for expert testimony and to conduct the rigorous analysis required for class certification.[2]

### Discussion

### I.     *Daubert* Motions

#### a.   Legal Standard

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which instructs the court to evaluate "(1) the proffered expert's *qualifications*; (2) the *reliability* of the expert's methodology; and (3) the *relevance* of the expert's testimony." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017).

Under Rule 702, a witness may be qualified as an expert "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. In evaluating the reliability of an expert's testimony, a court should consider whether the theory (1) can be and has been tested; (2) has been subjected to peer review; (3) has been evaluated in light of potential rates of error; and (4) has been accepted in the relevant scientific community. *Gopalratnam*, 877 F.3d at 779. A court should also consider whether maintenance standards and controls exist and whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; adequately accounted for obvious alternative explanations; and is being as careful as he would be in his regular professional work outside his paid litigation consulting. *Id.* at 779–80. This list is neither exhaustive nor mandatory, and the test of reliability is flexible. *Id.* at 780. The Court's focus "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993). "The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).

#### b.   Defendants' *Daubert* Motion[3]

Plaintiffs offer two expert witnesses in support of their motion for class certification. First, Plaintiffs offer the opinion of Dr. Barry Gerhart, the Bruce R. Ellig Distinguished Chair of Pay and

---

[2] The parties have filed under seal portions of their class certification and *Daubert* motions briefing and exhibits. If the Court refers to sealed material, it attempts to do so without revealing any information that could be reasonably deemed confidential. Nonetheless, if the Court discusses confidential information, it has done so because it is necessary to explain the path of its reasoning. *See In re Specht*, 622 F.3d 697, 701 (7th Cir. 2010) ("Documents that affect the disposition of federal litigation are presumptively open to public view, even if the litigants strongly prefer secrecy, unless a statute, rule, or privilege justifies confidentiality."); *Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 568 (7th Cir. 2000) (explaining that a judge's "opinions and orders belong in the public domain").

[3] In addition to the arguments addressed below, Defendants also move to exclude Dr. Gerhart's and Dr. Starr's opinions about the existence of missing documents and unproduced evidence. These opinions were also subject to a motion to strike that was pending before Magistrate Judge Kim. After the Plaintiffs filed their response to Defendants' *Daubert* motion, Magistrate Judge Kim granted Defendants' motion to strike these opinions. Thus, the Court denies Defendants' motion on this ground as moot.

Organizational Effectiveness at the Wisconsin School of Business, University of Wisconsin-Madison. *See* [666-3], Gerhart Report, ¶ 1. Dr. Gerhart holds a Ph.D. in Industrial Relations from the University of Wisconsin-Madison. *Id.* His work covers a variety of fields, including compensation design, employee mobility/turnover, and human resource management. *Id.* His research has been published in academic journals, including the *Academy of Management Journal*, the *Journal of Applied Psychology*, *Industrial and Labor Relations Review*, and *Personnel Psychology*, and he has also published a textbook on compensation. *Id.*

Second, Plaintiffs offer the opinion of Dr. Evan Starr, who is an Associate Professor at the University of Maryland's Robert H. Smith School of Business in the Department of Management and Organization. *See* [666-1], Starr Report, ¶ 1. Dr. Starr holds a Ph.D. in Economics from the University of Michigan. *Id.* ¶ 2. He specializes in performing economic and statistical analyses of labor markets, with a focus on earnings and restrictions on employee mobility. *Id.* ¶ 1. Dr. Starr's work has been published in several journals, including the *Review of Economics and Statistics*, the *Journal of Law and Economics*, the *Journal of Law, Economics, and Organization*, the *Journal of Legal Studies*, the *Journal of Human Resources*, *Management Science*, *Organization Science*, *Industrial and Labor Relations Review*, and *the Strategic Management Journal*. *Id.* ¶ 3. The Court addresses Defendants' challenges to these experts below.

### i. Dr. Gerhart's and Dr. Starr's Market Power Opinions

Dr. Gerhart and Dr. Starr each provided an opinion that Defendants have market power. Defendants move to exclude Dr. Gerhart's opinion because he is unqualified to offer such an opinion, and the opinion is not based on a reliable methodology. As for Dr. Starr's opinion, Defendants argue that he concludes that they had market power solely on the results of his wage regression analysis, which, according to Defendants, is an insufficient basis to establish an opinion on market power under Seventh Circuit law. In response, Plaintiffs argue that because they are challenging horizontal agreements among competitors that are illegal *per se*, market power and market definition are not elements of their claims, so "the jury will not be asked to address them at trial." [675] at 3. Plaintiffs are correct that they do not need to establish that Defendants had market power to succeed on their claims. "Under the per se framework, a restraint is deemed unreasonable without any inquiry into the market context in which the restraint operates." *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 336 (7th Cir. 2012) (citing *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 100 (1984)). The Seventh Circuit has made clear that "a showing of market power is not necessary in a case involving clear restrictions on price and output unless and until a full Rule of Reason analysis takes place." *Id.* at 337 n.3. Because Plaintiffs need not show market power to prevail on their claims and concede that they do not intend to offer such evidence at trial, the motion to exclude Dr. Gerhart and Dr. Starr's opinions on Defendants' market power is denied as moot.

### ii. Dr. Gerhart's and Dr. Starr's Discussion of Facts

Defendants move to exclude certain opinions from both Dr. Gerhart and Dr. Starr because they "improperly invade the province of the jury by weighing evidence and making credibility

3

determinations." [665] at 10.[4] In particular, Defendants argue that Dr. Gerhart and Dr. Starr improperly opined on the start and end dates of the recruiting agreements, and when Defendants implemented the "tell-your-boss" provision and included directors in the agreements. Defendants also maintain that Dr. Starr's opinion about the existence and timing of the alleged information sharing and Dr. Gerhart's opinion on the nature of Defendants' compensation practices and structures constitute impermissible fact-finding.

Dr. Gerhart and Dr. Starr may not opine on the ultimate issue of whether a conspiracy existed, nor can they narrate the evidence and tell the jury what to conclude about factual issues. *See, e.g.*, *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) (affirming exclusion of expert testimony that was "largely on purely legal matters and made up solely of legal conclusions"); *Kraft Foods Glob., Inc. v. United Egg Producers, Inc.*, 2023 WL 6248473, at *2 (N.D. Ill. Sept. 19, 2023) ("An expert is not a narrator of the evidence, offering a running commentary on what the jury has already heard."). However, there is an important distinction between "an expert testifying that a disputed fact actually occurred or that one witness is more credible than another and an expert giving an opinion based upon factual assumptions, the validity of which are for the jury to determine." *Richman v. Sheahan*, 415 F. Supp. 2d 929, 942 (N.D. Ill. 2006). To the extent Dr. Gerhart and Dr. Starr testify to opinions that are based on factual assumptions about the nature of the alleged agreements, they are permitted to identify those factual assumptions that support the opinions. But they will not be permitted to testify about their own conclusions from those underlying facts, for example, the timeframe of any conspiracy or the existence of an agreement, which is the province of the jury. In a similar vein, Dr. Gerhart's opinion on the nature of Defendants' compensation practices and structures is not excludable on this ground. Dr. Gerhart may not make credibility determinations or tell the jury whose version of the facts to believe, but he can summarize the evidence he reviewed and explain his opinion that Defendants had structured compensation systems. For present purposes, to the extent that statements in the experts' reports are phrased as assumptions or simply explain their review of the evidence, they are not engaging in fact-finding. If any statement in their report is phrased to suggest fact-finding, the Court will ignore it here, and it will not be permitted at trial. For these reasons, Defendants' motion is denied on this ground.

### iii. Dr. Gerhart's Other Opinions

#### 1. *Incentive to Collude*

Defendants move to exclude Dr. Gerhart's opinion that Defendants had incentives to collude because he lacks the qualifications to offer the opinion and did not use a reliable methodology. Dr. Gerhart posits three reasons that Defendants are incentivized to collude to suppress employee compensation: (1) Defendants are incentivized to collude to keep senior-level employee turnover and labor costs low; (2) the incentives to collude are stronger in a close-knit industry; and (3) collusion suppresses compensation because it pays to change employers. The Court finds that Plaintiffs have not established that Dr. Gerhart is qualified to offer any of these conclusions. "Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the

---

[4] Although Defendants could have challenged these opinions at a later time in advance of trial, Defendants raised it in their *Daubert* motion at the class certification stage, so the Court will address it now.

subject matter of the witness's testimony." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) (cleaned up). Here, while Plaintiffs have shown that Dr. Gerhart is an expert on compensation and human resources management, they have not established that Dr. Gerhart is qualified to opine on economic topics such as Defendants' incentives to collude. Within the field of economics is the study of markets and what makes them conducive to collusion, as well as the study of market participant behavior. *See In re Processed Egg Prods. Antitrust Litig.*, 81 F. Supp. 3d 412, 422 (E.D. Pa. 2015) ("The field of economics contains a field of study on the features of markets that make them particularly conducive to collusion[.]"). In general, expertise in economics gives the proper qualifications to make such an opinion. *See, e.g.*, *In re Dealer Mgmt. Sys. Antitrust Litig.*, 581 F. Supp. 3d 1029, 1052 (N.D. Ill. 2022) (collecting cases). At his deposition, Dr. Gerhart testified that he does not consider himself an economist and that his expertise does not include antitrust economics. [666-11], Gerhart Deposition, at 27:10–20. Although Dr. Gerhart testified he has "some knowledge of labor economics," this testimony is too vague to establish that Dr. Gerhart has the requisite qualifications. *See id.* at 28:16–24. Plaintiffs do not establish the extent to which Dr. Gerhart has knowledge, skills, experience, or education in economics or another similar field of study involving the evaluation of collusive behavior amongst market participants. Aside from indicating that Dr. Gerhart received a minor in labor economics, his curriculum vitae reveals no relevant experience in economics or other sub-specialties involving market participant behavior, such as coursework, teaching, presentations, publications, or research. The Court finds that Plaintiffs have not met their burden in establishing that Dr. Gerhart possesses the requisite qualifications to opine on Defendants' incentives to collude.

Even if Dr. Gerhart were qualified to opine on this topic, the Court also finds that he has not employed a reliable methodology in reaching this opinion. "[E]xperts' work is admissible only to the extent that it is reasoned, uses the methods of the discipline, and is founded on data." *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000). Rule 702 requires that "the expert explain the 'methodologies and principles' that support his opinion; he cannot simply assert a 'bottom line.'" *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) (quoting *Minix v. Canarecci,* 597 F.3d 824, 835 (7th Cir. 2010))

Through its gatekeeping function, the Court is strictly limited to evaluating Dr. Gerhart's methodology, not his ultimate conclusions. The Court has reviewed this section of the report carefully. The Court finds that Dr. Gerhart has failed to articulate any methodology for his conclusions or the principles on which he relies. For example, in his report, Dr. Gerhart opines that Defendants were incentivized to collude to reduce employee turnover and keep labor costs low. He approaches this conclusion by simply summarizing the evidence and concluding that the evidence "is consistent with employers (here, Defendants) that are strongly incentivized to collude" based on his "experience and research in compensation and human resource management." [666-3], Gerhart Report, ¶ 25. Dr. Gerhart provides no details of any research that supports this conclusion—he does not explain what experience he has that allows him to make this conclusion, and he does not elaborate on how that experience even provides a reliable foundation for that conclusion. Unlike his other opinions, there is no methodology identified based on any academic or peer-reviewed research. His third conclusion, that collusion suppresses compensation because it pays to change employers, does have citations to literature to support his conclusion that employees benefit from voluntary job changes and uninhibited access to job changes. *See id.* ¶¶ 44–54. But his ultimate conclusion, that competitors can avoid increased labor costs through

collusion, is not supported by any sources. *See id.* ¶ 57. His overall opinion that Defendants had incentives to collude is thus unreliable, and Defendants' motion is granted.

### 2. Recruiting Agreements and Information Sharing Likely Suppressed Compensation

Dr. Gerhart opines that the alleged no-poach agreements and information sharing "likely" suppressed employee compensation. *Id.* ¶¶ 59–92. Dr. Gerhart concludes that restrictions on cold calling, as well as the "tell-your-boss" provision, would have decreased employee job mobility and bargaining power, and that the alleged agreements to share confidential compensation data harmed employee compensation. *Id.* ¶¶ 59–83. He also opines that the evidence "is consistent with the effects of successful collusion" and is "inconsistent with the behavior and effects of employers that compete for labor." *Id.* ¶ 84. Defendants seek to exclude this opinion because it is not based on any analysis and is therefore speculative. The Court finds that Dr. Gerhart's conclusion that the alleged no-poach agreements would likely cause wage suppression is not speculative. However, the Court agrees that Dr. Gerhart's opinions about the likely effects of the alleged information sharing and the "tell-your-boss" provision, as well as his opinion that the evidence reflects successful collusion, are inadmissible.

As for his first conclusion that the alleged no-poach agreements would likely cause wage suppression, Dr. Gerhart first explains that proactive recruiting, or "cold calling," is a valuable recruiting mechanism, where "a hiring company proactively calls, emails, or otherwise reaches out through a platform like LinkedIn or Indeed to a passive candidate, i.e., an employee at a competitor firm who is not actively looking for a new job." *Id.* ¶ 61. Dr. Gerhart relies on multiple published sources to explain the importance and wide use of cold calling in U.S. labor markets. Dr. Gerhart then summarizes the record evidence that shows that Defendants relied on proactive recruiting methods such as cold calling to hire senior-level employees. Dr. Gerhart next explains how proactive recruitment increases employee access to higher-paying job opportunities, while restrictions on proactive recruitment decrease employee mobility, which deprives employees of those higher-paying job opportunities. Again, Dr. Gerhart relies on published sources to explain that employees typically have limited access to labor market information, which, according to Dr. Gerhart, is consistent with record evidence demonstrating that Defendants sought to limit pay transparency among their employees. Dr. Gerhart then explains how employees could otherwise acquire labor market information through cold calling and proactive recruitment. From there, Dr. Gerhart reviews the record evidence that demonstrates that because of the alleged agreements, "many candidates at Defendant firms never learned about outside opportunities with higher salaries because they never received the necessary phone calls, and their job mobility suffered." *Id.* ¶ 73.

The Court finds that Dr. Gerhart's opinion is not speculative. Dr. Gerhart's opinion that the challenged conduct would have resulted in wage suppression is supported by his explanation of the relevant theory and literature, which he then applies to the record evidence. Defendants fault Dr. Gerhart because "he has 'not conducted an analysis in this case of how many fewer job offers class members received as a result of the alleged conduct' or 'shown that there were in fact fewer offers.'" [665] at 17 (citing [666-11], Gerhart Deposition, at 143:16–18, 509:7–22). They also argue that he "did not 'do any analysis to show that opportunities at defendants would have been higher paying for class members than opportunities at non-defendant firms,' from which members

of the proposed class could still receive job offers." *Id.* (citing [666-11], Gerhart Deposition, at 393:4–8). However, Dr. Gerhart does not provide an opinion that requires empirical analysis. Rather, he provides a qualitative evaluation based on compensation and human resources theory and his review of the record evidence. Of course, "[s]ocial science testimony, like other expert testimony . . . must be tested to be sure that the person possesses genuine expertise in a field and that [his] court testimony 'adheres to the same standards of intellectual rigor that are demanded in [his] professional work.'" *Tyus v. Urb. Search Mgmt.*, 102 F.3d 256, 263 (7th Cir. 1996) (quoting *Braun v. Lorillard Inc.,* 84 F.3d 230, 234 (7th Cir.1996)). Here, Dr. Gerhart explains the theory behind why the alleged no-poach agreements would lead to wage suppression based on the published literature and research within his field, such as his citations to articles and studies published in the *Academy of Management Journal*, [666-3], Gerhart Report, ¶ 61 n.189, ¶ 61(c) n.191, ¶ 72(e) n.262; the *Academy of Management Review*, *id.* ¶ 61(b) n.190; and the *Journal of Management*, ¶ 61(f) n.197, *id.* ¶ 69(a) n.247. The Court finds that this opinion is not impermissibly speculative.

However, the Court finds that the rest of the conclusions Dr. Gerhart offers within this subject matter are speculative. Dr. Gerhart opines that the "tell-your-boss" provision and sharing of "competitively sensitive information" would have harmed employee pay. He also opines that the evidence is "consistent with the effects of successful collusion that is common to the Class and inconsistent with the behavior and effects of employers that compete for labor." *Id.* ¶ 84. Once again, for each of these conclusions, Dr. Gerhart's analysis consists of summarizing the evidence that supports this conclusion without providing any reliable methodology. An expert must show that the conclusions are based on a rigorous, objectively verified approach, *see Timm v. Goodyear Dunlop Tires N. Am., Ltd.*, 932 F.3d 986, 994 (7th Cir. 2019), and an expert cannot simply assert the bottom line. *Metavante*, 619 F.3d at 761; *see also Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 776 (7th Cir. 2014) ("[E]xperience without reliable, testable methodology is not sufficient."). Dr. Gerhart opines that the "tell-your-boss" provision limited employee bargaining power and mobility. For example, he writes, "I have reviewed substantial evidence that the "tell-your-boss" requirement had a chilling effect and harmed DaVita employees, by dissuading them from pursuing and accepting better jobs or using their offers as leverage. This evidence is consistent with (successful) collusion and is common to the Class." [666-3], Gerhart Report, ¶ 81(c). But his analysis simply summarizes the record evidence that purportedly shows that employees thought the "tell-your-boss" provision had a chilling effect. He does not add anything to the evidence to make this conclusion, nor does he provide any support for his conclusions, such as relevant academic studies to explain how a "tell-your-boss" provision would impact employees. To the extent he quotes the record evidence, a jury is perfectly capable of observing that same evidence and coming to its own conclusion.

In a similar vein, Dr. Gerhart opines that "Defendants' Competitively Sensitive Information Exchanges would likely lead to Class-wide wage suppression." *Id.* ¶ 82. He also opines that the evidence "is consistent with the effects of successful collusion that is common to the Class and inconsistent with the behavior and effects of employers that compete for labor." *Id.* ¶ 84. Again, his analysis consists of invoking his "experience and research" without any explanation, and then summarizing the evidence that supports these conclusions. *Id.* ¶¶ 82, 84. For each of these conclusions, Dr. Gerhart does not add value to the evidence he has reviewed, nor does he provide any literature or research to support them. Experts must provide reasons for their opinions. *See Lang*, 217 F.3d at 924. He does not, and thus these opinions are not reliable.

7

### 3. Defendants' Compensation Systems Would Likely Cause Classwide Impact

Defendants also move to exclude Dr. Gerhart's opinion that the challenged conduct would lead to classwide effects due to Defendants' structured compensation systems. Defendants challenge the reliability of this opinion, arguing that it is not based on any identified test or methodology. The Court also finds that this opinion is inadmissible because Plaintiffs have not established that Dr. Gerhart's opinion is the product of a reliable methodology. Here, Dr. Gerhart identifies certain characteristics or qualitative factors of Defendants' compensation systems and opines that compensation systems with those characteristics would lead to systematic effects from the alleged no-poach agreements and information sharing. The problem is that Plaintiffs have not shown that this opinion is based on a methodology that meets any of the relevant factors, such as whether these factors have been tested, are subjected to peer review and publication, have a known error rate, or have general acceptance in the relevant scientific or expert community. "Reliable inferences depend on more than say-so[.]" *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 420 (7th Cir. 2005). The report does not explain the basis for Dr. Gerhart's opinion, such as by identifying the relevant experience or academic literature to support it.

Plaintiffs respond that Dr. Gerhart (and Dr. Starr) "opine that the likely effect of Defendants' decade-long collusion was suppression of the pay of all or nearly all Class Members. This likely effect represents an informed hypothesis that yields testable and falsifiable predictions." [675] at 14. That last sentence means absolutely nothing. Of course, an expert need not necessarily provide an empirical analysis to support an opinion. But "[a]n expert must offer good reason to think that his approach produces an accurate estimate using professional methods, and this estimate must be testable." *Zenith*, 395 F.3d at 419. "The expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded." Fed. R. Evid. 702 advisory committee's note to 2000 amendments. Dr. Gerhart does none of this. Instead, he opines that Defendants had structured compensation systems, provides a hypothetical explanation for how a structured compensation system would cause classwide harm, and concludes that it happened in this case. The opinion is far too speculative and makes an analytical leap without providing any reliable support. For this reason, Defendants' motion to exclude this opinion is granted. Dr. Gerhart may opine that Defendants had structured compensation systems, but he may not opine that those systems would lead to classwide impact.

### 4. State of Mind Opinions

Finally, Defendants move to strike various sentences and/or paragraphs from Dr. Gerhart's report that, according to Defendants, contain state-of-mind opinions. Many of the paragraphs cited by Defendants have been excluded on other grounds in this opinion. The Court has reviewed the remaining paragraphs that have not otherwise been excluded and finds that striking them from Dr. Gerhart's report is not warranted. *See, e.g.*, *Corzo v. Brown Univ.*, 2025 WL 2753400, at *13 (N.D. Ill. Sept. 29, 2025) (declining to exclude state-of-mind opinions within the expert's allowable overall conclusions because they could be adequately addressed during the pretrial phase). The Court finds that the challenged lines are not improper state-of-mind opinions but are rather background observations from the evidence that Dr. Gerhart makes in support of his opinions. None of them goes to the ultimate issues in this case. For example, Defendants take issue with

8

certain sentences where Dr. Gerhart observes that Defendants valued high-skilled employees, did not want employees to know about others' salaries, and "care about internal equity." These are just observations as he recounts the records he reviewed, and the Court simply ignores them at this time. The Court is perfectly capable of making its own lay conclusions from the record evidence. If Dr. Gerhart is called to testify at trial and he starts to veer into improper state-of-mind opinions, "such testimony can be addressed through objections, cross-examination, and limiting instructions." *Ploss v. Kraft Foods Grp., Inc.*, 637 F. Supp. 3d 561, 576 (N.D. Ill. 2022).

### iv. Dr. Starr's Other Opinions

#### 1. Regression Models

As common evidence of classwide impact, Plaintiffs offer the expert opinion of Dr. Starr, who conducted a multivariate regression analysis to demonstrate that the proposed class members were subject to wage suppression because of Defendants' alleged conduct. Defendants move to exclude Dr. Starr's compensation suppression regression models and the analyses and opinions that are derived from them. In their *Daubert* motion, Defendants challenge the regression models on one ground: they argue that because Dr. Starr accounted for equity compensation at the time the equity was exercised or vested, rather than at the time it was awarded, Dr. Starr's regressions do not reliably measure wage suppression.[5] The Court agrees. For the reasons explained below, the Court finds that Dr. Starr's regression models do not reliably measure wage suppression. As a result, the subsequent empirical analysis derived from the regression analysis is also not reliable to prove common impact or to estimate damages. *See* [666-1] Starr Report, ¶¶ 137–42,145–71, 191–93.

Plaintiffs have the burden of establishing that Dr. Starr's regression models are admissible.[6] The Court is mindful that the Seventh Circuit and the United States Supreme Court have repeatedly held that the selection of variables an expert includes in a regression analysis generally goes to the weight of the evidence rather than its admissibility. *See, e.g.*, *Cullen v. Ind. Univ. Bd. of Trs.*, 338 F.3d 693, 701 n.4 (7th Cir. 2003). "Still, an expert's methodology is not automatically reliable and thus admissible under Rule 702 simply because it is based on a regression analysis, particularly if there are serious questions about the reliability of the expert's application of the regression analysis to the facts." *AOT Holding AG v. Archer Daniels Midland Co.*, 2022 WL 22393244, at *7 (C.D. Ill. Sept. 30, 2022) (citing *ATA Airlines, Inc. v. Fed. Express Corp.*, 665 F.3d 882, 889 (7th Cir. 2011)).

Dr. Starr's regression model is unreliable because he does not capture wage suppression during the class period. A regression analysis should be tied to the conclusion that the expert reaches, namely that the no-poach agreements suppressed wages that were awarded to all

---

[5] Proposed class members were compensated through a mix of wages, bonuses, and equity awards. The equity grants (options) had vesting periods of multiple years, and those equity grants formed a significant portion of the compensation these senior-level employees received.

[6] Neither side disputes that multivariate regressions can be a reliable methodology. This has been recognized consistently by the Seventh Circuit. *See, e.g.*, *Zenith*, 395 F.3d at 419 (suggesting that multivariate regression is the "leading" social science tool used to determine how multiple variables influence one dependent variable).

employees during the class period. But that is not what Dr. Starr does. By using valuing stock options at the time they vested or exercised—years later and even outside the class period—he does not capture the but-for world that should have existed at the time when an employee received the compensation. This leads to several significant concerns.

First, Dr. Starr's model artificially deflates conduct compensation and inflates post-conduct compensation for employees who were granted equity during the conduct period and chose not to exercise it until after the conduct period. Second, it does not account for equity compensation that Defendants granted but never vested, or the employee never exercised or sold, including because the employee left employment too soon. Third, the model attributes a significant portion of compensation to factors that are outside of Defendants' control (timing of the exercise, market forces) and not otherwise controlled for in his regressions. These are all criticisms launched by three of the defense experts, and the Court agrees. *See* [666-6], McCrary Report, ¶¶ 222–24; [666-8], Johnson Report, ¶¶ 166–76; [666-10], Stiroh Report, ¶¶ 97–99. The problem with valuing equity at the time it was exercised or vested, and not at the time it was granted, means that factors unrelated to Defendants' conduct are measured by the regression.[7]

The choice of how to value equity is not inconsequential to the results. Dr. McCrary and Dr. Stiroh each propose a method to value equity at the time it was awarded using DaVita's data.[8] When Dr. Starr re-runs his analysis using their proposed methods, as well as a modified version of Dr. McCrary's method, his model reveals smaller wage suppression figures, both for the overall figure and for each Defendant individually, except SCA's wage suppression figure, which remains about the same when Dr. Stiroh's method is used. *See* [666-4], Starr Rebuttal Report, ¶ 117, Figure 8. Thus, valuing equity at the time it was exercised or vested improperly inflates the estimates of impact, which renders Dr. Starr's models unreliable. *See Conrad v. Jimmy John's Franchise, LLC*, 2021 WL 718320, at *19 (S.D. Ill. Feb. 24, 2021) (excluding regression models that "inflated estimates of impact" due to a methodological flaw in how the underlying data was analyzed).

To be clear, the Court does not find that Dr. Starr's regression models are unreliable simply due to his choice of variables. The Supreme Court was explicit in *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), that any model at the class-certification stage must be consistent with a plaintiff's liability theory, particularly with respect to the anticompetitive effect of the violation. *Id.* at 35. As the Supreme Court noted, for class certification, a plaintiff must translate "the legal theory of the harmful event into an analysis of the economic impact of that event." *Id.* at 38 (cleaned up). Here, the issue is that Dr. Starr's primary regression models do not fit the conclusion that is reached— they do not measure wage suppression because they do not purport to measure the impact of the alleged no-poach agreements on Defendants' compensation decisions at the time they were awarded. *See Team Schierl Cos. v. Aspirus, Inc.*, 2025 WL 3687939, at *8 (W.D. Wis. Dec. 19, 2025) (excluding antitrust damages regression model that failed to reliably estimate "the price plaintiffs would have paid in the absence of the anti-competitive conduct"). This is a similar disconnect that was found in *Comcast*. Dr. Starr confirms this in his rebuttal report. In response to

---

[7] There are several empirical models available to value options at the time they were granted, such as the Black-Scholes model.

[8] The Court understands that DaVita's pay data contained estimates for the value of equity compensation at the time it was awarded, while the same data was not included in USPI or SCA's pay data.

the defense experts' criticisms of his treatment of equity compensation, he writes, "The goal of this analysis is to understand whether the Challenged Conduct affected *what workers actually receive*. If instead I were to focus on company pay decisions when those pay decisions do not reflect what workers actually received, then I would not be studying whether workers were harmed, because the definition of harm is lower *realized* compensation, not the extent of unrealized promises." [666-4], Starr Rebuttal Report, ¶ 115(b).

But, this argument confuses what the conspiracy caused the employee with what the employee experienced. The conspiracy purportedly caused the grant deficiency (*i.e.*, lower wages)—the harm. That harm occurred at the time that wages were awarded to the employee and the employee received that compensation. In a but-for world (the regression), according to Plaintiffs, the employer would have paid more (the total value of cash and options), and in the actual world, the employer awarded less. That alleged wage suppression harm occurred at that moment during the conspiracy, and the difference between those two figures is the alleged wage suppression. What the employee would have experienced when they chose to exercise those options when they finally vested years later is a separate question that does not measure the antitrust impact of the no-poach agreement. Years later, those options may have value far more than originally anticipated, or much less; they may be worthless or they may never be exercised. Thus, Dr. Starr's regression does not capture the but-for world at the time compensation is received by the employee (the harm), but at the time of an event that happens much later in the future, and often outside the conspiracy period. Dr. Starr's but-for world depends on the employee's own subsequent behavior (whether they exercise or when they exercise), as well as on the operation of the stock market, which is not the conspiracy's responsibility. Thus, the regressions *do not* properly and reliably measure wage suppression at the time the compensation is awarded.

Dr. Starr is adamant that his method is correct and supportable, and declines to adopt the other approach. *See, e.g.*, *id.* ¶ 116. In rebuttal, Dr. Starr argues that "as long as equity grants are unaffected by the Conduct, they will cancel each other out and not lead to any bias in the estimates." *Id.* ¶ 118(b)(i). He further explains, "if instead the Challenged Conduct systematically suppresses the amount of equity granted . . . then the delay between a stock grant and its realization will only make my estimates *conservative*." *Id.* ¶ 118(b)(ii). To support this theory, Dr. Starr developed a "simulation." However, the simulation is not before the Court, and Dr. Starr refers readers of his rebuttal report to his "workpapers," which were also not submitted. And as Defendants point out, whether Dr. Starr's approach is conservative is an empirical question, and he does not attempt to answer it empirically. Thus, the Court is not persuaded by Dr. Starr's rebuttal on this point.[9]

Plaintiffs also attempt to point to Dr. Starr's rebuttal report to establish that his regressions are reliable to show wage suppression and estimate damages. Dr. Starr explains that his "approach of measuring stock payments when they vest, are exercised, or are otherwise counted as income, as opposed to when they are granted, is consistent with how the IRS assesses income, SEC disclosure rules, and, perhaps more importantly, is exactly what one should care about if we care about estimating the effect of firm conduct on *worker-experienced* harm." *Id.* ¶ 110. The Court does not see the relevance of how the IRS or the SEC considers income when assessing wage

_____

[9] As Dr. McCrary notes, for DaVita, Dr. Starr overestimates wage suppression by 45%, so the error is not trivial.

suppression. What an employee ultimately received in their bank account when they exercise their options is not the relevant question. Rather, the appropriate question is what was the antitrust impact of the no-poach agreement, namely, how much compensation the employee would have received (the but-for world) without the no-poach agreement *at the time* they were awarded that compensation in the class period. *See* [666-8] Johnson Report ¶ 167. This is not a matter of weight; it is an issue that goes to the reliability of Dr. Starr's regression, and also does not fit Plaintiffs' theory under *Comcast*.

Dr. Starr's approach is also not a method that has been accepted in the relevant community. Plaintiffs provide "twenty examples of scholars accounting for equity pay in the same way as Dr. Starr, by measuring its value when it was actually paid." [675] at 20. None of these articles helps Plaintiffs because they do not employ similar methodologies to reach the relevant conclusion here, *i.e.,* the use of regression models to measure the impact on employee compensation. Plaintiffs have failed to provide any academic literature or research that explains why equity compensation should be valued at the time of vesting or exercise to assess wage suppression. And as Defendants point out, in other no-poach cases that even Plaintiffs heavily rely on, the experts who conducted similar analyses appear to have valued equity compensation at the time it was granted. *See* Expert Report of Edward E. Leamer, Dkt. 198-2, *In re High-Tech Emp. Antitrust Litig.*, No. 5:11-CV-02509-LHK (N.D. Cal.); Expert Report of Orley Ashenfelter, Dkt. 215-6, *In re Animation Workers Antitrust Litigation*, No. 5:14-CV-04062-LHK (N.D. Cal.).

As a result, Dr. Starr's main regression as well as his follow-on analysis based on that main regression, described as the by-employee-level category and defendant suppression model, quantile regression, in-sample prediction, interval in-sample prediction, and random coefficient model, [666-1], Starr Report, ¶¶ 137–42, 145–71, are all inadmissible under *Daubert*.

### 2. *Defendants' Compensation Systems*

Dr. Starr opines that all or nearly all the class members would have been harmed by wage suppression. He offers six independent methods in support of this opinion, most of which are the follow-on analysis to the main regression that have been excluded. Dr. Starr offers an additional method to prove common impact, which consists of qualitative and quantitative analysis to demonstrate that Defendants have a compensation structure that "would provide a natural mechanism for how the wage suppression . . . propagated across the whole Class." *Id.* ¶ 143. Defendants argue that both analyses are unsupported by a reliable methodology and fail to establish Dr. Starr's conclusion that Defendants' compensation systems would lead to classwide wage suppression. For the following reasons, the Court finds that Dr. Starr's opinion that Defendants maintained structured compensation systems that would cause widespread impact is admissible.

Starting with the qualitative analysis, Dr. Starr, like Dr. Gerhart, provides an analysis of record evidence that shows Defendants used compensation structures to maintain internal and external equity. He also relies on the relevant literature to explain these concepts, such as an article from the *Quarterly Journal of Economics* and Dr. Gerhart's compensation textbook. *See e.g.*, *id.* ¶ 173. As for his quantitative analysis, Dr. Starr conducts two different correlation analyses, referred to as "between-job" analysis and "within-job" analysis. The results of these analyses demonstrate that wages are positively correlated across job levels and within the same job level. In his rebuttal, Dr. Starr also conducts a "common factors" regression analysis to explain how

much of the variation in compensation can be explained by four common factors (job title, number of years employed, location, and year). Dr. Starr concludes that because 79% of the observed variation in hourly wages across all senior-level employees can be explained by these four factors, this shows that "the wage structures are highly systematic at each defendant." [666-4], Starr Rebuttal Report, ¶ 240.

Defendants first argue that Dr. Starr's opinion about the existence of structured compensation systems is vague and unintelligible. The Court disagrees. Dr. Starr explains the concept of internal and external equity, with references to the relevant literature, and identifies the evidence that reflects that Defendants' compensation structures incorporated these concepts.

Defendants also argue that Dr. Starr's opinion that Defendants' compensation structures would transmit harm to the entire class is unsupported by a reliable methodology. Not so. In addition to his qualitative analysis, Dr. Starr offers two other statistical analyses—the correlation analysis and the common factors analysis previously referenced. Defendants argue that none of these analyses "measure whether job mobility events or compensation changes for a single (or small group of) employee(s) actually did transmit harm to other members of the proposed class." [665] at 36. However, the Court finds that this argument goes to the persuasiveness of Dr. Starr's opinion, not its admissibility. Correlation analysis is "a standard methodology regularly used in antitrust litigation for demonstrating impact with class-wide evidence." *In re Broiler Chicken Grower Antitrust Litig. (No. II)*, 2024 WL 2117359, at *19 (E.D. Okla. May 8, 2024). This Court has previously acknowledged that "courts faced with similar correlation analyses have found that they could serve as reliable evidence [of common impact] in conjunction with overcharge regressions." *In re Turkey Antitrust Litig.*, 2025 WL 264021, at *10 (N.D. Ill. Jan. 22, 2025) (compiling cases). And both correlation and "common factors" analyses were accepted by the court in the *High-Tech* case to "bolster[] Plaintiffs' theory that there is a wage structure in place under which an impact on some employees would have resulted in an impact to all or nearly all employees." *In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1219 (N.D. Cal. 2013). For these reasons, the Court finds that Dr. Starr's opinion is not so speculative as to render it inadmissible.

### c.  Plaintiffs' *Daubert* Motion

Defendants offer expert rebuttal opinions from four experts: Dr. Justin McCrary,[10] Dr. John Johnson,[11] Dr. Celeste Saravia,[12] and Dr. Lauren Stiroh.[13] Their backgrounds and qualifications are described below.

### i.  Defense Experts' Qualifications

Plaintiffs first challenge the qualifications of all four defense experts. They argue that the defense experts testify for a living, have not subjected themselves to peer review, and lack relevant

---

[10] Dr. McCrary was retained by all Defendants. [676] at 3.

[11] Dr. Johnson was retained by all Defendants other than USPI. *Id.* at 4.

[12] Dr. Saravia was retained by USPI only. *Id.* at 5.

[13] Dr. Stiroh was retained by DaVita and Kent Thiry only. *Id.*

education, skill, and training to rebut Dr. Starr's and Dr. Gerhart's opinions. But, besides their many conclusory and rhetorical phrases in their motion (like the above), they provide no analysis for these statements. The only category of opinions that Plaintiffs challenge with specificity is the rebuttal opinions about Defendants' pay systems. To the extent Plaintiffs challenge the defense experts' qualifications as to any other opinion, such an argument is waived. It is well-established that undeveloped and cursory arguments are waived and need not be considered, and that is the case here. *See Dove v. Ind. Dep't of Corr.*, 2026 WL 936133, at *3 (7th Cir. Apr. 7, 2026). Plaintiffs also broadly argue that the defense experts' testimony is not based on relevant studies and ignores and contradicts the relevant literature, but Plaintiffs do not explain what testimony or literature they are referring to, so the Court disregards this argument. *See Draper v. Martin*, 664 F.3d 1110, 1113 n. 5 (7th Cir. 2011) (a court need not consider an undeveloped argument).

On the issue of Defendants' pay systems, Plaintiffs argue that "[g]eneric training in economics is insufficient to qualify an expert to opine on the specific questions at issue in Plaintiffs' experts' opinions: how employer collusion affects worker pay levels, and how employer compensation systems link worker pay levels together through the operation of internal equity and other human resource management practices." [658] at 23. But the Court finds that the defense experts have more than "generic training" in economics. Instead, each has decades of experience and economic training on relevant topics that qualify them to offer their rebuttal opinions regarding the impact of collusion on wages as well as Defendants' compensation systems.

Like Plaintiffs' expert Dr. Starr, defense experts Dr. McCrary and Dr. Johnson are both labor economists. Dr. McCrary holds a Ph.D. in Economics from the University of California, Berkeley and has taught economics at the university level, including courses on labor economics, antitrust, corporations, law and economics, and statistics. [666-6], McCrary Report, ¶ 1. He is currently the Paul J. Evanson Professor at the Law School at Columbia University. *Id.* He has also served on the Board of Editors of the *Journal of Law and Economics* and has been a Faculty Research Associate of the National Bureau of Economic Research since 2012. *Id.* ¶¶ 2, 4. Dr. McCrary has published papers on labor economics, antitrust, and econometric and statistical methodology in leading economic journals such as the *American Economic Review*, the *Review of Economics and Statistics*, the *Journal of Economic Literature*, and the *Journal of Econometrics*. *Id.* ¶ 5. Dr. Johnson holds a Ph.D. in Economics from the Massachusetts Institute of Technology and is the CEO of an economic consulting and financial analysis firm. [666-8], Johnson Report ¶¶ 13, 14. He is currently an Adjunct Professor at the Georgetown University McCourt School of Public Policy and previously served as an Assistant Professor of Economics and Labor and Industrial Relations at the University of Illinois at Urbana-Champaign. *Id.* ¶ 14. Dr. Johnson previously served as an Editor of the *Antitrust Law Journal*. *Id.* ¶ 15. He has published numerous papers and made presentations on topics related to antitrust, class certification, the use of econometrics in litigation, and antitrust damages. *Id.* Dr. Saravia holds a Ph.D. in Economics from the University of California, Berkeley and has expertise in industrial organization, which "is the study of markets and how firms compete." [666-7], Saravia Report, ¶ 1. She is the Co-Head of the antitrust practice of an economic consulting firm. *Id.* at Appendix A. Dr. Saravia previously held the position of lecturer at the University of California, Berkeley, where she taught Industrial Organization and Public Policy and Natural Resource Economics. *Id.* ¶ 1. She has also published on competition issues in energy markets in the *American Economic Review*, and she has contributed to multiple books and treatises on competition issues for the American Bar Association. *Id.* ¶ 2. She previously served as a Vice Chair of the Pricing Conduct and Distribution

14

and Franchising Committees of the American Bar Association's Antitrust Section. *Id.* Dr. Stiroh holds a Ph.D. in Economics from Harvard University and is a Senior Managing Director of an economics consulting firm. [666-10], Stiroh Report, ¶¶ 1, 3. She specializes in the economics of antitrust, intellectual property, and assessing impact and damages. *Id.* at Exhibit 1. Dr. Stiroh has published articles related to antitrust for the American Bar Association. *Id.* She has also presented on a topics including antitrust, class actions, and competition. *Id.* Dr. Stiroh is co-editor and contributing author of *Economic Approaches to Intellectual Property Policy, Litigation and Management*, published in 2005. *Id.*

First, the Court finds that all four experts are qualified to opine on how collusion affects worker pay given their training and expertise. All the defense experts are well-trained in economics, and specifically antitrust and competition principles, which is the relevant expertise they apply to rebut Plaintiffs' experts. Second, Plaintiffs offer little in support of their argument that the defense economists lack the requisite expertise to rebut Dr. Starr's and Dr. Gerhart's opinions about compensation systems, internal equity, and "other human resources management practices." To the extent Plaintiffs are suggesting that the defense experts are unqualified to offer their rebuttal opinions because they are not experts in "human resources management practices," the Court disagrees. Plaintiffs do not explain what opinions they consider fall into the category of "other human resources management practices," and the Court does not find that the defense experts offer rebuttal opinions that fall into this category. "The question we must ask is not whether an expert witness is qualified in general, but whether his 'qualifications provide a foundation for [him] to answer a specific question.'" *Gayton*, 593 F.3d at 617 (quoting *Berry v. City of Detroit,* 25 F.3d 1342, 1351 (6th Cir. 1994)).

The Court has reviewed each of the experts' reports and finds that their opinions about Defendants' compensation systems fall within their expertise as economists.[14] In particular, Dr. McCrary, Dr. Johnson, and Dr. Saravia identify flaws in both Dr. Gerhart's and Dr. Starr's analyses based on their review of the record evidence and the results of their own quantitative analyses. Their rebuttal opinions are rooted in economic and empirical analysis, which are within their respective expertise and experience. Just as Dr. Starr is qualified to opine on economic topics such as internal equity and external equity, and to conduct empirical analysis, so too are Dr. McCrary, Dr. Johnson, and Dr. Saravia. The defense experts are also qualified to opine about how Plaintiffs' experts' opinions about Defendants' compensation systems are inconsistent with record evidence because such rebuttal opinions do not require specialized expertise outside of economics training. Dr. McCrary, Dr. Johnson, and Dr. Saravia point out documentary evidence that contradicts Dr. Starr's and Dr. Gerhart's conclusions based on their own review of the record.

On a final note, Plaintiffs criticize the defense experts for having testified in many prior antitrust cases. The Court notes that other district courts have found that these experts are qualified to give similar opinions on antitrust issues. *See, e.g.*, [676] at 7 n.6 (citing cases where the defense experts have been found to be qualified). However, this point does not undermine their qualifications; it reinforces them. The Court denies Plaintiffs' challenges to the defense experts' qualifications.

---

[14] The Court notes that Dr. Stiroh did not provide a rebuttal opinion regarding Defendants' compensation structures, so this argument does not appear to apply to her.

15

### ii. Defense Experts' Opinion that Defendants' Collusion Was Incapable of Suppressing Class Pay

The defense experts each opine that Defendants lacked the ability to suppress class pay due to the existence of other labor market competitors. Plaintiffs maintain that these opinions have no reliable basis and contradict the relevant research. They further argue that the defense experts made speculative conclusions that "certain subcategories of Class Members could not have been harmed," which, according to Plaintiffs, contradicts the relevant literature and is not based on any reliable empirical test. Plaintiffs contend that these opinions fail to meet any of the factors identified by the Seventh Circuit in *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771 (7th Cir. 2017).

Concerning Plaintiffs' challenge to the defense experts' opinions about Defendants' ability to suppress class pay, the Court disagrees. The defense experts analyze resume data provided by a company called Lightcast as well as record evidence to conclude that Defendants compete with many different employers for senior-level employees.[15] As Defendants point out, the experts on both sides agree that determining a firm's labor market competitors involves analyzing the companies from which it hires employees and the companies that hire its employees. And Defendants provide various published economic sources that "recognize[] that competition with a large number of employers constrains a firm's ability to suppress compensation below competitive levels." *See* [676] at 12 n.18 (citing Robert Pindyck & Daniel Rubinfeld, *Microeconomics* 386–87 (8th ed. 2013); U.S. Department of Treasury, *The State of Labor Market Competition* 3 (2022); Gregor Jarosch et al., *Granular Search, Market Structure, and Wages*, 91 Rev. Econ. Studs. 3569, 3574, 3578 (2024); Dennis Carlton & Jeffrey Perloff, *Modern Industrial Organization* 155 (2015)).

Plaintiffs point to Dr. Starr's opinion that "concluding that Defendants do not have market power based on the employment shares analysis reflects a fundamental misunderstanding of the labor economics literature, which clearly highlights that market power exists even in unconcentrated markets, markets with low mobility, and even in markets with low switching costs." [658] at 25 (quoting [666-4], Starr Rebuttal Report, ¶ 314). Simply because Dr. Starr provides alternative or competing theories from the field of labor economics does not require exclusion—this goes to weight, not admissibility, as this reflects a disagreement amongst experts in the field, not that the defense experts' opinions are baseless. *See Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 589 (7th Cir. 2000) ("That two different experts reach opposing conclusions from the same information does not render their opinions inadmissible."). Defendants have established that the methodology employed by their experts—*i.e.*, evaluating the labor market by analyzing the flow of workers and the existence of competitors—is a reliable methodology in the field of economics.

Plaintiffs also challenge the defense experts' opinions that certain categories of proposed class members could not have been harmed. In one broad stroke, Plaintiffs maintain that these opinions are speculative, contradict the relevant literature, and are not supported by any reliable empirical test. The Court disagrees. The Court notes that Plaintiffs group all four expert opinions together and make sweeping arguments about the opinions. As a result, this argument is largely conclusory and does not provide a clear account of which opinions should be rejected and on which

---

[15] The Court addresses Plaintiffs' challenges to the Lightcast data in more detail below.

grounds. For example, Plaintiffs argue that the defense experts "perform no reliable empirical tests." [658] at 25. But this ignores the fact that both Dr. McCrary and Dr. Saravia conducted quantitative analyses in support of their opinions. And to the extent the defense experts do not conduct quantitative analyses to support all their conclusions, as rebuttal experts, they are not required to do so. "The proper function of rebuttal evidence is to contradict, impeach or defuse the impact of the evidence offered by an adverse party." *United States v. Grintjes*, 237 F.3d 876, 879 (7th Cir. 2001) (cleaned up). Thus, an expert witness "often need not replicate data or develop new data to offer rebuttal opinions about the gaps in method or data that another Rule 702 witness employs." *Forest River, Inc. v. inTech Trailers, Inc.*, 2023 WL 6938148, at *4 (N.D. Ind. Oct. 20, 2023); *see also Owens v. Nat'l Collegiate Athletic Ass'n*, 2022 WL 2967479, at *15 (N.D. Ill. July 27, 2022) (rebuttal expert "is not required to provide an alternative calculation of damages when challenging the reliability of the opinions offered by an opposing expert" (citation omitted)). Indeed, the Seventh Circuit has "expressly rejected the notion that hands-on testing is an absolute prerequisite to the admission of expert testimony." *Anderson v. Raymond Corp.*, 61 F.4th 505, 510 (7th Cir. 2023). Here, the challenged opinions of the defense experts serve to rebut and identify the flaws in Dr. Starr's and Dr. Gerhart's analyses, and the defense experts' opinions are not inadmissible simply because they did not conduct their own quantitative analyses.

Plaintiffs identify additional factors highlighted in *Gopalratnam* to argue that the challenged opinions are unreliable. The Court does not agree that any of the opinions fail under *Gopalratnam*. Again, many of the arguments are broad and undeveloped, so the Court only addresses those that have been sufficiently argued. *See Beard v. Whitley Cnty. REMC*, 840 F.2d 405, 408–09 (7th Cir. 1998) ("It is not the obligation of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel." (citation omitted)). First, Plaintiffs argue that the defense experts ignore relevant research, including two studies measuring the effects of no-poach agreements in the fast food and technology industries. But this argument goes to the weight of the testimony, not the admissibility, and Plaintiffs will be free to "cross-examine [the experts] on [their] review of the literature." *Sec. & Exch. Comm'n v. SBB Rsch. Grp., LLC*, 2024 WL 4894315, at *7 (N.D. Ill. Nov. 26, 2024), *reconsideration denied,* 2025 WL 1042822 (N.D. Ill. Apr. 8, 2025). Second, Plaintiffs also argue that the defense expert opinions are based on the faulty premise that the labor markets for the proposed class "work in a manner akin to perfect competition." [658] at 28. But as far as the Court can tell, none of the opinions offered by the defense experts rely on this assumption, and as Plaintiffs themselves highlight, the defense experts acknowledge that there are frictions within labor markets. *See id.* Third, Plaintiffs further assert that the defense experts ignore "obvious alternative explanations" for their conclusions, and they specifically challenge Dr. Saravia's analysis of the compensation of employees who switched from SCA to USPI. *Id.* at 30–31. But their argument misrepresents the nature of Dr. Saravia's analysis. Plaintiffs maintain that Dr. Saravia "examines certain examples of employee moves between SCA and USPI during the Class Period, and observes that their pay levels did not increase when they moved, contrary to established research showing that employees experience their largest pay increases when they move to a different employer." *Id.* at 31. Plaintiffs critique her conclusion and argue that she "ignores the obvious alternative explanation for the stagnate pay she observes: both the Defendant they left from and the Defendant they moved to were successfully colluding to coordinate and suppress their pay structures." *Id.* But as Defendants point out, Dr. Saravia only evaluated job changes that took place outside of the conduct period. [666-7], Saravia Report, ¶¶ 285, 288. Thus, Plaintiffs critique is inapt, since "the alleged conspiracy could not be an 'obvious alternative explanation' for the lack of pay increases

[Dr.] Saravia found." [676] at 20. Plaintiffs also suggest that the defense experts observe a "lack of mobility" for the proposed class members but fail to consider the obvious alternative explanation that "Defendants wielded a substantial amount of power over the pay of their workers, before, during, and after their collusion, consistent with other employers in the health care industry." [658] at 30. But as Defendants point out, their experts observed the opposite of a "lack of mobility." Rather, "they observed *widespread* mobility to non-Defendant employers[.]" [676] at 19. Plaintiffs' criticism is therefore without merit.

Finally, Plaintiffs also challenge the defense experts for not conducting their own relevant research independent of this litigation. But the defense experts did not have to conduct their own studies for the sole purpose of the litigation and could rely on the studies of others. *See, e.g.*, *Anderson*, 61 F.4th at 510 (reversing exclusion of expert and rejecting the argument that the expert's failure to conduct his own tests precludes his testimony). In summary, the Court does not find that any of the opinions of the defense experts should be excluded as unreliable on the grounds raised by Plaintiffs.

### iii. Defense Experts' Use of the Lightcast Data

Each of the defense experts relies on data provided by Lightcast, a third-party company. Lightcast "is a proprietary data provider that has constructed a structured database of job histories based on resumes posted to online resume websites." [666-7], Saravia Report, ¶ 6. Using this data, the defense experts analyzed the job movements of people with the same job levels as those in the proposed class. They opine that Defendants' ability to suppress compensation was constrained because the data shows that senior employees are hired from many non-Defendant employers and leave for many different employment opportunities beyond Defendants. Plaintiffs argue that these opinions should be excluded as unreliable because the experts did not authenticate or verify the Lightcast data. They also argue that the Lightcast data is inaccurate and unrepresentative.

As a threshold matter, an opinion is not unreliable simply because an expert relies on data supplied by a third party. *See, e.g.*, *NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 789 (7th Cir. 2000) (finding the expert's testimony based on third-party soil data to be "perfectly admissible"). When addressing challenges to an expert's underlying data, the Seventh Circuit has "distinguished between Rule 702 challenges to the reliability of an expert's *methodology* and the reliability of an expert's *conclusion*." *Gilbert v. Lands' End, Inc.*, 158 F.4th 839, 849 (7th Cir. 2025). Pursuant to Rule 702, expert testimony must be based on "sufficient facts or data." Fed. R. Evid. 702(b). However, an expert need not rely on "a complete and flaw-free set of data" to form an admissible opinion. *See United States v. Mikos*, 539 F.3d 706, 711 (7th Cir. 2008). District courts can usurp the role of the jury if they unduly scrutinize the quality of an expert's data and conclusions rather than the reliability of the methodology the expert employed. *Gilbert*, 158 F.4th at 849. "The line between data quality and methodological reliability" is not always clear. *Id.* This is because "conclusions and methodology are not entirely distinct from one another." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). When a party challenges the quality of the data on a *Daubert* motion, courts in this district analyze various factors, including whether the data is the type of data relied on by experts in the field, whether the experts independently verified the data, and whether the data was collected in a method consistent with the expert's field. *See, e.g.*, *United States v. Gardner*, 211 F.3d 1049, 1054 (7th Cir. 2000); *Newman ex rel. Newman v. McNeil Consumer Healthcare*, 2013 WL 4460011, at *8 (N.D. Ill. Mar. 29, 2013); *Zollicoffer v. Gold Standard*

18

*Baking, Inc.*, 335 F.R.D. 126, 148–49 (N.D. Ill. 2020); *Braun Corp. v. Vantage Mobility Int'l, LLC*, 2010 WL 5287484, at *6–7 (N.D. Ind. June 21, 2010), *report and recommendation adopted,* 2010 WL 5279974 (N.D. Ind. Dec. 17, 2010); *Lyman v. St. Jude Med. S.C., Inc.*, 580 F. Supp. 2d 719, 726–27 (E.D. Wis. 2008).

With this framework in mind, the Court finds that the expert opinions based on the Lightcast data are admissible. Although none of the defense experts had access to the underlying resumes, Dr. McCrary and Dr. Stiroh took certain steps to verify the data. For example, both experts checked the data against other record evidence in this case. *See* [683-11], McCrary Deposition, at 227:4–14; [683-10], Stiroh Deposition, at 59:13–60:14. Dr. McCrary also double-checked Lightcast's deduplication efforts and confirmed that duplication issues occurred rarely in the data. [660-22], McCrary Deposition, at 236:9–237:5. This case is therefore unlike those cases where the expert did nothing to verify the data. *Cf. King-Ind. Forge, Inc. v. Millennium Forge, Inc.*, 2009 WL 3187685, at *2 (S.D. Ind. Sept. 29, 2009); *Braun*, 2010 WL 5287484, *6–7; *Lyman*, 580 F. Supp. 2d at 726–27. The Court credits Dr. McCrary's testimony that "the way in which [he] went about informing [himself] as to the contours of this particular data collection is what [he] would normally do," and that he analyzed the data "exactly how academics analyze data." [660-22], McCrary Deposition, at 238:7–10, 20–24. Dr. McCrary also explained that he is "comfortable relying upon datasets such as Lightcast in the same way that [he] would in an academic publication." *Id.* at 299:9–11.

In addition, each of the defense experts either testified or noted in their reports that Lightcast data has been relied on by economists or academics. *See, e.g.*, [666-7], Saravia Report, ¶ 92 ("Lightcast data is commonly used by academic researchers to study labor market issues and underpins numerous peer-reviewed articles in leading economics journals."); [660-22], McCrary Deposition, at 299:16–19 ("I'm happy to tell you that I consider this to be a reliable dataset upon which academics would draw and I have observed academics drawing upon."); [683-9], Saravia Deposition, at 103:22–24 (testifying that Lightcast "is used in academic papers and in many industries"); [683-8], Johnson Deposition, at 244:15–20 ("I'm aware that there are studies that try to look at job vacancy and the like and I'm aware of different studies that use Lightcast data."); [710-17], Stiroh Deposition, at 125:7–22 (testifying that "Lightcast data is used by other economists" and used in research). It is significant that *four* experts here support the use of Lightcast data. The Court credits this testimony and finds the experts' assertions that academics rely on Lightcast data persuasive. *See United States v. Gardner*, 211 F.3d 1049, 1054 (7th Cir. 2000).

Although none of the defense experts provided specific examples of economists using Lightcast data to evaluate labor market concentration, Defendants submitted various sources in opposition to Plaintiffs' motion. The Court has reviewed the sources and finds that most are not comparable because they involve other industries, different economic topics, or different Lightcast data. However, there are two sources provided by Defendants that demonstrate that Lightcast resume data has been used by economists to evaluate labor market concentration or employment flow. *See* E. Mark Curtis, Layla O'Kane & R. Jisung Park, "Workers and the Green-Energy Transition: Evidence from 300 Million Job Transitions" 5 *Env'tal & Energy Pol'y & Econ.* 127 (2024); Gregor Schubert, Anna Stansbury & Bledi Taska, "Employer Concentration and Outside Options" (2024), https://ssrn.com/abstract=3599454. It does not appear that either of these sources is peer-reviewed, but the Court finds that these sources support the defense experts' position that

other academics have relied on this data. The Court also finds instructive that Plaintiffs' *own* expert, Dr. Starr, cites sources in his report that analyze other data sets from Lightcast data.[16]

Although the Court finds that Defendants have met their burden in establishing that the opinions based on the Lightcast data are reliable, some of Plaintiffs' criticisms are well taken. None of the experts had access to the underlying resumes or were involved in the data collection process. The verification of the data the experts did do was enough to cross the admissibility threshold, but still gives the Court some pause that the experts are not that familiar with the underlying data. *See, e.g.*, [660-20], Saravia Deposition, at 103:5–16 (testifying that her team did not receive the underlying resumes from which the dataset was created); [660-21], Stiroh Deposition, at 61:15–18 (testifying that she did not receive copies of the actual resumes). The academic sources referenced above that use the Lightcast data are also not peer-reviewed. *C.f. Newman*, 2013 WL 4460011, at *8 (finding testimony based on unpublished data reliable when the data formed the basis of several peer-reviewed and published reports). There were other flaws identified in the data, such as the same companies being coded as different employers,[17] and valid arguments that the data could be unrepresentative, since it is limited to only data that was posted and found online, all of which go to the amount of weight to give to the Lightcast opinions. The Court will evaluate the evidence accordingly in light of these concerns and give it the appropriate weight.

### iv. Defense Experts' Treatment of Class Pay Data

In addition to the Lightcast data, the defense experts also rely on Defendants' own pay data in forming their opinions. Plaintiffs maintain that the defense experts "improperly manipulate, change, and ignore large swaths" of this data. This argument is meritless, and the Court sees no grounds for excluding the defense experts' opinions that rely on this data based on Plaintiffs' challenge. Plaintiffs first take issue with how Dr. McCrary, Dr. Johnson, and Dr. Saravia address issues in the pay data that was produced by USPI, which under-recorded the number of hours certain employees worked in 2005 and 2006. These defense experts and Plaintiffs' expert Dr. Starr have both provided a different solution to address the issues with the data. In reviewing how the defense experts propose to address the data issue, the Court does not find that any of their proposed solutions is so outlandish as to render their opinions unreliable, and each method produces similar results. *See* [666-4], Starr Rebuttal Report, ¶ 98, Figure 3. Dr. McCrary and Dr. Saravia proposed using the employees' scheduled hours for weeks the employee worked, while Dr. Johnson assigned a figure of 40 hours a week to full-time employees only for paychecks actually received. *See* [666-6], McCrary Report, Appendix D ¶ 5; [666-7], Saravia Report, ¶ 215 n.338; [666-8], Johnson Report, ¶ 136. Dr. Starr disagrees with their approaches, but that does not render their opinions on how Dr. Starr should account for the data as unreliable. Plaintiffs will be free to cross-examine the experts on their proposed methods, just as Defendants will do the same with Dr. Starr.

---

[16] In a footnote, Plaintiffs argue, without further explanation, that "Defendants' failure to produce the Lightcast data during fact discovery is an independent reason for excluding it." [658] at 32 n.133. The time to raise discovery concerns was during expert discovery with the magistrate judge, which they did not do, and those arguments are now untimely.

[17] In her report. Dr. Stiroh also notes that the title "Medical Director" appears to be overrepresented in the Lightcast data when compared to DaVita's data. [660-10] at 16 n.63.

### v. Defense Experts' Evaluation of Defendants' Pay Structures

Plaintiffs' final section of their brief has a heading titled, "Defendants' Consultants Perform No Reliable Evaluation of Defendants' Pay Structures." [658] at 43. The argument is also largely undeveloped and conclusory. Plaintiffs assert that the defense experts have "total ignorance of the subject," "ignore Dr. Starr's reliable methods," and ignore evidence contrary to their opinions. *Id.* at 43, 44. After reviewing the opinions, the Court finds that all of Plaintiffs' criticisms go to weight, not admissibility. Plaintiffs' argument that the experts have "total ignorance of the subject" mischaracterizes the opinions. Plaintiffs suggest that "Dr. Saravia, Dr. Johnson, and Dr. McCrary all assert that overlapping pay bands are inconsistent with pay structures." *Id.* at 43. But those experts don't opine that overlapping pay bands are inconsistent with the existence of a pay structure in general; rather, they argue that overlapping pay bands are inconsistent with a pay structure that would result in classwide impact. Plaintiffs' additional arguments that certain tests Dr. Johnson and Dr. Saravia performed to rebut Dr. Starr's wage correlations are "rigged mathematically" and that the defense experts ignored Dr. Starr's methods and evidence contrary to their opinions go to the weight of the evidence, not to admissibility. The arguments amount to a classic "battle of the experts," which requires "the factfinder to determine what weight and credibility to give the testimony of each expert." *Gicla v. United States*, 572 F.3d 407, 414 (7th Cir. 2009). They are not grounds for excluding the defense experts' opinions.

Overall, except for the arguments about the Lightcast data, Plaintiff's *Daubert* motion are full of rhetoric, conclusory statements, and undeveloped arguments that do not grapple with Defendant's experts' actual qualifications or opinions. Plaintiffs also constantly bolster their own experts to demonstrate their superiority in an effort to undermine Defendant's experts; none of those arguments are relevant in a *Daubert* analysis and go towards weight, not admissibility.

## II.     Class Certification Motion

### a.   Legal Standard

Plaintiffs bear the burden of showing that a proposed class satisfies the Rule 23 requirements by a preponderance of the evidence. *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012).. To certify a class, Plaintiffs must satisfy the requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation—and one of the Rule 23(b) subsections. *Kleen Prods. LLC v. Int'l Paper Co.*, 831 F.3d 919, 923 (7th Cir. 2016). As Rule 23 "does not set forth a mere pleading standard," plaintiffs must "satisfy through evidentiary proof" each of Rule 23's elements. *Comcast*, 569 U.S. at 33. "[T]he court must satisfy itself with a 'rigorous analysis' that the prerequisites of certification are met, even if that analysis has 'some overlap with the merits of the plaintiff's underlying claim.'" *Dancel v. Groupon, Inc.*, 949 F.3d 999, 1005 (7th Cir. 2019) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011)). But "[i]n conducting [the Rule 23] analysis, the court should not turn the class certification proceedings into a dress rehearsal for trial on the merits." *Messner*, 669 F.3d at 811; *Dancel*, 949 F.3d at 1005 (the class analysis involves "a peek at the merits that is limited to those aspects of the merits that affect the decisions essential under Rule 23" (cleaned up)).

For Rule 23(b)(3), which is the applicable subsection here, "[p]redominance is satisfied when common questions represent a significant aspect of a case and can be resolved for all

members of a class in a single adjudication." *Kleen Prods.*, 831 F.3d at 925 (cleaned up). In analyzing predominance, courts give careful scrutiny to the relation between common and individuals questions. *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). "An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." *Id.* (cleaned up). The Supreme Court has noted that the predominance standard for Rule 23(b)(3) is "more demanding" than the commonality requirement of Rule 23(a). *Comcast*, 569 U.S. at 34. In evaluating class certification, district courts have broad discretion in determining whether a proposed class satisfies Rule 23. *Jacks v. DirectSat USA, LLC*, 118 F.4th 888, 894 (7th Cir. 2024).

### b. *Per Se* Standard

Plaintiffs rely exclusively on the *per se* method to demonstrate a Section 1 violation of the Sherman Act—that their nature and effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality. *Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 692 (1978). "Typically only 'horizontal' restraints—restraints 'imposed by agreement between competitors'—qualify as unreasonable *per se*." *Ohio v. Am. Express Co.*, 585 U.S. 529, 540–41 (2018) (quoting *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988)). In denying Defendants' motion to dismiss, the Court determined that the no-poach agreements, which included the no-hire, tell-your-boss, and exchange-of-compensation-information terms, were alleged naked horizontal market allocation agreements, and thus would be evaluated under the *per se* framework. *In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, 630 F. Supp. 3d 968, 988–90 (N.D. Ill. 2022); *see also Deslandes v. McDonald's, USA, LLC*, 81 F.4th 699, 703 (7th Cir. 2023) (naked agreement among competitors to not poach employees could be evaluated as a *per se* case). Nothing has occurred since then to change this conclusion, so the Court will evaluate class certification under the *per se* theory for a Section 1 violation.[18]

### c. Rule 23(a)

Plaintiffs seek to certify the following class:

Employees who worked in positions at the director-level and above in the United States for one or more of the following:

(a) from May 1, 2008 to December 31, 2019 for Surgical Care Affiliates, LLC, SCAI Holdings, LLC, or one of their subsidiary outpatient medical care centers;

(b) from May 1, 2010, to December 31, 2019 for United Surgical Partners Holdings, Inc., United Partners International, Inc., or one of their subsidiary outpatient medical care centers; or

---

[18] In a footnote, Defendants claim once again that the rule of reason should govern the analysis, but their argument is perfunctory, undeveloped, and repetitive of the arguments that were already rejected by the Court.

(c) from May 1, 2008 through December 31, 2019 for DaVita Inc. or one of its subsidiaries.

Defendants do not challenge that the Rule 23(a) requirements are met for this class. The Court also finds that Plaintiffs have met their burden in showing that Rule 23(a) is satisfied, as explained below.

### i. Numerosity

Rule 23(a) requires the class to be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The Seventh Circuit has recognized that "a forty-member class is often regarded as sufficient to meet the numerosity requirement." *Anderson v. Weinert Enters., Inc.*, 986 F.3d 773, 777 (7th Cir. 2021) (citation omitted). Plaintiffs propose a class of 6,096 individuals. This readily meets the numerosity requirements under Rule 23(a).

### ii. Commonality

To demonstrate commonality under Rule 23(a)(2), a plaintiff must show that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). For purposes of Rule 23(a)(2), "even a single common question will do." *Wal-Mart*, 564 U.S. at 359 (cleaned up). "Where an antitrust conspiracy has been alleged, courts have consistently held that the very nature of a conspiracy antitrust action compels a finding that common questions of law and fact exist." *Moehrl v. Nat'l Ass'n of Realtors*, 2023 WL 2683199, at *11 (N.D. Ill. Mar. 29, 2023) (citation omitted). Here, the Court finds that whether Defendants entered into no-poach agreements, whether Defendants agreed to fix wages by exchanging competitively sensitive wage information, whether such conduct should be judged unlawful, and whether the conduct suppressed the proposed class members' compensation are each common questions at the heart of this case.

### iii. Typicality

Rule 23(a)(3) is satisfied if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "As a general matter, a plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Howard v. Cook Cnty. Sheriff's Off.*, 989 F.3d 587, 605 (7th Cir. 2021) (cleaned up). Here, the named Plaintiffs and the proposed class members allege the same antitrust violation—the alleged no-poach agreements between DaVita and SCA and SCA and USPI, respectively—and they have the same theory of impact—wage suppression. This is sufficient to satisfy the typicality requirement.

### iv. Adequacy of Representation

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "This inquiry 'serves to uncover conflicts of interest between named parties and the class they seek to represent.'" *Howard*, 989 F.3d at 609 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997)). In assessing adequacy, the court evaluates "the adequacy of the named plaintiffs as representatives of the proposed class's myriad members, with their differing and separate interests," and "the adequacy of the proposed class

23

counsel." *Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592 (7th Cir. 2011); *see Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992) ("A class is not fairly and adequately represented if class members have antagonistic or conflicting claims.").

The Court finds that the named Plaintiffs have demonstrated they are well-suited to serve as Class Representatives by actively participating in this litigation. The Court also concludes, as the judge who previously presided over this case did, that Interim Co-Lead Class Counsel "have significant experience handling class action litigation, including complex antitrust cases" and "have knowledge of the applicable law, including based on prior success representing workers challenging no-poach agreements." *See* [50] at 6. The Court finds, and Defendants do not dispute, that class counsel is sufficiently qualified to represent the proposed class.

### v. Ascertainability

"Aside from the textual requirements provided for in Rule 23, the Seventh Circuit also requires plaintiffs to prove that the proposed class is ascertainable." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 2024 WL 3509668, at *8 (N.D. Ill. July 22, 2024). A class must be "defined clearly and based on objective criteria." *Mullins v. Direct Digit., LLC*, 795 F.3d 654, 659 (7th Cir. 2015). Plaintiffs identify each of the 6,096 class members based on Defendants' own objective data, so their proposed class "easily satisfies the Seventh Circuit's ascertainability requirement." *Dealer*, 2024 WL 3509668, at *9.

### d. Rule 23(b)(3)

When making the predominance determination under Rule 23(b)(3), the Court begins "with the elements of the underlying cause of action." *Messner*, 669 F.3d at 815 (citation omitted). Here, Plaintiffs bring one Sherman Act claim for violation of Section 1, which requires proof of (1) "a violation of antitrust law,"[19] (2) "individual injury, or impact, caused by that violation," and (3) "measurable damages." *Reed v. Advoc. Health Care*, 268 F.R.D. 573, 581 (N.D. Ill. 2009).

For the reasons explained below, the Court finds that Plaintiffs have not met their burden to show that common issues predominate because they have not demonstrated they have a reliable common method of proving impact or damages. Having excluded Dr. Starr's regression as a means of proving common impact and damages, the Court finds that Plaintiffs' other methods of proving wage suppression through record evidence, economic theory, and expert opinions are insufficient to demonstrate predominance given the diversity of the proposed class members in their skills, job titles, and geographic locations. This is compounded by the fact that the record evidence does not support Plaintiffs' theory about Defendants' compensation structures. As a result, Plaintiffs cannot meet their burden of proof by a preponderance of the evidence that they have a viable method of showing classwide injury with common proof such that it will predominate over individual issues.

---

[19] Defendants do not dispute that common evidence can be used to establish the existence of the alleged antitrust violation and this liability question predominates over any individual questions. *Kleen Prods.*, 831 F.3d at 927 ("Defendants do not contest that the existence of the conspiracy could be (perhaps had to be) proven by evidence common to the class.").

24

### i.    Predominance – Antitrust Impact

The Court begins by describing Plaintiffs' approach to establishing common impact. Plaintiffs offer similar methods of proof as well as a similar theory of impact as the plaintiffs in other no-poach class action cases. *See Broiler Chicken*, 2024 WL 2117359; *Seaman v. Duke Univ.*, 2018 WL 671239 (M.D.N.C. Feb. 1, 2018); *Nitsch v. Dreamworks Animation SKG Inc.*, 315 F.R.D. 270 (N.D. Cal. 2016); *High-Tech*, 985 F. Supp. 2d 1167.

Here, the Court finds it useful to separate Plaintiffs' theory into two major components. First, according to Plaintiffs, the alleged no-poach agreements and sharing of compensation information caused injury in the form of wage suppression. Second, such wage suppression had a widespread impact across the proposed class because employee pay was linked together through each Defendant's compensation structures. Under this theory, there were purportedly class members who were impacted directly (for example, those who would have been proactively recruited but-for Defendants' alleged conduct) and those who were impacted indirectly because their compensation was tied to those who were directly impacted through Defendants' pay structures. This is "a roadmap widely accepted in antitrust class actions that use evidence of general price effects plus evidence of a price structure to conclude that common evidence is capable of showing widespread harm to the class." *High-Tech*, 985 F. Supp. 2d at 1206.

### 1. *Wage Suppression*

To prove that Defendants' alleged conduct had the effect of suppressing wages, Plaintiffs offer Dr. Starr's multiple regression analysis.[20] In antitrust class actions, multiple regressions are a useful tool to establish both common impact and damages. *See, e.g.*, *In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1208, 1211 1226 (N.D. Cal. 2013). A multiple regression is a statistical tool used to "understand the relationship between or among two or more variables." Daniel L. Rubinfeld, Fed. Jud. Ctr., Reference Manual on Scientific Evidence, *Reference Guide on Multiple Regression*, *in* Reference Manual on Scientific Evidence 305 (3d ed. 2011). This type of analysis is useful in "(1) in determining whether a particular effect is present; (2) in measuring the magnitude of a particular effect; and (3) in forecasting what a particular effect would be, but for an intervening event." *Id.* at 306. Multiple regression analysis can be used to demonstrate a "but-for world," that is, a world about what would have occurred without Defendants' alleged conduct.

But as noted above, the Court finds that the regression analysis is inadmissible under *Daubert* because it is not a reliable method for proving impact. Plaintiffs' only remaining methods of proving wage suppression are some record evidence combined with compensation and labor economic theory about this evidence, as explained by their experts. Plaintiffs offer documents to demonstrate (1) the importance of proactive recruitment to Defendants, such as cold calling, and that but-for the alleged conduct, Defendants would have been proactively recruiting one another's employees; (2) that Defendants actually enforced the alleged no-poach agreements; (3) that the proposed class members were deprived of opportunities to either gain more lucrative employment or to leverage the offer of a higher paying job to negotiate higher pay at their current jobs, and

---

[20] As explained below, the regression analysis is offered to prove both impact and damages.

(4) that Defendants viewed each other as labor market competitors.[21] In asserting these positions, Plaintiffs also rely on the opinions of Dr. Gerhart and Dr. Starr to opine, based on economic and compensation theory, how this alleged conduct leads to wage suppression. To be clear, Plaintiffs seek to show that because simply three companies had agreements not to compete with each other for labor, wages were suppressed at all three places for senior-level employees, and that can be shown through common evidence that applies to all class members and predominates.

This Court finds that Plaintiffs method of proof "falls far short of satisfying plaintiffs' legal burden to establish a means of demonstrating by common proof that the members of the putative class were injured." *Reed*, 268 F.R.D. at 593. This is particularly so because the proposed class consists of diverse groups of senior employees who operated in different labor markets and had different employment opportunities. In other words, in the absence of a regression, individualized proof would be necessary to show the impact on individual class members, who have different employment options based on title, skills, and geography, which would affect whether their individual wages were actually suppressed at their company.

This is not to say that a but-for regression analysis is necessary to prove impact; the Seventh Circuit has specifically held that is not necessary. In *Kleen Products*, the parties "jousted over the need for some kind of 'but-for' analysis, by which Defendants mean an expert construction of a hypothetical market free of any anticompetitive restraint, to which the actual market can be compared." 831 F.3d at 927. The Seventh Circuit commented that such a method "might be one way in which a plaintiff could satisfy its burden," but such a formulation was "too narrow." *Id.* Rather, the essential question was "whether the class [could] point to common proof that will establish antitrust injury . . . on a classwide basis." *Id.* But even in light of this, without the regression, the Court concludes that Plaintiffs have failed to meet their burden in this case.

In the context of determining wage suppression, whether there are alternative employers and labor market mobility is relevant to determining whether there is common method to show wage suppression and to what extent. In the absence of Dr. Starr's wage regression, individual issues predominate on this topic, since the proposed class includes multiple different types of employees who had different employer opportunities and were hired in different geographic markets. Defendants operated nationwide with headquarters in different geographic regions—DaVita in Denver, SCA in Birmingham, and USP in Dallas[22]—and thus the proposed class members were susceptible to different labor conditions in different geographic markets. The proposed class consists of employees who worked in positions at the director-level and above in the United States, including directors, vice presidents and senior vice presidents. These senior executives held a variety of roles in information technology, marketing and communications, accounting and tax, clinical and research, and other business operations roles. [666-6], McCrary Report, ¶ 42. There are proposed class members with approximately 400 different job titles at

---

[21] Plaintiffs also offer record evidence regarding Defendants' compensation systems, which is addressed later in this opinion.

[22] SCA operated more than 230 outpatient medical centers and surgical facilities nationwide and employed approximately 10,000 individuals. USPI operates ambulatory surgery centers nationwide and had over 21,000 employees. DaVita also owned and operated outpatient medical centers across the United States. *See* [555].

DaVita, 150 job titles at SCA, and 40 job titles at USPI. [666-8], Johnson Report, ¶ 24. According to Defendants' online job descriptions and online job postings, the education, skill, and experience required for the various titles of the proposed class differed. *See* [666-6], McCrary Report, ¶ 55. This is true even for positions at the same seniority level and in the same specialty area (such as information technology). *See id.* ¶ 56. Thus, they were not a fairly homogeneous group of employees all doing the same or similar functions in the same general industry.

This is supported by the evidence offered by Defendants and unrebutted by Plaintiffs. For example, Bridie Fanning, former Chief Talent Officer for SCA, testified that SCA used recruiting firms to find candidates, and there was a list with 400 or 500 target companies. [683-23], Fanning Deposition, at 30:16–33:2. A 2015 email from Fanning contains a "Companies for SCA to Recruit from" presentation, which lists of hundreds of companies. [683-63]. These companies include other health care systems and investment banks, such as BMO Harris and JP Morgan. Similarly, Mark Garvin, former Chief Operating Officer for USPI, testified that UPSI's labor competitors include "health systems," "ambulatory surgery center companies," "private equity firms employing physician practice management," and "a host of multi-state, multi-site business operators, healthcare or not." [683-24], Garvin Deposition, at 195:14–196:2. An external recruiter for USPI testified that different roles would have a different geographic scope. [683-44], Tanner Deposition, at 61:5–8. Mike Staffieri, former Chief Operating Officer of DaVita, testified that DaVita has "hundreds and hundreds of job titles," and there are some positions where DaVita values prior experience in DaVita's industry, while there are other categories of employees where there is no value placed on prior experience in the industry. [683-43], Staffieri Deposition, at 118:5–21; 119:5–9. And a 2016 report from a recruiting firm for DaVita shows possible candidates for a senior-level position from multiple industries (including companies like Wal-Mart and McKesson). [683-75]. The named Plaintiffs' situation is also relevant here. Plaintiff Spralding, based in Birmingham, was an IT and product management executive, who came from the financial services industry to SCA and then left SCA to return to that industry at Bank of America. Plaintiff Keech, based in San Francisco, was a business executive in the healthcare industry. He came to SCA from Kaiser Permanente (not one of the defendants here) and then returned to that healthcare system when he left SCA.

Defendants' expert Dr. McCrary further shows how individual issues would predominate given the differences across the proposed class. Proposed class members were subject to different distinct labor markets based on their titles and skills. Using defendants' pay data, Dr. McCrary found that differences in pay across seniority levels, specialty area, and shows that there are varying competitive pressures that Defendants must consider when setting pay for the proposed class members. [666-6], McCrary Report, ¶¶ 60–62, Exhibits 8–10. The Lightcast data is relevant here, too—it shows that most common prior and next employers for individuals in class positions vary by specialty area.[23] *See id.* ¶ 43. It also shows that the percentage of individuals in class positions who moved to or from an employer in the same or different industries varies by specialty as well. *See id.* ¶ 44. Dr. McCray found that 98.9% of proposed class members joined a Defendant from a non-Defendant employer. Further, only 1.2% of proposed class members who left a

---

[23] Employees from these three defendant companies left to work at numerous other health care systems (Tenet, HCA, Banner), university-based health care systems (University of California, UCHealth), dental centers (American Dental Partners), and even Amazon, showing that there were numerous competitors and employment options for senior-level directors, vice-presidents, and other similar positions.

Defendant went to another Defendant and only 1.1% of proposed class members joined a Defendant from another Defendant. *See id.* ¶ 38.

Because the proposed class has such varying job titles, spread across the country, and with so many competitors, any evaluation of wage suppression would require an assessment of each individual employee's situation to determine whether they suffered any wage suppression as a result of a no-poach agreement among just three companies.

To be clear, the Court is not deciding whether market power or market definition is necessary to establish antitrust impact in a *per se* case. The parties vigorously dispute this issue. The Court notes that the Seventh Circuit case law instructs that Plaintiffs do no need to prove market power or a market definition to prove a violation of the Sherman Act in a *per se* case. In *Deslandes*, the Seventh Circuit noted that a showing of market power is not necessary in a *per se* case, but generally market power and definition are required in a rule of reason claim to determine whether the challenged conduct is an unreasonable restraint on competition. 81 F.4th at 703 ("The complaint alleges a horizontal restraint, and market power is not essential to antitrust claims involving naked agreements among competitors."); *see also Agnew*, 683 F.3d at 336 ("Under the per se framework, a restraint is deemed unreasonable without any inquiry into the market context in which the restraint operates."). *But see Republic Tobacco v. N. Atl. Trading Co.*, 381 F.3d 717, 737 (7th Cir. 2004) (suggesting that a market power showing may be necessary in certain cases). This is generally the law in other circuits as well. *See, e.g.*, *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 974 n.6 (9th Cir. 2023) ("We apply *per se* rules (*e.g.*, the prohibition against price-fixing) without inquiring into market power."); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 316 (3d Cir. 2010) ("Under the per se standard, plaintiffs are relieved of the obligation to define a market and prove market power.").

That being said, the Seventh Circuit cases also instruct that examining the market can be helpful in assessing predominance under Rule 23(b)(3). In *Arandell Corp. v. Xcel Energy Inc.*, 149 F.4th 883 (7th Cir. 2025), the Seventh Circuit evaluated the issue of market definition in a *per se* case when assessing whether predominance exists for antitrust impact with a proposed nationwide class. Note, this was not in the context of assessing the merits of a Section 1 claim, but rather in evaluating Rule 23(b)(3)'s predominance requirement. In that case, the plaintiffs alleged a conspiracy to fix gas prices amongst gas companies. *Id.* at 886. The plaintiffs' experts concluded that the market was national in scope and that "manipulated prices tended to move together across the country, so that price manipulations by defendants in, say, Louisiana or Texas affected the prices plaintiffs paid for natural gas in Wisconsin." *Id.* at 894. However the defendants' experts "raise[d] a host of issues with the methods and conclusions of the plaintiffs' experts," including the "variety of ways in which natural gas is sold and priced," "the differing lengths of time for which parties would agree on pricing," and "anomalies in the data indicating that prices did not actually move as predicted by plaintiffs' experts' model." *Id.* at 894–95. The defendants maintained that these flaws "undermine[d] the foundation for the [plaintiffs' experts'] model, namely, a national market in natural gas" and meant the case would "require so much individualized evidence that the district court should not have certified the class." *Id.* at 895. The Seventh Circuit reversed the district court's class certification order and instructed the district court "to engage with these debates and make findings of fact, ultimately, as to whether plaintiffs have shown the existence of a national market in which defendants' manipulations of prices affected the prices plaintiff class members paid for the natural gas in Wisconsin." *Id.* The court reasoned that the "[h]igher fixed

28

prices [were] the result of the illegal conduct," so "the question of antitrust impact [was] primarily an issue of causation and the scope of the geographic market." *Id.* at 887.

The Court need not delve into whether antitrust law requires a showing of market power or market definition to prove a per se case in this case—Seventh Circuit precedent dictates that it is generally unnecessary. But, for purposes of assessing class certification when evaluating classwide wage suppression under the predominance standard under the facts of this case, the Court does find that an assessment of competitors, employment opportunities, and geographic restrictions are important here in understanding whether there are individualized factors that would result in defeating predominance. Put another way, this is not an issue of law, but rather part of the Court's role in conducting a rigorous analysis in assessing the facts to determine whether there is a common method to address antitrust impact that would result in predominance over the individualized issues. To be even more clear, the Court is not suggesting that this analysis is needed for every *per se* antitrust case, or even every no-poach agreement case. Rather, with this particular proposed class, and consistent with *Arandell*, the Court finds that an analysis of who these employees are, what they do, where they live and work, and what employment opportunities they have is necessary to evaluate whether the predominance standard is satisfied.

As noted above, Defendants offer record evidence that suggests that the proposed class members operated in different labor markets, with different job titles, skills, opportunities, and competitors. Viewed in this light, Plaintiffs' experts' qualitative opinions about how there is wage suppression that can be assessed for the putative class in a common way simply because there is no cold-calling or recruiting among just these three defendant companies are unpersuasive in light of these individualized issues and the presence of numerous competitors in different industries. All of this demonstrates that the individual issues predominate over the common ones, and combined with the exclusion of the multiple regression analyses, demonstrates that Plaintiffs have not met their burden to show predominance over the individualized issues.

### 2. *Classwide Impact*

Turning next to classwide impact, Plaintiffs assert that their theory "centers on the absence of unrestricted job mobility that, in a competitive market, would lead to upward pay adjustments throughout the company (due to structured pay systems), *and* systemic preemptive pay increases . . . . In short, *the lack of proactive upward pay adjustments* to the compensation structure forms the foundation of Plaintiffs' theory of harm." [731] at 17–18. The problem with Plaintiffs' theory is that they have not demonstrated that classwide impact is susceptible to common proof because their assertions about Defendants' compensation structures are unsupported by the record evidence.

Recall that Plaintiffs' theory of widespread impact is that all proposed class members would be impacted by wage suppression, even if they were not directly impacted by Defendants' conduct, because Defendants' compensation structures linked pay across job titles.[24] They

---

[24] As noted above, Plaintiffs also offer multiple types of statistical tests conducted by Dr. Starr which purport to show that all or nearly all the proposed class members experienced wage suppression. But these analyses are all based on the main regression, which the Court has excluded as an unreliable method to establish impact and damages. *See* Starr Report, ¶¶ 138–42 (explaining that the methods of demonstrating common impact are based on or use similar regression models to the main regression). So the Court finds they are

maintain that they can prove the existence of those pay structures with common evidence, in the form of documentary and testimonial evidence and Dr. Gerhart's and Dr. Starr's expert opinions. In the absence of such compensation structures, individual issues would surely predominate on the issue of impact, since the issue of whether an individual class member was impacted would require individual proof.

Plaintiffs maintain, consistent with the theories advanced by the plaintiffs in other no-poach class actions, that each Defendant had formal compensation systems that incorporated the concept of internal equity. Internal equity is the idea that "similarly situated employees should be compensated similarly." *High-Tech*, 985 F. Supp. 2d at 1192. Plaintiffs also claim that Defendants incorporated principles of external equity, which in general refers to the idea that there should be fairness in how similar jobs at different companies are paid. Thus, according to Plaintiffs, all proposed class members experienced wage suppression, even if they were not directly impacted by the alleged agreements because Defendants maintained formal compensation structures that "prioritized internal and external equity, and thereby linked employee pay." [731] at 17. As alleged in the operative complaint, Plaintiffs assert that "Defendants, like other sophisticated companies, maintained internal compensation systems and developed compensation structures that preserved relatively stable relationships between the pay of their employees. The effect of such systems is that an adjustment to the pay of some employees will lead to adjustments to the pay structure as a whole, affecting the pay of all employees." [555] Third Amended Complaint ¶ 74. To show common evidence of Defendants' compensation systems, Plaintiffs offer the following categories of evidence: (1) record evidence, including emails and deposition testimony; (2) Dr. Gerhart's qualitative analysis of the record evidence; (3) Dr. Starr's qualitative analysis of the record evidence as well as (4) Dr. Starr's quantitative analysis to demonstrate that Defendants had structured compensation systems.

All three corporate Defendants vigorously dispute that they maintained structured compensation systems that were capable of transmitting widespread harm during the class period. Plaintiffs respond that such an argument is "not tailored to the predominance analysis," citing *Broiler Chicken* in support their argument. [731] at 8. In *Broiler Chicken*, the Court rejected a similar argument advanced by the defendants in that case, reasoning that whether the plaintiffs could establish that the defendants maintained certain pay structures could be resolved with common evidence. The court noted that the question for class certification was whether such an issue was susceptible to classwide proof, not whether the issue would be resolved in the plaintiffs' favor. 2024 WL 2117359, at *27. According to the district court, the defendant's argument actually bolstered the plaintiffs' predominance showing, reasoning that "[the defendant] may be correct, for example, that this is not a nationwide market or that there is no pay structure. If accepted by a trier of fact, these arguments concerning Plaintiffs' impact showing would likely defeat Plaintiffs' claim, but they would not require individualized inquiry. They would defeat the claim with evidence common to the class." *Id.* The court, quoting a Tenth Circuit decision, concluded that the defendant alleged a "fatal similarity—[an alleged] failure of proof as to an element of the [P]laintiffs' cause of action," meaning that if a trier of fact did not find the plaintiffs' evidence

---

not viable methods to show common impact. Having said that, the Court would reach the same conclusion on classwide impact regardless of the Court's decision on the *Daubert* motions for the reasons identified in this opinion.

persuasive, their claim would fail. *Id.* (quoting *Black v. Occidental Petroleum Corp.*, 69 F.4th 1161, 1179 (10th Cir. 2023)).

But, unfortunately for Plaintiffs, they are not in the Tenth Circuit, but the Seventh. The parties have a factual dispute that bears directly on the propriety of class certification. The Seventh Circuit instructs that the court must "make whatever factual and legal inquiries are necessary to ensure that requirements for class certification are satisfied before deciding whether a class should be certified, even if those considerations overlap the merits of the case." *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815 (7th Cir. 2010). To the extent the analysis overlaps with the merits of Plaintiffs' claim, "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013); *see also Wal-Mart*, 564 U.S. at 351 (noting that the rigorous analysis required of Rule 23(a) will frequently "entail some overlap with the merits of the plaintiff's underlying claim," and that "cannot be helped"); *Comcast*, 569 U.S. at 34 (confirming that the "same analytical principles govern Rule 23(b)" and noting that "[i]f anything, Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)"). Thus, "[i]f there are material factual disputes that bear on the requirements for class certification, the court must 'receive evidence if only by affidavit and resolve the disputes before deciding whether to certify the class.'" *Bell v. PNC Bank, Nat'l Ass'n,* 800 F.3d 360, 377 (7th Cir. 2015) (quoting *Szabo v. Bridgeport Machs., Inc.,* 249 F.3d 672, 676 (7th Cir. 2001)).

The Court has received a voluminous record of evidentiary material in connection with the parties' *Daubert* motions and Plaintiffs' motion for class certification. The Court has reviewed both the emails and deposition testimony that was submitted by Plaintiff in support of the assertion that there are structured compensations systems at the defendant companies. The Court is mindful that it "must walk a balance between evaluating evidence to determine whether a common question exists and predominates, without weighing that evidence to determine whether the plaintiff class will ultimately prevail on the merits." *Id.* "At class certification, the issue is not whether plaintiffs will be able to prove the[] elements [of their claims] on the merits, but only whether their proof will be common for all plaintiffs, win or lose." *In re Allstate Corp. Secs. Litig.*, 966 F.3d 595, 604 (7th Cir. 2020). But, whereas here, defendants have offered "admissible evidence that, if credited, would mean individual questions would predominate over common questions," the Court must "investigate[] the realism" of that evidence. *Arandell*, 149 F.4th at 894 (quoting *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1086 (7th Cir. 2014); *see also Jacks*, 118 F.4th at 896 (finding no reversible error where the district court's consideration of evidence that overlapped with the merits was "necessary to determine whether Plaintiffs met the requirements for class certification"); *Eddlemon v. Bradley Univ.*, 65 F.4th 335, 339 (7th Cir. 2023) (vacating the district court's class certification where its predominance analysis "merely accepted [the plaintiff's] proffered common questions without referring to the common evidence presented to answer those questions"). The Court is confident that it has balanced these considerations and addresses the evidence offered by Plaintiffs and Defendants on the nature of Defendants' compensation systems.

Plaintiffs, as well as their experts, identify various characteristics of Defendants' pay system that they argue support their theory of widespread impact. Plaintiffs' experts assert that Defendants had formal salary ranges or pay bands for employees based on job title and that Defendants make compensation decisions with a focus on internal equity and external equity.

31

Dr. Gerhart and Dr. Starr also emphasize the importance of standardized pay practices where pay is set in reference to other employees. *See, e.g.*, [666-1], Starr Report, ¶ 172 ("Just as a rising tide would lift all boats, a broad negative shock to employee compensation would tend to impact each and every employee whose pay is, in part, set with reference to the pay of those employees whose jobs are most similar to their own."); [666-3], Gerhart Report, ¶ 138 ("The most visible mechanism of suppression is in the case of individual employees who were denied the opportunity to be passive recipients of cold calling by other employers, and the higher pay and advancement opportunities those calls would have provided. However, the suppression effects of the No Poach Agreements go well beyond that, because of the systematic way in which the pay of all employees is connected in companies through their widespread use of standardized principles and practices of employee compensation management.").

After thoroughly reviewing the record evidence offered by both parties, the Court finds that Plaintiffs have not established that Defendants used formal compensation structures, set salary ranges for employees who had similar job titles, or divided job titles into pay bands or ranges by which employees were paid in relation to others. In addition, the record evidence demonstrates that compensation decisions were decentralized and individualized, depending on the geographic location. The record also demonstrates, particularly for DaVita and SCA, that employee performance played a large role in pay decisions. Finally, and most significantly, even though there is some support for the notion that Defendants incorporated internal equity and external equity into their compensation practices, the record evidence does not show that a change in pay for one employee would impact the pay for another employee of a different title.

Given this, the record evidence does not demonstrate by a preponderance of the evidence that the class members can rely on common evidence to establish impact.[25] Put differently, impact will be an individualized question "where 'members of a proposed class will need to present evidence that varies from member to member.'" *Tyson Foods*, 577 U.S. at 453 (quoting 2 W. Rubenstein, Newberg on Class Actions § 4:50, pp. 196–197 (5th ed. 2012)). Class members will have to offer different proof depending on their job titles and their particular circumstances given the discretionary and performance-dependent nature of Defendants' compensation practices. All of this is reflected in the assessment of the evidence below.[26]

### a. DaVita

The record evidence establishes that total compensation at DaVita included base salaries, multiple forms of bonuses, and equity and/or other long-term incentives. *See, e.g.*, [660-45]. As an initial matter, Plaintiffs offer internal emails that, on their face, suggest that DaVita incorporated principles of internal equity into its compensation structure. For example, Michael Staffieri, former

---

[25] The Court finds that Plaintiff has failed to meet its burden on widespread impact by a preponderance of the evidence, regardless of the Court's decision on the *Daubert* motions. That is, the Court would reach the same conclusions here based on the record evidence even if all of Plaintiff's experts' opinions were admissible.

[26] The Court does not address each and every piece of evidence offered by the parties in this opinion, but it summarizes the important aspects of what is reflected by the record. Rest assured, the Court has reviewed all the evidence regarding Defendants' compensation structures and practices submitted with Plaintiffs' motion for class certification as well as the parties' *Daubert* motions.

Chief Operating Officer of DaVita, testified that one of the responsibilities of the People Services group is to monitor pay equity. [675-1], Staffieri Deposition, at 132:13–133:2. According to Staffieri, "pay equity" refers to "a way of ensuring that there is not bias in pay decisions within an organization" and "[p]eople who are doing the same job at the same performance level are paid generally equally regardless of race, gender, other characteristics." *Id.* at 132:19–23. This is consistent with a 2017 email from Staffieri where he discusses not wanting "to get too out of whack with our DVP comp range" when discussing whether to offer more compensation to an employee who, based on the email, appeared to have a competing offer. [675-26]. Staffieri notes that the position is in a location "which probably has the highest wages in the country," so he recommends increasing the offer if appropriate. *Id.* Similarly, in a 2012 email from Kent Thiry, former Chairman and CEO of DaVita, Thiry appears to discuss an upcoming presentation. *See* [660-36]. He writes, "Now when stock way up, we need to maintain equity. If we have 2 citizens,[27] both with salary of $200,000, both with bonus potential of $100,000, and both with same performance and potential. Only diff is one of the people has $100,000 invested equity value this year. Therefore if right comp is $300,000k, one should get $100k bonus, other zero. That is equity." *Id.* at 2. And in another 2012 email, Robert Chipman, who at the time was a People Services Director, sent a compensation analysis for directors compared across different geographic locations and made compensation adjustment recommendations for two directors whose compensation fell "below the median." [660-37]. There are other examples where managers request compensation data, such as average compensation or 25th, 50th, and 75th percentile to use as comparators when making decisions about new hires or compensation increases for current employees. *See, e.g.*, [660-67], [675-20], [675-22].

Although the above documents and testimony provide some support for Plaintiffs, the overwhelming evidence before the Court shows that throughout the class period, DaVita's compensation philosophy strongly emphasized "highly differentiated compensation based on performance." *See* [660-45] at 4. Internal documents routinely emphasized that DaVita is a "pay for performance" company, a philosophy that "directly links monetary reward with individual performance." *See* [660-33] at 3. In a 2011 email, Cynthia Baxter-Diggles, Vice President of People Services, circulated a document titled "2011 Merit Process Manager Talking Points." *See id.* The attachment contained talking points about DaVita's merit increase process for 2011. The document recommended that managers use the merit pool to "reward your highest performers and/or rectify potential pay inequities within your team." *Id.* at 3. However, it also noted that "although a team may be made up of solid performers, *not everyone is guaranteed a merit increase*" and that leaders have to differentiate employee performance based on various factors, including "facility needs, team needs, retention needs and internal equity." *Id.* (emphasis added). A document reflecting "DaVita's Compensation Philosophy" in 2013 explained that "DaVita is a 'Pay for Performance' company," and its compensation philosophy incorporates three key principles, including that "[p]erformance is the first consideration when making pay decisions" and "[c]ompensation is highly differentiated." [660-45] at 4. On the latter point, the document noted that "[t]his means that we believe in, and take action to ensure, highly differentiated compensation based on performance. In fact, DaVita provides more differentiation and long-term financial opportunity than most companies." *Id.* The document further explained, "It is our practice to ensure that there is strong differentiation in pay based on performance. We are committed to top

---

[27] The Court understands that employees were referred to as "citizens" at DaVita.

33

performers earning substantially more." *Id.* at 5. The 2012 email from Thiry referenced previously is not inconsistent with this notion—in his hypothetical, Thiry notes that the two employees have "the same performance." [660-36] at 2.

The record evidence also reflects that DaVita had this compensation philosophy throughout the relevant time period. An attachment to a 2018 email reflected that the "General Principles" of compensation include that as "a person becomes more senior, more compensation is tied in variable compensation/long-term compensation, than fixed compensation/short term annual bonus." [683-78] at 3. It also noted there is a "high degree of customization" which "might mean unique structures for individual groups, or even individual people[.]" *Id.* Such a compensation philosophy, where compensation decisions are tied to individual performance and value is placed on differentiated pay based on performance, is inconsistent with the notion that DaVita's compensation structures caused widespread harm across the class, since such a philosophy would tolerate different pay levels to employees with the same title based on their individual performance.

In his report, Dr. Gerhart explains that "a compensation system that is guided by both pay-for-performance and internal equity principles can still be internally consistent." [666-3], Gerhart Report, ¶ 129. He explains that "[i]n fact, it is impossible for a system to maintain internal equity without paying for performance. Paying employees who perform differently equally is clearly inequitable, because pay should be proportional to an employee's contribution to the enterprise." *Id.* Even if the Court credits his explanation, there are additional gaps in the record evidence before the Court that fails to demonstrate that DaVita had compensation systems that would transmit widespread harm such that the proposed class members can rely on common evidence to prove impact.

The record reflects that in practice, compensation decisions were highly discretionary and depended in part on the particular needs of geographic divisions. Laura Mildenberger, former Chief People Officer, explained that DaVita had twelve to fifteen divisions that were generally defined by geographic region. [683-37], Mildenberger Deposition, at 20:20–21:14. Each division was led by an operating vice president who had "a tremendous amount of latitude to pay what they needed to pay to be successful in their market and to work within" their budgets, and there was a "great deal of latitude on a market-by-market-by market basis[.]" *Id.* at 21:15–22:6. She explained that "the decision-making on compensation was local because [the operating vice presidents] knew their markets" with regard to recruiting and retention. *Id.* at 21:3–11.

The record evidence does not establish that DaVita utilized formal pay ranges or pay bands. *See* [683-78] at 3 ("We don't believe in 'salary bands' or 'pay grades' . . . even though our performance review processes are extensive and in-depth and do correlate to compensation, they do not do so in a formulaic way."). Robert Chipman, former People Services Director and Vice President of Recruiting and Talent Management, testified that when he started at DaVita, they didn't have pay ranges or bands, and he did not have "any tools to be able to understand or know what those pay ranges or bands were, if there were any." [675-3], Chipman Deposition, at 61:3–17. Colleen Arthur, former Senior Director of Compensation & Analytics, also testified that while DaVita had defined pay ranges for clinical field roles (such as registered nurses, social workers, and dieticians), she was not aware of formal pay ranges for any other position. [683-14] at 78:20–79:6. When asked if DaVita had informal pay ranges for other positions, she testified that she could not speak to what individual teams or managers did, but the compensation team did not manage

34

any other pay ranges. *Id.* at 79:7–12. An external compensation consulting firm similarly found that "[p]ay is not formulaic and is based on discretion" at DaVita. [683-55] at 6. The same consultant also reported that there are differences between how salary increases are treated between executives. *See id.* at 7 ("Salaries and merit increases are reviewed annually at Director and below levels," while "[a]t VP and above levels, there are more irregular salary increases and typically in connection with significant increases in job responsibilities[.]").

Plaintiffs also offer emails where the DaVita compensation team is asked for information about what employees in certain roles were paid for comparison with incumbent employees or new hires. *See, e.g.*, [660-37], [660-67], [675-22], [675-27]. However, Colleen Arthur, former Senior Director of Compensation & Analytics, explained at her deposition that "from time to time, [her] team was asked for information around current pay practice, but it was not a formal band." [683-14], Arthur Deposition, at 181:2–7. Rather, it was "an ad hoc request that the team would have received," and "it was not a requirement of recruiters or people services directors to request this information regarding compensation decisions." *Id.* at 187:16–24. Most notably, the record does not demonstrate that compensation was linked across job titles or that DaVita maintained fixed differentials between job titles.

In summary, aside from emails and/or broad testimony that DaVita paid attention to internal equity, the record evidence does not establish that DaVita had structured, uniform compensation systems that link pay within and across jobs. As a result, proof of impact will require an individualized inquiry into a class member's title and job performance as well as the compensation practices of the particular region or division in which the class member was employed.

### b. SCA

Like DaVita, the record evidence demonstrates that SCA offered fixed pay in the form of salaries as well as variable pay in the form of cash bonuses and equity. *See, e.g.*, [660-103] at 4. SCA also maintained a "pay for performance" compensation philosophy. *See id.* Once again, there is some evidence that SCA incorporated principles of internal equity into its compensation practices. *See, e.g.*, [660-42] (discussing where a potential offer falls in the range for the potential employee's position); [660-98] at 3 (noting that the awarding of lump sum salary increases "helps to manage internal equity among members of the team."). Named Plaintiff Scott Keech was subject to a salary cut in 2012 because he was told that his pay was not in line with the internal equity of the organization and that he had to be paid similar to other people in the role. *See* [660-11], Keech Deposition, at 203:1–204:2.

Despite this evidence, the record does not demonstrate that these principles of internal equity were uniformly enforced across the company. Kevin Zaideman, former Director of Compensation, agreed with the notion that prior to 2021, "SCA had absolutely no framework for compensation." [683-48], Zaideman Deposition, at 54:22–55:1. He testified that there were no systems in place prior 2021 to help compensation managers decide what to pay their employees, and that was essentially his job. *Id.* at 55:7–13. According to Zaideman, "Everything came primarily to my email inbox ad hoc." *Id.* at 55:13–14. Bridie Fanning, former Chief Talent Officer, testified that SCA considered or tried to achieve internal equity "[t]o an extent" but noted there "were a lot of people that just negotiated their one-offs at the executive level." [683-23], Fanning Deposition, at 172:23–173:2.

35

In addition, the record evidence fails to establish that SCA used formal pay bands or ranges. In a 2018 email chain, Warren Cinnick, who was at the time Vice President of Human Resources, noted that "at SCA, we have no official published ranges and no unified job grades." [683-61] at 3. In a follow-up email, Jennifer Sandoz, Senior Director of Human Resources, agreed that "we have no unified grades or official pay ranges." *Id.* At his deposition, Cinnick testified that when he joined SCA, there was no discernible salary structure, and a salary structure was not put into place until the beginning of 2021 (after the class period). [710-12], Cinnick Deposition, at 153:20–154:9. This testimony is supported by other contemporaneous documentary evidence. A 2020 "Compensation Framework Alignment and Validation" presentation included a slide titled "Compensation Infrastructure Requires Update" that noted "SCA does not currently have a Job Code Infrastructure Framework" and that "SCA does not have a formal base salary/incentive structure, pay grades, or pay ranges." [683-74] at 5. Other documentary evidence demonstrates that a new pay structure with those features was implemented in 2021, which "includes many best practices in career development, compensation, and pay practices *we have been missing at SCA for the better part of a decade.*" [683-73] at 2 (emphasis added). Bridie Fanning, former Chief Talent Officer, testified that SCA did not have a software system to assist in setting wages and that was it "very much judgmental" and "a human decision." [683-23], Fanning Deposition, at 174:12–18. In addition, the record evidence shows that there was no formal structure for providing merit increases. *See, e.g.*, [683-59] at 2 ("[W]e do not have a traditional merit matrix for the merit process nor do we provide more concrete guidelines around how to determine a merit increase for teammates with successful performance.").

Plaintiffs point to various emails that suggest SCA inherited pay bands from its former parent organization, HealthSouth. However, as Defendants correctly note, other contemporaneous emails show that these pay ranges were not updated or actually utilized by SCA. For example, in 2017, the human resources team became aware that certain employees could view salary ranges in their internal system. *See* [638-68]. In discussing whether to remove those ranges from view, Sandoz notes that they "are not managing these nor have a robust grading system / salary structure so I don't feel like these carry a lot of weight." *Id.* at 4. Wanda McKenny, Senior Human Resources Director, replied, "I've treated those [pay ranges in the computer system] as inaccurate due to the outdated state of our Grades/etc. Does anyone really use the Grades? My vote would be to remove until we can get our hands around a grading process." *Id.* at 2. These emails are further evidence that SCA did not utilize formal pay ranges or bands during the relevant time period. As additional corroboration, when a similar issue apparently occurred again in 2018, Sandoz noted in an email that "the last time the pay ranges were updated was 2010," and she has "[n]o insight into where they came from." [683-65] at 3.

### c.  USPI

Like the other Defendants, the record evidence shows that USPI offered compensation in the form of base salary, equity, and bonuses. As with the other Defendants, there is support in the record that USPI considered principles of internal equity. Andrew Johnston, former Chief Administrative Officer, testified that in making salary increase recommendations, they "looked at pay across like-position at the company so that we knew who was on the high and who was on the low end and that would be a factor in our decisions on increases." [660-13], Johnston Deposition, at 39:21–40:2. Plaintiffs also point to the deposition of Sandi Karrmann, former Chief Human Resources Officer. She testified that USPI took internal equity into account when setting salaries

and that her understanding of internal equity was in part based on performance, the length of time an employee had been in the role, as well as the local market "because different markets pay differently across the country." [660-8], Karrmann Deposition, at 40:3–20. Plaintiffs also point to a 2014 email about salary adjustments, wherein a USPI executive writes that an employee's salary is "under market" and that "as a seasoned professional she should not be making less than all of my new hires." [660-52] at 2.

But as with DaVita and SCA, Plaintiffs do not offer record evidence that shows these principles of internal equity were enforced across the company. The record evidence also does not establish that USPI used formal pay ranges or pay bands. Plaintiffs point to a 2018 email as evidence that USPI had formal pay structures. *See* [660-109]. In that email thread, a USPI executive stated she has "been tasked with getting salary range info" for various job titles and requests the "min/mid/max information." *Id.* at 4–5. A Payroll and Benefits analyst provided the information in the body of the email, and the pay information is then added to a spreadsheet titled "Pay Ranges." *See id.* at 2, 6. While the email refers to pay ranges, the Court finds that it does not suggest that the USPI had established salary ranges or formal, set pay bands. As Defendants point out, the fact that someone was tasked with collecting pay range information does not show that USPI had established salary ranges "readily available" for use by compensation decision-makers, and Plaintiffs offer no evidence that these pay ranges were binding on those who made compensation decisions. And there is other record evidence that squarely contradicts the notion that USPI utilized formal pay ranges. Karrmann testified at her deposition that for administrators and more senior positions, USPI "did not have established salary ranges." [660-8], Karrmann Deposition, at 39:17–18. This is consistent with an email Karrmann sent in 2013, where she informed a new hire that USPI "do[es] not have salary ranges and levels . . . and titles aren't necessarily reflective of level of responsibility relative to others with the same title. Therefore, there's a wide range of pay for each title (which is the closest equivalent to levels)." [683-13] at 21.

In addition, while there is some support to show that USPI compared salaries within the same job title when making pay decisions, *see e.g.*, [660-13], Johnston Deposition, at 51:14–24, the record does not establish that changes in pay to one employee would impact the pay of another employee with a *different* title. To the contrary, Karrmann testified that they would not compare the salaries of one title to a different title when making compensation decisions. *See* [683-27], Karrmann Deposition, at 42:1–7 ("Q: And would you take care to make sure RVPs weren't being paid more than market presidents? A: We wouldn't specifically compare a market president to an RVP's pay, but we would look at RVPs against RVPs and market presidents against market presidents.").

### 3. *Conclusions on Structured Compensation Systems*

The record evidence before the Court contradicts Plaintiffs' theory and shows that there were no formal enforcement mechanisms to ensure that employees were paid consistently with other employees in the same or different roles. The evidence shows that Defendants did not have formal pay ranges or bands, and while internal equity and external equity may have been a consideration, there is no evidence that those principles were centrally enforced. And even if the evidence of internal equity was persuasive in showing that employees with the same job title were paid similarly, the record evidence is weak that any of Defendants linked compensation decisions across different job titles. In the case of USPI specifically, the deposition testimony of Sandi

37

Karrmann, the only record evidence directly bearing on this issue, demonstrates that USPI *did not* compare compensation across different job titles when making compensation decisions.

In this way, this case is unlike the other no-poach class action cases on which Plaintiffs rely. For example, in *High-Tech,* the court concluded that common questions predominated over individual questions with respect to impact, in part because "[t]he extensive documentary evidence suggest[ed] that Defendants maintained a formal wage structure and valued internal equity," which indicated "that the anti-solicitation agreements had a structural impact on class members' compensation." 985 F. Supp. 2d at 1227. There, the "extensive documentary evidence" demonstrated that the defendants (1) "used formal administrative compensation structures and divided jobs into pay bands, zones, grades, and ranges by which they evaluated and paid employees in groups in relationship to other groups"; (2) "used specific guidelines and tools" to ensure that employees were paid within prescribed salary ranges; (3) required special approval for deviations from set salary ranges; and (4) maintained their compensation structures according to "concerns about maintaining internal equity." *Id.* at 1197–1200. As a result, the district court was persuaded that "common questions about the impact of Defendants' compensation structures, their focus on internal equity, and the effects of these factors on the [proposed class] as a whole [were] likely to predominate over any individual questions." *Id.* at 1202. Likewise in *Nitsch*, the "documentary evidence tend[ed] to show that Defendants maintained formal compensation structures and made significant efforts to maintain internal equity within those structures," such as assigning employees to pay bands and ranges based on job titles and closely monitoring compensation across job titles. 315 F.R.D. at 295. The evidence supported the plaintiffs' theory that the defendants' "formal compensation structures, combined with the premium Defendants placed on internal equity, created a compensation system in which any individual class member's compensation was intertwined with that of her peers." *Id.* at 296. As a result, the court found that "common questions about the impact of Defendants' compensation structures, Defendants' prioritization of internal equity, and the effects of these factors on the class members as a whole are likely to predominate over any individual questions regarding internal equity." *Id.*

In order to secure class certification here, Plaintiffs have to demonstrate (and not merely allege) that there is a method of proof common to all class members, and that this method would predominate to show that the class suffered injuries that reflect the anticompetitive effect of either the violation or the anticompetitive acts made possible by the violation. *Kleen Prods.*, 831 F.3d at 926. The record evidence here is weak that Defendants had standardized mechanisms to enforce principles of internal equity company-wide and across job titles, and the evidence demonstrates that Defendants did not use formal, binding salary ranges or pay bands. This is again in contrast to the *High-Tech* case, where the evidence suggested that "internal equity was such an important aspect of Defendants' compensation practices that: (1) Defendants utilized software tools to generate internal equity reports and to compare each employee to his or her peers; (2) Defendants advised managers that internal equity was a prime consideration when setting and adjusting salaries; and (3) Defendants actively monitored their compensation structure to identify discrepancies within and beyond job titles and groups and to make adjustments as necessary." *High-Tech*, 985 F. Supp. 2d at 1215.

Due to the variances across pay decisions, Plaintiffs have not met their burden of establishing that common proof about injury will predominate. The individualized and discretionary nature of Defendants' pay decisions means that antitrust impact cannot be shown

38

effectively with common proof.[28] Rather, individualized inquiries would be necessary to determine whether a given employee would have been injured by the alleged conduct.

### 4. Expert Opinions on Compensation Systems

In addition to the documentary and testimonial evidence, Plaintiffs offer the expert opinions of Dr. Gerhart and Dr. Starr. The Court has ruled that both of their qualitative opinions that Defendants had structured compensation systems as well as Dr. Starr's quantitative analyses are admissible. As the Seventh Circuit has explained, "predominance requires a qualitative assessment . . . it is not bean counting." *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013). But the Court finds that such evidence is not persuasive in helping Plaintiffs meet their burden in light of the record evidence and competing statistical analyses. *See High-Tech*, 985 F. Supp. 2d at 1217 (N.D. Cal. 2013) (noting that "the importance of these statistical models *is diminished* in light of the extensive documentary evidence that supports Plaintiffs' theory of impact" (emphasis added)).

**Dr. Gerhart's Qualitative Analysis.** Dr. Gerhart offers a qualitative review of the record evidence and concludes that Defendants had structured compensation systems.[29] As part of this analysis, he opines that Defendants "created salary grades and ranges." [666-3], Gerhart Report, ¶ 114. He opines specifically that "DaVita's pay structures included salary ranges, levels, and structured pay differentials . . . that SCA used salary ranges, minimums, midpoints, and maximums for its employees. SCA maintained job families/groups, job titles therein, and job levels, and used salary minimums, midpoints, and maximums," and that "USPI maintained job structures and pay ranges." *Id.* ¶ 114(a)–(c).

But Dr. Gerhart relied on record evidence that directly contradicts his conclusions. For example, Dr. Gerhart relied on the deposition testimony of Robert Chipman, former People Services Director and Vice President of Recruiting and Talent Management, to opine that DaVita ensured that similar roles were paid within a similar range. He cites Chipman's testimony that, "as an HR professional, I do want to make sure that similar roles are within a relevant range," which means "that there is a range of pay for individuals based on their experience, skill sets, expertise, geography, and that you can compensate individuals within that range based on performance and potential." [675-3], Chipman Deposition, at 60:15–24. However, Gerhart's opinion seemingly ignores the next few lines of Chipman's testimony, which show that such statements do not apply to his experience at DaVita: "So we're talking hypothetically here. DaVita didn't have this when I was there. But the way I do it today and the way I did it in past roles, yes, it would be based on specific positions." *Id.* at 61:3–7. When asked to clarify what he meant when he said "DaVita

---

[28] To be clear, Plaintiffs claim that class members who worked at DaVita were also harmed by the SCA-USPI agreement and vice versa (USPI class members were harmed by the SCA-DaVita agreement). Thus, Plaintiffs theory requires showing predominance of common antitrust impact among class members who worked at a company not party by an agreement. This impact theory simply demonstrates another hurdle that Plaintiffs cannot overcome with the lack of evidence of a compensation structure that could transmit classwide harm to employees based on an agreement between companies where they did not work.

[29] As noted above, Dr. Gerhart also opines that Defendants' compensation systems would transmit the effect of the alleged conduct across the proposed class, but that opinion has been excluded, so the Court does not address it here, and in any event, it would not change the result here in light of the record evidence.

didn't have this," Chipman responded that when he first started at DaVita, they didn't have pay ranges or bands, and he didn't have any tools to "be able to understand or know what those pay ranges or bands were, if there were any." *Id.* at 61:9–17. He further testified that while he was at DaVita, there was no system that he had access to that provided pay data to determine what individuals in certain job titles were being paid. *Id.* at 61:18–23. Gerhart's complete exclusion of this part of the testimony significantly diminishes the persuasiveness of his conclusion.

As another example, Dr. Gerhart relies on the deposition testimony of SCA's former Group Vice President of Human Resources Warren Cinnick to opine that SCA had a formalized compensation structure. Specifically, he cites Cinnick's testimony that at SCA, "[a]ll jobs eventually ended up inside of a salary structure." [710-12], Cinnick, Deposition, at 65:4–18. However, as noted above, Cinnick later testified unequivocally that when he joined SCA, there was no discernible salary structure and that the formalized salary structure he testified about was put into place at the beginning of 2021, which is outside the class period. *Id.* at 153:20–156:1. In a similar vein, Dr. Gerhart relies on an email, [660-109], to opine that USPI used pay ranges. But as noted above, this email reflects only that an employee requested salary data for various employees; the fact that there are minimum, midpoint, and maximum pay data does not establish that those ranges were formal, binding pay ranges, nor does the email indicate that an employee could not be paid outside of the ranges listed without adjusting the pay of others in the same position. Once again, not persuasive.

**Dr. Starr Qualitative Analysis.** Dr. Starr also provides a qualitative assessment of the record evidence. Dr. Starr's analysis focuses on the use of internal and external equity in each Defendant's compensation structures and cites some of the record evidence about internal equity and external equity, some of which is described above. However, Dr. Starr's qualitative analysis broadly focuses on concepts of internal and external equity and does not strongly reflect, or specifically discuss, how Defendants' compensation practices linked compensation across job titles. *See* [666-1], Starr Report, ¶¶ 172–78 (discussing concepts of internal and external equity). Thus, Starr's opinion is unhelpful in this regard.

Ultimately, the Court finds that the record evidence "is likely to be among the most persuasive to a jury as it illustrates and confirms many of the actual dynamics at play within Defendants' firms." *High-Tech*, 985 F. Supp. 2d at 1215. So, while Dr. Gerhart and Dr. Starr opine about the record evidence on which the proposed class members can rely, the Court finds the hard record evidence far more credible than their paraphrasing of the record in determining whether the common issues will predominate in light of the contrary record evidence.

**Dr. Starr Quantitative Analysis.** In addition, Dr. Starr provides quantitative analysis as proof of Defendants' structured compensation systems. The Court has concluded that such analysis is admissible under *Daubert*, but for the reasons explained below, the Court gives it minimal weight that they demonstrate the effects of Defendants' alleged conduct would have spread throughout the proposed class. Dr. Starr first conducts two distinct analyses to demonstrate the existence of Defendants' compensation systems.[30] He analyzed whether earnings are positively correlated across job levels by running a regression for each Defendant using their pay data. *See*

---

[30] Dr. Starr reported the results of these analyses in his initial report, but after having to correct issues with the underlying data, he provided updated analyses in his rebuttal report.

[666-1], Starr Report, ¶¶ 183–86, Figures 19, 37; [666-4], Starr Rebuttal Report ¶ 234–35, Figures 46, 60. He found that "the wages of VPs and SVPs are positively correlated with the wages of Directors." [666-1], Starr Report, ¶ 185. Dr. Starr explains that these correlations are statistically significant, with the natural log of the average wages of VPs and SVPs explaining 48.7% of the variation in the natural log of average wages of Directors at DaVita, 91.9% at SCA, and 53.8% at USPI, as measured by the R-squared values. *See* [666-4], Starr Rebuttal Report, at Figure 46. According to Dr. Starr, this means that "knowing just the average wages of VPs and SVPs is in general highly informative of the average wages of Directors." [666-1], Starr Report, ¶ 185. Dr. Starr also ran the reverse analysis of these job titles, finding consistent results.

Dr. Starr next tested whether salaries within the same job titles are correlated. To implement this test, Dr. Starr used a randomized hold-out sample analysis to examine whether the average wages of randomly selected employees are predictive of individual wages of other employees with the same job title. Dr. Starr reports that for each Defendant, "the natural log of the average hourly wages of the random subsample are statistically significantly predictive of the statistically significantly predictive of the natural log of hourly wages in the hold natural log of hourly wages in the hold-out sample." *Id.* ¶ 190. Specifically, "by themselves, the average wages of the random subset of workers with the same job title explain wages of the random subset of workers with the same job title explain between [52.4] and [70.4] percent of the total variation in wages in the hold-out sample." *Id.*[31] According to Dr. Starr, such findings "are strongly consistent with the existence of a pay structure within jobs." *Id.*

Although the correlation analysis deals in averages, a point of criticism for Defendants' expert Dr. McCrary, the Court does not reject Dr. Starr's analysis outright. The Court acknowledges that correlation analyses have been accepted by other courts in no-poach cases as common evidence helping to demonstrate rigid or structured compensation systems. *See, e.g.*, *Broiler Chicken*, 2024 WL 2117359, at *19; *High-Tech*, 985 F. Supp. 2d at 1171; *Nitsch*, 315 F.R.D. at 300; *Seaman*, 2018 WL 671239, at *1. However, in light of the record evidence, the Court does not find these analyses conducted by Dr. Starr to be sufficient for Plaintiffs to meet their burden of showing that common issues predominate by a preponderance of the evidence. By Dr. Starr's own admission, the correlation analysis only partly accounts for variations to the point where it is merely "statistically significant." Of course, that is in no way determinative. Perhaps, with stronger record evidence, such tests would help Plaintiffs meet their burden, but such is not the case here. Such statistical analyses are secondary to the record evidence. Even Dr. Starr explains that his quantitative analysis "sought to answer the question of whether the data provide evidence consistent with—or whether they contradict—the qualitative evidence." [666-4], Starr Rebuttal Report, ¶ 276.

In addition, Dr. McCrary provides additional quantitative analyses that undermines Plaintiffs' theory of harm by showing that changes in compensation do not move together overtime. *Cf. High-Tech*, 985 F. Supp. 2d at 1221 (noting that the defendants had not presented any analysis that undermined the correlation analyses conducted by the plaintiffs' expert). In this battle of the experts, the Court credits Dr. McCrary's quantitative analysis of Defendants' own employee pay

---

[31] The numbers in brackets reflect the updated values from Dr. Starr's rebuttal report, once Dr. Starr corrected the underlying data. *See* [666-4], Starr Rebuttal Report, at Figure 47.

41

data[32] that shows compensation changes did not move together and that the observed pay ranges for proposed class members in the same seniority level are wide and frequently overlap with the pay ranges of adjacent seniority levels.

Dr. McCrary plots the percentage change in total pay (without equity) on a year-over-year basis. The results of his analyses show that for "2015 to 2016, total compensation increased markedly for some proposed class members, increased by a small amount or remained flat for many others . . . and decreased for some others," regardless of seniority. *Id.* ¶ 92. Dr. McCrary's finding that from 2015 to 2016 pay rose sharply for some class members, stayed flat for many, and fell for others—regardless of seniority—undercuts the claim that compensation moves in a unified, structured way. The results were similar for other pairs of years (2008–2009, 2009–2010, 2010–2011, etc.). As for his longer-run analysis, Dr. McCrary found that for a random sample of proposed class members hired in 2009, there was a wide variation in how their pay trended over time (2009–2022): "while some proposed class members in the sample saw their pay more than double over the 14-year time period under consideration, others saw their pay increase by less than half over the same time period." *Id.* ¶ 93. He also conducted the same analysis separately for each Defendant and for each seniority level. For each analysis, Dr. McCrary's conclusion remains the same: "proposed class members' pay does not generally move together over time, and instead, there is wide variation in how proposed class members' pay trends over time." *Id.* ¶ 94. The finding that class members hired in the same year (2009) saw radically divergent pay trajectories over fourteen years—some more than doubling, others rising by less than half—shows wide individual variation over time, which is evidence against the proposition that a common mechanism governed pay.

Dr. McCrary also conducts an analysis by comparing the observed pay ranges for proposed class members, which found that "the observed ranges of pay for proposed class members in the same seniority level (*i.e.*, the 5th and 95th percentiles of pay for individuals in a given seniority level as observed in the compensation data) are wide, and frequently overlap with the observed pay ranges for proposed class members in adjacent seniority levels. In other words, proposed class members at a given seniority level do not have pay that is similar, and the observed pay ranges for adjacent seniority levels are not highly differentiated from one another." *Id.* ¶ 96. These wide observed pay ranges within a level mean that, even if pay for proposed class members at one seniority level changed, there is no clear reason that pay for other proposed class members at that same level would need to change to maintain "internal equity" within a level. These are all conclusions reached from examining Defendants' own data. None of this standing alone is conclusive, and the Court takes Dr. Starr's point that evaluating changes in wages does not provide the full picture and that the Court should also look to his correlation analysis. Once again, there is a battle among these experts, but the Court finds that defendants' experts and their models raise significant concerns and criticisms about Plaintiffs' expert analysis on the purported structured compensation system.

---

[32] Given limits in the data, Dr. McCrary analyzed total pay without equity. *See* [666-6], McCrary Report, ¶ 92.

In his rebuttal report, Dr. Starr conducted an additional analysis, which the Court will refer to as a "common factors analysis."[33] In this analysis, Dr. Starr ran a regression to evaluate how much variation in compensation is explained by four factors—job title, the number of years employed with Defendant, location, and the year. Dr. Starr found that across all senior-level employees, the four facts alone explain 79.0% of the variation in hourly wages. [666-4], Starr Rebuttal Report, ¶ 239, Figure 36. However, when broken down by Defendant and job level, the results show the following:

**Figure 36: R-Squared Value by Defendant and Job Level**

|  | R-Squared | | | |
| --- | --- | --- | --- | --- |
|  | All | Davita | SCA | USPI |
| All Employees | 0.790 | 0.762 | 0.889 | 0.718 |
| Directors | 0.606 | 0.546 | 0.737 | 0.354 |
| Vice Presidents | 0.740 | 0.582 | 0.807 | 0.648 |

According to these results, the four factors alone explain 76.2% of the observed variation in hourly wages across all Senior-Level Employees at DaVita, 88.9% at SCA, and 71.8% at USPI. Dr. Starr focuses on the R-squared value for all employees, but the Court is concerned about the lower values, particularly for Directors at USPI and DaVita as well as for Vice Presidents at DaVita. According to Dr. Starr's results, the four factors explain only 35.4% of the observed variation in pay for Directors at USPI, 54.6% for Directors at DaVita, and 58.2% for Vice Presidents at DaVita. These are significant, unexplained differences among wage differences—64.6% for USPI Directors, 45.4% for DaVita Directors, and 41.8% for DaVita Vice Presidents.

Dr. Starr fails to explain how a rigid salary structure can be inferred given such low values, nor does he explain the significance of those numbers. His rebuttal report simply ignores them and only discusses the "all employees" value, but that value simply throws everyone into the same bucket without considering the defendant company where they worked (DaVita, SCA, or USPI) and their job title, so it is less persuasive. To be clear, the Court does not find that Dr. Gerhart's and Dr. Starr's opinions are entirely without support. But these low values also lend support to the concept that not all of these heterogenous, senior-level executives in different industries were all subjected to some rigid compensation structure within same job titles and across different titles that would demonstrate widespread class impact.

In summary, the Court finds that Plaintiffs cannot meet their burden to establish that common issues will predominate on antitrust impact. To be clear, the Court is not requiring certainty; it is evaluating the matter under the preponderance of the evidence standard. Unlike in other cases where class actions have been certified, Plaintiffs have no common econometric evidence proving wage suppression. Without such a method, Plaintiffs are left with some record evidence and opinions about wage suppression from expert witnesses. But the Court finds that the individual issues predominate over common ones because evidence of wage suppression will turn

---

[33] Defendants argue in a footnote that Dr. Starr's "common factors" analysis should be stricken as untimely because it was raised for the first time in Dr. Starr's Rebuttal Report. *See* [682] at 34 n.59. This argument was raised before the magistrate judge and rejected. *See* [686] at 4–5.

43

on each individual employee's circumstances. Moreover, Plaintiffs have failed to demonstrate a common method of proving widespread wage suppression impact across the class. Their chosen method—a structured compensation system—fails on review of the record evidence, and falls far short of demonstrating that Defendants had these structured systems that would result in this widespread impact across senior employees at all three companies, such that they can all be evaluated together in a class action. The expert opinions offered do not overcome that hurdle. Thus, proof of impact will necessarily vary among class members depending on the employees' job title, job location, and their job performance.

### ii. Predominance – Damages

The third element of Plaintiffs' claim is damages. For the purposes of Rule 23(b)(3), Plaintiffs must show that "damages are susceptible of measurement across the entire class." *Comcast*, 569 U.S. at 35. The Supreme Court's decision in *Comcast Corp. v. Behrend*, 569 U.S. 27, is on point. There, the Court determined an antitrust class action was improperly certified under Rule 23(b)(3) because the plaintiffs' damages model fell "far short of establishing that damages are capable of measurement on a classwide basis." *Id.* at 34. The Court went on to conclude: "Without presenting another methodology, respondents cannot show Rule 23(b)(3) predominance: Questions of individual damage calculations *will inevitably overwhelm questions common to the class.*" *Id.* (emphasis added).

Because the Court has excluded Plaintiffs' only method of proving damages, Plaintiffs in effect have no method of estimating the damages for any of the class members. Specifically, the Court has excluded in its *Daubert* analysis Dr. Starr's regression as a means of proving impact and estimating damages because he chose to use the vesting/exercise date of the options rather than the date it was granted to show wage suppression, which does not demonstrate antitrust impact or damages during the class period. Dr. Starr also provided no room on this issue, as he explicitly disavowed the other method proposed by defendants' experts and refused to adopt it. *See* [666-4], Star Rebuttal Report, ¶ 110 (rejecting defense experts' critiques regarding equity compensation); *id.* ¶ 117 ("I reiterate my objections to their approach."). Plaintiffs have offered no other method to measure damages on a classwide basis. As a result, Plaintiffs cannot establish by a preponderance of the evidence that common questions will predominate with respect to damages.

Of course, the Seventh Circuit has instructed that "the presence of individualized questions regarding damages does not prevent certification under Rule 23(b)(3)." *Messner*, 669 F.3d at 815. But the practical effect of this Court's decision is that Plaintiffs offer no admissible common method to prove aggregate damages, so they "will now have to bring their own, individual evidence as to damages—perhaps each even arguing the propriety of their own regression specification—which would make class treatment impossibly unwieldy." *City of Rockford v. Mallinckrodt ARD, Inc.*, 2024 WL 1363544, at \*10 (N.D. Ill. Mar. 29, 2024). As a result, Plaintiffs have also not met their burden in establishing predominance on the issue of damages.

### III. Conclusion

For the above reasons, Plaintiffs' motion to exclude expert testimony [657, 658] is denied, Defendants' motion to exclude expert testimony [662] is granted in part and denied in part, and Plaintiffs' motion for class certification [655, 656] is denied.


**SO ORDERED.**

Dated: June 10, 2026

_____

Sunil R. Harjani
United States District Judge